UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 04-12708-MLW

PHILLIP TRINGALI,            )
                             )
        Plaintiff,           )
                             )
v.                           )
                             )
PAUL MARTIN AND              )
JUMI LEE,                    )
                             )
        Defendants           )

Now comes the plaintiff, Phillip Tringali ("Tringali"), and hereby opposes the defendant

Paul Martin's ("Martin") motion to compel production of documents.  In support of his motion,

the plaintiff states:

**BACKGROUND**

In this diversity action, Tringali alleges breach of fiduciary duty and slander against the

defendants Martin and Jumi Lee ("Lee"), fellow shareholders in a closely held Massachusetts

Corporation, S.E.E., Inc. since 1997.  This action arose out of Martin's and Lee's resignation

from S.E.E., Inc. in 2002, and their subsequent formation of a competing business.

On April 5, 2005, Martin served a request for production of documents.  The parties

agreed that Tringali would respond to this request by June 1, 2002, not realizing that this day fell

on a weekend.  On June 2, 2005, Martin's counsel telephoned Tringali's counsel to inquire about

Tringali's response.  Tringali served his response that day.  Contrary to Martin's  Local Rule 7.1

certification, his counsel did not discuss any motion to compel on that day.

1

On June 7, 2005, defense counsel sent the letter it attached to the pending motion as exhibit "C". This letter did not formally request a discovery conference, or suggest that a motion to compel would be forthcoming. Tringali's counsel recalls discussing only two issues identified in the letter; namely, the contents of a computer disk provided to Martin and Lee in related state litigation[1], and the availability of documents in the hands of the trustee appointed in S.E.E., Inc.'s bankruptcy, Deborah Casey.

On June 28, 20005, Tringali produced 142 pages of documents responsive to Martin's requests. On July 7, 2005, at approximately 5:28 PM, Martin served his motion to compel, without warning or conference. In arguing the grounds for its motion, Martin's counsel simply inserted the contents if his June 7, 2005, letter almost verbatim.

## SPECIFIC REQUESTS

### Request No. 1

Martin requests all documents supporting paragraph 5 of Tringali's complaint, which alleges that all acts and omissions giving rise to the complaint occurred in Massachusetts. This is a general allegation of personal jurisdiction which is followed by specific allegations of the acts and omissions that are the gravamen of Tringali's complaint.

Requesting documents supporting a general allegation of jurisdiction in this case is overly broad and unduly burdensome. Tringali alleges that Martin and Lee breached their fiduciary duty him by resigning from S.E.E., Inc., and then used S.E.E.'s proprietary manufacturing, marketing and sales forecasting information to start a competing company that sold identical competing

---

[1]The history of these cases is set forth in Tringali's opposition to Martin's and Lee's motion to dismiss, which is currently pending.

2

products directly to S.E.E. customers and prospective customers.  Tringali also alleges that the

Martin and Lee incorporated research and development they performed during  2001 while still

employed by S.E.E. into their competing products.  The documents that support this allegation

reasonably include all of the documents generated by Martin and Lee relating to the sales,

marketing, and development of analytical products from the time S.E.E. moved its analytical

instrument business to Massachusetts in 2000 to their resignation in January 2002.[2]  These

documents comprise more than 10,000.00 pages of business records, as well as the hard drives of

30 computers formerly used in S.E.E.'s analytical instrument business (now in storage), as well

as financial documents, S.E.E.'s accounting database (Businessworks) and marketing database

(ACT), which are in the hands of trustee Casey.

More importantly, all documents identified by Tringali to be responsive to this request

were either produced to Martin and Lee more than two years ago in related state litigation, or

produced on June 28, 2005 (documents 1-142).   Tringali has adequately responded to this

request.  It is unfairly burdensome to compel a further response to this request without requiring

Martin and Lee to confer with Tringali to narrow the scope of the request, discuss obtaining

access to materials held by the trustee, and discuss a reasonable time table for the review of the

thousands of documents remaining from S.E.E.'s now defunct business.

**Request No. 2**

This ground is frivolous. Martin and Lee do not require documentary proof of this

allegation because they cannot deny it in good faith.  Martin and Lee allege the same facts, in

---

[2]S.E.E., Inc. was a manufacturer's representative of scientific instruments that began
manufacturing and selling its own analytical microspectrophotometers in 1996.

substance, in their Norfolk County shareholder derivative suit. Exhibit 1, ¶¶ 6-9. Their

deposition testimony in the Norfolk County action, taken on May 27 and 28, 2005, also

establishes this fact. See Exhibit 2, Martin Deposition, pages, 18-45, Exhibit 3, Lee Deposition,

pages 14-49. Had Martin and Lee answered the complaint instead of moving to dismiss, they

would have admitted this allegation.

     If Martin truly believed that Tringali alleged the existence of a written "business plan," as

their motion suggests, he should have conferred this motion as required. He would have learned

that Paragraph 9 of Tringali's complaint was not intended to be literal, that S.E.E. never had a

written "business plan," for the analytical instrument business, and that Tringali does not have

any documents dating from 1996, when S.E.E. Inc. entered the analytical instrument business.

**Request No. 4**

     This objection is made in bad faith. Paragraph 25 of Tringali's complaint alleges that the

analytical instrument business generated 1.7 million dollars of *earnings*, in 2000, not *profit.*

Moreover, financial documents previously provided to Martin and Lee *do* distinguish between

earnings from sales of analytical devices, and earnings from sales of devices that S.E.E. sold as a

manufacturer's representative, as indicated by report of and loss statement attached as Exhibit 4.

This document was produced to Martin and Lee in the Norfolk County action twice, once by

S.E.E.'s accountant in response to a subpoena ducas tecum, and once in response to a request for

production of documents. As explained to Martin's counsel prior to the filing of its motion,

S.E.E.'s financial records are now in the custody of trustee Casey. Tringali's counsel has

requested access to these documents on several occasions without success, and has recently been

instructed to contact the estate's accountants to arrange access. Tringali does not have the ability

to compel the trustee to produce documents and things belonging to the bankrupt estate.

**Request No. 5**

This ground is frivolous. All responsive documents presently known to exist were introduced as exhibits in the previously referenced depositions of Martin (Exhibits 2-6, 9, 10) and Lee (Exhibits 1-6).

**Request No. 6**

This ground is frivolous. All documents known to exist that are still in Tringali's custody or control were either introduced as exhibits in the Martin and Lee' deposition as referenced above, or produced on June 28, 2005 (documents numbered 19-33). If any additional documents are discovered, they will be produced.

**Request No. 8**

This ground is frivolous. Had Martin conferenced this motion, he would have learned that only one document supporting this allegation is known to exist; an affidavit of former S.E.E. employee Demitra Hickson, produced on June 28, 2005 (documents numbered 116, 117).

**Request No. 9**

This ground is frivolous. Had Martin conferenced this motion, he would have learned that the only documents presently known to support this allegation are the affidavit of Demitra Hickson, and documents showing apparent discrepancies in S.E.E.'s accounting records regarding a $20,000.00 part that was purchased by Lee but not found in S.E.E.'s inventory after her resignation (documents numbered 118-141), all produced on June 28, 2005.

**Request No. 11**

This ground is simply untrue. "Hard copies" of Quantum Dynamics' web site from the

5

year 2002  were produced to Martin and Lee in the Norfolk County Court shareholder derivative action (Exhibit 5).   These documents advertise  the instruments S.E.E. alleges were identical to its product.  Additional documents were produced on June 28, 2005 (documents numbered 1-17, 53-90).

**CONCLUSION**

Plaintiff Phillip Tringali has responded to defendant Paul Martins' request for production of documents to the best of his ability.  Mr. Martin's motion was intended solely to harass Mr. Tringali.  It should be denied, and Mr. Martin's conduct should be sanctioned accordingly.

Respectfully submitted,
Phillip Tringali
By his counsel,


Date:   July 19, 2005_____        //Daniel Treger//___
Daniel Treger, Esq.
B.B.O. #562147
Jeffrey J. Phillips, P.C.
B.B.O. #398480
Phillips & Angley
One Bowdoin Square
Boston, MA 02114
Tel. No.: (617) 367-8787


L:\LITG\Trng001\compelmotopp.wpd

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 04-12708-MLW

| | |
|---|---|
| PHILIP TRINGALI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| PAUL MARTIN AND | ) |
| JUMI LEE, | ) |
| | ) |
| Defendants | ) |

## PLAINTIFF, PHILIP TRINGALI'S OPPOSITION TO DEFENDANTS PAUL MARTIN'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS

EXHIBIT 1

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS

SUPERIOR COURT
C.A. NO. 02-801

PAUL MARTIN and JUMI LEE,       )
Individually and as Stockholders on )
behalf of S.E.E., INC.          )
        Plaintiffs               )
                                 )
V.                               )
                                 )
S.E.E., INC. and PHILLIP TRINGALI )
        Defendants               )

### FIRST AMENDED VERIFIED
### COMPLAINT AND DEMAND FOR JURY TRIAL

## PARTIES AND NATURE OF ACTION

1.    Plaintiff Paul Martin ("Martin") is a resident of Quincy, Norfolk County,
Massachusetts.

2.    Plaintiff Jumi Lee ("Lee") is a resident of said Quincy.

3.    S.E.E., Inc. ("S.E.E."), named both as plaintiff and defendant herein, is a
corporation duly organized under the laws of the Commonwealth of
Massachusetts, with a principal place of business at 48 Leona Drive,
Middleborough, Massachusetts.

4.    Defendant Phillip Tringali ("Tringali") has a usual place of business at the
offices of S.E.E. at Middleborough, aforesaid.

## NATURE OF ACTION

5.    This action is brought as a derivative action, pursuant to Mass.R.Civ.P.
23.1, for individual claims of the plaintiffs, pursuant to Mass. G.L. c.149 §150,
and for common law causes of action.  The derivative action principally
concerns the use of corporate funds by the defendant Tringali for the purchase
of a vacation home in Bridgton, Maine, such funds being used for the
purchase, mortgage payments, payments of real estate taxes and maintenance
on the property, which has no business purpose, the property being used by
Tringali as his vacation home.  The plaintiffs are informed and believe that

Tringali has caused S.E.E. to improperly deduct as business expenses on
S.E.E.'s Federal and Massachusetts corporation tax returns, expenses for
depreciation, interest, real estate taxes and maintenance with respect to said
property, which has and will expose S.E.E. to additional taxes, penalties and
interest.

Background Facts

6.    From February, 1994 to April, 1996, Martin was employed by
Nanometrics of Sunnyvale, California, as product manager of its
microspectrometer division.  When Nanometrics closed its division in April,
1996, Martin was laid off and commenced employment with S.E.E.

7.    Martin together with S.E.E., on or about May, 1996, started an analytical
microspectrometer business in Martin's home in San Francisco.

8.    Martin's wife, Jumi Lee ("Lee"), was hired by S.E.E. on or about October,
1996, to assist Martin in the development of the microspectrometer division.

9.    At S.E.E.'s direction, on or about February, 2000, Martin and Lee moved
the microspectrometer division from San Francisco to S.E.E.'s place of
business at Middleborough, Massachusetts.  Lee and Martin worked at
Middleborough from February, 2000 until they both resigned from S.E.E. on or
about January 9, 2002.

10.   S.E.E. issued 20,000 shares of its common stock to Martin as follows:

    a.    February 28, 1997, 20,000 shares were issued to Martin in
consideration for his services and development of the
microspectrometer division.

    b.    On or about August 28, 2000, Martin purchased from Tringali an
additional 5,000 shares.

