UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

PHILLIP TRINGALI            )
      Plaintiff            )            C. A. NO. 04-12708-MLW
            )
V.            )
            )
PAUL MARTIN AND JUMI LEE            )
      Defendants            )

**MOTION OF DEFENDANT JUMI LEE
FOR PARTIAL SUMMARY JUDGMENT
AS TO COUNT II**

The defendant, Jumi Lee, moves for partial summary judgment as to
Count II of the plaintiff's complaint and states as follows:

**I.**    <u>**Statement Of Material Facts As To Which The Defendant Contends
There Is No Genuine Issue To Be Tried.**</u>

1.    This action was commenced by the plaintiff, Phillip Tringali ("Tringali"),
against the defendants, Paul Martin ("Martin") and Jumi Lee ("Lee"), on
December 27, 2004.  The complaint sets forth two causes of action, Count I for
alleged breach of fiduciary duty and Count II for slander.

2.    In Paragraph 44 of the Complaint, Tringali has asserted that both Martin
and Lee made false statements of a defamatory nature as follows:

> 44.    On information and belief, after resigning from
> S.E.E., Martin and Lee made false statements to
> S.E.E.'s Analytical Product distributor and certain of
> its Analytical Product sales representatives Tringali
> had improperly used corporate funds for S.E.E. for
> personal purposes, and had engaged in other financial
> improprieties with respect to the operation of S.E.E.

3.    In Paragraphs 53, 54 and 55, Tringali again asserted that Lee made false
statements to third parties:

> 53.    At various times on and after January 9, 2002,
> Martin and Lee made false statements to S.E.E.'s
> Analytical Product sales representatives that Tringali
> had improperly used corporate funds of S.E.E. for

personal purposes, and had engaged in other financial improprieties with respect to the operation of S.E.E.

54.    These statements were false, and were made with actual malice.

55.    As a result of Martin and Lee's slanderous conduct, Tringali has suffered actual economic losses, emotional distress, and damage to his reputation.

4.    Tringali further prayed for relief against Lee requesting that the Court allowed him damages, interest, costs and attorney's fees against both Martin and Lee, jointly and severally.

5.    Lee served a first set of interrogatories to Tringali requesting that Tringali state all facts and identify all documents on which he based the allegation in Paragraph 53 of the complaint that Martin and Lee made false statements to S.E.E.'s distributors and representatives.  Tringali answered those interrogatories on August 14, 2005, and in response to the interrogatories he identified only statements allegedly made by the defendant Martin, however, he failed to identify any statements made by defendant Lee to support his allegations in Paragraph 53 (Exhibit "A" hereto).

6.    Tringali's deposition was taken by Lee's counsel on September 12, 2005, at which time Tringali was questioned specifically as to the basis for the allegations against Lee regarding the claims under Count II for slander. Tringali testified that he had no personal knowledge as to any defamatory statements having been made by Lee (Tringali Depo, Exhibit "B," Pgs. 82-83).

**Certification Under L.R. 7.1**

The undersigned certifies that on September 28, 2005, he discussed the subject of this Motion with Attorney Treger, requesting Attorney Treger to dismiss Dr. Lee as a defendant, all as set forth in two confirming letters dated September 30, 2005 and October 3, 2005 (Exhibit "C" hereto), the issues could not be resolved and this Motion has been filed accordingly.

October 5, 2005                                    Attorney for defendants,


    /s/Roger S. Davis
Roger S. Davis
BBO No. 116320
DAVIS & RUBIN
One Bowdoin Square
Suite 901
Boston, MA 02114-2919
(617) 742-4300

QDI11:USDC:MOTPSJ

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-12708-MLW

PHILLIP T IINGALI
    Plai: tiff

V.

PAUL MAl TIN AND JUMI LEE
    Defɛ ndants

## PLAINTIFF'S ANSWERS TO DEFENDANT JUMI LEE'S
## FIRST SET OF INTERROGATORIES

### INTERRO ¡ATORIES

1.    State all facts and identify all documents upon which you base the allegation iɪ Paragraph 53 that "At various times on or after January 9, 2002, Martin and Lee made fɛ se statements to S.E.E.'s Analytical Product Distributor and certain of its Analytical F ʾoduct sales representatives that Tringali had improperly used corporate funds of S.F E. for personal purposes, and had engaged in other financial improprieties with respect to the operation of S.E.E."

