UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 04-12708-MLW

| | |
|---|---|
| PHILLIP TRINGALI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| PAUL MARTIN AND | ) |
| JUMI LEE, | ) |
| | ) |
| Defendants | ) |

**DEFENDANT PHILLIP TRINGALI'S MOTION TO COMPEL
ANSWERS TO INTERROGATORIES AND PRODUCTION OF DOCUMENTS**

Now comes the defendant Phillip Tringali and hereby moves this honorable court to compel defendant Paul Martin to answer interrogatories and produce documents.

## INTRODUCTION

On September 15, 2005, plaintiff Phillip Tringali ("Tringali") served interrogatories and requests for production of documents upon defendant Paul Martin ("Martin"). As predicted, defendants have used confidentiality as an excuse to evade discovery. Martin refused to answer interrogatories 1, 4, 5, 6 and 7 and to respond to requests for production 1, 2, 3, 4, 6, 8, 9, 11, 12, 13, 14, 16, 18, 19, 20 and 22 based upon a blanket claim that the discovery requires the disclosure of confidential information.

## BACKGROUND

Plaintiff Phillip Tringali is the founder and principal shareholder of S.E.E., Inc., ("S.E.E.") a closely held Massachusetts corporation. From 1988 through 1996, S.E.E. sold scientific and analytical instruments as a manufacturer's representative, including instruments manufactured by

1

Nanometrics, Inc. Among Nanometrics' products was a microspectrophotometer designed for the forensics market. This instrument performed non-destructive spectrographic analysis of trace evidence by measuring the spectra of light passing through, or reflecting from it. In 1996, Nanometrics abandoned this market and terminated its forensics staff, including defendant Martin. Tringali decided to fill this market nitch. S.E.E. hired Martin, and later his wife, Jumi Lee, and commenced to design, manufacture and market its own microspectrophotometers for the forensics market. Martin and Lee were primarily responsible for the microspectrophotometer enterprise, while Tringali continued the sales business, which funded the microspectrophotometer business. S.E.E. successfully manufactured and sold microspectrophotometers until December, 2001. Martin and Lee became 20% stockholders, officers, and directors of S.E.E.

On January 9, 2002, Martin and Lee resigned from S.E.E. Within two weeks of their resignation, Martin and Lee were contacting S.E.E.'s customers, suppliers, vendors, sales representatives and employees, soliciting business for Quantum Dynamics International ("QDI") which they had incorporated in December 2001. Within one month of Martin's and Lee's resignation, while they still owned 20% of S.E.E.'s stock, QDI was marketing microspectrophotometers practically identical to S.E.E.'s products to S.E.E.'s customers, and to prospective customers Martin had cultivated while employed by S.E.E.

Within four months of Martin's and Lee's departure, QDI was marketing a new microspectrophotometer with enhanced features. S.E.E. had been developing a product with substantially similar enhancements since February, 2001. Martin and Lee were primarily responsible for developing the new product. After their departure, S.E.E.'s remaining employees could find no work product reflecting the development of the enhanced product.

In March of 2002, S.E.E. filed an action against QDI, Martin and Lee in Plymouth County

2

Superior Court seeking, among other things, to enjoin them from using S.E.E.'s confidential and proprietary customer information. On March 18, 2002, such an injunction issued. See Exhibit "1". By June, 2002, Martin and Lee moved to California, and organized CRAIC, LLC, which marketed "QDI" microspectrophotometers.

By March 22, 2004, S.E.E. had been driven into Chapter 7 bankruptcy. On August 1 2005, Martin and Lee and S.E.E.'s trustee in bankruptcy settled all of S.E.E.'s Massachusetts state court claims against Martin and Lee for $5,000.00. See Exhibit "1" to Docket No. 20. Tringali continues only his original business of representing analytical instrument manufacturers.

In this action, Tringali alleges that Martin and Lee breached their fiduciary duty owed to him as a fellow shareholder in a closely-held Massachusetts corporation by commencing a scheme to compete with S.E.E. by appropriating its confidential and proprietary customer data, its technology, its research and development, its corporate opportunities, and even items from its inventory of electronic components. Tringali alleges that Martin and Lee commenced this scheme before they resigned from S.E.E., while they were officers and directors as well as shareholders of S.E.E.

## ARGUMENT

There is no absolute privilege for trade secrets or other confidential information. ITT Electro-Optical Products Division of ITT Corporation v. Electronic Technology Corporation, 161 F.R.D. 228, 231 (D.Mass 1995); Fed.R.Civ.P. 26(1)(7). The party resisting discovery must establish that the discovery seeks trade secrets, and then demonstrate that disclosure will cause competitive harm. Id. The discovering party must then show that the information sought is relevant and necessary to its case. Id. If relevancy and necessity are shown, the trade secrets should be disclosed, subject to whatever safeguards the Court, in its discretion, deems

appropriate.  Id.

## I.    MARTIN AND LEE HAVE FAILED TO SHOW THEY ARE ENTITLED TO A PROTECTIVE ORDER

Fed.R.Civ.P. 26(c) requires the party resisting discovery to establish good cause for a protective order by demonstrating a factual basis for potential harm.  Ares-Serono, Inc. v. Organon International, 151 F.R.D. 215, 219 (D.Mass. 1993).   Martin and Lee have not even bothered to try.  Weeks after serving discovery responses representing that he promised a motion for a protective order, Martin has filed nothing.[1]  His inaction is indicative of defendants' true motives in refusing to respond to discovery; to force plaintiff to incur unnecessary legal fees at every stage of this litigation.

## II.    DISCLOSURE OF TRADE SECRETS ARE NECESSARY TO PLAINTIFF'S CASE, AND WILL NOT HARM DEFENDANTS

Plaintiff does not dispute that its discovery may require disclosure of confidential and proprietary information.  This disclosure, however, is necessary to his case, and will not harm defendants.

## A.    DISCLOSURE IS NECESSARY TO PLAINTIFF'S CASE

---

[1] Martin's fourth "general objection" states:
Martin and Tringali are competitors in the microspectrophotometer business. There is no noncompetition agreement existing between these parties, and to the extent that any Request seeks the production of secret or other confidential research, development or commercial information of Martin, CRAIC Technologies, LLC ("CRAIC") or Quantum Dynamics International, LLC ("Quantum"), which would otherwise harm Martin by placing him at a commercial disadvantage, Martin objects to such Request. Further, Martin should not be required to produce trade secrets or other confidential research, development or commercial information until such time as the Court has ruled upon a motion for protective order, which will be filed with the Court.

Martin also stated his intention to seek a protective order in each individual objection.

### *Customer Information*

Interrogatory No. 1

Identify each communication between you and any customer of S.E.E., Inc. that occurred between January 9, 2002 and March 22, 2004.

Objection

Certain customers of S.E.E. have become customers of Quantum or CRAIC. I was not subject to any noncompetition agreement with S.E.E. at the time I terminated employment on January 9, 2002 and therefore, I was free to compete with S.E.E. Any such communications constitute trade secrets or other confidential research, development or commercial information of Quantum and/or CRAIC and are the subject of a motion for protective order to be filed with the Court.

Interrogatory No. 2

Identify each communication between you and any prospective customer of S.E.E. that occurred between January 9, 2002 and March 22, 2004.

Objection

Certain prospective customers of S.E.E. have become customers of Quantum or CRAIC. I was not subject to any noncom petition agreement with S.E.E. at the time I terminated employment on January 9, 2002 and therefore, I was free to compete with S.E.E. Any such communications constitute trade secrets or other confidential research, development or commercial information of Quantum and/or CRAIC and are the subject of a motion for protective order to be filed with the Court.

Interrogatory No. 5

Identify all persons with whom Quantum and CRAIC have transacted business during the period between January 9, 2002 and March 22, 2004 relative to the purchase, sale, leasing, rental or other transfer of any manner of analytical instrument.

