UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PHILLIP TRINGALI<br>    Plaintiff<br><br>V.<br><br>PAUL MARTIN AND JUMI LEE<br>    Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)     C. A. NO. 04-12708-MLW |

**AFFIDAVIT OF PAUL MARTIN
IN SUPPORT OF DEFENDANTS' MOTION
FOR PROTECTIVE ORDER**

I, Paul Martin, hereby make the following Affidavit:

1. Prior to my association with the plaintiff, S.E.E., Inc. ("S.E.E."), I was employed by Nanometrics of Sunnyvale, California, from February, 1994 to March, 1996, as product manager of its microspectrophotometers analytical division. In March, 1996, Nanometrics closed this division and I was laid off.

2. During my employment at Nanometrics, I acquired a great deal of knowledge concerning the methods of constructing microspectrophotometers, and the integration and use of software as well as the semiconductor and forensic applications of those instruments. I also acquired knowledge of those companies which routinely purchased or were prospects for the sale of microspectrophotometers, in other words a potential and existing customer base.

3. While I was employed by Nanometrics, I became acquainted with Phillip Tringali ("Tringali"), president of S.E.E. S.E.E. was a sales representative for Nanometrics for the sale of semiconductor products, and was not engaged in the business of manufacturing or selling its own microspectrophotometers.

4. After I was laid off by Nanometrics, together with S.E.E., I started an analytical microspectrophotometer business from my home in San Francisco. My wife, Jumi Lee ("Dr. Lee") was hired by S.E.E. on or about October, 1996 as

a consultant to assist in the development of the microspectrophotometer division.

5. On or about October, 1997, after we had moved the business out of my home into a separate location, we began to manufacture the microspectrophotometer product.

6. At S.E.E.'s direction, in February, 2000, we moved the microspectrophotometer operation from San Francisco to S.E.E.'s place of business in Middleborough, to operate our microspectrophotometer business out of the same premises in which S.E.E. operated its sales representative business for the sale of semiconductor products.

7. Both Dr. Jumi Lee and I worked in Middleborough from February, 2000 until we resigned from S.E.E. in January, 2002.

8. At no time during the term of my employment did I nor my wife, Dr. Lee, ever execute nor were we presented with any confidentiality agreement or noncompetition agreement.

9. During the fall of 2001, while Dr. Lee and I were directors of S.E.E., we began to have serious differences with respect to the finances of S.E.E., the direction in which S.E.E. was moving in the microspectrophotometer field, settlement of another litigation matter as to which Tringali disagreed, and the fact that Tringali was devoting substantial company time to other personal endeavors while neglecting his duties for S.E.E. Ultimately, these differences lead to our resignation and termination of employment on January 9, 2002.

10. After leaving S.E.E. on January 9, 2002, Dr. Lee and I formed Quantum and CRAIC to provide consulting service and manufacture of microspectrophotometers, respectively. We have invested more than $1,000,000 of our funds and over three years of our time in the development of these companies.

11. We have now developed a product that will allow us to enter the film thickness/semiconductor market, which is the biggest market for our type of product.

12.   Tringali conducts business under the name of "PT Technology." Based upon Tringali's PT Technology document (Exhibit "B" hereto), which states that he represents Nanometrics, Inc., Tringali is engaged in competitive activities with those of my companies, Quantum Dynamics International, LLC ("Quantum") and CRAIC Technology ("CRAIC").

13.   Nanometrics is a direct competitor to both Quantum and CRAIC, according to the information which I have, it had more then $70,000,000 in gross revenue during the year 2004 in the film thickness/semiconductor market and has been a major player in the semiconductor metrology since 1978.

14.   Nanometrics employs hundreds of people, has established a sales and support network and a large research and development team.

15.   We are competing against Nanometrics, a company which Tringali represents now and has represented in the past, which by its size and revenues could easily overrun our company CRAIC in terms of sales, product development and entry into other markets, if any of our trade secrets and other confidential research, development or commercial information were disclosed to Tringali.

16.   We have been involved in other litigation against Tringali in three other cases since we left S.E.E. and he has indicated by his conduct that he would do anything to disrupt our company CRAIC.

17.   Two of the Nanometrics microspectrophotometer products in its lines are directly competitive to our QDI 2000, 1000 and 202 systems.

18.   The NanoSpec 6100 (Exhibit "C" hereto) is a reflectance microspectrophotometer that can measure sample areas as small as 10 microns and calculate the thickness of thin films deposited on wafers. It ranges from the deep ultraviolet into the near infrared. I believe that our QDI is superior in that it has a larger spectral range and can make types of measurements that the NanoSpec 6100 cannot. For example, both the NanoSpec 6100 and the QDI 2000 measure reflectance of microscopic sample areas, however, the QDI 2000 can also measure transmittance and fluorescence and of smaller areas. To provide proprietary information on the

QDI products, which would include the QDI 2000, would cause us irreparable harm.

19. The NanoSpec 3000 (Exhibit "D" hereto) is a direct competitor to the QDI 202 system. It is a reflectance microspectrophotometer that can calculate the thickness of thin films deposited upon wafers, it ranges from the visible into the near infrared. I believe our QDI 202 is superior in that it has a larger spectral range and can also make types of measurements that the Nanometrics product cannot and of a smaller sampling area. Providing proprietary information regarding this product to Tringali would cause us irreparable harm.

20. To assist this Court I have prepared a Competitive Comparison of our microspectrophotometers, the QDI 202 and the QDI 2000, to demonstrate the similarities and what I believe are the superior characteristics of our products (Exhibit "E" hereto). Once again, providing proprietary information regarding these products to Tringali would cause us irreparable harm.

Signed under the pains and penalties of perjury this 31 day of October, 2005.

_____
Paul Martin

QDI11:USDC:PMAFF

4