UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

PHILLIP TRINGALI )
     Plaintiff )          C. A. NO. 04-12708-MLW
      )
V. )
      )
PAUL MARTIN AND JUMI LEE )
     Defendants )

### DEFENDANT PAUL MARTIN'S OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL ANSWERS TO INTERROGATORIES AND PRODUCTION OF DOCUMENTS

The defendant, Paul Martin, opposes the motion of Phillip Tringali to compel answers to interrogatories and production of documents.[1]

## Prior Proceedings

1. This action was commenced by the plaintiff, Phillip Tringali ("Tringali"), against the defendants, Paul Martin ("Martin") and Jumi Lee ("Lee"), on December 27, 2004. The complaint sets forth two causes of action, Count I for alleged breach of fiduciary duty and Count II for slander.

2. On March 15, 2005, the defendants filed Defendants' Motion to Dismiss and a Memorandum in Support of Motion to Dismiss as to both Count I and Count II.

3. In the Motion to Dismiss the defendants assert that the complaint should be dismissed based upon lack of jurisdiction, that Tringali has failed to establish diversity jurisdiction and failed to show within the four corners of the complaint that the amount of controversy is greater than $75,000.

4. On May 6, 2005, Tringali filed Tringali's Opposition to Motion to Dismiss or in the Alternative for Summary Judgment.

5. Subsequently, defendants obtained leave and filed Defendants' Motion to File Reply Brief to Tringali's Opposition to Motion to Dismiss on May 24, 2005.

---

[1] The Motion was incorrectly styled as "Defendant Phillip Tringali's Motion..." whereas Tringali is the plaintiff in this action.

6.      On September 14, 2005, plaintiff served certain discovery documents on defendants counsel: Plaintiff's First Request for Production of Documents to Defendant Paul Martin and Plaintiff's First Set of Interrogatories Propounded to Defendant Paul Martin.

7.      The document requests and interrogatories propounded by the plaintiff relate to the claims and defenses as to Count I.

8.      On November 8, 2005, the defendants filed a Motion for Protective Order as to Confidential and Proprietary Information together with a Memorandum and Affidavit of Paul Martin.

9.      In the Defendants' Motion for a Protective Order the defendants requested that the Court stay the discovery and disclosure of confidential or proprietary information pending a ruling by the Court on the Motion to Dismiss filed by the defendants, which motion was filed on March 15, 2005. Alternatively, the defendants request that the Court enter a protective order in the suggested form attached to the Memorandum in Support of defendants' motion.

10.     Tringali has now filed a Motion to Compel Answers to Interrogatories and Production of Documents as to the same interrogatories and requests for production which are the subject of Defendants' Motion for a Protective Order.

**Argument and Authority**

1.      <u>Tringali Has Failed To Comply With Defendants' Discovery Requests.</u>

The parties previously filed a Joint Status Report in Response to Order of Magistrate Judgment dated August 15, 2005.  This Status Report was filed in response to the Defendants' Motion to Compel Production of Documents.  In that Report, Tringali indicated that he had requested additional business records of S.E.E. in the hands of the bankruptcy trustee (Requests Nos. 1 and 4).  Three months have now passed and no documents have been furnished by Tringali in response to these requests.

Tringali has asserted at Page 2 of his Motion that within four months of the defendants' departure their company was marketing a new

microspectrophotometer, claiming that S.E.E. had developed a product with "substantially similar enhancements since February 2001." On October 6, 2005, defendants served Defendant Jumi Lee's First Request for Production of Documents to Plaintiff (Exhibit "A" hereto), seeking documents evidencing the specifications of the S.E.E. claimed enhanced product. As of this date, Tringali has failed to serve any response or any objections, nor has he produced any documents in response to that Request for Production.

2.    Martin And Lee Have Demonstrated That They Are Entitled To A Protective Order.

Tringali argues at Page 4 of his Motion that Martin and Lee have failed to show that they are entitled to a protective order and have failed to file a motion for protective order. On October 14, 2005, Martin served his answer and objections to Tringali's first set of interrogatories and requests for production of documents, indicating clearly that he intended to file a motion for a protective order. On November 8, 2005, hardly an unreasonable time after serving the answers and objections, Martin, in fact, did file Defendants' Motion for Protective Order as to Confidential and Proprietary Information. We would respectfully ask that the Court consider the merits of that motion and accordingly deny Tringali's motion to compel based upon the defendants' own motion for a protective order.

3.    At This Point In Time, There Is No Immediate Need For The Disclosure Of Defendants' Trade Secrets.

Tringali has argued at Page 4 that disclosure of the defendants' trade secrets will not harm them and is necessary to this case.

As the court indicated in Duplan Corp. v. Deering Milliken, Inc., 397 F.Supp. 1146 (D.SC 1974), in discussing the general rule concerning discovery of trade secrets before the federal courts, the court cited 4 Moore, Federal Practice, para. 26.60[4], at 242-45 (2d ed. 1970):

> No absolute privilege protects trade secrets from disclosure through the discovery process. If the information sought is relevant and necessary, at the discovery stage of the litigation, to the preparation of

> the case of the applicant therefor, disclosure will be
> required.  However, the courts are loath to order
> disclosure of trade secrets absent a clear showing of
> an <u>immediate need</u> for the information requested.
> (emphasis added)  <u>Id</u>. at 1185.

In the present case the proceedings are only in the initial stages, a motion to dismiss is pending before the Court, and no scheduling conference has been had as of this date.  We respectfully submit there is no "immediate need" for the disclosure of the trade secrets or confidential information of Martin.

4.    <u>Tringali Has No Standing To Assert Any Claims In Behalf Of S.E.E.</u>

Tringali has repeatedly referred to the action filed by S.E.E. in the Plymouth Superior Court, <u>S.E.E. v. Martin, et al</u>, C. A. No. 02-801.  The claims which he has asserted in the instant case are in substance, the claims of S.E.E. in the Plymouth Superior Court action, and while the defendants have raised this argument as part of their motion to dismiss, the instant motion essentially repeats these allegations that Martin and Lee took S.E.E.'s customer information, called upon S.E.E.'s current and prospective customers and essentially competed with S.E.E. after they left S.E.E.'s employment in January, 2002.

