# United States District Court
# District of Massachusetts

PHILLIP TRINGALI,
     Plaintiff,

     V.                      CIVIL ACTION NO. 2004-12708-MLW

PAUL MARTIN,
JUMI LEE,
     Defendants.

# *REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION TO DISMISS (#2)*

COLLINGS, U.S.M.J.

## *I. Introduction*

On December 27, 2004, plaintiff Philip Tringali ("Tringali") filed a two-count complaint (#1) against defendants Paul Martin ("Martin") and Jumi Lee ("Lee"). In Count I the plaintiff alleges that the defendants breached a fiduciary duty they owed to him as fellow shareholders of a closely held corporation. In Count II Tringali contends that Martin and Lee slandered him and, as a

consequence, that he has suffered damage to his reputation, economic losses and emotional distress. In lieu of filing an answer, on March 31, 2005, the defendants filed a motion to dismiss (#2) together with a memorandum in support (#3). Following an extension of time Tringali filed an opposition (#7) to the dispositive motion including various exhibits. With the submission of a reply brief (#10)[1], the record is complete and the motion to dismiss stands ready for decision.

## II. The Facts

The facts as recited herein are gleaned from the allegations of the complaint.

Tringali is an individual residing in Halifax, Massachusetts. (#1 ¶1) Martin and Lee, husband and wife, are individuals residing in Atladena, California. (#1 ¶¶2-3) These three individuals own all of the shares of S.E.E., Inc. ("S.E.E."), a closely held corporation organized under the laws of Massachusetts and headquartered in the Commonwealth. (#1 ¶¶6-7)

S.E.E. was founded by Tringali in 1988 "as a sales organization engaged in selling various analytical equipment and systems used in the microelectronic

---

[1]

On May 23, 2005, Martin and Lee filed a motion for leave to file a reply brief (#10) with that proposed pleading attached. That motion was allowed on September 29, 2005.

industry." (#1 ¶8)  The focus of the company changed somewhat in 1996 when "S.E.E. embarked upon a business plan to design, manufacture and market an integrated, computer operated microspectrophotometry system for use in the forensic sciences (the "Analytical Product")."  (#1 ¶9)

In pursuit of this business plan, S.E.E. hired Martin in early May, 1996, to work as a research analyst in developing the Analytical Product. (#1 ¶10) Lee became employed by Wavetech, a consulting firm that provided research and development advice to S.E.E., on or about October 1, 1996. (#1 ¶17)  As a Wavetech consultant, Lee worked with Martin in developing the Analytical Product and ultimately herself became an S.E.E. employee in or around April, 1997. (#1 ¶¶18-19)  While Martin and Lee supervised  the development of the Analytical Product in California, S.E.E.'s sales business was located in Massachusetts. (#1 ¶12)

On February 28, 1997, in addition to becoming a director of S.E.E., Martin was given 10% of S.E.E.'s stock as well as an option to purchase additional stock at $.50 per share. (#1 ¶11)  About fifteen months later on May 13, 1998, Lee, too, was made an S.E.E. director, was granted 8000 shares of stock and an option to purchase more at $.50 per share. (#1 ¶20)  Lee received an additional 2000 shares of S.E.E. stock from the company on April 20, 1999. (#1 ¶21)

Martin and Lee moved to Quincy, Massachusetts when, in February of 2000, the Analytical Product and sales operations of S.E.E. were consolidated into a single facility in Middleboro, Massachusetts. (#1 ¶¶13-14)  In early April of that year Martin was promoted to the position of vice president of sales and marketing for the Analytic Product at S.E.E. (#1 ¶15)  The following month Lee received a promotion to the position of operations manager of S.E.E. (#1 ¶23)  It is alleged that

> As the personnel primarily responsible for developing and marketing S.E.E.'s analytical product, both Martin and Lee acquired, during their respective employment by S.E.E., comprehensive knowledge of S.E.E.'s most sensitive product development and customer-related trade secrets and confidential information, including but not limited to S.E.E.'s database of customer information.

Complaint #1 ¶24.

