UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

PHILLIP TRINGALI            )
      Plaintiff            )            C. A. NO. 04-12708-MLW
              )
V.            )
              )
PAUL MARTIN AND JUMI LEE            )
      Defendants            )

**OBJECTIONS OF DEFENDANTS TO
REPORT AND RECOMMENDATION ON
DEFENDANTS' MOTION TO DISMISS**

In accordance with MagR 3(c) the defendants (Martin and Lee) object to the Magistrate Judge's proposed recommendations as set forth in the Report and Recommendation on Defendants' Motion to Dismiss ("Report and Recommendation") dated February 23, 2006. In his notice on the docket, the Magistrate has stated that objections to the Report and Recommendation are due by March 9, 2006.

The portions of the Report and Recommendation which the defendants object to are set forth in detail below. In addition, we respectfully submit that recent discovery matters in the Norfolk County Action, which has been the subject of the Motion to Dismiss and the Report and Recommendation, which matters were not before the Magistrate when he prepared his Report and Recommendation, will shed new light on the abstention argument.

1.   <u>The Abstention Argument/Doctrine</u>

The defendants object to the Report and Recommendation with respect to the rejection of their argument that this Court should have exercised abstention. It appears that the Report and Recommendation was based at least in part, upon the finding that Tringali was not a party to the counterclaim in the Norfolk County Action for breach of fiduciary duty.

The Magistrate's footnote 4 on Page 13 indicates that S.E.E. filed a counterclaim, but states as follows: "S.E.E. filed a counterclaim against Martin and Lee, but Tringali did not." (Referring to the Motion to Dismiss, Ex. G).

Exhibit G to the motion to dismiss is a copy of the Defendants S.E.E., Inc. and Phillip Tringali's Answer to Plaintiff's Complaint and Counterclaim. In that answer and counterclaim, Tringali asserted a Third Defense claiming that Martin and Lee were estopped from obtaining relief by reason of "their representations and conduct that are in breach of their fiduciary duties as stockholders." Tringali further asserted in the Eighth Defense that Martin and Lee are not entitled to relief "in that they have breached their fiduciary duties to the corporation, are actively competing against the corporation,...have usurped corporate opportunities...and have used defendants' [plural referring to both S.E.E. and Tringali] confidential information and trade secrets..."

More particularly relevant are the facts alleged in the counterclaim, Count One,[1] a claim for breach of fiduciary duties, which is substantially similar to the allegations alleging breach of fiduciary duty in this instant action. While Count One of the Norfolk County Action counterclaim is initially styled referring to S.E.E., Inc. as the plaintiff in counterclaim, in the requests for relief, Tringali has included himself as a plaintiff in counterclaim, as on Page 9 of the answer and counterclaim where he states as follows:

> WHEREFORE the plaintiffs in counterclaim S.E.E., Inc and Phillip Tringali (emphasis added) make the following requests for relief:
>
> 1.    That the Court award judgment to plaintiffs [referring to plaintiffs in counterclaim] for damages, together with interest, costs and attorney's fees, pursuant to Counts I through III;
>
> 2.    For such relief as the Court may deem just and proper.
>
> S.E.E., Inc. and Phillip Tringali,
> By their attorneys,

---

[1] Neither Count Two, which was previously dismissed, nor Count Three, alleging alteration of wage records is relevant to this Objection.

_____
Susan S. Maire, Esq.
Oppenheim & Maire, LLP
313 Plymouth Street
Halifax, MA  02338
(781) 294-8000
BBO #315360

In the Norfolk County Action, the counterclaim, as to which Tringali has been included as a plaintiff in counterclaim, includes the following allegations of fact as set forth in the following numbered paragraphs:

2.    S.E.E., Inc. is a closely-held corporation with only four stockholders at the present time.

5.    Martin and Lee are and have been at all times relevant to this action, stockholders of the S.E.E., Inc. corporation.

6.    Quantum Dynamics International, LLC ("QDI") is a corporation duly organized and existing under the laws of the Commonwealth of Massachusetts which has a principal place of business at 54 Heritage Road, Quincy, Massachusetts and was organized on December 31, 2001 by Martin and Lee, during the period in which Martin and Lee were employees, officers, directors and stockholders, as well as key personnel of S.E.E.

7.    During the course of their employment Martin and Lee were officers of the S.E.E. corporation in charge of sensitive and confidential information of the corporation.

8.    On or about January 9, 2002, after an unsuccessful attempt to gain control of S.E.E. from majority stockholder and president Phillip Tringali, Martin and Lee resigned from S.E.E.

9.    At the time of tendering their resignation, the solely owned laptop computers of Martin and Lee contained the entire confidential data base of S.E.E.

10.    Prior to tendering her resignation, Lee had transferred confidential corporate financial information to her solely owned laptop computer.

15.    As shareholders of a closely held corporation, Martin and Lee owe the corporation a duty of the

utmost good faith and must discharge their corporate responsibilities without avarice, expediency or self-interest in derogation of their loyalty to other stockholders.

16.    The plaintiffs Martin and Lee, while stockholders of S.E.E., Inc. planned and conspired to establish a competing business with S.E.E. and incorporated such a business while still employed by S.E.E.

17.    The plaintiffs Martin and Lee made no disclosure to S.E.E. in regard to the establishment of their competing corporation, Quantum Dynamics International, LLC.

18.    During the last year of their employment with S.E.E., Martin and Lee were charged with the responsibility of hiring additional developmental personnel to insure the continuity of operation of the company, which duty they deliberately and intentionally failed to fulfill.

19.    The plaintiffs Martin and Lee, knowing they were key personnel to the development of S.E.E.'s product line, and knowing that there was no back-up personnel to replace them or perform their jobs for the company, resigned without notice.

20.    During the year prior to her resignation, Lee's major responsibility at S.E.E. was to develop the next generation of product, which was anticipated to take approximately one (1) year.

21.    Martin and Lee left S.E.E. with all the confidential information of S.E.E. with all the proprietary codes and trade secrets of S.E.E., and with all of the design and development information for the production of the next generation of product on their computer hard drives.

22.    Within two weeks of their resignation from S.E.E. Martin and Lee were contacting S.E.E. vendors, representatives and customers with a product virtually identical to S.E.E.'s product except that it included specifications which were those of the next generation of product as envisioned, discussed and planned while Martin and Lee were employed by and paid a salary by S.E.E. as well as stockholders of S.E.E.

23.    S.E.E. has suffered financial loss and economic opportunities as a result of the appropriation of work product and trade secrets developed by Martin and Lee while being paid as employees of S.E.E. to develop such work product.

24.    S.E.E. has suffered financial loss and economic opportunities as a result of the appropriation of work product and trade secrets developed by Martin and Lee and the communication of this work product and trade secret to the corporation of which they are principals in order to actively compete with S.E.E. while they remained stockholders of S.E.E.

Martin and Lee respectfully submit that the following numbered paragraphs of the complaint in this instant action set forth substantially the same allegations in the counterclaim in the Norfolk County Action, as is also evidenced by answers to interrogatories in the Norfolk County Action which are set forth on Pages 9 through 11 of the Defendants' Memorandum in Support of Motion to Dismiss.  The following numbered paragraphs of the complaint in this action are referred to:

6.    Plaintiff and defendants are all shareholders of S.E.E., Inc., ("S.E.E."), a closely held corporation organized under the laws of the Commonwealth of Massachusetts.

7.    At all times relative to this action, S.E.E. was headquartered in Massachusetts.

8.    Tringali founded S.E.E. in 1988 as a sales organization engaged in selling various analytical equipment and systems used in the microelectronic industry.

9.    In 1996, S.E.E. embarked upon a business plan to design, manufacture and market an integrated, computer operated microspectrophotometry system for use in the forensic sciences (the "Analytical Product").

10.    On or about May 8, 1996, S.E.E. hired Martin as a research analyst to develop the Analytical Product.

11.    On February 28, 1997, Martin was made a director of S.E.E., was granted 10%, or 20,000 shares of S.E.E.'s stock, and was given the opportunity to purchase additional company stock at .50¢ per share.

24.    As the personnel primarily responsible for developing and marketing S.E.E.'s analytical product, both Martin and Lee acquired, during their respective employment by S.E.E., comprehensive knowledge of S.E.E.'s most sensitive product development and

5

customer-related trade secrets and confidential information, including but not limited to S.E.E.'s database of customer information.

26.    In February 2001, S.E.E. embarked upon a plan to develop an enhanced analytical product ("Enhanced Product") product with features and improvements that would make the Analytical Product suitable for use in the microelectronics manufacturing process as well as in the forensic sciences.   Martin and Lee predicted that it would take one year to bring the Enhanced Product to market.

27.    Martin and Lee were primarily responsible for managing the development, manufacture and marketing of the Enhanced Product, including the hiring of additional employees required to develop the product, and cultivating contacts with prospective customers.

30.    In 2001, on information and belief, Martin and Lee embarked upon a plan to obtain control of S.E.E.

31.    On December 31, 2001, defendants Martin and Lee filed the articles of organization for Quantum Dynamics International, LLC, ("Quantum") a Massachusetts limited liability corporation.

33.    Martin and Lee formed Quantum for the purpose, and with the intent of designing, marketing and installing an integrated, computerized analytical device to compete directly with S.E.E.'s product.

34.    Defendants Martin and Lee did not disclose to S.E.E. or Tringali their intention to establish a competing corporation, Quantum Dynamics International, LLC.

35.    Defendants Martin and Lee did not offer S.E.E. or Tringali the opportunity to participate in S.E.E.'s business.

38.    Unbeknownst to Tringali, prior to resigning from S.E.E., Martin and Lee had duplicated the paper and digital records containing all of S.E.E.'s confidential and proprietary information of S.E.E., including but not limited to all of the design and development information for the Enhanced Product, and all of S.E.E.'s Analytical Product customer information, and had removed the copies from S.E.E.'s facility.

39.    Unbeknownst to Tringali, prior to resigning from S.E.E., Martin and Lee had removed from the S.E.E. facility a portion of S.E.E.'s inventory of the

components to be integrated into the Analytical Product and/or the Enhanced Product.

40.    Unbeknownst to Tringali, prior to resigning from S.E.E., Martin and Lee destroyed certain of S.E.E.'s corporate records, including all paper records and digital information regarding the specifications for the Enhanced Product, all computer code written for integration into the Enhanced Product, and all documentation regarding the process developed for assembling and manufacturing the Enhanced Product.

41.    Within two weeks of their resignation from S.E.E., Martin and Lee, as employees, managers, and sole equity owners of Quantum, began to market a product virtually identical to S.E.E.'s product except that it included the features that S.E.E. had discussed and planned to incorporate into the Enhanced Product while Martin and Lee were directors and stockholders of S.E.E.

42.    After Martin and Lee resigned, but while they were still stockholders of S.E.E., Quantum marketed its product by contacting S.E.E.'s existing customers, representatives and distributors to offer them products and services in direct competition with S.E.E.

48.    As shareholders of a closely held corporation, Martin and Lee owed a fiduciary duty of loyalty to their fellow stockholders.

In Paragraph 49 in the instant action, Tringali claims that Martin and Lee breached their fiduciary duties by conspiring to start a business competing with S.E.E. while they were stockholders of S.E.E., expropriating S.E.E.'s confidential information, converting confidential and proprietary information selling to S.E.E.'s customers a product that they had developed while employed by S.E.E., purposely failing to perform their duties while at S.E.E., and destroying S.E.E.'s corporate records.

There has been extensive discovery in the Norfolk County Action in the way of interrogatories, requests for production and depositions, relevant to the counterclaim for breach of fiduciary duty.

On January 19, 2005, in the Norfolk County Action notice of the taking of Tringali's deposition was served (Exhibit "A"), we note that this notice is directed to Tringali individually.

On March 10, 2005, Tringali's deposition was taken by counsel for Martin and Lee and a substantial portion of that deposition was devoted to discovery relative to the allegations relating to breach of fiduciary duty, the failure of Martin and Lee to perform their duties for S.E.E., and their competitive activities, as evidenced by the following pages of the transcript (Exhibit "B"):

Pages 86-97 dealing with the alleged misappropriation of trade secrets

Pages 100-104 dealing with misappropriation removal of customer information

Page 105 dealing with alleged misappropriation of customer bid information

Pages 106-108 testimony regarding alleged competitive activities

Pages 109-115 dealing with Martin and Lee's competitive products

Pages 125-127 testimony regarding inequitable conduct and breach of fiduciary duties

Page 128 allegations regarding attempts to hire S.E.E. employees

Page 129 allegations regarding taking over S.E.E.'s business

Pages 133-135 additional testimony regarding alleged breach of fiduciary duty

Pages 142-144 testimony regarding attempts to gain control of S.E.E.

Pages 144-146 allegations regarding appropriation of the confidential database of S.E.E. on Martin and Lee's laptop computers.

During the same deposition Tringali's own counsel, Attorney Treger, questioned him: pp. 199-202 regarding Martin and Lee's duties developing a next generation product for S.E.E.; pp. 203-204 regarding Martin and Lee's competitive products; p. 205 specifically with reference to Paragraph 21 of the counterclaim, he questioned his client regarding allegations that Martin and Lee left S.E.E. with confidential information of the company.

On May 24, 2005, Tringali's counsel took Martin's deposition in the Norfolk County Action.  A substantial portion of the questions put to Martin relate to the allegations regarding breach of fiduciary duty as follows (Exhibit "C"):

Pages 55-57 development of a new product

Pages 67-73 development of a new product

Pages 84-85 S.E.E. 1100, 2100 and Maximus products

Pages 102-104 upgrading S.E.E.'s operating system

Pages 156-157 termination at S.E.E. and the creation of Quantum Dynamics

Pages 162-165 use of personal laptop computer and business information of S.E.E.

Page 171 Martin's testimony that he erased the S.E.E. database on his laptop on January 11, 2002.

On May 25, 2005, Tringali's counsel took the deposition of Lee in the Norfolk County Action (Exhibit "D"), which included questions regarding subject matters which were relevant to the counterclaim as follows:  Pages 64-65 questions regarding her personal desktop computer, Pages 69-73 questions regarding the Maximus project, Pages 77-81 work on the upgrades for the S.E.E. Models 2100 and 1100, Page 84 additional testimony regarding the Maximus project.

On February 9, 2006, Attorney Treger gave notice of reconvening the depositions of Martin and Lee which he has tentatively scheduled for March 20 and 21, 2006.  In the meantime, the Superior Court in the Norfolk County Action has set the date of March 29, 2006 for filing of a pretrial memorandum, witness lists and completion of discovery with a pretrial conference set for April 5, 2006.  It therefore appears that the trial in the Norfolk County Action will be commenced in the very near future.

We request that this Court, however, revisit the abstention argument asserted by Martin and Lee in the motion to dismiss, that the counterclaim for breach of fiduciary duty as to which Tringali has included himself as a plaintiff

in counterclaim, and which is pending in the Norfolk Action, renders the Federal case redundant.  We therefore take exception with the statement on Pages 12 and 13 of the Report and Recommendation that in neither the Plymouth County Action nor the Norfolk County Action has Tringali individually asserted a claim against Martin and Lee.

2.    <u>Recent Developments in the Norfolk County Action</u>

While there may be a question regarding the wording of the counterclaim in the Norfolk County Action, i.e., that in Count One S.E.E. is named as the plaintiff in counterclaim, while the prayers for relief name both S.E.E. and Tringali as plaintiffs in counterclaim, it is Tringali who has created any question by the wording of his pleading.  We believe, however, that a recent development which occurred on February 9, 2006, were matters which were not before the Magistrate Judge and therefore not considered by him, make it clear that Tringali is pursuing the same cause of action, i.e., breach of fiduciary duty, in the Norfolk County Action as he is in the instant case.

On or about February 9, 2006, in the Norfolk County Action, Attorney Treger served two notices of the continued deposition of Martin and Lee for March 20 and 21, 2006.  The notices are identical (except for the time and date of the taking of the depositions) and attached to each notice is a Schedule A, which is again identical to each notice of deposition.  A copy of the two notices and the Schedule A are attached (Exhibit "E" hereto).

What is striking, however, it that the Schedule A request for documents attached to the deposition notices are identical with the same requests for production of documents which was served by Tringali on September 14, 2005 to Martin in the instant case, First Request for Production of Documents to Defendant Paul Martin (Exhibit "F" hereto).

In the instant case, Plaintiff's First Request for Production of Documents to Defendant Paul Martin, Exhibit "F", contains twenty-two numbered requests.

These requests seek communications between Martin and Lee's companies, Quantum and CRAIC, to customers or prospective customers,

documents concerning product specifications, source codes, application papers, communications with vendors, distributors, sales representatives, telephone bills, promotional literature, upgrades, documents concerning sales of products developed by Quantum and CRAIC, parts purchased, etc.

The Schedule A to the February 9, 2006 deposition notices, Exhibit "E," also contain twenty-two numbered requests. These requests are identical and word-for-word with Exhibit "F," Plaintiff's First Request for Production of Documents to Defendant Paul Martin in the instant case.

The identical discovery requests in both cases makes it clear that Tringali is pursuing Count One of the counterclaim for breach of fiduciary duty as a plaintiff in counterclaim in the Norfolk County Action based upon the exact same cause of action as he has asserted in Count I of the complaint in this case.

Based upon this recent information, which the Magistrate Judge did not have before him when he ruled on the motion to dismiss, the case for abstention is quite clear. Tringali seeks to have it both ways by pursuing a claim for breach of fiduciary duty in both the Norfolk County Action and in the instant action.

Where the same cause of action brought in this Court is pending in the prior action, and where identical relief is sought,[2] this Court has discretion to abate the second action. O'Reilly v. Curtis Publishing Co., 31 F.Supp. 364, 364 (D.Mass. 1970); Saloman S.A. v. Scott USA Ltd. Partnership, 117 F.R.D. 320, 321 (D.Mass. 1987). Based upon the recent discovery proceedings, we respectfully suggest that the Court should abate this action.

3.    The Plaintiff Failed to Make a Prima Facie Case of Personal Jurisdiction.

The defendants have challenged the complaint on the basis of lack of jurisdiction and upon such challenge the burden is then on the plaintiff Tringali of proving the court's jurisdiction to establish sufficient facts which

---

[2] In both this action and the Norfolk County Action, Tringali is seeking the same relief, i.e., damages, interest and costs.

support the authorization of in personum jurisdiction under the applicable state statute, here Massachusetts long arm statute, to establish the minimum contacts in order to satisfy the due process analysis, <u>Val Leasing v. Hutson</u>, 674 F.Supp. 53, 54 (D.Mass. 1987).  That opinion goes on to hold further:

> When personal jurisdiction is challenged, a plaintiff must establish a "threshold" showing of jurisdiction, but no more.  That is, through affidavits and other competent evidence, a plaintiff must make out a prima facie case for the existence of personal jurisdiction, demonstrating at the minimum that there is competent evidence to support each of the relevant jurisdictional prerequisites.  <u>Id</u>. at 55.

Furthermore, in <u>Val Leasing</u> the court went on to hold that while in some jurisdictions the trial judge must accept the uncontroverted allegations of the complaint as being true:

> What seems to this Court to be the better reasoning is found in <u>Amoco Oil v. Local 99</u>,...where Judge Pettine notes that "on deciding a motion to dismiss for lack of personal jurisdiction, a court need not assume the plaintiff's allegations to be true.  <u>Id</u>. at 55 n.1.

We respectfully submit that Count I as worded and within its four corners does not make a prima facie showing of personal jurisdiction.

To make a prima facie showing of this caliber, the plaintiff ordinarily cannot rest upon the pleadings, but is obliged to induce evidence of specific facts, <u>Foster-Miller v. Babcock and Wilcox</u>, 46 F.3d. 138, 145 (1st Cir. 1995).

In this case no affidavits were submitted by Tringali.  We note that the absence of an affidavit to support the $75,000 jurisdictional requirement was duly noted by the Magistrate.  Tringali attached a copy of the complaint in the Norfolk County Action brought by Martin and Lee, however, the Magistrate noted at Page 26 of the Report and Recommendation "there has been no verification of its contents by means of an affidavit, as is required."

