UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 04-12708-MLW

| | |
|---|---|
| PHILLIP TRINGALI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| PAUL MARTIN AND | ) |
| JUMI LEE, | ) |
| | ) |
| Defendants | ) |

**PLAINTIFF'S REPLY TO DEFENDANTS' WRITTEN OBJECTION
TO THE MAGISTRATE JUDGE'S REPORT AND
RECOMMENDATION ON DEFENDANTS' MOTION TO DISMISS**

## I.     PLAINTIFF'S REPLY TO THE FACTS

Despite being sanctioned for making false statements in their initial Motion to Dismiss,

defendants Paul Martin and Jumi Lee (the "Defendants") persist in misrepresenting the facts in

order to deny plaintiff, Phillip Tringali ("Plaintiff")  his right to proceed in federal court.  Almost

every supporting fact in Defendants' objection to the Magistrate Judge's Report and

Recommendation is grossly distorted, or simply false.

### A.     THERE IS NO COUNTERCLAIM PENDING IN THE NORFOLK ACTION.

Plaintiff did not bring a counterclaim in Martin and Lee v. Tringali Norfolk County

Superior Court Civil Action No. 2002-00801( the "Norfolk Action").  The Norfolk Action

answer, filed in May, 2002, contained a counterclaim of which S.E.E., Inc. was the only named

plaintiff.  [See document previously filed as Exhibit G to Docket No. 3, pp. 5-6.  Contrary to

Defendants' suggestion, the body of the counterclaim specifically alleges that the Defendants

1

breached a duty owed to S.E.E., Inc., causing damages to S.E.E., Inc.  It does not allege a duty owed to, or damages suffered by the Plaintiff here, Phillip Tringali, individually. [Id.].  The Norfolk Action Docket Sheet does not list Plaintiff Phillip Tringali, individually as a defendant-in-counterclaim.  [Exhibit 1, Norfolk Action Docket Sheet, pp., 1-2].[1]

Defendants suggest that there is "confusion" regarding the Norfolk Action counterclaims because Plaintiff's first counsel included his name in the name in the prayers for relief.  This argument is contrary to law.  Titles or subheadings inserted before or after numbered paragraphs "are properly no part of the complaint and add nothing to it."  Federal Shoe, Inc. v. United Shoe Machinery Corp., 19 F.R.D. 209, 210 (D.Mass. 1956); Quinn v. Walsh, 49 Mass.App.Ct. 696, 703-04 (2000)(nature of claim established by substance of allegations, not labels assigned to them).   The same is true of prayers for relief.  See, e.g. Smith v. Coughlin 727 F. Supp. 834, 837, at Note 4 (S.D.N.Y. 1983) (party named only in claim for relief but not in caption or body of complaint not a party to the suit); See, R.J.B. Builders and Developers v. Frank Durante, Inc., 5 Mass. App.Ct. 788 (1977) (action failed to state a claim where only intelligible prayer for relief ran against persons not named as parties); Commonwealth v. Decotis, 366 Mass. 234, 246 (1974) (relief available on bill in equity is based upon allegations of a bill, not on its prayers).

The February 9, 2006, document request that Defendants' waive about as fresh proof that Plaintiff is pursuing an identical counterclaim in Norfolk Action is a classic red herring.  Plaintiff served this request to gather facts to support his affirmative defenses to Defendants' claims pending against him in the Norfolk Action.  Plaintiff's counsel explained this in the letter enclosing the notices. [Exhibit 2, Enclosure Letter of February 9, 2006].  Defendants have known

---

[1]All exhibits are verified by the Affidavit of Daniel Treger, Esq., attached hereto as Exhibit 10.

that the conduct alleged in this matter might also support Plaintiff's affirmative defenses in the

Norfolk Action since at least March 11, 2005, when they questioned him about the bases of his

affirmative defenses during his deposition in the Norfolk Action deposition. [Exhibit 3, Norfolk

Action Deposition of Phillip Tringali, pp. 86-128]. Defendants' suggestion, in footnote 2 of their

Written Objection, that Plaintiff is seeking damages in the Norfolk Action is equally

disingenuous.

The truth is that changing circumstances have allowed Defendants to dispose of all

counterclaims against them in the Norfolk Action. On August 1, 2005, seven (7) months after

plaintiff filed this complaint, Defendants and S.E.E.'s Trustee in Bankruptcy entered into a

settlement agreement whereby S.E.E. and Defendants released their claims against each other

(including S.E.E.'s counterclaims in the Norfolk Action), and Defendants purchased the right to

assert their shareholder derivative claims pending in the Norfolk Action directly against the

Plaintiff. The Bankruptcy Court approved this settlement on August 18, 2005. [See document

previously filed as Exhibit 1 to Docket No. 20]. The Norfolk Superior Court then granted

Defendants leave to dismiss all claim against S.E.E., and assert claims directly against Tringali.

[Exhibit 1, p. 14, Docket Entry 71 and Order entered thereon October 31, 2005]. On November

29, 2005, Martin and Lee filed a Second Amended Substitute Complaint against Tringali

individually. [Exhibit 1, p. 14, Docket Entry 77; Exhibit 4, Substitute Second Amended

Complaint]. On January 25, 2006, Tringali filed an answer to the Substitute Second Amended

Complaint which asserted no counterclaim.[2] [Exhibit 5]. Because Tringali's answer to the

Substitute Second Amended Complaint did not incorporate any of the previous answer by

---

[2]Plaintiff Phillip Tringali suffered a mild heart attack in December, 2005, delaying his approval of certain filings.

reference, it superceded the original answer and counterclaims.  National Construction Company v. National Grange Mutual Insurance Company, 10 Mass.App.Ct. 38, 40 (amended pleading that is entirely self-contained waives any matter from original pleading not restated in the amended pleading); See Also, Alexander v. McPeck, 189 Mass. 34, 39 (1905) (pre-rules case, claim made in original answer, but not restated in substitute answer deemed waived).  Defendant's claim to the contrary is frivolous, if not down right dishonest.

**B.    DEFENDANTS HAVE REFUSED TO ANSWER DISCOVERY REGARDING THE ALLEGATIONS IN THIS COMPLAINT IN BOTH STATE AND FEDERAL COURT**

Defendants' claim that the parties have conducted extensive discovery in the Norfolk Action  regarding the allegations in the instant matter is only half true.  They asked Plaintiff about the basis of these allegations when they deposed him in the Norfolk Action on March 11, 2005, [See Exhibit 3], but refused to answer his questions about the same subject during their depositions in the Norfolk Action.  When Tringali deposed Paul Martin in the Norfolk Action on May 24, 2005, respectively, his counsel announced that the scope of Martin's deposition would be limited to Counts VI and VII of the Norfolk Action, which alleged contract and wage claims unrelated to the shareholder derivative claims against Tringali individually.[3]  Attorney Davis claimed that questions regarding any other topic would violate the automatic stay arising from S.E.E.'s Chapter 7 Bankruptcy.[4]  He then instructed Martin not to answer questions regarding QDI, the entity whose competitive conduct is the gravamen of the instant matter.  [Exhibit 7,

---

[3]See Counts VI and VII of the Substitute Second Amended Complaint [Exhibit 4], which allege the same claims.

[4]On March 16, 2005, Defendants' counsel sent Plaintiff's counsel a proposed Confidentiality Stipulation to be executed at his clients' deposition in the Norfolk Action, apparently anticipating questions regarding QDI and CRAIC.  [Exhibit 6].

Martin Deposition, pp. 1-11, 170-172]. At the commencement of Jumi Lee's Norfolk Action

deposition on March 26, 2005, Attorney Davis asserted the same limitation in scope. [Exhibit 8,

Lee Deposition, pp. 4, 125].

Notably, Defendants were able to depose Tringali in the Norfolk Action only after

obtaining confirmation from the Bankruptcy Court that the Automatic Stay did not apply to their

effect their personal claims against Tringali, and presenting a transcript of that hearing to the

Norfolk Superior Court in a Motion to Compel. [Exhibit 9, Defendants' Motion for Relief From

Stay and to Compel Appearance at Deposition filed in the Norfolk Action].[5] This same

clarification should have allowed Tringali to question Defendants about any personal

counterclaim for breach of fiduciary duty that he had brought in the Norfolk Action against them

individually.

In reality, Defendants have steadfastly resisted all discovery relating to QDI and CRAIC

in both forums. Soon after they refused to testify regarding QDI and CRAIC during their

Norfolk Action depositions, they objected to all interrogatories and document requests about the

same subject in the instant matter, and moved for a protective order asking that they not be

required to produce any proprietary information about these entities until the Court rules on their

Motion to Dismiss.[6] [See Docket No. 28, Defendants' Memorandum in Support of Motion for

Protective Order; Docket No. 30, Opposition to Plaintiff's Motion to Compel]. At the same

time, they have also disclosed that they will not attend their continued depositions in the Norfolk

---

[5]Attorney Davis obtained this clarification from the Bankruptcy Court in 2003 during
S.E.E.'s Chapter 11 case, however, S.E.E. filed for liquidation under Chapter 7 of the
Bankruptcy code before Tringali appeared for his deposition in the Norfolk Action.

[6]Defendants' definition of confidential information extends to all useful information
regarding QDI and CRAIC.

Action on March 20 and 21, 2006, purportedly because they are unavailable until April 18 and

19, 2006. Superior Court Justice Sikora has ordered the parties to complete discovery by the

August 5, 2006 pretrial conference. [See Exhibit 1, p. 15, Judge Sikora's Order of February 8,

2006; Exhibit 10, Letter from Defendants' Counsel dated March 15, 2006]. When asked,

however, whether they would produce outstanding documents pertaining to QDI and CRAIC as

part as an agreement to seek to extend discovery and continue the pretrial conference, they

refused, claiming that producing the documents in the Norfolk Action would subject them to

sanctions for not producing documents in the instant action.[7]  [Exhibit 11, Affidavit of Plaintiff's

Counsel, ¶¶ 3-5].

II.    **REPLY TO DEFENDANTS' LEGAL ARGUMENT**

    A.    **THERE ARE NO SPECIAL CIRCUMSTANCES SUPPORTING ABSTENTION**

Defendants have presented no facts showing "exceptional-circumstances" that would

justify this Court's declining its "virtually unflagging obligation" to exercise the jurisdiction

given to it. KPS & Associates, Inc., v. Designs by FMC, Inc., 318 F.3d 1, 10 (1st Cir.2003). That

Tringali's equitable defenses in the Norfolk case are based upon facts that may also form the

basis of the Federal claims will not justify abstention unless  "exceptional circumstances" favor

dismissal of one action over the other, such as the presence of a sophisticated state law issue that

might be interpreted differently in each forum.  Id., at 11, Citing, Liberty Mut. Ins. Co. v.

Foremost-McKesson, Inc., 751 F.2d 475, 477 (1st Cir.1985).  As did KPS & Associates, the

present matter requires the application of well settled state law, and is of primary concern only to

---

       [7]Tringali appended these requests to the fresh deposition notices to Martin and Lee pursuant to Mass.R.Civ.P. 30(b)(6). [See document previously filed as Exhibit 2 to Docket No. 37].

the litigants.  Id., Citing, Burns v. Watler, 931 F.2d 140, 146 (1st Cir.1991).  In these

circumstances, abstention is not warranted. Id.

In fact, the issues raised in the instant matter are not even an indispensable part of the

Norfolk Action.  Because they are relevant only to affirmative defenses to certain claims, the

fact-finder in the Norfolk Action will not reach them unless it first finds for the Defendants (the

Norfolk Action plaintiffs) on those claims.  Meanwhile, Tringali faces the very real possibility

that the Norfolk Superior Court will not permit him sufficient discovery to adequately present

these issues in defense of the Norfolk Action.  See KPS & Associates, Inc., v. Designs by FMC,

Inc., 318 F.3d 1, 10 (1st Cir.2003)(ability of party to protect rights in state forum relevant to

"Colorado River" abstention).

## B.      PERSONAL JURISDICTION OVER THE DEFENDANTS IS PROPER

The Magistrate Judge's finding of Personal Jurisdiction as to Count I is undeniably

correct.  [Docket No. 1, ¶¶13, 14, 31-41].  Defendants' counsel has already been sanctioned for

misrepresenting the substance of the Plaintiff's Complaint in a signed filing. [See Docket No.

35].  There is also personal jurisdiction as to Count II.  Tringali has provided signed interrogatory

answers stating that the slanderous comments at issue were made while Martin and Lee still

resided in Quincy, from a Massachusetts telephone number. [Exhibit 12, Tringali's Answers to

Lee's Interrogatory No. 2;].  Plaintiff's slander claim is also related to his breach of fiduciary

duty claim because Martin and Lee made the alleged slanderous statements to S.E.E.'s

distributors and sales representatives after they had resigned from S.E.E., Inc., while they were

marketing Quantum's products to S.E.E.'s distributors and representatives, and were part of the

same, post-resignation course of conduct intended to harm S.E.E. [See Complaint, Docket No. 1,

¶¶41-44].

## C.    THE AMOUNT IN CONTROVERSY GREATLY EXCEEDS THE JURISDICTIONAL THRESHOLD

There is no question that the amount in controversy here exceeds $75,000.00.  If judged by the facts Defendants recently re-alleged for the third time in their Substitute Second Amended Complaint, Tringali's damages are, at a minimum, $349,467.00.  Plaintiff asserts that his damages exceed $800,000.00, based upon calculations made by S.E.E.'s accountant shortly before Defendants resigned from S.E.E., Inc.  [Exhibit 13, Tringali Affidavit, ¶¶ 2-5].

CONCLUSION

WHEREFORE, plaintiff respectfully suggest that the Magistrate Judge's report and recommendation be adopted, and that defendant's motion to dismiss be denied.

Plaintiff Phillip Tringali,
By his attorneys,

/s/ Daniel Treger

Daniel Treger, Esq.
B.B.O. #562147
Phillips & Angley
One Bowdoin Square
Boston, MA 02114
Tel. No.: (617) 367-8787

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing. (NEF), and paper copies will be sent to those indicated as non-registered participants on this day, March 20, 2006.

/s/ Daniel Treger

L:\LITG\Trng001\objection.reply

# Commonwealth of Massachusetts
## NORFOLK SUPERIOR COURT
## Case Summary
## Civil Docket

## Martin Individually et al v S E E Inc et al

Details for Docket: NOCV2002-00801

### Case Information

| | | | |
|---|---|---|---|
| **Docket Number:** | NOCV2002-00801 | **Caption:** | Martin Individually et al v S E E Inc et al |
| **Filing Date:** | 05/14/2002 | **Case Status:** | Active |
| **Status Date:** | 09/15/2005 | **Session:** | Civil B-CtRm 3 |
| **Lead Case:** | NA | **Case Type:** | Most |

### Tracking Deadlines

| | | | |
|---|---|---|---|
| **TRK:** | A | **Discovery:** | 07/02/2004 |
| **Service Date:** | 08/12/2002 | **Disposition:** | 03/31/2006 |
| **Rule 15:** | 08/07/2003 | **Rule 12/19/20:** | 10/11/2002 |
| **Final PTC:** | | **Rule 56:** | 08/31/2004 |
| **Answer Date:** | 10/11/2002 | **Jury Trial:** | YES |

### Case Information

| | | | |
|---|---|---|---|
| **Docket Number:** | NOCV2002-00801 | **Caption:** | Martin Individually et al v S E E Inc et al |
| **Filing Date:** | 05/14/2002 | **Case Status:** | Active |
| **Status Date:** | 09/15/2005 | **Session:** | Civil B-CtRm 3 |
| **Lead Case:** | NA | **Case Type:** | Minority stockholder suit |

### Tracking Deadlines

| | | | |
|---|---|---|---|
| **TRK:** | A | **Discovery:** | 07/02/2004 |
| **Service Date:** | 08/12/2002 | **Disposition:** | 03/31/2006 |
| **Rule 15:** | 08/07/2003 | **Rule 12/19/20:** | 10/11/2002 |
| **Final PTC:** | | **Rule 56:** | 08/31/2004 |
| **Answer Date:** | 10/11/2002 | **Jury Trial:** | YES |

## Parties Involved

10 Parties Involved in Docket: NOCV2002-00801

| | | | |
|---|---|---|---|
| **Party Involved:** | | **Role:** | Defendant |
| **Last Name:** | S E E Inc | **First Name:** | |
| **Address:** | | **Address:** | |

| | | |
|---|---|---|
| **City:** | **State:** | |
| **Zip Code:** | **Zip Ext:** | |
| **Telephone:** | | |

| | | |
|---|---|---|
| **Party Involved:** | **Role:** | Defendant |
| **Last Name:** Tringali | **First Name:** | Philip |
| **Address:** | **Address:** | |
| **City:** | **State:** | |
| **Zip Code:** | **Zip Ext:** | |
| **Telephone:** | | |

| | | |
|---|---|---|
| **Party Involved:** | **Role:** | Defendant/counterclaim |
| **Last Name:** Lee | **First Name:** | Jumi |
| **Address:** | **Address:** | |
| **City:** | **State:** | |
| **Zip Code:** | **Zip Ext:** | |
| **Telephone:** | | |

| | | |
|---|---|---|
| **Party Involved:** | **Role:** | Defendant/counterclaim |
| **Last Name:** Martin | **First Name:** | Paul |
| **Address:** | **Address:** | |
| **City:** | **State:** | |
| **Zip Code:** | **Zip Ext:** | |
| **Telephone:** | | |

| | | |
|---|---|---|
| **Party Involved:** | **Role:** | Other interested party |
| **Last Name:** Husted | **First Name:** | Jeffrey |
| **Address:** | **Address:** | |
| **City:** | **State:** | |
| **Zip Code:** | **Zip Ext:** | |
| **Telephone:** | | |

| | | |
|---|---|---|
| **Party Involved:** | **Role:** | Plaintiff |
| **Last Name:** Lee individually | **First Name:** | Jumi |
| **Address:** | **Address:** | |
| **City:** | **State:** | |
| **Zip Code:** | **Zip Ext:** | |
| **Telephone:** | | |

| | | | |
|---|---|---|---|
| **Party Involved:** | | **Role:** | Plaintiff |
| **Last Name:** | Lee stockholder on behalf of S E E Inc | **First Name:** | Jumi |
| **Address:** | | **Address:** | |
| **City:** | | **State:** | |
| **Zip Code:** | | **Zip Ext:** | |
| **Telephone:** | | | |

| | | | |
|---|---|---|---|
| **Party Involved:** | | **Role:** | Plaintiff |
| **Last Name:** | Martin Individually | **First Name:** | Paul |
| **Address:** | | **Address:** | |
| **City:** | | **State:** | |
| **Zip Code:** | | **Zip Ext:** | |
| **Telephone:** | | | |

| | | | |
|---|---|---|---|
| **Party Involved:** | | **Role:** | Plaintiff |
| **Last Name:** | Martin stockholder on behalf of S E E Inc | **First Name:** | Paul |
| **Address:** | | **Address:** | |
| **City:** | | **State:** | |
| **Zip Code:** | | **Zip Ext:** | |
| **Telephone:** | | | |

| | | | |
|---|---|---|---|
| **Party Involved:** | | **Role:** | Plaintiff/counterclaim |
| **Last Name:** | S.E.E., Inc. | **First Name:** | |
| **Address:** | | **Address:** | |
| **City:** | | **State:** | |
| **Zip Code:** | | **Zip Ext:** | |
| **Telephone:** | | | |

## Attorneys Involved

12 Attorneys Involved for Docket: NOCV2002-00801

| | | | |
|---|---|---|---|
| **Attorney Involved:** | | **Firm Name:** | KRAU01 |
| **Last Name:** | Kraus | **First Name:** | Robert |
| **Address:** | 99A Court Street | **Address:** | |

| **City:** | Plymouth | **State:** | MA |
| **Zip Code:** | 02360 | **Zip Ext:** | |
| **Telephone:** | 508-747-4200 | **Tel Ext:** | |
| **Fascimile:** | 508-747-1131 | **Representing:** | Husted, Jeffrey (Other interested party) |

| **Attorney Involved:** | | **Firm Name:** | DAVI04 |
| **Last Name:** | Davis | **First Name:** | Roger S |
| **Address:** | 1 Bowdoin Square | **Address:** | Suite 901 |
| **City:** | Boston | **State:** | MA |
| **Zip Code:** | 02114 | **Zip Ext:** | 2919 |
| **Telephone:** | 617-742-4300 | **Tel Ext:** | |
| **Fascimile:** | 617-742-4304 | **Representing:** | Lee individually, Jumi (Plaintiff) |

| **Attorney Involved:** | | **Firm Name:** | DAVI04 |
| **Last Name:** | Davis | **First Name:** | Roger S |
| **Address:** | 1 Bowdoin Square | **Address:** | Suite 901 |
| **City:** | Boston | **State:** | MA |
| **Zip Code:** | 02114 | **Zip Ext:** | 2919 |
| **Telephone:** | 617-742-4300 | **Tel Ext:** | |
| **Fascimile:** | 617-742-4304 | **Representing:** | Lee stockholder on behalf of S E E Inc, Jumi (Plaintiff) |

| **Attorney Involved:** | | **Firm Name:** | DAVI04 |
| **Last Name:** | Davis | **First Name:** | Roger S |
| **Address:** | 1 Bowdoin Square | **Address:** | Suite 901 |
| **City:** | Boston | **State:** | MA |
| **Zip Code:** | 02114 | **Zip Ext:** | 2919 |
| **Telephone:** | 617-742-4300 | **Tel Ext:** | |
| **Fascimile:** | 617-742-4304 | **Representing:** | Martin Individually, Paul (Plaintiff) |

| **Attorney Involved:** | | **Firm Name:** | DAVI04 |
| **Last Name:** | Davis | **First Name:** | Roger S |
| **Address:** | 1 Bowdoin Square | **Address:** | Suite 901 |
| **City:** | Boston | **State:** | MA |
| **Zip Code:** | 02114 | **Zip Ext:** | 2919 |
| **Telephone:** | 617-742-4300 | **Tel Ext:** | |
| **Fascimile:** | 617-742-4304 | **Representing:** | Martin stockholder on behalf of S E E Inc, Paul (Plaintiff) |