11.   S.E.E. issued 15,000 shares of its common stock to Lee as follows:

    a.    On May 13, 1998, S.E.E. issued 8,000 shares to Lee in partial
consideration for the performance of her services for S.E.E.

    b.    On April 20, 1999, S.E.E. issued 2,000 shares, again, as
consideration for the services she had performed for S.E.E.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 04-12708-MLW

PHILIP TRINGALI,          )
                          )
        Plaintiff,        )
                          )
v.                        )
                          )
PAUL MARTIN AND           )
JUMI LEE,                 )
                          )
        Defendants        )

## PLAINTIFF, PHILIP TRINGALI'S OPPOSITION TO DEFENDANTS PAUL MARTIN'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS

EXHIBIT 2

# O'BRIEN&LEVINE

Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

# Paul Martin, et al. v. S.E.E., Inc., et al.

### Transcript of the Testimony of:

# Paul Martin

# May 24, 2005

www.court-reporting.com
mail@court-reporting.com

195 State Street
Boston, MA 02109
(617) 399-0130  888.825.DEPO(3376)

Deborah G. Rumson   1-15077

Paul Martin 5-24-2005
Paul Martin, et al. v. S.E.E., Inc., et al.

| 18 | | 20 | |
|---|---|---|---|
| 1 | Q. Can you explain the distinction. | 1 | A. Health benefits. |
| 2 | A. There was an industrial section which dealt | 2 | Q. Did you receive any commissions at that |
| 3 | mainly with semiconductors. | 3 | time? |
| 4 | Q Did you have employees under you at that | 4 | A. I don't recall. |
| 5 | point? | 5 | Q. And what were your responsibilities to be? |
| 6 | A. Yes. | 6 | A. For sales and marketing of forensic |
| 7 | Q. How many? | 7 | microspectrophotometers as well as |
| 8 | A. Two. | 8 | applications? |
| 9 | Q. And why did you leave Nanometrics? | 9 | Q. When you say "applications," are you |
| 10 | A. Nanometrics decided that the project was not | 10 | referring to programming? |
| 11 | making enough money and terminated the | 11 | A. No. Applications means if there is a sample |
| 12 | project. | 12 | to be analyzed, someone has to analyze it. |
| 13 | Q. And how did you come to be employed by | 13 | Q. Now, was S.E.E., Inc., going to buy and |
| 14 | S.E.E., Inc.? | 14 | resell these instruments or were they going |
| 15 | A. Mr. Tringali was a sales representative for | 15 | to manufacture them? |
| 16 | Nanometrics. I met him during the course of | 16 | A. Initially, yes. |
| 17 | my duties at Nanometrics. And we had known | 17 | Q. Initially they were going to buy and resell? |
| 18 | that the project was going to be terminated, | 18 | A. Yes. |
| 19 | and we decided that when it was terminated, | 19 | Q. Who were they going to buy from? |
| 20 | we would form a company or a division of an | 20 | A. First discussions were with Nanometrics. |
| 21 | existing company, S.E.E., to sell | 21 | Q. Were there any other discussions? |
| 22 | microspectrophometers into the forensic | 22 | A. Mission Peak Optics. |
| 23 | market. | 23 | Q. And where were they located? |
| 24 | Q. And do you recall around when you had these | 24 | A. Near Mission Peak, California, near |

| 19 | | 21 | |
|---|---|---|---|
| 1 | discussions? | 1 | Freemont, California. I can drive there. |
| 2 | A. It was over the course of the last six | 2 | Q. And they sold microspectrophometers? |
| 3 | months of my employment at Nanometrics. | 3 | A. Yes. |
| 4 | Q. That was towards the end of 1996? | 4 | Q. And did you end up reselling or did you end |
| 5 | A. No. That would be the end of 1995 to the | 5 | up manufacturing? |
| 6 | beginning of 1996. | 6 | A. We resold some of them, of Mission Peak |
| 7 | Q. And when you first started out, can you tell | 7 | Optics' microspectrophometers. We then |
| 8 | me what the terms of your employment were. | 8 | started manufacturing. |
| 9 | A. I don't understand the question. | 9 | Q. And when did you start manufacturing? |
| 10 | Q. Can you tell me what your arrangement was as | 10 | A. I don't recall the exact date. |
| 11 | to compensation. | 11 | Q. Do you recall the year? |
| 12 | A. $55,000 a year. | 12 | A. No, I would have to be guessing. |
| 13 | Q. How much were you being paid by Nanometrics? | 13 | Q. Why did you start manufacturing? |
| 14 | A. That was Nanometrics. What was the | 14 | A. Because it was simpler and cheaper to |
| 15 | question? At Nanometrics, I was being paid | 15 | manufacture. |
| 16 | $55,000 a year. | 16 | Q. And before you manufactured. did you have to |
| 17 | Q. I am sorry. When you went to work for | 17 | design something? |
| 18 | S.E.E., what was your compensation when you | 18 | A. We, essentially, copied the Mission Peak |
| 19 | first went there? | 19 | Optics' design. |
| 20 | A. $45,000, plus the premise of stock. | 20 | Q. And can you recall the name or designation |
| 21 | Q. Were you receiving any benefits at that time | 21 | of the first product that S.E.E. |
| 22 | from S.E.E.? | 22 | manufactured, the first. |
| 23 | A. Pror to their employment? | 23 | A. The very first one, that would be, |
| 24 | Q. No. When you became employed. | 24 | basically, actually two products introduced |

6 (Pages 18 to 21)

Paul Martin 5-24-2005
Paul Martin, et al. v. S.E.E., Inc., et al.

22

1    at the market at the same time, the SEE1000
2    and the SEE2000.
3    Q.  And can you describe what the SEE1000 was.
4    A.  It was a microspectrophometer that was
5        capable of visible near infrared range
6        microspectroscopy.
7    Q.  And what were the components that made up
8        this instrument, the 1000?
9    A.  How detailed?
10   Q.  Well, start basically.
11   A.  Microscope, spectrometer, optical
12       interface, computer, monitor.
13   Q.  And did you use a specific brand of
14       microscope?
15   A.  At that time, yes.  Olympus.
16   Q.  Were they modified in any way?
17   A.  Moving to the heat filters from the halogen
18       lamps.
19   Q.  Was that it?
20   A.  Yes.
21   Q.  And the spectrometer, is that a
22       scientific instrument?
23   A.  It can be used for a scientific instrument.
24   Q.  What did it consist of?  Was it a box of

23

1        circuits?
2    A.  A spectrophotometer consists of a method of
3        separating light into its various
4        wavelengths.  A detector to monitor the
5        intensity at each wavelength.  Electronic to
6        detect those variations in intensity heat,
7        and, in this case, analogue to analogue to
8        digital.
9    Q.  Now, did you buy an off-the-shelf
10       spectrophometer?
11   A.  Yes.
12   Q.  And whose did you buy?
13   A.  Ocean Optics.
14   Q.  Was it customized at all?
15   A.  No.
16   Q.  Was it interfaced with a microscope?
17   A.  Yes.
18   Q.  How was that done?
19   A.  With the optical interface unit.
20   Q.  And did you manufacture that or buy that off
21       the shelf?
22   A.  We had parts made for us, and these were
23       assembled.
24   Q.  And who designed those parts?

24

1    A.  Well, it was a copy of Mission Peak Optics'
2        design.
3    Q.  And who manufactured them for you, who
4        manufactured the parts?
5    A.  It would depend upon the parts, machine
6        shops, optical houses.
7    Q.  And what were the parts of the optical
8        interface?  I am assuming it had some screws
9        and metal.  Did it have lenses in it?
10   A.  I don't recall.  That was not my design.
11   Q.  And you say it had a computer?
12   A.  Yes.
13   Q.  What kind of software?  Was there any
14       specific software that was dedicated to your
15       device?
16   A.  Which device?
17   Q.  The microspectrophometer.
18   A.  The SEE1000?
19   Q.  Yes.
20   A.  There would be GRAMS software, which was
21       made by, it is now called Thermal Galactic.
22       I don't remember the full product
23       designation.
24   Q.  And was there any other software?

25

1    A.  There was interface software to make the
2        GRAMS work with the spectrometer.
3    Q.  And did you buy that off the shelf?
4    A.  That was written by Dr. Jumi Lee and
5        WaveTech, and WaveTech Corporation.
6    Q.  Who is WaveTech?
7    A.  That was her company.
8    Q.  Was that a one person company, or did it
9        have employees?
10   A.  That would be a one-person company, myself
11       included, two persons.
12   Q.  Can WaveTech work for anybody else?
13   A.  It did other things.
14   Q.  Did it do other things at the same time it
15       was contracting with --
16   A.  Yes.
17   Q.  Were these other things related to the field
18       of microspectrophotometry?
19   A.  No.
20   Q.  Did WaveTech just do programming?
21   A.  No.
22   Q.  What other things did they do?
23   A.  Real estate investment and investments.
24   Q.  And was there a contract between WaveTech

7 (Pages 22 to 25)

Paul Martin 5-24-2005
Paul Martin, et al. v. S.E.E., Inc., et al.

| 26 | | 28 | |
|---|---|---|---|
| 1 | and S.E.E.? | 1 | well as the near infrared regions. |
| 2 | A. I don't recall if there was a formal written | 2 | Q. And can you tell me how this product was |
| 3 | contract. | 3 | developed. |
| 4 | Q. Was there an oral agreement? | 4 | A. Essentially it was a copy of an instrument |
| 5 | A. Yes. | 5 | that Mission Peak Optics also manufactured. |
| 6 | Q. Can you tell me the terms of that agreement. | 6 | Q. And you said it used a different |
| 7 | A. No, I don't recall. | 7 | microspectrophometer. Was that manufactured |
| 8 | Q. What other operating system did that | 8 | by the same company? |
| 9 | computer run on? | 9 | A. I think you need to clarify the sentence. |
| 10 | A. When it was first run? | 10 | Q. Did this also use an Olympus microscope? |
| 11 | Q. Yes. | 11 | A. Yes. |
| 12 | A. Windows 95, a 16 bit operating system. | 12 | Q. It used a spectrophometer? |
| 13 | Q. And did Windows need to be modified at all | 13 | A. Yes. |
| 14 | to run this application? | 14 | Q. But it was a different one that had a |
| 15 | A. Not that I am aware of. | 15 | greater spectral range? |
| 16 | Q. Not that it is even possible. | 16 | A. Yes. |
| 17 | Now, were there any other software | 17 | Q. Who manufactured that? |
| 18 | packaging running on this besides GRAMS? | 18 | A. Ocean Optics. |
| 19 | A. It would depend on any options that a | 19 | Q. And it also had an optical interface? |
| 20 | customer ordered. | 20 | A. Yes. |
| 21 | Q. What options were available? | 21 | Q. And was that manufactured for -- |
| 22 | A. Microsoft Office. | 22 | A. It was the same, optical interfaces. |
| 23 | Q. Were there any other components that were | 23 | Q. It had a computer and monitor as well? |
| 24 | specifically manufactured for this device? | 24 | A. Yes. |