### ANSWER ] ĮO. 1

A.  I ɪ January and February of 2002 I was told by distributors and representatives Dave Patter: ɔn, Maclyn Smith, Paul Norlander, Graham Bird and Manfred Feustal that Paul Martin ɪad called them to solicit them to sell Quantum Dynamics' analytical instrument. ˙ was informed that during these conversations, Martin told these individuals that I was in properly spending S.E.E.'s money on "my vacation home" and for other personal puɪ ɔoses.

$\overset{\backslash\backslash}{\underset{}{\Large A}}{''}$

B. I ocuments supporting this allegation are pages 25 and 26 of the long distance billing recor s for account number 617 471 0411 131, comprising two pages for the billing staten ent dated 02/04/02, obtained in the Plymouth County state civil action.

Discc ery is ongoing. Plaintiff reserves the right to supplement his answer to this interrogatory prior to trial.

2.    With respect to the allegations in Paragraph 53, state fully the contents of each such alle ged false statement, whether it was oral or written, identify the person who made each su h false statement, the date and place of such occurrence and identify all persons prese t when each such alleged false statement was made.

**ANSWER N . 2**

I do n t know the exact contents of these false statements; however, the substance thereof is set f orth in answer number 1A. These false statements were all made orally or by telephone l y Paul Martin. I believe the telephone calls were made from the billing address for ac ount number 617 471 0411 to the office telephone numbers of the sales representative and distributors named in answer number 1a, at the office addresses disclosed in pl intiff's automatic disclosure statement. I do not know if any other individuals we e present when these statements were made. I have no personal knowledge of he exact date of the statements; however, the following individuals were contacted on th e following dates:

Paul Norlande - January 21, 2002.

Manford Feust l - January 21, 2002.

Dave Patterson - January 21, 2002.

Graham Bird - anuary 21, 2002.

Maclyn Sm th - January 21, 2002.

Dis overy is ongoing. Plaintiff reserves the right to supplement his answer to this interrogatoi y prior to trial.

3.  State all facts and identify all documents upon which you base the allegation ii Paragraph 40 that "Unbeknownst to Tringali, prior to resigning from S.E.E., Martin and .ee destroyed certain of S.E.E.'s corporate records, including all paper records and ligital information regarding the specifications for the Enhanced Product, all computer cc le written for integration into the Enhanced Product, and all documentation regarding th process developed for assembling and manufacturing the Enhanced Product."

**ANSWER l O. 3:**

A.  The officers of the corporation had been discussing the need to upgrade S.E.E.'s anal /tical product since the year 2000. On February 12 and 14, 2001, the Board of Directors eld meetings off-site, at the Hyatt Newport. During these meetings, the Board of Dir ctors planned the upgrade of S.E.E.'s analytical product. The project was given the nar e Project Maximus. Project Maximus was to proceed in two stages. The first stage of 'roject Maximus would be to upgrade S.E.E.'s product to run on a windows 2000 platforn , and to have capabilities between the Nanometrics 3000 and Nanometrics 6100. The se ond stage would add additional materials handling features useful to the semiconductc manufacturing industry.

Durin; these meetings, Martin, Lee and I determined that monthly meetings would be helc to review the progress and plan the development of the enhanced product. We also deter ined that it would be necessary to hire a programmer and an applications

engineer, to set up a budget, purchase equipment and software, and obtain a library of film samples to evaluate possible software components. Paul Martin subsequently developed specifications for stage one of Project Maximus. Jumi Lee developed a budget for the Project Maximus, and compiled a list of proposed components. Software and hardware were ordered, and tests were run to evaluate possible software applications. Lee purported to attempt to hire the personnel needed to develop the new product. S.E.E.'s industrial designer was instructed to begin designing components for use with the upgraded parts. Martin made representations to the United States Army that S.E.E. was developing an analytical product that would run on a windows 2000 platform.

As of this date, however, neither I nor other S.E.E. employees have been able to find any record of work performed on Project Maximus other than those produced and entered as Exhibits in the deposition of the defendants in the Norfolk County state civil action. As of this date, no work product generated for Project Maximus has been identified. Other corporate records, including S.E.E.'s insurance binder, and records relating to corporate approval of the Maine property were discovered to be missing from the S.E.E. after Martin's and Lee's resignation.

B.      Documents supporting facts are the documents entered as exhibits 1-5 and 9-14 in Lee's deposition in the Norfolk County state civil action, and documents produced in response to defendants' request for production of documents no. 2.