Objection

This interrogatory is vague and ambiguous as the term "analytical instrument" is not defined, and I am unable to answer the interrogatory as worded. Furthermore, the identities of Quantum and CRAIC's customers constitute trade secrets or other confidential research, development or commercial information and are the subject of a motion for protective order to be filed with the Court. Further objecting, this interrogatory seeks information which is not relevant or material to the subject

matter of this action.

Request No. 1

All documents concerning communications between Quantum and customers or prospective customers of S.E.E. during the years from January 9, 2002 through March 22, 2004 including, but not limited to, any computerized data base used to track customer contacts, such as ACT.

Objection

The documents requested contain trade secrets or other confidential research, development or commercial information of Quantum, which are the subject of a motion for protective order to be filed with the Court. Certain customers or prospective customers of S.E.E. have become customers of Quantum and therefore communications with those customers contain trade secrets or other confidential research, development or commercial information.

Request No. 2

All documents concerning communications between CRAIC and customers or prospective customers of S.E.E. from January 9, 2004 through March 22, 2004, but not limited to, any computerized data base used to track customer contacts, such as ACT.

Objection

The documents requested contain trade secrets or other confidential research, development or commercial information of CRAIC, which are the subject of the motion for protective order to be filed with the Court. Certain customers or prospective customers of S.E.E. have become customers of CRAIC and therefore communications with those customers contain trade secrets or other confidential research, development or commercial information.

Request No. 9

All itemized telephone bills for telephone numbers used by the defendants while engaged in activities related to designing, developing, manufacturing, and/or marketing of Quantum and CRAIC products between January 9, 2002 through March 22, 2004, including telephone numbers listed in the names of Quantum and CRAIC.

Objection

The telephone records of Quantum and CRAIC would disclose the identities of their respective customers, which constitute trade secrets or other confidential

research, development or commercial information and are the subject of a motion
for protective order to be filed with the Court.

Request No. 12

All documents concerning sales of products developed by Quantum and/or CRAIC
from January 9, 2002 through March 22, 2004.

Objection

The documents requested contain trade secrets or other confidential research,
development or commercial information and are the subject of a motion for
protective order to be filed with the Court.

The extent of QDI's and CRAIC's contacts with S.E.E.'s existing and potential

customers, and the identities of those to whom QDI and CRAIC sold competing products are

relevant to this matter.   Tringali alleges that Martin and Lee took all of S.E.E.'s confidential

customer information.  Telephone bills produced in the Plymouth County action revealed that on

January 21, 2002, Martin and Lee began calling and faxing S.E.E.'s current and prospective

customers.  S.E.E.'s prospective customers were prospects listed on a sales forecast Martin

generated prior to his resignation.  This forecast included the probability that the customer would

purchase, the status of funding for the purchase, specific contacts for each prospective customer,

and the dates upon which the prospective customer was likely to place an order and book the sale.

Martin developed this forecast from information contained in a database created using a

software application called ACT.  S.E.E.'s ACT database contained the sum total of S.E.E.'s

customer information, including the identity of all individual contracts within customer

organizations, all details of a customers specific needs, and a narrative history of all customer

contracts.  Tringali observed Martin copy this database to his personal laptop computer in

December of 2001.  These facts, and Martin's and Lee's ability to place calls and send faxes to

internal telephone and fax numbers within eleven days of leaving S.E.E. form the basis of

7

Tringali's allegations regarding S.E.E.'s customer information. To prove his case, Tringali must

be able to compare S.E.E.'s customer records, including the ACT database, with records of

Martin's and Lee's contacts with S.E.E. customers, and records of QDI's and CRAIC's customer

contact and sales histories. This should not come as a surprise to Martin and Lee. They were

ordered to preserve a portion of these records by the Plymouth Superior Court injunction, an

order that still stands despite the settlement of S.E.E claims.[2] Exhibit "1".

Request No. 11

All documents of, concerning or relating to upgrades of S.E.E. instruments, repairs or service performed on S.E.E. instruments by Quantum and/or CRAIC from January 9, 2002 through March 22, 2004.

Objection

To the extent that any upgrades or repairs or services were performed for customers who previously purchased S.E.E. instruments, the identity of those customers and the documents relating thereto constitute trade secrets and other confidential research, development or commercial information, which are the subject of a motion for protective order to be filed with the Court.

Request No. 20

All documents concerning any training performed by defendants for users of S.E.E. instruments after January 9, 2002

Objection

The documents requested contain trade secrets or other confidential research, development or commercial information which are the subject of a , motion for protective order to be filed with the Court. Notwithstanding, Martin further objects to produce any documents after March 22, 2004.

QDI's and CRAIC's website also advertised service and upgrades of S.E.E. products, and

training for S.E.E. products. Information regarding the sale of these services is relevant not only

_____

[2]Neither Martin, Lee, Quantum Dynamics, nor the trustee have filed a notice of dismissal.

to whether Martin and Lee converted S.E.E's customer information, but also to whether they took confidential technology and information necessary to allow them to service and upgrade S.E.E.'s products.  Martin's objection to these requests is absurd.  These services would logically appeal only to *S.E.E.* customers, to service *S.E.E.* products, information regarding which Tringali obviously already possesses.

### *Product Information*

Interrogatory No. 4

Identify each communication between you and any supplier of parts or services to S.E.E. that occurred between January 9, 2002 and March 22, 2004.

Objection

See answer to Interrogatory No. 1, and further answering, certain suppliers of parts or services to S.E.E. have become suppliers of Quantum and CRAIC and communication between Quantum and/or CRAIC and such suppliers constitute trade secrets or other confidential research, development or commercial information which is the subject of a motion for protective order to be filed with the Court. Further objecting, this interrogatory seeks information which is not relevant or material to the subject matter of this action.

Interrogatory No. 6

Identify each person with discoverable knowledge of the development and specifications of the all products developed by CRAIC and/or Quantum between January 9, 2002 and March 22, 2004.

Objection

Persons with discoverable knowledge of the development or specifications of the CRAIC or Quantum products would involve disclosure of its customers, employees, consultants and representatives all of which constitute trade secrets or other confidential research, development or commercial information of CRAIC and/or Quantum, which are the subject of a motion for protective order to be filed with the Court.

Request No. 3

All documents concerning the product specifications of all products developed by Quantum and/or CRAIC between January 9, 2002 and March 22, 2004.

Response

Martin will produce the documents requested to the extent that they do not
constitute trade secrets or other confidential research, development or commercial
information. These are the same documents which are the subject of Request No.
10. Otherwise, he objects to all other documents containing product specifications
for Quantum or CRAIC on the grounds that such documents contain trade secrets
or other confidential research, development or commercial information and are the
subject of a motion for protective order to be filed with the Court.

Request No. 4

All source code written for, or commissioned for use in the analytical device
developed between January 9, 2002 and March 22, 2004 including but not limited
to any source code for any graphic user interface, and for adaptation to the
Windows 2000 operating system.

Objection

The term "analytical device" is not defined and therefore, Martin objects to this
Request on the grounds that the wording is vague and ambiguous.
Notwithstanding, if this Request refers to products developed by CRAIC and/or
Quantum, then such documents contain trade secrets or other confidential
research, development or commercial information which are the subject of a
motion for protective order to be filed with the Court.

Request No. 19

All documents concerning the development of the following software packages
marketed for use with the Mach 1 and Mach 10:
    a.  Absolute Reflectance Package.

Objection

The documents requested contain trade secrets or other confidential research,
development or commercial information which are the subject of a motion for
protective order to be filed with the Court.

The designs and specifications of QDI microspectrophotometers and accessories are

relevant and necessary to Tringali's case.  S.E.E. microspectrophotometers used proprietary

components including a graphic user-interface software written by S.E.E. employees, adaptations

to applications software provided with S.E.E. microspectrophotometers, as well as optical

10

components, modified microscope stages, light sources, tamper-proof casing, and fiber optic

components designed for S.E.E. by outside vendors.  The enhanced product that Martin and Lee

were developing during their last year at S.E.E. should have included new designs for optics,

stages, and other physical components, as well as new software code to adapt the existing S.E.E.

system for use with Microsoft Windows 2000.  Exhibit "2", Martin Depo. p. 87, and Exhibit 6

thereto.[3]  In addition, developing the enhanced product would have required various testing

protocols to properly calibrate the new instrument.