Moreover, while Tringali has stated on Page 3 of his Motion that on August 1, 2005, Martin and Lee and S.E.E.'s trustee in bankruptcy settled all of S.E.E.'s Massachusetts claims, that is not exactly what has occurred.  In point of fact, on that date, Martin and Lee acquired all of S.E.E.'s claims including all of S.E.E.'s claims in the Plymouth Superior Court action.  This is evidenced in the Stipulation of Settlement entered into on August 1, 2005 between the trustee and Martin and Lee.  On Page 4, Paragraph 2, under the heading "The Settlement" (Exhibit "B" hereto) and more particularly in the Amendment to Stipulation of Settlement (Exhibit "C" hereto), which reads as follows:

> 2.    In consideration of the foregoing, the Trustee will
> assign to Martin and Lee the claims and counterclaims
> asserted by the Debtor [S.E.E.] in the Plymouth Action

and Norfolk Action, as well as all stockholder
derivative claims in the Norfolk Action.  The entry of an
Order of the Bankruptcy Court approving this
Stipulation shall effect the assignment of such claims
and counterclaims without the need for further
documentation.

On August 19, 2005, the Bankruptcy Court approved the settlement
(Exhibit "D" hereto) and therefore, apart from the settlement, it is clear that
Martin and Lee own all of S.E.E.'s claims.

5.    Martin And Lee Were Free To Compete With S.E.E.

Notwithstanding that the S.E.E. claims against Martin and Lee are now
moot, and that Tringali is attempting to usurp these claims contending that
Martin and Lee violated a nonexistent noncompetition agreement, it is clear
that Martin and Lee were free to compete with S.E.E. after they terminated
employment.

At all times, Martin and Lee were at-will employees of S.E.E.  At no time
did Martin and Lee enter into any noncompetition agreement with S.E.E. or
any other confidentiality agreement and indeed they were free to compete with
their former employer after they left S.E.E.'s employment in January, 2002,
Augat, Inc. v. Aegis, Inc., 565 N.E.2d 415, 419 (Mass. 1991).

An at-will employee may properly plan to go into
competition with his employer and may take active
steps to do so while still employed.  See Meehan v.
Shaughnessy, 404 Mass. 419, 435, 535 N.E.2d 1255
(1989); Chelsea Indus., Inc. v. Gaffney, 389 Mass. 1,
10, 449 N.E.2d 320 (1983).  Such an employee has no
general duty to disclose his plans to his employer, and
generally he may secretly join other employees in the
endeavor without violating any duty to his employer.
Id. at 12 n.20, 449 N.E.2d 320.  The general policy
considerations are that at-will employees should be
allowed to change employers freely and competition
should be encouraged.

6.    The Defendants Would Be Harmed By Disclosure of Trade Secrets Since
Tringali And Nanometrics Are Engaged In Competitive Activities.

On Page 2 of the Motion to Compel, Tringali states in part as follows:

Among Nanometrics' products was a microspectrophotometer designed for the forensics market. This instrument performed non-destructive spectrographic analysis of trace evidence by measuring the spectra of light passing through, or reflecting from it. In 1996, Nanometrics abandoned this market and terminated its forensic staff, including defendant Martin.

Tringali has stated at Page 17 of his motion, that contrary to Martin's assertion, there was no evidence that he and Tringali are competitors in the microspectrophotometer business. While he admits that Nanometrics presently manufactures microspectrophotometers, the evidence is clear, as set forth in the Affidavit of Paul Martin and in the exhibits to Defendants' Motion for Protective Order (Exhibits A, B, C and D to Defendants' motion) all of which are attached hereto, that Nanometrics is clearly a competitor of Martin and disclosure of Martin's trade secrets would cause substantial harm. Attached hereto are copies of the same Affidavit and Exhibits A, B, C and D to Martin's Motion for Protective Order which indicate clearly the following:

Exhibit "E," Affidavit of Paul Martin describing in detail the competitive products of Nanometrics

Exhibit "F," Tringali testifies that he is conducting a business under the name of PT Technology;

Exhibit "G," the PT Technology document indicates on the second page that Tringali is a representative of Nanometrics;

Exhibit "H," the website printout of Nanometrics indicates that Nanometrics is marketing a microspectrophotometer by the trade name of NanoSpec 6100;

Exhibit "I," the website printout of Nanometrics indicates that Nanometrics is marketing a microspectrophotometer by the trade name of NanoSpec 3000.

7.    <u>The Court Should Restrict Access To Martin's Trade Secrets Or Other
Confidential Research, Development Or Commercial Information.</u>

Federal courts have consistently afforded a greater deal of protection to
technical or trade information then to ordinary business information because
of the threat of an economic injury resulting from disclosure to a competitor,
<u>Duplan</u>, supra at 1186, <u>R&D Business Systems v. Xerox Corp.</u>, D.C. Colo.
(1993), 152 F.R.D. 195, 196-197.  The court held in the <u>R&D Business
Systems</u>, case that once a party objecting to discovery establishes that the
information sought is a trade secret and that its disclosure might be harmful,
that the burden then shifts to the party seeking discovery to establish that
disclosure of the trade secret is both relevant and necessary.  "[The] Court then
must balance the need for the disclosure against the injury that would result
from the disclosure." (citations omitted)  The court went on to hold that a party
objecting to the subpoena was therefore not required to disclose the identities
of its suppliers, financial records, product specifications or drawings or any
trade secret as defined by local law.

Alternatively, federal courts have restricted access to proprietary material
to the opposing counsel, in cases involving confidentiality of business records.
In <u>Sega Enterprises v. Accolade</u>, 997 F.2d 1510, 1532 (9th Cir. 1992), the court
there granted a protective order noting that it may restrict access to disputed
material to opposing party's counsel or to allow the parties to retain
independent experts to evaluate the material which is subject to the protective
order:

> Upon a showing that a protective order is warranted,
> see <u>American Standard, Inc. v. Pfizer, Inc.</u>, 828 F.2d
> 734, 739-44 (Fed.Cir. 1987), the court may restrict
> access to the disputed material to the opposing party's
> counsel, or may allow the parties to retain
> independent experts to evaluate material that is
> subject to the protective order.  See, e.g., <u>Safe Flight
> Instrument Corp. v. Sundstrand Data Control, Inc.</u>,
> 682 F.Supp. 20, 22 (D.Del. 1988) (listing cases).  The
> latter solution is particularly helpful to the court in a
> case such as this one, in which the dispute is highly
> technical in nature.

Martin has relied upon these authorities in his Motion for Protective Order.

8.    <u>Defendants' Customer Information Constitutes Trade Secrets Or Other Confidential Commercial Information.</u>

The following interrogatories and requests for documents seek the disclosure of the defendants' confidential proprietary customer information. Since it is clear that Tringali is a representative of Nanometrics and that Nanometrics is a competitor of the defendants, the Court should restrict the information which are the subject of these discovery requests.