On or about August 28, 2000, Martin and Lee exercised their respective options, each purchasing an additional 5000 shares of S.E.E. stock. (#1 ¶¶16, 22)  Together Martin and Lee owned 21% of S.E.E.'s stock by the start of 2001. (#1 ¶29)

S.E.E. earned $1.2 million from sales of the Analytical Product in 2000. (#1 ¶25)  In 2001, the company started what was predicted to be a year-long

4

development of an enhanced analytical product ("Enhanced Product") to be used not only in the forensic sciences, but also in the microelectronics manufacturing process. (#1 ¶26)  Martin and Lee were to take the lead on the project in that they "were primarily responsible for managing the development, manufacture and marketing of the Enhanced Product, including the hiring of additional employees required to develop the product, and cultivating contacts with prospective customers." (#1 ¶27)

It is alleged that on December 31, 2001 while Martin and Lee were still employed by S.E.E., still serving as directors of the company and still holding a 21% ownership interest in the company, they filed articles of organization for a Massachusetts limited liability corporation, Quantum Dynamics International, LLC ("Quantum"). (#1 ¶¶31, 36)  The principal place of business for Quantum was Martin and Lee's residence. (#1 ¶32)   According to the allegations of the complaint, "Martin and Lee formed Quantum for the purpose, and with the intent of designing, marketing and installing an integrated, computerized analytical device to compete directly with S.E.E.'s product." (#1 ¶33)  Martin and Lee did not inform Tringali or S.E.E. that they were establishing Quantum, nor did they offer Tringali or S.E.E. the opportunity to participate in the new

venture. (#1 ¶35[2])

When Martin and Lee failed in an attempt to force Tringali to sell them his shares of S.E.E. stock, on or about January 9, 2002, they resigned as employees and directors of S.E.E. (#1 ¶37)  It is alleged that before resigning, and unbeknownst to Tringali, the pair had:

> -duplicated the paper and digital records containing all of S.E.E.'s confidential and proprietary information, including but not limited to all of the design and development information for the Enhanced Product, and all of S.E.E.'s Analytical Product customer information, and had removed the copies from S.E.E.'s facility;
>
> -removed from the S.E.E. facility a portion of S.E.E's inventory of the components to be integrated into the Analytical Product and/or the Enhanced Product; and
>
> -destroyed certain of S.E.E.'s corporate records, including all paper records and digital information regarding the specifications for the Enhanced Product, all computer code written for integration into the Enhanced Product, and all documentation regarding the process developed for assembling and manufacturing the Enhanced Product.

Complaint #1 ¶¶38-40.

---

[2]

There appears to be a misstatement in the complaint where it is alleged that "[d]efendants Martin and Lee did not offer S.E.E. or Tringali the opportunity to participate in *S.E.E.'s* business. (#1 ¶35, emphasis added).  Presumably the allegation should read *Quantum's* business.

In short order after resigning from S.E.E. but while they were still stockholders, Martin and Lee started to market a product for Quantum, a company of which they were the sole equity owners, that was essentially S.E.E.'s proposed Enhanced Product. (#1 ¶42)  This marketing effort was directed to S.E.E.'s customers, representatives and distributors in head-to-head competition with S.E.E. (#1 ¶42)  During this time the couple also allegedly

> made false statements to S.E.E.'s Analytical Product distributor and certain of its Analytical Product sales representatives [that] Tringali had improperly used corporate funds of S.E.E. for personal purposes, and had engaged in other financial improprieties with respect to the operation of S.E.E.

Complaint #1 ¶44.

Martin and Lee's actions purportedly so impacted S.E.E.'s revenue that the company had to file for bankruptcy protection in 2003, and then ultimately for liquidation in 2004. (#1 ¶¶45-46)

### III. The Claims

In Count I Tringali asserts that as shareholders in a closely held corporation, Martin and Lee owed him, a fellow shareholder, a fiduciary duty of loyalty.  The defendants are said to have breached that fiduciary duty while they remained S.E.E. stockholders by: conspiring to start and operate a business

in direct competition with S.E.E.; conspiring to compete with S.E.E. by taking S.E.E.'s confidential and proprietary information; selling to S.E.E.'s customers as a Quantum product a product they developed for S.E.E. while working at S.E.E.; exploiting sales and economic opportunities that had been developed for S.E.E. to benefit Quantum; failing properly to perform their duties while at S.E.E.; and destroying S.E.E.'s corporate records. (#1 ¶¶49a-g) Tringali alleges that the defendants' breaches of their fiduciary duty caused S.E.E.'s financial failure which, in turn, rendered his S.E.E. stock worthless.