4.    <u>The Court Should Dismiss Count II (Slander).</u>

The defendants object to the Magistrate's recommendation that Count II not be dismissed.  While 28 U.S.C. 1367(a) provides that the District Court

shall have supplemental jurisdiction over other claims, which are so related to the claims in the action which form the basis for original jurisdiction that they form part of the same case or controversy, based upon the plain wording of Count II, it does not appear that the claim for slander forms a part of the same case or controversy which is set forth in Count I.

According to the wording of Count II, Paragraph 53, Tringali claims that at various times after January 9, 2002, Martin and Lee made slanderous statements "that Tringali had improperly used corporate funds of S.E.E. for personal purposes and had engaged in other financial improprieties with respect to the operation of S.E.E." We urge that these allegations have no relation to the alleged claims in Count I for breach of fiduciary duty.

To the contrary, the complaint in the Norfolk County Action (Exhibit "G" hereto, without the exhibits to that complaint), where Martin and Lee are the plaintiffs, alleges in Paragraphs 13 through 17 that Tringali used corporate funds of S.E.E. to purchase a vacation home in Maine. We respectfully submit therefore that the allegations of slander, if they relate to any cause of action, relate to the cause of action pending in Norfolk County and not to this instant case.

On the face of the allegations in Count II there is nothing which would indicate that any tortious acts of slander or defamation were committed in Massachusetts or that this Court should exercise jurisdiction over Count II. In the case of Milford Power Ltd. Partnership v. Enron Corp., 918 F.Supp. 471 (D.Mass 1996), previously cited in Defendants' Motion for Leave to File Reply Brief to Plaintiff's Opposition to Motion to Dismiss, the court there declined to exercise jurisdiction over claims of breach of contract and of the covenant of good faith and fair dealing. While the court maintained jurisdiction over other claims for civil conspiracy, violation of c.93A, defamation and abuse of process, it dismissed the other claims. Id. at 479-480.

In the other case cited in the defendants' reply brief, Figawi v. Horan, 16 F.Supp.2d 74 (D.Mass 1998), the court, in the exercise of its discretion, found that the plaintiff there had made a prima facie finding jurisdiction of

allegations that the defendant there committed fraud in applying for a trademark re-registration in Massachusetts, but that the plaintiff failed to make a prima facie showing that the defendant was transacting business in Massachusetts with respect to claims other than the alleged fraud.  Id. at 81. In the Figawi case there were in fact seven counts of the complaint and the court went on to rule that only two of the claims survived, a claim for deceptive trade practices under c.93A §11 and a claim for fraudulent procurement of registration under c.110B §10.  Id. at 82.

Therefore, we respectfully urge that notwithstanding a determination as to jurisdiction under Count I, that the Court, in its discretion, should dismiss Count II.  Moreover, if it finds that there is no jurisdiction under Count I it should decline to exercise supplement jurisdiction under Count II, pursuant to 28 U.S.C. §1367(c)(3).

5.     Conclusion

Based upon the arguments set forth above and pointedly to the recent developments of discovery proceedings in the Norfolk County Action, we respectfully urge this Court to redetermine the Report and Recommendation on defendants' motion to dismiss and to enter an order dismissing both counts of the complaint.

March 7, 2006                                    Attorney for defendants,


                                        _____/s/Roger S. Davis_____
                                        Roger S. Davis
                                        BBO No. 116320
                                        DAVIS & RUBIN
                                        One Bowdoin Square
                                        Suite 901
                                        Boston, MA  02114-2919
                                        (617) 742-4300


QDI12:OBJR&R

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS                                    SUPERIOR COURT
                                               C.A. NO. 02-801

PAUL MARTIN and JUMI LEE,            )
Individually and as Stockholders on  )
behalf of S.E.E., INC.               )
         Plaintiffs                  )        **NOTICE OF TAKING**
                                     )          **DEPOSITION**
V.                                   )
                                     )
S.E.E., INC. and PHILLIP TRINGALI    )
         Defendants                  )

TO:   Daniel Treger, Esq.
      PHILLIPS & ANGLEY
      One Bowdoin Square, Suite 300
      Boston, MA  02114


       Please take notice that, at 10:00 o'clock a.m., on January 27, 2005, the

plaintiffs in this action, Paul Martin and Jumi Lee, by their attorney, will take

the deposition upon oral examination of Phillip Tringali at the offices of Davis &

Rubin, One Bowdoin Square, Suite 901, Boston, Massachusetts, before a

notary public in and for the Commonwealth of Massachusetts, or before some

other officer authorized by law to administer oaths.  The oral examination will

continue from day to day until completed.

       You are invited to attend and cross-examine.


January 19, 2005                              Attorney for plaintiffs,


                                              _____
                                              Roger S. Davis
                                              BBO No. 116320
                                              DAVIS & RUBIN
                                              One Bowdoin Square
                                              Suite 901
                                              Boston, MA  02114-2919
                                              (617) 742-4300

QDI8:MARTIN:DEPONOTI2

00001

1                          Volume:  I

2                          Pages:  1-215

3                          Exhibits:  1-9

4           COMMONWEALTH OF MASSACHUSETTS

5    Norfolk, ss              Superior Court

6

7    Civil Action No. 02-801

8    - - - - - - - - - - - - - - - - - - x

9    PAUL MARTIN and JUMI LEE, Individually

10    and as Stockholders on behalf of

11    S.E.E., Inc.,

12              Plaintiffs,

13    vs.

14    S.E.E., INC. and PHILLIP TRINGALI,

15              Defendants.

16    - - - - - - - - - - - - - - - - - - x

17

18           DEPOSITION OF PHILLIP TRINGALI

19              Thursday, March 10, 2005

20                  Davis & Rubin

21                One Bowdoin Square

22            Boston, Massachusetts 02114

23            Commencing at 10:04 a.m.

24        Reporter:  Karen A. Morgan, CSR/RPR

00086

1   refresh your memory?

2       A.   Yes.

3       Q.   I direct you to Page 4.  Second defense.  It

4   says in pertinent part that the plaintiffs, that's

5   referring to Martin and Lee, seeking to destroy the

6   corporation, meaning S.E.E., by misappropriation and

7   use of corporation trade secrets and confidential

8   information.  Do you see that?

9       A.   Yes.

10      Q.   Tell me what do you claim that Martin and Lee

11  misappropriated of the corporation S.E.E.?

12      A.   Database records.

13      Q.   I'm sorry?

14      A.   Database records.

15      Q.   Anything else?

16      A.   Well, I allege they took -- misappropriated

17  company material.

18      Q.   Specifically other than database records.

19  Let me ask you what the database records consisted of?

20      A.   It would have been our internal database

21  which contained all the contact, customer information,

22  contact records, everything that we had done.

23      Q.   That database was on what form?

24      A.   It was in -- well, it was on a company

00087

1  server.

2      Q.  Disk format or a hard drive?

3      A.  It would have been in hard drive I believe.

4      Q.  On a computer?

5      A.  Well, accessible on all computers, yes.

6      Q.  That's what the database records consisted

7  of?

8      A.  Yes.

9      Q.  What else do you allege or claim that Martin

10  and Lee misappropriated as set forth in the second

11  defense?

12          MR. TREGER:  Specifically you're saying

13  what is he alleging?

14      Q.  Well, what does this refer to.  The second

15  defense says that Martin and Lee misappropriated trade

16  secrets and confidential information.  I'm asking you

17  to tell me what did Martin and Lee misappropriate?

18          MR. TREGER:  Are you asking him for what he

19  is able to prove now because discovery is still ongoing

20  or are you asking him what he alleges?

21          MR. DAVIS:  I didn't use the word proof.

22      Q.  What do you say that Martin and Lee

23  misappropriated in addition to the database?

24      A.  Internal development.

00088

1    Q.   In what form?  What format was that internal
2  development?
3         MR. TREGER:  Objection.  You can answer
4  that.
5    A.   Well, I guess in some cases I'm assuming some
6  documented format.
7    Q.   I'm sorry?
8    A.   I'm assuming some documented format.
9    Q.   Okay.  You're assuming a document format?
10   A.   Yes.
11   Q.   What type of a document format are you
12  assuming?
13        MR. TREGER:  Objection.  If you can answer.
14   A.   I can't answer that.
15   Q.   All right.  Have you told me everything that
16  Martin and Lee -- do you say Martin and Lee have
17  misappropriated by way of trade secrets and
18  confidential information anything other than the
19  database and the internal development?
20        MR. TREGER:  Objection.  Are you asking
21  what he believes at this time?
22        MR. DAVIS:  At any time.
23        MR. TREGER:  Or what he believed --
24   Q.   What you believed at any time.

00089

1    A.   Well, I guess it's very broad in the sense

2    customer bid information.  There could be a number of

3    issues.

4    Q.   Are these aspects of this misappropriation

5    what you knew at the time this document was filed on

6    July 1, 2002?

7        MR. TREGER:  Objection.  Are you asking

8    what he believes, what he knows?

9        MR. DAVIS:  What he knew then and what he

10   knows now.

11   Q.   What did you know in July 2002 when this

12   answer and counterclaim was filed as to what Martin and

13   Lee misappropriated?

14   A.   I don't know any difference between then and

15   now.  I mean there's been no discovery.

16   Q.   All right.  Going back to the database

17   records.  This consisted of a company server which

18   would have been a hard drive accessible to any

19   computer?

20   A.   It would have been with password, yes.

21   Q.   Okay.  Who maintained the password?

22   A.   Dr. Martin maintained the database.

23   Q.   On her own personal computer?

24   A.   No.  On his.

00090

1    Q.   On his computer.

2    A.   He made the master password.  He was the --

3    Q.   Was this database on any other computers

4    other than Dr. Martin?  Did you say it was on Dr.

5    Martin's computer?

6    A.   Well --

7         MR. TREGER:  I believe the testimony was it

8    was on a company server.

9    A.   It was on a company server.  Dr. Martin also

10   had a personal business database on his computer.

11   Q.   And when do you say that he misappropriated

12   database records?

13   A.   When do I say?

14   Q.   I'm sorry?

15   A.   When the time he left.

16   Q.   He left on January 9, 2002.

17   A.   Right.

18   Q.   Is that the date?

19   A.   I believe he stopped back in on the 11th.

20   Q.   The 11th?

21   A.   Yes.

22   Q.   When do you say is the date he

23   misappropriated the database records?

24        MR. TREGER:  Objection.  What do you mean

00091

1  by misappropriate?

2      Q.  Do you understand the word misappropriate?

3      A.  Yes.

4      Q.  What is your understanding of the word?

5      A.  Took for his own personal use.

6      Q.  Okay.  Based upon that definition, when do

7  you say Dr. Martin misappropriated the database records

8  of S.E.E.?

9      A.  When he walked out the door with his laptop.

10      Q.  What was on his laptop?

11      A.  The database.

12      Q.  How do you know that?

13      A.  I watched him put it on it.

14      Q.  When did you see Dr. Martin transfer the

15  database to his personal computer?

16      A.  I don't recall the exact date.  It was

17  shortly before leaving.

18      Q.  Do you know whether or not he erased it from

19  his computer?

20      A.  I have no knowledge of that.

21      Q.  One way or other; is that correct?  You don't

22  know whether he did or he didn't?

23      A.  No.  I don't know either way.

24      Q.  So if Dr. Martin erased that database from

00092

1  his personal computer, he would not have

2  misappropriated, would he?

3          MR. TREGER:  Objection.

4      A.  I did not see him erase the database.  I

5  can't answer that.

6      Q.  Where was it that you saw Dr. Martin transfer

7  this data?  Where did this occur?

8      A.  At S.E.E. offices.

9      Q.  Who was present at the time?

10     A.  In his office.

11     Q.  When you say he transferred this database to

12  his personal computer, who was present?

13     A.  I was present.

14     Q.  What did he do?

15     A.  Basically copied the database on to his

16  personal computer.

17     Q.  Did he tell you that?

18     A.  Yes.

19     Q.  How long before he left did that occur?

20     A.  Within a couple of weeks.

21     Q.  All right.  He gave you notice he was leaving

22  on January 9th.  Is that the date he resigned?

23     A.  Yes.

24     Q.  Was it two weeks before that that he

00093

1    transferred this database?

2        A.   Whenever he got the new laptop.

3        Q.   When did he get the new laptop?

4        A.   I believe it was a December time frame.

5        Q.   Okay.  December.  Was there a laptop that Dr.

6    Martin had before this particular laptop he acquired in

7    December?

8        A.   Yes.

9        Q.   And was that his personal laptop?

10       A.   I believe so.

11       Q.   Did he also have the database on his prior

12   laptop?

13       A.   I believe so.

14       Q.   How many other laptops were there that had

15   the company database on them?

16       A.   I believe my laptop that I'm aware of and I

17   can't answer for other laptops.

18       Q.   Have you changed laptops from time to time?

19       A.   Yes.

20       Q.   Each time when you changed them, did you

21   transfer the database?

22       A.   No.

23       Q.   Dr. Martin had done the same thing?

24       A.   Yes.

00094

1    Q.  Did Debra Bowles or anyone else transfer any

2  of the database to their personal laptop?

3    A.  I can't answer for them.

4    Q.  Did Miss Lee transfer the database if you

5  know?

6    A.  I don't know.

7    Q.  All right.  The internal development, and you

8  used the words after the internal development, you said

9  you assumed that was in a document format.  You say

10  that Dr. Martin and Miss Lee misappropriated internal

11  development.

12    A.  Yes.

13    Q.  What document format did they misappropriate?

14    A.  I can't answer that.

15    Q.  How do you know that they misappropriated

16  this internal development?

17       MR. TREGER:  Objection.

18    A.  There was no information.

19    Q.  What did the internal development consist of?

20  How did it evidence itself?

21    A.  It would usually be software programs and

22  drawings.

23    Q.  Okay.  Something disappeared from the S.E.E.

24  premise?

00095

1      A.   Something couldn't be found on the S.E.E.

2   premises.

3      Q.   What was it that couldn't be found?

4      A.   Ten months worth of work.

5      Q.   And ten months worth of work on what?

6      A.   Development of the next generation product.

7      Q.   The 2200?

8      A.   Yes.

9      Q.   All right.  Do you know whether Dr. Martin or

10   Miss Lee took that information with them?

11     A.   I don't know whether.

12     Q.   You have no personal knowledge as to the

13   misappropriation of this internal development work, do

14   you?

15     A.   Not that I physically saw, no.

16     Q.   Did anyone else see it?

17     A.   I can't answer that.  I don't know.

18     Q.   Do you have any evidence at all that any

19   internal development work was misappropriated by either

20   Martin or Lee?

21     A.   Not that I found.

22     Q.   You referred to customer bid information.

23     A.   Yes.

24     Q.   What was that?

00096

1    A.   Well, when we bid on projects or bid on sales

2   of products through government agencies there's a bid

3   process that takes place.

4    Q.   Is that bid process evidenced in some

5   documentary form?

6    A.   The bids we have would be in the files, yes.

7    Q.   And what type of files are they?  Hard copy?

8    A.   Company records, yes.

9    Q.   Were they kept in some kind of a filing

10  cabinet or some type of files?

11   A.   Usually.

12   Q.   Okay.  File folders with documents in them?

13   A.   Yes, I believe so.

14   Q.   Okay.  You say that Dr. Martin and Miss Lee

15  took these files?

16   A.   I allege, yes.

17   Q.   And when did they take them?

18   A.   I don't know the exact time.

19   Q.   Did you see them take the files?

20   A.   I didn't personally see them take the files,

21  no.

22   Q.   Did these files disappear?

23   A.   There are some files missing, yes.

24   Q.   Some files.  Tell me what files were missing

00097

1  at the time that this answer and counterclaim was filed

2  in July '02.

3          MR. TREGER:  Objection.  You can answer.

4      A.   There were corporate records, records on

5  Maine.

6      Q.   Records on names?

7      A.   On Maine.

8      Q.   On Maine?

9      A.   Yes.

10     Q.   What do mean on Maine?  You mean the State of

11  Maine?

12     A.   No.  On our property in Maine.

13     Q.   Okay.

14     A.   Our insurance records, all our financials.

15     Q.   Did any of these corporate records -- first

16  of all the records with regard to the State of Maine.

17  What do you say that Martin and Lee took with them?

18     A.   Copies of all the information on Maine.  All

19  the records.

20     Q.   Which information did they copy?

21     A.   It would probably be the mortgage

22  information, any of the records on things spent in

23  Maine, any of the legal records, the rentals, numbers.

24  Pretty much all of that.


00100

1  take.

2      Q.   My question is did the records regarding the

3  Maine property have anything to do with a competing

4    business?

5        A.   Not the Maine property, no.

6        Q.   How about the insurance records?

7        A.   Insurance and corporate would, yes.

8        Q.   Okay.  Corporate records that you say they

9    took consisted of what?  Minutes of meetings?

10       A.   They took copies of all the financials.  I

11   don't know about the minutes of meetings.

12       Q.   Okay.  Customer bid information.  Let's go

13   back to that.

14       A.   Right.

15       Q.   That consisted of a number of files?

16       A.   Yes.

17       Q.   What files were missing in July '02?

18       A.   There were no files missing that I'm aware

19   of.

20       Q.   So what customer bid information was taken?

21       A.   I'm alleging they took information on current

22   bids.

23       Q.   On what?

24       A.   On upcoming bids.

00101

1    Q.   And that information on upcoming bids

2  consisted of what?  Paperwork?

3    A.   It would have been forecast and other

4  additional information.

5    Q.   And was that kept in a file cabinet?

6    A.   Yes.  I believe.  It is also on disk or hard

7  drive.  Excuse me.

8    Q.   I'm sorry?

9    A.   It's on hard drive also I believe.

10    Q.   At the time that they left in January '02,

11  what did these customer bids consist of that you say

12  were taken or misappropriated?

13    A.   Basically specifications and bids that were

14  ongoing at the time.

15    Q.   And who has knowledge concerning this

16  misappropriation of the customer bids?

17    A.   I would assume the -- well, depending on the

18  case the plaintiffs or the defendants Martin and Lee.

19    Q.   Other than Martin and Lee, did someone see

20  this occurring?

21        MR. TREGER:  If you know.

22    A.   I don't know.

23    Q.   Do you have any personal knowledge that

24  Martin and Lee ever took any customer bid information?

00102

1       A.   They had the French QC book.  I don't know if

2    there was bid information in it in their possession.

3       Q.   They had the what?

4       A.   There's a book that we do on each sale and

5    they had the French one in their possession.

6       Q.   Do you have any personal knowledge that they

7    took any of that information with them?

8       A.   Well, yeah.

9       Q.   What personal knowledge do you have?

10      A.   They sent it back to me after they left the

11   company.

12      Q.   What was sent back to you after they left the

13   company?

14      A.   There was a QC manual on a French order and I

15   don't recall what other stuff was included at the time.

16      Q.   A French order?

17      A.   Yes.

18      Q.   An order submitted by who?

19      A.   The order submitted from our distributor in

20   Europe.

21      Q.   That company was what?

22      A.   Resultech.

23      Q.   Resultech was located where?

24      A.   In Germany.

00103

1      Q.   They had a bid for a French customer?

2      A.   They had a bid and order for a French

3   customer, yes.

4      Q.   Bid and order.  The order was placed by who?

5   What was the French customer's name?

6      A.   Well, it was placed by the gendarmerie.

7      Q.   That's a law enforcement agent in France?

8      A.   Yes.

9      Q.   For what product?

10     A.   I believe it was the 2100.

11     Q.   Was that the information that you say Martin

12   and Lee or somebody, either Martin or Lee, returned to

13   you?

14     A.   That was returned to me by them, yes.

15     Q.   When?

16     A.   As best I can recall, it would have been

17   maybe in February.

18     Q.   Did you request it or did they send it back

19   on their own?

20     A.   I requested it.

21     Q.   How did you request that?

22     A.   I believe by letter or fax.  I don't recall

23   100 percent.

24     Q.   And what was returned to you physically?

00104

1  What was sent back to you?

2     A.   The binder on the French sale and I don't

3  recall what else at the time.

4     Q.   Did S.E.E. end up making the sale to this

5  gendarmerie in France?

6     A.   It was already a sale.

7     Q.   It was already a sale?

8     A.   Yes.

9     Q.   So what if anything did Martin and Lee

10  misappropriate with respect to this French order?

11    A.   All of the records concerning the French

12  order.