| 09/26/2005 | 70 | Second Motion for partial Summary Judgment Pursuant to Superior Court |
|---|---|---|
| 09/26/2005 | 70 | Fule 9A (B) (4) |
| 09/26/2005 | | re: Letter (P#70.0) ALLOWED , limited to 5 pages (Patrick F. Brady, |
| 09/26/2005 | | Associate Justice) dated 9/26/05 Notices mailed September 26, 2005 |
| 10/05/2005 | 71 | Plaintiffs' motion to vacate stay and for leave to file second |
| 10/05/2005 | 71 | amended complaint (rec'd 10/3/05) |
| 10/05/2005 | 71 | Affidavit of compliance with Superior Court Rule 9A. |
| 10/05/2005 | 71 | Rule 9A List of documents |
| 10/13/2005 | 72 | Deft, Tringali's reply brief to plffs' opposition to deft's second |
| 10/13/2005 | 72 | motion for partial summary judgment |
| 10/24/2005 | 73 | Rule 9 A Notice sent out to appear on 11/9/2005 at 2:00 P.M. for |
| 10/24/2005 | 73 | hearing on P. 67.0; Defendant Philip Tringali's Second Motion for |
| 10/24/2005 | 73 | Partial Summary Judgment. To be held in Room 3 before Judge Hely. |
| 10/24/2005 | 74 | Affidavit of compliance with Superior Court Rule 9A. as to SEE, Inc. |
| 10/31/2005 | 75 | Defendant Philip Tringali's MOTION to strike sham affidavit, and for |
| 10/31/2005 | 75 | costs (Rec'd. 10/28/05) |
| 10/31/2005 | 75 | Plffs'. Paul Martin and Jumi Lee's Opposition (Rec'd. 10/28/05) |
| 10/31/2005 | 75 | Notice of Filing (Rec'd. 10/28/05) |
| 10/31/2005 | 75 | Document List (Rec'd. 10/28/05) |
| 10/31/2005 | | MOTION (P#71.0) Treated as a motion to vacate stay, dismiss all |
| 10/31/2005 | | claims asserted against W.E.E., Inc. and to file second amended |
| 10/31/2005 | | complaint and, as such, allowed. (Charles J. Hely, Associate Justice) |
| 10/31/2005 | | (IDated 10/31/05) Notices mailed 10/31/2005 |
| 10/31/2005 | 76 | Second amended complaint filed and jury claim |
| 11/04/2005 | | Pleading, Notice of Withdrawal of Appearance, returned to Christopher |
| 11/04/2005 | | W Parker, Esq.: 9A Motion to Withdraw required as defendant is not |
| 11/04/2005 | | represented by other counsel. Your appearance was entered from Notice |
| 11/04/2005 | | of Removal Re: S.E.E., Inc. docketed on 9/29/03. |
| 11/29/2005 | 77 | Assented to motion for leave to Subsstitute second amended complaint. |
| 11/29/2005 | 77 | List of docouments. |
| 12/02/2005 | | MOTION (P#77.0) ALLOWED by assent (Connor,Jr,,Associate Justice) |
| 12/02/2005 | | dated 11/29/05 Notices mailed December 02, 2005 |
| 12/02/2005 | 78 | Substitute Second Amended Complaint and Demand for Jury Trial |
| 12/09/2005 | 79 | Defendant Philip Tringali's Emergency MOTION to continue Pretrial |
| 12/09/2005 | 79 | Conference from 12/14/05 to 1/25/06 at 2:00 P.M. (faxed copy) |
| 12/15/2005 | | MOTION (P#79.0) ALLOWED The pre-trial conference is continued to |
| 12/15/2005 | | January 25,2006 at 2:00 P.M. (Charles J. Hely, Associate Justice) |
| 12/15/2005 | | dated 12/15/05 Notices mailed December 15, 2005 |
| 12/22/2005 | | MOTION (P#67.0) DENIED See Memorandum of Decision and Order of this |
| 12/22/2005 | | Date (Charles J. Hely, Associate Justice) dated 12/21/05 Notices |
| 12/22/2005 | | mailed December 22, 2005 |
| 12/22/2005 | | MOTION (P#45.0) The Court declines to consider the plaintiffs' |
| 12/22/2005 | | affidavit and also declines to award costs. See Memorandum of |

| 12/22/2005 | | Decision and Order of this date (Charles J. Hely, Associate Justice). |
| 12/22/2005 | | dated 12/21/05 Notices mailed December 22, 2005 |
| 12/22/2005 | 80 | Memorandum of Decision and Order on Second Motion for Partial Summary |
| 12/22/2005 | 80 | Judgment and Motion to Strike Affidavit --See Memo-Order Defendant', |
| 12/22/2005 | 80 | Phillip Tringali's Second Motion for Partial Summary Judgment is |
| 12/22/2005 | 80 | DENIED. On Defendant Phillip Tringali's Motion to Strike Sham |
| 12/22/2005 | 80 | Affidavit, and for Costs, the court declines to consider the |
| 12/22/2005 | 80 | plaintiffs' affidavit and also declines to award costs (Hely,Justice) |
| 12/22/2005 | 80 | dated 12/21/05 certified copies mailed 1222/05 |
| 01/23/2006 | 81 | Joint MOtion to continue pretrial conference. fax |
| 01/24/2006 | | MOTION (P#81.0) RULING and ORDER: (1) The new Joint Pretrial |
| 01/24/2006 | | Conference date shall be February 14,2006 at 2:00 P.M. (2) The Final |
| 01/24/2006 | | Joint Pretrial Memorandum shall be due by 1:00 P.M. on Friday, |
| 01/24/2006 | | February 10,2006. (3) In light of the age of the case., the lateness |
| 01/24/2006 | | of this motion, and the weakness of its grounds, counsel should not |
| 01/24/2006 | | expect any further continuances (Mitchell J. Sikora, Associate |
| 01/24/2006 | | Justice).dated 1/24/06 Notices mailed January 24, 2006 |
| 01/27/2006 | 82 | Defendant, Phillip Tringali's answer to plaintiffs' second substitute |
| 01/27/2006 | 82 | second amended complaint |
| 01/27/2006 | 83 | Plff's assented to motion for reconsideration re: Continuance of |
| 01/27/2006 | 83 | pretrial conference. |
| 02/08/2006 | | MOTION (P#83.0) RULING and ORDER Upon Reconsideration: (1) The Joint |
| 02/08/2006 | | Pretrial Memorandum shall be due by close of March 29,2006. The |
| 02/08/2006 | | witness lists shall be final and binding for trial. All discovery |
| 02/08/2006 | | shall be completed. (2) The new conference date shall be April |
| 02/08/2006 | | 5,2006. (3) In light of the age and lateness of the case, counsel |
| 02/08/2006 | | should NOT expect any further extensions (Mitchell J. Sikora, |
| 02/08/2006 | | Associate Justice). dated 2/6/06 Notices mailed February 08, 2006 |

# PHILLIPS & ANGLEY

ATTORNEYS AND COUNSELLORS AT LAW
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
ONE BOWDOIN SQUARE
BOSTON, MASSACHUSETTS 02114
(617) 367-8787

JEFFREY J. PHILLIPS, P.C.
JEFFREY T ANGLEY, P.C.
JONATHAN M. FEIGENBAUM*
CHRISTOPHER S TOLLEY
DANIEL TREGER
STEPHANIE M. SWINFORD
KRISTEN M PLOETZ

*ALSO ADMITTED IN DC AND CA

TELECOPIER (617) 227-8992

February 9, 2006
By Hand

Roger S. Davis, Esq.
Davis & Rubin
One Bowdoin Square, Suite 901
Boston, MA 02114-2919

Re:   Paul Martin and Jumi Lee v. Phillip Tringali
      Norfolk Superior Court, Civil Action No. 02-801

Dear Mr. Davis:

As you recall, on May 24 and May 25, 2005, your clients were deposed in this matter. As you will also recall, you instructed your clients not to answer questions about the first four counts of your complaint or the corporate counterclaims against them, arguing that the automatic stay precluded any such questions. I therefore suspended both depositions.

As this action is no longer subject to the automatic stay, I will reconvene the depositions of Paul Martin and Jumi Lee, on March 20 and 21st, respectively, at 10:00 am at my office. Because your clients now assert all counts against my client individually, my client is entitled to obtain discovery regarding the counts that were formerly subject to the automatic stay. My client is also entitled to obtain discovery regarding the formation and operation of Quantum Dynamics and CRAIC, which are the basis of several of his affirmative defenses.

If you have any questions or comments, please do not hesitate to contact me.

Very truly yours,

Daniel Treger

DT/hs
enclosure
cc:   Client
      Jeffrey J. Phillips, Esq.
L:\LITG\trng002\Davis.l2.9.06.wpd

1                                          Volume:   I

2                                          Pages:   1-215

3                                          Exhibits:  1-9

4              COMMONWEALTH OF MASSACHUSETTS

5    Norfolk, ss                    Superior Court

6

7    Civil Action No. 02-801

8    - - - - - - - - - - - - - - - - - - - - - x

9    PAUL MARTIN and JUMI LEE, Individually

10   and as Stockholders on behalf of

11   S.E.E., Inc.,

12            Plaintiffs,

13   vs.

14   S.E.E., INC. and PHILLIP TRINGALI,

15            Defendants.

16   - - - - - - - - - - - - - - - - - - - - - x

17

18            DEPOSITION OF PHILLIP TRINGALI

19            Thursday, March 10, 2005

20                Davis & Rubin

21             One Bowdoin Square

22         Boston, Massachusetts 02114

23           Commencing at 10:04 a.m.

24      Reporter:  Karen A. Morgan, CSR/RPR

Phillip Tringali

Page 130

```
 1      Q.  And who elected the directors?
 2      A.  The stockholders.
 3      Q.  Who had the majority -- you could have
 4  elected anyone on the board, could you not?  You were
 5  the 70 percent stockholder; correct?
 6      A.  I suppose, yes.
 7      Q.  You could have removed any director.
 8      A.  Through a meeting, yes, I guess I could.
 9      Q.  Tell me you owned 70 percent and they owned
10  20 percent, 21 percent.  How could they gain control of
11  S.E.E.?
12          MR. TREGER:  Objection.
13      A.  Well, I guess the story will present itself,
14  won't it?
15      Q.  You don't know then.  Can you answer that
16  question?
17          MR. TREGER:  Objection.  Are you qualified
18  to answer that without the advice of counsel?
19      A.  No.
20      Q.  You don't know then.
21          MR. TREGER:  Don't answer that.
22          MR. DAVIS:  Don't answer for him.
23      Q.  Did you understand that you were the 70
24  percent stockholder of the company?
```

Page 131

```
 1      A.  Yes.  That's a detail.
 2      Q.  What does that mean, a 70 percent
 3  stockholder?
 4      A.  That means I'm the majority stockholder of
 5  the corporation.
 6      Q.  And you have the right to control the
 7  company; correct?
 8      A.  I have influence on the control of the
 9  question, company.
10      Q.  You have the controlling influence or you had
11  the controlling influence.
12      A.  Of the stock of the company, yes.  I had the
13  controlling interest of the stock of the company.
14      Q.  Going back to August of '01.  What do you say
15  you learned about what took place in August '01?
16      A.  I didn't learn it in August of '01.
17      Q.  When did you learn it?
18      A.  I learned it shortly after they had left the
19  company.
20      Q.  Miss Hixon told you what specifically?
21      A.  Told me specifically that there were
22  discussions going on that she had aware of in August.
23  There was also records that she was asked to make
24  copies of prior to Paul and Jumi leaving.
```

Page 132

```
 1      Q.  And what did that have to do with gaining
 2  control of the company?  First let's go back to August.
 3  What did she tell you took place in August?  You said
 4  there was discussions; correct?
 5      A.  Yes.
 6      Q.  Did she say she was involved in any
 7  discussions?
 8      A.  Not that I recall.  I don't recall.
 9      Q.  Did she say who was involved in the
10  discussions?
11      A.  Other than Jumi, I don't recall.
12      Q.  Did she tell you what the discussions were
13  between Jumi and somebody else?
14      A.  I think it was a little vague at the time.  I
15  don't recall, no.
16      Q.  Did she tell you what the nature of these
17  discussions were?
18      A.  No.
19      Q.  Do you have any knowledge other than what
20  Miss Hixon told you about any of these so-called
21  discussions in August of '01?
22      A.  No.
23      Q.  Getting back to the claim of breach of
24  fiduciary duties.  Is there anything else you can tell
```

Page 133

```
 1  me that constituted a breach of fiduciary duty by
 2  Martin and Lee?
 3          MR. TREGER:  Objection.  Are you saying
 4  anything that he believes?  Asking him what he alleges?
 5      Q.  I want to know what you know about any other
 6  alleged breach of fiduciary duty.
 7      A.  Well, I guess all the details about starting
 8  a competitive company and coming out with a competitive
 9  product.
10      Q.  That's what you testified.  Other than what
11  you have already testified to, is there anything in
12  addition to what you testified to that you say
13  constituted a breach of fiduciary duty by Martin and/or
14  Lee?
15      A.  Well, I guess other than the file that I
16  found about Jumi planning this.
17      Q.  I'm sorry?
18      A.  Other than the file I found about Jumi
19  planning this.
20      Q.  What file was that?
21      A.  There was a file I found on a laptop after
22  she had left.
23      Q.  Whose laptop?
24      A.  It was on Jumi Lee's laptop.
```

34 (Pages 130 to 133)

Phillip Tringali

Page 126

1    Q.   When did they start that competing company?
2         MR. TREGER:  Objection.  Asked and
3    answered.
4    A.   Before they left.
5    Q.   Do you have any knowledge as to any competing
6    activities of Martin and Lee before they left the
7    company?
8    A.   I guess I can't answer that at this time.
9    Q.   Now, other than what you told me, what other
10   conduct do you say of Martin or Lee or the both of them
11   constituted a breach of fiduciary duty?
12   A.   I guess the fact that they were supposed to
13   be building our next generation product and came out
14   with their own a month later.
15   Q.   Well me about that.
16   A.   As far as what?
17   Q.   What were they supposed to be doing?
18   A.   They had been for last ten months supposed to
19   be developing the next generation of product for us
20   which was the 2200.
21   Q.   That product was never completed; correct?
22   A.   No.
23   Q.   And did Martin and Lee thereafter compete
24   S.E.E. with a product identical to the 2200?

Page 127

1    A.   Yes.
2    Q.   When?
3    A.   That I'm first aware of was in February.
4    Q.   Of '02.  You say that was the product you
5    first saw at the trade show?
6    A.   No.  That was a paper they gave on their new
7    product at an American Academy conference.
8    Q.   You were present at that time?
9    A.   Yes.
10   Q.   What did the paper consist of?
11   A.   If I recall, it had something to do with UV
12   microspectroscopy.
13   Q.   Were the specifications in that paper the
14   same as the specifications for the 2200?
15   A.   As best I recall.
16   Q.   Were there specifications in the paper?
17   A.   I don't believe there were specifications in
18   the paper.
19   Q.   Do you have this, quote unquote, paper in
20   your possession?
21   A.   They are may be in S.E.E. a copy of it.  It
22   was done at the American AAFS show so there would have
23   been a record of it.
24   Q.   Other than this paper that was delivered,

Page 128

1    tell me what else you say constituted a breach of
2    fiduciary duty?
3    A.   Trying to hire employees from the company.
4    Q.   And when did Martin and Lee try to hire any
5    S.E.E. employees?
6    A.   From what I understand, before they left and
7    after they left.
8    Q.   What do you understand that before they left?
9    Did someone tell you something?
10   A.   I heard --
11   Q.   Let me withdraw that.  Before Martin and Lee
12   left you say they attempted to hire an employee or
13   employees of S.E.E.
14   A.   I learned they were talking to employees of
15   S.E.E.
16   Q.   What did you learn and from whom did you
17   learn it?
18   A.   I learned from Dee Hixon for one that there
19   were discussions I think that went on internally that I
20   wasn't aware of.
21   Q.   What did Miss Hixon tell you and when did she
22   tell you it?  What did she say and when did she say it?
23   A.   I believe it was shortly after they had left
24   is that there was some comments made in I believe

Page 129

1    around the August time frame when I was not at the
2    company that there were discussions by Jumi Lee about,
3    you know, I guess doing their thing.
4    Q.   I'm sorry?
5    A.   Well, from what I understand there were
6    discussions about them basically in a sense taking over
7    the business.
8    Q.   Taking over the S.E.E. business?
9    A.   Yes.
10   Q.   All right.  You claim that -- by the way, do
11   you claim that Martin and Lee at some point attempted
12   to take control of the company?
13   A.   Well, I think there was an effort was made to
14   take control of the company, yes.
15   Q.   How much of the stock did Martin and Lee own?
16   A.   Twenty percent.
17   Q.   What percentage of stock did you own?
18   A.   About 70 percent.
19   Q.   If Martin and Lee owned 20 percent of the
20   stock, tell me how they would gain control of the
21   company.
22   A.   Because there were two directors.  They were
23   both directors of the company and I was the third
24   director.

33 (Pages 126 to 129)

Phillip Tringali

Page 122

1   Q.  Did you purchase these, the components for
2   the optical designs from other vendors?
3   A.  Yes.
4   Q.  And the head design itself, did you purchase
5   that from another vendor?
6   A.  Parts.  Again, it is hard without getting
7   into every detail.  Parts of it, yes.
8   Q.  When you examined the Martin and Lee device
9   you say at the trade show, was the head design of their
10  device the same as your 2100?
11  A.  I couldn't tell you.
12  Q.  Was the optical design the same as your 2100?
13  A.  Very similar.
14  Q.  Do you know how did you determine it was
15  similar?
16  A.  It was using all reflecting optics which is
17  the design we were using.
18  Q.  What type of an optical design did the J and
19  M product use?
20  A.  Used a fiber optic based design.
21  Q.  They used a different type?
22  A.  Right.
23  Q.  Now at these trade shows in addition to J and
24  M and your products and Martin and Lee's products, were

Page 123

1   there other vendors, other people?
2   A.  Not for this specific product, no.
3   Q.  So there were only three people in the field
4   you, Martin and Lee and J and M?
5   A.  At what time?
6   Q.  At any time after they left in January '02.
7   A.  Yes.
8   Q.  You were the only three parties involved in
9   this field?
10  A.  Yes.
11  Q.  Page 5 of the answer and counterclaim.  There
12  is a section called the eighth defense.  Just read that
13  to yourself.
14      (Witness perused document.)
15  A.  Right.
16  Q.  The second line -- it starts in the first
17  line.  It says that Martin and Lee are guilty of
18  inequitable conduct.  Do you see that?
19  A.  Yes.
20  Q.  Tell me all the instances of inequitable
21  conduct you say that Martin and Lee were guilty of.
22  A.  I guess I need more detail.
23  Q.  Other than what you told us today, is there
24  anything else that you say Martin and Lee did that

Page 124

1   constituted, quote unquote, inequitable conduct?
2      MR. TREGER:  We have to take a break.  I
3   think you're getting into attorney-client.  Let's go
4   outside.
5      (Witness conferred with counsel.)
6      MR. TREGER:  I'm going to instruct him not
7   to answer on the basis of attorney-client privilege.
8   Q.  At the time that this document was filed in
9   July of '02, do you know, apart from anything any
10  attorney told you, do you know of any conduct by Martin
11  and Lee that constituted inequitable conduct?
12      MR. TREGER:  Objection.  I'm going to
13  instruct him not to answer based on attorney-client
14  privilege.
15  Q.  Other than what an attorney told you, other
16  than communicating with an attorney, do you have any
17  knowledge of any inequitable conduct committed by
18  Martin and Lee?
19      MR. DAVIS:  That's a fair question,
20  Mr. Treger.  I'm excluding anything he learned as a
21  result of a discussion with an attorney.
22      MR. TREGER:  Do you know what inequitable
23  means other than what an attorney explained to you?
24  A.  I think I need you explain that to me again,

Page 125

1   the legal context.
2      MR. TREGER:  I mean you're asking about a
3   legal concept that came from an attorney.
4   Q.  You don't understand the word inequitable?
5      MR. TREGER:  You're asking about an
6   affirmative defense.
7      MR. DAVIS:  I understand that.  I'm asking
8   what facts he knows.
9   Q.  I'm not asking you what an attorney told you.
10  I'm asking what facts you know that constituted
11  inequitable conduct by Martin and Lee.
12  A.  I guess I can't answer that at this point.
13  Q.  All right.  In third line it also claims
14  Martin and Lee, quote unquote, breached their fiduciary
15  duties to the corporation, unquote.  Do you understand
16  that phrase?
17  A.  Yes.
18  Q.  Other than what an attorney told you, what
19  conduct of Martin and Lee constituted -- first of all
20  Martin, constituted a breach of fiduciary duty to the
21  corporation?
22  A.  Well, they were in addition to stockholders,
23  directors and officers of the corporation, they started
24  a competing company.

32 (Pages 122 to 125)

Phillip Tringali

Page 118

1    A.    I don't recall exactly.
2    Q.    Well, fair statement that J and M was the
3    principal player and basically appeared at all of these
4    trade shows.
5    A.    Not all of them.
6    Q.    Most of them?
7    A.    No.  A couple main shows.
8    Q.    A couple of main shows?
9    A.    Couple of major shows.
10   Q.    Okay.  What is the difference between a major
11   show and one that is not a major show?
12   A.    Well, one is you have for example the
13   forensic societies have different groups around the
14   country.  Then you have an American Forensic Society
15   which has it meeting and then you have international
16   societies which have their meetings.
17   Q.    So which of these constitute major shows?
18   A.    To me the American Academy of Forensic
19   Science, the Crime Lab Directors shows and some of the
20   international shows.
21   Q.    Did you attend all of these major shows?
22   A.    A portion of them, yes.
23   Q.    Did you attend the shows that weren't major
24   shows?

Page 119

1    A.    Yes.
2    Q.    All of them?
3    A.    A good portion of them.
4    Q.    Did Martin and Lee attend all of the shows
5    that you were at?
6    A.    I believe Paul was at most all the shows I
7    was at.
8    Q.    You observed the J and M product?
9    A.    Right.
10   Q.    At one or more of these shows.  How was that
11   product similar to any of your products?
12   A.    Well, it did the same -- had similar
13   capabilities to measure fibers and paint chips.
14   Q.    How about its features?
15   A.    There was a different design.
16   Q.    How is the design different?
17   A.    Well, they used fiber optic design and used
18   quartz objectives and quartz optics.
19   Q.    Is that considered to be a more advanced
20   design?
21   A.    I guess that's probably a matter of opinion.
22   Q.    Whose opinion would that be?  People in the
23   industry?
24   A.    Sure.

Page 120

1    Q.    Have you noticed over the period of time
2    Martin and Lee's products have changed?
3    A.    I haven't looked at the Martin and Lee
4    products for over a year now so I couldn't I guess
5    answer that.
6    Q.    All right.  These products by the way that
7    they sold, are they made up of components that were
8    purchased from different manufacturers?
9    A.    Yes.
10   Q.    Basically it's a fair statement the
11   components for most of the 2100 you purchased from
12   different manufacturers?
13   A.    Well, I guess I need you to clarify different
14   manufacturers.
15   Q.    Well, who manufactured the components for the
16   2100?
17   A.    We had a number.  Olympus, Ealing Optics.
18   We purchased from Ocean Optics, CDI.
19   Q.    That's three.  Any others that you recall?
20   A.    I mean we bought at times computers.  We made
21   our own computers.  There were some software packages
22   we bought from those customers.
23   Q.    All right.
24   A.    Then we had smaller suppliers of components

Page 121

1    within our system.
2    Q.    Basically what you did is you assembled all
3    of these components to make up the 2100; is that a fair
4    statement?
5    A.    Well, I guess I need you to clarify that a
6    little bit.
7    Q.    You bought the components from various other
8    vendors?
9    A.    We didn't just buy all of the components from
10   other vendors.
11   Q.    I understand.  What did you develop in-house?
12   A.    We developed the head design and optical
13   design on the system.
14   Q.    What does the head design consist of?
15   A.    Well, it was proprietary design at the time.
16   Q.    Head design being what part of the device was
17   that?
18   A.    There was one on top of the microscope
19   optics.
20   Q.    You developed that in-house?
21   A.    Yes.
22   Q.    That was an optical design?
23   A.    Well, it had optics and electronics and
24   connections and mechanical components within it, yes.