| 27 | | 29 | |
|---|---|---|---|
| 1 | A. I am not sure I understand the question. | 1 | Q. Did it utilize the same software? |
| 2 | Q. We have run through the basic components of | 2 | A. Yes. |
| 3 | this product and who they were bought from | 3 | Q. So the only difference was the spectral |
| 4 | or who manufactured them. Are there any | 4 | range? |
| 5 | that I have missed? | 5 | A. Yes. |
| 6 | A. No. | 6 | Q. Where was S.E.E. located? Where was your |
| 7 | Q. What about the SEE2000; what was that? | 7 | operation located when you first started |
| 8 | A. That was a microspectrophometer that could | 8 | with S.E.E.? |
| 9 | measure from the UV through the visible into | 9 | A. In our home in Redwood Shores. |
| 10 | the near infrared. | 10 | Q. At some time did you move to another |
| 11 | Q. And were the components of this device the | 11 | facility? |
| 12 | same as the components, meaning, the same in | 12 | A. Yes. |
| 13 | type; it also consisted of a microscope, a | 13 | Q. Where was that? |
| 14 | computer? | 14 | A. That was up in Burlingame, California. |
| 15 | A. Yes. | 15 | Q. And when did you rent that facility? |
| 16 | Q. What changes were made to the 1000 to change | 16 | A. I don't recall the exact dates. |
| 17 | the spectra that this device was able to | 17 | Q. Do you recall the year? |
| 18 | measure? | 18 | A. I would be guessing. |
| 19 | A. It had more to do with what spectral range | 19 | Q. And at some point did you begin to employ |
| 20 | it could measure. It involved removal of | 20 | people other than yourself and Dr. Lee? |
| 21 | the optics from the Olympus microscope, | 21 | A. Yes. |
| 22 | utilizing a different light source. That | 22 | Q. And who was that? |
| 23 | also had the optics removed. Utilizing a | 23 | A. The first person would be Deborah Koenig. |
| 24 | spectrophometer that would cover the UV as | 24 | Q. And what did she do? |

8 (Pages 26 to 29)

Paul Martin 5-24-2005
Paul Martin, et al. v. S.E.E., Inc., et al.

30

1   A.  Office manager.
2   Q.  Anybody else?
3   A.  I don't remember the exact order.  I can
4       only give you names.  Andrea Desrosier.
5   Q.  What did she do?
6   A.  Applications.
7   Q.  Can you explain to me what you mean, since I
8       have a different idea of what that term
9       means, can you explain to me what
10      applications means with respect to what you
11      were manufacturing.
12  A.  It would depend on -- it is a very broad
13      term.  It can mean analysis of different
14      types of samples.  It can mean training and
15      installation, attendance at trade shows.
16      Different companies have different
17      designations.
18  Q.  At S.E.E., in the manufacturing operation,
19      did it mean writing computer software?
20  A.  She was also hired as a programmer.
21  Q.  And anybody else?
22  A.  Ann Sofi was her first name.  I don't
23      remember her last.
24  Q.  What did she do?

31

1   A.  Applications.
2   Q.  For her did that include programming?
3   A.  I don't recall.  There's more.  Melissa
4       Calberro.
5   Q.  What did she do?
6   A.  Office manager.  There was one engineer, but
7       I don't recall his name.
8   Q.  What did he do?
9   A.  Not much.  He was only there for two weeks.
10  Q.  Were there any others?
11  A.  For Middleborough?
12  Q.  For Burlingame.
13  A.  For Burlingame, Dee Hixson.
14  Q.  What did she do?
15  A.  Office assistant.
16  Q.  And any others?
17  A.  Judy Moniz, I believe it was.
18  Q.  And what did she do?
19  A.  She was hired as an office assistant.
20  Q.  And?
21  A.  Tony Facchiano, as an assembler.  I am
22      trying to think of the name.  John was hired
23      as an intern, not hired as such.  I believe
24      that's all I remember.

32

1   Q.  Do you remember anyone named Peter Lin?
2   A.  I think that might have been the engineer,
3       but I am not sure.
4   Q.  Why did he end up leaving so soon?
5   A.  I don't know.
6   Q.  And who was responsible for record keeping
7       at the California facility?
8   A.  It would depend upon the records.
9   Q.  Who was responsible for keeping records of
10      the day-to-day operations, like, checkbook,
11      inventory?
12  A.  Deborah Koenig and Jumi Lee.
13  Q.  And in what form were those records?  Were
14      they electronic or paper?
15  A.  Both.
16  Q.  And who was in charge of maintaining records
17      related to sales and marketing?
18  A.  That could be Deborah Koenig and myself.
19  Q.  And what form were those records kept in,
20      electronic or paper?
21  A.  Both.
22  Q.  And what kind of records did you maintain
23      specifically with respect to marketing?
24  A.  Competitive information, specifications of

33

1       our own tools, price lists, customer contact
2       information, prospective customers, and
3       general contact information.
4   Q.  And was any specific piece of software used
5       to maintain the categories of information
6       that you just identified?
7   A.  Could you read each category back.
8   Q.  Customer contact info.
9   A.  We used ACT! database.
10  Q.  Prospective customers?
11  A.  ACT! database, Excel.
12  Q.  And general contact information?
13  A.  ACT! database.
14  Q.  And price list?
15  A.  Word, Excel.
16  Q.  Specifications?
17  A.  Word.
18  Q.  And competitive info?
19  A.  That was paper and electronic, HTML website.
20  Q.  Did S.E.E. have a website for its
21      microspectrophometers?
22  A.  Yes.
23  Q.  And who designed that website?
24  A.  Joe Buckle.

9 (Pages 30 to 33)

Paul Martin 5-24-2005
Paul Martin, et al. v. S.E.E., Inc., et al.

| 34 | |
|---|---|
| 1 | Q.  And was he out of California? |
| 2 | A   No. |
| 3 | Q.  Was he in Massachusetts? |
| 4 | A.  No. |
| 5 | Q   Where was he located? |
| 6 | A.  Ottawa, Canada. |
| 7 | Q.  Was he someone who you knew from |
| 8 |     Nanometrics? |
| 9 | A.  Yes. |
| 10 | Q.  Was he self-employed, or did he have a |
| 11 |     company? |
| 12 | A.  He was employed by the Royal Canadian |
| 13 |     Mounted Police.  He also had his own web |
| 14 |     design company. |
| 15 | Q.  And did it have a name, or was it just Joe |
| 16 |     Buckle? |
| 17 | A.  I don't know. |
| 18 | Q.  Now, after those first two products -- |
| 19 |     strike that.  With respect to the customer |
| 20 |     contact information and prospective customer |
| 21 |     info, how was that information obtained? |
| 22 | A.  My knowledge of people in the field, trade |
| 23 |     shows, experience at Nanometrics. |
| 24 | Q.  Now, did you make new contacts after you |

| 35 | |
|---|---|
| 1 |     left Nanometrics? |
| 2 | A.  Not many. |
| 3 | Q.  Can you estimate the -- what percentage of |
| 4 |     the customer contacts -- I'm sorry.  Strike |
| 5 |     that.  Before you moved to Massachusetts, |
| 6 |     how many trade shows did you attend? |
| 7 | A.  I don't know the exact number. |
| 8 | Q.  Can you tell me on average how many a year? |
| 9 | A.  12 to 15. |
| 10 | Q.  And the purpose of going to trade shows was |
| 11 |     to sell the equipment, I take it? |
| 12 | A.  Was to generate knowledge of our products |
| 13 |     and to sell our equipment. |
| 14 | Q.  And how long were you operating as S.E.E. in |
| 15 |     California? |
| 16 | A.  Approximately, four years. |
| 17 | Q.  So between that time, you attended between |
| 18 |     40 and 50 trade shows? |
| 19 | A.  That would be fair. |
| 20 | Q.  And S.E.E. paid for those, that travel? |
| 21 | A.  Yes. |
| 22 | Q.  And when you made a new customer contact, |
| 23 |     how would that be made part of the |
| 24 |     information stored by S.E.E.? |

| 36 | |
|---|---|
| 1 | A.  It would be entered into the database.  I |
| 2 |     would keep in contact with that customer. |
| 3 | Q.  Did you keep running notes of the contacts |
| 4 |     with the customers? |
| 5 | A.  Sometimes. |
| 6 | Q.  And would the information that you entered |
| 7 |     into the database, would it indicate the |
| 8 |     circumstance of your meeting this contact? |
| 9 | A.  Meeting meaning face to face? |
| 10 | Q.  Meeting them or coming to identify them. |
| 11 | A.  No. |
| 12 | Q.  What would it indicate? |
| 13 | A.  It would indicate if they had prospective |
| 14 |     sales, what was the likelihood of that sale, |
| 15 |     what type of equipment they may wish. |
| 16 | Q.  And how would you learn these facts? |
| 17 | A.  Through conversation. |
| 18 | Q.  While you were in -- the four years you were |
| 19 |     in California, what other products did you |
| 20 |     develop or sell besides the 1000 and the |
| 21 |     2000? |
| 22 | A.  The S.E.E. 3000. |
| 23 | Q.  Before I go to that, in the four years, were |
| 24 |     the 1000 and 2000 upgraded or improved at |

| 37 | |
|---|---|
| 1 |     all? |
| 2 | A.  That was going to be my next answer.  The |
| 3 |     SEE1000 and 2000, new models came out to |
| 4 |     replace them. |
| 5 | Q.  Did these new models have different |
| 6 |     designations? |
| 7 | A.  Yes. |
| 8 | Q.  What were those designations? |
| 9 | A.  The SEE1100 replaced SEE1000. |
| 10 | Q.  What was different about the 1100?  How did |
| 11 |     it differ from the 1000? |
| 12 | A.  The spectrometer was upgraded.  The |
| 13 |     spectrometer was mounted above the |
| 14 |     microscope rather than in the computer. |
| 15 |         The SEE2100 had two spectrometers |
| 16 |     and similar physical configuration as the |
| 17 |     SEE1000, 1100. |
| 18 | Q.  How was the spectrometer operated on the |
| 19 |     1100? |
| 20 | A.  Ocean Optics discontinued the model used in |
| 21 |     the 1000, so we had to use their new model. |
| 22 | Q.  Did Ocean Optics provide drivers for this? |
| 23 | A.  You could get drivers with them, yes. |
| 24 | Q.  Did you use their drivers in your -- |

10 (Pages 34 to 37)

Case 1:04-cv-12708-MLW    Document 13-2    Filed 07/19/2005    Page 11 of 46

Paul Martin 5-24-2005
Paul Martin, et al. v. S.E.E., Inc., et al.

38

1  A.  I believe so.
2  Q.  And this new mounting system, did S.E.E.
3      design that?
4  A.  Yes.
5  Q.  And can you describe for me the process by
6      which that was designed.
7  A.  I didn't take part in it, so no.
8  Q.  Who designed it?
9  A.  Gary Unruh and Jumi Lee.
10 Q.  Who is Gary Unruh?
11 A.  President and consultant at Dynamic Light
12     Control.
13 Q.  And was information provided to Gary Unruh
14     to allow him to design this thing?
15 A.  Besides a working model of the microscope
16     and the spectrometer, beyond that, I do not
17     know.
18 Q.  So you made a mock-up.  You say working
19     model?
20 A.  Working model is not a mock-up.
21 Q.  You built a prototype?
22 A.  No.  There was a microscope.  He did only
23     the physical design.
24 Q.  He physically designed the box?