Discovery is ongoing. Plaintiff reserves the right to supplement his answer to this interrogatory prior to trial.

4.      State all facts and identify all documents upon which you base the allegation in Paragraph 41 that "Within two weeks of their resignation from S.E.E.

4

Martin and Lee, as employees, managers, and sole equity owners of Quantum, began to market a product virtually identical to S.E.E.'s product except that it included the features that S.E.E. ad discussed and planned to incorporate into the Enhanced Product while Martin and Lee were directors and stockholders of S.E.E."

**ANSWER NO. 4:**

A.    Martin and Lee incorporated Quantum Dynamics before they resigned from S.E.E., Inc. By February 2002, Quantum's website advertised an integrated, computerize analytical device that competed directly with S.E.E.'s product. In February, 2002, Martin attended a conference at which he delivered a paper relating to a specific application o microphotospectroscopy as the founder of Quantum. Prior to resigning from S.E.E., nc. Martin had been scheduled to deliver an identical paper at this conference as a key employee of S.E.E., Inc. Immediately after resigning from S.E.E., Inc., Martin and/or Lee began contacting S.E.E.'s customers, distributors and vendors. Martin and Lee attempted to hire each of S.E.E.'s employees, and, on information and belief, attemp ed to retain eight (8) of S.E.E.'s domestic and overseas distributors and solicited busir ess from 29 of S.E.E.'s existing or prospective customers using S.E.E.'s confidential d tabase and sales projections. In 2002, Quantum sent letters to S.E.E.'s existing custo1 iers offering to service S.E.E. equipment, and advertising competing products. In F bruary or March, 2002, Quantum began advertising an analytic product that met the sp cifications of Phase 1 of the Maximus Project. On information and belief, in mid-2002, a ter being enjoined from using S.E.E.'s confidential information to compete again: S.E.E., Martin and Lee formed CRAIC Technologies in California in an attempt to evad the Massachusetts injunction prohibiting Quantum from doing so.

Marᵗ n and Lee had contacted S.E.E.'s distributors to sell Quantum Dynamics' products on ˙anuary 21, 2002, 12 days after resigning from S.E.E., Inc. Telephone calls were made t ᵗ the following customers and prospective customers of S.E.E by the end of January, 20C ²

| | |
|---|---|
| Onondaga C ᵗunty Department of Criminal Investigation | 1/10/02 |
| Mary Eng, N Y City Police Department Lab | 1/29/02 |
| Broward Coᵗ nty Medical Examiner's Office | 1/29/02 |
| MS, Westchᵗ ster County Forensic Lab | 1/29/02 |
| US Army Cr ˙ninal Investigation Laboratory | 1/29/02 |
| Bureau of Al ᵗohol, Tobacco, and Firearms Forensic Science Lab | 1/29/02 |
| Illinois State ᵗolice | 1/29/02 |
| Lake County Regional Forensic Lab | 1/29/02 |
| Contra Costa ᵗounty Sheriff's Department Criminalistics Lab | 1/29/02 |
| California Deᵗartment of Justice | 1/30/02 |
| US Secret Seᵗ vice Forensic Services Division | 1/30/02 |
| Federal Bureᵗ ᵗ of Investigation | 1/30/02 |
| Georgia Instit ᵗte of Technology | 1/30/02 |
| Sacramento C ᵗunty Crime Lab | 1/30/02 |
| Mansfield Oh ᵗ Police Department | 1/30/02 |
| Los Angeles ( ounty Sheriff's Office | 1/30/02 |
| Colorado Burᵗ au of Investigation | 1/31/02 |

B.    D Documents supporting this allegation are the long distance billing records for acᵗ ᵗunt number 617 471 0411 131 obtained in the Plymouth County state

civil action.    Discovery is ongoing.  Plaintiff reserves the right to supplement his

answer to th s interrogatory prior to trial.

      5.    State all facts and identify all documents upon which you base the

allegation in Paragraph 42 that "After Martin and Lee resigned, but while they were still

stockholders of S.E.E., Quantum marketed its product by contacting S.E.E.'s existing

customers, r presentatives and distributors to offer them products and services in direct

competition vith S.E.E."

**ANSWER I O. 5**

      A.    See answers to interrogatories 1, 3, 4, and 5.  Several of S.E.E.'s sales

representativ es and distributors reported when Paul Martin contacted them about leaving

S.E.E. for Q antum, he had stated that because he and Lee had left S.E.E., S.E.E. had no

staff availab e to sell or market products. Quantum Dynamic's website contained

references tc offering support and upgrades on S.E.E.'s products.  Quantum solicited

S.E.E.'s cust )mers by direct mail.