      During his deposition in another related State Court matter in Norfolk County Superior

Court, Martin estimated that it took S.E.E. one year to develop its most sophisticated

microspectrophotometers.  Exhibit "2", Martin Depo., p. 82-83.  Martin also testified that S.E.E.

completed no significant development work on its enhanced microspectrophotometer during

2001, and denied S.E.E. had planned intended to upgrade its product to run on Microsoft

Windows 2000.  Exhibit "2", Martin Depo., pp.  102-103; 154-155.   Nevertheless, Martin and

Lee were demonstrating QDI's first product at a trade show approximately five weeks after

leaving S.E.E., Inc., and introduced QDI's "Mach 10" microspectrophotometer approximately

four months after leaving S.E.E., Inc.  The "Mach 10" met many of the specifications of S.E.E.'s

planned enhanced product, including the use of Windows 2000.  Tringali is entitled to discover

the specifications, designs and software source code of QDI and/or CRAIC products to determine

whether they incorporate S.E.E.'s technology, and whether they were the product of research and

development Martin and Lee performed during 2001 while still employed by S.E.E.   See, e.g.,

ITT Electro-Optical Products Division of ITT Corporation v. Electronic Technology

---

[3]The date on this memo reflects the date it was harvested from S.E.E. computers, not the
date it was drafted and circulated.

Corporation, 161 F.R.D. 228, 232 (D.Mass. 1995)(product design information discoverable to allow product comparison that might reveal misappropriation of trade secrets).

Interrogatory No. 7

Identify each vendor of component parts, software or services related to the design, assembly and manufacture of the all products developed by CRAIC and/or Quantum between January 9, 2002 and March 22, 2004.

Objection

Identification of vendors or parts, software or services constitute trade secrets or other confidential research, development or commercial information which is the subject of a motion for protective order to be filed with the Court.

Request No. 6

All documents concerning vendors who supplied software, hardware, optical, electrical or other components, and design or other services related to the development of the Quantum and/or CRAIC products between January 9, 2002 and March 22, 200 including but not limited to all communications therewith.

Objection

The identities of the vendors of Quantum and CRAIC and communications with such vendors contain trade secrets or other confidential research, development or commercial information, which are the subject of a motion for protective order to be filed with the Court.

Request No. 8

All documents concerning communications between the defendants and any of S.E.E., Inc.'s distributors or sales representatives dating from after January 9, 2002.

Objection and Response

Martin objects to producing any documents after March 22, 2004, consistent with the other Requests which limit the period to March 22, 2004, notwithstanding, he will produce only such documents that do not contain trade secrets or other confidential research, development or commercial information.

Request No. 18

All documents concerning communications between the defendants and Dynamic

Light Control, LLC dating from and after January 9, 2002.

Objection

The documents requested contain trade secrets or other confidential research, development or commercial information which are the subject of a motion for protective order to be filed with the Court. Notwithstanding, Martin further objects to produce any documents after March 22, 2004

Discovering the nature and extent of QDI's and CRAIC's contacts with vendors and suppliers is necessary and relevant to Tringali's action. Vendors who supplied components for S.E.E. products were all required to execute confidentiality agreements. Exhibit "2", Martin Depo., p. 96-97. Martin has conceded that a supplier's design and specification information constitutes trade secrets by swearing to his objections under oath. Yet, he also admits that some S.E.E. vendors became QDI's and CRAIC's vendors. Tringali is entitled to discover whether Martin and Lee used S.E.E.'s vendors to obtain S.E.E.'s confidential information, as well as to compare the design of QDI's and CRAIC's component parts to S.E.E.'s. ITT Electro-Optical Products Division of ITT Corporation v. Electronic Technology Corporation, 161 F.R.D. 228, 232 (D.Mass 1995) (supplier information discoverable to reveal extent of defendant's discussion of plaintiff's confidential information with a supplier). The same applies to communications with S.E.E.'s distributors and sales representatives, from whom S.E.E. also required confidentiality agreements.

### *Miscellaneous*

Request No. 13

All documents concerning parts purchased for the first prototypes of the Mach 1 and/or the Mach 10, as identified in Exhibit "A".

Objection

The documents requested contain trade secrets or other confidential research, development or commercial information and are the subject of a motion for

protective order to be filed with the Court.

In early December, 2001, S.E.E. employee Demetra Hixson observed Martin and Lee remove component parts from S.E.E.'s facility, including an integrated circuit board. After Martins' and Lee's departure, S.E.E.'s inventory records reflected inconsistencies regarding a $20,000.00 integrated circuit board. Though S.E.E.'s records now reflect that the order was cancelled and a $20,000.00 check was voided, the number of the purportedly voided check was in fact negotiated, by a completely different vendor. Jumi Lee managed S.E.E.'s inventory. The records of parts purchased for QDI's and CRAIC's first prototypes will reveal whether they contained parts stolen from S.E.E.'s inventory.

Request No. 14

All documents, including employment contracts, concerning, in whole in or in part, any policy of confidentiality maintained by Quantum and/or CRAIC.

Response

Martin will produce such documents which do not contain trade secrets or other confidential research, development or commercial information.

S.E.E.'s employees were all required to sign contracts containing confidentiality agreements. Exhibit "2", Martin Depo., pp. 62-63. Martin and Lee, however, never did so. Whether Martin and Lee implemented a similar policy and QDI and CRAIC is relevant to whether they knew that S.E.E.'s product and customer information was confidential, and to whether they breached their fiduciary duty to Tringali when, as officers, directors and shareholders of S.E.E., Inc., they exempted themselves (two key employees) from their own confidentiality requirement. Tringali is entitled to discover this information without the qualification Martin has placed upon his response.

Request No. 16

14

All documents concerning communications between the defendants and Sarah Walbridge dating from after January 9, 2002.

Response

If any documents exist which to not constitute trade secrets or other confidential research, development or commercial information of Quantum or CRAIC, they will be produced.

After Martin and Lee left S.E.E., Tringali attempted to hire Walbridge for S.E.E.'s microspectrophotometer business, until she suddenly ceased contact with S.E.E., apparently after Martin contacted her. Neither QDI nor CRAIC hired Walbridge, however. S.E.E. is entitled to discover whether Martin's communications contained any confidential or defamatory statements, without qualification.

Request No. 17

All documents concerning communications between the defendants and Georgia Institute of Technology, its agents or employees dating from after January 9, 2002.

Objection

The documents requested contain trade secrets or other confidential research, development or commercial information which are the subject of a motion for protective order to be filed with the Court. Notwithstanding, Martin further objects to produce any documents after March 22, 2004.

S.E.E. sold Georgia Institute of Technology a microspectrophotometer at a steep discount on the condition that G.I.T. would publicize its use of the instrument when publishing and presenting research and data obtained using the instrument. Before Martin left S.E.E., he was to present one such collaborative project at a forensics conference in February 2002. Martin presented this paper instead as a representative of QDI, in conjunction with QDI's rollout of its first product. Tringali has the right to investigate whether Martin's and Lee's bad-faith conduct including converting S.E.E.'s contract rights and corporate opportunities relating to its agreement with G.I.T.

15

    <u>Request No. 22</u>

All documents reflecting the income and expenses of Quantum and/or CRAIC
from January 7, 2002 through March 22, 2004.

    <u>Objection</u>

The documents requested contain trade secrets or other confidential research,
development or commercial information which are the subject of a motion for
protective order to be filed with the Court. Further, the documents reflecting the
income and expenses of Quantum of CRAIC are irrelevant and immaterial and not
calculated to lead to any relevant or material information.

The information sought in Request No. 22 is necessary and relevant.  QDI's income and

expenses will reveal whether and when QDI and CRAIC generated revenues using S.E.E.'s

customer information, as well as whether either entity expended funds necessary to develop their

own products, or relied on technology stolen from S.E.E.