<u>Interrogatory No. 1</u>

Identify each communication between you and any customer of S.E.E., Inc. that occurred between January 9, 2002 and March 22, 2004.

<u>Objection</u>

Certain customers of S.E.E. have become customers of Quantum or CRAIC. I was not subject to any noncompetition agreement with S.E.E. at the time I terminated employment on January 9, 2002 and therefore, I was free to compete with S.E.E. Any such communications constitute trade secrets or other confidential research, development or commercial information of Quantum and/or CRAIC and are the subject of a motion for protective order to be filed with the Court.

<u>Interrogatory No. 2</u>

Identify each communication between you and any prospective customer of S.E.E. that occurred between January 9, 2002 and March 22, 2004.

<u>Objection</u>

Certain prospective customers of S.E.E. have become customers of Quantum or CRAIC. I was not subject to any noncompetition agreement with S.E.E. at the time I terminated employment on January 9, 2002 and therefore, I was free to compete with S.E.E. Any such communications constitute trade secrets or other confidential research, development or commercial information

of Quantum and/or CRAIC and are the subject of a motion for protective order to be filed with the Court.

Interrogatory No. 5

Identify all persons with whom Quantum and CRAIC have transacted business during the period between September, 2002 and March 22, 2004 relative to the purchase, sale, leasing, rental or other transfer of any manner of analytical instrument.

Objection

This interrogatory is vague and ambiguous as the term "analytical instrument" is not defined, and I am unable to answer the interrogatory as worded. Furthermore, the identities of Quantum and CRAIC's customers constitute trade secrets or other confidential research, development or commercial information and are the subject of a motion for protective order to be filed with the Court. Further objecting, this interrogatory seeks information which is not relevant or material to the subject matter of this action.

Request No. 1

All documents concerning communications between Quantum and customers or prospective customers of S.E.E. during the years from January 9, 2002 through March 22, 2004 including, but not limited to, any computerized data base used to track customer contacts, such as ACT.

Grounds for Opposition

Certain customers and prospective customers of S.E.E. are now customers of Quantum, and the identities of Quantum customers constitute trade secrets or other confidential or commercial information. Additionally, such communications may include Quantum product information, which likewise constitutes trade secrets and confidential information.

Request No. 2

All documents concerning communications between CRAIC and customers or prospective customers of S.E.E. from January 9, 2004 through

March 22, 2004, but not limited to, any computerized data base used to track customer contacts, such as ACT.

Grounds for Opposition

Certain customers and prospective customers of S.E.E. are now customers of CRAIC and the identities of CRAIC customers constitute trade secrets or other confidential or commercial information. Additionally, such communications may include CRAIC product information, which likewise constitutes trade secrets and confidential information.

Request No. 9

All itemized telephone bills for telephone numbers used by the defendants while engaged in activities related to designing, developing, manufacturing, and/or marketing of Quantum and CRAIC products between January 9, 2002 through March 22, 2004, including telephone numbers listed in the names of Quantum and CRAIC.

Grounds for Opposition

The customer records of Quantum or CRAIC would disclose the identities of their respective customers, which in turn constitutes trade secrets or other confidential commercial information.

Request No. 12

All documents concerning sales of products developed by Quantum and/or CRAIC from January 9, 2002 through March 22, 2004.

Grounds for Opposition

This Request as worded would seek to require disclosure of specifications and other trade secrets or confidential research, development or commercial information of Quantum and CRAIC.

Request No. 11

All documents of, concerning or relating to upgrades of S.E.E. instruments, repairs or service performed on S.E.E. instruments by Quantum and/or CRAIC from January 9, 2002 through March 22, 2004.

Grounds for Opposition

To the extent that any upgrades or repair services were performed by customers who previously purchased S.E.E. instruments, the identity of those customers and documents relating thereto constitute trade secrets and other confidential research, development or commercial information.

Request No. 20

All documents concerning any training performed by defendants for users of S.E.E. instruments after January 9, 2002

Grounds for Opposition

The identity of users of S.E.E. instruments, particularly since S.E.E. is no longer in business, constitute trade secrets or other confidential commercial information.

9.    Defendants' Product Information Constitutes Trade Secrets Or Other Confidential Product Information.

The following requests for documents and interrogatories seek the disclosure of the defendants' trade secrets regarding source code, software development, and the information related to development and manufacture of their products, all of which should be restricted by the Court at this time.

Interrogatory No. 4

Identify each communication between you and any supplier of parts or services to S.E.E. that occurred between January 9, 2002 and March 22, 2004.

Objection

See answer to Interrogatory No. 1, and further answering, certain suppliers of parts or services to S.E.E. have become suppliers of Quantum and CRAIC and communications between Quantum and/or CRAIC and such suppliers constitute trade secrets or other confidential research, development or commercial information which is the subject of a motion for protective order to be filed with the Court.  Further objecting, this interrogatory seeks information which is not relevant or material to the subject matter of this action.

Interrogatory No. 6

Identify each person with discoverable knowledge of the development and specifications of the all products developed by CRAIC and/or Quantum between January 9, 2002 and March 22, 2004.

Objection

Persons with discoverable knowledge of the development or specifications of the CRAIC or Quantum products would involve disclosure of its customers, employees, consultants and representatives all of which constitute trade secrets or other confidential research, development or commercial information of CRAIC and/or Quantum, which are the subject of a motion for protective order to be filed with the Court.

Request No. 3

All documents concerning the product specifications of all products developed by Quantum and/or CRAIC between January 9, 2002 and March 22, 2004.

Grounds for Opposition

Product specifications of Quantum and CRAIC constitute trade secrets or other confidential research, development or other commercial information.

Request No. 4

All source code written for, or commissioned for use in the analytical device developed between January 9, 2002 and March 22, 2004 including but not limited to any source code for any graphic user interface, and for adaptation to the Windows 2000 operating system.

Grounds for Opposition

Source codes of Quantum and CRAIC constitute trade secrets or other confidential research, development or other commercial information.

Request No. 19

All documents concerning the development of the following software packages marketed for use with the Mach 1 and Mach 10:

a.    Absolute Reflectance Package.

Grounds for Opposition

Software packages referred to contain and constitute trade secrets or other confidential research, development or commercial information.

Interrogatory No. 7

Identify each vendor of component parts, software or services related to the design, assembly and manufacture of the all products developed by CRAIC and/or Quantum between January 9, 2002 and March 22, 2004.