In Count II Tringali claims that Martin and Lee made false and malicious statements about him, i.e., that he engaged in financial improprieties with regard to S.E.E. monies, including having used corporate funds for personal purposes, to S.E.E.'s Analytical Product distributor and others. (#1 ¶¶53-54)  It is alleged that these statements were slanderous and intended to prejudice the plaintiff's business. (#1 ¶55)  Tringali contends that he has been damaged by the defendants' slander in that he has suffered actual economic loss, emotional distress and damage to his reputation. (#1 ¶56)

## IV. The Law

Martin and Lee have moved to dismiss the complaint on the grounds of

abstention as to Count I, lack of jurisdiction as to both Counts I and II, and failure to satisfy the amount in controversy requirement of diversity jurisdiction as to both Counts I and II.

Turning first to the abstention doctrine, the Supreme Court has held that although a federal court "does have jurisdiction of a particular proceeding, it may, in its sound discretion, whether its jurisdiction is invoked on the ground of diversity of citizenship or otherwise, refuse to enforce or protect legal rights." *Burford v. Sun Oil Co.*, 319 U.S. 315, 317-18 (1943). The abstention doctrine is not a rigid, bright line rule, but rather is dependent on the facts in any given case. In the present case, the defendants argue that the Court should abstain from hearing the case under *Colorado River* abstention which allows a federal court to abstain where there are concurrent federal and state proceedings. *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 818-819 (1976).

As to the defendants' second argument, the issue is whether the Court has personal jurisdiction over Martin and Lee based on the transaction of business in Massachusetts, tortious activity conducted by them or through an agent relating to the Commonwealth or causing tortious injury in Massachusetts by

an act or omission outside the Commonwealth and, if so, whether the exercise of personal jurisdiction comports with the requirements of constitutional due process?

The plaintiff bears the burden of proving that the defendants are subject to the jurisdiction of Massachusetts courts. *Massachusetts School of Law at Andover, Inc. v. American Bar Association*, 142 F.3d 26, 34 (1 Cir., 1998). To meet this burden it must be shown that Martin and Lee are subject to Massachusetts jurisdiction under the Massachusetts long-arm statute, Mass. Gen. L. c. 223A, and under the strictures of constitutional due process. *Noonan v. Winston Co.*, 902 F. Supp. 298, 302 (D. Mass., 1995), *aff'd.*, 135 F.3d 85 (1 Cir., 1998). When no evidentiary hearing is held, as in this case, a *prima facie* standard applies. *United States v. Swiss American Bank, Ltd.*, 274 F.3d 610, 618 (1 Cir., 2001). In evaluating whether the *prima facie* standard has been fulfilled, the Court "accepts properly supported proffers of evidence by a plaintiff as true and makes its ruling as a matter of law." *Swiss American Bank, Ltd.*, 274 F.3d at 619.

Lastly, for the federal court properly to exercise subject matter jurisdiction under diversity of citizenship, there must be at least $75,000 in controversy.

10

Title 28 U.S.C. §1332(a).  The First Circuit has held that:

> The longstanding test for determining whether a party
> has met the amount-in-controversy states that:
>
>> The rule governing dismissal for want of
>> jurisdiction in cases brought in the federal
>> court is that, unless the law gives a
>> different rule, the sum claimed by the
>> plaintiff controls if the claim is apparently
>> made in good faith. It must appear to a
>> legal  certainty that the claim is really for
>> less than the jurisdictional amount to
>> justify dismissal.

*Stewart v. Tupperware Corp.*, 356 F.3d 335, 338 (1 Cir., 2004) *quoting St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 288-89 (1938)(footnotes omitted); *see also Spielman v. Genzyme Corp.*, 251 F.3d 1, 5 (1 Cir., 2001).

These three grounds for dismissal shall be addressed seriatim.