13    Q.   To what extent did they use that?

14    A.   You would have to ask them.

15    Q.   Do you know whether or not any of this

16  information was ever used by Martin and Lee?

17    A.   Can't answer that.

18    Q.   Do you know if any -- other than the French

19  order were there any other customer bids either on

20  disk, hard drive or documents that you say were

21  misappropriated by Martin and Lee?

22    A.   Not that I'm aware of.

23       MR. TREGER:  He is not asking you what

24  you're aware of.  He's asking you what you allege.

00105

1     A.   Well again, I haven't got all the discovery.

2   I don't know all the details.

3     Q.   Do you have any knowledge as you sit here

4   today of any other customer bid information either on

5   disk, hard drive or documents that were allegedly

6   misappropriated by Martin and Lee?

7     A.   Not specifically at this point.

8     Q.   Going back to the second defense.  It also

9   claims in there that Martin and Lee are engaging in

10   active competition with S.E.E.

11     A.  Yes.

12     Q.   At that time what were Martin and Lee -- what

13   did Martin and Lee's active competition consist of?

14     A.   What type of detail would you like?

15     Q.   Well, tell me what you know about this active

16   competition.  Did they form another company?

17     A.  Yes.

18     Q.  When?

19     A.  Prior to them leaving.

20     Q.  December 31, '01?

21     A.  It may have been.

22     Q.  That was nine days before they left?

23     A.  If that's the date, yes.

24     Q.  During the period between December 31, '01

00106

1  and the time they left, whether January 9th or January

2  11th, what activities do you say that Martin and Lee

3  engaged in with respect to competition with S.E.E.?

4      A.  I can't answer that.

5      Q.  Do you have any evidence that Martin and Lee

6  ever did any competitive activities, engaged in any

7  competitive activities between the time they formed

8  Quantum, the company, and the time they left S.E.E.?

9      A.  I don't have first-hand knowledge I guess.

10      Q.  Do you have any information other than

11  first-hand knowledge that Martin and Lee ever engaged

12  in any competitive activity from the time that they

13  organized Quantum and the time that they left S.E.E.?

14      A.  Not that I'm aware.

15      Q.  So the competitive activities were engaged in

16  by Martin and Lee after they left S.E.E.; is that

17  correct?

18          MR. TREGER:  Objection.

19      A.  I don't have the answers.

20      Q.  Well, in the second defense you say that

21  Martin and Lee are engaged in active competition with

22  the corporation.

23      A.  Yes.

24      Q.  My question is when did this active

00107

1   competition commence?

2       A.   I guess only Martin and Lee can answer that.

3       Q.   So you don't know that?

4       A.   Well, I know that they set up a competing

5   company.  I know that they went to a conference and

6   presented a paper in February.

7       Q.   In February of '02.  That would be after they

8   left?

9       A.   Right.

10      Q.   Anything other than that?

11      A.   They were offering products for sale,

12  competitive products to us.

13      Q.   When?

14      A.   I don't know.  The first date they did I'm

15  aware of it in March.

16      Q.   Neither one of them had a noncompetition

17  agreement; correct?

18          MR. TREGER:  Objection.

19      A.   Not a signed.

20      Q.   And other than what you have told me about

21  the conference and the paper in February '02 and

22  offering competitive products in March '02, what other

23  competitive activities were they engaged in at the time

24  this answer and counterclaim was filed in July '02?

00108

1          MR. TREGER:  Objection.  Are you asking

2    what he knows or what he's alleging?

3       Q.   What do you know?

4       A.   Well, I know they started a competitive

5    company offering competitive products.  I know they

6    presented data on a system in February which was just

7    over a month after they left.  I know they had set up

8    Quantum Dynamics and I know they were contacting

9    employees, representatives, distributors and customers.

10      Q.   The customers that you say -- when you say

11   they, who was contacting the customers of S.E.E.?

12      A.   I don't know specifically if it was Paul or

13   Jumi.

14      Q.   Either Dr. Martin or Miss Lee would you agree

15   that they would know the identities of the customers by

16   reason of their employment?

17      A.   Identities.

18      Q.   Yes.

19      A.   Possibly.

20      Q.   When Martin left, he had working for S.E.E.

21   for how many years?

22      A.   Close to six.  I believe over five years.

23      Q.   He started in 1995?

24      A.   Mm-mm.

00109

1    Q.  So it was close to six years?

2    A.  Six years.

3    Q.  Fair statement that during that six-year

4  period he would have acquired the knowledge of who the

5  customers, forensic customers of S.E.E. were?

6    A.  Some knowledge, yes.

7    Q.  How about Miss Lee?

8    A.  Yes.

9    Q.  Did either Martin or Lee ever solicit any of

10  the semiconductor customers of S.E.E.?

11    A.  Yes.

12    Q.  For what product?

13    A.  For one of our models.

14    Q.  For a forensic product?

15    A.  Yes.  Well, it was one of our designs for a

16  semiconductor application.

17    Q.  For which model?

18    A.  I don't recall which one at the time.

19    Q.  Was it similar to one of your models?

20    A.  Yes.

21    Q.  Which one was it similar to?

22    A.  One of the two at the time.  I don't recall

23  which one.

24    Q.  When you say one of the two, give me the

00110

1   model number?

2       A.   The 1100 or the 2100.

3       Q.   Bot of these were forensic devices?

4       A.   They were sold to the forensic business by

5   us, yes.

6       Q.   Who did Martin and Lee solicit for a sale of

7   a -- you say that they solicited a customer of S.E.E.

8   for a sale of a product similar to the 1100 or the

9   2100?

10      A.   Yes.

11      Q.   What was the product that was solicited?

12  What did they solicit these customers for?

13      A.   One of those two products.

14      Q.   What customer did they solicit?

15      A.   I believe at the time it was Cortek.

16      Q.   How do you spell that, please?

17      A.   C-O-R-T-E-K.

18      Q.   Located where?

19      A.   I think Billerica.

20      Q.   And when did this solicitation take place?

21      A.   I'm not sure of the time frame.  I don't

22  recall the exact time.

23      Q.   Having in mind that they left January of '02,

24  how long after the time they left was it?

00111
1       A.   It was not after the time they left.
2       Q.   This was a solicitation before they left?
3       A.   Yes.
4       Q.   For what product though?
5       A.   It would have been one of the two products.
6   I don't recall.
7       Q.   Who were they soliciting on behalf of,
8   themselves or S.E.E.?
9       A.   S.E.E.
10      Q.   My question to you is did Martin and Lee --
11  so they didn't solicit this Cortek for a product of
12  their own.  It was for one of your products?
13      A.   Right.
14      Q.   I think my question to you was --
15      A.   You can repeat it.  You asked me if they
16  solicited anyone.
17      Q.   Did they solicit any of your customers after
18  they left?
19      A.   I don't recall.
20      Q.   Do you have any evidence that Martin and Lee
21  solicited any of S.E.E.'s customers after they resigned
22  from the company?
23      A.   Yes.
24      Q.   What evidence is that?

00112

1     A.  Phone records.

2     Q.  Who did they solicit?

3     A.  I would have to go back and look.

4     Q.  For what product did they solicit?

5     A.  For their product.

6     Q.  When did this take place?  In 2002?

7     A.  Right.

8     Q.  What was, quote unquote, their product?

9     A.  I would have to go back and recall the

10    numbers.  I don't know.

11        Q.  Their product was a competing forensic

12    device?

13        A.  Yes, it was.

14        Q.  Who developed it?

15        A.  I can't answer that.

16        Q.  Did you ever inspect the Martin and Lee

17    product?

18        A.  No.

19        Q.  Do you know in any way if it is similar to

20    any product that was developed or sold by S.E.E.?

21        A.  Yes.

22        Q.  How do you know that?

23        A.  By what I have seen at shows.

24        Q.  I'm sorry?

00113

1    A.  But what I have seen at shows.

2    Q.  What do you base that on?  What did you see?

3    A.  Well, I saw their product at a show.  I saw

4    some of the features on it.  Some of the capabilities.

5    Q.  Were there features and capabilities similar

6    to which of your product?

7    A.  What I saw would have been similar to the

8    2100 or the 2200 design.

9    Q.  Were there any other products in the

10   marketplace that were similar to your 2100 product?

11   A.  Yes.  One by J and M.

12   Q.  Tell me what were the features that you say

13   were similar between your 2100 product and the Martin

14   and Lee product?

15   A.  Well, had the same capabilities.  It had the

16   same reflecting optic configuration.  It had utilized

17   the same detector board we were looking at and some

18   software.

19   Q.  Did you examine the detector board to

20   determine that?

21   A.  Not physically.

22   Q.  How did you make that determination that it

23   used the same detector board?

24   A.  I'm aware of the specifications and

00114

1  capabilities.

2      Q.   Do you have a document that shows the

3  specification and capability of the Martin and Lee

4  product?

5      A.   I don't know if I have a copy of their

6  specifications.  I'm assuming there's some -- I know

7  there's some someplace.

8      Q.   Did you make any determination as to the J

9  and M product whether it was similar?  You said it was

10  similar to your 2100.

11     A.   Right.

12     Q.   What J and M product was this?  Did it have a

13  particular trade name?

14     A.   I don't recall but I believe they did.

15     Q.   By itself way, going back to the Martin and

16  Lee product, when did you make the determination as to

17  the similarity?

18     A.   I guess between looking at specifications and

19  looking at the product.

20     Q.   When?

21     A.   I don't recall the time.

22     Q.   Was it during the year 2002?

23     A.   Yes.

24     Q.   Have you made any determinations or

00115
1   examinations of any of the Martin and Lee products
2   after 2002?
3       A.  Well, I didn't examine it.  I saw it.
4       Q.   Have you seen any -- where did you see the
5   Martin and Lee product?  Was it at a trade show?
6       A.   Trade shows.
7       Q.   Where did that take place?
8       A.   There were a number of them.
9       Q.   During what year?  2000?
10      A.   Well, 2002 and on.
11      Q.   You have attended a number of trade shows?
12      A.   Yes.
13      Q.   Have they sold the same product consistently
14  throughout that period of time?
15      A.   I think they have introduced additional
16  products.
17      Q.   And which of their products do you say were
18  similar to yours, the first one or the subsequent ones?
19      A.   Well, the first one was similar and the
20  subsequent ones were similar to a project we were
21  working on.
22      Q.  Is that the 2200?
23      A.  No.  That was a special system.
24      Q.   What was that project you were working on,

00125
1   the legal context.
2           MR. TREGER:  I mean you're asking about a
3   legal concept that came from an attorney.

4     Q.   You don't understand the word inequitable?

5          MR. TREGER:  You're asking about an

6    affirmative defense.

7          MR. DAVIS:  I understand that.  I'm asking

8    what facts he knows.

9     Q.   I'm not asking you what an attorney told you.

10   I'm asking what facts you know that constituted

11   inequitable conduct by Martin and Lee.

12    A.   I guess I can't answer that at this point.

13    Q.   All right.  In third line it also claims

14   Martin and Lee, quote unquote, breached their fiduciary

15   duties to the corporation, unquote.  Do you understand

16   that phrase?

17    A.   Yes.

18    Q.   Other than what an attorney told you, what

19   conduct of Martin and Lee constituted -- first of all

20   Martin, constituted a breach of fiduciary duty to the

21   corporation?

22    A.   Well, they were in addition to stockholders,

23   directors and officers of the corporation, they started

24   a competing company.

00126

1    Q.   When did they start that competing company?

2        MR. TREGER:  Objection.  Asked and

3  answered.

4    A.   Before they left.

5    Q.   Do you have any knowledge as to any competing

6  activities of Martin and Lee before they left the

7  company?

8    A.   I guess I can't answer that at this time.

9    Q.   Now, other than what you told me, what other

10  conduct do you say of Martin or Lee or the both of them

11  constituted a breach of fiduciary duty?

12    A.   I guess the fact that they were supposed to

13  be building our next generation product and came out

14  with their own a month later.

15    Q.   Well me about that.

16    A.   As far as what?

17    Q.   What were they supposed to be doing?

18    A.   They had been for last ten months supposed to

19  be developing the next generation of product for us

20  which was the 2200.

21    Q.   That product was never completed; correct?

22    A.   No.

23    Q.   And did Martin and Lee thereafter compete

24  S.E.E. with a product identical to the 2200?

00127

1     A.  Yes.

2     Q.  When?

3     A.  That I'm first aware of was in February.

4     Q.  Of '02.  You say that was the product you

5   first saw at the trade show?

6     A.  No.  That was a paper they gave on their new

7   product at an American Academy conference.

8     Q.  You were present at that time?

9     A.  Yes.

10     Q.  What did the paper consist of?

11     A.  If I recall, it had something to do with UV

12   microspectroscopy.

13     Q.  Were the specifications in that paper the

14   same as the specifications for the 2200?

15     A.  As best I recall.

16     Q.  Were there specifications in the paper?

17     A.  I don't believe there were specifications in

18   the paper.

19     Q.  Do you have this, quote unquote, paper in

20   your possession?

21     A.  They are may be in S.E.E. a copy of it.  It

22   was done at the American AAFS show so there would have

23   been a record of it.

24     Q.  Other than this paper that was delivered,

00128

1  tell me what else you say constituted a breach of

2  fiduciary duty?

3    A.  Trying to hire employees from the company.

4    Q.  And when did Martin and Lee try to hire any

5  S.E.E. employees?

6    A.  From what I understand, before they left and

7  after they left.

8    Q.  What do you understand that before they left?

9  Did someone tell you something?

10    A.  I heard --

11    Q.  Let me withdraw that.  Before Martin and Lee

12  left you say they attempted to hire an employee or

13  employees of S.E.E.

14    A.  I learned they were talking to employees of

15  S.E.E.

16    Q.  What did you learn and from whom did you

17  learn it?

18    A.  I learned from Dee Hixon for one that there

19  were discussions I think that went on internally that I

20  wasn't aware of.

21    Q.  What did Miss Hixon tell you and when did she

22  tell you it?  What did she say and when did she say it?

23    A.  I believe it was shortly after they had left

24  is that there was some comments made in I believe

00129

1  around the August time frame when I was not at the

2  company that there were discussions by Jumi Lee about,

3  you know, I guess doing their thing.

4      Q.  I'm sorry?

5      A.  Well, from what I understand there were

6  discussions about them basically in a sense taking over

7  the business.

8      Q.  Taking over the S.E.E. business?

9      A.  Yes.

10      Q.  All right.  You claim that -- by the way, do

11  you claim that Martin and Lee at some point attempted

12  to take control of the company?

13      A.  Well, I think there was an effort was made to

14  take control of the company, yes.

15      Q.  How much of the stock did Martin and Lee own?

16      A.  Twenty percent.

17      Q.  What percentage of stock did you own?

18      A.  About 70 percent.

19      Q.  If Martin and Lee owned 20 percent of the

20  stock, tell me how they would gain control of the

21  company.

22      A.  Because there were two directors.  They were

23  both directors of the company and I was the third

24  director.

00133

1  me that constituted a breach of fiduciary duty by

2  Martin and Lee?

3         MR. TREGER:  Objection.  Are you saying

4    anything that he believes?  Asking him what he alleges?

5        Q.   I want to know what you know about any other

6    alleged breach of fiduciary duty.

7        A.   Well, I guess all the details about starting

8    a competitive company and coming out with a competitive

9    product.

10        Q.   That's what you testified.  Other than what

11    you have already testified to, is there anything in

12    addition to what you testified to that you say

13    constituted a breach of fiduciary duty by Martin and/or

14    Lee?

15        A.   Well, I guess other than the file that I

16    found about Jumi planning this.

17        Q.   I'm sorry?

18        A.   Other than the file I found about Jumi

19    planning this.

20        Q.   What file was that?

21        A.   There was a file I found on a laptop after

22    she had left.

23        Q.   Whose laptop?

24        A.   It was on Jumi Lee's laptop.

00134

1    Q.   And this is a laptop she left at the company?

2    A.   Yes, it is.

3    Q.   Where is that laptop now?

4    A.   I believe it is in the possession of the

5  trustee.

6    Q.   And did you print a hard copy of this file?

7    A.   Yes, I did.

8    Q.   Where is that hard copy of it?

9    A.   It would be with the trustee.

10    Q.   You didn't keep a copy of the record?

11    A.   Everything was -- I was required to turn over

12  everything to the trustee.

13    Q.   And how many pages did this hard copy consist

14  of?

15    A.   One page.

16    Q.   What did it say on it?

17    A.   Well, it had details of pro and con of taking

18  over S.E.E.

19    Q.   Okay.  When was it created, the date of it?

20    A.   From what I could tell in early December.

21    Q.   What did it say with respect to pro or con

22  with respect to taking over S.E.E.?

23    A.   I would have to review the document again.

24    Q.   Do you have any memory of what this document

00135

1  says?

2     A.   There was something about, you know -- again,

3  I would have to review it.  Something about, you know,

4  buying out, not buying out, legal issues, house and

5  car, losing it.  I don't have all the specifics.

6     Q.   Buying out and not buying?

7     A.   Yes.  There was a list of details, pros and

8  cons which I assume she was surmising herself and

9  without having a copy I mean I can't, you know, answer

10  those questions I guess.

11     Q.   Was it a plan to buy you out?

12     A.   You could interpret it different ways.  I

13  really don't know.

14     Q.   Were there some discussions at some time you

15  had with Martin and Lee about either you buying them

16  out or them buying you out?

17     A.   We had discussions in January, yes.

18     Q.   And what were those discussions?

19     A.   Well, there was a meeting I believe the

20  fourth of January or so, somewhere in that time frame

21  prior to them leaving.

22     Q.   And that meeting, who was present at the

23  meeting?

24     A.   I believe the Jeff Husted was present at the

00142

1     Q.   It took place after January 2, '02?

2     A.   I believe so.

3     Q.   Where did it take place?

4      A.   At S.E.E.

5      Q.   You say there was discussion concerning you

6  running the rep business yourself and Martin and Lee

7  running the forensic business?

8      A.   There was discussion about breaking up the

9  two ends of the company, yes.

10      Q.   Who initiated that discussion?

11      A.   I don't recall at the time.

12      Q.   Well, other than that discussion what other

13  events took place with regard to this unsuccessful

14  attempt to gain control of S.E.E.?

15      A.   Well, other than the fact that they were

16  not -- when I had asked for a staff meeting, they

17  refused to have a staff meeting.  They weren't keeping

18  me posted of what was going on in the manufacturing end

19  of the business.

20      Q.   I'm talking about gaining control from them

21  of the majority stockholder.  What took place that

22  constituted an attempt to gain control of the company?

23      A.   They were many details I think and a lot of

24  that had to do with isolating me from the business.

00143

1    Q.  When did that take place?

2    A.  That had been going on for some time.

3    Q.  Starting when?

4    A.  I would say probably the beginning of 2001.

5    Q.  And isolating you from the business, how did

6   that evidence itself?

7    A.  Well, there were I think a number of things

8   that went on.  The first one is that if I recall in

9   February of that year I was on the road working and got

10  a phone call from Jumi that she was either going to

11  leave the company or she had asked everyone in the

12  company to resign.

13    Q.  Why was that?

14    A.  There were some internal issues going on with

15  personnel and as much I can tell, that was something

16  she brought on.

17    Q.  What were the internal issues?

18    A.  Personnel I guess bickering a little bit,

19  stuff not happening and I don't have all the details.

20  You would have to ask her.

21    Q.  Directing yourself to gaining control as

22  referred to in Paragraph 8.  When I use the term

23  gaining control, I mean gaining control ownership.

24  What attempts were made by Martin and Lee to gain

00144

1   control ownership of the company other than the

2   discussion that was had with you on January 4th

3   concerning a buyout?

4       A.   I guess, you know, to answer that would be

5   probably somewhat involved unless you were going

6   through the situation at the time.  I don't know what

7   specifics you're looking for.

8       Q.   All right.  Let's go to Paragraph 9 then.

9   Solely owned laptops of Martin and Lee contained the

10  entire confidential database of S.E.E.

11      A.   Yes.

12      Q.   Tell me with respect to Miss Lee's laptop the

13  entire confidential database of S.E.E. consisted of

14  what?

15      A.   All of the customer contact information and

16  records.

17      Q.   You say that was on her personal laptop?

18      A.   Right.

19      Q.   Do you know whether -- do you recall that in

20  another case that Martin and Lee gave some affidavits

21  concerning that they had erased that from their laptop

22  computers?