Phillip Tringali

Page 114

1  capabilities.
2      Q.  Do you have a document that shows the
3  specification and capability of the Martin and Lee
4  product?
5      A.  I don't know if I have a copy of their
6  specifications.  I'm assuming there's some -- I know
7  there's some someplace.
8      Q.  Did you make any determination as to the J
9  and M product whether it was similar?  You said it was
10 similar to your 2100.
11     A.  Right.
12     Q.  What J and M product was this?  Did it have a
13 particular trade name?
14     A.  I don't recall but I believe they did.
15     Q.  By itself way, going back to the Martin and
16 Lee product, when did you make the determination as to
17 the similarity?
18     A.  I guess between looking at specifications and
19 looking at the product.
20     Q.  When?
21     A.  I don't recall the time.
22     Q.  Was it during the year 2002?
23     A.  Yes.
24     Q.  Have you made any determinations or

Page 115

1  examinations of any of the Martin and Lee products
2  after 2002?
3      A.  Well, I didn't examine it.  I saw it.
4      Q.  Have you seen any -- where did you see the
5  Martin and Lee product?  Was it at a trade show?
6      A.  Trade shows.
7      Q.  Where did that take place?
8      A.  There were a number of them.
9      Q.  During what year?  2000?
10     A.  Well, 2002 and on.
11     Q.  You have attended a number of trade shows?
12     A.  Yes.
13     Q.  Have they sold the same product consistently
14 throughout that period of time?
15     A.  I think they have introduced additional
16 products.
17     Q.  And which of their products do you say were
18 similar to yours, the first one or the subsequent ones?
19     A.  Well, the first one was similar and the
20 subsequent ones were similar to a project we were
21 working on.
22     Q.  Is that the 2200?
23     A.  No.  That was a special system.
24     Q.  What was that project you were working on,

Page 116

1  the special system?
2      A.  I don't have all the details other than the
3  fact we were working with the Secret Service and
4  Battelle and the army.
5      Q.  This special -- what did you call it?
6      A.  It was a project.  It was a phase two
7  project.
8      Q.  When you were working on that, were you
9  developing a new device for the Secret Service?
10     A.  Potentially a new product, yes.
11     Q.  What was the product that you were
12 developing?  It wasn't the 2200?
13     A.  No.  It was different.
14     Q.  What was it?
15     A.  I don't know if you could give it a specific
16 name.  There was a specific requirement we were looking
17 at for them.
18     Q.  You were looking at a requirement.  Had you
19 done any development work for this phase two project?
20     A.  We had done phase one and had a phase two
21 contract, yes.
22     Q.  What had you done with respect to phase one?
23     A.  I don't have specific details.
24     Q.  Who had done it?

Page 117

1      A.  Paul had the secret clearance for the company
2  so he was actively involved in that.
3      Q.  With the Secret Service?
4      A.  Yes.
5      Q.  Do you know what exactly he did since he had
6  the clearance?
7      A.  All I know it was to develop a new instrument
8  and was taking a look at currencies.
9      Q.  Going back to the number of products you say
10 that you examined at different trade shows.  You say
11 there was one that was similar to a 2100 and there was
12 subsequent devices, Martin and Lee devices.
13     A.  Products.
14     Q.  Products.  Similar to your 2100 or similar to
15 one of your other products?
16     A.  No.  It was similar to the 2100.
17     Q.  Did you observe in these trade shows any
18 other competitors products that were similar to any of
19 your products?
20     A.  No.
21     Q.  You indicated the J and M product was.
22     A.  Right.
23     Q.  At how many trade shows did you examine or
24 did you observe the J and M product?

30 (Pages 114 to 117)

Phillip Tringali

Page 110

1 model number?
2    A. The 1100 or the 2100.
3    Q. Bot of these were forensic devices?
4    A. They were sold to the forensic business by
5 us, yes.
6    Q. Who did Martin and Lee solicit for a sale of
7 a -- you say that they solicited a customer of S.E.E.
8 for a sale of a product similar to the 1100 or the
9 2100?
10    A. Yes.
11    Q. What was the product that was solicited?
12 What did they solicit these customers for?
13    A. One of those two products.
14    Q. What customer did they solicit?
15    A. I believe at the time it was Cortek.
16    Q. How do you spell that, please?
17    A. C-O-R-T-E-K.
18    Q. Located where?
19    A. I think Billerica.
20    Q. And when did this solicitation take place?
21    A. I'm not sure of the time frame. I don't
22 recall the exact time.
23    Q. Having in mind that they left January of '02,
24 how long after the time they left was it?

Page 111

1    A. It was not after the time they left.
2    Q. This was a solicitation before they left?
3    A. Yes.
4    Q. For what product though?
5    A. It would have been one of the two products.
6 I don't recall.
7    Q. Who were they soliciting on behalf of,
8 themselves or S.E.E.?
9    A. S.E.E.
10    Q. My question to you is did Martin and Lee --
11 so they didn't solicit this Cortek for a product of
12 their own. It was for one of your products?
13    A. Right.
14    Q. I think my question to you was --
15    A. You can repeat it. You asked me if they
16 solicited anyone.
17    Q. Did they solicit any of your customers after
18 they left?
19    A. I don't recall.
20    Q. Do you have any evidence that Martin and Lee
21 solicited any of S.E.E.'s customers after they resigned
22 from the company?
23    A. Yes.
24    Q. What evidence is that?

Page 112

1    A. Phone records.
2    Q. Who did they solicit?
3    A. I would have to go back and look.
4    Q. For what product did they solicit?
5    A. For their product.
6    Q. When did this take place? In 2002?
7    A. Right.
8    Q. What was, quote unquote, their product?
9    A. I would have to go back and recall the
10 numbers. I don't know.
11    Q. Their product was a competing forensic
12 device?
13    A. Yes, it was.
14    Q. Who developed it?
15    A. I can't answer that.
16    Q. Did you ever inspect the Martin and Lee
17 product?
18    A. No.
19    Q. Do you know in any way if it is similar to
20 any product that was developed or sold by S.E.E.?
21    A. Yes.
22    Q. How do you know that?
23    A. By what I have seen at shows.
24    Q. I'm sorry?

Page 113

1    A. But what I have seen at shows.
2    Q. What do you base that on? What did you see?
3    A. Well, I saw their product at a show. I saw
4 some of the features on it. Some of the capabilities.
5    Q. Were there features and capabilities similar
6 to which of your product?
7    A. What I saw would have been similar to the
8 2100 or the 2200 design.
9    Q. Were there any other products in the
10 marketplace that were similar to your 2100 product?
11    A. Yes. One by J and M.
12    Q. Tell me what were the features that you say
13 were similar between your 2100 product and the Martin
14 and Lee product?
15    A. Well, had the same capabilities. It had the
16 same reflecting optic configuration. It had utilized
17 the same detector board we were looking at and some
18 software.
19    Q. Did you examine the detector board to
20 determine that?
21    A. Not physically.
22    Q. How did you make that determination that it
23 used the same detector board?
24    A. I'm aware of the specifications and

29 (Pages 110 to 113)

Phillip Tringali

Page 106

1 and the time they left, whether January 9th or January
2 11th, what activities do you say that Martin and Lee
3 engaged in with respect to competition with S.E.E.?
4     A.  I can't answer that.
5     Q.  Do you have any evidence that Martin and Lee
6 ever did any competitive activities, engaged in any
7 competitive activities between the time they formed
8 Quantum, the company, and the time they left S.E.E.?
9     A.  I don't have first-hand knowledge I guess.
10     Q.  Do you have any information other than
11 first-hand knowledge that Martin and Lee ever engaged
12 in any competitive activity from the time that they
13 organized Quantum and the time that they left S.E.E.?
14     A.  Not that I'm aware.
15     Q.  So the competitive activities were engaged in
16 by Martin and Lee after they left S.E.E.; is that
17 correct?
18         MR. TREGER:  Objection.
19     A.  I don't have the answers.
20     Q.  Well, in the second defense you say that
21 Martin and Lee are engaged in active competition with
22 the corporation.
23     A.  Yes.
24     Q.  My question is when did this active

Page 107

1 competition commence?
2     A.  I guess only Martin and Lee can answer that.
3     Q.  So you don't know that?
4     A.  Well, I know that they set up a competing
5 company.  I know that they went to a conference and
6 presented a paper in February.
7     Q.  In February of '02.  That would be after they
8 left?
9     A.  Right.
10     Q.  Anything other than that?
11     A.  They were offering products for sale,
12 competitive products to us.
13     Q.  When?
14     A.  I don't know.  The first date they did I'm
15 aware of it in March.
16     Q.  Neither one of them had a noncompetition
17 agreement; correct?
18         MR. TREGER:  Objection.
19     A.  Not a signed.
20     Q.  And other than what you have told me about
21 the conference and the paper in February '02 and
22 offering competitive products in March '02, what other
23 competitive activities were they engaged in at the time
24 this answer and counterclaim was filed in July '02?

Page 108

1         MR. TREGER:  Objection.  Are you asking
2 what he knows or what he's alleging?
3     Q.  What do you know?
4     A.  Well, I know they started a competitive
5 company offering competitive products.  I know they
6 presented data on a system in February which was just
7 over a month after they left.  I know they had set up
8 Quantum Dynamics and I know they were contacting
9 employees, representatives, distributors and customers.
10     Q.  The customers that you say -- when you say
11 they, who was contacting the customers of S.E.E.?
12     A.  I don't know specifically if it was Paul or
13 Jumi.
14     Q.  Either Dr. Martin or Miss Lee would you agree
15 that they would know the identities of the customers by
16 reason of their employment?
17     A.  Identities.
18     Q.  Yes.
19     A.  Possibly.
20     Q.  When Martin left, he had working for S.E.E.
21 for how many years?
22     A.  Close to six.  I believe over five years.
23     Q.  He started in 1995?
24     A.  Mm-mm.

Page 109

1     Q.  So it was close to six years?
2     A.  Six years.
3     Q.  Fair statement that during that six-year
4 period he would have acquired the knowledge of who the
5 customers, forensic customers of S.E.E. were?
6     A.  Some knowledge, yes.
7     Q.  How about Miss Lee?
8     A.  Yes.
9     Q.  Did either Martin or Lee ever solicit any of
10 the semiconductor customers of S.E.E.?
11     A.  Yes.
12     Q.  For what product?
13     A.  For one of our models.
14     Q.  For a forensic product?
15     A.  Yes.  Well, it was one of our designs for a
16 semiconductor application.
17     Q.  For which model?
18     A.  I don't recall which one at the time.
19     Q.  Was it similar to one of your models?
20     A.  Yes.
21     Q.  Which one was it similar to?
22     A.  One of the two at the time.  I don't recall
23 which one.
24     Q.  When you say one of the two, give me the

28 (Pages 106 to 109)

Phillip Tringali

Page 102

1     A.  They had the French QC book.  I don't know if
2   there was bid information in it in their possession.
3     Q.  They had the what?
4     A.  There's a book that we do on each sale and
5   they had the French one in their possession.
6     Q.  Do you have any personal knowledge that they
7   took any of that information with them?
8     A.  Well, yeah.
9     Q.  What personal knowledge do you have?
10    A.  They sent it back to me after they left the
11  company.
12    Q.  What was sent back to you after they left the
13  company?
14    A.  There was a QC manual on a French order and I
15  don't recall what other stuff was included at the time.
16    Q.  A French order?
17    A.  Yes.
18    Q.  An order submitted by who?
19    A.  The order submitted from our distributor in
20  Europe.
21    Q.  That company was what?
22    A.  Resultech.
23    Q.  Resultech was located where?
24    A.  In Germany.

Page 103

1     Q.  They had a bid for a French customer?
2     A.  They had a bid and order for a French
3   customer, yes.
4     Q.  Bid and order.  The order was placed by who?
5   What was the French customer's name?
6     A.  Well, it was placed by the gendarmerie.
7     Q.  That's a law enforcement agent in France?
8     A.  Yes.
9     Q.  For what product?
10    A.  I believe it was the 2100.
11    Q.  Was that the information that you say Martin
12  and Lee or somebody, either Martin or Lee, returned to
13  you?
14    A.  That was returned to me by them, yes.
15    Q.  When?
16    A.  As best I can recall, it would have been
17  maybe in February.
18    Q.  Did you request it or did they send it back
19  on their own?
20    A.  I requested it.
21    Q.  How did you request that?
22    A.  I believe by letter or fax.  I don't recall
23  100 percent.
24    Q.  And what was returned to you physically?

Page 104

1   What was sent back to you?
2     A.  The binder on the French sale and I don't
3   recall what else at the time.
4     Q.  Did S.E.E. end up making the sale to this
5   gendarmerie in France?
6     A.  It was already a sale.
7     Q.  It was already a sale?
8     A.  Yes.
9     Q.  So what if anything did Martin and Lee
10  misappropriate with respect to this French order?
11    A.  All of the records concerning the French
12  order.
13    Q.  To what extent did they use that?
14    A.  You would have to ask them.
15    Q.  Do you know whether or not any of this
16  information was ever used by Martin and Lee?
17    A.  Can't answer that.
18    Q.  Do you know if any -- other than the French
19  order were there any other customer bids either on
20  disk, hard drive or documents that you say were
21  misappropriated by Martin and Lee?
22    A.  Not that I'm aware of.
23        MR. TREGER:  He is not asking you what
24  you're aware of.  He's asking you what you allege.

Page 105

1     A.  Well again, I haven't got all the discovery.
2   I don't know all the details.
3     Q.  Do you have any knowledge as you sit here
4   today of any other customer bid information either on
5   disk, hard drive or documents that were allegedly
6   misappropriated by Martin and Lee?
7     A.  Not specifically at this point.
8     Q.  Going back to the second defense.  It also
9   claims in there that Martin and Lee are engaging in
10  active competition with S.E.E.
11    A.  Yes.
12    Q.  At that time what were Martin and Lee -- what
13  did Martin and Lee's active competition consist of?
14    A.  What type of detail would you like?
15    Q.  Well, tell me what you know about this active
16  competition.  Did they form another company?
17    A.  Yes.
18    Q.  When?
19    A.  Prior to them leaving.
20    Q.  December 31, '01?
21    A.  It may have been.
22    Q.  That was nine days before they left?
23    A.  If that's the date, yes.
24    Q.  During the period between December 31, '01

27 (Pages 102 to 105)

Phillip Tringali

Page 98

1    Q.    How do you know these documents were taken?
2    A.    Because she had a subordinate copy them.
3    Q.    I'm sorry?
4    A.    Jumi Lee had a subordinate copy all the
5    records.
6    Q.    Photocopy these?
7    A.    Yes.
8    Q.    Who copied them?
9    A.    Dee Hixon.
10   Q.    Is it Mr. or Mrs.?
11   A.    Mrs.
12   Q.    Hixon?
13   A.    Yes.
14   Q.    What is her first name?
15   A.    Dee or Dimetra I believe.
16   Q.    Is she employed by the company?
17   A.    No longer.
18   Q.    What was her capacity?
19   A.    Office administrator.
20   Q.    Where does Miss Hixon live now?
21   A.    In Middleboro.
22   Q.    When was the last time you spoke with her?
23   A.    I don't know exactly.
24   Q.    Did Miss Hixon tell you she copied the Maine

Page 99

1    records?
2    A.    Yes.
3    Q.    Miss Lee didn't take the originals, did she?
4    A.    No, I don't believe so.
5    Q.    The insurance and financials consisted of
6    what? Photocopies?
7    A.    Yes.
8    Q.    Photocopies of what?
9    A.    All our financials, all of the insurance
10   records.
11   Q.    Insurance records on what? The Maine
12   property?
13   A.    Everything.
14   Q.    Okay. Did Miss Hixon say she copied these,
15   too?
16   A.    Yes. Well, I don't know on the insurance
17   records. I know that the last time the insurance
18   folder was in the hands of Jumi Lee and it could not be
19   found.
20   Q.    All right. These records with regard to the
21   Maine property, insurance or financials have nothing to
22   do with a competing business that you say was organized
23   by Martin and Lee, did it?
24   A.    You just asked me what I saw them copy or

Page 100

1    take.
2    Q.    My question is did the records regarding the
3    Maine property have anything to do with a competing
4    business?
5    A.    Not the Maine property, no.
6    Q.    How about the insurance records?
7    A.    Insurance and corporate would, yes.
8    Q.    Okay. Corporate records that you say they
9    took consisted of what? Minutes of meetings?
10   A.    They took copies of all the financials. I
11   don't know about the minutes of meetings.
12   Q.    Okay. Customer bid information. Let's go
13   back to that.
14   A.    Right.
15   Q.    That consisted of a number of files?
16   A.    Yes.
17   Q.    What files were missing in July '02?
18   A.    There were no files missing that I'm aware
19   of.
20   Q.    So what customer bid information was taken?
21   A.    I'm alleging they took information on current
22   bids.
23   Q.    On what?
24   A.    On upcoming bids.

Page 101

1    Q.    And that information on upcoming bids
2    consisted of what? Paperwork?
3    A.    It would have been forecast and other
4    additional information.
5    Q.    And was that kept in a file cabinet?
6    A.    Yes. I believe. It is also on disk or hard
7    drive. Excuse me.
8    Q.    I'm sorry?
9    A.    It's on hard drive also I believe.
10   Q.    At the time that they left in January '02,
11   what did these customer bids consist of that you say
12   were taken or misappropriated?
13   A.    Basically specifications and bids that were
14   ongoing at the time.
15   Q.    And who has knowledge concerning this
16   misappropriation of the customer bids?
17   A.    I would assume the -- well, depending on the
18   case the plaintiffs or the defendants Martin and Lee.
19   Q.    Other than Martin and Lee, did someone see
20   this occurring?
21         MR. TREGER:  If you know.
22   A.    I don't know.
23   Q.    Do you have any personal knowledge that
24   Martin and Lee ever took any customer bid information?

26 (Pages 98 to 101)

Phillip Tringali

Page 94

1    Q.  Did Debra Bowles or anyone else transfer any
2  of the database to their personal laptop?
3    A.  I can't answer for them.
4    Q.  Did Miss Lee transfer the database if you
5  know?
6    A.  I don't know.
7    Q.  All right.  The internal development, and you
8  used the words after the internal development, you said
9  you assumed that was in a document format.  You say
10  that Dr. Martin and Miss Lee misappropriated internal
11  development.
12    A.  Yes.
13    Q.  What document format did they misappropriate?
14    A.  I can't answer that.
15    Q.  How do you know that they misappropriated
16  this internal development?
17        MR. TREGER:  Objection.
18    A.  There was no information.
19    Q.  What did the internal development consist of?
20  How did it evidence itself?
21    A.  It would usually be software programs and
22  drawings.
23    Q.  Okay.  Something disappeared from the S.E.E.
24  premise?

Page 95

1    A.  Something couldn't be found on the S.E.E.
2  premises.
3    Q.  What was it that couldn't be found?
4    A.  Ten months worth of work.
5    Q.  And ten months worth of work on what?
6    A.  Development of the next generation product.
7    Q.  The 2200?
8    A.  Yes.
9    Q.  All right.  Do you know whether Dr. Martin or
10  Miss Lee took that information with them?
11    A.  I don't know whether.
12    Q.  You have no personal knowledge as to the
13  misappropriation of this internal development work, do
14  you?
15    A.  Not that I physically saw, no.
16    Q.  Did anyone else see it?
17    A.  I can't answer that.  I don't know.
18    Q.  Do you have any evidence at all that any
19  internal development work was misappropriated by either
20  Martin or Lee?
21    A.  Not that I found.
22    Q.  You referred to customer bid information.
23    A.  Yes.
24    Q.  What was that?

Page 96

1    A.  Well, when we bid on projects or bid on sales
2  of products through government agencies there's a bid
3  process that takes place.
4    Q.  Is that bid process evidenced in some
5  documentary form?
6    A.  The bids we have would be in the files, yes.
7    Q.  And what type of files are they?  Hard copy?
8    A.  Company records, yes.
9    Q.  Were they kept in some kind of a filing
10  cabinet or some type of files?
11    A.  Usually.
12    Q.  Okay.  File folders with documents in them?
13    A.  Yes, I believe so.
14    Q.  Okay.  You say that Dr. Martin and Miss Lee
15  took these files?
16    A.  I allege, yes.
17    Q.  And when did they take them?
18    A.  I don't know the exact time.
19    Q.  Did you see them take the files?
20    A.  I didn't personally see them take the files,
21  no.
22    Q.  Did these files disappear?
23    A.  There are some files missing, yes.
24    Q.  Some files.  Tell me what files were missing

Page 97

1  at the time that this answer and counterclaim was filed
2  in July '02.
3        MR. TREGER:  Objection.  You can answer.
4    A.  There were corporate records, records on
5  Maine.
6    Q.  Records on names?
7    A.  On Maine.
8    Q.  On Maine?
9    A.  Yes.
10    Q.  What do mean on Maine?  You mean the State of
11  Maine?
12    A.  No.  On our property in Maine.
13    Q.  Okay.
14    A.  Our insurance records, all our financials.
15    Q.  Did any of these corporate records -- first
16  of all the records with regard to the State of Maine.
17  What do you say that Martin and Lee took with them?
18    A.  Copies of all the information on Maine.  All
19  the records.
20    Q.  Which information did they copy?
21    A.  It would probably be the mortgage
22  information, any of the records on things spent in
23  Maine, any of the legal records, the rentals, numbers.
24  Pretty much all of that.