39

1  A.  The package.
2  Q.  I assume the package had slots in it?
3  A.  It didn't have slots.
4  Q.  What did it hold?
5  A.  The spectrometer, optical interface unit.
6  Q.  Was there any additional programming
7      required for the 2200?
8  A.  I don't recall.  Excuse me.  Rephrase that.
9      Did you say the 2200?
10 Q.  Actually, we are talking about the 1100.
11     Was there any additional programming
12     required to upgrade the 1000 to the 1100?
13 A.  Not as far as I know.
14 Q.  Now, the 2100, you added an additional
15     spectrometer?
16 A.  Yes.
17 Q.  And how did that change the function of the
18     instrument?
19 A.  It extended the spectral range.  It also
20     forced the user to take a UV or visible
21     range spectra.
22 Q.  Why was that an enhancement?
23 A.  It is not.
24 Q.  And who manufactured the second

40

1      spectrometer?
2  A.  Ocean Optics.
3  Q.  And did it use the same packaging or
4      assembly as the 1100?
5  A.  Slightly different to take into account the
6      second spectrometer.
7  Q.  And was there any additional software
8      required?
9  A.  I don't know.
10 Q.  And then you mentioned that there was a
11     3000?
12 A.  Yes.
13 Q.  And can you describe that instrument for me.
14 A.  It, basically, used a ruggized computer, and
15     it had a spectrometer inserted into that
16     computer to be a portable spectrometer.
17 Q.  Did it have some kind of portable optical
18     device like a microscope?
19 A.  Other than the fiberoptic probe.
20 Q.  And what operating system did the 1100 run
21     on?
22 A.  It started out as Windows 95, the very first
23     models, then transitioned to Windows 98.
24 Q.  Is it the same with the 2100?

41

1  A.  Yes.
2  Q.  The same with the 3000?
3  A.  3000, I don't recall.  That was never sold.
4  Q.  How long did it take to develop the 2100?
5  A.  I was not involved with the development.
6  Q.  Who was involved with the development?
7  A.  Jumi Lee, Gary Unruh.
8  Q.  That was it?
9  A.  Yes.
10 Q.  None of the other employees?
11 A.  Not as far as I am aware.
12 Q.  None of the programmers?
13 A.  No.
14 Q.  Was testing required before these products
15     were marketed?
16 A.  Yes.
17 Q.  What kind of testing?
18 A.  How detailed?
19 Q.  Well, let's start generally, and we can skip
20     over --
21 A.  General quality control testing.
22 Q.  And what kind of operations were run to test
23     these instruments?
24 A.  Testing with various known samples,

11 (Pages 38 to 41)

Paul Martin 5-24-2005
Paul Martin, et al. v. S.E.E., Inc., et al.

| 42 | |
|---|---|
| 1 | monitoring the instrument to make sure it |
| 2 | meets specifications. |
| 3 | Q.  That's it? |
| 4 | A.  Yes. |
| 5 | Q.  Do you know how long these operations were |
| 6 | run before the device was ready to market? |
| 7 | A.  Market or ship? |
| 8 | Q.  Well, until they are ready to ship. |
| 9 | A.  That would be depending upon the technician |
| 10 | and the number of tests they ran, if there |
| 11 | were any issues with the instrument. |
| 12 | Q.  And what kind of tests were run before the |
| 13 | devices were ready to market? |
| 14 | A.  I don't know.  I can't recall. |
| 15 | Q.  Were they tested to determine whether they |
| 16 | functioned correctly? |
| 17 | A.  Of course. |
| 18 | Q.  The design was tested before it went into |
| 19 | production? |
| 20 | A.  Yes. |
| 21 | Q.  Can you tell me who did that testing. |
| 22 | A.  Some of it would have been me.  Some of it |
| 23 | would have been Dr. Lee, and possibly other |
| 24 | technicians. |

| 44 | |
|---|---|
| 1 | company"? |
| 2 | A.  Interpersonal relationships were not good |
| 3 | between Mr. Tringali and the personnel in |
| 4 | California. |
| 5 | Q.  Which personnel? |
| 6 | A.  Myself and Dr. Lee. |
| 7 | Q.  And whose idea was it move to the operation |
| 8 | to Massachusetts? |
| 9 | A.  I think initially the suggestion was made by |
| 10 | me. |
| 11 | Q.  And did you have any marketing materials, |
| 12 | any pamphlets or anything like that for your |
| 13 | instruments? |
| 14 | A.  Yes. |
| 15 | Q.  While you were in California, did you |
| 16 | develop these materials? |
| 17 | A.  Yes. |
| 18 | Q.  Who developed them? |
| 19 | A.  I did. |
| 20 | Q.  You wrote the text? |
| 21 | A.  Yes. |
| 22 | Q.  Were they designed professionally? |
| 23 | A.  I did the initial design and then gave it to |
| 24 | a printer. |

| 43 | |
|---|---|
| 1 | Q.  Is it the same tests, testing various known |
| 2 | samples, and monitoring the instruments, or |
| 3 | were there additional tests? |
| 4 | A.  It would depend upon the person.  There was |
| 5 | no set test schedule. |
| 6 | Q.  Now, at some point, I'm sorry, and before |
| 7 | you moved the operation to Massachusetts, |
| 8 | what was Mr. Tringali's role in the |
| 9 | microspectrometry venture? |
| 10 | A.  He essentially didn't do anything.  He was |
| 11 | president of the company and sales |
| 12 | representative for various products. |
| 13 | Occasionally he would attend a trade show. |
| 14 | Q.  Now, at some point did this operation move |
| 15 | to Massachusetts? |
| 16 | A.  Yes. |
| 17 | Q.  And why was that? |
| 18 | A.  We were having friction in the company, and |
| 19 | the California operation was outgrowing its |
| 20 | facility.  And it was decided that the |
| 21 | friction would be reduced, and we could get |
| 22 | a new facility by combining everything in |
| 23 | Massachusetts. |
| 24 | Q.  What do you mean by "friction in the |

| 45 | |
|---|---|
| 1 | Q.  I assume they were designed on a computer? |
| 2 | A.  Yes. |
| 3 | Q.  What kind of software did you use? |
| 4 | A.  Word.  I think that's it. |
| 5 | Q.  And do you recall how many pieces of written |
| 6 | marketing material you developed while you |
| 7 | were in California? |
| 8 | A.  Two brochures, a number of applications |
| 9 | papers, and a number of technical notes. |
| 10 | Q.  Can you tell me generally what the |
| 11 | applications papers were. |
| 12 | A.  Analysis of choice evidence in various |
| 13 | forms. |
| 14 | Q.  How to? |
| 15 | A.  How to. |
| 16 | Q.  Technical notes were specific? |
| 17 | A.  Details of instruments. |
| 18 | Q.  How to use this specific -- |
| 19 | A.  Or to analyze particular types of evidence. |
| 20 | Q.  Were these documents posted on the Internet? |
| 21 | A.  The initial -- well, actually, yes, they |
| 22 | were.  Are we talking about the applications |
| 23 | papers or technical notes? |
| 24 | Q.  We are going to talk about something |

12 (Pages 42 to 45)

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 04-12708-MLW

PHILIP TRINGALI,          )
                          )
        Plaintiff,        )
                          )
v.                        )
                          )
PAUL MARTIN AND           )
JUMI LEE,                 )
                          )
        Defendants        )

## PLAINTIFF, PHILIP TRINGALI'S OPPOSITION TO DEFENDANTS PAUL MARTIN'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS

EXHIBIT 3

# O'BRIEN&LEVINE

### Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

## Paul Martin, et al. v. S.E.E., Inc., et al.

### Transcript of the Testimony of:

# Jumi Lee

# May 25, 2005

www.court-reporting.com
mail@court-reporting.com

195 State Street
Boston, MA 02109
(617) 399-0130  888.825.DEPO(3376)

Lynda C. Vetter   1-15078

Jumi Lee 5-25-2005
Paul Martin, et al. v. S.E.E., Inc., et al.

14

1    A.    SEE.
2    Q.    Okay. While you were working at
3    Wavetech, did you do any other work for SEE besides
4    the color software?
5    A.    Yes.
6    Q.    What else?
7    A.    Answering phones, shipping, packaging,
8    customer support.
9    Q.    What programming language did you do
10   the color software in?
11   A.    I believe something C and Array Basic.
12   Q.    When you were doing customer support,
13   whose customers were you supporting?
14   A.    SEE.
15   Q.    What product were you supporting?
16   A.    Product was SE-1000 -- strike that. I
17   don't remember having a customer during the Wavetech
18   period. Most of the time I answered the phone as a
19   secretary.
20   Q.    And what was your experience doing
21   computer programming?
22   A.    I did most of my Ph.D. work.
23   Q.    And was there a time when you became
24   employed by SEE?

15

1    A.    Yes.
2    Q.    When was that?
3    A.    I have to check the record but sometime
4    around March of 1997 maybe, something like that. I'm
5    not sure.
6    Q.    What position were you hired for?
7    A.    The title given to me was director of
8    R&D, research and development.
9    Q.    Can you tell me how you came to be
10   hired by SEE.
11   A.    I do not remember. That was between
12   Paul Martin and Tringali.
13   Q.    At some point, was it discussed with
14   you -- did somebody discuss with you the fact that
15   you might become an employee of SEE?
16   A.    They might have. I don't recall.
17   Q.    Was this position offered to you at
18   some point?
19   A.    I'm sure.
20   Q.    Do you recall who offered it to you?
21   A.    No.
22   Q.    Can you tell me what your duties were
23   there.
24   A.    Answering the phone, paying the bills,

16

1    HR, shipping, packaging, ordering, software testing,
2    anything, everything you need to keep the company
3    going.
4    Q.    Okay.
5    A.    Including contractor work, real estate
6    contractor work.
7    Q.    Real estate contractor work?
8    A.    Yes.
9    Q.    And what kind of software testing did
10   you do?
11   A.    Press the button, collect the data and
12   make sure that the instrument generates the proper
13   data.
14   Q.    Was that in the nature of quality
15   control?
16   A.    Yes.
17   Q.    Was that finished products?
18   A.    Yes.
19   Q.    Did you test the piece of software that
20   you had written?
21   A.    Yes.
22   Q.    How did you test that?
23   A.    There was a standard. For example,
24   holmium, H-O-L-M-I-U-M, oxide filter, standard,

17

1    collect the data of holmium oxide and compare the
2    number from the known data.
3    Q.    How many times did you run the
4    software?
5    A.    Numerous times.
6    Q.    How long did it take to test that?
7    A.    Actual data collection takes about one
8    minute, half a second, 30 seconds to a minute.
9    Q.    How long did the whole process take?
10   A.    Which process?
11   Q.    Of testing to make sure it was in
12   proper form to deliver it to the customer?
13   A.    There was long-term test, short-term
14   test. And average I would say a week maybe.
15   Q.    And what was the terms of your
16   employment?
17   A.    Are you talking about compensation?
18   Q.    Yes.
19   A.    Something around 40, 45,000 a year plus
20   promise of stock.
21   Q.    Did you --
22   A.    I don't remember whether there was a
23   commission.
24   Q.    What real estate contract work were you

5 (Pages 14 to 17)

Jumi Lee 5-25-2005
Paul Martin, et al. v. S.E.E., Inc., et al.