      B.    Documents supporting this allegation are:

      See a iswers to interrogatories 1, 3,  4 and 5.  In addition:

      (a)    Documents, drawings, test results, specifications, designs, and source code

with docume itation relating to the development, the specifications, the identity of

component p rts, and the testing of S.E.E. microspetrophotometers, currently located, if

at all, in a stc rage facility in Halifax, Massachusetts in paper form and on the hard drives

of approxima tely 30 computers formerly used by S.E.E. to manufacture, test and market

microspectrc )hotometers.

(b)     The contents of S.E.E.'s ACT database containing all histories of contacts with S.E.E. customers, distributors, vendors, suppliers and S.E.E. personnel, currently stored on a 1ard drive on a computer in the possession of the U.S. Bankruptcy Trustee.

(c)     Documents relating to the design, development, marketing and sales of QDI produc s, currently in the possession, custody or control of defendants as officers and/or mana gers of QDI and CRAIC, Inc., and the subject of a court order issued by the Plymouth S perior Court preliminary injunction requiring their preservation.

(d)     Quantum Dynamics' Web Site contents, previously produced

(e)     Quantum Dynamics' direct mail material, previously produced.

Disc very is ongoing. Plaintiff reserves the right to supplement his answer to this interrogatory prior to trial.

6.     State all facts and identify all documents upon which you base the allegation in 'aragraph 43 that "On information and belief Martin sold Quantum's product to cu tomers that Martin had solicited while he was being paid by S.E.E. to market S.E.E 's Enhanced Product."

**ANSWER N ). 6:**

A.     See answers to interrogatories 3 through 5.

In add tion, in September of 2001 while Martin and Lee were installing a new S.E.E. system in New Zealand, they had discussions with S.E.E.'s Australian distributor regarding dev loping a new low cost system. Martin and Lee were working on a classified proj ct to adapt S.E.E.'s analytical instrument to detect counterfeit currency. According to 'uantum Dynamics and/or Craic's website, Martin and Lee have patented a system to dete t counterfeit currency. In early November, 2001, Martin and Lee

8

attended a conference in Boston during which they entertained S.E.E. customers from the Georgia In titute of Technology on S.E.E.'s expense account. S.E.E. had sold an analytical evice to the Georgia Institute of Technology at a discount with the understand ng that scientists from the Georgia Institute of Technology would present papers usin ; S.E.E.'s analytical instruments, providing S.E.E. with exposure and acknowledg ment. In April, 2002, Martin and Lee, as representatives of Quantum, presented a )aper jointly with the scientists from the Georgia Institute of Technology in Australia at a conference on polymers. Martin and Lee were working to adapt S.E.E.'s instruments or use in the field polymers and conducting polymers in the year 2001, before they i esigned from S.E.E.

B.       See answers to interrogatories 3 through 5. Additional documents include print-outs of Vick Weber's email of March, 2002, previously produced.

Discc /ery is ongoing. Plaintiff reserves the right to supplement his answer to this interrogatory prior to trial.

7.       State all facts and identify all documents upon which you base the allegation in 1 aragraph 44 that "On information and belief, after resigning from S.E.E., Martin and Le e made false statements to S.E.E.'s Analytical Product distributor and certain of its / nalytical Product sales representatives Tringali had improperly used corporate func ; of S.E.E. for personal purposes, and had engaged in other financial improprieties v ith respect to the operation of S.E.E."

**ANSWER NC . 7:**

A. and B.

See nswer to interrogatory number 1.  Discovery is ongoing.  Plaintiff reserves the right to supplement his answer to this interrogatory prior to trial.

8.      State all facts and identify all documents upon which you base the allegation in Paragraph 49(b) that Martin and Lee breached their fiduciary duties by "Conspiring o compete with S.E.E. by expropriating S.E.E.'s confidential information, including but not limited to the specifications and work product for S.E.E.'s Enhanced Product, and S.E.E.'s database of customers and customer service and purchase histories, sales represen tatives and service agents."

**ANSWER N ). 8:**

A. and B.

See an swer to interrogatory numbers 1 through 7 and answers to Paul Martin's interrogatorie number 5 through 10.  Discovery is ongoing.  Plaintiff reserves the right to supplement hi answer to this interrogatory prior to trial.