This information is also relevant to defendants' credibility, and the nature and extent of

their bad-faith conduct.  Martin and Lee incorporated QDI in December 2001, before they

resigned from S.E.E., and were contacting S.E.E.'s customers, prospective customers,

distributors and vendors from their personal telephone numbers by January 21, 2002.  QDI's

website advertised microspectrophotometers by February 20, 2002.  In March, 2002, S.E.E. sued

QDI, Martin and Lee over their improper possession and use of S.E.E.'s confidential information

and trade secrets.  On March 18, 2002, the Plymouth Superior Court enjoined QDI from using

S.E.E.'s confidential customer  information.  By June of 2002, Martin and Lee had left

Massachusetts for California and had organized CRAIC.

Martin now denies that QDI was organized to compete with S.E.E., or that it ever

developed or manufactured microspectrophotometers.  Instead, he claims that QDI was formed in

December 2001 as a "consulting" and real estate investment company that sold

microspectrophotometers manufactured by CRAIC, notwithstanding that QDI's website clearly

identified QDI as a *manufacturer,* and that CRAIC's microspectrophotometers bear the "QDI" brand name to this date. Exhibit "2", Martin Depo., pp. 156-157; Exhibit "3", QDI and CRAIC web postings. QDI's and CRAIC's income and expenses will reveal whether Martin and Lee's continuing bad-faith conduct included manipulating QDI's and CRAIC's corporate structures to hide their unlawful conduct and evade the Plymouth County injunction, as well as offering false deposition testimony.

**B.        DISCLOSURE WILL NOT HARM DEFENDANTS**

Contrary to Martin's assertion, there is no evidence that he and Tringali are competitors in the microspectrophotometer business (see Footnote 1). Of Tringali's present accounts, only Nanometrics manufactures microspectrophotometers. Nanometrics never re-entered the forensics field, and does not compete with QDI/Quantum in the microelectronics field. QDI/CRAIC makes low end, multi-use, table-top instruments. Nanometrics' only table-top microspectrophotometers are dedicated instruments used only for semiconductor manufacturing quality control. Tringali is unaware that QDI/CRAIC has successfully marketed to such customers in his sales territory. Any possible harm, however, may be easily prevented by the appropriate protective order restricting Tringali's use and disclosure of QDI/CRAIC semiconductor customer information in Tringali's territory (the eastern third of the United States).

**III.    DEFENDANTS SHOULD BE SANCTIONED PURSUANT TO FED.R.CIV.P. 37 (a)(4)(A)**

Martin and Lee should be sanctioned for their blanket refusal to respond to discovery, as provided in Fed.R.Civ.P. 37 (A)(4)(a). It is their burden to produce factual support for the protective order they never tried to obtain. By failing to state specific facts or identify specific possible harm, they have forced the plaintiff to incur considerable expense drafting this lengthy and exhaustive motion to compel justifying each and every discovery request. Moreover, several

17

of Martin's objections are frivolous, such as claiming that communications with S.E.E. customers

regarding repairing S.E.E. instruments somehow contain information proprietary to Martin and

Lee.  Martin also repeats his specious claim that he should be excused from discovery until the

Court rules on his now-moot motion to dismiss, a suggestion the Court recently rejected.  See

Footnote 1, Docket Numbers 19, 20, 22.

Most importantly, defendants have no reasonable expectation of avoiding this discovery.

The lack of a blanket privilege against producing trade secrets has been established law since

1979.  Federal Open Market Committee v. Marrill, 433, U.S.  340, 362, 99 S.Ct. 2800, 2813, 61

L.E. 2d. 587 (1979).   The best they could have reasonably hoped to achieve was a confidentiality

order.  Plaintiff offered to agree to any reasonable confidentiality stipulation right off the bat.

Exhibit "4".  Defendants refused out of hand, without good cause, in order to inflict maximum

expense upon the plaintiff.  Exhibit "5".    This blatant defiance of the spirit and intent of Rule

26(c)  and L.R. 7.1 is simply unacceptable, and should be sanctioned.

## RULE 7.1 CERTIFICATE

On October 20, 2005, plaintiff initiated a Rule 7.1 conference by sending Exhibit "4".  On

October 21, the parties conferred by telephone.  The letter from defense counsel attached as

Exhibit "5" accurately reflects the substance of the conference and the issues resolved.

## CONCLUSION

Wherefore, plaintiff Phillip Tringali respectfully requests that his motion be allowed, and

that plaintiff be awarded his considerable legal fees associated with bringing this motion.

RESPECTFULLY SUBMITTED
Phillip Tringali
By his attorneys,

Date:   November 2, 2005

//Daniel Treger//
Jeffrey J. Phillips, Esq.
B.B.O. #398480
Daniel Treger, Esq.
B.B.O. #562147
Phillips & Angley
One Bowdoin Square
Boston, MA 02114
Tel. No.: (617) 367-8787

**VERIFICATION**

Now comes the plaintiff, Phillip Tringali, and in lieu of filing an affidavit hereby attests under the pains and penalties of perjury to the truth of the factual statements set forth herein.

Date:   November 2, 2005

//Phillip Tringali//
Phillip Tringali

C:\Documents and Settings\Dan Treger\My
Documents\p&aworkproduct\TRNG001\compel[1].mot.wpd

**C\ mmonwealth of Massachuse  .s**
**County of Plymouth**
**The Superior Court**

Plymouth, ss                                    CIVIL DOCKET# **PLCV2002-00306**

RE:    **S.E.E., INC. v Quantum Dynamics International, LLC et al**

TO:Brian P Voke, Esquire
      Campbell Campbell Edwards & Conroy
      1 Constitution Plaza
      3rd floor
      Boston, MA 02129

## PRELIMINARY INJUNCTION

This action came on to be heard before the Court upon the return of an Order of Notice
to show cause why the application for a preliminary injunction should not be granted,
and was argued by counsel; and upon consideration thereof,

    It is **ORDERED and ADJUDGED** that upon payment to the clerk of the sum of
$50.00, and until further order of the Court, the application under the prayers of the
complaint is hereby granted; and the defendant(s), its agents, servants, attorneys and
deputies are **ENJOINED AND RESTRAINED** from using and/or communicating to any
persons or entities, including but not limited to by, between and among the defendants
themselves, any and all of the information contained in the database of S.E.E.,
Inc.("SEE") organized and maintained in the software program "ACT", you are further
ordered to desist and refrain from destroying, altering, formatting, deleting, renaming, or
otherwise hiding and/or destroying the information contained on or in the defendants'
Toshiba laptop computers, including but not limited to their hard-drive, tapes, disks, and
memory as well as any and all backup copies and deleted files on the computers or
computer storage devices or media and on or in any and all other computers including
but not limited to their hard-drives, tapes, disks, and memory as well as any and all
backup copies and deleted files on the computers or computer storage devices or
media, which may have been used and/or owned during the past year or are now
owned or used by each and/or all of the defendants, until further order of the court.

Dated at Brockton, Massachusetts this 19th day of March, 2002.

                                                      Richard J. Chin, Justice

                                                      Francis R. Powers,
                                                      Clerk of the Courts

                                          BY:

                                                      Clerk

cvdpinj_2.vpd 274134 inidocol dolores

Paul Martin 5-24-2005
Paul Martin, et al. v. S.E.E., Inc., et al.