Objection

Identification of vendors or parts, software or services constitute trade secrets or other confidential research, development or commercial information which is the subject of a motion for protective order to be filed with the Court.

Request No. 6

All documents concerning vendors who supplied software, hardware, optical, electrical or other components, and design or other services related to the development of the Quantum and/or CRAIC products between January 9, 2002 and March 22, 200 including but not limited to all communications therewith.

Grounds for Opposition

The identities of vendors of Quantum and CRAIC constitute trade secrets or other confidential development or other commercial information.

Request No. 8

All documents concerning communications between the defendants and any of S.E.E., Inc.'s distributors or sales representatives dating from after January 9, 2002.

<u>Grounds for Opposition</u>

Certain of S.E.E.'s distributors or sales representatives have become distributors or representatives of Quantum or CRAIC and communications with those persons or entities constitute trade secrets or other confidential commercial information.  Notwithstanding, Martin has now produced documents responsive to this Request.

<u>Request No. 18</u>

All documents concerning communications between the defendants and Dynamic Light Control, LLC dating from and after January 9, 2002.

<u>Grounds for Opposition</u>

The documents requested would contain trade secrets or other confidential research, development or commercial information which may include specifications or other confidential information regarding CRAIC or Quantum products.

<u>Request No. 13</u>

All documents concerning parts purchased for the first prototypes of the Mach 1 and/or the Mach 10, as identified in Exhibit "A".

<u>Grounds for Opposition</u>

This Request as worded would seek to require disclosure of specifications and other trade secrets or confidential research, development or commercial information of Quantum and CRAIC.

<u>Request No. 14</u>

All documents, including employment contracts, concerning, in whole in or in part, any policy of confidentiality maintained by Quantum and/or CRAIC.

<u>Grounds for Opposition</u>

Martin has now produced documents responsive to this Request.

Request No. 16

All documents concerning communications between the defendants and Sarah Walbridge dating from after January 9, 2002.

Grounds for Opposition

The defendants now have not identified any documents responsive to this Request.

Request No. 17

All documents concerning communications between the defendants and Georgia Institute of Technology, its agents or employees dating from after January 9, 2002.

Grounds for Opposition

The documents requested would contain trade secrets or other confidential research, development or commercial information which may include specifications or other confidential information regarding CRAIC or Quantum products.

Request No. 22

All documents reflecting the income and expenses of Quantum and/or CRAIC from January 7, 2002 through March 22, 2004.

Grounds for Opposition

There is no reason for the production of any records at this time concerning the income and expenses of Quantum and/or CRAIC. The documents are neither relevant nor material, and are not calculated to lead to any relevant or material information and furthermore, constitute confidential commercial information.

**Conclusion**

The Motion to Dismiss previously filed by the defendants, if allowed, would operate to dismiss Count I, which is the count of the complaint on which this document dispute arises. The defendants respectfully submit as they have argued in their Motion for Protective Order, that the discovery of the

defendants' trade secrets and confidential documents and information should be stayed pending resolution of that motion.  For those reasons and for the other reasons cited in this Opposition, Martin respectfully requests that the Court deny the motion to compel.

November 17, 2005                                  Attorney for defendant,


                                         _____/s/Roger S. Davis_____
                                         Roger S. Davis
                                         BBO No. 116320
                                         DAVIS & RUBIN
                                         One Bowdoin Square
                                         Suite 901
                                         Boston, MA  02114-2919
                                         (617) 742-4300

QDI12:USDC:OPPMOTCOMP

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| PHILLIP TRINGALI | ) | |
| Plaintiff | ) | C. A. NO. 04-12708-MLW |
| | ) | |
| V. | ) | |
| | ) | |
| PAUL MARTIN AND JUMI LEE | ) | |
| Defendants | ) | |

**DEFENDANT JUMI LEE'S FIRST
REQUEST FOR PRODUCTION OF DOCUMENTS
TO PLAINTIFF**

The defendant, Jumi Lee ("Lee"), pursuant to Rule 34 of the Rules of Civil Procedure, requests that the plaintiff, Phillip Tringali ("Tringali"), respond within thirty (30) days from the date of service hereof, to the following Request for Production of Documents.

Defendant further requests that it be permitted to inspect, copy, photograph, or photocopy the documents requested, and that said documents be made available at the office of its counsel, Roger S. Davis, Davis & Rubin, One Bowdoin Square, Suite 901, Boston, MA  02114, no later than the close of business November 10, 2005.

## DEFINITIONS

A.     As used herein, the term "document" shall mean all originals and nonidentical copies, regardless of origin or location, pertaining to any media, upon which intelligence or information is recorded, including without limiting the generality of the foregoing acknowledgments; agreements; analysis; announcements; appointment books; authorization books; budgets; calendars; charts; computer-produced interpretations of data processing disks, tapes or cards; contracts; correspondence; data processing disks, tapes or cards; data sheets; diaries; drafts; drawings; expense reports; graphics; handwritten notes; indices; instructions; invoices; ledgers; letters; logs; memoranda; microfilm; minutes of meetings of any kind; movie films; notebooks; notes; papers;

"A"

periodicals; pamphlets; phonograph records; photographs; price lists; printouts; projections; punch cards; purchase orders; records; registers; reports; sales orders; schedules; studies; tables; tape recordings; tapes; telegrams; transcripts; writings; work sheets; working papers; or any other written, recorded, transcribed, typed, punched, encoded, taped, filmed, or graphic matter, however produced or reproduced, to which you have or at any time had access.  In all cases where originals and/or nonidentical copies are not available, "document" also means identical copies of original documents and copies of nonidentical copies.

B.    As used herein, the term "communication" shall mean any oral or written transmittal of information, or request for information, made from one person to another person, whether made in person, by telephone or by any other means and includes any documents made only for the purpose of recording a communication, idea, statement, opinion, or belief.

**<u>INSTRUCTIONS</u>**

A.    This Request is intended to cover all documents in possession of the party to whom this Request is directed or subject to its custody and control whether the documents are located in any of such party's offices or the offices of its attorneys, agents or employees, and if such party is a corporation, any division, group, subsidiary, parent or affiliate.

B.    In your response and in the production of the foregoing documents, you are requested to identify and segregate the documents according to the separate numbered requests set forth below.  If any documents are produced pursuant to more than one request, you are to so indicate.