### V. Discussion

### A. Abstention

In seeking dismissal of Count I on the grounds of abstention, Martin and Lee observe that there are two other state court cases pending which involve substantially the same parties and substantially the same claims.  In the first of these actions which was filed in the Plymouth County Superior Court in March of 2002, S.E.E. brought claims of breach of implied contract of employment, breach of an implied covenant of good faith and fair dealing and breach of

11

fiduciary duty against Martin and Lee, claims of intentional interference with advantageous contractual relations and accounting against Quantum, and claims for violation of Mass. Gen. L. c. 93 §§42 and 42A and Mass. Gen L. c. 93A and civil conspiracy against all three defendants. (#3, Exh. A)  Martin and Lee contend that S.E.E.'s beach of fiduciary duty claim against them is essentially identical to Tringali's breach of fiduciary duty claim in the instant case.[3] Because S.E.E. is in bankruptcy and all actions involving the company are stayed, Martin and Lee argue that Tringali is attempting

> to usurp the corporate action belonging to S.E.E., Inc., which is now pending in the Plymouth Action, and to further usurp the duties and discretion of trustee in bankruptcy. The prosecution of the Plymouth Action is subject to the determination of the bankruptcy trustee and does not vest Tringali with the authority to substitute himself in place of the corporation.

Defendants' Memorandum #3 at 11-12.

The defendants' position is not persuasive.  No evidence has been offered to suggest that there is some basis upon which to pierce the corporate veil, i.e., to treat Tringali and S.E.E. as one in the same.  In neither the Plymouth County

---

[3] The defendants devote approximately ten pages of their fifteen-page memorandum to quoting at length from documents in the Plymouth County case in order to highlight the purported similarities between the claims.

case nor the Norfolk County case[4] has Tringali individually asserted a claim against Martin or Lee, so the federal case is not redundant.  Moreover, Tringali as a stockholder in the closely held corporation has a personal claim for breach of fiduciary duty separate from S.E.E.'s claim.  The Court is hard-pressed to see how the defendants could argue otherwise when they themselves have each individually alleged just such a claim against Tringali in the Norfolk County case.

In addition to their primary "usurpation" argument, Martin and Lee briefly address the abstention factors to be weighed. (#3 at  11-12) At the outset it should be noted that *Colorado River* abstention is the exception, not the rule. As the Supreme Court wrote in that case:

> [T]here are principles unrelated to considerations of proper constitutional adjudication and regard for federal-state relations which govern in situations involving the contemporaneous exercise of concurrent jurisdictions, either by federal courts or by state and federal courts. These principles rest on considerations of "(w)ise judicial administration, giving regard to conservation of judicial resources and comprehensive

---

[4]

In the Norfolk County case Martin and Lee have filed a seven-count complaint against S.E.E. and Tringali. (#7, Exh. 2) The claims alleged are Inspection of Books and Records against S.E.E. and Tringali (Count I), Breach of Fiduciary Duty to Stockholders against Tringali (Count II), Breach of Fiduciary Duty to S.E.E. against Tringali (Count III), Breach of the Implied Covenant of Good Faith and Fair Dealing against Tringali (Count IV), Accounting against Tringali (Count V), Breach of Contract against S.E.E. and Tringali (Count VI) and Violation of Mass. Gen. L. c. 148 and 149, §150 against S.E.E. and Tringali.  S.E.E. filed a counterclaim against Martin and Lee, but Tringali did not. (#3, Exh. G)

disposition of litigation." Generally, as between state and federal courts, the rule is that "the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction . . . ." As between federal district courts, however, though no precise rule has evolved, the general principle is to avoid duplicative litigation. This difference in general approach between state-federal concurrent jurisdiction and wholly federal concurrent jurisdiction stems from the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them. Given this obligation, and the absence of weightier considerations of constitutional adjudication and state-federal relations, **the circumstances permitting the dismissal of a federal suit due to the presence of a concurrent state proceeding for reasons of wise judicial administration are considerably more limited than the circumstances appropriate for abstention.** The former circumstances, though exceptional, do nevertheless exist.

*Colorado River*, 424 U.S. at 817-818 (citations omitted; emphasis added).