23      A.   They alleged.

24      Q.   Okay.  Do you have any information whether

00145

1   that is true or not true?

2       A.   No, I don't.

3       Q.   You don't know whether or not they erased the

4   confidential database from their laptops, do you?

5       A.   No, I don't have first-hand knowledge.

6       Q.   I'm sorry?

7       A.   I don't have first-hand knowledge, no.

8       Q.   Do you have personal knowledge that they kept

9   the -- that either of them kept any of the confidential

10   database on their personal laptops without erasing it?

11           MR. TREGER:  Objection.  You can answer.

12       A.   I don't have personal knowledge.

13       Q.   What knowledge do you have that Lee

14   transferred the confidential information to her laptop

15   prior to leaving?

16       A.   I don't have personal first-hand knowledge.

17   It was indicated to me that the information was put on

18   to a laptop.

19       Q.   By who?

20       A.   I don't recall.  Maybe Debbie Bowles at the

21   time.

22       Q.   As far as Martin having the database, this is

23   something you have testified before that you observed

24   that being transferred?

00146

1     A.  Yes.

2     Q.  Once again, you don't know whether he erased

3  it or not?

4     A.  No, I can't answer that.

5     Q.  You are aware of the fact both Dr. Martin and

6  Miss Lee have given affidavits to the effect they have

7  erased that?

8     A.  I'm aware of the fact that they have alleged

9  that they erased it, yes.

10         MR. DAVIS:  Off the record.

11         (Discussion off the record.)

12         (A break was taken for lunch.)

13     Q.  Going to Page 7 of this answer and

14  counterclaim.  Paragraph 20.  First Jumi Lee's

15  responsibility to develop the next generation of

16  product.  When did that responsibility commence?

17     A.  I believe that was in February of 2001.

18     Q.  And was there a some meeting that or other --

19  strike that.  Is there any documents that evidence

20  that?

21     A.  There was a directors meeting that was taking

22  place off site to discuss a number of issues.

23     Q.  And what was discussed at that meeting?

24     A.  We discussed putting together specifications


00199

1         EXAMINATION BY MR. TREGER

2     Q.  You just want to ask you a few questions

3    about a subject we touched on before relating to the

4    development of the next generation product.  Was that

5    the 2200 product?

6        A.  Yes, it was.

7        Q.  And you testified that there was a directors

8    meeting at which it was determined that this product

9    would be developed; is that the case?

10       A.  Yes.

11       Q.  When was that directors meeting again?

12       A.  In February of 2001 I believe.

13       Q.  And I believe you testified several times

14    that you are unable to testify as to what work was

15    actually done on that product; is that correct?

16       A.  All the details of it, yes.

17       Q.  And why is that?

18       A.  Well, in most cases usually with a small

19    company, six people, people are off doing the jobs that

20    they need to do.  Part of my responsibilities were

21    running the rep end of things and I was traveling quite

22    a bit.  I had gone through an overview of what we

23    needed to do.  We discussed hiring people.  We put

24    numbers together for the development in the time frame

00200

1   and it was up to in primary function Paul and Jumi to

2   get going and get things done.

3       Q.   Between the meeting at which the development

4   of this product was discussed and Paul and Jumi's

5   resignation, what was your understanding as to what

6   they were actually doing at S.E.E. with respect to the

7   second generation product?

8       A.   It was my understanding that we had -- they

9   had put together an overview of the product

10  specifications and that they were in the process of

11  developing and getting the hardware and software done

12  to bring out the next generation product and also allow

13  us to develop a semiconductor system from it.

14      Q.   After Paul and Jumi resigned, were you able

15  to find any evidence of the work they had performed?

16      A.   I didn't find anything internally as far as

17  software or anything in the development.  Other than

18  components being bought, discussions being done, no.

19      Q.   Were you able to determine whether any of the

20  work product -- strike that.  Did you find any evidence

21  of any work product relating to the development of this

22  product after they left?

23      A.   Well, I found basically orders -- well, we

24  had components in house of the next generation.  I

00201

1   found records of purchase of software for development,

2   third party software we used in the system.  I did find

3   missing software but I couldn't find any software

4   relating to the design.

5       Q.   Now when you say you saw a purchase order for

6   software, these were purchase orders for software that

7   was going to be incorporated into the product?

8       A.   Yes.

9       Q.   Were those purchase orders paid for?

10      A.   Yes.

11      Q.   Was that software actually in the inventory

12  of S.E.E.?

13      A.   Yes.

14      Q.   Did you find any evidence that any work had

15  ever been done to incorporate it into a product?

16      A.   Not that I could find.

17      Q.   Did you find any evidence that any of the

18  adaption of various components necessary to make it

19  into the product had been performed?

20      A.   Yes.

21      Q.   Did you find that that had been performed?

22      A.   Well, no.  I found records of components for

23  the new system, purchases of detector boards, purchases

24  of software used in the development, purchases of

00202

1   software for doing I think Adobe.  There was also

2   development of software from CDI in house but I didn't

3   find any hard S.E.E. software on the next generation,

4   no.

5       Q.   The S.E.E. software would have been a

6   combination or an adaption of those products that had

7   been purchased?

8       A.   Right.  It's drivers and controllers that

9   pull all the functions together of the different

10   software and hardware.

11       Q.   Where would that S.E.E. product have been

12   stored or found?

13       A.   It should have been found on Jumi's computer.

14       Q.   Should it have been found on the server?

15       A.   Might have been found on the server.  It

16   depends on if she had uploaded the information into the

17   server.  There was nothing that I could find on the

18   server.

19       Q.   Was it found anywhere after they left?

20       A.   No.

21       Q.   Did you have a time line or an estimation of

22   how long it would take to develop a second generation

23   product?

24       A.   One year.

00203

1    Q.   And how long after their resignation are you

2  aware that Jumi Lee and Paul Martin rolled out their

3  product?

4    A.   I saw data from their product within a month.

5  Just over a month after they left.

6    Q.   Now with respect to bids for products, were

7  you privy to details of all of the deals that were in

8  the works between S.E.E. and customers while Paul

9  Martin was working for S.E.E.?

10    A.   Basically some details.  I usually had a

11  forecast sheet that was provided to me for potential

12  sales and sales coming down.

13    Q.   Were there some deals that you weren't

14  permitted to know about?

15    A.   I didn't have a lot of details of the

16  discussions because of the secret nature.  Paul was

17  cleared for secret clearance in the dealings with the

18  Secret Service, Battelle, and the army concerning the

19  development of a potentially new designed system.  I

20  was aware we had a phase one, phase two contract with

21  them and I was aware we brought a safe into the office

22  which contained the secure information.

23    Q.   So you have no way of knowing what the status

24  of those deals were at the time they left?

00204

1    A.   No.  The only thing I know is that a couple

2   of months after they left, I think Battelle or the army

3   showed up and picked up everything that was in the safe

4   which I didn't even have the combination to.  Paul

5   provided it to them.

6    Q.   Did S.E.E. to your knowledge obtain or

7   receive any compensation from the army for the work

8   that was done while Mr. Martin was at S.E.E.?

9    A.   I believe we received, if I recall, a couple

10  of payments for work that was done.

11   Q.   Is there any way you could be aware of

12  whether work that was done while Mr. Martin was at

13  S.E.E. was eventually sold to the army?

14   A.   I don't have enough discovery to even fathom

15  that.  The only thing I know is that did introduce an

16  instrument, a secure instrument for currency.

17   Q.   To your knowledge is that what Mr. Martin was

18  developing while he was at S.E.E.?

19   A.   Could have been.  I can only surmise.

20   Q.   Now, you were also asked repeatedly about the

21  factual support for various answers and affirmative

22  defenses in your complaint which was marked as Exhibit

23  4.  I'm referring to Exhibit 4.  Now you testified

24  previously as to various information that was taken by

00205

1   Martin and Lee I believe that's in Paragraph 21 of the

2   counterclaim.  Can you state the facts that led you to

3   believe or lead you to believe that Martin and Lee left

4   with confidential information of S.E.E.?

5        A.   Well, I know that they purchased two personal

6   laptops in roughly the December time frame, brought

7   them into the company and uploaded information onto

8   those.  I was with Paul when he had put in the database

9   to his system and it was interesting because he was

10  authorized by me to purchase computers and he went out

11  and purchased them individually for himself and Jumi

12  Lee and I got a new computer at that time which he

13  assisted me in uploading the information onto mine.

14       Q.   Now, with respect to the business records of

15  S.E.E., were there any business records that you have

16  been unable to locate since Martin and Lee left the

17  corporation?

18       A.   Yes, there have been a few.  I haven't been

19  able to find records of the approvals for the purchase

20  of the Maine property.  I haven't been able to find any

21  records of the software development by Jumi on the

22  2200.  I know there is software that was purchased

23  prior to them leaving that is no longer at the company

24  and I know that they were seen taking parts and

Case 1:04-cv-12708-MLW    Document 37-4    Filed 03/08/2006    Page 1 of 9
Paul Martin 5-24-2005
Paul Martin, et al. v. S.E.E., Inc., et al.

1           COMMONWEALTH OF MASSACHUSETTS

2    NORFOLK, SS.              SUPERIOR COURT

3                             C.A. NO. 02-801

4    -------------------------------x

5    PAUL MARTIN and JUMI LEE,

6    Individually and as Stockholders

7    on Behalf of S.E.E., Inc.,

8                    Plaintiffs

9         vs.

10   S.E.E., INC., and PHILLIP

11   TRINGALI,

12                   Defendants

13   -------------------------------x

14       DEPOSITION OF PAUL MARTIN, a witness

15   called on behalf of the Defendant Phillip

16   Tringali, taken pursuant to the

17   Massachusetts Rules of Civil Procedure,

18   before Deborah G. Rumson, Registered

19   Professional Reporter and Notary Public, in

20   and for the Commonwealth of Massachusetts,

21   at the Offices of Phillips & Angley, One

22   Bowdoin Square, Boston, Massachusetts, on

23   Tuesday, May 24, 2005, commencing at 10:25

24   a.m.

Case 1:04-cv-12708-MLW    Document 37-4    Filed 03/08/2006    Page 2 of 9
Paul Martin 5-24-2005
Paul Martin, et al. v. S.E.E., Inc., et al.

54

1   whole rather than the day-to-day operations
2   of just the analytical division.
3   Q.  And during 2000, did you hire any additional
4   employees in Massachusetts?
5   A.  I do not remember the exact dates of hires.
6   Q.  When you were in Massachusetts, did you hire
7   any additional employees?
8   A.  Yes.
9   Q.  Can you tell me who you hired.
10  A.  As I stated previously, Dee Hixson, Judy
11  Moniz, Tony Facchiano.
12  Q.  These people were hired in Massachusetts?
13  A.  Yes.  And there was one other lady, who was
14  a secretary.  I don't recall her name.
15  Q.  And so just to clarify, which of these
16  employees worked for you while you were in
17  California?
18  A.  Andrea Desrosier.
19  Q.  And did the products, once you got to
20  Massachusetts, did you introduce any new
21  products?
22  A.  The 3100 and 3200.
23  Q.  What was the 3100?
24  A.  They are both, basically, imaging systems.

55

1   Q.  What did they do?
2   A.  Create images, take pictures.
3   Q.  What was their application?
4   A.  We were hoping to apply them to larger scale
5   forensic analysis as well as industrial
6   applications as we could determine.
7   Q.  Were there further improvements to the 1100
8   and 2100 when you were in Massachusetts?
9   A.  Olympus discontinued the microscope so we
10  had to redesign the base, but that was not
11  completed while we were employed there.
12  Q.  And when did Olympus discontinue the
13  microscope?
14  A.  I would assume 2001.
15  Q.  Who was retained to redesign the base?
16  A.  Dr. Lee and Gary Unruh.
17  Q.  And were there any plans to develop any new
18  products?
19  A.  There were plans to develop a new product.
20  Q.  And what was that product going to be?
21  A.  Microspectrophometer for semiconductor
22  analysis.
23  Q.  And was it going to have application in the
24  forensic field as well?

56

1   A.  It was designed for semiconductor analysis.
2   Q.  And when was it decided to go into this, to
3   start work on this product?
4   A.  We never got to the stage of working on the
5   product.
6   Q.  When was the product first discussed?
7   A.  March 2001 on or about.
8   Q.  And what were the circumstances of that
9   discussion?
10  A.  I don't understand the question.
11  Q.  How did you come to discuss the development
12  of a new product?
13  A.  We were having a board of directors'
14  meeting.
15  Q.  What was discussed at the directors'
16  meeting?
17  A.  Why we needed a new product and some of the
18  specifications of that new product.
19  Basically, what it should do.
20  Q.  What were the specifications of the product?
21  A.  I don't recall the exact specifications, but
22  it was to mirror one of the Nanometrics
23  tabletop models.
24  Q.  What decisions were made in March of 2000

57

1   with respect to developing this?
2   A.  To attempt to develop it.
3   Q.  Yes.
4   A.  To hire people to develop it.
5   Q.  To hire people to develop it?
6   A.  Yes.
7   Q.  Were you going to have any role in
8   developing it?
9   A.  Personally?
10  Q.  Yes.
11  A.  No.
12  Q.  What existing employees were to have a role
13  in --
14  A.  Dr. Jumi Lee.
15  Q.  Any others?
16  A.  I don't recall.
17  Q.  Did Ms. Desrosier remain employed throughout
18  2000 and 2001?
19  A.  She was terminated sometime in either 2000
20  or 2001.
21  Q.  How come?
22  A.  She resigned her position.
23  Q.  Do you know why?
24  A.  She was asked to resign her position.

15 (Pages 54 to 57)

Case 1:04-cv-12708-MLW    Document 37-4    Filed 03/08/2006    Page 3 of 9

Paul Martin 5-24-2005
Paul Martin, et al. v. S.E.E., Inc., et al.

66

1    off-the-shelf components.
2    Q.  What share of the market did you have, let's
3        say, in America compared to Zeiss?
4    A.  It would depend upon the year that we were
5        discussing.
6    Q.  In 1998.
7    A.  In 1998, this is an estimate only, I would
8        say 80 percent.
9    Q.  Of the U.S. market?
10   A.  Yes.
11   Q.  And how about; 99?
12   A.  1999 Zeiss closed down their division.
13   Q.  So your only competitors at this point were
14       like J&M, whatever?
15   A.  Yes.
16   Q.  In 1999, what percent of the U.S. market did
17       S.E.E. have?
18   A.  I don't have the exact figures, but I would
19       say 90 percent.
20   Q.  And in 2000?
21   A.  The same.
22   Q.  In 2001?
23   A.  I don't know.
24   Q.  What percentage of your sales were

67

1    international in 1998, 1999, and 2000?
2    A.  I don't know the numbers.
3    Q.  Are you able to determine or tell me what
4        market share you had internationally?
5    A.  No.
6    Q.  At the bottom of that page, there's five
7        steps: Define a standard, define a
8        specification, build the instrument,
9        instrument testing and characterization, and
10       define marketing plan.  Now, did you ever
11       determine what standard this instrument
12       would be defined by or what standard would
13       be used to test?
14   A.  No, we never got that far.
15   Q.  How did you intend to determine what
16       standard to use?
17   A.  We never got that far.
18   Q.  Did you define any specifications?
19   A.  Only generally, as stated here in this
20       document.
21   Q.  Did you build any of the instrument?
22   A.  No.
23   Q.  Did you do any defining of the marketing
24       plan?

68

1    A.  Defining of the market plan?
2    Q.  Yes.  Did you do any of that?
3    A.  Only in very general terms.  No definitive
4        defining.
5    Q.  What was the N&K patent?
6    A.  N&K is a company that makes a
7        microspectrophometer for semiconductor
8        analysis.  They have a patent on a
9        particular type of film thickness
10       calculation technique we needed to make.
11       Strike that.
12   Q.  I assume you were going to have to compete
13       with that product; you had to develop your
14       own system that did not violate their
15       patent?
16   A.  Precisely.
17   Q.  The next one says, "Phil:  Hardware is there
18       for spectroscopy.  We need software,
19       increase wafer handling size, programmable
20       stage with autofocus and cassette handling."
21       Were those additional steps that you needed
22       to do, write programming, and write
23       software, develop a stage?
24   A.  This sentence is a combination of minimum

69

1        specifications required for the instrument,
2        as well as steps that needed to be taken.
3    Q.  The next page, it says, "First step is to
4        build a UV-visible 3000 unit with
5        transmission and thick film capability."
6    A.  Okay.
7    Q.  Was that ever accomplished?
8    A.  No.
9    Q.  And did you acquire a library of the
10       characterized samples?  That's a couple of
11       lines down.
12   A.  Did we require or acquire?
13   Q.  Did you acquire?
14   A.  Not a library, no.
15   Q.  Did you acquire any?
16   A.  Yes.
17   Q.  Did you evaluate any software packages?
18       That's the next line down.
19   A.  We started to evaluate some software
20       packages.
21   Q.  Did you purchase those software packages?
22   A.  I don't recall which ones were used so I
23       can't answer that question.
24   Q.  Now, that was continued on February 13.  You

18 (Pages 66 to 69)

Paul Martin 5-24-2005
Paul Martin, et al. v. S.E.E., Inc., et al.

70

1    named a project Maximus. Did you purchase
2    any equipment for Maximus?
3    A.  Not that I recall.
4    Q.  And it says, "Can GRAMS do the job?" What
5    is GRAMS?
6    A.  GRAMS is the software package that we used
7    for spectral analysis on the current
8    forensic tools or current at that time
9    forensic tools.
10   Q.  And is that software simply loaded in, or
11   does it need to be adapted in any way?
12   A.  It was loaded in, the GRAMS package.
13   Q.  Did it in any way need to be integrated with
14   any other software?
15   A.  Yes. Other software was integrated with it.
16   Q.  Was that process performed by S.E.E.
17   personnel?
18   A.  Yes.
19   Q.  And then it references, the next meeting.
20   That would be product specifications from
21   Jumi and Paul, product design from Jumi,
22   Phil, and Paul, and software guidelines."
23   Do you recall if that meeting occurred?
24   A.  I don't recall that meeting occurring.

71

1    Q.  Do you recall coming up with product
2    specifications?
3    A.  Only in this meeting.
4    Q.  How much of the work of Maximus was going to
5    be done by yourself?
6    A.  By myself?
7    Q.  Yes.
8    A.  Defining specifications, marketing, very
9    general product design and requirements.
10   Q.  And can you tell me what part of this
11   process Dr. Lee was going to perform.
12   A.  Product design. Overseeing product design,
13   I should say.
14   Q.  Now, Maximus was, basically, an adaptation
15   of the tool guide for forensics?
16   A.  We never got that far in product design to
17   determine which way it would go.
18   Q.  So you didn't know whether you were going to
19   adapt the existing machine or make an
20   entirely new machine?
21   A.  Precisely.
22   Q.  Who was going to make that decision?
23   A.  We would have, the board of directors.
24        MR. TREGER: Off the record.

72

1        (Discussion off the record)
2        MR. TREGER: The next document is,
3    for the record, a memo, and it is dated
4    7/12/02, which, again, I believe is not the
5    accurate date. It is RE: Project Maximus
6    Review Meeting Notes.
7    (Document marked as Exhibit 3 for
8    identification)
9    Q.  Do you recall drafting this memo?
10   A.  No, I don't.
11   Q.  Do you recall, if you look at No. 9, it
12   says, "To be done by April meeting." Do you
13   recall having a meeting about project
14   Maximus in March?
15   A.  No, I don't.
16   Q.  Do you recall any meetings after the
17   off-site board meeting?
18   A.  Not as such, not formal meetings.
19   Q.  Do you know what No. 1 refers to?
20   A.  Yes.
21   Q.  What does it refer to?
22   A.  Mr. Tringali had an agreement with
23   Nanometrics to act as their representative.
24   If we were to develop a potentially

73

1    competing product, we would have to
2    terminate that, and we felt it best that the
3    attorney review that contract.
4    Q.  And, No. 2, do you know what that refers to?
5    A.  Yes.
6    Q.  What does that refer to?
7    A.  Tony was an employee of Thermo Galactic, and
8    GRAMS 6 was that generation of software.
9    Q.  Was that a new generation of software?
10   A.  Yes.
11   Q.  And that was what you were going to use; you
12   were looking at using that in this product?
13   A.  We were evaluating several possibilities.
14   Q.  Why were you wondering whether you had to
15   divulge customer names?
16   A.  All previous versions had required that we
17   do that.
18   Q.  No. 3, it says, "Use SEE1100 demo system for
19   development bench." Was that ever done?
20   A.  I don't recall.
21   Q.  When it said, "Build a computer specifically
22   for the project," does that mean for
23   development or --
24   A.  I don't know.