25 (Pages 94 to 97)

Phillip Tringali

Page 90

1   Q.   On his computer.
2   A.   He made the master password.  He was the --
3   Q.   Was this database on any other computers
4   other than Dr. Martin?  Did you say it was on Dr.
5   Martin's computer?
6   A.   Well --
7        MR. TREGER: I believe the testimony was it
8   was on a company server.
9   A.   It was on a company server.  Dr. Martin also
10  had a personal business database on his computer.
11  Q.   And when do you say that he misappropriated
12  database records?
13  A.   When do I say?
14  Q.   I'm sorry?
15  A.   When the time he left.
16  Q.   He left on January 9, 2002.
17  A.   Right.
18  Q.   Is that the date?
19  A.   I believe he stopped back in on the 11th.
20  Q.   The 11th?
21  A.   Yes.
22  Q.   When do you say is the date he
23  misappropriated the database records?
24       MR. TREGER: Objection.  What do you mean

Page 91

1   by misappropriate?
2   Q.   Do you understand the word misappropriate?
3   A.   Yes.
4   Q.   What is your understanding of the word?
5   A.   Took for his own personal use.
6   Q.   Okay.  Based upon that definition, when do
7   you say Dr. Martin misappropriated the database records
8   of S.E.E.?
9   A.   When he walked out the door with his laptop.
10  Q.   What was on his laptop?
11  A.   The database.
12  Q.   How do you know that?
13  A.   I watched him put it on it.
14  Q.   When did you see Dr. Martin transfer the
15  database to his personal computer?
16  A.   I don't recall the exact date.  It was
17  shortly before leaving.
18  Q.   Do you know whether or not he erased it from
19  his computer?
20  A.   I have no knowledge of that.
21  Q.   One way or other; is that correct?  You don't
22  know whether he did or he didn't?
23  A.   No.  I don't know either way.
24  Q.   So if Dr. Martin erased that database from

Page 92

1   his personal computer, he would not have
2   misappropriated, would he?
3        MR. TREGER: Objection.
4   A.   I did not see him erase the database.  I
5   can't answer that.
6   Q.   Where was it that you saw Dr. Martin transfer
7   this data?  Where did this occur?
8   A.   At S.E.E. offices.
9   Q.   Who was present at the time?
10  A.   In his office.
11  Q.   When you say he transferred this database to
12  his personal computer, who was present?
13  A.   I was present.
14  Q.   What did he do?
15  A.   Basically copied the database on to his
16  personal computer.
17  Q.   Did he tell you that?
18  A.   Yes.
19  Q.   How long before he left did that occur?
20  A.   Within a couple of weeks.
21  Q.   He gave you notice he was leaving
22  on January 9th.  Is that the date he resigned?
23  A.   Yes.
24  Q.   Was it two weeks before that that he

Page 93

1   transferred this database?
2   A.   Whenever he got the new laptop.
3   Q.   When did he get the new laptop?
4   A.   I believe it was a December time frame.
5   Q.   Okay.  December.  Was there a laptop that Dr.
6   Martin had before this particular laptop he acquired in
7   December?
8   A.   Yes.
9   Q.   And was that his personal laptop?
10  A.   I believe so.
11  Q.   Did he also have the database on his prior
12  laptop?
13  A.   I believe so.
14  Q.   How many other laptops were there that had
15  the company database on them?
16  A.   I believe my laptop that I'm aware of and I
17  can't answer for other laptops.
18  Q.   Have you changed laptops from time to time?
19  A.   Yes.
20  Q.   Each time when you changed them, did you
21  transfer the database?
22  A.   No.
23  Q.   Dr. Martin had done the same thing?
24  A.   Yes.

24 (Pages 90 to 93)

Phillip Tringali

Page 86

1  refresh your memory?
2       A.  Yes.
3       Q.  I direct you to Page 4.  Second defense.  It
4  says in pertinent part that the plaintiffs, that's
5  referring to Martin and Lee, seeking to destroy the
6  corporation, meaning S.E.E., by misappropriation and
7  use of corporation trade secrets and confidential
8  information.  Do you see that?
9       A.  Yes.
10      Q.  Tell me what do you claim that Martin and Lee
11  misappropriated of the corporation S.E.E.?
12      A.  Database records.
13      Q.  I'm sorry?
14      A.  Database records.
15      Q.  Anything else?
16      A.  Well, I allege they took -- misappropriated
17  company material.
18      Q.  Specifically other than database records.
19  Let me ask you what the database records consisted of?
20      A.  It would have been our internal database
21  which contained all the contact, customer information,
22  contact records, everything that we had done.
23      Q.  That database was on what form?
24      A.  It was in -- well, it was on a company

Page 87

1  server.
2       Q.  Disk format or a hard drive?
3       A.  It would have been in hard drive I believe.
4       Q.  On a computer?
5       A.  Well, accessible on all computers, yes.
6       Q.  That's what the database records consisted
7  of?
8       A.  Yes.
9       Q.  What else do you allege or claim that Martin
10  and Lee misappropriated as set forth in the second
11  defense?
12          MR. TREGER:  Specifically you're saying
13  what is he alleging?
14      Q.  Well, what does this refer to.  The second
15  defense says that Martin and Lee misappropriated trade
16  secrets and confidential information.  I'm asking you
17  to tell me what did Martin and Lee misappropriate?
18          MR. TREGER:  Are you asking him for what he
19  is able to prove now because discovery is still ongoing
20  or are you asking him what he alleges?
21          MR. DAVIS:  I didn't use the word proof.
22      Q.  What do you say that Martin and Lee
23  misappropriated in addition to the database?
24      A.  Internal development.

Page 88

1       Q.  In what form?  What format was that internal
2  development?
3          MR. TREGER:  Objection.  You can answer
4  that.
5       A.  Well, I guess in some cases I'm assuming some
6  documented format.
7       Q.  I'm sorry?
8       A.  I'm assuming some documented format.
9       Q.  Okay.  You're assuming a document format?
10      A.  Yes.
11      Q.  What type of a document format are you
12  assuming?
13          MR. TREGER:  Objection.  If you can answer.
14      A.  I can't answer that.
15      Q.  All right.  Have you told me everything that
16  Martin and Lee -- do you say Martin and Lee have
17  misappropriated by way of trade secrets and
18  confidential information anything other than the
19  database and the internal development?
20          MR. TREGER:  Objection.  Are you asking
21  what he believes at this time?
22          MR. DAVIS:  At any time.
23          MR. TREGER:  Or what he believed --
24      Q.  What you believed at any time.

Page 89

1       A.  Well, I guess it's very broad in the sense
2  customer bid information.  There could be a number of
3  issues.
4       Q.  Are these aspects of this misappropriation
5  what you knew at the time this document was filed on
6  July 1, 2002?
7          MR. TREGER:  Objection.  Are you asking
8  what he believes, what he knows?
9          MR. DAVIS:  What he knew then and what he
10  knows now.
11      Q.  What did you know in July 2002 when this
12  answer and counterclaim was filed as to what Martin and
13  Lee misappropriated?
14      A.  I don't know any difference between then and
15  now.  I mean there's been no discovery.
16      Q.  All right.  Going back to the database
17  records.  This consisted of a company server which
18  would have been a hard drive accessible to any
19  computer?
20      A.  It would have been with password, yes.
21      Q.  Okay.  Who maintained the password?
22      A.  Dr. Martin maintained the database.
23      Q.  On her own personal computer?
24      A.  No.  On his.

23 (Pages 86 to 89)

Phillip Tringali

Page 82

1  1000 series?
2      A.  I'm not sure on the 1000.
3      Q.  What other mechanical design work had Dynamic
4  Light done for you historically?  We have the 1000,
5  2000, 3000.  We have a 2100, 1100.  Which of these
6  devices did --
7      A.  The 2100 and 1100 that I know of.
8      Q.  And the mechanical design consisted of what?
9  What type of work was that?
10     A.  Well, it had to do with head design for some
11 of the components and cabling, electronics, boards
12 within it.
13     Q.  Okay.  With respect to the 2200, what type of
14 work did Dynamic Light Control do?
15     A.  He was contracted to draw up new drawings for
16 the mechanical components.
17     Q.  Were those drawings prepared?
18     A.  At what time?
19     Q.  At any time.
20     A.  Partially.
21     Q.  Dynamic Light did partially the drawings?
22     A.  Right.
23     Q.  Where are these drawings now?
24     A.  They would be with S.E.E.

Page 83

1      Q.  In the documents that you had with the
2  trustee?
3      A.  Maybe or if not, in computer S.E.E. records.
4      Q.  Were these drawings computerized?
5      A.  Yes.
6      Q.  So in addition to maybe being on hard copies
7  they were also on computerized disks?
8      A.  Yes.
9      Q.  Where are these disks now?
10     A.  I believe some would be with the trustee and
11 there could be some on the computers from the company.
12     Q.  Where are the computers for the company?
13     A.  In storage.
14     Q.  The software that you mentioned that you
15 indicated Dr. Lee was in charge of.  Where is the
16 software for this 2200?
17     A.  What portion of the software?
18     Q.  Any of it.
19     A.  At the facility.  Well, in the facility's
20 assets.  Probably some on computer.
21     Q.  Is this an S.E.E. computer in storage?
22     A.  Could be.  I'm not a hundred percent sure.
23     Q.  How many computers did S.E.E. have?  This is
24 going back to February '01.

Page 84

1      A.  February '01?
2      Q.  Yes.
3      A.  I couldn't answer that.
4      Q.  Was there a specific computer that Dr. Lee
5  was assigned to work on with respect to the 2200
6  software?
7      A.  No, not a specific computer I'm aware of.
8      Q.  Did Dr. Lee take any of this 2200 software
9  with her when she left?
10     A.  I can't answer that question.
11     Q.  Did Dr. Lee take any of the mechanical -- you
12 can't answer that question.  Why is that?
13     A.  Because I don't know where the software is.
14     Q.  What about the mechanical design work that's
15 also on computer disk?  Dr. Lee or Dr. Martin take any
16 of that?
17     A.  That wasn't done when they left that I'm
18 aware of.
19     Q.  It wasn't done.  It was done after they left?
20     A.  Partially.
21     Q.  All right.  You have contended in this case
22 Dr. Martin and Miss Lee took certain of the company
23 property with them when they left the employ.
24     A.  In what case?

Page 85

1      Q.  In this case.
2      A.  You will be more specific.  There's two
3  cases right now.
4          MR. DAVIS:  Mark this as Exhibit 4.
5          (Exhibit No. 4 marked
6          for identification.)
7      Q.  This is Defendant S.E.E., Inc. and Phillip
8  Tringali's Answer to Plaintiffs' Complaint and
9  Counterclaim in the Norfolk Superior Court Case No.
10 02801 which is the same case as we're taking this
11 deposition in.  Do you recall seeing that document at
12 some time, Mr. Tringali, prepared by your attorney I
13 think Miss Maire?
14     A.  Yes.
15     Q.  Did you see it before it was filed or at the
16 time it was filed or any time thereafter?
17     A.  I don't recall.
18     Q.  Why don't you take a moment and examine it if
19 you could.  That might refresh your recollection.
20         (Witness perused document.)
21         MR. TREGER:  I would like to take a break.
22         MR. DAVIS:  Yes.
23         (A break was taken.)
24     Q.  Now having looked at this document, does that

22 (Pages 82 to 85)

Page 78

1    Q.   Was there any work done to develop the 2200
2    product?
3        A.   Yes.
4        Q.   When was that done?
5        A.   From February onward.
6        Q.   And what was the result of the work?
7        A.   As far as?
8        Q.   How far did the development go?
9        A.   Well, the product never got finished.
10       Q.   Did it get designed?
11       A.   Conceptually, yes.
12       Q.   The components of that product, the 2200,
13   would have been manufactured by who?
14       A.   Some components by us.
15       Q.   What components would S.E.E. manufacture?
16       A.   Probably to do with some of the hardware
17   modifications to the system and software development.
18       Q.   The other components were purchased from
19   outside vendors?
20       A.   Yes.
21       Q.   You say development never got finished?
22       A.   Not that I'm aware of, no.
23       Q.   Was this something knew that -- was there
24   anything like this in the marketplace, a device that

Page 79

1    would used bot for forensic purposes and semiconductor
2    purposes?
3        A.   It could be, yes.
4        Q.   Was there another product in the marketplace
5    at that time?
6        A.   I don't know if our competitor was in the
7    semiconductor market.
8        Q.   Has it ever been developed by anybody, a
9    combination product. I call it a combination product
10   used for both forensic and semiconductor purposes?
11       A.   Well, I can't answer that because you have to
12   understand in essence the base technology of the
13   instrument.
14       Q.   Which I don't. In layman's terms I
15   understand the 2200 to be a product that's something
16   new. It can be used for forensic purposes and also to
17   measure the thickness of film.
18       A.   And modified to measure the thickness of
19   film, yes.
20       Q.   Was there a product that was ever developed
21   by anyone else to perform these functions?
22              MR. TREGER:  Objection. At what time?  At
23   any time?
24       Q.   Any time after February '01.

Page 80

1        A.   Not that I'm aware of.
2        Q.   The technology that -- strike that. February
3    '01 was Dr. Lee -- I'm not sure it's Dr. Lee but was
4    Miss Lee assigned the duties of developing the 2200?
5        A.   Yes.
6        Q.   When she left in January of '02, what was the
7    stage of development of the 2200?
8        A.   Not complete.
9        Q.   Okay. Were there documents and work product
10   that went into the development of the 2200?
11       A.   There were overview discussions and there was
12   some development going on.
13       Q.   What was the -- how did the development
14   evidence itself physically?  Paperwork.
15       A.   Well, we had purchased components to built
16   it.
17       Q.   Were there design drawings?  What paperwork
18   existed to evidence the development of the 2200 other
19   than the purchase of components?
20       A.   Software purchases. There was systems sent
21   to a mechanical designer.
22       Q.   What else?
23       A.   My understanding there was ongoing software
24   development.

Page 81

1        Q.   Software development. Who performed that
2    service?
3        A.   Jumi Lee.
4        Q.   And the mechanical design, who performed
5    that?
6        A.   Both internal and external.
7        Q.   Internal by who?
8        A.   Dr. Martin, Dr. Lee.
9        Q.   External by who?
10       A.   We were using a mechanical designer Dynamic
11   Light Control and it was by I believe Gary Unruh.
12       Q.   Dynamic Light Control?
13       A.   Yes.
14       Q.   Who else?
15       A.   Gary Unruh was the principal, U-N-R-U-H or
16   something.
17       Q.   Where is Dynamic Light Control located?
18       A.   California.
19       Q.   Dynamic Light Control prepared some drawings
20   or other paperwork?
21       A.   Well, they had been our mechanical designers
22   right along, yes.
23       Q.   Had they done the mechanical design for the
24   other instruments you had produced starting with the

21 (Pages 78 to 81)

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS

SUPERIOR COURT
C.A. NO. 02-801

PAUL MARTIN and JUMI LEE,        )
Individually and as Assignees    )
of S.E.E., INC.                  )
    Plaintiffs               )
                                 )
V.                               )
                                 )
PHILLIP TRINGALI                 )
    Defendant                )

**SUBSTITUTE SECOND AMENDED
COMPLAINT AND DEMAND FOR JURY TRIAL**

**PARTIES AND NATURE OF ACTION**

1.    Plaintiff Paul Martin ("Martin") is a resident of Quincy, Norfolk County, Massachusetts.

2.    Plaintiff Jumi Lee ("Lee") is a resident of said Quincy.

3.    S.E.E., Inc. ("S.E.E."), is a corporation duly organized under the laws of the Commonwealth of Massachusetts, with a principal place of business at 48 Leona Drive, Middleborough, Massachusetts.

4.    Defendant Phillip Tringali ("Tringali") has a usual place of business at the offices of S.E.E. at Middleborough, aforesaid.

**NATURE OF ACTION**

5.    This action is brought as a derivative action, pursuant to Mass.R.Civ.P. 23.1, for individual claims of the plaintiffs, pursuant to Mass. G.L. c.149 §150, and for common law causes of action. The derivative action principally concerns the use of corporate funds by the defendant Tringali for the purchase of a vacation home in Bridgton, Maine, such funds being used for the purchase, mortgage payments, payments of real estate taxes and maintenance on the property, which has no business purpose, the property being used by Tringali as his vacation home. The plaintiffs are informed and believe that Tringali has caused S.E.E. to improperly deduct as business expenses on

S.E.E.'s Federal and Massachusetts corporation tax returns, expenses for depreciation, interest, real estate taxes and maintenance with respect to said property, which has and will expose S.E.E. to additional taxes, penalties and interest.

Background Facts

6.   From February, 1994 to April, 1996, Martin was employed by Nanometrics of Sunnyvale, California, as product manager of its microspectrometer division.  When Nanometrics closed its division in April, 1996, Martin was laid off and commenced employment with S.E.E.

7.   Martin together with S.E.E., on or about May, 1996, started an analytical microspectrometer business in Martin's home in San Francisco.

8.   Martin's wife, Jumi Lee ("Lee"), was hired by S.E.E. on or about October, 1996, to assist Martin in the development of the microspectrometer division.

9.   At S.E.E.'s direction, on or about February, 2000, Martin and Lee moved the microspectrometer division from San Francisco to S.E.E.'s place of business at Middleborough, Massachusetts.  Lee and Martin worked at Middleborough from February, 2000 until they both resigned from S.E.E. on or about January 9, 2002.

10.   S.E.E. issued 20,000 shares of its common stock to Martin as follows:

   a.   February 28, 1997, 20,000 shares were issued to Martin in consideration for his services and development of the microspectrometer division.

   b.   On or about August 28, 2000, Martin purchased from Tringali an additional 5,000 shares.

11.   S.E.E. issued 15,000 shares of its common stock to Lee as follows:

   a.   On May 13, 1998, S.E.E. issued 8,000 shares to Lee in partial consideration for the performance of her services for S.E.E.

   b.   On April 20, 1999, S.E.E. issued 2,000 shares, again, as consideration for the services she had performed for S.E.E.

c.    On August 28, 2000, Lee purchased an additional 5,000 shares from Tringali.

12.    At the present time Martin and Lee together own a total of 40,000 shares or approximately 21% of the outstanding common stock of S.E.E.

Tringali's Vacation Home

13.    On or about September 3, 1998, S.E.E. purchased a vacation home in Bridgton, Maine (the "Bridgton Property").  The plaintiffs are informed that the original purchase price for this property was approximately $206,400, that corporate funds of S.E.E. were used for the down payment, and that S.E.E. borrowed the balance of the purchase price from the Northeast Bank in the original amount of $147,000 secured by a first mortgage.

14.    Since the date of the purchase, the Bridgton Property has been used by Tringali as his personal vacation home, notwithstanding that the mortgage principal, interest, taxes and other expenses for the maintenance of the Bridgton residence have been paid by S.E.E.

15.    S.E.E. has listed the Bridgton Property on its books as a business asset and has listed the note and mortgage as a corporate liability.

16.    Notwithstanding that S.E.E. lists the Bridgton Property as a business asset on its books and records and financial statements, since the time of its purchase, it has produced virtually no income as it has been used as Tringali's personal vacation home.

17.    For the fiscal year ended June 30, 1999, S.E.E.'s books and records showed no rental income; for the following year ended June 30, 2000, the books and records showed rental income of $5,440, and in the most recent fiscal year ended June 30, 2001, the books and records showed no rental income.

Martin and Lee's Resignation

18.    After Martin and Lee moved the microspectrometer division to Middleborough in February, 2000, as stated herein above, Lee took on additional duties overseeing the finances and accounting system of S.E.E.

3

19.    By March, 2000, Martin and Lee experienced differences with Tringali concerning the operation and finances of S.E.E., including but not limited to the conduct of certain litigation and S.E.E.'s purchase of the vacation home for Tringali's personal use.

20.    The differences between Martin and Lee and Tringali continued into the fall of 2001. On or about October 9, 2000, Tringali threatened to fire Lee, and thereafter Tringali again threatened to fire Lee on or about December 20, 2001, and again, on or about January 3, 2002.

21.    Furthermore, Tringali represented that he would discontinue the use of the Bridgton Property as a business asset and take steps to remove the expense and the liability from S.E.E.'s books and records, however, he failed and refused to do so.

22.    On or about January 9, 2002, Martin and Lee both resigned from S.E.E.

Stock Re-Purchase Agreement                                          -

23.    The stock issued to Martin and Lee as aforesaid, as well as all of the other common stock issued to other stockholders including Tringali is subject to the terms of an agreement entitled "Agreement Between Corporation and Stockholders Restricting Transfer of Shares" dated December 4, 1996 (Exhibit "A" hereto).

24.    Pursuant to the provisions of section 5 of the Agreement of December 4, 1996, upon Martin and Lee's termination, S.E.E. is obligated to purchase the stock of Martin and Lee in an amount equal to the book value of the stock. Demand was made for repurchase of their stock, however, S.E.E. has refused to repurchase the stock of Martin and Lee.

25.    According to S.E.E.'s balance sheet as of June 30, 2001 (Exhibit "B" hereto), the total book value of all of the issued S.E.E. common stock, shown as Stockholder's Equity, is the amount of $499,239. Martin and Lee's proportionate share of the book value according to the June 30, 2001 balance sheet, based upon their 21% ownership interest, is approximately $99,850.

4

26.    Martin and Lee, however, believe that the book value of their stock as shown on the S.E.E. balance sheet is understated by reason of the following:

    a.    S.E.E.'s payments for the purchase and maintenance of Tringali's vacation home which have been improperly charged to S.E.E. and therefore have reduced the book value of their stock.

    b.    Other transactions which may also have reduced their book values, including but not limited to excessive expenses taken by Tringali, payment by S.E.E. of Tringali's personal expenses and loans by S.E.E.

27.    Notwithstanding the provisions of the Agreement of December 4, 1996, on or about January 11, 2002, Martin and Lee entered into an agreement wherein Tringali and/or S.E.E. agreed to purchase all of Martin and Lee's stock for $200,000. Tringali and S.E.E. have also refused to perform the agreement of January 11, 2002.

Claim for Unpaid Vacation and Commissions

28.    According to S.E.E.'s records, at the time of Martin's resignation from S.E.E. on January 9, 2002, Martin had earned 256.47 hours of vacation (Exhibit "C" hereto), to which he would be entitled to at his rate of pay, the amount of $14,179.84. On January 29, 2000, S.E.E. paid him the amount of $4,006.75, leaving a balance due for his vacation pay in the amount of $10,173.09.

29.    Martin is also due commissions from S.E.E. in the amount of approximately $1,900.00.

30.    Lee is due commissions from S.E.E. in the amount of approximately $1,100.00.

31.    Martin and Lee made demand upon S.E.E. for payment of Martin's vacation pay and Martin and Lee's unpaid commissions by letter dated February 19, 2002, however, S.E.E. has neglected and refused to pay the amounts due to Martin and Lee for vacation pay and commissions.

Derivative Action

32.    This action is brought, in part, pursuant to Mass.R.Civ.P. 23.1, as a derivative action to enforce the rights of S.E.E. and its stockholders.

33.    By letter dated March 22, 2002 (Exhibit "D" hereto), Martin and Lee made demand upon the stockholders and directors to investigate and remedy matters pertaining to the conduct of business of S.E.E., including but not limited to the following matters:

      a.    Purchase of Tringali's vacation home, the Bridgton Property, and the use of corporate funds for the payment of the purchase price, mortgage, and other expenses.

      b.    The lack of any substantial rental income from said property.

      c.    Excessive reimbursement of business expenses paid to Tringali.

      d.    Loans from S.E.E. to Tringali.

      e.    Whether the corporation has discharged any loans or receivables or notes receivable to any other third party.

      f.    To the extent to which Tringali has failed to perform his duties for S.E.E. while devoting his attention to the purchase of a motel property.