18

1  referring to?
2      A.    Originally the SEE was located at house
3  -- our house. And at some point it was decided to
4  acquire an office. I was asked to search for an
5  office. And when we found a place, I had to actually
6  work as a general contractor to make that place good
7  enough for an office, including removing items,
8  painting, carpeting, et cetera.
9      Q.    You fixed up the office?
10     A.    Correct.
11     Q.    Did you hire people to help you?
12     A.    Yes.
13     Q.    Did you physically do this work?
14     A.    Yes.
15     Q.    What work did you physically do?
16     A.    Cleaning, scrubbing, painting, moving.
17     Q.    Were you an employee of SEE by that
18  time?
19     A.    I don't remember - - I believe I was.
20  I don't remember.
21     Q.    You expected to be compensated extra?
22     A.    No. I considered that as I will do
23  anything to get the company moving.
24     Q.    Now, can you tell me when you started

19

1  working for SEE, what its business was?
2      A.    Representative business, reseller at
3  best.
4      Q     And what type of business was it
5  engaged in in California?
6      A.    SEE?
7      Q.    Yes.
8      A.    They sold microspectrometer.
9      Q.    Do you have an understanding as to what
10  your husband was hired to do?
11     A.    Sell microspectrometer.
12     Q.    At some point did your husband --
13  strike that. At some point did the California
14  personnel of SEE start designing microspectrometers?
15     A     Yes.
16     Q.    When was that?
17     A.    Warren Lin from Mission Peak Optics
18  rejected Tringali's offer to be a partner.
19     Q.    Can you explain what you mean by that.
20     A.    Mission Peak Optics was building an
21  instrument SEE was purchasing and doing some testing
22  and sold instruments. They were charging a lot of
23  money and quality was very poor. But some point I
24  believe, Tringali decided to be a partner with Warren

20

1  Lin and Mission Peak Optics, therefore forming a
2  partner that they were built and SEE was something
3  along that line. That's my understanding. I was in
4  the meeting with Tringali, Paul Martin and Warren Lin
5  and my understanding was that Tringali made an offer
6  and Warren Lin rejected it. And I mentioned to
7  Tringali and Paul Martin maybe we should do it
8  ourselves. It's easy to copy the same thing.
9      Q.    When you say "copy the same thing,"
10  what do you mean?
11     A.    Copy Mission Peak Optics.
12     Q.    What was the product that Mr. Tringali
13  was purchasing from Mission Peak Optics?
14     A.    Major component of SE-1000 and SE-2000.
15     Q.    What was that component?
16     A.    Microscope, all hardware in it.
17     Q.    The microscope?
18     A.    Yes. Interface major hardware
19  components.
20     Q.    And you suggested that SEE go into that
21  business, the manufacturing business?
22     A.    I don't remember. I don't recall
23  whether I suggested it. I remember mumbling. I
24  don't remember whether I specifically suggested it or

21

1  not.
2      Q.    Okay. At some point, SEE decided to,
3  in fact, do that?
4      A.    I suppose so.
5      Q.    And do you know when SEE began
6  developing its product?
7      A.    Sometime probably around 1997.
8      Q.    And when did you do the consulting for
9  SEE? Was that in '96?
10     A.    No. I believe it was 1996 up until
11  1997 sometime. But I would have to check the date.
12     Q.    And was SEE developing a product at the
13  time you were consulting?
14     A.    No. If you define developing the
15  product. I was doing color software
16     Q.    What was that software to be used in?
17     A.    Software was used in? To analyze
18  sample.
19     Q.    Was it used in an instrument that was
20  sold by SEE?
21     A.    Yes.
22     Q.    In an instrument that was produced by
23  SEE?
24     A.    Yes.

6 (Pages 18 to 21)

Jumi Lee 5-25-2005
Paul Martin, et al. v. S.E.E., Inc., et al.

22

1    Q.    You were producing that in 1996?
2    A.    What?
3    Q.    You were writing that in 1996?
4    A.    I believe so. You would have to check
5    the record. SEE corporate record would show when
6    they paid me.
7    Q.    Okay. Now, after you were hired, did
8    you keep books?
9    A.    No.
10   Q.    Okay. Maybe --
11   A.    I don't recall.
12   Q.    Let me ask you this. After you were
13   hired by SEE, did you have responsibility for
14   accounts payable receivable for things that went on
15   in California?
16   A.    I remember paying bills. But it would
17   have been the responsibility of Deborah Koenig,
18   office manager.
19   Q.    Were you responsible for maintaining
20   and reconciling the checkbook?
21   A.    No. I don't think so.
22   Q.    Were you responsible for keeping track
23   of the costs and expenses that were incurred by the
24   California office?

23

1    A.    No. Debra Koenig was.
2    Q.    Did you have the responsibility of
3    monitoring the cash flow for the California office?
4    A.    No.
5    Q.    You said you had HR responsibilities.
6    What were your responsibilities in respect to human
7    resources?
8    A.    I was with one of two people, Paul
9    Martin and myself. We need to hire office manager.
10   We need to have a programmer. I was actively
11   involved in it.
12   Q.    When you say "actively involved," what
13   did you do?
14   A.    Advertised, interviewed, made an offer,
15   hired them.
16   Q.    And do you recall how long it took you
17   to do the hiring from the time you first advertised
18   to the time you made the offer?
19   A.    Which one?
20   Q.    For the programming.
21   A.    About year and a half, year, year and a
22   half. You would have to check the record.
23   Q.    And what kind of programmer were you
24   looking for?

24

1    A.    Labview, L-A-B-V-I-E-W, programmer,
2    Labview C, C Plus Plus programmer.
3    Q.    What is Labview?
4    A.    That's one of the computer languages
5    that used a lot in the instrument control.
6    Q.    And when you say "instrument control,"
7    that's the program that you had drivers in?
8    A.    Most people did, yes.
9    Q.    And who did you hire?
10   A.    Andrea Desroiser. I cannot pronounce
11   her name.
12   Q.    Did you interview her?
13   A.    I did, yes.
14   Q.    Did anybody else interview her?
15   A.    Yes.
16   Q.    That was in California or
17   Massachusetts?
18   A.    Both.
19   Q.    Did you keep control of the records in
20   California?
21   A.    What records?
22   Q.    Well, did you keep the records related
23   to cost and expenses?
24   A.    Particularly I don't recall.

25

1    Q.    Do you recall what form the records
2    were maintained in?
3    A.    Cost?
4    Q.    Yes. Was there an accounting system?
5    A.    I believe there was an accounting
6    system called QuickBooks. I don't recall
7    particularly using it too much. But I did get
8    involved when BusinessWorks started.
9    Q.    When did BusinessWorks start?
10   A.    I don't know. I don't recall.
11   Q.    Did you have -- did you sign -- did you
12   have the authority to sign checks for SEE?
13   A.    I don't recall.
14         MR. DAVIS: Are you talking about
15   California?
16         MR. TREGER: Yes.
17   A.    I don't recall. I don't think I did.
18   Q.    Did you manage the inventory of parts?
19   A.    I don't know what you mean by "manage."
20   Q.    Well, did you keep track of what parts
21   were in stock, what parts were needed?
22   A.    Yes.
23   Q.    And did you use any kind of computer
24   software to keep track of that?

7 (Pages 22 to 25)

Jumi Lee 5-25-2005
Paul Martin, et al. v. S.E.E., Inc., et al.

26

1    A.    No.
2    Q.    Did you use paper ledgers or anything
3    like that?
4    A.    I really don't recall.
5    Q.    And did you have the responsibility to
6    order the parts that were needed?
7    A.    Yes.
8    Q.    And do you know what records there
9    would be of parts that were ordered?
10   A.    I only recall BusinessWorks. I don't
11   remember what I did with the QuickBooks.
12   Q.    Okay. Did you have any responsibility
13   with respect to managing employee benefits?
14   A.    No.
15   Q.    Now, after you were hired as an
16   employee, did you do any technical work on the
17   product itself?
18   A.    Yes.
19   Q.    Can you tell me what technical work you
20   did.
21   A.    I copied Mission Peak Optics design and
22   I packaged and put it together. I did assembly work.
23   Q.    When you say you copied the design, the
24   design of what?

27

1    A.    SE-2000 that I purchased from Mission
2    Peak Optics.
3    Q.    So you purchased a machine from Mission
4    Peak Optics?
5    A.    Yes.
6    Q.    And what did you do?
7    A.    Reverse engineering.
8    C.    How did you do that?
9    A.    Take it apart, measure components or
10   analyze components, try to rebuild it.
11   Q.    And was Mr. Martin involved at all?
12   A    I don't recall, but I don't think so.
13   Q.    Okay. And when you put together the
14   machine SEE would sell, do you recall what components
15   were incorporated into it?
16   A    What was in SEE?
17   Q    Yes. When you put together a product
18   or when you developed the product that SEE would
19   sell.
20   A.    Microscope, spectrometer, interface
21   unit, computer and monitor and the software.
22   Q    What kind of microscope did you use?
23   A.    Olympix.
24   Q.    Was anything done to that microscope to

28

1    make it part of the product? Was it changed at all?
2    A.    Which model?
3    Q.    What was the first one you developed or
4    put together?
5    A.    First one? I don't recall which ones
6    were first.
7    Q.    Let's start with the 1000.
8    A.    Modification was not done in the
9    microscope but it was 1000. They take heat filter
10   out and add interface module and spectrometer and
11   connect it to computer.
12   Q.    Okay. So the lamp housing was changed?
13   A.    Yes.
14   Q.    And the heat filter was taken out?
15   A.    Yes.
16   Q.    Were the eye pieces taken out?
17   A.    No.
18   Q.    What is the interface unit?
19   A.    What is it?
20   Q.    Yes.
21   A.    Interface from microscope to
22   spectrometer.
23   Q.    And was that something that fit over
24   the eye piece?

29

1    A.    Yes. They make eye piece.
2    Q.    So sometimes you wouldn't order the eye
3    piece?
4    A.    Correct.
5    Q.    And what was the inter -- was the
6    interface unit an office shelf product or was it
7    something that had to be assembled?
8    A.    The latter.
9    Q.    What parts went into it?
10   A.    Lens, mirror, camera, polarizer,
11   fiberoptic.
12   Q.    And how did you determine how to
13   arrange these parts properly?
14   A.    Reverse engineering.
15   Q.    And did this all fit into some kind of
16   box or container or case?
17   A.    Initially it didn't.
18   Q.    It was hanging out there?
19   A.    Yes.
20   Q.    And when was it placed in a box?
21   A.    Six months. I don't recall.
22   Q.    And were any of these parts: The lens,
23   the mirror, the camera, the polarizer or fiberoptics,
24   were any of those manufactured specially for SEE?

8 (Pages 26 to 29)

Jumi Lee 5-25-2005
Paul Martin, et al. v. S.E.E., Inc., et al.

30

1   A.   Especially for SEE?
2   Q.   Were any of them manufactured to
3   specifications given to the manufacturer by SEE?
4   A.   Yes.
5   Q.   Which parts were those?
6   A.   Mirror part.
7   Q.   Who manufactured that if you can
8   recall?
9   A.   I don't recall.
10  Q.   The camera, was that a still picture
11  camera?
12  A.   I believe it was a Cohu, C-O-H-U,
13  camera.
14  Q.   Is that a camera that you use now or
15  was it a video camera?
16  A.   I don't know.
17  Q.   What kind of camera --
18  A.   CCD camera.
19  Q.   Okay. And you say the second or third
20  instrument that you manufactured you put this on a
21  box?
22  A.   Yes.
23  Q.   And was the box designed by SEE?
24  A.   Yes.