9.      State all facts and identify all documents upon which you base the allegation in P ragraph 49(c) that Martin and Lee breached their fiduciary duties by "Converting al of S.E.E.'s confidential and proprietary information, and some or all of S.E.E.'s invente ry of Analytical Product components."

**ANSWER NO 9:**

A. and B.

See ans /er to interrogatory number 8.  Discovery is ongoing.  Plaintiff reserves the right to supp lement his answer to this interrogatory prior to trial.

10.     S ate all facts and identify all documents upon which you base the allegation in Pai igraph 49(g) that Martin and Lee breached their fiduciary duties by

"Destroying S.E.E.'s corporate records in order to inhibit S.E.E.'s continued operation in the event of their departure from S.E.E."

**ANSWER NO. 10:**

A. and B.

See answer to interrogatory number 3. Discovery is ongoing. Plaintiff reserves the right to supplement his answer to this interrogatory prior to trial.

11.    State all facts and identify all documents upon which you base the allegation in Paragraph 49(d) that Martin and Lee breached their fiduciary duties by "Selling to S.E.E.'s customers a product that they had developed for S.E.E. while they were employed by S.E.E. to do so."

**ANSWER NO. 11:**

A. and B.

See answer to interrogatory numbers 3, 4, 5 and 6 and answers to Paul Martin's interrogatories number 6 through 8. Discovery is ongoing. Plaintiff reserves the right to supplement his answer to this interrogatory prior to trial.

12.    State all facts and identify all documents upon which you base the allegation in Paragraph 49(e) that Martin and Lee breached their fiduciary duties by "Exploiting economic relationships and sales opportunities, and other corporate opportunities that they had developed for S.E.E. while they were employed by S.E.E. to do so."

**ANSWER NO. 2:**

A. and B.

11

See answer to interrogatory numbers 3 through 11. Discovery is ongoing. Plaintiff reserves the right to supplement his answer to this interrogatory prior to trial.

13.    State all facts and identify all documents upon which you base the allegation in Paragraph 49(f) that Martin and Lee breached their fiduciary duties by "Purposefully failing to perform their duties as employees of S.E.E., most importantly their responsibility to hire additional software developer and Application Engineer to insure the continuity of operation of the S.E.E. for the purpose of inhibiting S.E.E.'s continued operation in the event of their departure from S.E.E."

**ANSWER NO. 13**

A.    See answer to interrogatory number 3.

In addition, Martin and Lee identified the need to hire a new software developer and applications engineer in February of 2001 at the latest. Despite the fact that this was a year of high unemployment in the high tech sector, and that S.E.E. received hundreds of resumes from many qualified candidates, only one offer was extended, to a doctoral graduate of the Georgia Institute of Technology, whose area of expertise was more likely in genetics, and did not fit S.E.E.'s needs.

Soon after Martin and Lee resigned from S.E.E., I contacted one of the candidates Martin had been speaking to. This candidate, Sarah Walbridge, had a background in forensic science and was receiving her master degree from Michigan State. Michigan State has purchased one of S.E.E.'s analytical instruments, and I believe she did her graduate work on an S.E.E. 2100. She initially seemed very interested in the opportunity at S.E.E., Inc. I soon heard from an industry source, I do not recall who, that Martin had

approache l her about working for Quantum. Soon thereafter, she became uninterested in

S.E.E., Inc

B. See Answer to interrogatory numbers 1 and 3.

Dis covery is ongoing. Plaintiff reserves the right to supplement his answer to this

interrogate y prior to trial.

Sig ied under the pains and penalties of perjury this ___ day of August, 2005.

Phillip Tringali

AS TO OB ECTIONS:

Daniel Tre¡ er, Esq.
B.B.O. #56 147
Phillips & ngley
One Bowd in Square
Boston, M/ 02114
Tel. No.: (6 7) 367-8787

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document
was served upon the attorney of record for each other
party by (hand) (mail) on

13

1

 1                                    Volume:  I

 2                                    Pages:  1 to 274

 3                                    Exhibits:  1 to 4

 4              UNITED STATES DISTRICT COURT

 5          FOR THE DISTRICT OF MASSACHUSETTS

 6            CIVIL ACTION NO. 04-12708-MLW

 7     - -------------------------------

 8    PHILLIP TRINGALI,                )

 9                   Plaintiff,        )

10    vs.                              )

11    PAUL MARTIN AND JUMI LEE,        )

12                   Defendants.       )

13     - -------------------------------

14

15            DEPOSITION OF PHILLIP TRINGALI

16              Monday, September 12, 2005

17                   10:04 a.m.