62

1    looked over?
2    A.   No.
3    Q.   Were resumes forwarded to you as a result of
4         the ads?
5    A.   Yes.
6    Q.   Do you know whether those -- sorry.  Were
7         those documents retained by S.E.E.?
8    A.   Yes.
9    Q.   Where were they placed?
10   A.   I do not know.  That would have been the
11        responsibility of one of the office staff.
12   Q.   You didn't have to do your own filing?
13   A.   No.
14   Q.   And the next thing it says, "Should we redo
15        the employment contract to conform with
16        Mass. law, or should we not have a new
17        employment contract at all?"  The employment
18        contract, do you know what that was
19        referring to?
20   A.   It was a basic employment contract derived
21        from -- I don't recall where we got it from.
22        But it was a basic employment contract that,
23        basically, stated the person's position,
24        what their duties were to be, as well as

63

1         what their initial pay was going to be.
2    Q.   Did those employment contracts have
3         confidentiality and nondisclosure clauses?
4    A.   They had confidentialities.
5    Q.   Had you ever signed a contract with S.E.E.,
6         an employment contract?
7    A.   No.
8    Q.   If you go down to the third from the bottom.
9         Who's Nancy?
10   A.   That was another person we hired.
11   Q.   Do you recall her last name?
12   A.   No.
13   Q.   Do you recall what she did?
14   A.   She was very disruptive to the company.  I
15        don't recall her exact duties.  She was very
16        disruptive.
17   Q.   You don't recall what she did?
18   A.   Not her exact duties.
19   Q.   Was she on the technical or office
20        management side?
21   A.   Office.
22   Q.   If you turn to the third page, it states,
23        you can see halfway down the page the print
24        gets larger.  It starts talking about the

64

1         need to get to the semiconductor market.
2         Was that the first time it was discussed?
3    A.   This was the first board of directors'
4         meeting where it was discussed.
5    Q.   When had it been discussed prior to that?
6    A.   Numerous informal conversations.
7    Q.   Do you recall when?
8    A.   Not exact dates, no.
9    Q.   Was it in the year 2000, 2001?
10   A.   2001, 2000, back to 1996.
11   Q.   The need to get into the semiconductor
12        industry?
13   A.   Yes.
14   Q.   Do you know if that's reflected in any
15        document anywhere?
16   A.   I do not know.
17   Q.   The third box down, it says, "We will lose
18        approximately $500,000 but bring in $2.5
19        million in sales."  Can you explain what
20        that means.
21   A.   Mr. Tringali was representing Nanometrics at
22        the time.  If we developed a semiconductor
23        tool, he would have to cancel his
24        representation contract with Nanometrics.

65

1         But we could conservatively make, at least,
2         $2.5 million in sales to replace that.
3    Q.   So Nanometrics was the competitor?
4    A.   At that time, technically, no.
5    Q.   If you developed that tool?
6    A.   Then it would be.
7    Q.   In the time you were selling instruments for
8         the forensics field, who were your
9         competitors?
10   A.   There would be Carl Zeiss, LEICA, J&M, some
11        long German name after that, 3Y.  Excuse me.
12        3Y was not in the forensics field.
13   Q.   Did they make instruments that were
14        comparable to S.E.E.'s instruments?
15   A.   Yes.
16   Q.   Were they comparable in capabilities?
17   A.   Yes.
18   Q.   Were they comparable in design?
19   A.   In the basic way light was measured, yes.
20   Q.   Did they all use off-the-shelf components,
21        or were some of them completely manufactured
22        by other companies?
23   A.   Excuse me.  I am reviewing each one.  It
24        would depend upon the model, but most used

17 (Pages 62 to 65)

Paul Martin 5-24-2005
Paul Martin, et al. v. S.E.E., Inc., et al.

| 82 | | 84 | |
|---|---|---|---|
| 1 | Were any of these machines used in the | 1 | (Document marked as Exhibit 5 for |
| 2 | semiconductor -- | 2 | identification) |
| 3 | A. Yes. | 3 | Q. Do you recognize this document? |
| 4 | Q. Do you recall whether you had anyone putting | 4 | A. No. |
| 5 | together this budget? | 5 | Q. Can you tell me what the term "1200/2200" |
| 6 | A. I don't recall. | 6 | refers to? |
| 7 | Q. This document shows a software engineer | 7 | A. As a guess. |
| 8 | being hired in June. It shows a payroll | 8 | Q. As a guess? |
| 9 | expense for a software engineer in June, and | 9 | A. Yes. |
| 10 | a payroll expense for an applications | 10 | Q. What is your guess? |
| 11 | engineer in July, and for a sales engineer | 11 | A. A next generational product for S.E.E. |
| 12 | in September. I think the columns are off. | 12 | Q. That was the Maximus product? |
| 13 | Does this represent a reasonable estimate of | 13 | A. I don't know. |
| 14 | the schedule for the development of this | 14 | Q. And do you recall deciding that the Maximus |
| 15 | project? | 15 | project would use a microscope base |
| 16 | A. Since I don't recall, the document, I | 16 | manufactured by Olympus? |
| 17 | couldn't say. | 17 | A. We were considering it. |
| 18 | Q. When you were planning the project, did you | 18 | Q. Do you recall receiving a microscope base to |
| 19 | ever formulate in your mind a schedule for | 19 | test for use in this product? |
| 20 | developing the product? | 20 | A. No. |
| 21 | A. I don't recall. | 21 | Q. Do you recall considering using a lamp |
| 22 | Q. How long did it take to develop the first | 22 | socket and full socket housing lens, do you |
| 23 | project, the first product, the first | 23 | recall considering whether to use that |
| 24 | analytical product that you sold? I'm | 24 | assembly? |

| 83 | | 85 | |
|---|---|---|---|
| 1 | sorry. The first analytical product that | 1 | A. Excuse me. What are you referring to? |
| 2 | S.E.E. manufactured and sold, how long did | 2 | Q. The second part down, Part info: 10398. |
| 3 | it take to develop that? | 3 | A. Okay. |
| 4 | A. Can you redefine the sentence, please. | 4 | Q. Do you recall determining or do you recall |
| 5 | Q. How long did it take you to develop the | 5 | considering using that product as a |
| 6 | first microspectrophometers that S.E.E. | 6 | prospective part of the Maximus project? |
| 7 | sold? | 7 | A. No. |
| 8 | A. I don't know the exact time. I could only | 8 | Q. Do you recall receiving one to test? |
| 9 | estimate. | 9 | A. No. |
| 10 | Q. What is your estimate? | 10 | Q. If you turn the page, it has a turret by |
| 11 | A. It was a copy of the system from Mission | 11 | Olympus. Do you recall considering using |
| 12 | Peak Optics, about a year. | 12 | that part for the Maximus project? |
| 13 | Q. It took a year to develop a copy? | 13 | A. No. |
| 14 | A. Estimated, one year. | 14 | Q. Do you recall ordering one of them to |
| 15 | Q. How long did it take you to develop the | 15 | examine for use? |
| 16 | 2100? | 16 | A. No. |
| 17 | A. I don't recall. | 17 | Q. Did you do the ordering of the parts and |
| 18 | Q. Do you remember how long after you | 18 | supplies? |
| 19 | introduced the first round of machines that | 19 | A. No. |
| 20 | you began to develop the 1100 and the 2100? | 20 | Q. Who did? |
| 21 | A. No. | 21 | A. Dr. Jumi Lee, and Debbie Bowles, and other |
| 22 | MR. TREGER: The next document is | 22 | staff. |
| 23 | entitled "S.E.E. Inc. Detail Master Parts | 23 | MR. TREGER: Do you want to break |
| 24 | list." | 24 | for half an hour? |

22 (Pages 82 to 85)

Paul Martin 5-24-2005
Paul Martin, et al. v. S.E.E., Inc., et al.

86

1       MR. DAVIS: All right.
2  (Whereupon the luncheon recess was taken
3  at 1:04 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

87

1              AFTERNOON SESSION
2       MR. TREGER: The next exhibit is
3  No. 6. It is a memo from Dr. Paul Martin to
4  directors. The subject is: Project Maximus
5  specifications for Stage 1. Again, I
6  believe the date is incorrect.
7  (Document marked as Exhibit 6 for
8  identification)
9  Q.  Dr. Martin, do you recognize this document?
10 A.  No.
11 Q.  Do you recognize the file name Tw1ster,
12     spelled with a 1 instead of an I?
13 A.  That would not be a file name.
14 Q.  Is that a password?
15 A.  Yes.
16 Q.  Do you recognize that password?
17 A.  Yes.
18 Q.  How do you recognize it?
19 A.  It was my default password.
20 Q.  Do you recognize the material in this
21     document?
22 A.  Besides the specifications?
23 Q.  Yes.
24 A.  I recognize it as specifications.