C.    With respect to each document which is withheld from production for any reason, provide a statement setting forth:

    (1)    the name and title of the author(s);

    (2)    the name and title of the person(s) to whom the document was addressed;

(3)    the names and titles of those to whom copies of the document were sent;

(4)    the dates on which the document was written or otherwise produced and the date on which it was mailed, sent or delivered to its addressee(s);

(5)    the number of pages;

(6)    a brief description of the nature and subject mater of the document;

(7)    the grounds upon which it is being withheld; and

(8)    the paragraph number to which the document is otherwise responsive.

D.    Your attention is directed to Rule 26(e) which requires supplementation of your responses to these Requests under the circumstances set forth in said Rule.

## **REQUESTS**

1.    All documents evidencing any and all specifications for the S.E.E., Inc., Model 2200 microphotospectrometer (S.E.E. Model 2200") including, but not limited to documents setting forth or evidencing the following matters:

a.    Spectral range;

b.    Smallest sampling area;

c.    Largest sampling area;

d.    Spectral resolution;

e.    Signal-to-noise ratio of instrument;

f.    Type of detectors used;

g.    Type of cooling;

h.    The number of dimensional arrays;

i.    Number of pixels in each detector;

j.    Type of grating in each spectrometer;

k.    Dimensions of silt in each spectrometer;

l.    Spectral range of each spectrometer;

m.    Magnification eyepieces.

2.    All documents evidencing and/or identifying the make and model of the spectrophotometer used or to be used for the S.E.E. Model 2200;

3.    All documents evidencing and/or identifying the make and model of the microscope used or to be used for the S.E.E. Model 2200.

4.    All documents evidencing and/or identifying the make and model of the imaging system used or to be used for the S.E.E. Model 2200.

5.    All documents evidencing and/or identifying the software used or to be used for the S.E.E. Model 2200.

6.    All documents evidencing and/or identifying any and all persons or entities engaged for the mechanical, optical, electrical and software designs for the S.E.E. Model 2200.

7.    All documents evidencing and/or identifying any and all computers purchased for software development in connection with the development of the S.E.E. Model 2200.

October 7, 2005                                    Attorney for defendants,

_____
Roger S. Davis
BBO No. 116320
DAVIS & RUBIN
One Bowdoin Square
Suite 901
Boston, MA  02114-2919
(617) 742-4300

QDI11:USDC:REQPROD

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

In Re:                                )
                                      )        Chapter 7
       S.E.E., Inc.                   )        Case No. 04-12352-WCH
                                      )
       _____Debtor_____   )

## STIPULATION OF SETTLEMENT

Stipulation made this _1st_ day of ~~July~~ August 2005, by and between Trustee, Debora Casey

("Trustee"), Chapter 7 Trustee of the bankruptcy estate of S.E.E., Inc. ("Debtor"), and Paul Martin

("Martin") and Jumi Lee ("Lee").

## PRELIMINARY STATEMENT

WHEREAS, on March 23, 2004, the debtor filed a voluntary petition under Chapter 7 of the

Bankruptcy Code; and

WHEREAS, Debora Casey is the duly appointed and acting Chapter 7 Trustee of the

Debtor's bankruptcy estate; and

## BACKGROUND

WHEREAS, the Debtor was in the business of designing, programming and selling and

installing an analytical instrument known as a microspectrometer which incorporates software and

hardware for use in the forensic science field for investigation of trace evidence; and

WHEREAS, Philip Tringali ("Tringali") was the principal shareholder, officer and employee

of the Debtor; and

WHEREAS, Martin and Lee were employees, officers and minority shareholders of the

Debtor; and

WHEREAS, Martin and Lee terminated their employment with the Debtor in or about

January 2002; and

β ""

WHEREAS, Tringali and the Debtor allege that Martin and Lee organized a competing business to the Debtor's while still employed by the Debtor; and

WHEREAS, Tringali and the Debtor allege that Martin and Lee breached an implied contract with the Debtor, misappropriated trade secrets and confidential information, and breached a duty owed to the Debtor and Tringali; and

WHEREAS, on or about March 22, 2002, the Debtor filed a complaint in the Plymouth Superior Court, *S.E.E. Inc., v. Martin, et al.,* Civil Action No. 02-306 ("Plymouth Action") asserting the claims based upon the allegations set forth in the previous paragraph as well as a claim under M.G.L. c. 93; and

WHEREAS, Martin and Lee denied the allegations and are vigorously defending the Plymouth Action; and

WHEREAS, in or about May 2002, Martin and Lee filed a complaint in the Norfolk Superior Court, *Martin, et al. v. S.E.E., Inc.,et al.,* Civil Action Number 02-801 ("Norfolk Action"). In or about May 2002, Martin and Lee filed their First Amended Complaint in the Norfolk Action. The Norfolk Action was brought as a derivative action on behalf of the Debtor and for common law causes of action alleging based upon Tringali's misuse of corporate funds in connection with the purchase and use of a vacation home, seeking the enforcement of a stock repurchase agreement claiming a value of $185,555, and for payment of vacation time and commissions earned; and

WHEREAS, the Norfolk Action asserts claims against Tringali for, *inter alia,* beach of fiduciary duty to Martin, Lee and the Debtor, breach of a covenant of good faith and fair dealing, breach of contract and payment of vacation time and commissions earned; and

WHEREAS, Tringali and the Debtor filed an answer denying Martin and Lee's allegations and asserting counterclaims on behalf of the Debtor similar to the claims advanced in its initial

2

complaint in the Plymouth Action; and

WHEREAS, prior to the commencement of the instant Chapter 7 Case, on or about May 22, 2003, the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Massachusetts, Chapter 11 Case No. 03-14379-WCH; and

WHEREAS, on or about June 6, 2003, the Debtor removed the Plymouth Action and Norfolk Action to the Bankruptcy Court in its Chapter 11 case commencing adversary proceeding numbers 03-1224 and 03-1225; and

WHEREAS, the Plymouth Action and Norfolk Action are principally a shareholder dispute; and

WHEREAS, on or about December 11, 2003, the Bankruptcy Court abstained from the Debtor's Chapter 11 case and the two related adversary proceedings, all of which were subsequently dismissed; and

WHEREAS, the Trustee, by her counsel, has reviewed all of the litigation pleadings generated in the Plymouth Action and the Norfolk Action, as well as the pleadings filed in the Debtor's Chapter 11 case and the related adversary proceedings, and reviewed discovery requests and responses and certain deposition transcripts generated in connection with the litigation matters; and

WHEREAS, the Trustee, by her counsel, has assessed the merits of the claims and counterclaims asserted by the Debtor in the Plymouth Action and Norfolk Action; and

WHEREAS, Martin and Lee filed several proofs of claim in the approximate aggregate amount of $251,970 ("Martin and Lee Claim") in the Debtor's Chapter 7 case; and

WHEREAS,   a real dispute exists between the parties; and

3

WHEREAS, the parties acknowledge the cost, expense, uncertainties, and delays associated with any litigation matter and have agreed to settle and resolve the pending disputes among the parties.