The first two factors to be considered have no applicability to the facts of this case: There has been no assumption by the Plymouth County court, the Norfolk County court or this Court of jurisdiction over any res or property, nor have the defendants raised any issue with respect to the federal forum being somehow less convenient to the parties than the state forum. *Colorado River*, 424 U.S. at 818; *see also Moses H. Cone Memorial Hospital v. Mercury Construction*

14

*Corporation*, 460 U.S. 1, 19-22 (1983)(applying the *Colorado River* factors).[5]
The next factor, avoidance of piecemeal litigation, is basically impossible in light
of S.E.E.'s bankruptcy. *Colorado River*, 424 U.S. at 818.  All the claims involving
S.E.E. in the two state court actions are stayed, yet Martin and Lee's claims
against Tringali are proceeding.  With piecemeal litigation already underway,
there seems no equitable reason to permit Martin and Lee to pursue their claims
yet foreclose Tringali from doing the same.

The fact that the state courts obtained jurisdiction first is of little
consequence in the circumstances at hand, particularly in view of the automatic
stay which thwarts any progress with respect to S.E.E.'s claims.  *Colorado River*,
424 U.S. at 818.  A final factor, whether federal or state law provides the rule
of decision on the merits, is of "ambiguous relevance" on the facts of this case.
*Moses H. Cone Memorial Hospital*, 460 U.S. at 23.  In sum, balancing all of these
considerations, the Court finds no compelling justification to dismiss Count I of
the complaint based on the abstention doctrine. *Colorado River*, 424 U.S. at 819
("Only the clearest of justifications will warrant dismissal.")

B.  Personal Jurisdiction

---

[5]

The decision in the *Moses H. Cone Memroial Hospital* case was superseded by statute as stated in the
case of *Bradford-Scott Data Corp., Inc. v. Physician Computer Network, Inc.,* 128 F.3d 504 (7 Cir., 1997).

Turning now to the defendants' second ground for seeking dismissal, the Court shall determine whether personal jurisdiction may properly be exercised over Martin and Lee.

The Massachusetts long-arm statute provides in pertinent part[6] that:

> A court may exercise personal jurisdiction over a person, who acts directly or by an agent as to a cause of action in law or equity arising from the person's
>
> (a) transacting any business in this commonwealth;
> * * * * *
> (c) causing tortious injury by an act or omission in this commonwealth;
> (d) causing tortious injury in this commonwealth by an act or omission outside this commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this commonwealth.

Mass. Gen. L. c. 223A §3.

When assessing a defendant's actions for the purpose of personal jurisdiction under the long-arm statute, courts look at two factors: 1) whether the defendant transacted business in Massachusetts, and 2) whether the plaintiff's claim arose from such business. *Tatro v. Manor Care, Inc.*, 416 Mass. 763, 767, 625 N.E.2d

---

[6]    The defendants acknowledge that subsections (b) and (e)-(h) of Mass. Gen. L.c. 223A §3 are not relevant to this inquiry. (#3 at 12)

549, 551 (1994). The "transacting business" prong is to be read broadly. *Heins v. Wilhelm Loh Wetzlar Optical Mach. GmbH*, 26 Mass. App. Ct. 14, 17, 522 N.E.2d 989, 991, *review denied*, 402 Mass. 1105, 525 N.E.2d 678 (1988).

The defendants contend that

> Tringali has failed to allege any facts with regard to the transacting of any business by the defendants in Massachusetts for purposes of jurisdiction under §3(a) or any facts regarding causing any tortious injury under §3(c) or (d)...[or] any facts which permit this Court to conclude that his claim arises out of any activities on the part of either Martin or Lee necessary to establish personal jurisdiction under the Massachusetts Long Arm Statute.

Defendants' Memorandum #3 at 13.

A cursory review of the allegations of the complaint demonstrates the defendants' argument to be without merit.

Tringali alleges that at all times relevant to the complaint S.E.E., a closely held corporation organized under the laws of Massachusetts, was headquartered in the Commonwealth. (#1 ¶¶6-7) Both Martin and Lee were hired to work for S.E.E. and ultimately were promoted into positions as directors of the company as well as stockholders. (#1 ¶¶10,11, 15, 19, 20) While employed by S.E.E., the defendants physically relocated from California to Massachusetts in early 2000.

(#1 ¶¶12, 13, 14)

In 2001

> Martin and Lee were primarily responsible for managing the development, manufacture and marketing of the Enhanced Product, including the hiring of additional employees required to develop the product, and cultivating contacts with prospective customers.