19 (Pages 70 to 73)

Paul Martin 5-24-2005
Paul Martin, et al. v. S.E.E., Inc., et al.

82

1    Were any of these machines used in the
2    semiconductor --
3    A. Yes.
4    Q. Do you recall whether you had anyone putting
5    together this budget?
6    A. I don't recall.
7    Q. This document shows a software engineer
8    being hired in June. It shows a payroll
9    expense for a software engineer in June, and
10   a payroll expense for an applications
11   engineer in July, and for a sales engineer
12   in September. I think the columns are off.
13   Does this represent a reasonable estimate of
14   the schedule for the development of this
15   project?
16   A. Since I don't recall, the document, I
17   couldn't say.
18   Q. When you were planning the project, did you
19   ever formulate in your mind a schedule for
20   developing the product?
21   A. I don't recall.
22   Q. How long did it take to develop the first
23   project, the first product, the first
24   analytical product that you sold? I'm

83

1    sorry. The first analytical product that
2    S.E.E. manufactured and sold, how long did
3    it take to develop that?
4    A. Can you redefine the sentence, please.
5    Q. How long did it take you to develop the
6    first microspectrophometers that S.E.E.
7    sold?
8    A. I don't know the exact time. I could only
9    estimate.
10   Q. What is your estimate?
11   A. It was a copy of the system from Mission
12   Peak Optics, about a year.
13   Q. It took a year to develop a copy?
14   A. Estimated, one year.
15   Q. How long did it take you to develop the
16   2100?
17   A. I don't recall.
18   Q. Do you remember how long after you
19   introduced the first round of machines that
20   you began to develop the 1100 and the 2100?
21   A. No.
22           MR. TREGER: The next document is
23   entitled "S.E.E. Inc. Detail Master Parts
24   list."

84

1    (Document marked as Exhibit 5 for
2    identification)
3    Q. Do you recognize this document?
4    A. No.
5    Q. Can you tell me what the term "1200/2200"
6    refers to?
7    A. As a guess.
8    Q. As a guess?
9    A. Yes.
10   Q. What is your guess?
11   A. A next generational product for S.E.E.
12   Q. That was the Maximus product?
13   A. I don't know.
14   Q. And do you recall deciding that the Maximus
15   project would use a microscope base
16   manufactured by Olympus?
17   A. We were considering it.
18   Q. Do you recall receiving a microscope base to
19   test for use in this product?
20   A. No.
21   Q. Do you recall considering using a lamp
22   socket and full socket housing lens, do you
23   recall considering whether to use that
24   assembly?

85

1    A. Excuse me. What are you referring to?
2    Q. The second part down, Part info: 10398.
3    A. Okay.
4    Q. Do you recall determining or do you recall
5    considering using that product as a
6    prospective part of the Maximus project?
7    A. No.
8    Q. Do you recall receiving one to test?
9    A. No.
10   Q. If you turn the page, it has a turret by
11   Olympus. Do you recall considering using
12   that part for the Maximus project?
13   A. No.
14   Q. Do you recall ordering one of them to
15   examine for use?
16   A. No.
17   Q. Did you do the ordering of the parts and
18   supplies?
19   A. No.
20   Q. Who did?
21   A. Dr. Jumi Lee, and Debbie Bowles, and other
22   staff.
23           MR. TREGER: Do you want to break
24   for half an hour?

22 (Pages 82 to 85)

Paul Martin 5-24-2005
Paul Martin, et al. v. S.E.E., Inc., et al.

102

1    regarding this quotation from Mr. Houser.
2    Q. Was there anything else discussed during
3       that meeting?
4    A. I don't recall.
5    Q. In 2001, were there any plans to upgrade the
6       forensic product?
7    A. No.
8    Q. There were none. Were there any plans to
9       upgrade the operating system to Windows
10      2000?
11   A. There was discussion, but no plans.
12   Q. What were the discussions?
13   A. Informal discussions.
14   Q. Informal discussions with whom?
15   A. Mr. Tringali, Dr. Lee.
16   Q. Did you ever discuss this with customers or
17      suppliers?
18   A. I don't recall.
19   Q. Do you recall the nature of the discussions?
20      Strike that. Did these discussions have to
21      do with the feasibility or affordability or
22      some other subtopic like that?
23   A. I don't recall.
24   Q. Were you in favor of doing such an upgrade?

103

1    A. Yes.
2    Q. What would that have required with respect
3       to creating the upgrade?
4    A. You would have to ask a programmer.
5    Q. And the programmer, what would the
6       programmer change?
7    A. The ability to program.
8    Q. What part of the S.E.E., what part of the
9       existing models would be retained and what
10      part would be replaced?
11   A. That was never discussed or decided.
12   Q. But to make it possible, you had to create a
13      new project; you just write software to
14      allow your --
15   A. That was never discussed.
16   Q. Let me ask you this. What was necessary
17      when you upgraded to Windows 98 from 95?
18   A. I didn't do the software on that.
19   Q. What was required just new software?
20   A. I don't know. I didn't do the software.
21   Q. Did you do anything with respect to that
22      upgrade?
23   A. No.
24   Q. Who was that work done by?

104

1    A. That would be Dr. Lee and Andrea Desrosier.
2    Q. Do you recall how long it took to create
3       that upgrade?
4    A. No. I do not know if an upgrade took place.
5    Q. From 95 to 98?
6    A. Correct.
7    Q. You made a number of claims against Mr.
8       Tringali, individually, in this case. I
9       would like to ask you some questions about
10      them.
11         First, is it true that you're
12      alleging that a contract existed between you
13      and Mr. Tringali, individually, to purchase
14      your stock in S.E.E.?
15   A. Yes.
16   Q. In your interrogatories, I believe you
17      stated the offer to purchase was made on
18      January 9; is that correct?
19   A. Correct.
20   Q. Can you tell me how you had come to have
21      this discussion on January 9, 2002?
22   A. From previous meetings, we decided to meet
23      again and come to terms where we could have
24      a mutual agreement. Mr. Tringali came up

105

1       with two proposals for us to accept.
2    Q. This was made on January 9, 2002?
3    A. Yes.
4    Q. Can you tell me who was present at this
5       meeting.
6    A. Mr. Tringali, myself, Dr. Lee, Jeff Housted.
7    Q. Was this the same day that there was a
8       stenographer present to take down
9       discussions?
10   A. Not for that meeting.
11   Q. Can you tell me why the stenographer was
12      dismissed for this part of the meeting?
13   A. I can't recall.
14   Q. Who went about retaining the stenographer?
15   A. Myself.
16   Q. Do you recall what temp agency you used?
17   A. No.
18   Q. Do you recall how she took down the meeting?
19      Was it shorthand, or was it like she is
20      doing?
21   A. I don't recall.
22   Q. Now, what meetings occurred before the
23      meeting at which you claim this offer was
24      made?

27 (Pages 102 to 105)

Paul Martin 5-24-2005
Paul Martin, et al. v. S.E.E., Inc., et al.

154

1    hire people, no.
2    Q.  Are you able to tell me any work product at
3        all that was generated for the Maximus
4        project by you?
5    A.  The only ones that I am aware of are from
6        documents that you have presented.
7    Q.  And when you say you devoted time to
8        personnel, what specific -- strike that.  Do
9        you recall what projects you were working
10       on, what sales you were working on in 2001?
11   A.  All of them?
12   Q.  The ones that you recall.
13   A.  The ones that I recall.  Hewlett-Packard
14       Corporation.  I would have to refer back to
15       company records to tell you the rest.
16       French, Maryland State Police, State of
17       Texas.
18   Q.  Did you ever --
19           MR. DAVIS:  Have you exhausted your
20       memory?
21           THE WITNESS:  I am still thinking.
22   A.  And more.
23   Q.  And did you ever make any suggestions to the
24       other directors as how to increase revenue

155

1        in order to better fund the Maximus project?
2    A.  No.
3    Q.  Are you able to recall how much time on
4        average, if any, how much time an on average
5        per month you spent on the Maximus project?
6    A.  No.
7    Q.  But you did continue to work on that; is
8        that correct?
9    A.  I don't recall spending time on it beyond
10       the meetings and the meeting notes.
11   Q.  You did offer employment to someone in
12       September?
13   A.  If you would include that as part of the
14       Maximus project.
15   Q.  Did you forward any work to your mechanical
16       designer?
17   A.  No.
18   Q.  Do you know if Dr. Lee did?
19   A.  No, I am not aware of that.
20   Q.  Did you speak with any customers about
21       upcoming products that would be released?
22   A.  I don't recall.
23   Q.  Did S.E.E. ever have a plan to lease a
24       Windows 2000 upgrade for the 2100?

156

1    A.  There was no plan.
2    Q.  Did you ever discuss any possible upgrade
3        like that with any of your customers?
4    A.  I don't recall.
5    Q.  So it is your testimony that in 2001, your
6        time was dedicated primarily to marketing
7        existing products and serving existing
8        customers?
9    A.  Installations, training, applications,
10       attending trade shows.
11   Q.  When did you decide to leave S.E.E.?
12   A.  January 2002.
13   Q.  Was that decision made on January 9?
14   A.  No.
15   Q.  When was it made?
16   A.  I don't recall the exact date.
17   Q.  Was it made before January?
18   A.  No.
19   Q.  Didn't you incorporate Quantum Dynamics in
20       December?
21   A.  No.
22   Q.  Did you organize it in December?
23   A.  Yes.
24   Q.  What was the purpose of organizing it?

157

1    A.  As a consulting company.
2    Q.  What consulting would it offer?
3    A.  Let's see, consulting for anything that
4        needed to be done.  It was also used as a
5        real estate company.
6    Q.  What real estate did it buy and sell?  What
7        real estate did it own?
8    A.  It never did.
9    Q.  What was it intended to own?
10   A.  That was one of the purposes of forming it
11       and then look for property.
12   Q.  When did you decide to use Quantum Dynamics
13       to develop spectrometry equipment for the
14       forensics market?
15   A.  Quantum Dynamics was not used to develop
16       spectrometers.
17   Q.  What was it used -- what products -- did it
18       ever sell spectrometers?
19   A.  It sold them.
20   Q.  And who manufactured the spectrometers?
21   A.  CRAIC Technologies.
22   Q.  When was CRAIC organized?
23   A.  It was officially organized June 2002.
24   Q.  QDI, weren't they advertising for

40 (Pages 154 to 157)

Paul Martin 5-24-2005
Paul Martin, et al. v. S.E.E., Inc., et al.

162

1  that is.
2  A.  It is an organization of the U.S. Army that
3      works on research projects.
4  Q.  And was that done pursuant to a contract?
5  A.  I don't recall.
6  Q.  And was that work done during 2001?
7  A.  Part of the work was done during 2001.
8  Q.  And part of it was done during 2000?
9  A.  Yes.
10 Q.  Was that project completed?
11 A.  No.
12 Q.  Now, you stated you had a laptop that was
13     personal. Did you ever copy the S.E.E.
14     database onto your laptop?
15 A.  While an employee of S.E.E., yes.
16 Q.  Did you also retain your own database
17     separate from the company?
18 A.  What type of database?
19 Q.  A list of customers and contacts.
20 A.  No, not of customers and contacts.
21 Q.  Did you have any kind of personal business
22     database that you kept on your personal
23     computer?
24 A.  Not a personal computer database.

164

1  Q.  Now, the computers that you used, were they
2      password protected? The S.E.E. computers,
3      were they password protected?
4  A.  What do you mean?
5  Q.  Did the individual workers have to have a
6      password to get on a computer?
7  A.  Yes. But it was an open operating system
8      and it could be easily avoided by pressing
9      escape.
10 Q.  What would that do?
11 A.  Put you right into full access to the
12     computer.
13 Q.  Would it give you full access to all of the
14     files on the computer?
15 A.  If those were individually password
16     protected, no. But if they were standard
17     files, yes.
18 Q.  Did you individually password protect all of
19     your files?
20 A.  No.
21 Q.  Did you individually protect some of them?
22 A.  Some.
23 Q.  How did you determine which ones to password
24     protect?

163

1  Q.  Did you have any other business related
2      information on your personal computer?
3  A.  Yes.
4  Q.  What was that?
5  A.  Electronic copies of brochures and
6      applications papers.
7  Q.  Do you have any knowledge of how the
8      inventory was maintained at S.E.E.?
9  A.  No.
10 Q.  Did you ever have any discussions with any
11     of your distributors, with any of S.E.E.'s
12     distributors, about leaving prior to leaving
13     S.E.E., prior to resigning your positions?
14 A.  What type of distributors?
15 Q.  Any of the distributors that sold S.E.E.
16     equipment.
17 A.  No.
18 Q.  Did you have discussions or did you tell
19     anybody about your decision to leave prior
20     to your resignation?
21 A.  No, except for Dr. Lee.
22 Q.  Did you do the documents to organize QDI,
23     did you do that yourself?
24 A.  Yes, with Dr. Lee.

165

1  A.  The ones that I thought I didn't want other
2      people to see.
3  Q.  And can you tell me, in general, what types
4      those usually included?
5  A.  No general ones as such. The only one I
6      recall, in particular, was the document
7      referring to the Maximus project.
8  Q.  Why did you want that to be restricted?
9  A.  It was a board meeting.
10 Q.  So you thought it should be restricted to
11     the board?
12 A.  People in the company.
13 Q.  You password protected the sales forecasts
14     as well, though, didn't you?
15 A.  Yes.
16 Q.  Why was that password protected?
17 A.  Because I thought it was important
18     information.
19     MR. TREGER: Let's take a quick
20     break. I think I am almost done.
21     (Recess taken)
22 Q.  I am going to ask you just a few more
23     questions. In 2001, did you have a project
24     whereby you were working on fiber analysis

42 (Pages 162 to 165)

Paul Martin 5-24-2005
Paul Martin, et al. v. S.E.E., Inc., et al.

170

1    recall the identity of every other file on
2    there.
3    Q.  Did you need a password and a user name to
4        get access to the network server?
5    A.  I don't recall.
6    Q.  And were the doors always kept locked at the
7        facility?
8    A.  Which doors?
9    Q.  The doors to the manufacturing portion.
10   A.  I don't know.  I don't recall.
11   Q.  And you were the administrator of the ACT
12       software.  You were designated as the
13       administrator?
14   A.  Not officially.
15   Q.  With respect to the one person who can
16       change the settings.  They say, "Do you want
17       to be the administrator."
18   A.  Everybody could change the settings.
19   Q.  And Dr. Lee was the administrator of the
20       BusinessWorks program; is that correct?
21   A.  One of them.  The other two were Mr.
22       Tringali and myself.
23   Q.  And did you have full access to everything
24       in the BusinessWorks program?

171

1    A.  Yes.
2    Q.  Did Mr. Tringali?
3    A.  Yes.
4            MR. TREGER:  I think that's all I
5        have.
6
7            EXAMINATION BY MR. DAVIS:
8
9    Q.  Mr. Tringali asked you whether you had
10       copied, I think, the S.E.E., database onto
11       your laptop.  I think you answered you did.
12       Did you erase that?
13   A.  Yes, I did.
14   Q.  When did you erase that?
15   A.  January 11, 2002.
16   Q.  What did you erase?
17   A.  The S.E.E. database and any S.E.E. files.
18   Q.  One other question.  Did you also turn over
19       the passwords to --
20   A.  Yes, I did.
21   Q.  When was that?
22   A.  January 9, 2002.
23           MR. DAVIS:  That's all.
24

172

1            EXAMINATION BY MR. TREGER:
2
3    Q.  How long were you out of work before you
4        started working at Quantum Dynamics?
5            MR. DAVIS:  Wait a minute.  I just
6        gave him a redirect.  You are entitled to
7        ask him cross on my redirect.  If you are
8        going into a whole line of questioning about
9        Quantum Dynamics, I am objecting that that's
10       irrelevant.  You don't have any standing.  I
11       am instructing him not to answer.
12           MR. TREGER:  Very good.  To the
13       extent I am going to object to that, based
14       on your conduct of the deposition, I will
15       suspend.  Otherwise, it is completed.
16           (Whereupon the deposition was
17           adjourned at 4:26 p.m.)
18
19
20
21
22
23
24

173

1    COMMONWEALTH OF MASSACHUSETTS    ESSEX, SS.
2
3        I, Deborah G. Rumson, Registered
4    Professional Reporter and Notary Public in
5    and for the Commonwealth of Massachusetts,
6    do hereby certify that pursuant to
7    appropriate notice of taking deposition,
8    there came before me the following-named
9    person, to wit: PAUL MARTIN, who was by me
10   duly sworn; that he was thereupon examined
11   upon his oath and his examination reduced to
12   writing by me; and that the deposition is a
13   true record of the testimony given by the
14   witness.
15       IN WITNESS WHEREOF, I have hereunto
16   set my hand and seal this        day of
17       , 2005.
18
19
20   My commission expires:
21   December 15, 2006
22
23           Notary Public
24

44 (Pages 170 to 173)

Case 1:04-cv-12708-MLW    Document 37-5    Filed 03/08/2006    Page 1 of 7
Jumi Lee 5-25-2005
Paul Martin, et al. v. S.E.E., Inc., et al.

1              COMMONWEALTH OF MASSACHUSETTS
2
3     NORFOLK COUNTY, SS.              SUPERIOR COURT
4
5
      * * * * * * * * * * * * * * * * * * * * * * * * * * * *
6                                      *

      PAUL MARTIN and JUMI LEE,        *
7     Individually and as              *
      Stockholders on behalf of        *        No. 02-801
8     S.E.E, Inc.                      *
                                       *
9                                      *
                                       *
10         vs.                         *
                                       *
11                                     *
      S.E.E., INC. and PHILLIP         *
12    TRINGALI                         *
                                       *
13    * * * * * * * * * * * * * * * * *
14
15
16
17           Deposition of JUMI LEE taken under the
18    applicable provisions of the Massachusetts Rules of
19    Civil Procedure by Lynda C. Vetter, Registered
20    Professional Court Reporter and Notary Public of the
21    State of Massachusetts, taken at the law offices of
22    Phillips & Angley, One Bowdoin Square, Boston,
23    Massachusetts, on Wednesday, May 25, 2005, commencing
24    at 10:14 a.m.

Jumi Lee 5-25-2005

Paul Martin, et al. v. S.E.E., Inc., et al.