34.    S.E.E., by its attorney, responded by letter dated March 26, 2002 (Exhibit "E" hereto), however, as of the date hereof, S.E.E.'s Board of Directors has not taken any action with respect to the demands made by the plaintiffs in their letter of March 22, 2002.

35.    At this time some several weeks have elapsed since the plaintiffs made demand upon the stockholders and directors of S.E.E., there appears to be no likelihood that the stockholders and directors will take any action in view of their failure to respond, and therefore, plaintiffs having waited a reasonable time for such response, are now entitled to bring this action for derivative relief.

36.    Notwithstanding the demand made by the plaintiffs upon the stockholders and directors, the plaintiffs believe that such demand, in any event, would be futile since Tringali is the controlling stockholder of S.E.E.

owning approximately 70%, and the members of the board of directors, other than Tringali, are not disinterested persons, and are under the control of Tringali.

37.    On March 24, 2004, S.E.E. filed a Chapter 7 petition in the Bankruptcy Court, which then operated as an automatic stay regarding this action.

38.    On August 1, 2005, the bankruptcy trustee filed in the U.S. Bankruptcy Court a motion entitled "Chapter 7 Trustee's Motion for Order Authorizing Compromise of Controversy and for Approval of Stipulation of Settlement."

39.    The trustee also filed with the Motion a Stipulation of Settlement and on August 6, 2005, filed an Amendment to Stipulation of Settlement.  In accordance with Paragraph 2 of the Amendment to Stipulation of Settlement, the trustee had agreed to assign to Martin and Lee the counterclaims asserted by S.E.E. in the Norfolk Action as well as all stockholder derivative claims in the Norfolk Action.

40.    On August 19, 2005, the Bankruptcy Court approved the trustee's Motion together with the Stipulation of Settlement and Amendment to Stipulation.

41.    As a result of the approval by the Bankruptcy Court, Martin and Lee are now the assignees of all stockholders' derivative claims in this action and desire to prosecute same against the defendant Tringali.

**COUNT I – Inspection of Books and Records**

42.    Paragraphs 1 through 41 are incorporated herein by reference.

43.    Pursuant to G.L. c.156B §32 and the common law, plaintiffs have the right to inspect the books, records and accounts of S.E.E. .

44.    On or about March 1, 2002, pursuant to G.L. c.156B §32, plaintiffs, acting in good faith for the purpose of advancing S.E.E.'s interests and protecting their own interests, requested inspection of the articles of organization, by-laws, records of meetings and stock transfer records.

45.    On or about March 18, 2002, the plaintiffs requested the examination of the books and records pertaining to the financial condition of S.E.E.

46.     Notwithstanding said request, the defendants have refused to permit the plaintiffs to inspect the records requested.

47.     Plaintiffs petition the Court for an order requiring the defendants to produce for inspection all of the books, records and accounts of S.E.E. in a timely and reasonable manner.

**COUNT II – Breach of Fiduciary Duty to Stockholders**

48.     Paragraphs 1 through 47 are incorporated herein by reference.

49.     By virtue of his role as president and controlling stockholder of S.E.E., Tringali stood in a fiduciary relationship to the plaintiffs and owed a duty of utmost good faith and fair dealing.

50.     Tringali acted in bad faith, was guilty of willful misconduct, and otherwise breached his fiduciary duty to the plaintiffs.

51.     As a result of Tringali's breach of fiduciary duty, plaintiffs have sustained damage as alleged.

**COUNT III – Breach of Fiduciary Duty to S.E.E.**

52.     Paragraphs 1 through 51 are incorporated herein by reference.

53.     By virtue of his role as president and controlling stockholder of S.E.E., Tringali stood in a fiduciary relationship to S.E.E. and owed a duty of utmost good faith and fair dealing.

54.     Tringali acted in bad faith, was guilty of willful misconduct, and otherwise breached his fiduciary duty to S.E.E.

55.     As a result of Tringali's breach of fiduciary duty, S.E.E. has sustained damage as alleged.

**COUNT IV – Implied Covenant of Good Faith and Fair Dealing**

56.     Paragraphs 1 through 55 are incorporated herein by reference.

57.     Implicit in the duty owed by Tringali to the stockholders and S.E.E. is the covenant of good faith and fair dealing.

58.     Tringali breached the covenant of good faith and fair dealing as set forth above by reason of the purchase and maintenance of the Bridgton Property used as his vacation home, using corporate funds of S.E.E. for the purchase

and maintenance of said property while producing virtually no income, and his breach of fiduciary duty as aforesaid.

## COUNT V – Accounting

59.    Paragraphs 1 through 58 are incorporated herein by reference.

60.    The defendant Tringali, for his own personal advantage, has been making use of the Bridgton Property as his vacation home and as stated aforesaid, used corporate funds of S.E.E. for the purchase, mortgage payments and maintenance of said property.

61.    The plaintiffs are informed and believe that Tringali has caused S.E.E. to improperly deduct as business expenses on its Federal and Massachusetts corporation tax returns, expenses relating to the Bridgton Property for depreciation, interest, real estate taxes and maintenance.

62.    The plaintiffs are informed and believe and estimate that as a result of the improper deductions for depreciation, interest and real estate taxes only, as the plaintiffs are not aware of the amount of expenses deducted for maintenance, S.E.E. may be exposed to substantial additional Federal and Massachusetts tax liabilities, together with penalties and interest.

63.    As a result of the conduct of Tringali, as aforesaid, Tringali should be ordered to account for and pay over and reimburse S.E.E. for all of the monies and funds of S.E.E. used for the purchase of the Bridgton Property, mortgage payments, maintenance and other related expenses, together with all amounts which S.E.E. may be liable for by way of additional Federal and Massachusetts taxes, penalties and interest.

## COUNT VI – Breach of Contract

64.    Paragraphs 1 through 63 are incorporated herein by reference.

65.    The defendants have breached the agreement to purchase the plaintiffs' stock as set forth in the Agreement of December 4, 1996.

66.    Furthermore, the defendants have breached the agreement for the repurchase of the plaintiff's stock in accordance with the agreement of the parties of January 11, 2002.

67.    As a result of the defendants' breach of the contract, the plaintiffs have sustained damage.

## COUNT VII – Massachusetts G.L. c.149 §150

68.    Paragraphs 1 through 67 are incorporated herein by reference.

69.    This Count is brought for violation of G.L. c.148 and for relief pursuant to c.149 §150 against both defendants.

70.    Massachusetts G.L. c.149 §148 requires the payment by an employer within six days of the termination of a pay period during which the compensation was earned or wages which by definition includes payment for vacations and commissions.

71.    Furthermore, c.149 §148 (fifth paragraph), also provides in pertinent part as follows:

> The president and treasurer of a corporation and any officers or agents having the management of such corporation shall be deemed to be the employers of the employees of the corporation within the meaning of this section.

72.    At all times relevant hereto Tringali was the president of the employer S.E.E. and therefore, he is deemed to be the employer within the meaning of c.149 §148.

73.    The acts of S.E.E. and Tringali as set forth hereinabove, constitute a violation of §148 for which Martin and Lee are entitled to pursue a civil action to seek relief pursuant to c.149 §150.

74.    Chapter 149 §150 provides that an employee aggrieved by a violation of §148 may bring an action in his own name for damages, including treble damages for loss of wages and other benefits, costs and reasonable attorney's fees.

75.    Pursuant to c.149 §150, plaintiffs filed a complaint with the Attorney General's Office and the Attorney General's Office has by letters dated February 17, 2005 (Exhibits "A" and "B" respectively), advised the plaintiffs that they are authorized to pursue this matter with a private civil action, stating in pertinent part as follows:

10

This letter is to inform you that we have carefully reviewed your complaint and have determined that the proper resolution of this matter may be through a private suit in civil court. Accordingly, we are authorizing you to pursue this matter through a civil lawsuit immediately.

## DEMAND FOR JURY TRIAL

The plaintiffs make demand for a jury trial as to all issues which are triable by a jury.

## REQUEST FOR RELIEF

The plaintiffs make the following requests for relief.

(1)    That the Court award judgment to plaintiffs for damages, together with interest, costs and attorney's fees, pursuant to Counts I through IV and VI;

(2)    That the Court, pursuant to Count V, order an accounting from the defendant Tringali, that Tringali be ordered to pay over and reimburse to S.E.E., Inc. all monies and funds of S.E.E. used for the purchase of the Bridgton Property, mortgage payments, real estate taxes, maintenance and any other related expenses and, in addition, that Tringali be ordered to account and pay over to S.E.E. all amounts which S.E.E. may be liable for by way of additional Federal and Massachusetts corporation taxes, interest and penalties;

(3)    That the Court award the plaintiffs damages, including treble damages, costs and attorney's fees, pursuant to Count VI, under G.L. c.149 §150;

(4)    That the Court enter injunctive relief as set forth in Plaintiffs' Motion for Preliminary Injunction as amended, filed herewith;

(5)    For such other relief as the Court may deem just and proper.

11

November 16, 2005                              Attorney for plaintiffs,

 

 

 

Roger S. Davis
BBO No. 116320
DAVIS & RUBIN
One Bowdoin Square
Suite 901
Boston, MA 02114-2919
(617) 742-4300

AGREEMENT BETWEEN CORPORATION AND STOCKHOLDERS
RESTRICTING TRANSFER OF SHARES

Agreement made December 4, 1996, between S.E.F., Inc., a corporation organized and existing under the laws of Massachusetts with its principal office at 98 Walnut St., Halifax, Plymouth County, Massachusetts, 02338, hereinafter referred to as the corporation, and the following stockholders of the corporation, hereinafter referred to as the stockholder:

| Name | Stockholder's Residence | Number of Shares |
|------|------------------------|------------------|
| Phillip G. Tringal, Jr. | 98 Walnut St., Halifax, MA | 100% |

## RECITALS

A.    The above-named stockholder of the corporation desire to assure continuity of ownership of the corporation by persons actively involved in the affairs and business of the corporation.

B.    The stockholder and the corporation, after mutual consultations, have agreed, in order to insure such continuity, to restrict the ownership, sale or transfer of shares of the corporation to those persons employed by the said corporation.

For the reasons above set forth, and in consideration of the mutual covenants and promises of the parties hereto, the corporation and the stockholder agree as follows:

## SECTION ONE

## FIRST RIGHT OF PURCHASE IN CORPORATION

If any stockholder shall, during the stockholder's lifetime, desire to sell or transfer all or any part of the stockholder's shares of stock in the corporation, the stockholder shall first offer to

sell the above-mentioned shares to the corporation at the same price per share paid for the most

recent sale or transfer of said shares during the or if there is no such sale or transfer within the

prior year, then at a price per share equal to the then book value of each of the shares as of the

last day of the calendar month next preceding the date the shares are offered for sale. Book value

shall be determined by the independent certified accounts for the corporation and such valuation

shall be in accordance with generally accepted accounting principles consistent with the method

of accounting then employed by the corporation and shall be binding on the parties

## SECTION TWO

### OFFER TO OTHER STOCKHOLDERS IF CORPORATION DOES NOT PURCHASE

The offer to sell shall be communicated in writing by the selling stockholder to the board

of directors of the corporation and to all other stockholders, and the corporation shall be given a

period of Sixty (60) days after receipt of such notice in which to exercise its rights to purchase

the shares at a price determined as specified in Section One. If the corporation shall refuse or

neglect to notify the selling stockholder in writing of its intention to purchase the shares within

the 60 day period, or if the corporation is prohibited by law from making such a purchase or

redemption, the selling stockholder shall then notify in writing the other stockholders of the

stockholder's intention to sell and the number of shares offer for sale and the other stockholders

shall have an additional period of ten (10) days within which to accept the offer to sell on the

same terms and conditions as offered to the corporation.

## SECTION THREE

### STOCKHOLDER'S RIGHTS IF NEITHER CORPORATION NOR OTHER

## STOCKHOLDERS EXERCISE OPTION

If neither the corporation nor the other stockholders elect to purchase the shares within the time limited on the terms set forth above, the stockholder desiring to sell or transfer his or her shares shall be free to do so to any other person employed by the corporation in accordance with any restrictions provided herein; provided, further, that such sale or transfer shall not be on terms less favorable to the selling stockholder unless the favorable terms are re-offered to the corporation and/or the other stockholders as herein provided. If the sale or transfer to any other such person is not completed within Ninety (90) days after the expiration of the periods of time set forth in this agreement, the selling stockholder must, before making any subsequent sale or transfer, re-offer the shares to the corporation and/or the other stockholders as provided in this agreement

### SECTION FOUR

### CLOSING OF SALE

The closing of the sale and transfer of such shares to the corporation or to the other stockholders of the corporation shall take place within Fourteen (14) days after the acceptance of the selling stockholder' offer to sell and the purchase price so determined shall be paid by the purchasers to the seller by means of a promissory note due One (1) years from the date, bearing interest the rate of 2% over current prime annum on the unpaid principal balance, principal payable in full at the end of the one year term, plus interest. Such promissory note shall permit prepayment at any time without penalty.

Simultaneously with such payments, the stock of the selling stockholder shall be delivered to the purchaser in such form as to effectively transfer such shares, at which time such

3

selling stockholder's rights as a shareholder of the corporation shall cease to exist as to the shares so transferred.

## SECTION FIVE

## DEATH OF STOCKHOLDER OR TERMINATION OF EMPLOYMENT

On the death or at the termination of employment of a stockholder , the corporation shall purchase and the employee or the estate or personal representative of the deceased stockholder shall sell the employee or decedent's stock in the corporation for a consideration equal to the book value of such stock as established by the accountants for the corporation as herein provided above.  In the event the corporation is then prohibited by law from making such purchase or redemption of the decedent's shares of stock in the corporation, the then surviving stockholders of the corporation shall purchase and the employee decedent's estate shall sell all of the shares of stock owned by the decedent on the date of his or her death at the same price and on the same terms and conditions as set forth above.  In the event of the survival of two or more stockholders of the corporation, each shall be jointly and severally liable to the decedent's estate for the purchase price, but as between them , they shall share such liability in the ratio that the number of the shares of stock respectively owned by them at the time of the decedent's death bears to the aggregate number of such shares and the shares of stock owned by the decedent's estate shall, in like manner, be apportioned between them based on their proportionate ownership of the shares of stock of the corporation at the date of decedent's death.  The closing of the sale and the purchase of the shares by the corporation or, in the event of its inability to complete the purchase,

4

by the surviving stockholders, shall be made within Six months after the date of the deceased stockholder's death and the purchase price shall be paid to the estate of the decedent under the terms of Section Four. In making the valuation of the shares, the accountants for the corporation shall determine the book value as herein provided as of the end of the calendar month next preceding the date of the decedent's death.

## SECTION SIX

## LEGEND ON STOCK CERTIFICATE

No stockholder of the corporation shall sell or offer to sell to a person not a party to this agreement, nor transfer or assign any of his or her right, title or interest in or to any stock owned by the stockholder during the stockholder's lifetime nor shall a stockholder's heirs, personal representatives, successors, or assigns make any such sale or transfer of such shares after the death of any of the stockholders except in accordance with the terms and conditions of this agreement. Certificates of stock subject to this agreement shall be endorsed as follows: "This certificate of stock is subject to a stock purchase agreement between its owners, the issuing corporation, and other stockholders thereof, dated _____, and is transferable only in accordance with the agreement."

## SECTIONS SEVEN

## TERMINATION OF AGREEMENT

This agreement shall terminate and become null and void on the occurrence of any of the following events.

(a)    Cessation of the corporate business or enterprise during the lifetime of the stockholders;

5

(b)     bankruptcy or receivership or dissolution of the corporation;

(c)     Death of the stockholder simultaneously or within a period of Ninety (90) days, one from the other; or

(d)     Mutual agreement of termination executed by all of the stockholders of the corporation and shown in the minute book.

In witness whereof, the parties have executed this agreement at Halifax, MA    the day and year first above written.

_____
Phillip G. Tringali

6

S.E.E., INC.

BALANCE SHEET

As of June 30, 2001 and 2000

ASSETS

|  | | As of Jun. 30, 2001 | As of Jun. 30, 2000 |
|---|---|---|---|
| Current Assets | | | |
| Cash | $ | 133,731 $ | 134,859 |
| Accounts receivable, net | | 379,292 | 337,689 |
| Inventory (notes 1&2) | | 140,694 | 337,781 |
| Prepaid expenses | | 5,300 | 5,105 |
| Prepaid insurance | | 4,726 | 2,744 |
| Prepaid taxes, state | | 4,042 | 1,079 |
| Due from stockholder | | 19,306 | 16,504 |
| TOTAL CURRENT ASSETS | | 687,091 | 835,761 |
| PROPERTY AND EQUIPMENT (notes 1,2&3) | | | |
| Land | | 61,920 | 61,920 |
| Building | | 144,482 | 144,482 |
| Machinery & equipment | | 94,795 | 83,481 |
| Furniture & fixtures | | 11,975 | 11,219 |
| | | 313,172 | 301,102 |
| Less-accumulated depreciation | | ( 96,578) | ( 69,513) |
| NET PROPERTY AND EQUIPMENT | | 216,594 | 231,589 |
| OTHER ASSETS | | | |
| Deposits | | 25,000 | 25,000 |
| TOTAL OTHER ASSETS | | 25,000 | 25,000 |
| TOTAL ASSETS | $ | 928,685 $ | 1,092,350 |

See accompanying notes and accountant's report.

-2-

S.E.E, INC

2949

**Employee ID:** MARTIN     **Employee Name:** Paul Martin     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

| Pay period : 12/29/01 to 01/11/02 | Earnings | | | Taxes | | Deductions & Other Pays | |
|---|---|---|---|---|---|---|---|
| | Type | Hours | Dollars | Type | Dollars | | |
| Gross 4423.08 | Reg | 80.00 | 4423.08 | FWT | 908.40 | BONUSD1 | 0.00 |
| Taxes -1491.33 | OT1 | 0.00 | | OASDI | 274.23 | BCBS-M4 | 0.00 |
| | OT2 | 0.00 | | MED | 64.13 | MEDI-SG | -28.12 |
| Net Pay 2903.63 | Vac | 0.00 | | SWT | 244.57 | SEPIRA1 | 0.00 |
| | Sick | 0.00 | | SDI | 0.00 | | |
| | Hol | 0.00 | | SUI | 0.00 | | |
| | Comm | | | | | | |
| | Gross Pay | | 4423.08 | Total Tax | 1491.33 | | |

| Year-to-Date Earning: | | | | | | Vacation: Earned | 256.47 | Taken | 0.00 |
|---|---|---|---|---|---|---|---|---|---|
| Gross: 4423.08 | FWT | 908.40 | SWT | 244.57 | | Sick Day: Earned | 60.40 | Taken | 0.00 |
| | OASDI | 274.23 | SDI | 0.00 | | | | | |
| | MED | 64.13 | SUI | 0.00 | | | | | |

---

S.E.E, INC

2948

**Employee ID:** LEE     **Employee Name:** Jumi Lee     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

| Pay period : 12/29/01 to 01/11/02 | Earnings | | | Taxes | | Deductions & Other Pays | |
|---|---|---|---|---|---|---|---|
| | Type | Hours | Dollars | Type | Dollars | | |
| Gross 4423.08 | Reg | 80.00 | 4423.08 | FWT | 908.40 | BONUSD1 | 0.00 |
| Taxes -1491.33 | OT1 | 0.00 | | OASDI | 274.23 | OLD1-SG | -28.12 |
| | OT2 | 0.00 | | MED | 64.13 | SEPIRA1 | 0.00 |
| Net Pay 2903.63 | Vac | 0.00 | | SWT | 244.57 | | |
| | Sick | 0.00 | | SDI | 0.00 | | |
| | Hol | 0.00 | | SUI | 0.00 | | |
| | Comm | | | | | | |
| | Gross Pay | | 4423.08 | Total Tax | 1491.33 | | |

| Year-to-Date Earning: | | | | | | Vacation: Earned | 40.85 | Taken | 0.00 |
|---|---|---|---|---|---|---|---|---|---|
| Gross: 4423.08 | FWT | 908.40 | SWT | 244.57 | | Sick Day: Earned | 24.40 | Taken | 0.00 |
| | OASDI | 274.23 | SDI | 0.00 | | | | | |
| | MED | 64.13 | SUI | 0.00 | | | | | |



DAVIS & RUBIN

ATTORNEYS AT LAW

ROGER S DAVIS
JOEL S. RUBIN (1948-1990)

ONE BOWDOIN SQUARE
SUITE 001
BOSTON, MASSACHUSETTS 02114-2910
(617) 742-4700
FACSIMILE (617) 742-4304

**VIA CERTIFIED MAIL RRR
7000 1670 0000 4529 6597**

March 22, 2002

Mr. Phillip G. Tringali, Jr.
Ms. Deborah Bowles
Mr. Timothy Fahey, Directors
and Stockholders of S.E.E., Inc.
48 Leona Drive, Suite D
Middleborough, MA  02346

Re:    Paul Martin and Jumi Lee

To the Directors and Stockholders of S.E.E., Inc.:

Please be advised that I represent Paul Martin and Jumi Lee, stockholders of
S.E.E., Inc.  This is a demand for the directors and/or stockholders to take
action to investigate and remedy matter pertaining to the conduct of business
of the corporation, particularly with respect to its finances, as follows:

1.    The purchase by the corporation of a vacation cottage situated in
Bridgton, Maine.  The use of corporate funds for payment of the purchase price
or part thereof as well as mortgage payments and other expenses relating to
said property.

2.    The use of said property by Mr. Tringali as his personal vacation home
which the corporation has and continues to fund.

3.    The lack of any substantial rental income from said property.

4.    Excessive reimbursement of business expenses paid by the corporation
to Mr. Tringali.

5.    The facts and circumstances with respect to any borrowing of Mr.
Tringali from the corporation.

6.    Whether the corporation has written off or discharged any loans
receivable or notes receivable to any third party.

7.    To the extent of which Mr. Tringali has failed to perform duties for the
corporation, devoting his attention to the purchase of a motel property in
Falmouth, Massachusetts.

Very truly yours,

Roger S  Davis
RSD cat
cc:    Drs. Paul Martin and Jumi Lee



# OPPENHEIM & MAIRE, LLP

Attorneys at Law

IAN S. OPPENHEIM
SUSAN S. MAIRE*

Paralegals
Beth M. Ellis
Barbara A. Parr

*Also admitted in New Hampshire

*Main Office*
313 Plymouth Street
Halifax, MA 02338
Tel (781) 294-8000
Fax. (781) 294-1606
e-mail. o&m@www seniorlaw.n

*Plymouth Office*
(By Appointment Only)
28 Samoset Street
Plymouth, MA 02360

March 26, 2002

Roger S. Davis, Esq.
Davis & Rubin
One Bowdoin Square, Suite 901
Boston, MA 02114-2919

Re:  S.E.E., Inc.