31

1   Q.   Who designed it?
2   A.   Dynamic Light Control.
3   Q.   What information did SEE provide
4   Dynamic Light Control so they could make the box?
5   A.   I told them this is interface unit I
6   will put on the box.
7   Q.   Did you give them any written
8   specifications?
9   A.   No.
10  Q.   They just came up with the design?
11  A.   Yes.
12  Q.   And then who did you get - - did you
13  work with anyone particularly at Dynamic Light
14  Control?
15  A   Yes, Gary Unruh, U-N-R-U-H, and Matt --
16  I don't remember his last name.
17  Q.   What software did the 1000 use?
18  A.   There were several softwares. Which
19  one are you talking about?
20  Q.   Which level?
21  A.   Yes. There are three different levels.
22  Q.   Meaning three different models?
23  A.   No.
24  Q.   Meaning three --

32

1   A.   Different levels of software to make
2   things work.
3   Q.   You mean operating system?
4   A.   No.
5   Q.   A driver and something else?
6   A.   Yes.
7   Q.   What were the three levels?
8   A.   Driver.
9   Q.   And?
10  A.   Interface unit, GRAMS 4.
11  Q.   And the driver came with -- was for the
12  spectrometer?
13  A.   Yes.
14  Q.   That was a solid state spectrometer?
15  A.   Yes.
16  Q.   Who did you get that from?
17  A.   Ocean Optics.
18  Q.   Did they provide their own drivers?
19  A.   When we first purchased it, yes.
20  Q.   Okay. Did they stop providing their
21  own drivers at some point?
22  A.   Yes.
23  Q.   When was that?
24  A.   When they upgraded the spectrometer.

33

1   Q.   When was that?
2   A.   Sometime in between 1998 and 1999. I
3   would have to check the record.
4   Q.   Okay. And what was the interface unit?
5   A.   Interface unit is written in Array
6   Basic. It's called a button control.
7   Q.   What was the function of that piece of
8   software?
9   A.   Graphic user interface.
10  Q.   And was that something you were able to
11  purchase?
12  A.   No. It written by Paul Martin.
13  Q.   And then GRAMS 4. That's --
14  A.   Data analysis package.
15  Q.   Okay. And was that customized in any
16  way?
17  A.   No, which part?
18  Q.   The data analysis package GRAMS?
19  A.   No.
20  Q.   Now, did the driver -- were the drivers
21  compatible -- when Ocean Optics provided its own
22  drivers, were they compatible with GRAMS 4?
23  A.   Yes.
24  Q.   Beside the graphic user interface, was

9 (Pages 30 to 33)

Jumi Lee 5-25-2005
Paul Martin, et al. v. S.E.E., Inc., et al.

| 34 | | 36 | |
|---|---|---|---|
| 1 | any other software needed to make the instrument | 1 | Q. And who did you have supply those to -- |
| 2 | work? | 2 | A. Edmund Optics. |
| 3 | A. To make the instrument work, no. | 3 | Q. Who was the packaging engineer? |
| 4 | Q. Was any other software provided with | 4 | A. Gary Unruh at Dynamic Light Control. |
| 5 | the instrument? | 5 | Q. Were there any other parts or |
| 6 | A. Color software. | 6 | components that were put together to go into this? |
| 7 | Q. That was what you wrote? | 7 | A. Machine parts. |
| 8 | A. Yes. | 8 | Q. What machine parts went into it? |
| 9 | Q. Was anything else provided? What | 9 | A. The packaging engineer designed. |
| 10 | operating system did that work on? | 10 | Q. Were there any other optics that went |
| 11 | A. Windows 95, guessing. | 11 | into it? |
| 12 | Q. Whatever Windows was out there? | 12 | A. Yes: Mirror, polarizer, camera, |
| 13 | A. Yes. | 13 | fiberoptic. |
| 14 | Q. And were you involved with putting | 14 | Q. Was there some kind or something called |
| 15 | together the 2,000? | 15 | an objective lens? |
| 16 | A. Yes. | 16 | A. Objective lens? |
| 17 | Q. And can you tell me how you put that | 17 | Q. Objective. |
| 18 | together. | 18 | A. I don't understand. |
| 19 | A. When? Before? | 19 | Q. What software went into this computer |
| 20 | Q. The first time it was -- | 20 | or this system? |
| 21 | A. First time? | 21 | A. For SE-2000 and 1000? |
| 22 | Q. Yes. | 22 | Q. Yes. |
| 23 | A. Very first time? | 23 | A. GRAMS 4-based software, driver, GUI and |
| 24 | Q. How was the product designed? | 24 | color software when it was ordered. |

| 35 | | 37 | |
|---|---|---|---|
| 1 | A. Product design or assembly? | 1 | Q. Now, during the years that you were in |
| 2 | Q. Design. | 2 | California, were those products improved at all? |
| 3 | A. Design? | 3 | A. From SE-2000 to SE-2100; SE-1000 to SE- |
| 4 | Q. Yes. | 4 | 1100. |
| 5 | A. I had a system from Mission Peak | 5 | Q. Were you involved at all in the |
| 6 | Optics. I took it apart, measured the lens | 6 | software? |
| 7 | characteristics to my best ability and hired a | 7 | A. Yes. |
| 8 | package engineer to package and put it together and | 8 | Q. What characteristics of the 1000 were |
| 9 | tested it. | 9 | upgraded? |
| 10 | Q. Was it the same system that you based | 10 | A. Ocean Optics continued the spectrometer |
| 11 | the 1000 on? | 11 | used in SE-1000 and SE-2000. We were forced to |
| 12 | A. Yes. | 12 | upgrade the spectrometer. |
| 13 | Q. What was the difference between the | 13 | Q. What did you use after that? |
| 14 | 1000 and the 2,000? | 14 | A. Ocean Optic upgrade spectrometer. |
| 15 | A. 2,000 collects data in a wider range. | 15 | Q. They are all an upgrade? |
| 16 | Q. Wider spectrum? | 16 | A. Yes. |
| 17 | A. I don't understand -- wider spectrum? | 17 | Q. At that point did they stop providing |
| 18 | Q. What parts were different in the -- | 18 | the driver? |
| 19 | A. The glass part has to be removed for | 19 | A. They stopped it. |
| 20 | 2,000. | 20 | Q. And what did you do to replace the |
| 21 | Q. You mean the eye pieces? | 21 | drivers? |
| 22 | A. There was no eye piece in 2,000. | 22 | A. Thermalgalactic -- I think at the time |
| 23 | Q. Okay. Now, what lens did you measure? | 23 | Galactic produced the GRAMS software, provided the |
| 24 | A. Projection lens. | 24 | software. |

10 (Pages 34 to 37)

Jumi Lee 5-25-2005
Paul Martin, et al. v. S.E.E., Inc., et al.

38

1  Q.  They provided the drivers?
2  A.  Correct.
3  Q.  And besides that, were there any
4  changes made to the 1000?
5  A.  Box became bigger. That's it and
6  instead of mounting the spectrometer in the computer,
7  we put the spectrometer on top of the
8  microspectrometer.
9  Q.  Were there any changes made to the
10  software?
11  A.  There was a bug. I fixed the bug in
12  the driver.
13  Q.  There was a bug in the --
14  A.  Driver.
15  Q.  In the GRAMS driver?
16  A.  Ocean Optics GRAMS driver for Ocean
17  Optics spectrometer.
18  Q.  But there was no change made to the
19  graphic interface?
20  A.  Moved the button around.
21  Q.  Did you do that?
22  A.  Yes.
23  Q.  Okay. Was there a change made to the
24  color software?

39

1  A.  No.
2  Q.  Okay.
3  A.  Not that I recall.
4  Q.  Okay. And what was changed with
5  respect to the 2100?
6  A.  Same.
7  Q.  So --
8  A.  Same as the 1100, moved up.
9  Q.  To a different spectrometer?
10  A.  Yes.
11  Q.  Was any change required to make this
12  system run on Windows 98?
13  A.  No.
14  Q.  So no programming or anything was
15  provided to --
16  A.  It was running.
17  Q.  It ran on 98?
18  A.  Yes.
19  Q.  Now, besides the assembly aspects, did
20  you do any other type of work while you were in
21  California beside the design that you have already
22  described to us?
23  A.  I assembled. I did quality control. I
24  packed. I arranged the shipping. I arranged

40

1  installation and training. I went over to customer
2  site, installed the system. When Paul Martin asked
3  for it, I did the training as well as customer
4  support as well the pre- and postsales support.
5  Q.  I asked if you did any additional
6  technical work, design or testing or research on new
7  products, anything like that?
8  A.  Regarding SE-2100 and 1100?
9  Q.  Any other products that SEE served.
10  A.  Yes, SE-2100X.
11  Q.  What was that?
12  A.  That's wider range than SE-2100.
13  Q.  I see. And what work did you do on
14  that?
15  A.  I built and I designed.
16  Q.  When was that?
17  A.  Best guess is 1999.
18  Q.  How did you design it?
19  A.  I put one more spectrometer into SE
20  2100.
21  Q.  And did that require a change in the
22  array in the camera?
23  A.  I don't recall.
24  Q.  Did you put a different -- what was the

41

1  second spectrometer you added?
2  A.  Mirror infrared spectrometer.
3  Q.  Who did that?
4  A.  I believe it was control development.
5  Q.  Okay. Did they provide their open
6  drivers?
7  A.  Yes.
8  Q.  And were those drivers compatible with
9  GRAMS?
10  A.  No.
11  Q.  How did you get the CDI to work with
12  GRAMS?
13  A.  Andrea Desroiser wrote a Labview
14  programming language. She had a user interface using
15  Labview language.
16  Q.  That was something that allowed the --
17  there was a name for that subdriver -- that basically
18  converted the data coming out of the CDI spectrometer
19  into recognizable format re GRAMS?
20  A.  She did write that but main function
21  was Labview switched from one driver to another.
22  Q.  So she had to write something to switch
23  back and forth?
24  A.  Yes, press button. User selects

11 (Pages 38 to 41)

Jumi Lee 5-25-2005
Paul Martin, et al. v. S.E.E., Inc., et al.

42

1    button.
2        Q.    Okay.  She wrote something to make
3    the -- to make the parts compatible?
4        A.    To collect the data from two separate
5    spectrometers, yes.
6        Q.    Okay.  Were any other changes needed to
7    this - - strike that.  Was that product designed for
8    a specific customer?
9        A.    Yes, US Secret Service.
10        Q.    What were they going to use it for?
11        A.    I don't know.
12        Q.    And that -- the enhanced capabilities
13    of that product, was that something specifically
14    recuested by the customer?
15        A.    Yes.
16        Q.    After you sold that unit, did you
17    continue to offer that model with the two
18    spectrometers to the general public?
19        A.    I don't know.
20        Q.    Were there any other employees in
21    California beside Mrs. Desroiser?
22        A.    Deborah Koenig, Peter Linn and
23    Ann-Sophi.
24        Q.    What did Peter Lin do, do you know?

43

1        A.    He was hired to help me on that reverse
2    engineering.
3        Q.    And how long did he work there?
4        A.    Not -- less than three months.
5        Q.    Was it a temporary job?
6        A.    No.
7        Q.    Why did he leave?
8        A.    He didn't pass orientation time.
9        Q.    Why not?
10        A.    He didn't have enough engineering skill
11    that I needed.
12        Q.    And where did you get the engineering
13    skills that you needed after he left?
14        A.    Hired packaging engineering consultant.
15        Q.    Did you have a written contract with
16    the packaging engineer?
17        A.    I don't recall.
18        Q.    And what did Ann-Sophi do?
19        A.    I believe she was an intern of some
20    sort.
21        Q.    And where did the -- where did the seed
22    capital come from to start building the equipment?
23        A.    My understanding is it is from SEE
24    Incorporated.