18                       at

19                  Davis & Rubin

20          One Bowdoin Square, Suite 901

21               Boston, MA  02114

22

23          Reporter:  Kathryn L. Santo

24

"B"

Phillip Tringali

82

1      A.   I don't recall exactly.

2      Q.   All right.  Did Mr. Smith ever reduce

3  that to any kind of a written statement?

4      A.   Not that I'm aware of.

5      Q.   When was the last time you spoke to

6  Mr. Smith about this subject matter?

7      A.   I don't recall.

8      Q.   I'm sorry?

9      A.   I don't recall.

10     Q.   All right.  Did he say anything

11 concerning any statements made by Dr. Lee?

12     A.   I don't recall.

13     Q.   Of the people that you named -- there are

14 seven people -- Patterson, Smith, Bird, Feustel,

15 Weber, Norlander, and Hirche, if I now pronounced

16 that correctly.  Which of them claimed that

17 statements were made to them by Dr. Lee?

18     A.   I don't recall by Dr. Lee.

19     Q.   Do you have any information that Dr. Lee

20 made any statements that you say were false

21 concerning either S.E.E. or you to any of sales

22 representatives or any distributors?

23     A.   I don't know specific, no.

24     Q.   Do you have any information?

83

1          A.   Other than the conversations back to me

2     a)out Paul discussion with --

3          Q.   Just -- we're talking about -- I'm

4     tilking about Dr. Lee for the moment.

5               Is it a fair statement that you have no

6     iiformation that Dr. Lee made any of these

7     allegedly false statements to any person?

8          A.   First-hand knowledge, there may have

9     bien.  I don't know.  I know there were contacted

10    b' QDI.

11         Q.   I'm sorry?

12         A.   They were contacted by QDI.  It may have

13    bien Paul specifically or Jumi.

14         Q.   Well, I'm specifically asking you

15    concerning Paragraph 53 of the complaint.

16         A.   Yes.

17         Q.   When you say that Martin and Lee made

18    filse statements, I'm asking you what false

19    s:atements were made by Dr. Lee and to who?

20         A.   I believe there were comments made to the

21    r:presentatives by her also.  I don't have

22    s)ecifics.

23         Q.   Okay.  You've indicated that there were

24    n) comments made to -- by Dr. Lee to Mr. Patterson

## DAVIS & RUBIN

ATTORNEYS AT LAW

ROGER S. DAVIS
JOEL S. RUBIN (1948-19 1)

ONE BOWDOIN SQUARE
SUITE 901
BOSTON, MASSACHUSETTS 02114-2919
(617) 742-4300
FACSIMILE (617) 742-4304

**VIA FACSIMILE**
**617-227-899 Z**

September 30, 2005

Daniel Treger Esq.
PHILLIPS & ANGLEY
One Bowdoin Square
Boston, MA 02114

Re:     Phillip Tringali
Vs:     Paul Martin, et al
No:     04-127 )8

Dear Mr. Treger:

This is to confirm our telephone discussion of September 28, 2005 at which time I requested that you dismiss Ms. Lee as to Count II. Your client testified at his deposition that he had no knowledge of any slanderous statements made by Ms. Lee.

Very truly yours,

Roger S. Davis

RSD:cat

DAVIS & RUBIN

ATTORNEYS AT LAW

ROGER S. DAVIS
JOEL S. RUBIN (1948-1991)

ONE BOWDOIN SQUARE
SUITE 901
BOSTON, MASSACHUSETTS 02114-2919
(617) 742-4300
FACSIMILE (617) 742-4304

**VIA FACSIMILE**
**617-227-8992**

October 3, 2005



Daniel Treger, Esq.
PHILLIPS & ANGLEY
One Bowdoin Square
Boston, MA 02114

Re:    Phillip Tringali
Vs:    Paul Martin, et al
No:    04-12708

Dear Mr. Treger:

This is to confirm our discussion of last Wednesday regarding the deposition of Mr. Tringali. He testified at Pages 82 through 84 that he had no knowledge of any slanderous statements made by Dr. Lee, contrary to the allegations in the complaint. Since I see no reason why she was named as a defendant as to Count II, I have requested that you dismiss her forthwith as to Count II.

Very truly yours,

Roger S. Davis

RSD:cat

QDI11:USDC:DTFAX