88

1  Q.  Do you recall coming up with these
2      specifications?
3  A.  Not specifically, no.
4  Q.  Do you recall where it says, "Hardware
5      components," do you recall compiling a list
6      of hardware components?
7  A.  No.
8  Q.  On the second page, do you recall
9      determining the facility requirements?
10 A.  No.
11 Q.  Do you recall determining the technical
12     requirements?
13 A.  No.
14 Q.  Do you know how you would have arrived at
15     these specifications?
16 A.  Are you asking me to guess?
17 Q.  You don't know how you came up with these
18     specifications?
19      MR. DAVIS: I am not sure that he
20 testified that he came up with the
21 specifications.
22 Q.  You don't know who did this memo?
23 A.  It has my name on it, but I don't recall the
24     memo.

89

1  Q.  Do you recall the date?
2  A.  The date?
3  Q.  Do you recall coming up with the set of
4      specifics at any date?
5  A.  No.
6  Q   Do you recall buying a Windows 2000 machine
7      for S.E.E. before you left?
8  A.  Yes.
9  Q.  Do you recall when that was?
10 A.  November 2001.
11 Q.  Was that a laptop or desktop?
12 A.  Desktop.
13 Q.  And do you recall why you purchased it?
14 A.  Yes.
15 Q   Why was that?
16 A.  To act as our Internet server.
17 Q.  How many computers did you have at the
18     facility?
19 A.  I don't know.
20 Q.  How many different computers did you have
21     the occasion to use while you were in
22     Massachusetts at S.E.E.?
23 A.  All of them.
24 Q.  Were there more than ten?

23 (Pages 86 to 89)

Paul Martin 5-24-2005
Paul Martin, et al. v. S.E.E., Inc., et al.

94

1    happened to be of a scientific background or
2    have a scientific background.
3  Q.  Do you recall interviewing someone named
4    Raju?
5  A.  No.
6  Q.  You already said you didn't extend offers to
7    anyone?
8  A.  Correction. I extended one offer.
9  Q.  Do you recall why you didn't extend an offer
10    to Mr. Parmen?
11  A.  He would not have made a good employee.
12  Q.  Why did you believe that to be so?
13  A.  Personality and scientific background.
14  Q.  Do you recall what his scientific background
15    was?
16  A.  No, I don't.
17  Q.  If you go to the bottom on 6/20/01, there is
18    an expense for headhunter. Do you recall if
19    S.E.E. employed the services of a
20    headhunter?
21  A.  I don't recall that.
22  Q.  There is another on 8/2. Are you able to
23    recall any additional interviews besides Mr.
24    Bartko and Mr. Parmen?

95

1  A.  I recall one person driving down for an
2    interview but then turning around and
3    canceling.
4  Q.  Do you recall what that person's name was?
5  A.  No.
6  Q.  Do you recall when that was?
7  A.  No.
8  Q.  Do you remember why they turned around?
9  A.  Yes.
10  Q.  Why?
11  A.  Middleborough was too far.
12  Q.  2001, that was in the middle of the
13    high-tech recession, wasn't it?
14  A.  No.
15  Q.  It wasn't. Did Mr. Bartko accept the offer?
16  A.  No.
17  Q.  Why not?
18  A.  He told me for two reasons. The salary was
19    too low. Second reason, very negative
20    company culture.
21  Q.  And do you recall who he met with?
22  A.  I only recall some people.
23  Q.  Which people?
24  A.  Jumi Lee, myself.

96

1  Q.  Is that all you are able to recall?
2  A.  Yes. I don't recall anybody else.
3        MR. TREGER: The next document, I
4    believe we are up to 9. It is a document
5    entitled "Mutual Confidentiality Agreement"
6    dated the 27th day of February, 2001.
7    (Document marked as Exhibit 9 for
8    identification)
9  Q.  Do you recognize this document?
10  A.  Yes.
11  Q.  What is it?
12  A.  It is a confidentiality agreement.
13  Q.  And who was Multimode Fiber Optics?
14  A.  They made fiberoptics and sold them to
15    various companies.
16  Q.  What did they provide to S.E.E.?
17  A.  Fiberoptics.
18  Q.  And was that a standard agreement used with
19    all suppliers?
20  A.  I believe so.
21  Q.  And how long, prior to the date of this
22    agreement, which is February 27, 2001, how
23    long prior to this agreement had S.E.E. been
24    using these contracts?

97

1  A.  I don't know.
2  Q.  Did you use that contract in California?
3  A.  For some suppliers, yes.
4  Q.  What was the purpose of this document?
5  A.  If there was special work done or if we
6    wanted to keep the fact that we were using
7    them as a vendor, we would have the vendor
8    sign that document.
9  Q.  Now, in the first paragraph that's indented,
10    I'm sorry, Paragraph 1, it says,
11    "Proprietary information disclosed by the
12    disclosing party to the receiving party
13    shall be used by receiving party for the
14    purpose of aiding S.E.E. in design of new
15    analytical equipment and with the
16    improvement of current products." Was that
17    paragraph standard, or was that added
18    specifically at this period of time?
19  A.  That's a standard paragraph.
20  Q.  Do you know why this was sent in 2001? Was
21    this a new supplier?
22  A.  I don't recall.
23  Q.  Were they being asked to customize any
24    equipment?

25 (Pages 94 to 97)

Paul Martin 5-24-2005
Paul Martin, et al. v. S.E.E., Inc., et al.

102

1    regarding this quotation from Mr. Houser.
2  Q.  Was there anything else discussed during
3      that meeting?
4  A.  I don't recall.
5  Q.  In 2001, were there any plans to upgrade the
6      forensic product?
7  A.  No.
8  Q.  There were none.  Were there any plans to
9      upgrade the operating system to Windows
10     2000?
11 A.  There was discussion, but no plans.
12 Q.  What were the discussions?
13 A.  Informal discussions.
14 Q.  Informal discussions with whom?
15 A.  Mr. Tringali, Dr. Lee.
16 Q.  Did you ever discuss this with customers or
17     suppliers?
18 A.  I don't recall.
19 Q.  Do you recall the nature of the discussions?
20     Strike that.  Did these discussions have to
21     do with the feasibility or affordability or
22     some other subtopic like that?
23 A.  I don't recall.
24 Q.  Were you in favor of doing such an upgrade?

103

1  A.  Yes.
2  Q.  What would that have required with respect
3      to creating the upgrade?
4  A.  You would have to ask a programmer.
5  Q.  And the programmer, what would the
6      programmer change?
7  A.  The ability to program.
8  Q.  What part of the S.E.E., what part of the
9      existing models would be retained and what
10     part would be replaced?
11 A.  That was never discussed or decided.
12 Q.  But to make it possible, you had to create a
13     new project; you just write software to
14     allow your --
15 A.  That was never discussed.
16 Q.  Let me ask you this.  What was necessary
17     when you upgraded to Windows 98 from 95?
18 A.  I didn't do the software on that.
19 Q.  What was required just new software?
20 A.  I don't know.  I didn't do the software.
21 Q.  Did you do anything with respect to that
22     upgrade?
23 A.  No.
24 Q.  Who was that work done by?