## THE SETTLEMENT

NOW THEREFORE, in consideration of the foregoing, it is hereby agreed and stipulated as follows:

Subject to the entry of an Order of the Bankruptcy Court approving this Stipulation:

1. Martin and Lee, jointly and severally, will pay to the Trustee $5,000 and withdraw the Martin and Lee Claim. The entry of an Order of the Bankruptcy Court approving this Stipulation shall effect the withdrawal of the Martin and Lee Claim without the need for further documentation.

2. In consideration of the foregoing, the Trustee will assign to Martin and Lee the claims and counterclaims asserted by the Debtor in the Plymouth Action and Norfolk Action. The entry of an Order of the Bankruptcy Court approving this Stipulation shall effect the assignment of such claims and counterclaims without the need for further documentation.

3. Effective upon the Bankruptcy Court's approval of this Stipulation, and without the need for further documentation, Martin and Lee, for themselves and their employees, predecessors, successors, affiliates, companies, subsidiaries, assigns, partners, principals, attorneys, insurers, agents, representatives, and heirs release the Trustee and the Debtor's bankruptcy estate of and from any and all claims, debts, demands, actions, causes of action, suits, accounts, covenants, contracts, agreements, damages, and any and all claims, demands, and liabilities of every name and nature, both in Law and Equity.

4. Effective upon the Bankruptcy Court's approval of this Stipulation, and without the

4

need for further documentation, other than the obligations arising hereunder and the claims and counterclaims that are being assigned hereby, the Trustee, for the Debtor and the estate releases the Martin and Lee of and from any and all claims, debts, demands, actions, causes of action, suits, accounts, covenants, contracts, agreements, damages, and any and all claims, demands, and liabilities of every name and nature, both in Law and Equity.

5.    This Stipulation is conditioned upon a final order of the Bankruptcy Court. Upon such approval, this Stipulation shall be binding upon and inure to the benefit of the parties to this Stipulation and their respective successors and assigns.

6.    The Trustee agrees to execute or re-execute any and all other documents reasonably necessary to carry out the terms of this Stipulation of Settlement and/or to correct any typographical errors and scrivener's errors in this document or any other documents which may be executed in connection herewith.

7.    No statements or recitals contained herein shall be deemed an admission by either party and are contained herein for settlement purposes only.

8.    This Stipulation may be executed in counterparts.


Paul Martin and Jumi Lee                          Debora Casey, Chapter 7 Trustee
By their attorneys,                               By her attorneys,


_____                       _____
Roger S. Davis, BBO# 116320                       Neil D. Warrenbrand, BBO# 556938
Davis & Rubin                                     Fitzpatrick & Warrenbrand LLP
One Bowdoin Square                                One McKinley Square
Ste. 901                                          Boston, 02109
Boston, MA 02114                                  Tel.: (617) 720-2286
(617) 742-4300                                    Fax: (617) 723-1710
                                                  Email: ndwlaw@aol.com

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

In Re:

S.E.E., Inc.

       Debtor

Chapter 7
Case No. 04-12352-WCH

## AMENDMENT TO STIPULATION OF SETTLEMENT

The Stipulation of Settlement dated August 1, 2005 between the
Trustee, Debora Casey ("Trustee"), Chapter 7 Trustee of the bankruptcy
estate of S.E.E., Inc. ("Debtor"), and Paul Martin ("Martin") and Jumi Lee
("Lee"), is hereby amended so that Paragraph 2 of the Settlement is
revised to read as follows:

> 2. In consideration of the foregoing, the
> Trustee will assign to Martin and Lee the claims
> and counterclaims asserted by the Debtor in the
> Plymouth Action and Norfolk Action, as well as
> all stockholder derivative claims in the Norfolk
> Action. The entry of an Order of the Bankruptcy
> Court approving this Stipulation shall effect the
> assignment of such claims and counterclaims
> without the need for further documentation.

Dated this 4th day of August, 2005.

Paul Martin and Jumi Lee,
By their attorney,

Roger S. Davis
BBO No. 116320
DAVIS & RUBIN
One Bowdoin Square
Suite 901
Boston, MA 02114-2919
(617) 742-4300

Debora Casey, Chapter 7
Trustee, By her attorney,

Neil D. Warrenbrand
BBO No. 556938
Fitzpatrick & Warranbrand LLP
One McKinley Square
Boston, MA 02109
Tel: (617) 720-2286
Fax: (617) 723-1710
Email: ndwlaw@aol.com

QD110.BANK.AMNDSTIP

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

In Re:                                              )
                                                    )      Chapter 7
        S.E.E., Inc.                                )      Case No. 04-12352-WCH
                                                    )
        Debtor                                      )

### CHAPTER 7 TRUSTEE'S MOTION FOR ORDER AUTHORIZING COMPROMISE OF CONTROVERSY AND FOR APPROVAL OF STIPULATION OF SETTLEMENT

TO THE HONORABLE WILLIAM C. HILLMAN, BANKRUPTCY JUDGE:

Now come Debora Casey ("Trustee"), Chapter 7 Trustee of the bankruptcy estate of Chapter 7

Trustee of the bankruptcy estate of S.E.E., Inc. ("Debtor"), and respectfully moves pursuant to

Federal Bankruptcy Rule 9019(a) and MLBR 9019 for an Order authorizing the Trustee to

compromise the estate's controversies with and Paul Martin ("Martin") and Jumi Lee ("Lee")

relative to certain claims and counterclaims asserted by the Debtor against Lee and Martin in non-

bankruptcy litigation matters identified hereinafter. Briefly, pursuant to the terms of this

compromise, Martin and Lee will pay to the estate $5,000 and withdraw their several proofs of claim

in the aggregate amount of approximately $251,970 and they will be given an assignment of the

claims and counterclaims as set forth hereinafter, all of which is set forth with more particularity

hereinafter and in the Stipulation.

        In support hereof, the Trustee states as follows:

#### PRELIMINARY STATEMENT

        1.      On March 23, 2004, the debtor filed a voluntary petition under Chapter 7 of the

Bankruptcy Code.