Complaint #1 ¶27.

On December 31st of that year the defendants filed articles of organization for Quantum, a Massachusetts limited liability corporation they had formed. (#1 ¶31) Quantum's principal place of business was Martin and Lee's residence. (#1 ¶32) On December 31, 2001, the defendants were still directors and stockholders of S.E.E. (#1 ¶36)

Quantum allegedly was formed to design, market and install "an integrated computerized analytical device" to compete directly with S.E.E.'s Enhanced Product. (#1 ¶33) Essentially Quantum exploited the knowledge and expertise that Martin and Lee had gained while employed by S.E.E. to compete against S.E.E. (#1 ¶¶38, 39, 40) For example, before they resigned from the company the defendants purportedly duplicated and took all of the confidential, proprietary design and development information for the Enhanced Product as

18

well as customer information. (#1 ¶38)   Martin and Lee also alleged took components for the Analytical Product and/or Enhanced Product from S.E.E.'s facility and destroyed "all paper records and digital information regarding the specifications for the Enhanced Product, all computer code written for integration into the Enhanced Product, and all documentation regarding the process for assembling and manufacturing the Enhanced Product." (#1 ¶40) Since S.E.E.'s entire operation was located in Middleboro, Massachusetts (#1 ¶13), it can readily be inferred that all of this conduct by the defendants occurred in the Commonwealth.

Martin and Lee resigned from S.E.E. on or about January 9, 2002, but remained stockholders. (#1 ¶37)  "Within two weeks of their resignation from S.E.E. Martin and Lee, as employees, managers, and sole equity owners of Quantum, began to market a product virtually identical to S.E.E.'s product" although it included features that were to have been added to S.E.E.'s Enhanced Product. (#1 ¶41)  Quantum's marketing effort was aimed at S.E.E's customers, representatives and distributors. (#1 ¶42)  It is alleged that as a result of the defendants' conduct S.E.E.'s revenues declined steeply and the company was ultimately forced into bankruptcy and liquidation. (#1 ¶¶45-46)   The bankruptcy rendered Tringali's interest in S.E.E. worthless. (#1 ¶50)

These facts squarely show that Martin and Lee are alleged to have conducted business in the Commonwealth and that Tringali's injury arose from that transaction of business. Additionally, or alternatively, it can be said that Martin and Lee caused tortious injury to Tringali consequent to their conduct in Massachusetts. In either event, facts supporting personal jurisdiction under the long-arm statute are plainly alleged in the complaint.

Of course, whether the exercise of personal jurisdiction is proper does not depend upon the long-arm statute analysis alone. The constitutional analysis must also be undertaken.

The Supreme Court has held that the due process clause protects the liberty interest of individuals and prevents binding judgments in forums of which he/she has "no meaningful 'contacts, ties, or relations.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471-72 (1985) (*quoting Int'l Shoe Co. v. State of Washington*, 326 U.S. 310, 319 (1945)). The First Circuit has held that in personal jurisdiction suits, due process requires three components: relatedness, purposeful availment, and reasonableness. *Foster-Miller, Inc. v. Babcock & Wilcox Canada*, 46 F.3d 138, 144 (1 Cir., 1995).

The first component, relatedness, addresses whether the injury suffered

20

is the result of forum-related activity. This test is similar to the first and second prongs of the Massachusetts long-arm statute in that the inquiry is whether the injury arises from or relates to the in-forum activity. *Ticketmaster-New York v. Alioto*, 26 F.3d 201, 206 (1 Cir., 1994)(*quoting Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)). Although the test to determine "relatedness" is a "flexible, relaxed standard," it must be based on specific, as opposed to general, contacts between the defendant and the forum state. *Sawtelle v. Farrell*, 70 F.3d 1381, 1390 (1 Cir., 1995).

Martin and Lee, residents of Massachusetts, formed a Massachusetts limited liability corporation to manufacture and market a product in direct competition with the product of their Massachusetts employer. The specific contacts between the defendants and the forum state are clear.