62

| | | |
|---|---|---|
| 1 | Q. | Okay. |
| 2 | A. | I recall there was in 2000, 2001. I |
| 3 | don't recall. | |
| 4 | Q. | I'm going to enter the next exhibit. |
| 5 | For the record, it's the ledger page that was entered | |
| 6 | in -- actually, we don't need to enter this. Do you | |
| 7 | remember interviewing somebody named Steve Parmen? | |
| 8 | A. | I don't remember the name but I might |
| 9 | have. | |
| 10 | Q. | Do you recall interviewing somebody in |
| 11 | May? | |
| 12 | A. | May of? |
| 13 | Q. | 2001? |
| 14 | A. | I don't recall. |
| 15 | Q. | Do you recall interviewing somebody in |
| 16 | August of 2001? | |
| 17 | A. | I believe there was somebody in August, |
| 18 | yes. Maybe. | |
| 19 | Q. | Do you know if an offer was extended to |
| 20 | that person? | |
| 21 | A. | I don't remember. |
| 22 | Q. | Okay. Do you know if any other offers |
| 23 | were extended at all? | |
| 24 | A. | I don't remember. |

63

| | | |
|---|---|---|
| 1 | Q. | Okay. Was anybody hired for that |
| 2 | position? | |
| 3 | A. | No. |
| 4 | Q. | Do you know why no one was hired? |
| 5 | A. | Because I could not find anybody that |
| 6 | was qualified and would accept the salary that we | |
| 7 | offered. And I wasn't quite sure what qualifications | |
| 8 | that I was actually looking for, combination of all | |
| 9 | three. | |
| 10 | Q. | Okay. You weren't sure if the mix was |
| 11 | good? | |
| 12 | A. | I wasn't quite sure what programming |
| 13 | skill that a programmer must have. | |
| 14 | Q. | And who was to determine what the |
| 15 | skills were, what the required skills were? | |
| 16 | A. | Who was to determine? |
| 17 | Q. | Yes. |
| 18 | A. | That was not clear, the defined |
| 19 | function of that. | |
| 20 | Q. | Okay. What was the salary you were |
| 21 | offering? | |
| 22 | A. | The $40,000 a year salary for a Ph.D., |
| 23 | probably 60,000 if we push it. Programmer, 60,000 | |
| 24 | maybe. That was the amount we had been offering. | |

64

| | | |
|---|---|---|
| 1 | Q. | Who set that salary? |
| 2 | A. | I don't recall. |
| 3 | Q. | And did you post the ads? Were you the |
| 4 | one who actually did that work? | |
| 5 | A. | I did many different things. I don't |
| 6 | recall whether I specifically posted the ads. | |
| 7 | Q. | Did you write the ads? |
| 8 | A. | I don't recall. |
| 9 | Q. | Do you know what records there would |
| 10 | be, what the ads said? | |
| 11 | A. | Records? |
| 12 | Q. | Yes. |
| 13 | A. | What does it say in the job? |
| 14 | Q. | Yes. Is there any record of the text |
| 15 | of these job postings that you would put out? | |
| 16 | A. | Probably in vendor file. |
| 17 | Q. | Okay. Would that have been done on a |
| 18 | computer or would you have written those up on a | |
| 19 | computer? | |
| 20 | A. | If I did, yes. |
| 21 | Q. | Was there a specific computer at work |
| 22 | that you used? | |
| 23 | A. | One in my office. |
| 24 | Q. | Okay. Did you ever use any of the |

65

| | | |
|---|---|---|
| 1 | other computers at SEE? | |
| 2 | A. | Yes. |
| 3 | Q. | Which ones? |
| 4 | A. | I don't recall specifically which |
| 5 | computer but all computers except Internet computer. | |
| 6 | Q. | Okay. |
| 7 | A. | Actually, you need to define "use." |
| 8 | Did I have access to it or use it? | |
| 9 | Q. | Did you use it to do your job? |
| 10 | A. | Mainly it would my personal desktop |
| 11 | computer. | |
| 12 | Q. | At some point, did you have a lap-top |
| 13 | that the company provided you? | |
| 14 | A. | No. |
| 15 | Q. | If you turn to the third page of this |
| 16 | document, it says, "John's status as a co-op | |
| 17 | student." Was he from Northeastern? | |
| 18 | A. | Yes. I believe so. |
| 19 | Q. | Now, at the bottom of the third page, |
| 20 | the bullets change shape. It says, "Need to go into | |
| 21 | the semi-conductor market." Do you recall this | |
| 22 | discussion? | |
| 23 | A. | Yes. |
| 24 | Q. | Can you tell me basically why the |

17 (Pages 62 to 65)

Case 1:04-cv-12708-MLW    Document 37-5    Filed 03/08/2006    Page 3 of 7
Jumi Lee 5-25-2005
Paul Martin, et al. v. S.E.E., Inc., et al.

66

1   decision was made to go into the semi-conductor
2   market?
3       A.   I don't believe there was a decision.
4       Q.   Okay. What was it? Was it a
5   suggestion?
6       A.   Talking about it. I believe so.
7       Q.   Okay. Down from that, there is a list
8   of -- starts with line one, two, three, four, five.
9   Now at one point, you said there was a list of tasks
10  to be performed --
11      A.   Yes.
12      Q.   -- In development of new product. Is
13  this the kind of list you are talking about?
14      A.   No.
15      Q.   Okay. Do you know what that list
16  represents?
17      A.   Are you talking about one, two, three,
18  four, five?
19      Q.   Yes.
20      A.   Are you asking my opinion?
21      Q.   I'm asking what your understanding was
22  at the time.
23      A.   I believe it was a procedure to bring
24  the product to the market.

67

1       Q.   Okay. Did you discuss how long it
2   would take to bring this product to the market?
3       A.   I don't recall.
4       Q.   Okay. If you look at that -- by the
5   way, was it Mr. Martin who typed up this document?
6       A.   You would have to ask him. I did not
7   type this.
8       Q.   Okay. Looking at that list of steps,
9   would any of those have been your responsibility?
10      A.   Number two, three, four.
11      Q.   Defining a specification, building?
12      A.   I'm sorry. Nos. three and four.
13      Q.   Okay. Did you ever discuss how long it
14  would take to build the instrument?
15      A.   I don't recall.
16      Q.   Do you recall if you ever discussed how
17  long it would take to test and characterize the
18  instrument?
19      A.   I don't recall.
20      Q.   Okay. If you go to the next page, the
21  seventh bullet down, it says, "The first step is to
22  build a UV visible 3000 unit." Do you recall
23  discussing how long that would take?
24      A.   No. I don't recall.

68

1       Q.   Okay. Do you recall discussing how
2   much that would cost?
3       A.   I don't recall either.
4       Q.   A little bit further down, just before
5   it says, "February 13, 2001," it says, "Jumi can use
6   these to evaluate software packages." It says, "Phil
7   needs to acquire a library of well-characterized
8   samples. These must be single and multi-layer
9   films." The next bullet says, "Jumi can use these to
10  evaluate software packages."
11      A.   Yes.
12      Q.   Do you recall discussing that?
13      A.   Yes.
14      Q.   What software packages were you going
15  to be evaluating?
16      A.   I don't remember the name of the
17  software. Something -- I don't recall. There were
18  three or something.
19      Q.   What was the function of that software?
20      A.   Calculate film thickness.
21      Q.   Those were off-the-shelf programs?
22      A.   Yes.
23      Q.   Do you recall buying any of these
24  software packages?

69

1       A.   I recall purchasing one software,
2   one -- I cannot give you the name.
3       Q.   Do you recall when that was?
4       A.   Sometime in the year 2001.
5       Q.   On the 13th, sixth bullet down, "Have
6   to purchase equipment from Maximus. Need to set up a
7   budget." Would that have been your responsibility to
8   set up a budget?
9       A.   No.
10      Q.   Do you know if a budget was ever set
11  up?
12      A.   No.
13      Q.   At the bottom, it says -- the fifth
14  bullet from the bottom -- it says, "Can GRAMS do the
15  job? It handles three-dimensional arrays, it can do
16  deconvolutions, Kramers-Kronig transforms and other
17  math functions as well as sophisticated statistical
18  analysis." Was GRAMS the software package you
19  purchased?
20      A.   I purchased?
21      Q.   That was purchased for you to use and
22  evaluate?
23      A.   No.
24      Q.   Okay. Now, if you look at the bottom,

18 (Pages 66 to 69)

Jumi Lee 5-25-2005
Paul Martin, et al. v. S.E.E., Inc., et al.

70

1  it says, "March 15th will be the meeting to review
2  Maximus, project specifications from Phil and Paul."
3  Then it says, "Product design from Jumi, Phil and
4  Paul." Do you recall another meeting regarding this
5  project?
6      A.  No.
7      Q.  Do you recall if meetings were held
8  regularly about this project?
9      A.  No.
10     Q.  Were they -- do you know if they were
11 held or you just don't recall?
12     A.  I don't recall attending a meeting.
13     Q.  Any meetings?
14     A.  Meeting like this (indicating)?
15     Q.  No, meetings about this particular
16 project.
17     A.  I recall informing my test results.
18     Q.  Okay. What were those tests results
19 of? What tests did you perform?
20     A.  There was a wafer, W-A-F-E-R. And I
21 don't know if that's a wafer or standard. I believe
22 it's a standard for Nanometrics. I run that waver
23 under a SE instrument, SE 2100, and plugged that data
24 to see whether I can come up with the correct

71

1  results.
2      Q.  What were the test results?
3      A.  Bad.
4      Q.  And do you know why it did not give you
5  the right results?
6      A.  I believe it was lack of my
7  understanding in film thickness and number two,
8  software interface. Number three, misunderstanding
9  of parameters. But I cannot tell for sure.
10     Q.  Were those test results preserved in a
11 file, computer file or printed out?
12     A.  They should be in the computer in the
13 conference room.
14     Q.  What was that computer usually used
15 for?
16     A.  That's SE-2100.
17     Q.  So that the unit processed toward the
18 data?
19     A.  Yes.
20     Q.  You said you recall discussing or
21 reporting these results?
22     A.  Yes.
23     Q.  Who did you report them to?
24     A.  My recollection it was more informal.

72

1  I tested software, doesn't seem to work, to Paul
2  Martin and Mr. Tringali.
3      Q.  Okay. And do you know if anything was
4  done as a result of that?
5      A.  I don't think so.
6      Q.  Did you buy any other pieces of
7  software to test?
8      A.  Buy another?
9      Q.  Yes.
10     A.  No.
11     Q.  Was there any discussion about writing
12 your own piece of software?
13     A.  If they ever were going to make this
14 product, maybe. I don't recall.
15     Q.  Did you keep any personal notes of your
16 meetings about this?
17     A.  No, I don't. There might be --
18         MR. DAVIS: You have answered that.
19 Just answer the question.
20     Q.  Do you know if any notes of these
21 meetings were ever kept by anyone?
22     A.  Meeting notes?
23     Q.  Any notes. Do you know if there were
24 any notes of the progress of this project kept?

73

1      A.  I don't recall.
2      Q.  What were you going to say before your
3  attorney stopped you? You said there might be?
4      A.  I might have worked with some -- the
5  test results on a piece of paper.
6      Q.  If you had, would this have been
7  retained anywhere?
8      A.  It would be in -- either in my office
9  computer, yes.
10     Q.  Okay. I would like to take a short
11 break.
12         (Luncheon recess.)
13         MR. TREGER: The next document is a
14 memo that was marked as Exhibit 3 at Mr. Martin's
15 deposition. For the record, that's Exhibit 2.
16         (Lee Exhibit No. 2 was marked for
17 identification.)
18     Q.  Do you recall seeing this document
19 before?
20     A.  I do not.
21     Q.  Do you recall attending a meeting about
22 Project Maximus in March of 2001?
23     A.  I do not.
24     Q.  Do you recall discussing any of the

19 (Pages 70 to 73)

Jumi Lee 5-25-2005
Paul Martin, et al. v. S.E.E., Inc., et al.

| 74 | | 76 | |
|---|---|---|---|
| 1 | subjects listed in this document? | 1 | Q.    You don't recall? |
| 2 | A.    Number, item three discussed at some | 2 | A.    No. |
| 3 | other time but not at this meeting, no. | 3 | MR. TREGER:  Appears next exhibit is |
| 4 | Q.    You said you were recall discussing No. | 4 | the document entered as Exhibit 4 in Mr. Martin's |
| 5 | 3? | 5 | deposition. |
| 6 | A.    Item No. 3 but not in this meeting.  I | 6 | (Lee Exhibit No. 4 was marked for |
| 7 | remember talking about it. | 7 | identification.) |
| 8 | Q.    Which part of No. 3?  It has two | 8 | Q.    Do you recognize that document? |
| 9 | subjects.  Using one of the demo systems for a bench | 9 | A.    No. |
| 10 | and then building a computer specific -- | 10 | Q.    Do you know who generated it? |
| 11 | A.    Demo system for development. | 11 | A.    No. |
| 12 | Q.    That was the one in the conference room | 12 | Q.    Do you recall ever discussing putting |
| 13 | that you ended up using? | 13 | together a budget for the Maximus project? |
| 14 | A.    Yes. | 14 | A.    No. |
| 15 | Q.    In No. 9, it says, "To be done by April | 15 | Q.    Do you recall ever discussing expenses |
| 16 | meeting, evaluate software packages with essentials | 16 | for the development of the Maximus project? |
| 17 | we have received, will use dedicated computer."  Is | 17 | A.    No. |
| 18 | that referring to the same instrument that you used | 18 | MR. TREGER:  This is the next exhibit. |
| 19 | for the bench? | 19 | It is the exhibit entered in Mr. Martin's deposition |
| 20 | A.    I don't know what this is. | 20 | as Exhibit I5. |
| 21 | Q.    And No. 7, it says, "A&P samples used | 21 | (Lee Exhibit No. 5 was marked for |
| 22 | in Nan 4150 with a 49. Map."  Do you know what was | 22 | identification.) |
| 23 | inscribed on the back? | 23 | MR. DAVIS:  Again, this is dated |
| 24 | A.    I don't know anything about this. | 24 | January 22, 2003, an entire year after my clients |

| 75 | | 77 | |
|---|---|---|---|
| 1 | Q.    Okay.  The next exhibit is the memo | 1 | left the employ of SEE. |
| 2 | that was entered as Exhibit 6 in Mr. Martin's | 2 | Q.    Do you recognize this document? |
| 3 | deposition.  I believe it's a memo dated 7-12-02. | 3 | A.    In terms of - -  this particular |
| 4 | MR. DAVIS:  I want to raise an | 4 | document, no. |
| 5 | objection to these memos.  They are all dated | 5 | Q.    Do you recognize what software it was |
| 6 | 7-12-02.  That's long after Dr. Martin and Dr. Lee | 6 | generated in? |
| 7 | left the employ of SEE. | 7 | A.    It appears to be from BusinessWorks. |
| 8 | (Lee Exhibit No. 3 was marked for | 8 | Q.    Do you know what the term SE-1200/2200 |
| 9 | identification.) | 9 | refers to? |
| 10 | Q.    Do you recognize this document? | 10 | A.    That must be the product designations. |
| 11 | A.    No. | 11 | Q.    Was that a product that was being |
| 12 | Q.    Do you recognize the password Twyster? | 12 | developed while you were at SEE? |
| 13 | A.    Yes. | 13 | A.    I don't recall. |
| 14 | Q.    What password is that? | 14 | Q.    Do you recall ever discussing with |
| 15 | A.    That's one of the passwords Dr. Martin | 15 | anybody working on an upgrade for the SE 2100 and |
| 16 | used. | 16 | 1100 that would run out of the Windows operating |
| 17 | Q.    Do you recall ever seeing a document | 17 | system? |
| 18 | listing the specifications for project Maximus, stage | 18 | A.    Any upgrade? |
| 19 | one? | 19 | Q.    While you were working at SEE, do you |
| 20 | A.    I don't recall. | 20 | recall discussing with anybody working on an upgrade |
| 21 | Q.    Do you recall seeing or discussing any | 21 | to the SE-1100 and 2100 that was run on a Windows |
| 22 | of the subjects of this document? | 22 | operating system? |
| 23 | A.    In a directors meeting something | 23 | A.    Yes. |
| 24 | related to Nanometric.  I don't recall. | 24 | Q.    When? |

20 (Pages 74 to 77)

Jumi Lee 5-25-2005
Paul Martin, et al. v. S.E.E., Inc., et al.

78

1   A.   1999.
2   Q.   Who did you discuss that with?
3   A.   Dr. Paul Martin mostly. I believe with
4   Mr. Tringali as well.
5   Q.   What would have been necessary to
6   create that upgrade?
7   A.   It must be upgraded to Windows 2000
8   platform.
9   Q.   How would that be accomplished?
10  A.   Writing new software.
11  Q.   What part of the software would need to
12  be changed?
13  A.   Drivers.
14  Q.   How about the graphic user interface?
15  A.   Yes.
16  Q.   Would that need to be rewritten?
17  A.   Yes.
18  Q.   How about the color software?
19  A.   I do not know.
20  Q.   Okay. Can you tell me if any work was
21  ever done on that upgrade?
22  A.   No. What do you mean by "work was
23  done"?
24  Q.   Can you tell me whether anybody ever

79

1   rewrote the drivers?
2   A.   Rewrote the drivers, no.
3   Q.   Did anybody do any programming work?
4   A.   No.
5   Q.   Why was that?
6   A.   Why was what?
7   Q.   Why was no work done on this?
8   A.   Number one, I did not know the program
9   language. Number two, I wasn't sure which language
10  to go to. There are two possibilities. I did not
11  know either languages.
12  Q.   Did you ever bring up these problems at
13  any directors meetings?
14  A.   Yes, with the programmer.
15  Q.   So you are referring to the meeting,
16  the minutes of which we have reviewed today?
17  A.   Yes, unofficial indications.
18  Q.   As well as doing the Maximus project,
19  you were planning on do this upgrade?
20  A.   Yes.
21  Q.   Were there going to be two instruments
22  or one instrument that was adaptable to either
23  application?
24  A.   I don't understand your question.

80

1   Q.   You just stated there were two apparent
2   goals. One was to upgrade the system, the
3   instruments to run on Windows 2000 and the other goal
4   was to enter the semi-conductor market. Were you
5   intending on building a completely new instrument or
6   were you intending on building an instrument that
7   would run on Windows 2000 and be adaptable to both?
8   A.   First step is to write a software to
9   collect data which will work on forensic. And film
10  thickness software has to be written on top of Beta
11  collection software.
12  Q.   That was going to be put on the
13  instrument you already had designed?
14  A.   What? I don't understand the question.
15  Q.   Let me ask you this. What language
16  were you going to have to write in to adapt the
17  system to 2000?
18  A.   Are you talking about data collection
19  portion, forensic portion?
20  Q.   Forensic portion?
21  A.   I haven't made a decision. There was
22  one version of the GRAMS 5,6-AI versus which is a
23  second generation version of GRAMS 4 that requires
24  understanding and programming ability of ACTIVE X,

81

1   OCX, CONS, OLE. And the second item was a Labview,
2   second programming possible language was a Labview.
3   Q.   And you did not know these programming
4   languages?
5   A.   I don't even know if Active X.
6   Q.   Did Dr. Martin know any of these
7   languages?
8   A.   You would have to ask him.
9   Q.   You don't know?
10  A.   I don't.
11  Q.   Getting back to the exhibits before
12  you, do you recall ever making a parts list for the
13  upgraded 1200 and 2200?
14  A.   Olympus discontinued Model BX-60 or
15  something like that. And we had no choice but
16  upgrading to BX50 something and at the time maybe put
17  the new number on it.
18  Q.   Was the product that is designated 1200
19  and 2200, was that going to be the next generation of
20  the forensic product?
21  A.   I don't recall.
22       MR. TREGER: This is the next exhibit
23  for the record, a memo dated 9-4-01 from SEE
24  Incorporated from Jeff Hustead.