Dear Mr. Davis:

In reply to your letter of dated March 22, 2002, please be advised that the matter will be referred to the Board of Directors of the corporation for a determination by them of the action, if any, to be taken in regard to your clients' demands. You will be advised of the decision of the said Board of Directors with respect to this matter.

Very truly yours,

Susan S. Maire

SSM/pas

cc: S.E.E., Inc.

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS

SUPERIOR COURT DEPARTMENT
CIVIL ACTION NO. 02801

PAUL MARTIN AND JUMI LEE,                    )
INDIVIDUALLY AND AS ASSIGNEES OF             )
OF S.E.E., INC.                              )
      Plaintiffs                             )
                                             )
vs.                                          )
                                             )
PHILLIP TRINGALI,                            )
      Defendants                             )

## DEFENDANT PHILLIP TRINGALI'S ANSWER TO PLAINTIFFS' SECOND SUBSTITUTE SECOND AMENDED COMPLAINT

    1.      Denied

    2.      Denied

    3.      Admitted.

    4.      Denied.

    5.      The defendant has no knowledge of the truth of the allegations contained in

paragraphs 5 and therefore deny same.

    6.      The defendant has no knowledge of the truth of the allegations contained in

paragraphs 5 and therefore deny same.

    7.      Admitted that S.E.E. started an analytical division in 1996 that initially operated

out of Martin's home, otherwise denied.

    8.      Denied.

    9.      Denied that the move was made at the direction of S.E.E., otherwise admitted.

1

10.    Admitted that Martin owns 25,000.00 shares of S.E.E. common stock, otherwise denied.

11.    Admitted that Lee owns 15,000.00 shares of S.E.E. common stock, otherwise denied.

12.    Admitted.

13.    Admitted that property in Bridgton Maine was purchased by S.E.E., Inc., otherwise denied.

14.    Admitted that the mortgage principal, interest and taxes for the Bridgton property were paid by S.E.E., otherwise denied.

15.    Admitted

16.    Denied.

17.    Admitted as to the fiscal years 1999 and 2000, otherwise denied.

18.    Admitted that Lee was the person in charge of the finances and accounting system of S.E.E. during 2001 and 2002, otherwise denied.

19.    Denied.

20.    Denied.

21.    Denied

22.    Admitted.

23.    Admitted.

24.    The document speaks for itself, otherwise denied.

25.    Admitted as to the book value as of June 30, 2001, otherwise denied.

26.    Denied.

2

27.    Denied.

28.    Denied.

29.    Denied.

30.    Denied.

31.    The document speaks for itself.

32.    No response required.

33.    Admitted

34.    The document speaks for itself, otherwise denied.

35.    Denied.

36.    Admitted that Tringali owns 70% of S.E.E. stock, otherwise denied.

37.    Admitted.

38.    Admitted.

39.    Admitted.

40.    Admitted.

41.    No response required.

42.    Paragraphs 1 through 41 of this answer are incorporated herein by reference.

43.    The statute speaks for itself, otherwise denied.

44.    Admitted that plaintiffs sought to inspect the articles of organization, by-laws,

records of stockholder meetings and stock transfer records, otherwise denied.

45.    Denied.

46.    denied.

47.    No response required.

3

48.   Paragraphs 1 through 47 of this answer are incorporated herein by reference

herein..

49.   States a legal conclusion to which no answer is required.

50.   Denied.

51.   Denied.

52.   Paragraphs 1 through 51 of this answer are incorporated herein by reference

herein.

53.   States a legal conclusion to which no answer is required.

54.   Denied.

55.   Denied.

56.   Paragraphs 1 through 55 of this answer are incorporated herein by reference

herein

57_   States a legal conclusion to which no answer is required.

58.   Denied.

59.   Paragraphs 1 through 58 of this answer are incorporated herein by reference.

60.   Denied.

61.   Denied.

62.   Denied.

63.   No response required.

64.   Paragraphs 1 through 62 of this answer are incorporated herein by reference.

65.   Denied.

66.   Denied.

4

67.    Denied.

68.    Paragraphs 1 through 67 of this answer are incorporated herein by reference.

69.    No response required.

70.    The statute speaks for itself.

71.    The statute speaks for itself.

72.    Defendant admits that he was the president of S.E.E., otherwise, calls for a legal
conclusion to which no response is required.

73.    Denied.

74.    The statute speaks for itself.

75.    Denied.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

The plaintiffs' complaint fails to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

Some or all of the plaintiffs' claims are barred by the applicable statutes of limitation.

### THIRD AFFIRMATIVE DEFENSE

Some or all of the plaintiffs' claims are barred by laches.

### FOURTH AFFIRMATIVE DEFENSE

The plaintiffs' claims are barred by their own unclean hands.

### FIFTH AFFIRMATIVE DEFENSE

The plaintiffs are estopped from recovering upon their claims by their own bad-faith and
disloyal conduct.

### SIXTH AFFIRMATIVE DEFENSE

The plaintiffs are barred from recovering on their contract claims by their own breach of

contract and/or obligations of good faith and fair dealing..

### SEVENTH AFFIRMATIVE DEFENSE

The plaintiffs' claims are barred  by their failure to exhaust their administrative remedies.

### EIGHT AFFIRMATIVE DEFENSE

The plaintiffs are barred from recovering due to their failure to mitigate damages.

### NINTH AFFIRMATIVE DEFENSE

The plaintiffs' claims are barred by waiver and\or release.

### TENTH AFFIRMATIVE DEFENSE

The plaintiffs' claims are barred by accord and satisfaction.

### ELEVENTH AFFIRMATIVE DEFENSE

Plaintiffs alleged injuries or damages were caused in whole or in part by the violation by

the plaintiffs, their servants or agents, of the various statutes, ordinances and regulations

governing the conduct of the parties at the time the injuries or damage were received.

### TWELFTH AFFIRMATIVE DEFENSE

Plaintiffs are barred from recovery on some or all of its claims by a novation.

### THIRTEENTH AFFIRMATIVE DEFENSE

Any claims of monies owed to plaintiffs must be set off against extra damages caused by

plaintiffs' conduct.

### FOURTEENTH AFFIRMATIVE DEFENSE.

All of plaintiffs' claims sounding in contract are barred for lack of consideration.

6

### FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiffs are barred from recovering on their claims because of their ratification of the conduct alleged in their complaint.

### SIXTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claim of damages in claims assigned to them by S.E.E., Inc. must be set off or reduced proportionally according to defendant's interest in S.E.E., Inc.

### SEVENTEENTH AFFIRMATIVE DEFENSE*

Plaintiffs' claims are barred due to improper venue.

### EIGHTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred by fraud.

### NINETEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred by the business judgment rule.

WHEREFORE  defendant Phillip Tringali requests that  that plaintiffs' claims be dismissed, and that he be awarded his fees and costs incurred defending this action.

RESPECTFULLY SUBMITTED
Defendant, Phillip Tringali
By his attorneys

Date    1\ 15 \06

Jeffrey J. Phillips, Esq.
B.B.O. #398480
Daniel Treger, Esq.
B.B.O. #562147
Phillips & Angley
One Bowdoin Square
Boston, MA 02114
Tel. No.: (617) 367-8787

L:\LITG\trng002\secondamendedans.wpd

7

# DAVIS & RUBIN

### ATTORNEYS AT LAW

ROGER S. DAVIS
JOEL S. RUBIN (1948-1991)

ONE BOWDOIN SQUARE
SUITE 901
BOSTON, MASSACHUSETTS 02114-2919
(617) 742-4300
FACSIMILE (617) 742-4304

## VIA FACSIMILE
## 617-227-8992

May 16, 2005

Daniel Treger, Esq.
Phillips & Angley
One Bowdoin Square
Boston, MA 02114

Re:     Paul Martin, et al
Vs:     S.E.E., Inc., et al
No:     NOCV2002-00801

Dear Mr. Treger:

In advance of the depositions which you have scheduled for Paul Martin and
Jumi Lee on May 24-25, 2005, I am enclosing herewith a Confidentiality
Stipulation. In the event that the depositions of Martin and Lee may result in
revealing of confidential or proprietary information, I have prepared a
Confidentiality Stipulation for your review. I will ask you to sign the
Stipulation and if your client is present to sign the Exhibit "A." Please advise.

Very truly yours,

Roger S. Davis

RSD:cat
Enclosure

QDJ9:MARTIN:DT

Paul Martin 5-24-2005
Paul Martin, et al. v. S.E.E., Inc., et al.

1          COMMONWEALTH OF MASSACHUSETTS

2    NORFOLK, SS.                    SUPERIOR COURT

3                                    C.A. NO. 02-801

4    --------------------------------x

5    PAUL MARTIN and JUMI LEE,

6    Individually and as Stockholders

7    on Behalf of S.E.E., Inc.,

8                        Plaintiffs

9         vs.

10   S.E.E., INC., and PHILLIP

11   TRINGALI,

12                        Defendants

13   --------------------------------x

14        DEPOSITION OF PAUL MARTIN, a witness

15   called on behalf of the Defendant Phillip

16   Tringali, taken pursuant to the

17   Massachusetts Rules of Civil Procedure,

18   before Deborah G. Rumson, Registered

19   Professional Reporter and Notary Public, in

20   and for the Commonwealth of Massachusetts,

21   at the Offices of Phillips & Angley, One

22   Bowdoin Square, Boston, Massachusetts, on

23   Tuesday, May 24, 2005, commencing at 10:25

24   a.m.

O'Brien & Levine Court Reporting Services
888.825.DEPO(3376) * www.court-reporting.com

Paul Martin 5-24-2005
Paul Martin, et al. v. S.E.E., Inc., et al.

| 2 | |
|---|---|
| 1 | A P P E A R A N C E S |
| 2 | ROGER S. DAVIS, ESQUIRE |
| 3 | Davis & Rubin |
| 4 | One Bowdoin Square |
| 5 | Boston, MA 02114-2919 |
| 6 | (617) 742-4300 |
| 7 | Counsel for the Plaintiffs |
| 8 | |
| 9 | DANIEL TREGER, ESQUIRE |
| 10 | Phillips & Angley |
| 11 | One Bowdoin Square |
| 12 | Boston, MA 02114 |
| 13 | (617) 367-8787 |
| 14 | Counsel for the Defendant |
| 15 | Phillip Tringali |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

| 4 | | |
|---|---|---|
| 1 | 9 | Mutual confidentiality agreement  96 |
| 2 | 10 | Mutual confidentiality agreement  98 |
| 3 | 11 | Letter to Mr. Tringali from |
| 4 | | Attorney Davis dated 2/19/02    113 |
| 5 | 12 | Agreement between corporation |
| 6 | | and stockholders restricting |
| 7 | | transfer of shares           114 |
| 8 | 13 | Letter to the Directors and |
| 9 | | Shareholders from Attorney |
| 10 | | Rubin dated 3/22/02          117 |
| 11 | 14 | Special directors' meeting      120 |
| 12 | 15 | Special directors' meeting      122 |
| 13 | 16 | Employee handbook           135 |
| 14 | 17 | Pay invoices                138 |
| 15 | 18 | Proof of claim              145 |
| 16 | | |
| 17 | | |
| 18 | | (Exhibits retained by Attorney Treger) |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |

| 3 | | |
|---|---|---|
| 1 | I N D E X | |
| 2 | WITNESS | EXAMINATION |
| 3 | | |
| 4 | PAUL MARTIN | |
| 5 | (By Mr. Treger) | 5 |
| 6 | | 172 |
| 7 | (By Mr. Davis) | 171 |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | E X H I B I T S | |
| 13 | NO. | PAGE |
| 14 | | |
| 15 | 1 Agreement of confidentiality   6 | |
| 16 | 2 Memo to Mr. Tringali and Dr. Lee 59 | |
| 17 | 3 Memo to Mr. Tringali and Dr. Lee | |
| 18 | 4 Maximus project budget       72 | |
| 19 | 5 S.E.E. Inc. detail master parts | |
| 20 | list          84 | |
| 21 | 6 Memo to Directors from Dr. Martin | |
| 22 | 7 Letter to Mr. Bartko from | |
| 23 | Dr. Martin           91 | |
| 24 | 8 Costs related to interviews    93 | |

| 5 | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | PAUL MARTIN, having been |
| 3 | satisfactorily identified by the production |
| 4 | of his driver's license and duly sworn by |
| 5 | the Notary Public, was examined and |
| 6 | testified as follows in answer to direct |
| 7 | interrogatories: |
| 8 | |
| 9 | EXAMINATION BY MR. TREGER: |
| 10 | |
| 11 | Q.  Good morning, Mr. Martin.  My name is Dan |
| 12 | Treger.  I represent Mr. Tringali, |
| 13 | individually, not as to either corporation, |
| 14 | in the Norfolk Superior Court action, which |
| 15 | we are here for today. |
| 16 | Before we go any further, I will |
| 17 | enter as the first exhibit this agreement of |
| 18 | confidentiality dated July 24, 2002.  This |
| 19 | was originally filed to apply to two disks |
| 20 | containing information called "trial |
| 21 | balance."  This will serve as a stipulation |
| 22 | that all information, to the extent it is |
| 23 | proprietary, will be treated as confidential |
| 24 | pursuant to this agreement. |

2 (Pages 2 to 5)

Paul Martin 5-24-2005
Paul Martin, et al. v. S.E.E., Inc., et al.

6

1        Just for the sake of clarification,
2   if there is any question as to whether
3   something is proprietary or not, any party
4   can designate it as proprietary by just
5   saying "proprietary," that would be
6   understood to reference this agreement.
7        MR. DAVIS:  I don't believe they
8   are going to reach that issue in any event.
9        MR. TREGER:  Just for
10  clarification.
11  (Document marked as Exhibit 1 for
12  identification)
13       MR. DAVIS:  Did you indicate that
14  you represented S.E.E.?
15       MR. TREGER:  Not S.E.E.  I do not.
16  I specifically do not represent S.E.E.
17       THE WITNESS:  What's the scope of
18  this confidentiality agreement?
19       MR. TREGER:  It was specifically
20  intended to apply to those two disks.  But
21  for the purposes of this action will apply
22  to anything that the parties designate as
23  proprietary.
24       MR. DAVIS:  Well, you're entitled

7

1   to say what you want, but I am not agreeing
2   to anything.  Don't take my silence or lack
3   of reply as to agreeing to that.
4        That document speaks for itself,
5   and the sole purpose of that is what it
6   states on that.
7        MR. TREGER:  I was under the
8   impression that we were going to stipulate
9   that all information --
10       MR. DAVIS:  I don't believe we are
11  going to reach that point, but you can
12  proceed with the deposition.
13       MR. TREGER:  So you are not
14  agreeing to it?
15       MR. DAVIS:  That document speaks
16  for itself.  If we get to the point of any
17  confidential information becoming the
18  subject of this deposition, then I will
19  address that then.
20       MR. TREGER:  Okay.
21  Q.  Mr. Martin, have you had your deposition
22      taken before?
23  A.  No.
24  Q.  I will give you a quick explanation of the

8

1   rules.  If you don't understand anything,
2   just ask.
3        I am going to ask you a series of
4   questions that you have to answer under
5   oath.  The stenographer has to try to take
6   everything down, so it is important that we
7   not speak over each other.  So I am going to
8   ask that you wait until I finish asking the
9   question before you answer, and I will try
10  to wait until you finish your answer before
11  I ask the next question.
12       If at any time you don't understand
13  a question, just let me know, and I will
14  rephrase it.  If you would like to take a
15  break or speak to your attorney, just let me
16  know.
17       MR. TREGER:  Usual stipulations?
18       MR. DAVIS:  Well, not in this case.
19  The usual stipulations, I am not going to
20  waive all objections based upon the fact
21  that this deposition may be limited to the
22  scope.  So I reserve the right to object if
23  the deposition goes beyond the scope of what
24  I think it should be.

9

1        MR. TREGER:  Do you intend to move
2   for protective order in that case?
3        MR. DAVIS:  No.  You represent Mr.
4   Tringali, and there are only two counts in
5   this complaint that are pending.  That's
6   Counts 5 and 6.  All of the other counts
7   have been stayed.
8        MR. TREGER:  Nevertheless in your
9   deposition, you went beyond the scope.
10       MR. DAVIS:  You didn't point that
11  out at that point.  Maybe we both overlooked
12  that.
13       But when yu sent me this letter,
14  and I will refer to the letter of May 11, in
15  which you say that "I am in receipt of your
16  letter of May 6, 2005.  After review of your
17  letter, I am unable to determine how the
18  documents you have requested relate to your
19  client's claims against Mr. Tringali
20  individually, rather they appear to be
21  related to the shareholders' derivative suit
22  and cease counterclaim both of which are
23  subject to the automatic stay in
24  bankruptcy."

3 (Pages 6 to 9)

Paul Martin 5-24-2005
Paul Martin, et al. v. S.E.E., Inc., et al.

| 10 | | 12 | |
|---|---|---|---|
| 1 | I don't think either one of us were | 1 | A. Two companies, Quantum Dynamics |
| 2 | aware of that at the time of the deposition | 2 | International and CRAIC Technologies. |
| 3 | previously. If you had pointed that out to | 3 | Q. And what is Quantum Dynamics International? |
| 4 | me, the deposition of Mr. Tringali may well | 4 | A. It is a representatives company and a |
| 5 | have been limited. I don't know. Although, | 5 | consulting company. |
| 6 | he appeared as the president of S.E.E. in my | 6 | Q. What do you mean by "representatives |
| 7 | deposition. | 7 | company"? |
| 8 | MR. TREGER: He appeared -- | 8 | A. As in selling other people's manufactured |
| 9 | MR. DAVIS: He is or was the | 9 | goods. |
| 10 | president of S.E.E. and filed some | 10 | Q. They don't manufacture goods? |
| 11 | counterclaim. | 11 | A. No. |
| 12 | I suppose you could have raised | 12 | Q. Whose goods do they sell? |
| 13 | this point at the deposition of Mr. | 13 | A. CRAIC Technologies. |
| 14 | Tringali, and we would dealt with it then. | 14 | Q. And what is your position with QDI? |
| 15 | But now that you have raised it in the | 15 | A. Managing partner. It is an LLC. |
| 16 | letter of May 11, I am compelled to suggest | 16 | Q. And is that still incorporated in |
| 17 | that your deposition today should be limited | 17 | Massachusetts? |
| 18 | to Counts 5 and 6. | 18 | A. It is not a corporation. |
| 19 | MR. TREGER: Well, then I may | 19 | Q. Organized? |
| 20 | become compelled to go to court and seek | 20 | A. Organized. |
| 21 | sanctions against you for violating the | 21 | Q. Are there any other employees? |
| 22 | automatic stay. | 22 | A. Yes. |
| 23 | MR. DAVIS: Well, we can do that. | 23 | Q. And who are those employees? |
| 24 | Q. Now, Mr. Martin, first of all, where do you | 24 | A. Dr. Jumi Lee. |

| 11 | | 13 | |
|---|---|---|---|
| 1 | live? | 1 | Q. What's her position? |
| 2 | A. Exact address? | 2 | A. Manager. |
| 3 | Q. Yes. | 3 | Q. And with respect to QDI, what are your |
| 4 | A. 255 South Grand Avenue, Los Angeles, | 4 | duties with respect to its business? |
| 5 | California. | 5 | A. Consulting, training. |
| 6 | Q. And who do you live there with? | 6 | Q. And what's the subject of the training you |
| 7 | A. My wife, Dr. Jumi Lee. | 7 | offer? |
| 8 | Q. How old are you? | 8 | A. Forensic science. |
| 9 | A. 40. | 9 | Q. What specific subfield or subarea of |
| 10 | Q. And can you briefly go through your | 10 | forensic science? |
| 11 | educational background for me. | 11 | A. Trace evidence, question documents. |
| 12 | A. Beyond graduating high school, went to | 12 | Q. Is this training specifically related to the |
| 13 | University of Washington, where I got a | 13 | products that -- does QDI sell products as |
| 14 | bachelor of science in chemistry. | 14 | well? |
| 15 | Q. When was that? | 15 | A. It did. It no longer does. |
| 16 | A. Graduated 1988 with a bachelor of science, | 16 | Q. It just does consulting? |
| 17 | 1987, excuse me, graduated 1988 with my | 17 | A. Yes. |
| 18 | master's of science in inorganic chemistry, | 18 | Q. When you say "consulting," what exact |
| 19 | and then went to Carnegie-Mellon University | 19 | activities does that entail? |
| 20 | and received my doctorate in biophysical | 20 | A. Training at this point and advice. |
| 21 | chemistry in 1994. | 21 | Q. Training. And any programming? |
| 22 | Q. Are you currently employed? | 22 | A. No. |
| 23 | A. Yes. | 23 | Q. Is that advice as how to use specific |
| 24 | Q. Where are you employed? | 24 | equipment? |

4 (Pages 10 to 13)

Paul Martin 5-24-2005
Paul Martin, et al. v. S.E.E., Inc., et al.

14

1    A.   At times.
2    Q.   Does QDI act as an expert?  Does it offer
3         expert witnesses services?
4    A.   No.
5    Q.   And QDI's customers, are they limited to the
6         New England area?
7    A.   No.
8    Q.   And what is your position with CRAIC?
9    A.   President and manager.
10   Q.   Is that a corporation or a LLC?
11   A.   LLC.
12   Q.   And are there other officers?
13   A.   Yes.
14   Q.   Who are they, the officers?
15   A.   Dr. Jumi Lee.
16   Q.   And what does she do?  What position does
17        she hold?
18   A.   Vice-president and manager.
19   Q.   Are there any other officers?
20   A.   No.
21   Q.   How many employees does CRAIC have?
22        THE WITNESS:  Would that be
23   considered confidential?
24        MR. DAVIS:  No.

15

1    A.   We have six.
2    Q.   Who are they?
3    A.   Who?
4    Q.   Yes.
5         MR. DAVIS:  You can give that
6    answer.
7    A.   Dr. Jumi Lee, myself, Sy Yamaguchi, Jim
8    Thorne.  Susan, what is her last name?  I
9    don't remember her last name.  Susan and
10   Mark.  I can't pronounce Mark's last name.
11   Q.   And what is CRAIC's business?
12   A.   Manufacturing of scientific equipment.
13   Q.   What kind of scientific equipment does it
14   manufacture?
15   A.   At this point in time, it manufactures
16   microspectrophotometers.
17   Q.   And when you say "manufacture," can you
18   tell me what -- do they actually have a
19   manufacturing facility?
20   A.   Yes.
21   Q.   And what are your duties besides management?
22   What are your duties at CRAIC?
23   A.   Sales, marketing, training, if needed on our
24   equipment.