44

1        Q.    Did you put in any capital?
2        A.    No.
3        Q.    Okay.  Did your husband pay any
4    capital?
5        A.    Not that I am aware of.
6        Q.    And was the microspectrometer, did that
7    business bring in any revenue in 1996?
8        A.    I believe so.
9        Q.    Okay.  Do you recall how much?
10        A.    Approximately $100,000.
11        Q.    Did it bring in any revenue in 1997?
12        A.    Yes.
13        Q.    Do you know how much?
14        A.    I don't recall.
15        Q.    Did it bring in more revenues than its
16    expenses in '97?
17        A.    Are you asking my opinion or fact?
18        Q.    I'm asking if you know.
19        A.    Know for a fact?
20        Q.    Yes.
21        A.    No.
22        Q.    Now, at some point this part -- did the
23    microspectrometer business move to Massachusetts?
24        A.    Yes.

45

1        Q.    How long did it take to make the
2    changes required to go from the 2000 to the 2100?
3        A.    Are you including asking from design to
4    production stage or what are you --
5        Q.    Yes.
6        A.    Including the time in the machine shop?
7        Q.    Yes.
8        A.    It depends on how big the machine shop
9    is.  But design process usually lasts about a month.
10    It was packaging engineering.  On top of that
11    whatever machine shop time plus assemble and test
12    time, probably two months, in my best estimation.
13        Q.    And how long did it take to develop the
14    2100X?
15        A.    That took a long time, probably six
16    months.  There was a project list.  I would have to
17    check the corporate record.
18        Q.    There was a project list?
19        A.    Yes.
20        Q.    What was the project list?
21        A.    Project list, what needs to be done on
22    SE 2100X.
23        Q.    So there was a specific -- specific
24    chart of --

12 (Pages 42 to 45)

Jumi Lee 5-25-2005
Paul Martin. et al. v. S.E.E., Inc., et al.

46

```
1      A.    No. It was formal project list, To Do
2  list type of thing.
3      Q.    Okay. How long did it take to develop
4  the first two models, the 1000 and the 2,000?
5      A.    Could you state starting time? Is this
6  the time that I have everybody in place, people in
7  place?
8      Q.    Well --
9      A.    Actual time for reverse engineering or
10 how long it took to get people?
11     Q.    No, just the time it took to reverse
12 engineer it and then to do whatever design was
13 needed.
14     A.    Including production, less than three
15 months, best guess, my best estimation.
16     Q.    How long did it take you to write the
17 color software?
18     A.    I don't recall.
19     Q.    Do you know how long it took your
20 husband to write the graphic interface?
21     A.    I don't recall.
22     Q.    Now, at some point, part of the
23 business moved to California?
24     A.    No.
```

47

```
1      Q.    I'm sorry, moved to Boston,
2  Massachusetts?
3      A.    Yes.
4      Q.    How did that come about?
5      A.    There was a drift between Tringali and
6  Paul Martin. There were many issues that needed to
7  be addressed. And somehow, did not recall how -- I
8  was told that we are moving to Massachusetts or
9  something like that. I don't particularly recall how
10 it all happened. All I remember was I was asked to
11 move.
12     Q.    What was the --
13     A.    Looking for an office property in
14 Massachusetts.
15     Q.    What were the rifts between your
16 husband and Mr. Tringali?
17     A.    Number one, lawsuit against Reynold,
18 R-E-Y-N-O-L-D, Tech. Number two, reckless financial
19 management, including main property. Number three,
20 constantly told analytical division was losing money,
21 Tringali constantly overwriting Paul Martin's
22 authority as a general manager. That's my
23 understanding of it.
24     Q.    What was specifically the problem with
```

48

```
1  the Reynolds Tech lawsuit?
2      A.    You have to ask Paul Martin.
3      Q.    You have no personal knowledge?
4      A.    I do.
5      Q.    You do have?
6      A.    Yes.
7      Q.    You have personal knowledge?
8      A.    Of what?
9      Q.    You said there was friction regarding
10 this lawsuit. Why?
11     A.    Because Paul Martin and myself, at
12 least myself, considered it as a frivolous lawsuit.
13     Q.    Why --
14     A.    And must be settled immediately.
15     Q.    Why did you consider it frivolous?
16     A.    Why did I consider it frivolous?
17 Because it was a simple contract dispute and payment
18 or commission dispute and tried to settle even 50
19 cents on the dollar. I believe by then seven or
20 eight years. I don't know exactly when they started.
21     Q.    So you wanted to discount the case?
22 You wanted to settle the case for --
23     A.    We felt the resources were limited and
24 lawyers cost was very high. And Paul and myself
```

49

```
1  believed - - I believed that we should focus on
2  building manufacturing company and not wasting
3  resources and money in lawsuit.
4      Q.    Do you know how many funds were
5  spent -- do you know when this lawsuit was filed?
6      A.    Best estimate is something around 1997
7  or 1998 or something like that. I would have to
8  check the corporate record.
9      Q.    Was this over an analytic product?
10     A.    No.
11     Q.    Something in the rep end?
12     A.    Yes.
13     Q.    Do you know how much in legal fees were
14 spent in '97?
15     A.    I don't have a breakdown, no.
16     Q.    Do you know how much had been spent in
17 '98?
18     A.    No.
19     Q.    Do you know how much had been spent by
20 the time the decision was made to move?
21     A.    I am roughly aware of total amount, how
22 much was spent.
23     Q.    How much?
24     A.    Approximately $300,000. It was more
```

13 (Pages 46 to 49)

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 04-12708-MLW

PHILIP TRINGALI,        )
                        )
        Plaintiff,      )
                        )
v.                      )
                        )
PAUL MARTIN AND         )
JUMI LEE,               )
                        )
        Defendants      )

## PLAINTIFF, PHILIP TRINGALI'S OPPOSITION TO DEFENDANTS PAUL MARTIN'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS

EXHIBIT 4

# DOCUMENTS RESPONSIVE TO REQUEST NO. 1

### S.E.E. Inc.
## Profit and Loss
July 1, 1999 through June 8, 2000

*All*
*Ex 32*
*1 tested*

| | Jul 1, '99 - Jun 8, '00 |
|---|---|
| **Ordinary Income/Expense** | |
| **Income** | |
| Analytical Sales | 1,074,372.80 |
| Commissions Income | -4,221,843.51 |
| Courtesy Discount | 99.99 |
| Rental Property | 2,560.00 |
| Rep Sales | 4,580,768.72 |
| **Total Income** | 1,435,958.00 |
| **Gross Profit** | 1,435,958.00 |
| **Expense** | |
| Administration Fee | 2,512.62 |
| Annual Member Fee | 355.00 |
| Automobile Expense | 10,271.34 |
| Bank Service Charges | 944.22 |
| Cash Discounts | -77.43 |
| Commissions Expense | 24,963.53 |
| Consulting | 1,021.25 |
| **Credit Card Fees** | |
| Monthly Fee | 7.00 |
| Set Up Fee | 658.00 |
| Credit Card Fees - Other | 3,651.70 |
| **Total Credit Card Fees** | 4,316.70 |
| Domain Registration | 70.00 |
| Dues and Subscriptions | 276.00 |
| **Employee Expense** | |
| Entertainment | 45.50 |
| Meals | 9,134.53 |
| Medical/Dental | 1,799.08 |
| Moving | 20,675.08 |
| Travel | 73,055.67 |
| **Total Employee Expense** | 104,709.86 |
| Exhibits & Conferences | 2,187.02 |
| Filing Fees | 1,044.00 |
| Freight | 3,931.48 |
| **Insurance** | |
| Auto | 1,136.57 |
| Disability Insurance | 7,406.07 |
| Flood | 1,351.00 |
| Liability Insurance | 125.06 |
| Medical Ins. | 24,250.94 |
| Workman 's Comp | 6,282.06 |
| Insurance - Other | -447.81 |
| **Total Insurance** | 40,103.89 |
| **Interest Expense** | |
| Finance Charge | 1,895.85 |
| Loan Interest | 20,308.82 |
| Mortgage | 9,992.88 |
| **Total Interest Expense** | 32,197.55 |
| Internet Services | 781.60 |
| Job Posting Advertisement | 56.00 |
| Landscaping & Plowing | 1,285.00 |
| Miscellaneous | 387.84 |
| Office Setup | 14,478.27 |
| Payroll Expenses | 402,593.76 |
| Petty Cash | 100.00 |
| Postage and Delivery | 1,253.75 |
| Printing and Reproduction | 546.44 |
| Processing Fee | 2,512.30 |
| **Professional Fees** | |
| Accounting | 3,566.50 |
| Legal Fees | 28,247.23 |

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 04-12708-MLW

PHILIP TRINGALI,           )
                           )
        Plaintiff,         )
                           )
v.                         )
                           )
PAUL MARTIN AND            )
JUMI LEE,                  )
                           )
        Defendants         )

### PLAINTIFF, PHILIP TRINGALI'S OPPOSITION TO DEFENDANTS PAUL MARTIN'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS

EXHIBIT 5

http://www.microspectra.com/prod02.htm

QDi spectrophotometer and microspectrometer

# QDi



## QDi Mach1™ MSP

The QDI Mach1™ Spectrophotometer for Microscopes is used to give many models of microscopes spectroscopic capabilities without the expense of a dedicated system. It enables a scientist to measure the spectral characteristics of microscopic samples non-destructively. The system can measure transmission, reflectance, and fluorescence spectra in the visible and near infrared regions with high spectral resolution depending on the microscopes configuration.

Home

Up



spectrophotometer and microspectrometer



*Reflectance Spectra*

*Fluorescence Spectra*

## Key Benefits



- ☑ LS and LX models
- ☑ Designed for for durability and ease of use
- ☑ Easy to use and maintain
- ☑ Visible and near infrared range in one spectra...not two or three
- ☑ Transmission, reflectance and fluorescence of microscopic samples
- ☑ Easy-to-use Windows software
- ☑ Includes a high resolution digital imaging
- ☑ Economical alternative to dedicated microspectrophotometers
- ☑ Service and support by experts in the field of microspectroscopy

## Contact Information

**Telephone**
1-617-328-8518

**FAX**
1-617-471-0411

**Postal address**
54 Heritage Road, Quincy, MA 02169 USA

http://www.microspectra.com/prod02.htm

crc :pectrophotometer and microspectrometer

**Electronic mail**
Information, Sales, and Support: support@microspectra.com

[ Home ] [ Up ]

**Copyright © 2002 Quantum Dynamics International**

icro spectrophotometer and Microspectrometer

# QDi

™

## QDI Mach10™ MSP

The QDI Mach10™ Microspectrophotometer is the most advanced microspectrophotometer to date. It is a powerful yet user friendly tool for measuring the spectral characteristics of microscopic samples non-destructively. Samples can be as small as 2 microns across and require little preparation. The system can measure transmission, reflectance, and fluorescence spectra in the near-UV, visible, and NIR regions with high spectral resolution.