104

1  A.  That would be Dr. Lee and Andrea Desrosier.
2  Q.  Do you recall how long it took to create
3      that upgrade?
4  A.  No.  I do not know if an upgrade took place.
5  Q.  From 95 to 98?
6  A.  Correct.
7  Q.  You made a number of claims against Mr.
8      Tringali, individually, in this case.  I
9      would like to ask you some questions about
10     them.
11        It's not true that you're
12     alleging that a contract existed between you
13     and Mr. Tringali, individually, to purchase
14     your stock in S.E.E.?
15 A.  Yes.
16 Q.  In your interrogatories, I believe you
17     stated the offer to purchase was made on
18     January 9, is that correct?
19 A.  Correct.
20 Q.  Can you tell me how you had come to have
21     this discussion on January 9, 2002?
22 A.  From previous meetings, we decided to meet
23     again and come to terms where we could have
24     a mutual agreement.  Mr. Tringali came up

105

1      with two proposals for us to accept.
2  Q.  This was made on January 9, 2002?
3  A.  Yes.
4  Q.  Can you tell me who was present at this
5      meeting.
6  A.  Mr. Tringali, myself, Dr. Lee, Jeff Housted.
7  Q.  Was this the same day that there was a
8      stenographer present to take down
9      discussions?
10 A.  Not for that meeting.
11 Q.  Can you tell me why the stenographer was
12     dismissed for this part of the meeting?
13 A.  I don't recall.
14 Q.  Who went about retaining the stenographer?
15 A.  Myself.
16 Q.  Do you recall what temp agency you used?
17 A.  No.
18 Q.  Do you recall how she took down the meeting?
19     Was it shorthand, or was it like she is
20     doing?
21 A.  I don't recall.
22 Q.  Now, what meetings occurred before the
23     meeting at which you claim this offer was
24     made?

27 (Pages 102 to 105)

Paul Martin 5-24-2005
Paul Martin, et al. v. S.E.E., Inc., et al.

154

1     hire people, no.
2  Q.  Are you able to tell me any work product at
3     all that was generated for the Maximus
4     project by you?
5  A.  The only ones that I am aware of are from
6     documents that you have presented.
7  Q.  And when you say you devoted time to
8     personnel, what specific -- strike that. Do
9     you recall what projects you were working
10    on, what sales you were working on in 2001?
11 A.  All of them?
12 Q.  The ones that you recall.
13 A.  The ones that I recall. Hewlett-Packard
14    Corporation. I would have to refer back to
15    company records to tell you the rest.
16    French, Maryland State Police, State of
17    Texas.
18 Q.  Did you ever --
19        MR. DAVIS: Have you exhausted your
20    memory?
21        THE WITNESS: I am still thinking.
22 A.  And more.
23 Q.  And did you ever make any suggestions to the
24    other directors as how to increase revenue

155

1     in order to better fund the Maximus project?
2  A.  No.
3  Q.  Are you able to recall how much time on
4     average, if any, how much time an on average
5     per month you spent on the Maximus project?
6  A.  No.
7  Q.  But you did continue to work on that; is
8     that correct?
9  A.  I don't recall spending time on it beyond
10    the meetings and the meeting notes.
11 Q.  You did offer employment to someone in
12    September?
13 A.  If you would include that as part of the
14    Maximus project.
15 Q.  Did you forward any work to your mechanical
16    designer?
17 A.  No.
18 Q.  Do you know if Dr. Lee did?
19 A.  No, I am not aware of that.
20 Q.  Did you speak with any customers about
21    upcoming products that would be released?
22 A.  I don't recall.
23 Q.  Did S.E.E. ever have a plan to lease a
24    Windows 2000 upgrade for the 2100?

156

1  A.  There was no plan.
2  Q.  Did you ever discuss any possible upgrade
3     like that with any of your customers?
4  A.  I don't recall.
5  Q.  So it is your testimony that in 2001, your
6     time was dedicated primarily to marketing
7     existing products and serving existing
8     customers?
9  A.  Installations, training, applications,
10    attending trade shows.
11 Q.  When did you decide to leave S.E.E.?
12 A.  January 2002.
13 Q.  Was that decision made on January 9?
14 A.  No.
15 Q.  When was it made?
16 A.  I don't recall the exact date.
17 Q.  Was it made before January?
18 A.  No.
19 Q.  Didn't you incorporate Quantum Dynamics in
20    December?
21 A.  No.
22 Q.  Did you organize it in December?
23 A.  Yes.
24 Q.  What was the purpose of organizing it?

157

1  A.  As a consulting company.
2  Q.  What consulting would it offer?
3  A.  Let's see, consulting for anything that
4     needed to be done. It was also used as a
5     real estate company.
6  Q.  What real estate did it buy and sell? What
7     real estate did it own?
8  A.  It never did.
9  Q.  What was it intended to own?
10 A.  That was one of the purposes of forming it
11    and then look for property.
12 Q.  When did you decide to use Quantum Dynamics
13    to develop spectrometry equipment for the
14    forensics market?
15 A.  Quantum Dynamics was not used to develop
16    spectrometers.
17 Q.  What was it used -- what products -- did it
18    ever sell spectrometers?
19 A.  It sold them.
20 Q.  And who manufactured the spectrometers?
21 A.  CRAIC Technologies.
22 Q.  When was CRAIC organized?
23 A.  It was officially organized June 2002.
24 Q.  QDI, weren't they advertising for

40 (Pages 154 to 157)



http://www.microspectra.com/prod05.htm

# QDi

## Accessories

QDI also manufactures accessories and specialized software packages for its tools. In addition, QDI stocks QDI Certified lamps and other consumables. These include:

**Home**  **Up**

## Software

- Kramers-Kronig Transformation Software Package: used for calculating the N and K values of reflectance spectra.
- Color Package: for calculation of tristimulus values, chromaticity coordinates, Hunter values, whiteness and many more. Includes a NIST traceable white reference.
- Statistical Analysis Software Package: adds powerful multivariate analysis tools. Includes PLS-1, PLS-2, and PCR.
- Absolute Reflectance Package: for calculation of true reflectance spectra. Includes an absolute reflectance standard.
- QDI/3D: For real-time, interactive three dimensional spectral visualization.
- Image Analysis Package: For enhanced analysis of images captured with the digital imaging system.

## Accessories



## QDI 1000 ™ UV-Visible-NIR Microspectroph...



The QDI 1000™ Microspectrophotometer has
standard workhorse instrument for microspect
designed for ease-of-use and durability while p
best microspectral results. It acquires spectra
destructively from samples under 1 micron in v
times. These capabilities allow it to acquire tra
reflectance, polarization and fluorescence mic
the UV, visible, and NIR regions. And because
array based instrument, it can also acquire full
range kinetics with high spectral resolution. All
single instrument!

*The QDI 1000™ Microspectrometer can take spectra from the deep ultraviolet to near infrared.*
*fitted with the DirecVu™ package to view samples by eye as well as with the high resolution dig*
*system.*

### Applications

- *Flat Panel Display Color Masks*
- *Flat Panel Light Sources*
- *Telecommunications*
- *Optics*
- *Questioned Documents*
- *Chemistry*
- *Physics*

### Key Advantages

- UV microscopy
- Visible range microspectroscopy
- NIR microspectroscopy...all with
  instrument
- A TE cooled array detector for lo
  long term stability
- Ultraviolet-visible spectra in one
- Transmission, reflectance, fluore
  polarization spectroscopy of micr
  samples...all with the same instru
- Variable sampling areas!
- Easy-to-use Windows XP softwa
- True high resolution digital imagi
- Direct visualization through eyep
  bigger fields of view and superio
  color correlation
- Turn-key system that includes U\
  microscope, spectrophotometer,
  software, etc.
- Lifetime technical support by the
  microspectroscopy experts
- Easy to use and maintain



## QDI 2000 ™ UV-Visible-NIR Microspectroph[...]



The QDI 2000™ Microspectrophotometer emb[...] advanced technology and ease-of-use. This [...] microspectrometer employs cutting edge softw[...] hardware resulting in a powerful yet user-frien[...] non-destructively measuring the spectra of mi[...] samples. Samples under 1 micron can be ana[...] and with minimal preparation.

The microspectrometer can measure transmis[...] reflectance, polarization and fluorescence mic[...] the near-UV, visible, and NIR regions with hig[...] resolution...all with the same instrument and w[...] swapping components. Spectra can be acquire[...] variable sampling areas while simultaneously [...] samples with a high resolution digital imaging [...] Samples can also be viewed directly through e[...] with the DirecVu™ package with research gra[...] microscope optics.