        2.      Debora Casey is the duly appointed and acting Chapter 7 Trustee of the Debtor's

bankruptcy estate.

08/19/2005. Granted. Stipulation Approved.



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

PHILLIP TRINGALI          )
     Plaintiff            )       C. A. NO. 04-12708-MLW
                       )
V.                   )
                       )
PAUL MARTIN AND JUMI LEE   )
     Defendants        )

**AFFIDAVIT OF PAUL MARTIN
IN SUPPORT OF DEFENDANTS' MOTION
FOR PROTECTIVE ORDER**

I, Paul Martin, hereby make the following Affidavit:

1.    Prior to my association with the plaintiff, S.E.E., Inc. ("S.E.E."), I was employed by Nanometrics of Sunnyvale, California, from February, 1994 to March, 1996, as product manager of its microspectrophotometers analytical division.  In March, 1996, Nanometrics closed this division and I was laid off.

2.    During my employment at Nanometrics, I acquired a great deal of knowledge concerning the methods of constructing microspectrophotometers, and the integration and use of software as well as the semiconductor and forensic applications of those instruments.  I also acquired knowledge of those companies which routinely purchased or were prospects for the sale of microspectrophotometers, in other words a potential and existing customer base.

3.    While I was employed by Nanometrics, I became acquainted with Phillip Tringali ("Tringali"), president of S.E.E.  S.E.E. was a sales representative for Nanometrics for the sale of semiconductor products, and was not engaged in the business of manufacturing or selling its own microspectrophotometers.

4.    After I was laid off by Nanometrics, together with S.E.E., I started an analytical microspectrophotometer business from my home in San Francisco. My wife, Jumi Lee ("Dr. Lee") was hired by S.E.E. on or about October, 1996 as

a consultant to assist in the development of the microspectrophotometer division.

5.      On or about October, 1997, after we had moved the business out of my home into a separate location, we began to manufacture the microspectrophotometer product.

6.      At S.E.E.'s direction, in February, 2000, we moved the microspectrophotometer operation from San Francisco to S.E.E.'s place of business in Middleborough, to operate our microspectrophotometer business out of the same premises in which S.E.E. operated its sales representative business for the sale of semiconductor products.

7.      Both Dr. Jumi Lee and I worked in Middleborough from February, 2000 until we resigned from S.E.E. in January, 2002.

8.      At no time during the term of my employment did I nor my wife, Dr. Lee, ever execute nor were we presented with any confidentiality agreement or noncompetition agreement.

9.      During the fall of 2001, while Dr. Lee and I were directors of S.E.E., we began to have serious differences with respect to the finances of S.E.E., the direction in which S.E.E. was moving in the microspectrophotometer field, settlement of another litigation matter as to which Tringali disagreed, and the fact that Tringali was devoting substantial company time to other personal endeavors while neglecting his duties for S.E.E. Ultimately, these differences lead to our resignation and termination of employment on January 9, 2002.

10.     After leaving S.E.E. on January 9, 2002, Dr. Lee and I formed Quantum and CRAIC to provide consulting service and manufacture of microspectrophotometers, respectively. We have invested more than $1,000,000 of our funds and over three years of our time in the development of these companies.

11.     We have now developed a product that will allow us to enter the film thickness/semiconductor market, which is the biggest market for our type of product.

2

12.    Tringali conducts business under the name of "PT Technology." Based upon Tringali's PT Technology document (Exhibit "B" hereto), which states that he represents Nanometrics, Inc., Tringali is engaged in competitive activities with those of my companies, Quantum Dynamics International, LLC ("Quantum") and CRAIC Technology ("CRAIC").

13.    Nanometrics is a direct competitor to both Quantum and CRAIC, according to the information which I have, it had more then $70,000,000 in gross revenue during the year 2004 in the film thickness/semiconductor market and has been a major player in the semiconductor metrology since 1978.

14.    Nanometrics employs hundreds of people, has established a sales and support network and a large research and development team.

15.    We are competing against Nanometrics, a company which Tringali represents now and has represented in the past, which by its size and revenues could easily overrun our company CRAIC in terms of sales, product development and entry into other markets, if any of our trade secrets and other confidential research, development or commercial information were disclosed to Tringali.

16.    We have been involved in other litigation against Tringali in three other cases since we left S.E.E. and he has indicated by his conduct that he would do anything to disrupt our company CRAIC.

17.    Two of the Nanometrics microspectrophotometer products in its lines are directly competitive to our QDI 2000, 1000 and 202 systems.

18.    The NanoSpec 6100 (Exhibit "C" hereto) is a reflectance microspectrophotometer that can measure sample areas as small as 10 microns and calculate the thickness of thin films deposited on wafers. It ranges from the deep ultraviolet into the near infrared. I believe that our QDI is superior in that it has a larger spectral range and can make types of measurements that the NanoSpec 6100 cannot. For example, both the NanoSpec 6100 and the QDI 2000 measure reflectance of microscopic sample areas, however, the QDI 2000 can also measure transmittance and fluorescence and of smaller areas. To provide proprietary information on the

3

QDI products, which would include the QDI 2000, would cause us irreparable harm.

19.    The NanoSpec 3000 (Exhibit "D" hereto) is a direct competitor to the QDI 202 system. It is a reflectance microspectrophotometer that can calculate the thickness of thin films deposited upon wafers, it ranges from the visible into the near infrared. I believe our QDI 202 is superior in that it has a larger spectral range and can also make types of measurements that the Nanometrics product cannot and of a smaller sampling area. Providing proprietary information regarding this product to Tringali would cause us irreparable harm.

20.    To assist this Court I have prepared a Competitive Comparison of our microspectrophotometers, the QDI 202 and the QDI 2000, to demonstrate the similarities and what I believe are the superior characteristics of our products (Exhibit "E" hereto). Once again, providing proprietary information regarding these products to Tringali would cause us irreparable harm.

Signed under the pains and penalties of perjury this $\underline{31}$ day of October, 2005.

$\overline{\qquad\qquad}$
Paul Martin

Phillip Tringali

5

| 1 | A. | Yes. |

1    A.    Yes.

2    Q.    Are you employed or self-employed?

3    A.    Self-employed.

4    Q.    And the name of your business is what?

5    A.    PT Technology.

6    Q.    And the nature of that business is what?

7    A.    Sales manufacturer's representatives.

8    Q.    And what products do you sell?

9    A.    Primarily in the semiconductor business

10   for about six companies.