The second component, purposeful availment, contains two distinct factors: voluntariness and foreseeability. Voluntariness means that the defendant cannot be haled into Massachusetts due to a unilateral action done by another party. *Ticketmaster-New York*, 26 F.3d at 208. Foreseeability has been interpreted to mean that the act should put the defendant on notice that he/she could be haled into court in Massachusetts as a result of that act.

21

*Ticketmaster-New York*, 26 F.3d at 208.

The defendants chose to form Quantum as a Massachusetts limited liability corporation.  Given their alleged actions with respect to Quantum vis-a-vis S.E.E. in Massachusetts, Martin and Lee undoubtedly should have foreseen that they could be haled into court in the Commonwealth.

The last component, reasonableness, requires that haling the defendant into court in Massachusetts will not offend "traditional notions of fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 316.  Reasonableness is determined by "gestalt factors." *United Elec., Radio and Mach. Workers of America v. 163 Pleasant Street Corp.*, 960 F.2d 1080, 1088 (1 Cir., 1992).[7]  These "gestalt factors" include: i) the defendant's burden of appearing, ii) the forum state's interest in adjudicating the dispute, iii) the plaintiff's interest in obtaining convenient and effective relief, iv) the judicial system's interest in obtaining the most effective resolution of the controversy, and v) the common interest of all sovereigns in promoting substantive social policies. *Burger King Corp.,* 471 U.S. at 477.

The defendants are pursuing an action against Tringali in the state court

---

[7]

Superseded by rule as stated in *Central States, Southeast and Southwest Area Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934 (7 Cir., 2000).

in the Commonwealth and their conduct occurred in Massachusetts, so their burden to appear here is minimal. Massachusetts has a strong interest in adjudicating the case given the alleged impact the conduct of a Massachusetts limited liability corporation controlled by the defendants had on a Massachusetts business and resident. As a Massachusetts resident, Tringali obviously has a significant interest in obtaining convenient and effective relief in his home state. The final two factors, the judicial system's interest in obtaining the most effective resolution of the controversy and the common interest of all sovereigns in promoting substantive social policies, are, on balance, essentially neutral. Considering these gestalt factors, it is plainly reasonable to require the defendants to answer in the jurisdiction of Massachusetts. In short, it will not offend "traditional notions of fair play and substantial justice" for the Court to exercise personal jurisdiction over Martin and Lee.

C. <u>Amount-in-Controversy</u>

Moving on to the issue of subject matter jurisdiction, with the defendants having challenged the allegation in the complaint that "the amount in controversy is greater than $75,000.00", it is incumbent upon the plaintiff to establish that his claim, in fact, meets the requisite threshold amount.

*Spielman*, 251 F.3d at 4.  As detailed by the First Circuit:

> The longstanding test for determining whether a party has met the amount-in-controversy states that:
>
>> The rule governing dismissal for want of jurisdiction in cases brought in the federal court is that, unless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal.
>
> *St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 288-89, 58 S.Ct. 586, 82 L.Ed. 845 (1938) (footnotes omitted). When applying this test, a court must look at the circumstances at the time the complaint is filed. *Spielman*, 251 F.3d at 5. Plaintiffs' "general allegation of damages that meet the amount requirement suffices unless questioned by the opposing party or the court." *Id.* (citing *Dep't of Recreation & Sports v. World Boxing Ass'n*, 942 F.2d 84, 88 (1st Cir.1991)). If the opposing party questions the damages allegation, then "'the party seeking to invoke jurisdiction has the burden of alleging with sufficient particularity facts indicating that it is not a legal certainty that the claim involves less than the jurisdictional amount.'" *Id.* (quoting *Dep't of Recreation and Sports*, 942 F.2d at 88) (further citations omitted).

*Stewart*, 356 F.3d at 338.

The Court has further noted that "'[a] party may meet this burden by amending

the pleadings or by submitting affidavits." *Spielman*,  251 F.3d at 5 (quoting *Dep't of Recreation and Sports v. World Boxing Ass'n*, 942 F.2d 84, 88 (1 Cir., 1991) citing *Diefenthal v. Civil Aeronautices Bd.*, 681 F.2d 1039, 1052 (5 Cir., 1982)).  Indeed, it is explained in a leading treatise that when undertaking to determine whether the amount-in-controversy has been met, a court "will rely upon the pleadings, but there often is other information before the court, such as discovery material and any affidavits, that may be submitted on a motion under Federal Rule 12(b)(1) challenging the court's power to continue with the case." Wright, Miller & Cooper, *Federal Practice and Procedure*: Jurisdiction 3d §3702 at 57-9 (footnotes omitted); *see also* 2 *Moore's Federal Practice*, §12.30[4] (Matthew Bender 3d ed).