21 (Pages 78 to 81)

Jumi Lee 5-25-2005
Paul Martin, et al. v. S.E.E., Inc., et al.

| 82 | | 84 | |
|---|---|---|---|
| 1 | (Lee Exhibit No. 6 was marked for | 1 | two-minute break? |
| 2 | identification.) | 2 | (Recess.) |
| 3 | Q.    Do you recognize that document? | 3 | Q.    Are you able to tell me if additional |
| 4 | A.    Appears it's what I wrote. | 4 | work was done on the Maximus project? |
| 5 | Q.    Do you recall sending this memo? | 5 | A.    In addition to what I already testified |
| 6 | A.    I don't recall sending it. | 6 | to? |
| 7 | Q.    Do you recall the subject matter of the | 7 | Q.    Yes. |
| 8 | memo? | 8 | A.    I don't think so. |
| 9 | A.    I'm not quite sure. I don't know. | 9 | Q.    Do you know if any additional parts |
| 10 | Q.    Does this refresh your recollection as | 10 | were ordered for use in developing? |
| 11 | to what work was done on the upgrade to the | 11 | A.    For the Maximus project? |
| 12 | 2200/1200? | 12 | Q.    Yes. |
| 13 | A.    It looks like it. | 13 | A.    No. |
| 14 | Q.    This has something -- it refers to the | 14 | Q.    Do you know if any additional parts |
| 15 | IC Module. What is that? | 15 | were purchased for developing the 2200 and the old |
| 16 | A.    Inventory control module. That's | 16 | 1200? |
| 17 | BusinessWorks inventory control module. | 17 | A.    At the then Olympus VX 50 something -- |
| 18 | Q.    What was that? What was the inventory | 18 | I don't know, no. |
| 19 | control module used for? | 19 | Q.    You don't know one way or the other? |
| 20 | A.    In an accounting package in | 20 | A.    I don't recall issuing a purchase order |
| 21 | BusinessWorks, there was an account receivable | 21 | for that. |
| 22 | module, account payable module, payroll module, | 22 | Q.    All right. You made a series of claims |
| 23 | inventory module, and general ledger module. | 23 | against Mr. Tringali. I will ask you some questions |
| 24 | Q.    Whose responsibility was it to maintain | 24 | about these claims. Now, first of all, you claim |

| 83 | | 85 | |
|---|---|---|---|
| 1 | the data in the inventory control module? | 1 | there is a contract between yourself and Mr. Tringali |
| 2 | A.    Responsible for? I was doing it. I'm | 2 | personally to purchase your stock in SEE? |
| 3 | not sure whether I am responsible for it. | 3 | A.    Yes. |
| 4 | Q.    Did anybody else do it? | 4 | Q.    And can you explain to me how that |
| 5 | A.    Yes. | 5 | contract came to be. |
| 6 | Q.    Who else? | 6 | A.    Not exactly -- I don't recollect, but |
| 7 | A.    Debbie Bowles, Tony Faciano, Phil | 7 | it was January 8th or 9th. After meeting, Tringali |
| 8 | Tringali and myself and Paul Martin and possibly Jeff | 8 | and Jeff Hughstead went out for lunch. They came |
| 9 | Hustead. Those are the people to make the | 9 | back with two proposals. Proposal number one is that |
| 10 | modifications. | 10 | was negotiable, proposal number one. Based on |
| 11 | Q.    When did they make modifications? Was | 11 | estimate of company value, it will -- to purchase a |
| 12 | there somebody specifically responsible for entering | 12 | stock of Tringali by me and Paul -- it will be |
| 13 | new equipment or new parts in inventory? | 13 | neighborhood of 1.5 something million dollars |
| 14 | A.    Whoever receives the parts. | 14 | approximately with approximately 2 to $300,000 cash |
| 15 | Q.    Comes over to the computer and enters | 15 | up-front. Option No. 2 was non-negotiable. Tringali |
| 16 | it into the inventory control model? | 16 | will purchase Paul Martin and Jumi Lee's stock for |
| 17 | A.    I don't understand. | 17 | $200,000 cash. And Tringali is expecting an answer |
| 18 | Q.    You are saying whoever received the | 18 | on the 11th of January around ten a.m. |
| 19 | part would go to the computer and input it in the -- | 19 | Q.    What was said that made you believe one |
| 20 | A.    Yes. | 20 | was negotiable and one was not? |
| 21 | Q.    -- in the BusinessWorks program? | 21 | A.    That's what I was told. |
| 22 | A.    Correct. | 22 | Q.    Who told you that? |
| 23 | Q.    Okay. | 23 | A.    Tringali and Jeff Hughstead. |
| 24 | MR. DAVIS: Can we take a short | 24 | Q.    Both? |

22 (Pages 82 to 85)

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS                          SUPERIOR COURT DEPARTMENT
                                     CIVIL ACTION NO. 02801

PAUL MARTIN AND JUMI LEE,            )
INDIVIDUALLY AND AS STOCKHOLDERS     )
ON BEHALF OF S.E.E., INC.            )
       Plaintiffs                    )
                                     )
vs.                                  )
                                     )
S.E.E., INC. AND                     )
PHILLIP TRINGALI,                    )
       Defendants

## **NOTICE OF CONTINUED TAKING DEPOSITION OF PAUL MARTIN**

To:  Roger S. Davis, Esq.
     Davis & Rubin
     One Bowdoin Square, Suite 901
     Boston, MA 02114-2919

     Please take notice that at 10:00 a.m. on Monday, March 20

2006 at the law offices of Phillips & Angley, One Bowdoin Square,

Boston, Massachusetts the defendant Phillip Tringali, by his

attorney will recommence the deposition upon oral examination of

the plaintiff Paul Martin pursuant to Rule 30 of the

Massachusetts Rules of Civil Procedure, before a notary public in

and for the Commonwealth of Massachusetts or before some other

officer authorized by law to administer oaths. Pursuant to

Mass.R.Civ.P. 30(b)(5) and 30, deponent is further directed to

produce, at the deposition, the documents and things described in

Schedule "A" hereto.  The oral examination will continue from day

to day until completed. You are invited to attend and cross-

examine.

PHILLIP TRINGALI,
By his attorney,

Date: February 9, 2006

Jeffrey J. Phillips, Esq.
B.B.O. #398480
Daniel Treger
B.B.0. 562140
Phillips & Angley
One Bowdoin Square
Boston, MA 02114
Tel. No.: (617) 367-8787

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing

on all parties or their attorney of record this day by hand.

Date: February 9, 2006

Daniel Treger, Esq.

L:\LITG\trng002\lee.not2.wpd

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS                    SUPERIOR COURT DEPARTMENT
                              CIVIL ACTION NO. 02801

PAUL MARTIN AND JUMI LEE,            )
INDIVIDUALLY AND AS STOCKHOLDERS     )
ON BEHALF OF S.E.E., INC.            )
     Plaintiffs                      )
                                     )
vs.                                  )
                                     )
S.E.E., INC. AND                     )
PHILLIP TRINGALI,                    )
     Defendants

### NOTICE OF CONTINUED TAKING DEPOSITION OF JUMI LEE

To:  Roger S. Davis, Esq.
     Davis & Rubin
     One Bowdoin Square, Suite 901
     Boston, MA 02114-2919

     Please take notice that at 10:00 a.m. on Tuesday, March 21

2006, at the law offices of Phillips & Angley, One Bowdoin

Square, Boston, Massachusetts the defendant Phillip Tringali, by

his attorney will recommence the deposition upon oral examination

of the plaintiff Jumi Lee pursuant to Rule 30 of the

Massachusetts Rules of Civil Procedure, before a notary public in

and for the Commonwealth of Massachusetts or before some other

officer authorized by law to administer oaths. Pursuant to

Mass.R.Civ.P. 30(b)(5) and 30, deponent is further directed to

produce, at the deposition, the documents and things described in

Schedule "A" hereto.  The oral examination will continue from day

to day until completed. You are invited to attend and cross-

examine.

PHILLIP TRINGALI,
By his attorney,

Date: February 9, 2006

_____
Jeffrey J. Phillips, Esq.
B.B.O. #398480
Daniel Treger
B.B.O. 562140
Phillips & Angley
One Bowdoin Square
Boston, MA 02114
Tel. No.: (617) 367-8787

CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing
on all parties or their attorney of record this day by hand.

Date: February 9, 2006

_____
Daniel Treger, Esq.

L:\LITG\trng002\martin.not2.wpd

SCHEDULE A

DEFINITIONS

(1) Communication.   The term "communication" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

(2) Document.

a. The word "document" includes without limitation the original or any copy of any notes, correspondence, memoranda (including written memoranda of telephone conversations, other communications, discussions, agreements, and any other acts, transactions or activities), contracts, agreements, letters, telegrams, evaluations, work papers, calendars, appointment books, diaries, instructions, order forms, records, sound recordings, forms, statements, photographs, x-rays, journals, notices, interoffice and interoffice communications, photostats, and any other written matter of any kind, including, but without limitation, any marginalia appearing on any documents or any other writing.   A document in the possession, custody or control of another person is considered to be in the possession, custody or control of the defendant if the defendant has a right or privilege to examine it upon request or demand.

b. In the event that it is claimed that any communication or document responsive to any interrogatory is privileged or attorney's work product, each such communication or document should be fully identified in writing, except that the substance thereof need not be described to the extent it is claimed to be privileged.

(3) Identify (With Respect to Persons).  When referring to a person, "to identify" means to give, to the extent known, the person's full name, present or last known address, and, when referring to a natural person, the present or last known place of employment.  Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

(4) Identify (With Respect to Documents).  When referring to documents, "to identify" means to give, to the extent known, the

(a) type of document;

(b) general subject matter;

(c) date of the document;  and

(d) author(s), addressee(s), and recipient(s).

(5) Parties.  The terms "plaintiff" and "defendant" as well as a party's full or abbreviated name or a pronoun referring to a party mean the party and, where applicable, its officers, directors, employees, partners, corporate parent, subsidiaries, or affiliates.  This definition is not intended to impose a discovery obligation on any person who is not a party to the litigation.

(6) Person.  The term "person" is defined as any natural person or any business, legal, or governmental entity or association.

(7) Concerning.  The term "concerning" means referring to, describing, evidencing, or constituting.

(8) State the Basis. When an interrogatory calls upon a party to "state the basis" of or for a particular claim, assertion, allegation, or contention, the party shall

(a) identify each and every document (and, where pertinent, the section, article, or subparagraph thereof), which forms any part of the source of the party's information regarding the alleged facts or legal conclusions referred to by the interrogatory;

(b) identify each and every communication which forms any part of the source of the party's information regarding the alleged facts or legal conclusions referred to by the interrogatory;

(c) state separately the acts or omissions to act on the part of any person (identifying the acts or omissions to act by stating their nature, time, and place and identifying the persons involved) which form any part of the party's information regarding the alleged facts or legal conclusions referred to in the interrogatory; and

(d) state separately any other fact which forms the basis of the party's information regarding the alleged facts or conclusions referred to in the interrogatory.

Additional definitions are as follows:

(9) Quantum means Quantum Dynamics International, LLC, its agents and employees.

(10) CRAIC means CRAIC  Technologies, LLC, its agents and employees

(11) S.E.E. means S.E.E., Inc, its agents or employees.

(12) Customer of S.E.E. means any person who purchased products manufactured by S.E.E. Inc. prior to your separation from S.E.E., Inc.

(13) Prospective Customer of S.E.E. means any person contacted by S.E.E., Inc., its agents or employees regarding the purchase of products manufactured by S.E.E., Inc. prior to January 11, 2002.

## REQUESTS

### Request No. 1

All documents concerning communications between Quantum and customers or prospective customers of S.E.E. during the years from January 9, 2002 through March 22, 2004 including, but not limited to, any computerized data base used to track customer contacts, such as ACT.

### Request No. 2

All documents concerning communications between CRAIC and customers or prospective customers of S.E.E. from January 9, 2004 through March 22, 2004, but not limited to, any computerized data base used to track customer contacts, such as ACT.

### Request No. 3

All documents concerning the product specifications of all products developed by Quantum and/or CRAIC between January 9, 2002 and March 22, 2004.

## Request No. 4

All source code written for, or commissioned for use in the analytical device developed between January 9, 2002 and March 22, 2004 including but not limited to any source code for any graphic user interface, and for adaptation to the Windows 2000 operating system.

## Request No. 5

All documents concerning applications papers presented by you during the year 2002, including but not limited to the paper entitled "Ultraviolet Spectroscopy of Textile Fibers."

## Request No. 6

All documents  concerning vendors who supplied software, hardware, optical, electrical or other components, and design or other services related to the development of the Quantum and/or CRAIC products between January 9, 2002 and March 22, 200 including but not limited to all communications therewith.

## Request No. 7

All documents concerning communications between the defendants and employees of S.E.E., Inc. dating from after January 9, 2002.

## Request No. 8

All documents concerning communications between the defendants and any of S.E.E., Inc.'s distributors or sales representatives dating from after January 9, 2002.

## Request No. 9

All itemized telephone bills for telephone numbers used by the defendants while engaged in activities related to designing,

developing, manufacturing, and/or marketing of Quantum and CRAIC

products between January 9, 2002 through March 22, 2004,

including telephone numbers listed in the names of Quantum and

CRAIC.

Request No. 10

All promotional literature for Quantum and/or CRAIC products

dating from between January 9, 2002 through March 22, 2004,

including but not limited to all documents posted on websites

maintained by Quantum and/or CRAIC.

Request No. 11

All documents of, concerning or relating to upgrades of

S.E.E. instruments, repairs or service performed on S.E.E.

instruments by Quantum and/or CRAIC from January 9, 2002 through

March 22, 2004.

Request No. 12

All documents concerning sales of products developed by

Quantum and/or CRAIC from January 9, 2002 through March 22, 2004.

Request No. 13

All documents concerning parts purchased for the first

prototypes of the Mach 1 and/or the Mach 10, as identified in

Exhibit "A".

Request No. 14

All documents, including employment contracts, concerning,

in whole or in part, any policy of confidentiality maintained by

Quantum and CRAIC.

Request No. 15

All documents concerning or relating to the organization of Quantum and/or CRAIC.

Request No. 16

All documents concerning communications between the defendants and Sarah Walbridge dating from after January 9, 2002.

Request No. 17

All documents concerning communications between the defendants and Georgia Institute  of Technology, its agents or employees dating from after January 9, 2002.

Request No. 18

All documents concerning communications between the defendants and Dynamic Light Control, LLC dating from and after January 9, 2002.

Request No. 19

All documents concerning the development of the following software packages marketed for use with the Mach 1 and the Mach 10:

a. Absolute Reflectance Package.

Request No. 20

All documents concerning any training performed by defendants for users of S.E.E. instruments after January 9, 2002.

Request No. 21

All documents concerning the "low end system" that is the subject of the email attached hereto as Exhibit "B".

Request No. 22

All documents reflecting the income and expenses of Quantum and/or CRAIC from January 7, 2002 through March 22, 2004.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 04-12708-MLW

PHILLIP TRINGALI,                    )
                                     )
          Plaintiff,                 )
                                     )
v.                                   )
                                     )
PAUL MARTIN AND                      )
JUMI LEE,                            )
                                     )
          Defendants                 )

## PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFENDANT PAUL MARTIN

Pursuant to Fed.R.Civ.P., Rule 34 and Local Rules 26.5 and 34.1 of the United States District Court for the District of Massachusetts, plaintiff Phillip Tringali hereby requests that the defendant, Paul Martin respond to the following document request and produce documents at plaintiff's counsel's office in accordance with the Rules.

### DEFINITIONS

The uniform definitions set forth in Rule 26.5 of the Local Rules of the United States for the District of Massachusetts apply:

(1) *Communication.* The term "communication" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

(2) *Document.* The term "document" is defined to be synonymous in meaning and equal in scope to the usage of this term in <u>Fed.R.Civ.P. 34(a)</u>. A draft or non-identical copy is a separate document within the meaning of this term.

(3) *Identify (With Respect to Persons)*.  When referring to a person, "to identify" means to give, to the extent known, the person's full name, present or last known address, and, when referring to a natural person, the present or last known place of employment.  Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

(4) *Identify (With Respect to Documents)*.  When referring to documents, "to identify" means to give, to the extent known, the

(a) type of document;

(b) general subject matter;

(c) date of the document;  and

(d) author(s), addressee(s), and recipient(s).

(5) *Parties*.  The terms "plaintiff" and "defendant" as well as a party's full or abbreviated name or a pronoun referring to a party mean the party and, where applicable, its officers, directors, employees, partners, corporate parent, subsidiaries, or affiliates.  This definition is not intended to impose a discovery obligation on any person who is not a party to the litigation.

(6) *Person*.  The term "person" is defined as any natural person or any business, legal, or governmental entity or association.

(7) *Concerning*.  The term "concerning" means referring to, describing, evidencing, or constituting.

(8) *State the Basis*.  When an interrogatory calls upon a party to "state the basis" of or for a particular claim, assertion, allegation, or contention, the party shall

2

(a) identify each and every document (and, where pertinent, the section, article, or subparagraph thereof), which forms any part of the source of the party's information regarding the alleged facts or legal conclusions referred to by the interrogatory;

(b) identify each and every communication which forms any part of the source of the party's information regarding the alleged facts or legal conclusions referred to by the interrogatory;

(c) state separately the acts or omissions to act on the part of any person (identifying the acts or omissions to act by stating their nature, time, and place and identifying the persons involved) which form any part of the party's information regarding the alleged facts or legal conclusions referred to in the interrogatory;  and

(d) state separately any other fact which forms the basis of the party's information regarding the alleged facts or conclusions referred to in the interrogatory.

Additional definitions are as follows:

(9) *Quantum* means Quantum Dynamics International, LLC, its agents and employees.

(10) *CRAIC* means CRAIC  Technologies, LLC, its agents and employees

(11) *S.E.E.* means S.E.E., Inc, its agents or employees.

(12) *Customer of S.E.E.* means any person who purchased products manufactured by S.E.E. Inc. prior to your separation from S.E.E., Inc.

(13) *Prospective Customer of S.E.E.* means any person contacted by S.E.E., Inc., its agents or employees regarding the purchase of products manufactured by S.E.E., Inc. prior to January 11, 2002.

## REQUESTS

<u>Request  No. 1</u>

3

All documents concerning communications between Quantum and customers or prospective customers of S.E.E. during the years from January 9, 2002 through March 22, 2004 including, but not limited to, any computerized data base used to track customer contacts, such as ACT.

Request No. 2

All documents concerning communications between CRAIC and customers or prospective customers of S.E.E. from January 9, 2004 through March 22, 2004 , but not limited to, any computerized data base used to track customer contacts, such as ACT.

Request No. 3

All documents concerning the product specifications of all products developed by Quantum and/or CRAIC between January 9, 2002 and March 22, 2004.

Request No. 4

All source code written for, or commissioned for use in the analytical device developed between January 9, 2002 and March 22, 2004 including but not limited to any source code for any graphic user interface, and for adaptation to the Windows 2000 operating system.

Request No. 5

All documents concerning applications papers presented by you during the year 2002, including but not limited to the paper entitled "Ultraviolet Spectroscopy of Textile Fibers."

Request No. 6

All documents  concerning vendors who supplied software, hardware, optical, electrical or other components, and design or other services related to the development of the Quantum and/or CRAIC products between January 9, 2002 and March 22, 200 including but not limited to all communications therewith.

4

Request No. 7

All documents concerning communications between the defendants and employees of S.E.E., Inc. dating from after January 9, 2002.

Request No. 8

All documents concerning communications between the defendants and any of S.E.E., Inc.'s distributors or sales representatives dating from after January 9, 2002.

Request No. 9

All itemized telephone bills for telephone numbers used by the defendants while engaged in activities related to designing, developing, manufacturing, and/or marketing of Quantum and CRAIC products between January 9, 2002 through March 22, 2004, including telephone numbers listed in the names of Quantum and CRAIC.

Request No 10

All promotional literature for Quantum and/or CRAIC products dating from between January 9, 2002 through March 22, 2004, including but not limited to all documents posted on websites maintained by Quantum and/or CRAIC.

Request No 11

All documents of, concerning or relating to upgrades of S.E.E. instruments, repairs or service performed on S.E.E. instruments by Quantum and/or CRAIC from January 9, 2002 through March 22, 2004.

Request No. 12

All documents concerning sales of products developed by Quantum and/or CRAIC from January 9, 2002 through March 22, 2004.

Request No. 13

All documents  concerning parts purchased for the first prototypes of the Mach 1 and/or the Mach 10, as identified in Exhibit "A"..

Request No. 14

All documents, including employment contracts, concerning, in whole or in part, any policy of confidentiality maintained by Quantum and CRAIC.

Request No. 15

All documents concerning or relating to the organization of Quantum and/or CRAIC.

Request No. 16

All documents concerning communications between the defendants and Sarah Walbridge dating from after January 9, 2002.

Request No. 17

All documents concerning communications between the defendants and Georgia Institute of Technology, its agents or employees dating from after January 9, 2002.

Request No. 18

All documents concerning communications between the defendants and Dynamic Light Control, LLC dating from and after January 9, 2002.

Request No. 19

All documents concerning the development of the following software packages marketed for use with the Mach 1 and the Mach 10:

a.      Absolute Reflectance Package.

Request No. 20

All documents concerning any training performed by defendants for users of S.E.E. instruments after January 9, 2002.

Request No. 21

All documents concerning the "low end system" that is the subject of the email attached hereto as Exhibit "B".

Request No. 22

All documents reflecting the income and expenses of Quantum and/or CRAIC from January 7, 2002 through March 22, 2004.

RESPECTFULLY SUBMITTED,
Phillip Tringali,
By his attorney,

Date: 9/14/05

_____
Jeffrey J. Phillips, Esq
B.B.O. #398480
Daniel Treger, Esq
B.B.O. #562147
Phillips & Angley
One Bowdoin Square
Boston, MA 02114
Tel. No. 617-367-8787

L:\LITG\Trng001\martinreq.wpd

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document
was served upon the attorney of record for each other
party by (hand) (mail) on 9/14/05

http://www.microspectra.com/prod01.htm

crospectrophotometer and Microspectrometer



# QDI Mach10™ MSP

The QDI Mach10™ Microspectrophotometer is the most advanced microspectrophotometer to date. It is a powerful yet user friendly tool for measuring the spectral characteristics of microscopic samples non-destructively. Samples can be as small as 2 microns across and require little preparation. The system can measure transmission, reflectance, and fluorescence spectra in the near-UV, visible, and NIR regions with high spectral resolution.