16

1    Q.   And Dr. Lee, what are her duties?
2    A.   Basically, daily operations, as well as R&D.
3    Q.   Mr. Yamaguchi's duties?
4    A.   Ms.
5    Q.   Ms.
6    A.   Shipping, HR, basically, and my assistant.
7    Q.   And Jim Thorne?
8    A.   Applications.
9    Q.   Is he an engineer?
10   A.   Yes.
11   Q.   And Susan?
12   A.   Susan, office management.
13   Q.   And Mark?
14   A.   Mark, he is an assembler.
15   Q.   And you graduated from Carnegie-Mellon in
16   1994.  Can you give me a brief history of
17   your employment from 1994 through 1997.
18   A.   Yes.  In 1994 to 1996, I worked at
19   Nanometrics, and then I joined S.E.E. in
20   1996.
21   Q.   And what was your position at Nanometrics?
22   A.   Product manager.
23   Q.   And what were your duties as project
24   manager?

17

1    A.   Product.
2    Q.   Product manager?
3    A.   Would be involved, basically, many hats.
4    Applications development.  The company was
5    also focused on, or at least my portion of
6    the company was focused on forensics.
7         We also did some semiconductors,
8    though, that was handled mainly by other
9    people.  Development of new products,
10   development of new applications, sales,
11   marketing.
12   Q.   Had you had experience in the field of
13   microspectrophotometry prior to 1994?
14   A.   Not for microspectrophotometry, but for
15   spectrophotometry of different types, yes, I
16   had.
17   Q.   What was your dissertation in?
18   A.   Residence Raman spectroscopy of
19   photosynthetic bacteria.
20   Q.   And when you say you were the product
21   manager, were you the head or part of the
22   organization concerned with
23   microspectrophotometry or just the part --
24   A.   Scientific microspectrophotometry.

5 (Pages 14 to 17)

Paul Martin 5-24-2005
Paul Martin, et al. v. S.E.E., Inc., et al.

170

1  recall the identity of every other file on
2  there.
3  Q. Did you need a password and a user name to
4     get access to the network server?
5  A. I don't recall.
6  Q. And were the doors always kept locked at the
7     facility?
8  A. Which doors?
9  Q. The doors to the manufacturing portion.
10 A. I don't know. I don't recall.
11 Q. And you were the administrator of the ACT
12    software. You were designated as the
13    administrator?
14 A. Not officially.
15 Q. With respect to the one person who can
16    change the settings. They say, "Do you want
17    to be the administrator."
18 A. Everybody could change the settings.
19 Q. And Dr. Lee was the administrator of the
20    BusinessWorks program; is that correct?
21 A. One of them. The other two were Mr.
22    Tringali and myself.
23 Q. And did you have full access to everything
24    in the BusinessWorks program?

171

1  A. Yes.
2  Q. Did Mr. Tringali?
3  A. Yes.
4         MR. TREGER: I think that's all I
5     have.
6
7     EXAMINATION BY MR. DAVIS:
8
9  Q. Mr. Tringali asked you whether you had
10    copied, I think, the S.E.E. database onto
11    your laptop. I think you answered you did.
12    Did you erase that?
13 A. Yes, I did.
14 Q. When did you erase that?
15 A. January 11, 2002.
16 Q. What did you erase?
17 A. The S.E.E. database and any S.E.E. files.
18 Q. One other question. Did you also turn over
19    the passwords to --
20 A. Yes, I did.
21 Q. When was that?
22 A. January 9, 2002.
23        MR. DAVIS: That's all.
24

172

1         EXAMINATION BY MR. TREGER:
2
3  Q. How long were you out of work before you
4     started working at Quantum Dynamics?
5         MR. DAVIS: Wait a minute. I just
6     gave him a redirect. You are entitled to
7     ask him cross on my redirect. If you are
8     going into a whole line of questioning about
9     Quantum Dynamics, I am objecting that that's
10    irrelevant. You don't have any standing. I
11    am instructing him not to answer.
12        MR. TREGER: Very good. To the
13    extent I am going to object to that, based
14    on your conduct of the deposition, I will
15    suspend. Otherwise, it is completed.
16        (Whereupon the deposition was
17        adjourned at 4:26 p.m.)
18
19
20
21
22
23
24

173

1  COMMONWEALTH OF MASSACHUSETTS    ESSEX, SS.
2
3      I, Deborah G. Rumson, Registered
4  Professional Reporter and Notary Public in
5  and for the Commonwealth of Massachusetts,
6  do hereby certify that pursuant to
7  appropriate notice of taking deposition,
8  there came before me the following-named
9  person, to wit: PAUL MARTIN, who was by me
10 duly sworn; that he was thereupon examined
11 upon his oath and his examination reduced to
12 writing by me; and that the deposition is a
13 true record of the testimony given by the
14 witness.
15     IN WITNESS WHEREOF, I have hereunto
16 set my hand and seal this     day of
17 , 2005.
18
19
20 My commission expires:
21 December 15, 2006
22
23        Notary Public
24

1

2

3     COMMONWEALTH OF MASSACHUSETTS

NORFOLK COUNTY, SS.              SUPERIOR COURT

4

5

* * * * * * * * * * * * * * * * * * * * * * * * *

6                              *

PAUL MARTIN and JUMI LEE,    *

7  Individually and as         *

Stockholders on behalf of    *      No. 02-801

8  S.E.E, Inc.                   *

                           *

9                             *

                           *

10     vs.                   *

                           *

11                           *

S.E.E., INC. and PHILLIP     *

12  TRINGALI                  *

                           *

13  * * * * * * * * * * * * * * *

14

15

16

17          Deposition of JUMI LEE taken under the

18  applicable provisions of the Massachusetts Rules of

19  Civil Procedure by Lynda C. Vetter, Registered

20  Professional Court Reporter and Notary Public of the

21  State of Massachusetts, taken at the law offices of

22  Phillips & Angley, One Bowdoin Square, Boston,

23  Massachusetts, on Wednesday, May 25, 2005, commencing

24  at 10:14 a.m.

Case 1:04-cv-12708-MLW     Document 46-9     Filed 03/20/2006     Page 2 of 4

Lynda C. Vetter  1-15078

(617) 399-0130  888.825.DEPO(3376)
Boston, MA 02109
195 State Street

mail@court-reporting.com
www.court-reporting.com

# May 25, 2005

## Jumi Lee

Transcript of the Testimony of:

# Paul Martin, et al. v. S.E.E., Inc., et al.

YOUR BOSTON CONNECTION...WORLDWIDE



Court Reporting Services

# O'BRIEN&LEVINE

**122**

```
1      Q. Do you recall why that happened?
2      A. No, I don't recall.
3      Q. You don't recall?
4      A. No. The only thing that I remember is
5      a bad time.
6          MR. TREGER: I'm going to enter the
7      next exhibit as what was entered as Exhibit 9 in
8      Mr. Martin's deposition.
9          (Lee Exhibit No. 13 was marked for
10     identification.)
11         MR. TREGER: For the record, this is a
12     document entitled "mutual confidentiality agreement."
13     This is both Exhibit 9 and 10.
14     Q. Do you recognize that document? Are
15     those two documents?
16     A. I recognize first document. I don't
17     recognize second document.
18     Q. What was the first document?
19     A. Mutual confidentiality agreement.
20     Q. Did you draft that agreement?
21     A. No.
22     Q. Do you know where that agreement came
23     from?
24     A. I believe it was Mr. Martin.
```

**123**

```
1      Q. Do you know why that agreement was
2         entered into?
3      A. Why?
4      Q. Yes.
5      A. Because we do not want Mullima to
6      discuss our company information with Filmetrics.
7      Q. Filmetrics was what?
8      A. That's a semi-conductor company.
9      Q. Okay.
10     A. That's my best recollection.
11     Q. And isn't it true that you also
12     designed the head assembly of your instruments to be
13     tamper-proof so that people couldn't take them apart?
14     A. Wasn't successful.
15     Q. But it's something you tried to do.
16     correct?
17     A. Tamper-proof, yes.
18     Q. And why was that?
19     A. Basically we do not want customer to
20     take them apart and start meddling.
21     Q. Why was it unsuccessful?
22     A. Because design failure people can
23     wiggle out.
24     Q. You wanted to do that to keep people
```

**124**

```
1      from copying your design, correct?
2      A. I did not have that much attention. I
3      didn't think anybody would be interested in it.
4      Q. You were still trying to solve that
5      problem almost up until the time you left, correct?
6      A. Not particularly on my high priority
7      list. I don't recall.
8          MR. TREGER: The last exhibit, it's a
9      purchase order from SEE, Inc. to Dynamic Light
10     Control dated 12-18-01.
11         (Lee Exhibit No. 14 was marked for
12     identification.)
13     Q. Do you recognize that?
14     A. I don't remember but I remember
15     having -- I don't remember.
16     Q. Okay. Do you know who issued the
17     purchase order?
18     A. It says JL.
19     Q. That refers to you?
20     A. Yes.
21     Q. You have no recollection of issuing a
22     purchase order to have them fix the cover and make it
23     tamper-proof?
24     A. Not really.
```

**125**

```
1          MR. TREGER: That's all I have. I'm
2      going to suspend the deposition to the extent I may
3      choose to compel on the basis the objection made in
4      Mr. Martin's deposition is improper.
5          MR. DAVIS: I have no questions.
6          (Deposition concluded at 3:07 p.m.)
```

Juni Lee 5-25-2005
Paul Martin et al. v. S.E.E., Inc., et al.

2

APPEARANCES

For the Plaintiffs: DAVIS & RUBIN
One Bowdoin Square
Boston, MA 02114
By: Roger S. Davis, Esq.

For the Defendants: Phillips & Angley
One Bowdoin Square
Boston, MA 02114
By: Daniel Treger, Esq.

Also Present: Paul Martin

3

1    I N D E X
2
3    WITNESS                                    —
4    JUMI LEE
5    EXAMINATION                              Page
6    By Mr. Treger                              4
7
8    EXHIBITS FOR IDENTIFICATION
9
10   Number                                  Page
11   1   Memo ............................ 53
12   2   7/12/02 memo .................... 73
13   3   7/12/02 memo .................... 75
14   4   Lakimax budget document ......... 76
15   5   1-22-03 document ................ 77
16   6   9-4-01 document ................. 82
17   7   1-9-02 document ................. 85
18   8   2-19-02 document ................ 93
19   9   Novipaid listing document ....... 94
20   10  Employee handbook ............... 104
21   11  3-22-02 document ................ 106
22   12  Balance sheet ................... 112
23   13  Mutual confidentiality agreement  122
24   14  Purchase order .................. 124
     Exhibits retained by Mr. Treger.

4

1    JUMI LEE,
2    Having been duly sworn and identified
3    with a California driver's license, was
4    deposed and testified as follows:
5    EXAMINATION
6    BY MR. TREGER:
7    Q.   Good morning. My name is Dan Treger
8    representing Mr. Tringali individually but not the
9    corporation SEE in this matter. Yesterday we went
10   over some basic ground rules. Do you want to go over
11   them again?
12   A.   I am fine with that. Thank you.
13        MR. TREGER: Regular stipulations
14   except for whatever objections you have to the
15   subject matter?
16        MR. DAVIS: The same statement I put on
17   the record yesterday.
18        MR. TREGER: We had not discussed
19   reading and signing, waive notary?
20        MR. DAVIS: Waive notary.
21   Q.   Can you tell me your name, please.
22   A.   First name Jumi, J-U-M-I, last name
23   Lee, L-E-E. I am generally known by the name JU M,
24   last name Lee, L-E-E. Two names.

5

1    Q.   And where do you live?
2    A.   255 South Grand Avenue, Los Angeles.
3    Q.   Are you employed?
4    A.   Yes.
5    Q.   And who is your employer?
6    A.   QDI and CRAIC Technologies.
7    Q.   What is your position with QDI?
8    A.   Manager.
9    Q.   And what kind of company is QDI?
10   A.   Consulting company, real estate
11   company.
12   Q.   And what type of consulting services
13   does it offer?
14   A.   Training.
15   Q.   What kind of training?
16   A.   Forensic science.
17   Q.   And what kind of work of real estate?
18   A.   Purchasing real estate.
19   Q.   Does it presently hold any real estate?
20   A.   No.
21   Q.   Has it ever?
22   A.   No.
23   Q.   And what are your day-to-day duties for
24   QDI?

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS                                    SUPERIOR COURT
                                               C.A. NO. 02-801

PAUL MARTIN and JUMI LEE,               )
Individually and as Stockholders on     )
behalf of S.E.E., INC.                  )
        Plaintiffs                      )
                                        )
V.                                      )
                                        )
S.E.E., INC. and PHILLIP TRINGALI       )
        Defendants                      )

### PLAINTIFFS' SECOND MOTION TO COMPEL
### DEPOSITION OF PHILLIP TRINGALI

The plaintiffs, Paul Martin ("Martin") and Jumi Lee ("Lee"), hereby move

for an order to compel the deposition of the defendant, Phillip Tringali

("Tringali").

## I.    Prior Proceedings In This Court

1.   . This action was initially filed by the plaintiffs in Norfolk Superior Court

on May 14, 2002, in the nature of a stockholder's derivative action, as well as

claims against Tringali individually, a wage claim under c.149 §150 and claim

for breach of contract.

2.   The two of the counts which set forth causes of action against Tringali

individually are as follows:

> Count VI – for breach of the contract to repurchase the
>         plaintiffs' stock
>
> Count VII – pursuant to c.149 §150, that Tringali as
>         president of S.E.E. was personally liable
>         for failure to pay salary and commissions

4.   On May 22, 2003, the defendant S.E.E. filed a petition in the U.S.

Bankruptcy Court, pursuant to Chapter 11, for reorganization.

5.   On December 11, 2003, the U.S. Bankruptcy Court entered an order

abstaining from the entire reorganization petition, which order effectively

dismissed the Chapter 11 filing and also effectively remanded this case back to the Norfolk Superior Court.

6.    On April 12, 2004, the plaintiffs filed a motion to compel Tringali's deposition, which was opposed by the defendants, claiming that the action in question is a derivative action.

7.    Judge Hely, on April 27, 2004, issued an order denying the motion for the following reasons:

> The amended complaint describes the claims as a derivative action. For this reason, the action is treated as an asset of the S.E.E., Inc. bankruptcy estate for purposes of the present motion.

In order to clarify that Counts VI and VII are not assets of the bankrupt S.E.E., Inc., but are actions against Tringali individually, Martin and Lee have filed a motion in the Bankruptcy Court, which has now ruled upon that, as will be discussed hereinbelow. Based upon that ruling, Martin and Lee have now refiled this Motion to compel the deposition of Tringali.

## II.    Argument   Counts VI And VII Are Not Derivative Claims, But Are Claims Against Tringali.

1.    Count VI Is For Breach Of Contract Against Tringali.

Count VI was brought for breach of contract against Tringali, and is based upon the allegations in Paragraph 27 as follows:

> 27.    Notwithstanding the provisions of the Agreement of December 4, 1996, on or about January 11, 2002, Martin and Lee entered into an agreement wherein Tringali and/or S.E.E. agreed to purchase all of Martin and Lee's stock for $200,000. Tringali and S.E.E. have also refused to perform the agreement of January 11, 2002. (emphasis added)

Based upon the allegations in Paragraph 27, Count VI therefore alleges that Tringali breached the stock purchase agreement, which are the claims set forth in Paragraphs 58 and 59:

> 58.    The defendants have breached the agreement to purchase the plaintiffs' stock as set forth in the Agreement of December 4, 1996.

2

> 59.    Furthermore, the defendants have breached the
> agreement for the repurchase of the plaintiffs' stock in
> accordance with the agreement of the parties of
> January 11, 2002.

It is therefore clear that Count VI, which includes Tringali individually, is
an action against him for his breach of the agreement to repurchase the
plaintiffs' stock and this is not a derivative claim.

    2.   <u>Count VII Is A Claim Against Tringali Individually Under G.L. c.149
§150.</u>

With respect to Count VII it is clearly not a derivative count as it is
brought under Massachusetts G.L. c.149 §150 for violation of §148.

This claim arises from the failure to pay to the plaintiffs wages which
include payments for compensation for vacations and commissions.  Chapter
149 §148, fifth paragraph, renders the president and treasurer individually
liable for violations of the wage statute, and this is as set forth in Paragraphs
64 and 65 of the amended complaint

> 64.    Furthermore, c.149 §148 (fifth paragraph), also
> provides in pertinent part as follows:
>
> > The president and treasurer of a
> > corporation and any officers or agents
> > having the management of such
> > corporation shall be deemed to be the
> > employers of the employees of the
> > corporation within the meaning of this
> > section.
>
> 65.    At all times relevant hereto Tringali was
> the president of the employer S.E.E. and
> therefore, he is deemed to be the employer
> within the meaning of c.149 §148.

14.    Therefore, since Tringali can be held personally liable as an officer of
S.E.E., pursuant to c.149 §148, this is clearly not a derivative action.

## III.    <u>Proceedings In The Bankruptcy Court</u>

In order to clarify that the defendant Tringali is not subject to an
automatic stay and to proceed with his deposition, the plaintiffs filed a motion

3

in the U.S. Bankruptcy Court on September 30, 2004 (a copy of that motion without the voluminous exhibits is attached hereto as Exhibit "A").

In their motion, the plaintiff requested that the Bankruptcy Court enter the grant the following relief as set forth in Prayer (1):

> (1)     That this court enter an order granting relief from the automatic stay or in the alternative find that the automatic stay does not apply to the claims of Martin and Lee against Tringali individually pending in the Norfolk Superior Court, pursuant to Counts VI and VII of the Amended Verified Complaint and that Martin and Lee are permitted to continue to prosecute their action in the Norfolk Superior Court against Tringali individually.

After hearing, the Bankruptcy Court allowed Martin and Lee's motion for relief in part as set forth in Exhibit "B" as its clearly stated as follows:

> Granted in part.  Automatic stay does not apply to actions against Tringali individually.

Attached hereto is a copy of the transcript of the hearing held by the bankruptcy judge on November 10, 2004 (Exhibit "C" hereto).  Reference is made to the comments of Judge Hillman on Page 5 as follows:

> I mean, its rudimentary that the automatic stay does not protect Mr. Tringali personally.  No effort has been made to bring him in under the **Otero** theory or any other theory, and I'm not about to stop that.
>
> I sent this thing away once, and I'm going to send it away again.  I'll grant relief from stay to – I'm going to say this.  The automatic stay does not apply to actions against Tringali individually, let them continue.  If the parties or any one of the parties feels that we have to bring S.E.E., Inc. into that litigation, serve the Trustee, and we'll talk about it.  That's today's ruling.  Thank you, gentlemen.

It is clear as the bankruptcy judge expressed there is no stay in the bankruptcy action which would in any way prevent the deposition of Tringali. As the judge observed in his comments on Page 4 of the transcript the automatic stay as against S.E.E. may have been misconstrued by this Court

previously. In essence, the bankruptcy of S.E.E. does not stay or suspend the action against Tringali.

## IV.   Grounds For This Motion

On November 15, 2004, the plaintiffs renoticed the deposition of Tringali for December 1, 2004 (Exhibit "D" hereto). Attorney Voke, counsel for Tringali, has advised plaintiff's counsel that Tringali will not appear for the deposition.

It is clear according to the Bankruptcy Court's ruling that there is no automatic stay as to Tringali individually and that this case should go forward as to Tringali individually with respect to Counts V, VI and VII, which lie against him individually.

## V.   Certificate of Conference

Pursuant to Superior Court Rule 9C, a telephone conference was held between counsel on December 20, 2004, at which time Attorney Davis advised Attorney Voke that a motion to compel would be filed based upon the bankruptcy judge's ruling that the automatic stay does not apply to Tringali. Counsel were unable to resolve that matter, therefore, this Motion is being filed.

WHEREFORE, the plaintiffs, Martin and Lee, request that this Court enter an order compelling the defendant Tringali to attend his deposition at the offices of plaintiff's counsel, at the time and date to be selected by plaintiffs' counsel.

December _____, 2004                    Attorney for plaintiffs,

_____
Roger S. Davis
BBO No. 116320
DAVIS & RUBIN
One Bowdoin Square
Suite 901
Boston, MA 02114-2919
(617) 742-4300

QD18:MARTI:MOTCOMP2

5

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

IN RE:                          )
                                )
S.E.E., INC.                    )          Chapter 7
                                )          Case No. 04-12352-CJK
          DEBTOR.               )
_____)

## MOTION OF CREDITORS PAUL MARTIN
## AND JUMI LEE FOR RELIEF FROM STAY
## TO PROCEED AGAINST PHILLIP TRINGALI

Now comes Paul Martin ("Martin") and Jumi Lee ("Lee"), creditors of
S.E.E., Inc. ("S.E.E."), and move this Court for relief from the automatic stay
imposed, pursuant to 11 U.S.C. §362(a), in order to permit Martin and Lee to
pursue an action filed against Phillip Tringali ("Tringali"), which is pending in
the Norfolk Superior Court and state as follows:

1.     On May 14, 2002, Martin and Lee filed an action against S.E.E. and
Tringali individually in the Norfolk Superior Court, <u>Paul Martin and Jumi Lee
v. S.E.E. Inc. and Phillip Tringali</u>, C.A. No. 02-801.

2.     According to the Amended Verified Complaint (Exhibit "A" hereto), two of
the counts set forth causes of action against Tringali individually, Gount VI for
Breach of Contract to repurchase the plaintiffs' [Martin and Lee] stock, and
Count VII, pursuant to c.149 §150, to hold Tringali individually liable for
failure to pay salaries and commissions to Martin and Lee.

3.     On May 22, 2003, S.E.E. filed a petition in the U.S. Bankruptcy Court
pursuant to Chapter 11 for reorganization.

4.     On December 11, 2003, the U.S. Bankruptcy Court entered an order
abstaining from the reorganization case, effectively dismissing the Chapter 11
and remanding the case back to the Norfolk Superior Court.

5.     Martin and Lee thereafter filed a motion in Norfolk Superior Court for
preliminary injunction requiring S.E.E. to place in escrow the sum of
$207,815.00, which was allowed by that court on December 24, 2003.

A

6.    On March 24, 2004, S.E.E. then filed this Chapter 7 bankruptcy petition in the U.S. Bankruptcy Court.

7.    On January 19, 2004, Martin and Lee noticed the deposition of Tringali, a party defendant in the Norfolk case, which was opposed by Tringali.

8.    On April 12, 2004, Martin and Lee filed a motion in Superior Court to compel the deposition of Tringali, which was opposed by Tringali.

9.    A copy of the opposition is attached hereto as Exhibit "B." In that Opposition Tringali's counsel stated as follows, on Page 2:

> "The only claim in this action that does not appear to be stayed by the Bankruptcy filing is Martin and Lee's claims for unpaid vacation pay and commissions. The Bankruptcy Court will soon decide those issues."

10.    There is nothing pending in this Court with respect to the issues in the Norfolk case, which have been asserted against Tringali individually, i.e., Count VI for breach of contract and Count VII to hold Tringali individually liable for failure to pay salaries and commissions.

11.    By notice dated April 27, 2004, the Norfolk Superior Court denied the motion to compel the deposition of Tringali stating that the complaint treats these claims as a derivative action (Exhibit "C" hereto).