**Home**

**Up**

cro¹ :pectrophotometer and Microspectrometer

http://www.microspectra.com/prod01.htm

*The QDI Mach10™ Microspectrometer can take spectra from the ultraviolet to near infrared.*



*Red nylon fiber*



*Holmium Oxide Glass*

## Key Benefits

- Designed for scientists by scientists
- Easy to use and maintain
- Ultraviolet, visible, and near infrared range in one spectra...not two or three
- Transmission, reflectance and fluorescence of microscopic samples
- Easy-to-use Windows 2000 software
- Only microspectrophotometer with a cooled scientific grade CCD detector
- Only microspectrophotometer with high resolution digital image capture
- The absolute best price-performance of any microspectrophotometer
- Service and support by experts in the field of microspectroscopy

## Contact Information

**Telephone**
   1-617-328-8518

**FAX**
   1-617-471-0411

**Postal address**
   54 Heritage Road, Quincy, MA 02169 USA

**Electronic mail**

http://www.microspectra.com/prod01.htm

ier spectrophotometer and Microspectrometer

Information, Sales, and Support: support@microspectra.com

[ Home ] [ Up ]

**Copyright © 2002 Quantum Dynamics International**





Home



Under construction

## Applications Papers from Quantum Dynamics International

- *Ultraviolet Spectroscopy of Textile Fibers*, **American Academy of Fo Sciences**, February 15, 2002

[ Home ]

Copyright © 2002 Quantum Dynamics International



# Accessories

QDI also manufactures accessories and specialized software packages for its tools. In addition, QDI stocks QDI Certified lamps and other consumables. These include:

## Software

- Kramers-Kronig Transformation Software Package: used for calculating the N and K values of reflectance spectra.
- Color Package: for calculation of tristimulus values, chromaticity coordinates, Hunter values, whiteness and many more. Includes a NIST traceable white reference.
- Statistical Analysis Software Package: adds powerful multivariate analysis tools. Includes PLS-1, PLS-2, and PCR.
- Absolute Reflectance Package: for calculation of true reflectance spectra. Includes an absolute reflectance standard.
- QDI/3D: For real-time, interactive three dimensional spectral visualization.
- Image Analysis Package: For enhanced analysis of images captured with the digital imaging system.

## Accessories

- Absolute Reflectance Standard: for replacement of standards used with the Absolute Reflectance Package
- NIST Traceable White Standard: for replacement of standards used with the Color Package
- NIST Traceable Calibration Standards: Designed for use with microspectrophotometers. Includes a set of standards and software
- NIST Standard Re-certification: standards must be inspected for damage and recertified once a year. Call to schedule an appointment.
- Auxiliary Data Workstations: Network directly to a QDI instrument.
- Quartz slides and Quartz cover slips: for UV microspectroscopy
- QDI certified lamps and consumables for microspectrometers

# Contact Information

**Telephone**
1-617-328-8518

**FAX**
1-617-471-0411

**Postal address**
54 Heritage Road, Quincy, MA 02169 USA

**Electronic mail**
Information, Sales, and Support: support@microspectra.com

[ Home ] [ Up ]

**Copyright © 2002 Quantum Dynamics International**



# QDi

# Training

Training is available for any QDI system. Training includes introduction to physics behind the instruments, usage of the instruments, and applications of techniques. This includes one-on-one instruction with the instructor. Training is generally conducted on-site with a maximum of seven people per class. Students are certified as Qualified Users at the end of a class.

## Key Benefits

- Keeps users up-to-date on applications, maintenance and use of instruments.
- Valid for training certification requirements.
- New users can get the most out of instruments. Experienced users can refresh their training and learn the latest techniques.

## Capabilities

### Experts in the field

Training is conducted by a Ph.D. level expert in the field of microspectroscopy. We believe very strongly that training should only be done by the best.

### On-site

Our training is conducted at your facility and on your instrument. This enables you to use your own samples under the conditions that you normally work.

### Qualified training for QDI and other manufacturers

QDI instructors are qualified to train personnel on both QDI and SEE microspectrophotometers.

**Home**

**Up**

[ Home ] [ Up ]

**Copyright © 2002 Quantum Dynamics International**

rvi: es Page



# QDi

## Services

**Home**

**Service Contracts**

**Training**

**Recertification**

### Service Contracts

Service Contracts and Preventative Maintenance ensure peace of mind beyond the initial warranty period. Contracts are available for both QDI and microspectrophotometers of other brands.

### Training

Training is available for any QDI systems. Training is also available for microspectrophotometers of other brands.

### NIST Standard Recertification

Certification of NIST Traceable Standards is valid for one year. Beyond that period, the standards are no longer NIST Traceable unless recertified.

## Contact Information

**Telephone**
1-617-328-8518

**FAX**
1-617-471-0411

**Postal address**
54 Heritage Road, Quincy, MA 02169 USA

**Electronic mail**
Information, Sales, and Support: support@microspectra.com



# NIST Standards

*NIST Traceable Standards designed for ultraviolet, visible, and near-infrared range microspectrophotometers.*

It is necessary to determine the accuracy and precision of microspectrometers prior to measuring unknown samples.

The NIST Traceable Filter Set manufactured by QDI conform to the ASTM Standard Practice for measuring the performance of UV, visible and NIR spectrophotometers. This set is specially designed for use with microspectrometers. This standard set also conforms with SWGMAT protocols for calibration verification.

Home

Up



*Holmium Oxide and Neutral Density Standards*



# QDi

## Service Contracts

All QDI systems undergo extensive and rigorous Quality Control testing prior to shipment. Problems are eliminated before the system arrives at your door. In addition, QDI systems come with a Parts and Labor Warranty valid for one year from date of shipment. During that time, customers receive Priority One treatment for any service issues that may occur. After the initial warranty period, service contracts may be purchased that ensure peace of mind .

Technical support by experts in the field is always included with QDI systems.

## Key Benefits

- Service costs can be budgeted.
- Hassle free service when needed…just a telephone call away.
- Preventative Maintenance visits can be included in Service Contracts.

## Capabilities

**Rapid Response Times**
Most service issues can be resolved by telephone. Depending upon the priority level of the Service Contract purchased, service technicians can be at a facility anywhere in the continental United States within 12 hours.

**Modular Designs**
This allows QDI to rapidly repair systems and get them back on-line.

**Preventative Maintenance**
Preventative maintenance visits can be scheduled. A QDI qualified engineer will check the instrument, clean the system and then realign the optics.

**Bi-Coastal Service**
QDI has facilities in Boston and in Los Angeles staffed with trained engineers.

**Qualified Service for QDI and other manufacturers**
QDI Service is qualified to perform service on both QDI and SEE microspectrophotometers…with lower costs and faster response times.

Home

Up

# QDi

## Recertification

NIST traceability certification is valid for one year. Beyond that period, the standards are required to be recertified in order to maintain their NIST traceability status. This service requires that the Standards be returned to QDI. At QDI, the Standards will be inspected for damage, cleaned, and then recertified. The Standards will then be returned with new software and a new traceability certificate.

## Key Benefits

- Maintain NIST traceability of Standards.
- Ensure instrument usage conforms with ASTM and SWGMAT protocols.
- Ensure calibration of instruments.
- Ensure that standards are free from damage.

## Capabilities

**Rapid Response Times**
Make an appointment for recertification to ensure a rapid turn around.

**Statistical Analysis**
QDI performs statistical analysis on all Standards that it certifies in order to maximize their effectiveness. QDI is the only company that performs this procedure.

**Qualified Recertification for QDI and other manufacturers**
QDI recertifies NIST traceable standards from any manufacturer. QDI has specialists who concentrate on make the best standards available.

## Contact Information

**Telephone**
1-617-328-8518

FAX

Home

Up

http://www.microspectra.com/serv03.htm

1-617-471-0411

**Postal address**
    54 Heritage Road, Quincy, MA 02169 USA
**Electronic mail**
    Information, Sales, and Support: support@microspectra.com

[ Home ] [ Up ]

**Copyright © 2002 Quantum Dynamics International**

icro :pectrophotometer and Microspectrometer



# QDI Mach10 MSP

The QDI Mach10 Microspectrophotometer is the most advanced microspectrophotometer to date. It is a powerful yet user friendly tool for measuring the spectral characteristics of microscopic samples non-destructively. Samples can be as small as 2 microns across and require little preparation. The system can measure transmission, reflectance, and fluorescence spectra in the near-UV, visible, and NIR regions with high spectral resolution.

**Home**

**Up**



*The QDI Mach10 Microspectrometer can take spectra from the ultraviolet to near infrared.*

http://www.microspectra.com/prod01.htm



*Red nylon fiber*



*Holmium Oxide Glass*

## Key Benefits

- Designed for scientists by scientists
- Easy to use and maintain
- Ultraviolet, visible, and near infrared range in one spectra…not two or three
- Transmission, reflectance and fluorescence of microscopic samples
- Easy-to-use Windows 2000 software
- Only microspectrophotometer with a cooled scientific grade CCD detector
- Only microspectrophotometer with high resolution digital image capture
- The absolute best price-performance of any microspectrophotometer
- Service and support by experts in the field of microspectroscopy

# Contact Information

**Telephone**
1-617-328-8518

**FAX**
1-617-471-0411

**Postal address**
54 Heritage Road, Quincy, MA 02169 USA

**Electronic mail**

fic: spectro photometer and Microspectrometer

Information, Sales, and Support: support@microspectra.com

[ Home ] [ Up ]

Copyright © 2002 Quantum Dynamics International



**QDI**

*We Answer to Light*

Mr. Anthony Brown
Virginia Division of Forensic Science
Western Forensic Laboratory
6600 Northside High School Rd.
Roanoke, VA 24019
United States

### *Service and Support for Your Microspectrometer*

Dear Anthony:

Quantum Dynamics International is the worlds technical leader in microspectrophotometry. QDI has the most sophisticated upgrades, accessories, standards and services for UV-visible microspectrophotometers in the world. These packages incorporate years of experience and the highest quality and are backed with the most experienced technical support in the industry.

- *QDI Upgrade Packages* are designed to bring an older microspectrometer into this century. All systems are upgraded to Windows 2000 for ease of use, stability, and security. Hardware upgrades can include spectrophotometers with more sensitivity, stability, and resolution. The optics can be upgraded for better images and digital imaging can be added.

- *QDI Software Upgrade Packages* are designed to update a microspectrometer with Windows 2000 software for ease of use, stability, and security. In addition, there are a host of new software features, not the least of which is automatic NIST calibration checking software.

- *QDI NIST Standards for Microspectrophotometers;* these standards are designed for use with microspectrophotometers of all makes and models.

- *NIST Standards Recertification* NIST standards must be recertified once a year in order to maintain traceability. For minimal cost and a rapid turnaround time, QDI can recertify any brand of NIST standard for microspectrophotometers.

- *QDI Service Plans* are to ensure that a microspectrophotometer owner gets the best possible service for the best possible price. Services and service plans are tailored to best meet your needs and budget. Available for many brands and models.

- *QDI Preventative Maintenance* ensures that a microspectrophotometer is operating at its peak. Available for many brands and models.

- *QDI Training* in the science and use of microspectrophotometers at your facility.

- *QDI Technical Support* is always available with your UV-visible microspectrometer. It is fast and accurate.

- *QDI Accessories* include special software packages and consumables for micro-spectroscopic analysis.

Remember, QDI has the most technical experience in microspectroscopy in the world. Please contact QDI and let us help you assess your microspectroscopy needs.

Sincerely,

Dr. Paul Martin

Quantum Dynamics Intl   54 Heritage Road, Quincy, MA 02169 U.S.A.   T: 1-617-328-4518 F:1-617-471-0411 http://www.microspectra.com