*The QDI 2000™ Microspectrometer can take spectra from the deep ultraviolet to near infrared [...] seamless operation. It can acquire microspectra in absorbance, reflectance, and fluorescence. [...] both the DirecVu™ to view samples by eye as well as with the high resolution digital imaging sy[...]*

### Applications

- *Trace Evidence*
- *Flat Panel Displays*
- *Semiconductor Film Thickness*
- *Process Impurity Detection*
- *Questioned Documents*
- *Photonic Crystals*
- *DNA Analysis*
- *Chemistry*

### Key Advantages

- Deep UV microspectroscopy
- Visible range microspectroscopy
- NIR microspectroscopy...all with [...] instrument
- Integrated TE cooled array dete[...] noise and long term stability
- Ultraviolet-visible-NIR spectra in [...] And without changing optics!
- Variable sampling areas
- True high resolution digital imagi[...]







### QDI 202™ Microscope Spectroph[...]



***Bringing greater depth to your legacy syste[...]***

The QDI 202™ Microscope Spectrophotomete[...]
to add spectroscopy to your optical microscop[...]
upgrade a legacy microspectrometer. The QD[...]
attaches to the microscope or microspectrome[...]
enables you to collect transmission, reflectanc[...]
polarization or fluorescence spectra of micros[...]
samples. Depending upon the microscope opt[...]
sources, the spectral range ranges from the d[...]
the near infrared region. With the QDI 202™, [...]
spectra of microscopic samples can be acquire[...]
destructively and with ease.

The QDI 202™ is ideal for diverse applications[...]
quality control of flat panels monitors, when int[...]
probe stations, to vitrinite reflectometry at 546[...]
surface analysis. The system is also a cost eff[...]
to upgrade that old microspectrometer to the la[...]
optics and software.

#### Applications

- *Flat Panel Color Masks*
- *Flat Panel LEDs*
- *Mineralogy*
- *Semiconductors*
- *Vitrinite Coal Reflectometry*
- *Process Contamination Analysis*

#### Key Advantages

- The only microscope spectropho[...]
  a TE cooled array detector for lo[...]
  long term stability
- Effective spectral range is 200 to[...]
  with the specific range selected b[...]
- Optional NIR microspectrophoton[...]
  package extends the range to 17[...]
- Variable sampling areas!
- Upgrade your old microspectroph[...]
  with modern hardware and softw[...]
- The only microspectrophotomete[...]
  resolution digital imaging...up to [...]





# PHILLIPS & ANGLEY

ATTORNEYS AND COUNSELLORS AT LAW
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
ONE BOWDOIN SQUARE
BOSTON, MASSACHUSETTS 02114
(617) 367-8787

TELECOPIER (617) 227-8992

JEFFREY J. PHILLIPS, P.C.
JEFFREY T. ANGLEY, P.C.
JONATHAN M. FEIGENBAUM*
CHRISTOPHER S. TOLLEY
DANIEL TREGER
STEPHANIE M. SWINFORD
KRISTEN M. PLOETZ

*ALSO ADMITTED IN DC AND CA

October 20, 2005

**BY FAX ONLY 617-742-4304**

Roger S. Davis, Esq.
Davis & Rubin
One Bowdoin Square, Suite 901
Boston, MA 02114-2919

Re:    Philip Tringali v. Paul Martin and Jumi Lee
       Federal District Court No. 04-12708-MLW

Dear Mr. Davis:

I am writing you with respect to your responses to Mr. Tringali's Interrogatories and Request for Production of Documents to defendant Paul Martin. I wish ton confer regarding the following:

1.    Interrogatories No. 1, 2, 4, 5, 6, 7 and 18; Request for Production of Documents No. 1, 2, 3, 4, 6, 8, 9, 11, 12, 13, 14, 16, 18, 19, 20, 22: As I previously stated, I will stipulate to any reasonable confidentiality you wish. That information requested may contain confidential information is not an absolute bar to discovery. Moreover, contrary to your past assertion, Mr. Tringali is not a competitor to Quantum, Craic or any other entity controlled by your clients. Though my client is a manufacturer's representative of Nanometrics, that company does not manufacture a product that competes with Quantum's or Craic's products. Any claim to confidentiality is especially dubious given that at least 40 of your clients' business contracts were already disclosed in the Plymouth County action.

2.    Interrogatory No. 3: This answer is not complete. XTEC PTY terminated its distribution agreement with S.E.E. in February, 2002. Clearly, some communication occurred between Nick Webber of XTEC and your clients prior to this date.

Roger S. Davis, Esq.
October 20, 2005
Page 2


      3.  Interrogatory No. 4:  Your clients' contacts with S.E.E.'s vendors are relevant to this matter.  Your clients have already admitted that when they were employed by S.E.E., they requested that vendors execute confidentiality agreements.  Whether your clients then used S.E.E.'s vendors as a source of S.E.E.'s confidential information is relevant to this action. Moreover, whether these vendors relied upon S.E.E.'s specifications or proprietary or confidential information to develop Quantum and Craic products is also relevant.

      4.  Interrogatory No. 5 and 13; Request for Production No. 4:  An analytical instrument shall mean any microspectrophotometers and any accessories thereto.  The information requested in these interrogatories and document requests is relevant because they seek the identity of potential witnesses to defendants' use of confidential information, trade secrets and good will of S.E.E.

      5.  Interrogatory No. 10:  The uniform definitions applicable to interrogatories in the District of Massachusetts dictates that the identities of individuals shall include their home addresses.  As these are individuals, and not corporations, they cannot be served with subpoenas at their business address.  I am entitled to their home addresses so that I may serve them with deposition subpoenas, if necessary.

      6.  Request for Production No. 10:  This objection is absurd.  Promotional literature is, by definition, circulated to the public in order to advertise a product.  Information that is circulated to the public cannot be confidential.

      I will contact you this afternoon to confer about the foregoing.

Very truly yours,


Daniel Treger

DT/mf
cc:    Jeffrey J. Phillips, Esq.
       Client


L:\LITG\Trng001\davis.L.10.20.05.wpd

# DAVIS & RUBIN

**ATTORNEYS AT LAW**

ROGER S. DAVIS
JOEL S. RUBIN (1948-1991)

ONE BOWDOIN SQUARE
SUITE 901
BOSTON, MASSACHUSETTS 02114-2919
(617) 742-4300
FACSIMILE (617) 742-4304

## IN HAND

October 21, 2005

Daniel Treger, Esq.
PHILLIPS & ANGLEY
One Bowdoin Square
Boston, MA  02114

Re:    Phillip Tringali
Vs:    Paul Martin, et al
No:    04-12708

Dear Mr. Treger:

I am responding to your letter of October 20, 2005 and following up our telephone conversation of October 21, 2005.  My responses are directed to the numbered paragraphs of your letter.

1.    You have stated in your letter that Tringali is not a competitor to Quantum, CRAIC or any other entity, that while he is a manufacturer's representative of Nanometrics, that Nanometrics does not manufacture a competitive product.  I do not agree with that as I have indicated to you and I further believe that since the Motion to Dismiss is pending, the court should stay the discovery of trade secrets and confidential and proprietary commercial information.

2.    As regards Interrogatory No. 3, I will be in touch with my client and plan to supplement that answer.

3.    As regards Interrogatory No. 4, once again, this information is a trade secret, confidential and proprietary.

4.    My answers to Interrogatories 5 and 13 stand as stated as this information constitute, trade secrets or other confidential commercial information.

5.    The reference that you made to identifying an individual refers to an individual's address, but does not require disclosure of the home address which is a privacy issue.  As to the second sentence where you set forth the proposition that an individual cannot be served with a subpoena at his or her business address, that is totally incorrect.  If you serve a subpoena to an individual at his or her business address I am certain it will be honored.

D. Treger, Esq./Tringali v. Martin
October 21, 2005/Page Two

6.    I take it there is no issue with regard to Request No. 10 since we have
      supplemented that.

Very truly yours,

Roger S. Davis

RSD:cat

QD111:USDC:DT