11   Q.    And where are you located, your business

12   address?

13   A.    At the home.

14   Q.    Do you have any employees?

15   A.    No.

16   Q.    And how long have you been engaged in

17   this particular business?

18   A.    Roughly just over a year.

19   Q.    Okay.  At some time, you were the

20   president of a company by the name of "S.E.E." --

21   that's S.E.E.; correct?

22   A.    Yes.

23   Q.    When did you originally form S.E.E.?

24   A.    1988.

F

July 18, 2005

# PT Technology

**Is pleased to represent the following companies and their products in New England, New York, and Eastern Canada.**

## GTI Technologies, Inc.- Shelton, CT          www.gtitechnologies.com

- Wafer Thickness Measurement Systems
- Wafer Grinding Systems
  - Si, GaAs, InP, SiC, Sapphire, Ceramics, Quartz
- Wafer Scribers and Bonders
- Semi-Auto Probe Station
- Gas Detection and Monitoring Systems
- Carbon Fiber End Effectors
- Takatori Products
  - Tape Laminating, Wafer Mounting, Tape Removal, Wire Saws

## Integrated Designs, LP- Carrollton, TX          www.integrated-designs.com

- Chemical Delivery Systems
- Resist Pumps
  - Cybor, IDI
- Dispense Systems
  - Resist, EBR, SOG, Low-K, Solvent

## Micro-Metric, Inc.- San Jose, CA          www.micro-metric.com

- Optical Metrology Systems
  - CD Measurements
  - Overlay Measurements
  - 2"-12" Wafers
  - Masks and Reticles
- Fiber Optic Measurement Systems
  - Fiber, V-Groove, Ferrule
  - Concentricity, Diameters, Spacing, Pitch
- Coordinate Measurement Systems

"G"

## Nanometrics Inc.- Milpitas CA                www.nanometrics.com

- Film Thickness Measurement Systems
    - o Table Top: Manual and Semi Automated
    - o Fully Automated w/ DUV-NIR Spectroscopic Ellipsometry
- Fully Automated OCD Metrology Systems
- Fully Automated UDI Metrology System

## SSS, Inc.- Montvalle NJ                www.s-cubed.com

- Flexi-PCS
    - o Spin Coat, Develop, Bake Systems
- TruClean Double-Sided Scrubbing Systems
    - o Round, Square, Rectangular, to 300mm
- Cyclone Chemical Processing Systems
    - o Cleaning, Etching, Liftoff

**Please contact us for any questions or assistance we may provide for our product lines. We may be reached at the following information.**

**PT Technology**
**98 Walnut St.**
**Halifax ,MA 02338**

Tel:     781-293-5974
Fax     781-294-0504
Mobile:339-933-3365

Email: ptringali@aol.com

# ⊙NANO metrics

INNOVATION. RELIABILITY. EXPERIENCE.    **process control** metrology solutions

**RELATED TECHNOLOGIES**
Spectroscopic Reflectometry

Spectroscopic Ellipsometry

Combined SR / SE

**RELATED PRODUCTS**
NanoOCD/DUV 9010
NanoSpec 9000 Series

Nanometrics FLX
Nanometrics ATLAS
NanoSpec 9200
NanoSpec 9100
NanoSpec 8000

NanoSpec 6100 [tabletop]
NanoSpec 3000 [tabletop]

N2000 Software
NanoNet



**NanoSpec® 6100**
Tabletop Film Analysis System

The NanoSpec 6100 is a fast, low cost tabletop film thickness and mapping system that provides a broad range of measurement capabilities for thin film metrology. The 6100 utilizes non-contact spectroscopic reflectometry to measure sites as small as 10µm in diameter on production wafers. The computerized sample stage coupled to a robust autofocus system enables automatic generation of film thickness uniformity maps. The system will measure wafer substrates in the size range of 75 to 200mm and photomasks from 5 to 9 inches square.

The 6100 measures film thickness in the range of 200Å - 20µm with the visible light source (400 to 800nm halogen lamp) and 25Å - 20µm with optional UV light source (210 - 400nm deuterium lamp). The upper thickness range can be extended to 70µm with the thick film option. Optical constants n and k can be determined with the XMP option.

A variety of substrates are easily measured and mapped with the motorized, precision x-y sample stage with a resolution of better than 1µm. The high-resolution color graphics display provides contour and 3D film thickness mapping.

**APPLICATIONS**

Film Analysis

Critical Dimension Metrology

Overlay Metrology

Defect Inspection

Surface Profiling

Mask Metrology

home | news | products | solutions | investor | support | contact | careers | email alert

©2004 Nanometrics Incorporated. All Rights Reserved. | legal info

⊙ **NANOmetrics**

INNOVATION. RELIABILITY. EXPERIENCE.    **process control** metrology solutions

OCT 21 2005 03:19:19 PM



**RELATED TECHNOLOGIES**
Spectroscopic Reflectometry

Spectroscopic Ellipsometry

Combined SR / SE

**RELATED PRODUCTS**
NanoOCD/DUV 9010
NanoSpec 9000 Series

Nanometrics FLX
Nanometrics ATLAS
NanoSpec 9200
NanoSpec 9100
NanoSpec 8000

NanoSpec 6100 [tabletop]
NanoSpec 3000 [tabletop]

N2000 Software
NanoNet

**NanoSpec® 3000**
Tabletop Film Analysis System

The NanoSpec 3000 is a low cost, film thickness measurement system that utilizes a modern small spot spectroscopic reflectometer that is built on a simple-to-use tabletop platform. The rugged, solid state linear diode array provides fast, precise measurements of single-layer films such as oxide, nitride and photoresist, as well as the top layer on film stacks of up to 3 layers in the thickness range of 250Å to 35μm. The flexible software platform makes it simple and easy for the user to configure measurement programs and recipes for both simple and advanced measurement applications. With the ability to select film constants, scan ranges and substrate types, the 3000 is the ideal tool for rapid measurement program development. Data management features include a database, statistical analysis, histograms and the ability to export data files. Both tabular and Cauchy dispersion models are available for use and material files may be imported and exported. Optical constants n and k can be determined with the XMP option.

**APPLICATIONS**

Film Analysis

Critical Dimension Metrology

Overlay Metrology

Defect Inspection

Surface Profiling

Mask Metrology

home | news | products | solutions | investor | support | contact | careers | email alert

©2004 Nanometrics Incorporated. All Rights Reserved. | legal info

"I"