In the case at bar, th2e amount-in-controversy at issue in Count I cannot be resolved from the face of the allegations of the complaint.  The plaintiff does not appear to contend otherwise as he directs the Court's attention to the allegations in one of the state court complaints in order to deduce that amount. (#7 at pp. 10-11)  Considering the allegations of the federal complaint together with those of the Norfolk County complaint, the amount in controversy on the breach of fiduciary duty claim is duly established.

Tringali alleges that he, Martin and Lee are "all shareholders of S.E.E., Inc." (#1 ¶6) with the plaintiff holding "the majority interest". (#1 ¶37)  He specifically asserts that as a direct consequence of the defendants' breaches of fiduciary duty, his interest in S.E.E. was rendered valueless. (#1 ¶50)  In the Norfolk County complaint, Martin and Lee alleged that Tringali owned "approximately 70%" of the stock of S.E.E. (#7, Exh. B ¶36) and that "as of June 30, 2001... the total book value of all of the issued S.E.E. common stock...is the amount of $499,239." (#7, Exh. B ¶25)  Doing the calculation, Tringali's interest in S.E.E. on or about June of 2001, i.e., within the time period at issue in the federal complaint, was roughly $350,000, an amount well in excess of the requisite $75,000 in controversy.

One problem remains outstanding, however.  The Norfolk County complaint has been proffered for the Court's consideration merely as an exhibit to the plaintiff's opposition.  There has been no verification of its contents by means of an affidavit as is required.  Thus, while Tringali clearly can remedy the

26

deficiency in his complaint, he has not properly done so on the present record. I shall recommend that the plaintiff be granted leave to file an affidavit verifying the Norfolk County complaint, which will thereby establish the amount-in-controversy.

Lastly the defendants argue that even if the Court finds that jurisdiction may properly be exercised over Count I, there is no jurisdiction with respect to Count II. (#10 at pp. 2-3)  This contention is unavailing.  Having concluded that the Court will have diversity jurisdiction over Count I of the complaint once the aforementioned affidavit is filed, the Court may exercise supplemental jurisdiction over the claim alleged in Count II.  *See* Title 28

U.S.C. §1367[8]; *see also Exxon Mobil Corporation v. Allapattah Services, Inc.*, -U.S.-, 125 S.Ct. 2611, 2617-2620 (2005)("Section 1367(a) is a broad grant of supplemental jurisdiction over other claims within the same case or controversy, as long as the action is one in which the district courts would have original jurisdiction."); *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966).

## VI. Recommendation

For all the reasons stated, I RECOMMEND that the plaintiff, Philip Tringali, be GRANTED LEAVE to file an affidavit in support of the damages claimed with respect to Count I so as to satisfy the amount-in-controversy requirement of federal jurisdiction. Upon said filing, I FURTHER RECOMMEND that the Court issue an Order DENYING Defendants' Motion To Dismiss (#2).

## VII.  Review by the District Judge

---

[8] This statute provides that :

> (a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

Title 28 U.S.C. §1367.

Subsections (b) and (c) are inapplicable on the facts at hand.

The parties are hereby advised that pursuant to Rule 72, Fed. R. Civ. P., any party who objects to these recommendations must file a specific written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation.   The written objections must specifically identify the portion of the recommendations, or report to which objection is made and the basis for such objections.   The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b), Fed. R. Civ. P., shall preclude further appellate review.   *See Keating v. Secretary of Health and Human Services*, 848 F.2d 271 (1 Cir., 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1 Cir., 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1 Cir., 1983); *United States v. Vega*, 678 F.2d 376, 378-379 (1 Cir., 1982); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1 Cir., 1980); *see also Thomas v. Arn*, 474 U.S. 140 (1985).

*/s/ Robert B. Collings*
ROBERT B. COLLINGS
United States Magistrate Judge

February 23, 2006.