Home

Up

$\overset{\scriptscriptstyle\backslash\,\prime}{A}$

trophotomet.    1 microspectrometer





# QDI Mach1™ MSP

The QDI Mach1™ Spectrophotometer for Microscopes is used to give many models of microscopes spectroscopic capabilities without the expense of a dedicated system. It enables a scientist to measure the spectral characteristics of microscopic samples non-destructively. The system can measure transmission, reflectance, and fluorescence spectra in the visible and near infrared regions with high spectral resolution depending on the microscopes configuration.

Home

Up

represent your company going forward for all sales and support (the latter most important to ESR). However, nothing was mentioned by either of us regarding Foster & Freeman. I was told in an e-mail by Nick on 1 March that "The Fx5 is back there [at ESR] and working fine." (see below)

Apparently, the problems with this instrument continued past this time and Angus must have believed that Alphatech was still involved with this product but was not assisting F&F with it. Paul is going to call Angus directly to get his spin on this but this is how I read things from Paul's comments. So the negative comments about Alphatech in the Referee Review given by Angus appear to have been based on his perception that we were not doing what they expected to support the "entire package" (including the F&F FX5).

I have asked Paul to find out from Angus if this is indeed how he (Angus) viewed Alphatech when he gave his evaluation to DAIS in his role as our reference. More tomorrow on this.

Stay tuned,

Evan S.

>Date: Fri, 01 Mar 2002 08:36:50 +1100
>From: Nick Weber <nick@xtek.net>
>Subject: Head Up
>X-Envelope-To: evan.sales@alphatech.co.nz
>To: "Evan Snyder (E-mail)" <evan.sales@alphatech.co.nz>
>Cc: "'Nigel French (E-mail)'" <nigel@xtek.net>,
> "Nick Away (E-mail)" <nickw@xtek.net>
>X-MIMEOLE: Produced By Microsoft MimeOLE V6.00.2600.0000
>X-Mailer: Microsoft Outlook CWS, Build 9.0.2416 (9.0.2911.0)
>Importance: Normal
>X-MSMail-priority: Normal
>
Evan,

The Fx5 is back there and working fine.

More importantly, you might be interested to know that Paul Martin and S.E.E. have parted company. Paul and Phil couldn't see eye to eye over various matters. The upshot is that Paul has started his own company (QDI) with Jumi and already has an improved range of equipment including a less expensive low end system (which he and I worked out in New Zealand).

Paul has undertaken to pick up the warranty issues on all the equipment I've sold over the last two or three years, so I'm comfortable with the arrangements.

The upshot is that XTEK has informed S.E.E. that we no longer intend to represent them. It would seem to me that the same will happen at S.E.E. as it did at Nanometrics - the msp division will wither away without their input and ideas. I expect that Phil will be in touch with you very soon, if he has not already been offering some attractive deals. That's entirely up to you of course, but I know that I'll be sticking with Paul.

QDI - www.microspectra.com - will be attending the ANZFSS conference with us and showing their new range of instruments - perhaps you might like to come along as well?

Cheers,

Nick
nick@xtek.net
Website: www.xtek.net
Tel: +61 2 6280 6321
Fax: +61 2 6280 6518

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS                                          SUPERIOR COURT
                                                    C.A. NO. 02-801

PAUL MARTIN and JUMI LEE,          )
Individually and as Stockholders on )
behalf of S.E.E., INC.             )
      Plaintiffs                )
                                   )
V.                                 )
                                   )
S.E.E., INC. and PHILLIP TRINGALI  )
      Defendants                )

**FIRST AMENDED VERIFIED
COMPLAINT AND DEMAND FOR JURY TRIAL**

**PARTIES AND NATURE OF ACTION**

1.     Plaintiff Paul Martin ("Martin") is a resident of Quincy, Norfolk County, Massachusetts.

2.     Plaintiff Jumi Lee ("Lee") is a resident of said Quincy.

3.     S.E.E., Inc. ("S.E.E."), named both as plaintiff and defendant herein, is a corporation duly organized under the laws of the Commonwealth of Massachusetts, with a principal place of business at 48 Leona Drive, Middleborough, Massachusetts.

4.     Defendant Phillip Tringali ("Tringali") has a usual place of business at the offices of S.E.E. at Middleborough, aforesaid.

**NATURE OF ACTION**

5.     This action is brought as a derivative action, pursuant to Mass.R.Civ.P. 23.1, for individual claims of the plaintiffs, pursuant to Mass. G.L. c.149 §150, and for common law causes of action.  The derivative action principally concerns the use of corporate funds by the defendant Tringali for the purchase of a vacation home in Bridgton, Maine, such funds being used for the purchase, mortgage payments, payments of real estate taxes and maintenance on the property, which has no business purpose, the property being used by Tringali as his vacation home.  The plaintiffs are informed and believe that

Tringali has caused S.E.E. to improperly deduct as business expenses on S.E.E.'s Federal and Massachusetts corporation tax returns, expenses for depreciation, interest, real estate taxes and maintenance with respect to said property, which has and will expose S.E.E. to additional taxes, penalties and interest.

Background Facts

6.    From February, 1994 to April, 1996, Martin was employed by Nanometrics of Sunnyvale, California, as product manager of its microspectrometer division.  When Nanometrics closed its division in April, 1996, Martin was laid off and commenced employment with S.E.E.

7.    Martin together with S.E.E., on or about May, 1996, started an analytical microspectrometer business in Martin's home in San Francisco.

8.    Martin's wife, Jumi Lee ("Lee"), was hired by S.E.E. on or about October, 1996, to assist Martin in the development of the microspectrometer division.

9.    At S.E.E.'s direction, on or about February, 2000, Martin and Lee moved the microspectrometer division from San Francisco to S.E.E.'s place of business at Middleborough, Massachusetts.  Lee and Martin worked at Middleborough from February, 2000 until they both resigned from S.E.E. on or about January 9, 2002.

10.   S.E.E. issued 20,000 shares of its common stock to Martin as follows:

    a.    February 28, 1997, 20,000 shares were issued to Martin in consideration for his services and development of the microspectrometer division.

    b.    On or about August 28, 2000, Martin purchased from Tringali an additional 5,000 shares.

11.   S.E.E. issued 15,000 shares of its common stock to Lee as follows:

    a.    On May 13, 1998, S.E.E. issued 8,000 shares to Lee in partial consideration for the performance of her services for S.E.E.

    b.    On April 20, 1999, S.E.E. issued 2,000 shares, again, as consideration for the services she had performed for S.E.E.

     c.    On August 28, 2000, Lee purchased an additional 5,000 shares from Tringali.

12.    At the present time Martin and Lee together own a total of 40,000 shares or approximately 21% of the outstanding common stock of S.E.E.

Tringali's Vacation Home

13.    On or about September 3, 1998, S.E.E. purchased a vacation home in Bridgton, Maine (the "Bridgton Property").  The plaintiffs are informed that the original purchase price for this property was approximately $206,400, that corporate funds of S.E.E. were used for the down payment, and that S.E.E. borrowed the balance of the purchase price from the Northeast Bank in the original amount of $147,000 secured by a first mortgage.

14.    Since the date of the purchase, the Bridgton Property has been used by Tringali as his personal vacation home, notwithstanding that the mortgage principal, interest, taxes and other expenses for the maintenance of the Bridgton residence have been paid by S.E.E.

15.    S.E.E. has listed the Bridgton Property on its books as a business asset and has listed the note and mortgage as a corporate liability.

16.    Notwithstanding that S.E.E. lists the Bridgton Property as a business asset on its books and records and financial statements, since the time of its purchase, it has produced virtually no income as it has been used as Tringali's personal vacation home.

17.    For the fiscal year ended June 30, 1999, S.E.E.'s books and records showed no rental income; for the following year ended June 30, 2000, the books and records showed rental income of $5,440, and in the most recent fiscal year ended June 30, 2001, the books and records showed no rental income.

Martin and Lee's Resignation

18.    After Martin and Lee moved the microspectrometer division to Middleborough in February, 2000, as stated herein above, Lee took on additional duties overseeing the finances and accounting system of S.E.E.

19.    By March, 2000, Martin and Lee experienced differences with Tringali concerning the operation and finances of S.E.E., including but not limited to the conduct of certain litigation and S.E.E.'s purchase of the vacation home for Tringali's personal use.

20.    The differences between Martin and Lee and Tringali continued into the fall of 2001. On or about October 9, 2000, Tringali threatened to fire Lee, and thereafter Tringali again threatened to fire Lee on or about December 20, 2001, and again, on or about January 3, 2002.

21.    Furthermore, Tringali represented that he would discontinue the use of the Bridgton Property as a business asset and take steps to remove the expense and the liability from S.E.E.'s books and records, however, he failed and refused to do so.

22.    On or about January 9, 2002, Martin and Lee both resigned from S.E.E.

Stock Re-Purchase Agreement

23.    The stock issued to Martin and Lee as aforesaid, as well as all of the other common stock issued to other stockholders including Tringali is subject to the terms of an agreement entitled "Agreement Between Corporation and Stockholders Restricting Transfer of Shares" dated December 4, 1996 (Exhibit "A" hereto).

24.    Pursuant to the provisions of section 5 of the Agreement of December 4, 1996, upon Martin and Lee's termination, S.E.E. is obligated to purchase the stock of Martin and Lee in an amount equal to the book value of the stock. Demand was made for repurchase of their stock, however, S.E.E. has refused to repurchase the stock of Martin and Lee.

25.    According to S.E.E.'s balance sheet as of June 30, 2001 (Exhibit "B" hereto), the total book value of all of the issued S.E.E. common stock, shown as Stockholder's Equity, is the amount of $499,239. Martin and Lee's proportionate share of the book value according to the June 30, 2001 balance sheet, based upon their 21% ownership interest, is approximately $99,850.

26.    Martin and Lee, however, believe that the book value of their stock as shown on the S.E.E. balance sheet is understated by reason of the following:

    a.    S.E.E.'s payments for the purchase and maintenance of Tringali's vacation home which have been improperly charged to S.E.E. and therefore have reduced the book value of their stock.

    b.    Other transactions which may also have reduced their book values, including but not limited to excessive expenses taken by Tringali, payment by S.E.E. of Tringali's personal expenses and loans by S.E.E.

27.    Notwithstanding the provisions of the Agreement of December 4, 1996, on or about January 11, 2002, Martin and Lee entered into an agreement wherein Tringali and/or S.E.E. agreed to purchase all of Martin and Lee's stock for $200,000.  Tringali and S.E.E. have also refused to perform the agreement of January 11, 2002.

Claim for Unpaid Vacation and Commissions

28.    According to S.E.E.'s records, at the time of Martin's resignation from S.E.E. on January 9, 2002, Martin had earned 256.47 hours of vacation (Exhibit "C" hereto), to which he would be entitled to at his rate of pay, the amount of $14,179.84.  On January 29, 2000, S.E.E. paid him the amount of $4,006.75, leaving a balance due for his vacation pay in the amount of $10,173.09.

29.    Martin is also due commissions from S.E.E. in the amount of approximately $1,900.00.

30.    Lee is due commissions from S.E.E. in the amount of approximately $1,100.00.

31.    Martin and Lee made demand upon S.E.E. for payment of Martin's vacation pay and Martin and Lee's unpaid commissions by letter dated February 19, 2002, however, S.E.E. has neglected and refused to pay the amounts due to Martin and Lee for vacation pay and commissions.

Derivative Action

32.    This action is brought, in part, pursuant to Mass.R.Civ.P. 23.1, as a derivative action to enforce the rights of S.E.E. and its stockholders.

33.    By letter dated March 22, 2002 (Exhibit "D" hereto), Martin and Lee made demand upon the stockholders and directors to investigate and remedy matters pertaining to the conduct of business of S.E.E., including but not limited to the following matters:

 a. Purchase of Tringali's vacation home, the Bridgton Property, and the use of corporate funds for the payment of the purchase price, mortgage, and other expenses.

 b. The lack of any substantial rental income from said property.

 c. Excessive reimbursement of business expenses paid to Tringali.

 d. Loans from S.E.E. to Tringali.

 e. Whether the corporation has discharged any loans or receivables or notes receivable to any other third party.

 f. To the extent to which Tringali has failed to perform his duties for S.E.E. while devoting his attention to the purchase of a motel property.

34.    S.E.E., by its attorney, responded by letter dated March 26, 2002 (Exhibit "E" hereto), however, as of the date hereof, S.E.E.'s Board of Directors has not taken any action with respect to the demands made by the plaintiffs in their letter of March 22, 2002.

35.    At this time some several weeks have elapsed since the plaintiffs made demand upon the stockholders and directors of S.E.E., there appears to be no likelihood that the stockholders and directors will take any action in view of their failure to respond, and therefore, plaintiffs having waited a reasonable time for such response, are now entitled to bring this action for derivative relief.

36.    Notwithstanding the demand made by the plaintiffs upon the stockholders and directors, the plaintiffs believe that such demand, in any event, would be futile since Tringali is the controlling stockholder of S.E.E.

owning approximately 70%, and the members of the board of directors, other than Tringali, are not disinterested persons, and are under the control of Tringali.

## COUNT I – Inspection of Books and Records

37.    Paragraphs 1 through 36 are incorporated herein by reference.

38.    Pursuant to G.L. c.156B §32 and the common law, plaintiffs have the right to inspect the books, records and accounts of S.E.E. .

39.    On or about March 1, 2002, pursuant to G.L. c.156B §32, plaintiffs, acting in good faith for the purpose of advancing S.E.E.'s interests and protecting their own interests, requested inspection of the articles of organization, by-laws, records of meetings and stock transfer records.

40.    On or about March 18, 2002, the plaintiffs requested the examination of the books and records pertaining to the financial condition of S.E.E.

41.    Notwithstanding said request, the defendants have refused to permit the plaintiffs to inspect the records requested.

42.    Plaintiffs petition the Court for an order requiring the defendants to produce for inspection all of the books, records and accounts of S.E.E. in a timely and reasonable manner.

## COUNT II – Breach of Fiduciary Duty to Stockholders

43.    Paragraphs 1 through 42 are incorporated herein by reference.

44.    By virtue of his role as president and controlling stockholder of S.E.E., Tringali stood in a fiduciary relationship to the plaintiffs and owed a duty of utmost good faith and fair dealing.

45.    Tringali acted in bad faith, was guilty of willful misconduct, and otherwise breached his fiduciary duty to the plaintiffs.

46.    As a result of Tringali's breach of fiduciary duty, plaintiffs have sustained damage as alleged.

## COUNT III – Breach of Fiduciary Duty to S.E.E.

47.    Paragraphs 1 through 46 are incorporated herein by reference.

48.     By virtue of his role as president and controlling stockholder of S.E.E., Tringali stood in a fiduciary relationship to S.E.E. and owed a duty of utmost good faith and fair dealing.

49.     Tringali acted in bad faith, was guilty of willful misconduct, and otherwise breached his fiduciary duty to S.E.E.

50.     As a result of Tringali's breach of fiduciary duty, S.E.E. has sustained damage as alleged.

## COUNT IV – Implied Covenant of Good Faith and Fair Dealing

51.     Paragraphs 1 through 50 are incorporated herein by reference.

52.     Implicit in the duty owed by Tringali to the stockholders and S.E.E. is the covenant of good faith and fair dealing.

53.     Tringali breached the covenant of good faith and fair dealing as set forth above by reason of the purchase and maintenance of the Bridgton Property used as his vacation home, using corporate funds of S.E.E. for the purchase and maintenance of said property while producing virtually no income, and his breach of fiduciary duty as aforesaid.

## COUNT V – Accounting

54.     Paragraphs 1 through 53 are incorporated herein by reference.

55.     The defendant Tringali, for his own personal advantage, has been making use of the Bridgton Property as his vacation home and as stated aforesaid, used corporate funds of S.E.E. for the purchase, mortgage payments and maintenance of said property.

56.     The plaintiffs are informed and believe that Tringali has caused S.E.E. to improperly deduct as business expenses on its Federal and Massachusetts corporation tax returns, expenses relating to the Bridgton Property for depreciation, interest, real estate taxes and maintenance.

57.     The plaintiffs are informed and believe and estimate that as a result of the improper deductions for depreciation, interest and real estate taxes only, as the plaintiffs are not aware of the amount of expenses deducted for

maintenance, S.E.E. may be exposed to substantial additional Federal and Massachusetts tax liabilities, together with penalties and interest.

58.    As a result of the conduct of Tringali, as aforesaid, Tringali should be ordered to account for and pay over and reimburse S.E.E. for all of the monies and funds of S.E.E. used for the purchase of the Bridgton Property, mortgage payments, maintenance and other related expenses, together with all amounts which S.E.E. may be liable for by way of additional Federal and Massachusetts taxes, penalties and interest.

**COUNT VI – Breach of Contract**

57    Paragraphs 1 through 56 are incorporated herein by reference.

58.    The defendants have breached the agreement to purchase the plaintiffs' stock as set forth in the Agreement of December 4, 1996.

59.    Furthermore, the defendants have breached the agreement for the repurchase of the plaintiff's stock in accordance with the agreement of the parties of January 11, 2002.

60.    As a result of the defendants' breach of the contract, the plaintiffs have sustained damage.

**COUNT VII – Massachusetts G.L. c.149 §150**

61.    Paragraphs 1 through 60 are incorporated herein by reference.

62.    This Count is brought for violation of G.L. c.148 and for relief pursuant to c.149 §150 against both defendants.

63.    Massachusetts G.L. c.149 §148 requires the payment by an employer within six days of the termination of a pay period during which the compensation was earned or wages which by definition includes payment for vacations and commissions.

64.    Furthermore, c.149 §148 (fifth paragraph), also provides in pertinent part as follows:

> The president and treasurer of a corporation and any officers or agents having the management of such corporation shall be deemed to be the employers of the employees of the corporation within the meaning of this section.

65.    At all times relevant hereto Tringali was the president of the employer S.E.E. and therefore, he is deemed to be the employer within the meaning of c.149 §148.

66.    The acts of S.E.E. and Tringali as set forth hereinabove, constitute a violation of §148 for which Martin and Lee are entitled to pursue a civil action to seek relief pursuant to c.149 §150.

67.    Chapter 149 §150 provides that an employee aggrieved by a violation of §148 may bring an action in his own name for damages, including treble damages for loss of wages and other benefits, costs and reasonable attorney's fees.

**DEMAND FOR JURY TRIAL**

The plaintiffs make demand for a jury trial as to all issues which are triable by a jury.

**REQUEST FOR RELIEF**

The plaintiffs make the following requests for relief.

(1)    That the Court award judgment to plaintiffs for damages, together with interest, costs and attorney's fees, pursuant to Counts I through IV and VI;

(2)    That the Court, pursuant to Count V, order an accounting from the defendant Tringali, that Tringali be ordered to pay over and reimburse to S.E.E., Inc. all monies and funds of S.E.E. used for the purchase of the Bridgton Property, mortgage payments, real estate taxes, maintenance and any other related expenses and, in addition, that Tringali be ordered to account and pay over to S.E.E. all amounts which S.E.E. may be liable for by way of additional Federal and Massachusetts corporation taxes, interest and penalties;

(3)    That thCe Court award the plaintiffs damages, including treble damages, costs and attorney's fees, pursuant to Count VI, under G.L. c.149 §150;

(4)    That the Court enter injunctive relief as set forth in Plaintiffs'
       Motion for Preliminary Injunction as amended, filed herewith;

(5)    For such other relief as the Court may deem just and proper.


May ____, 2002                                 Attorney for plaintiffs,


                                               _____
                                               Roger S. Davis
                                               BBO No. 116320
                                               DAVIS & RUBIN
                                               One Bowdoin Square
                                               Suite 901
                                               Boston, MA  02114-2919
                                               (617) 742-4300


QDI:MARTIN:AMNDCOMP