12.    In any event, the automatic stay under 11 U.S.C. §362 applies only against the debtor, S.E.E., Inc. and does not apply to Tringali since he is not a party to this bankruptcy petition.

13.    It is clear that Counts VI and VII of the Amended Verified Complaint in the Norfolk case, are not derivative actions, but were brought against Tringali individually and he should not be permitted to thwart the prosecution of those accounts as against him individually.

14.    Martin and Lee respectfully request that this Court enter an order either clarifying that the automatic stay applies only as to S.E.E., or grant relief from the automatic stay so as to permit Martin and Lee to continue their claims against Tringali individually on the Counts VI and VII of the Amended Verified Complaint in the case pending in the Norfolk Superior Court.

WHEREFORE, Martin and Lee pray as follows:

(1)   That this court enter an order granting relief from the automatic stay or in the alternative find that the automatic stay does not apply to the claims of Martin and Lee against Tringali individually pending in the Norfolk Superior Court, pursuant to Counts VI and VII of the Amended Verified Complaint and that Martin and Lee are permitted to continue to prosecute their action in the Norfolk Superior Court against Tringali individually.

(2)   For such other relief as the Court may deem proper.

September 30, 2004                           Attorney for creditors, Paul
                                             Martin and Jumi Lee,


                                             _____
                                             Roger S. Davis
                                             BBO No. 116320
                                             DAVIS & RUBIN
                                             One Bowdoin Square
                                             Suite 901
                                             Boston, MA  02114-2919
                                             (617) 742-4300

QDI8:BANK:MOTRELEIF

UNITED STATES BANKRUPTCY COURT, DISTRICT OF MASSACHUSETTS
Proceeding Memorandum/Order of Court

In re: S.E.E., Inc.                                    Case#: 04-12352     Ch: 7

MOVANT/APPLICATNT/PARTIES:
#35 Motion by Creditor Jumi Lee and Paul Martin for Relief from Stay
#41 Response by Accountant Philip Tringali
R. Davis, B. Voke

OUTCOME:

☐ -By Agreement of the Parties

_____ Granted_____ Approved_____ Sustained
_____ Denied_____ Denied without prejudice_____ Withdrawn in open court___ __Overrulled
_____ OSC enforced/released

_____ Continued to: _____ For: _____ _____

_____ Formal order/stipulation to be submitted by: _____ Date due: _____
_____ Findings and conclusions dictated at close of hearing incorporated by reference.

_____ Taken under advisement:  Brief(s) due _____ From _____
                                 Response(s) due _____ From _____
_____ Fees allowed in the amount of: $ _____ Expenses of: $ _____

_____ No appearance/response by: _____

_____ DECISION SET OUT MORE FULLY BY COURT AS FOLLOWS:

Granted in part.  Automatic stay does not apply to actions against Tringali individually

IT IS SO NOTED:                          IT IS SO ORDERED:

                                         _William C Hillman_____

_____                 _____ Dated: 11/10/2004
Courtroom Deputy                         William C. Hillman, U.S. Bankruptcy Judge

"B"

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS - BOSTON

==============================
IN THE MATTER OF:                    .    Case #04-12352

S.E.E., INC.    .                    .    Boston, Massachusetts
                                     .    **November 10, 2004**
                         Debtors     .    9:35 a.m. O'clock
==============================

TRANSCRIPT OF HEARING ON:
(#35) MOTION BY CREDITORS JUMI LEE AND PAUL MARTIN FOR RELIEF
FROM STAY;
(#41)  RESPONSE BY ACCOUNTANT, PHILIP TRINGALI
BEFORE THE HONORABLE WILLIAM C. HILLMAN, J.U.S.B.C.

**APPEARANCES**

For Philip Tringali                  BRIAN P. VOKE, ESQ.
                                     Campbell, Campbell, Edwards & Conroy
                                     One Constitution Plaza
  -                                  Boston, MA 02129

For Jumi Lee and Paul Martin:        ROGER S. DAVIS, ESQ.
                                     Davis & Rubin
                                     One Bowdoin Square,  Suite 901
                                     Boston, MA  02114-2910


Electronic Sound Recording Operator:   Mary Jo Tedder

Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Certified Transcription Service

GCI TRANSCRIPTION SERVICES
**210 Bayberry Avenue**
**Egg Harbor Township, NJ  08234-5901**
**1-609-927-0299        FAX 1-609-927-6420        1-800-471-0299**
**e-mail - irwingloria@aol.com**



Page 2

1 (At Tape #1,  Index #217.  Time 9:35 a.m.)

2          THE COURT:  S.E.E., Inc.

3          MR. DAVIS:  Good morning, Your Honor, Roger Davis for

4 the movants, Paul Martin and Jumi Lee.

5          MR. VOKE:  Good morning, Your Honor.  Brian Voke for

6 Philip Tringali.

7          THE COURT:  Go ahead, Mr. Davis.

8          MR. DAVIS:  Your Honor, this case has some history

9 to it.  Prior to the filing --

10          THE COURT:  And I was there.

11          MR. DAVIS:  I understand.  And after the initial

12 suit was filed in Norfolk Superior Court, that suit, going back

13 to 2002, was against both S.E.E., the bankrupt corporation, and

14 also against Mr. Tringali, asserting counts against him

15 individually.

16          S.E.E. then filed a petition for Chapter 11 on

17 December 11th of last year.  You remanded the -- you abstained.

18 We went back to the Superior Court.  That Court entered another

19 order.  As a result of that order, S.E.E., only the corporation

20 filed a bankruptcy petition in a Chapter 7 on March 24th.

21          We then proceeded to notice the deposition of Mr.

22 Tringali in the Superior Court case based upon the fact that

23 three of the counts, two of the counts pending against him

24 individually, one for breach of contract and one against him

25 for the statutory failure to pay -- as an officer to pay wages.

1    Mr. Voke filed in opposition and he stated in
2 opposition, he said as follows:
3            "The only claim in this action that does not appear
4            to be stayed in the bankruptcy filing is Martin and
5            Lee's claims for unpaid vacation pay and commissions.
6            The Bankruptcy Court will soon decide these issues."
7 Well, respectfully, Your Honor, there's nothing before, and
8 there hasn't been anything before the Bankruptcy Court with
9 respect to any of the issues involving Mr. Tringali.
10 Nevertheless, the Superior Court treating this matter as being
11 entirely a derivative action would not allow it to depose Mr.
12 Tringali.
13            Therefore, I filed a motion here to make it clear
14 that the automatic stay does not apply against Mr. Tringali,
15 and that we should be allowed to -- with respect to Counts 6
16 and 7 of the complaint in the Norfolk case, which are not
17 derivative actions, we should be allowed to not only depose him
18 but to prosecute those actions, that action individually
19 against him, and that's why I've filed a motion asking this
20 Court to either grant the relief from the stay with respect to
21 Tringali, or find that the automatic stay does not apply to
22 those claims.
23            THE COURT:    Thank you, Mr. Davis.  Mr. Voke.
24            MR. VOKE:    Your Honor, There are a couple of State
25 Court actions, and there's one in Plymouth, one in Norfolk.

04-12352                                                      11-10-04

1  There are claims brought by S.E.E. against the creditors here

2  in the Plymouth action.  There is a derivative action filed by

3  the creditors on behalf of S.E.E. in Norfolk, and it is

4  tailored as a derivative action.  I know Mr. Davis claims

5  they're individual claims, and you could look at it that way;

6  but the individual actions taken by the State Court would -- to

7  stick to -- to stop any proceedings in the case, and there was

8  no -- there has been no order issued, or any suggestion that

9  there was a stay issued by this Court with respect to any

10  individual claims against Mr. Tringali.  That's just not the

11  case.  There has been an automatic stay with respect to S.E.E.,

12  in the State Court action.

13            THE COURT:   That's -- that's a problem that counsel

14  may have with State Court Judges.  They think once the word

15  "bankruptcy" comes up, everything gets frozen.

16            MR. VOKE:   Well, yeah, I -- but that's not the --

17  that's not what --  we argued in the case that they ought to

18  stop the proceedings because to handle it piecemeal made no

19  sense, particularly in light of the fact that Mr. Tringali

20  didn't have any of the documents to defend himself at a

21  deposition.  So there's much more to the argument; and in

22  addition, there was consideration by the State Court of

23  consolidating those two cases, and we suggested they wait until

24  this bankruptcy is finalized, rather than handle the litigation

25  piecemeal.

Page 5

```
 1            THE COURT:    Well, I don't see the Trustee here to
 2    tell me about his or her views.  Who's the Trustee?
 3            MR. VOKE:    Your Honor, I have no idea.  I've not
 4    been involved in this case.
 5            THE COURT:    Pat, do we know?  We can find out very
 6    quickly.
 7            MR. DAVIS:    The Trustee, Your Honor, is Kathleen
 8    Dwyer, I believe.
 9            THE COURT:    Okay.  Well, Ms. Dwyer is no here.  I
10    mean, it's rudimentary that the automatic stay does not protect
11    Mr. Tringali personally.  No effort has been made to bring him
12    in under the Otero theory or any other theory, and I'm not
13    about to stop that.
14            I sent this thing away once, and I'm going to send it
15    away again.  I'll grant relief from stay to -- I'm going to say
16    this.  The automatic stay does not apply to actions against
17    Tringali individually, let them continue.  If the parties or
18    any one of the parties feels that we have to bring S.E.E., Inc.
19    into that litigation, serve the Trustee, and we'll talk about
20    it.  That's today's ruling.  Thank you, gentlemen.
21            MRS. HEANEY:    And I believe the Trustee is Debora
22    Casey.
23            THE COURT:    Debora Casey?
24            MRS. HEANEY:    I believe so, yes.
25            THE COURT:    Okay, well, you know where to find her
```

04-12352                                                    11-10-04

1 │ if you want to serve her.

2 │ (End at Tape #1, Index #515.   9:42 a.m.)

3 │            * * * * * * * * * * * *

4 │            I certify that the foregoing is a true and accurate

5 │ transcript from the electronically sound recorded record of the

6 │ proceedings.

GLORIA C. IRWIN                                    Date
Certified Transcriber NJ AOC200
      Federal  CET #122
GCI TRANSCRIPTION SERVICES
210 Bayberry Avenue
Egg Harbor Township, NJ  08234-5901
609-927-0299  1-800-471-0299
      FAX 609-927-6420
e-mail  irwingloria@comcast.net

04-12352                                           11-10-04

# DAVIS & RUBIN

ATTORNEYS AT LAW

ROGER S. DAVIS
JOEL S. RUBIN (1948-1991)

ONE  BOWDOIN SQUARE
SUITE 901
BOSTON, MASSACHUSETTS 02114-2919
(617) 742-4300
FACSIMILE (617) 742-4304

November 15, 2004

Brian P. Voke, Esq.
CAMPBELL CAMPBELL EDWARDS
   & CONROY
One Constitution Plaza
Boston, MA  02129

Re:   Paul Martin, et al
Vs:   S.E.E., Inc., et al
No:   02-801A

Dear Mr. Voke:

Since you were present in the Bankruptcy Court when Judge Hillman allowed my motion for relief from the stay and indicated that he would enter an order clarifying that Mr. Tringali is not subject to any stay, and that the Norfolk case can go forward, I am enclosing herewith a Notice of Taking Deposition for Mr. Tringali for December 1, 2004 at 10:00 a.m. at my office.

Very truly yours,

Roger S. Davis

RSD:cat
Enclosure

QDIS MARTIN LTV

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS

SUPERIOR COURT
C.A. NO. 02-801

PAUL MARTIN and JUMI LEE,          )
Individually and as Stockholders on )
behalf of S.E.E., INC.              )
    Plaintiffs                     )        **NOTICE OF TAKING**
                                   )        **DEPOSITION**
V.                                  )
                                   )
S.E.E., INC. and PHILLIP TRINGALI   )
    Defendants                     )

TO:    Brian P. Voke, Esq.
       Campbell Campbell Edwards & Conroy
       One Constitution Plaza
       Boston, MA 02129

      Please take notice that, at 10:00 o'clock a.m., on December 1, 2004, the

plaintiffs in this action, Paul Martin and Jumi Lee, by their attorney, will take

the deposition upon oral examination of Phillip Tringali at the offices of Davis &

Rubin, One Bowdoin Square, Suite 901, Boston, Massachusetts, before a

notary public in and for the Commonwealth of Massachusetts, or before some

other officer authorized by law to administer oaths. The oral examination will

continue from day to day until completed.

      You are invited to attend and cross-examine.

November 15, 2004

Attorney for plaintiffs,

_____
Roger S. Davis
BBO No. 116320
DAVIS & RUBIN
One Bowdoin Square
Suite 901
Boston, MA 02114-2919
(617) 742-4300

QDIS.MARTIN.DEPONOTI

# DAVIS & RUBIN

ATTORNEYS AT LAW

ROGER S. DAVIS
JOEL S RUBIN (1948-1991)

ONE BOWDOIN SQUARE
SUITE 901
BOSTON, MASSACHUSETTS 02114-2919
(617) 742-4300
FACSIMILE (617) 742-4304

**VIA FACSIMILE**
**617-227-8992**

March 15, 2006

Daniel Treger, Esquire
PHILLIPS AND ANGLEY
One Bowdoin Square, Suite 300
Boston, MA 02114

Re:    Paul Martin, et al
Vs:    Tringali
      Norfolk Superior Court

Dear Mr. Treger:

This is to confirm our telephone discussion of March 9, 2006 regarding the scheduling of my clients' depositions. As I have informed you in a previous letter, the depositions that you have noticed of Martin and Lee for March 20 and 21, 2006 should be continued due to the reasons set forth in that letter suggesting April 18 and 19, 2006 and I have called you to discuss that.

In the course of that discussion, I pointed out to you that the requests for documents, Schedule A to both deposition notices was in identical form to the request for production in the U.S. District Court case, and in both cases, claims for breach of fiduciary duty are set forth. You indicated that the requests for documents, Schedule A, in this Norfolk Count case are relevant to your affirmative defenses. Nevertheless, based upon our discussion I intend to file for a motion for protective order in the Norfolk County case.

Very truly yours,

Roger S. Davis

RSD:cat

QDII2:MARTIN:DTFAX

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 04-12708-MLW

PHILLIP TRINGALI,                    )
                                     )
            Plaintiff,               )
                                     )
v.                                   )
                                     )
PAUL MARTIN AND                      )
JUMI LEE,                            )
                                     )
            Defendants               )

**AFFIDAVIT OF PLAINTIFF'S COUNSEL IN SUPPORT OF THE PLAINTIFF'S REPLY TO THE DEFENDANTS' WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION REGARDING DEFENDANTS' MOTION TO DISMISS.**

Now comes counsel for the plaintiff, Daniel Treger, Esq., and hereby on oath does depose and say:

1.      My name is Daniel Treger.

2.      I am an attorney licensed to practice law in the Commonwealth of Massachusetts since 1992, and before the United States District Court for the District of Massachusetts since 1996.

3.      On March 9, 2006, I telephoned Roger Davis, counsel for the Defendants, to discuss his request for a joint motion to continue the pretrial conference in Martin and Lee v. Tringali, Norfolk Superior Court Civil Action NOCV2002-00801 (the "Norfolk Action") until after April 18 and 19, 2006, the next available dates his clients were available to be deposed.

4.      I responded that I would assent to such a motion if his clients agreed to produce the documents I had requested by appending a Mass.R.Civ.P. 34 request to Paul Martin's

deposition notice.

5.      Attorney Davis told me that he would not produce the documents, suggesting that producing the documents in the Norfolk Action would be a concession that his resistance to discovery in the instant matter was inappropriate, and would subject him to sanctions.

6.      Exhibit 1 is a true and accurate copy of selected pages of the Massachusetts Trial Court Docket Sheet for the Norfolk Action available over the internet from the Trial Court Information Center.

7.      Exhibit 2 is a true and accurate copy of my letter of February 9, 2006, enclosing fresh deposition notices of Paul Martin and Jumi Lee in the Norfolk Action.

8.      Exhibit 3 is a true and accurate copy of selected pages of the transcript of Phillip Tringali's deposition taken in the Norfolk Action.

9.      Exhibit 4 is a true and accurate copy of the Substitute Second Amended Complaint served upon this office in the Norfolk Action.

10.     Exhibit 5 is a true and accurate copy of Phillip Tringali's Answer to the Substitute Second Amended Complaint served by this office in the Norfolk Action.

11.     Exhibit 6 is a true and accurate copy of Attorney Roger Davis' letter of May 16, 2005.

12.     Exhibit 7 is a true and accurate copy of selected pages of the transcript of the deposition of Paul Martin in the Norfolk Action.

13.     Exhibit 8 is a true and accurate copy of selected pages of the transcript of the deposition of Jumi Lee in the Norfolk Action..

14.     Exhibit 9 is a true and accurate copy of the Defendants Motion for Relief From Stay and to Compel Appearance at Deposition served upon this office in the Norfolk Action.

15.     Exhibit 10 is a true and accurate copy of Attorney Roger Davis' letter of March

15, 2006.

16.    Exhibit 12 is a true and accurate copy of selected pages of Phillip Tringali's

answers to Jumi Lee's interrogatories signed under oath and served by this office.

Signed under the pains and penalties of perjury this 20th day of March, 2006.


　　　　　　　　　　　　　　　　/s/ Daniel Treger
　　　　　　　　　　　　　　　　Daniel Treger, Esq.
　　　　　　　　　　　　　　　　B.B.O. #562147
　　　　　　　　　　　　　　　　Phillips & Angley
　　　　　　　　　　　　　　　　one Bowdoin Square
　　　　　　　　　　　　　　　　Boston, MA 02114
　　　　　　　　　　　　　　　　Tel. No. (617) 367-8787



CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing.
(NEF), and paper copies will be sent to those indicated as non-registered participants on this day,
March 20,  2006.

　　　　　　　　　　　　　　　/s/ Daniel Treger



L:\LITG\Trng001\response\treger.aff.wpd

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-12708-MLW

PHILLIP TRINGALI
    Plaintiff

V.

PAUL MARTIN AND JUMI LEE
    Defendants

## PLAINTIFF'S ANSWERS TO DEFENDANT JUMI LEE'S FIRST SET OF INTERROGATORIES

### INTERROGATORIES

1.    State all facts and identify all documents upon which you base the allegation in Paragraph 53 that "At various times on or after January 9, 2002, Martin and Lee made false statements to S.E.E.'s Analytical Product Distributor and certain of its Analytical Product sales representatives that Tringali had improperly used corporate funds of S.E.E. for personal purposes, and had engaged in other financial improprieties with respect to the operation of S.E.E."

### ANSWER NO. 1

A.    In January and February of 2002 I was told by distributors and representatives Dave Patterson, Maclyn Smith, Paul Norlander, Graham Bird and Manfred Feustal that Paul Martin had called them to solicit them to sell Quantum Dynamics' analytical instrument. I was informed that during these conversations, Martin told these individuals that I was improperly spending S.E.E.'s money on "my vacation home" and for other personal purposes.

B.   Documents supporting this allegation are pages 25 and 26 of the long distance billing records for account number 617 471 0411 131, comprising two pages for the billing statement dated 02/04/02, obtained in the Plymouth County state civil action.

Discovery is ongoing.  Plaintiff reserves the right to supplement his answer to this interrogatory prior to trial.

2.       With respect to the allegations in Paragraph 53, state fully the contents of each such alleged false statement, whether it was oral or written, identify the person who made each such false statement, the date and place of such occurrence and identify all persons present when each such alleged false statement was made.

**ANSWER No. 2**

I do not know the exact contents of these false statements; however, the substance thereof is set forth in answer number 1A.  These false statements were all made orally or by telephone by Paul Martin.  I believe the telephone calls were made from the billing address for account number 617 471 0411 to the office telephone numbers of the sales representatives and distributors named in answer number 1a, at the office addresses disclosed in plaintiff's automatic disclosure statement.  I do not know if any other individuals were present when these statements were made.  I have no personal knowledge of the exact date of the statements; however, the following individuals were contacted on the following dates:

Paul Norlander - January 21, 2002.

Manford Feustal - January 21, 2002.

Dave Patterson - January 21, 2002.

Graham Bird - January 21, 2002.

2

approached her about working for Quantum. Soon thereafter, she became uninterested in

S.E.E., Inc.

     B.    See Answer to interrogatory numbers 1 and 3.

    Discovery is ongoing. Plaintiff reserves the right to supplement his answer to this

interrogatory prior to trial.

    Signed under the pains and penalties of perjury this ___ day of August, 2005.

                   Phillip Tringali

AS TO OBJECTIONS:

Daniel Treger, Esq.
B.B.O. #562147
Phillips & Angley
One Bowdoin Square
Boston, MA 02114
Tel. No.: (617) 367-8787

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document
was served upon the attorney of record for each other
party by (hand) (mail) on _____

13

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 04-12708-MLW

PHILLIP TRINGALI,            )
                             )
        Plaintiff,           )
                             )
v.                           )
                             )
PAUL MARTIN AND              )
JUMI LEE,                    )
                             )
        Defendants           )


**PLAINTIFF PHILLIP TRINGALI'S AFFIDAVIT IN SUPPORT OF HIS OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR LACK OF JURISDICTIONAL AMOUNT**

1.      My name is Phillip Tringali.

2.      I make this affidavit in support of my opposition to defendants Motion To Dismiss for lack of jurisdictional amount, in anticipation of, and to facilitate, the adoption of the Report and Recommendation of Magistrate Judge Collings, dated, February 23, 2006. (See Docket Entry # 33).

3.      In this matter, I have specifically alleged that I am a stockholder in S.E.E., Inc., and that Defendants Martin and Lee's conduct caused S.E.E. to fail, rendering my ownership interest in S.E.E., Inc. worthless. [See Docket Entry #1, ¶¶ 6, 51, 52].

4.      The defendants alleged, under oath in a verified complaint filed in Norfolk Superior Court Action No. 03-801, in paragraphs 25 and 36, that I owned %70 of S.E.E.'s stock, and that as of June, 2001, the book value of S.E.E.'s stock was $499,239.00.  By Defendants' own

1

calculus, my damages are, at minimum, $349,467.00.  [See Exhibit B to Docket Entry # 7].

5.      While I verify that I was, and remain, the owner of %70 of S.E.E.'s stock, I do not adopt defendants' calculation of S.E.E.'s book value.  According to S.E.E., Inc.'s accountant, Jeffrey Husted, as of December 31, 2001, nine (9) days before the defendants resigned, S.E.E.'s book value was approximately $883,000.  Based upon this calculation, my damages are at least $618,718.00.  I believe that my interest in S.E.E., Inc. was worth significantly more if S.E.E. were valued as a going concern.

Signed under the pains and penalties of perjury this 23st day of February, 2006.

//Phillip Tringali//
Phillip Tringali

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.  (NEF), and paper copies will be sent to those indicated as non-registered participants on this day, February 23, 2006.

//Daniel Treger//

L:\LITG\Trng001\tringali.damages.aff.wpd