v



UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 04-12708-MLW

PHILLIP TRINGALI,          )
                           )
         Plaintiff,        )
                           )
v.                         )
                           )
PAUL MARTIN AND            )
JUMI LEE,                  )
                           )
         Defendants        )

**PLAINTIFF PHILLIP TRINGALI'S ANSWER
TO DEFENDANT PAUL MARTIN'S FIRST SET OF INTERROGATORIES**

GENERAL OBJECTIONS

1.    Plaintiff objects to the instructions and definitions, to the extent that they differ from the

standard definitions prescribed by the Local Rules of the District of Massachusetts.

ANSWERS

**INTERROGATORY NO. 1** State all facts on which you base the allegation in Paragraph 24

that "both Martin and Lee acquired, during their respective employment by S.E.E.,

comprehensive knowledge of S.E.E.'s most sensitive product development and customer-related

trade secrets and confidential information, including but not limited to S.E.E.'s database of

customer information" and as part of your answer identify all persons having knowledge of such

allegation and all documents which evidence or support such allegation.

**ANSWER**

1

Plaintiff objects to this interrogatory on the grounds that it is overly broad, unduly burdensome, and interposed to harass the defendant. Notwithstanding, and without waiving said objection, the plaintiff states:

A. Since S.E.E., Inc. hired Mr. Martin 1996, he has been primarily responsible for developing, marketing, selling, installing and servicing analytical microspectrophotometers for S.E.E., Inc. At all times during his employment by S.E.E., Mr. Martin was intimately involved in the development and marketing of S.E.E.'s analytical products. As part of his duties, Mr. Martin maintained computer records reflecting and/or containing S.E.E.'s product development and customer related trade secrets. Since S.E.E. hired Ms. Lee in 1997, she has participated in, and/or directed, the development, fabrication, and assembly of S.E.E.'s products and the components thereof. As part of her duties, Ms. Lee had access to all of S.E.E.'s confidential information.

B. Those with knowledge of these fact would include every former employee, customer, vendor, and distributor of S.E.E. Inc. I cannot possible name them all. All witnesses of note were identified in my disclosure statement.

C. Documents that support this allegation might reasonable include every document generated by the defendants since the microphotospectrometer activities moved to Massachusetts. They are too numerous to identify.

**INTERROGATORY NO. 2** State all facts on which you base the allegation in Paragraph 25 that "In 2000, S.E.E. earned 1.7 million dollars from the sale of the Analytical Product." and as part of your answer identify all persons having knowledge of such allegation and all documents which evidence or support such allegation.

Paul Martin and Jumi Lee, 2400 N. Lincoln Avenue, Altadena, CA

Deborah Bowles, 78 Stoney Weir Rd., Halifax, MA

Demetra Hixson, 12 Basking Ridge Dr., Middleboro, MA

Anthony Facchiano, 425 Archer St. Fall River, MA

Gary Unruh, Dynamic Light Control, Grass Valley, CA

Keeper of the Records, Control Development, Inc., South Bend, IA

Andrew Bartko, last known address: 161 Maribeau Square, Atlanta, GA 30327;

Steven Parmen, address unknown;

Kanakaraju Subramaniam, last known address, c/o School of Engineering and Applied Science, University of Virginia, 351 McCormick Road, Charlottesville, VA 22904-4743

Nick Webber, XTEK PTY LTD, 25 Yallourn Street, Fushwick, Canberra, Australia

C.       Documents known to contain supporting facts are those documents produced in response to defendant request for production of documents, specifically documents numbers 0- 8 and 113 -133.

Discovery is ongoing. Plaintiff reserves the right to supplement his answer to this interrogatory prior to trial.

**INTERROGATORY NO. 6** State all facts on which you base the allegation in Paragraph 33 that "Martin and Lee formed Quantum for the propose, and with the intent of designing, marketing and installing an integrated, computerized analytical device to compete with S.E.E.'s product." and as part of your answer identify all persons have knowledge of such allegation and all documents which evidence or support such allegation.

<u>ANSWER</u>

11

As early as February, 2002, Quantum's website advertised a integrated, computerized analytical device that competed directly with S.E.E.'s product. In February, 2002, Martin attended a conference at which he delivered a paper relating to a specific application of microphotospectroscopy as the founder of Quantum. Prior to resigning from S.E.E., Inc. Martin had been scheduled to deliver an identical paper at this conference as a key employee of S.E.E., Inc. Immediately after resigning from S.E.E., Inc., Martin and/or Lee began contacting S.E.E.'s customers, distributors and vendors. Martin and Lee attempted to hire each of S.E.E.'s employees, and, on information and belief, attempted to retain eight (8) of S.E.E.'s domestic and overseas distributors and solicited business from 29 of S.E.E.'s existing or prospective customers using S.E.E.'s confidential database and sales projections. In 2002, Quantum sent letters to S.E.E.'s existing customers offering to service S.E.E. equipment, and advertising competing products. In February or March, 2002, Quantum began advertising an analytic product that met the specifications of Phase 1 of the Maximus Project. On information and belief, in mid-2002, after being enjoined from using S.E.E.'s confidential information to compete agains S.E.E., Martin and Lee formed CRAIC Technologies in California in an attempt to evade the Massachusetts injunction prohibiting Quantum from doing so.

B.    The following individuals may have knowledge of the facts so alleged:

Phillip Tringali, 98 Walnut Street Halifax, MA 02338

Paul Martin and Jumi Lee, 2400 N. Lincoln Avenue, Altadena, CA

Deborah Bowles, 78 Stoney Weir Rd., Halifax, MA

Demetra Hixson, 12 Basking Ridge Dr., Middleboro, MA

Anthony Facchiano, 425 Archer St. Fall River, MA

12

Andrea Desrosiers, 475 Medford St. Apt 2, Somerville, Massachusetts

Gary Unruh, Dynamic Light Control, Grass Valley, CA

Brad Rogers, Oklahoma State Bureau of Investigations, Oklahoma City, OK,

Keeper of the Records, Control Development, Inc., South Bend, IA

Sarah Walbridge - last known address, Lansing, MI

Optoline Associates, Wilmington, MA;

Edmund Scientific, Haddon Heights, NJ;

Ludl Electronic, Pleasantville, NY;

Coerent, Auburn, CT, Melles Griot, Irvine, CA;

OceanOptics, Dunedin, FL;

Esco Products, New Foundland, NJ;

Multimedia Fiber Optics, Whippany, NJ;

Paul Norman, Chroma Tech, HI;

Norm Park, AMS Intercert, Boca Raton, FL;

Randy Griffin, Franklin Mechanical Services, Gilroy, CA;

Andrew Bartko, last known address: 161 Maribeau Square, Atlanta, GA 30327;

Steven Parmen, address unknown;

Kanakaraju Subramaniam, last known address, c/o School of Engineering and Applied

Science, University of Virginia, 351 McCormick Road, Charlottesville, VA 22904-4743.

Gary Schubert, Illinois State Police, Carbondale, IL;

Employees of the California Department of Justice, Riverside, CA;

Anthony Tambasco, Mansfield Police Department, Mansfield, OH;

13

Mary Carrabba, Hewlett Packard, Corvallis, OR

Tracy Tanaka, Tim Pasell, Honolulu Police Department Honolulu, HI;

Tim Wolfe, Alaska State Crime Lab, Anchorage, AK;

James Brown, Washington, D.C.;

Stephen Kaszubinsky, Onondaga County Department of Criminal Investigation, Syracuse, NY;

Kathleen Connado Onondaga Center for Forensics, Syracuse, NY;

Allen L. Southmayd, US Army CIL, 4553 North 2nd Street Forest Park, GA 30297-5122;

Marvin Reed; Stephen D. Greene; Paul McCaffrey; Jeffrey Fletcher; Frederick H. Panhorst, MSM; Joseph L. Parker; Alvin J. Hazan, BS; Janelle Mueller, BS; Derek L. Hammond, BA; Clyde J. Gayle, MBA; Chris E. Taylor; Larry Chelko; Robert Thibault, MFS; US Army Criminal Investigation Lab, 4553 N 2nd Street Forest Park, GA 30297-5122;

Michael Wagner, BS, MS, PA, Robin Gall, Broward County Medical Examiner's Office 5301 Southwest 31st Avenue, Fort Lauderdale, FL 33312;

Gretchen Hicks, Maine State Police Crime Laboratory, 30 Hospital Street, Augusta, ME 04338;

Ted R. Schwartz, MS, Westchester County Forensic Lab, 2 Dana Road, Valhalla, NY 10595;

Mary Eng, NY City Police Department Lab, 150-12 Jamaica Avenue Jamaica, NY 11432;

Marc Surrency, US Secret Service Forensic Services Division, 950 H Street, NW, Washington, DC 20223;

14

Dave Patterson, D.B. Patterson & Associates 555 Plate Drive, Suite 3, East Dundee, IL 60118;

Maclyn Smith, Maclyn Smith & Company, 2115 NW 33rd Avenue, Portland, OR 97210;

Paul Norlander, Nord Scientific Company, 26575 Dolorosa, Mission Viejo, CA 92691;

Jim Viets, Western Analytical Instrumentation, 268 Gardenia Court Golden, CO 80401;

Dr. Manfred Feustel, Resultec Analytic Equipment Bremer Str. 54 D-30826 Garbsen, Germany;

Bob Hirche, ICMAS, TN;

Lihsi Ho, Hopewell (USA), Merrimac NH;

C.    Documents known to contain supporting facts include, but are not limited to, the documents entered as exhibits 1-5 and 9-14 in the deposition of Lee, the documents produced in response to defendant's  request for production of documents, and the following categories of documents:

(a)    Documents, drawings, test results, specifications, designs, and source code with documentation relating to the development, the specifications, the identity of component parts, and the testing of S.E.E. microspectrophotometers, currently located, if at all, in a storage facility in Halifax, Massachusetts in paper form and on the hard drives of approximately 30 computers formerly used by S.E.E. to manufacture, test and market microspectrophotometers;

(b)    The contents of S.E.E.'s ACT database containing all histories of contacts with S.E.E. customers, distributors, vendors, suppliers and S.E.E. personnel, currently

16

stored on a hard drive on a computer in the possession of the U.S. Bankruptcy
Trustee.

(c)    The contents of S.E.E.'s Businessworks database containing all of S.E.E.'s
financial information including financial statements, profit and loss statements,
check book register, inventory control information, currently stored on a hard
drive on a computer in the possession of the U.S. Bankruptcy Trustee;

(d)    Documents, correspondence, print materials, pamphlets, scientific papers, service
records and other materials used to sell or market S.E.E.
microspectrophotometers, or to service customers who had purchased such
instruments, currently located, if at all, in a storage facility in Halifax,
Massachusetts in paper form and on the hard drives of approximately 30
computers formerly used by S.E.E. to manufacture, test and market
microspectrophotometers;.

(e)    "Vendor files" documenting parts purchased by S.E.E. for inventory, currently
located in a storage facility in Halifax, Massachusetts in paper form;

(f)    Documents relating to the design, development, marketing and sales of Quantum
products, currently in the possession, custody or control of defendants as officers
and/or managers of Quantum and CRAIC, Inc., and the subject of a court order
issued by the Plymouth Superior Court preliminary injunction requiring their
preservation;

17

(g)    All documents relating to the specification and identity of parts ordered by
Quantum from S.E.E.'s suppliers after defendants' departure from S.E.E., currently
in the possession of said suppliers.

(h)    An S.E.E. 2100 microspectrophotometer, currently in a storage facility in Halifax,
Massachusetts;

(I)    A Quantum Mach 1 and Mach 10 microspectrophotometer, currently in the
possession of Quantum and/or CRAIC.

Discovery is ongoing.  Plaintiff reserves the right to supplement his answer to this
interrogatory prior to trial.

**INTERROGATORY NO. 7**  State all facts on which you base the allegation in Paragraph 37
that "On or about January 9, 2002, after Martin and Lee had unsuccessfully attempted to force
Tringali to sell to them his majority interest in S.E.E., Martin and Lee resigned from their
positions as officers and directors of S.E.E." and as part of your answer identify all persons
having knowledge of such allegation and all documents which evidence or support such
allegation.

**ANSWER**

A.    During a meeting that occurred on or about January 9, 2002, after Martin and Lee
demanded that Tringali either purchase their interests in S.E.E., Inc., or sell them his interest in
S.E.E., Inc., they handed Tringali their letters of resignation.

B.    Phillip Tringali, Martin, Lee, Jeffrey  Husted.

18

Signed under the pains and penalties of perjury this 6th day of July, 2005.

Phillip Tringali

AS TO OBJECTIONS:

Daniel Treger, Esq.
B.B.O. #562147
Jeffrey J. Phillips, Esq.
B.B.O. #398480
Phillips & Angley
One Bowdoin Square
Boston, MA 02114
Tel. No.: (617) 367-8787

L:\LITG\Trng001\maratnans7.5.05.rtf.wpd

**CERTIFICATE OF SERVICE**
I hereby certify the copy of the above document
was served upon the attorney of record for each other
party by (hand) (mail) 7/11/05

33

COMMONWEALTH OF MASSACHUSETTS

PLYMOUTH, S.S.                              SUPERIOR COURT DIVISION
                                           Civil Action No.

| | |
|---|---|
| S.E.E., Inc., | ) |
| Plaintiff | ) |
| | ) |
| v | ) |
| | ) |
| Quantum Dynamics International, LLC) | ) |
| and Paul Martin and Jumi Lee | ) |
| Defendants | ) |
| | ) |

## AFFIDAVIT OF DEBORAH BOWLES

I, Deborah Bowles, being duly sworn on my oath, depose and say as follows:

1    I am currently employed by S.E.E., Inc. (SEE), plaintiff herein, as sales and
     marketing associate, clerk of the Corporation and a director.

2.   I have been employed by SEE since 1997 and have held various positions within
     the company during my employment

3.   During the last year, it has been a part of my duties to interact on a nearly daily
     basis with Paul Martin ("Martin") and Jumi Lee,("Lee") defendants herein.

4.   As a result of that close interaction, I was aware of the fact that both Martin and
     Lee had downloaded the corporation's database, kept by the software program
     "ACT", onto each of their laptop computers used in the course of their
     employment.

5    In December 2001, the laptop computers used by Martin for business purposes,
     had a problem with its hard drive. Martin determined it needed to be replaced.
     On our about mid-December 2001, Martin and Lee replaced their current laptops
     with new laptop computers, Toshiba Tecra 8200. Neither replacement computer
     was purchased by SEE.

6.    On or about December 2001, I observed Martin download the database of the corporation onto his new Toshiba laptop computer. I did not see Lee download the database onto her new laptop computer.

7.    After Lee returned her SEE owned laptop to the corporation, I was able to confirm that the laptop computer had the current database on its hard drive.

8.    The database managed by the program "ACT" contains the names, addresses, telephone numbers, contact persons within the customer's company, notes regarding the status of jobs, and notes regarding telephone conversations with customers or potential customers and forecasts of the needs of the corporation's customers and other pertinent customer information.

9.    Entry to the database is restricted by password and a log of entry into "ACT" is maintained by date, time and password.

10.   Every employee of the corporation does not have access to all functions of "ACT".

11.   Martin had full access to all functions of "ACT".

12.   The database information contained on the program "ACT" is secret, confidential and not generally known except to authorized personnel of the corporation.

13.   The possession and use of this information by a competitor is of great advantage to the competitor and extremely harmful to SEE being able to capitalize on its business opportunities.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY

_Deborah Bowles_  3/12/02

Deborah Bowles

| Date | Time | | | | |
|---|---|---|---|---|---|
| 7/23/01 | 11:33 AM | Call Attempted | Question about databasing spectra. Eyring comments. New rep. No news per reps that he likes just that Stan is SMARMY. Been travelling a lot since June. home 10 days in 2 months. Was in Helsinki and someone told him (wouldn't say who) that he had bought multiple J+M units. So bad (didn't say why as bad English) that he made them buy them back. Hmm. Told him about experience at BKA and what jerks they were. Talked about Galactice database. Wants to create a database of automotive carpet fibers. Wanted to know how to use it. I ran him through the wizard. Wants to know if you can edit the database, which type of database to use, and do they have a better instructions. Also wants to know if I want to do workshop again. I said yes and that I could do the paint section as Menold is no longer with them. Need to contact Dawn Young in LA ME office. Told him that I would get back | PM | |
| 7/23/01 | 9:54 AM | Call Completed | Question about databasing spectra. Eyring comments. New rep. | PM | |
| 7/19/01 | 5:20 PM | Call Attempted | Question about databasing spectra. Eyring comments. New rep. | PM | |
| 7/17/01 | 11:00 AM | Call Left Message | Question about databasing spectra. Eyring comments | PM | |
| 6/27/01 | 12:30 PM | Call Left Message | Question about databasing spectra | PM | |
| 6/14/01 | 9:30 AM | Note | Paul was going to contact him this morning. | Debbie Bowles | |
| 6/12/01 | 5:30 PM | Call Left Message | Paul out of town at installs. Is it something that Debbie Bowles needs immediate DETAILS: attention? He will try to contact you Thursday. | Debbie Bowles | |
| 6/11/01 | 12:40 PM | Call Received | Wanted to ask Paul question about databasing spectra. | Debbie Bowles | |
| 5/31/01 | 10:26 AM | Note | At ATF Rockville. Lee from Michigan is working JL at ATF. they cannot get the holmium oxide spectra right. They have not turned on the instruments for 2 years. Max to try and fax spectra.Contact LEE @3017629800 | JL | |
| 11/8/00 | 12:47 PM | Call Completed | Hasn't heard about workshop. Assuming it is a PM | PM | |
| 11/2/00 | 5:37 PM | Letter Sent | Fax with virus warning | PM | C:\My Documents\ACT\Doc |
| 11/2/00 | 10:32 AM | Note | Checked on invoice pymnt; he explained that they are notorious for not paying in a timely manner. He told me to check on a Monthly basis! The contact in A/P is Mike Frady | Debbie Bowles | |
| 10/25/00 | 2:30 PM | Call Left Message | Payment - is all paperwork in place? | Debbie Bowles | |
| 10/13/00 | 4:26 PM | To-do Done | send certificate and Thank you letter (8 hours) | Debbie Bowles | |
| 10/5/00 | 9:00 AM | Meeting Held | Installation and Training | Debbie Bowles | |
| 10/5/00 | 7:41 AM | Meeting Held | Installation and Training | PM | |
| 10/4/00 | 9:00 AM | Meeting Held | Installation and Training | Debbie Bowles | |
| 10/4/00 | 7:54 AM | Meeting Held | Installation and Training | PM | |
| 10/3/00 | 4:54 PM | Meeting Held | Installation and Training | PM | |
| 10/3/00 | 9:00 AM | Meeting Held | Installation and Training | JL | |
| 10/2/00 | 4:54 PM | Meeting Held | Installation and Training | PM | |
| 10/2/00 | 9:00 AM | Meeting Held | Installation and Training | Debbie Bowles | |
| 9/29/00 | 2:41 PM | Call Left Message | Will need conference room and powerpoint projector for training. | PM | |
| 9/29/00 | 2:40 PM | Call Received | Security clearances go through? Jumu is not a threat. Won't need fngprt. | PM | |
| 9/27/00 | 11:14 AM | Call Completed | Security clearances go through? Is checking. | PM | |
| 9/25/00 | 5:56 PM | To-do Done | Ship SEE 2100 | PM | |
| 9/ /00 | 4:04 PM | Call Left Message | Security clearances go through? Timing for instrument shipping OK? | PM | |
| 9/19/00 | 4:56 PM | Call Completed | Security clearances for Dr. Lee | PM | |
| 9/19/00 | 1:40 PM | Letter Sent | Fax with security background check info | PM | C:\My Documents\ACT\Doc |
| 9/18/00 | 3:15 PM | Note | Faxed install requirement diagram | Debbie Bowles | |
| 9/18/00 | 2:11 PM | Call Received | Set dates for installation | PM | |

| Date | Time | Type | Description | | |
|---|---|---|---|---|---|
| 9:45:00? | 3:49 | Note | already gone! Left with security clearance for Paul and John? Install date. Use wk begin of 1st wk Oct? | | Bowles |
| 8/14/00 | 10:21 AM | Letter Sent | Fax asking about workshop at AAFS2001 | PM | C:\My Documents\ACT\Docu |
| 8/7/00 | 5:29 PM | Note | Faxed copy of SEE 2100 install and setup requirements diagram | Debbie Bowles | |
| 0 | 3:56 PM | Call Completed | Gave him update on Angela Brown. Will follow up on Monday. She | PM | |
| | | | DETAILS: cuts the PO. | | |
| 19:00 | 6:12 PM | Call Completed | Where is PO? Purchasing lost paperwork. Should have new copy to them | PM | |
| | | | DETAILS: by Friday. | | |
| 7/17/00 | 3:55 PM | Call Left Message | Where is PO? | PM | |
| 7/14/00 | 1:29 PM | Call Attempted | Where is PO? | PM | |
| 7/11/00 | 2:42 PM | Call Left Message | Where is PO? | PM | |
| 5/22/00 | 3:13 PM | Note | Req. in Purchasing, should be placed by July 10. If not, have Stan call him | Phil Tringali | |
| 6/16/00 | 3:14 PM | Call Completed | Would like to do another workshop but needs permission. Will let me | PM | |
| | | | DETAILS: know in a couple of weeks. Doesn't have anyone for paint though. I suggested Skip but he has a tendency of cancelling at the last minute. Was also invited to do it at MAAFS and I said I would help as well. No answer on | | |
| 6/15/00 | 5:04 PM | Call Left Message | Do you want to repeat our workshop at next years AAFS? | PM | |
| 5/18/00 | 1:28 PM | Call Completed | Are they working on a fibers database or does he know of anyone? | PM | |
| | | | DETAILS: They will make a DB when get new instrument but only for internal use. Nobody else is making one either. Suggests Dr. Jay Siegel for potential students. He was on Max's graduate committee. Hasn't heard about PO. Just wait. | | |
| 5/3/00 | 12:46 PM | Call Completed | Where is PO? Purchasing lost it. But Max had copy with all signatures. | PM | |
| | | | DETAILS: This isn't the first time. He and Karen are now both watching it. It is a sole source.. not a GSA | | |
| 4/21/00 | 2:52 PM | Call Left Message | Where is PO? | PM | |
| 4/18/00 | 11:24 AM | Call Completed | Where is PO? Their person tracking through paperwork. Will know toda | PM | |
| 4/11/00 | 4:29 PM | Call Attempted | Where is PO? | PM | |
| 4/3/00 | 3:42 PM | Call Left Message | Where is PO? | PM | |
| 12/28/99 | 11:41 AM | Call Completed | Paul: Discuss shipping arrangements, call Stephanie Spitler | PM | |
| 12/10/99 | 9:22 AM | Call Completed | Finish workshop | PM | |
| 12/9/99 | 12:28 PM | Call Completed | Workshop is finished. How should I send it? | PM | |
| | | | DETAILS: It would be 8 MB PowerPoint file. Can't FedEx overnight due to security. Write up a handout on Word and then e-mail it. A lot of people want to attend. Requests already to redo workshop at SAFS and MAFS. | | |
| 12/6/99 | 10:40 AM | Call Completed | Update on workshop | PM | |
| | | | DETAILS: Needs workshop by this Friday! Also, should have PO submitted by end of month. Instrument budget cut to 2 instruments.. this | | |
| 10/15/99 | 7:31 AM | Call Completed | About workshop: will have 0.5 hour discussion on instrument and 1 hour for demonstration. | PM | |

| Date | Time | | | | |
|---|---|---|---|---|---|
| ..1 99 | 10 07 AM | ...ie .... m.cted | does nc ..e.d from me for w. .....e. / 'my CV | PM | |
| ..30/99 | 10 28 AM | .. ..tt MessageWhat does he need from me for workshop? | | PM | |
| ..7/99 | 2:01 PM | Letter Sent | Fax with quote 1093 | PM | C:\ACT\Document\fax to Ma |
| ? 99 | 12 07 PM | Letter Sent | Letter with quote 1093 | PM | C:\ACT\Document\Letter to |
| ..... | 12 03 PM | To va: tione | Quote: SEE2100, NIST, CD RW, Printer. ...age, UV T, Fi | PM | |
| 6 99 | 11 16 AM | Note | Per Steve F. of SSS; Has 2 Zeiss microspectrophotometers. Ex-Oxford microscopist. Great Demo; Dept dir Doug Detrick also present he was comitted to unit(s) as well.Monies available on Oct 1  They will push now for 1 to 2 units SEE2100, next generation 2000); 2100 is not on GSA-let's discuss. Also discussed 'trade-in' on Zeiss 400 & 800 ( we'll have to listen & explore their motives closely, they did mention if no trade-in, then they'll send the Zeiss 800 to Quantico and keep the 400 for Ron Menold in their paint group. I'll forecast at least 1 unit before EOY. Paul, pls quote SEE2100 (discount for two), and let's discuss 'trade-in' issues. Quote to include auto stage, CD-RW, Nist Cube, Printer, Image Capture, UV | PM | |
| ..1/99 | 10.00 AM | Meeting Held | Demonstration of SEE1000 | JL | |
| 5 14/99 | 11 34 AM | Call Completed | Schedule a meeting date on July 1. Still interested in doing joint workshop in AAFS | PM | |
| 5 12/99 | 2:27 AM | Note | Meet at EFG meeting in Zurich. Saw 1000 with new software. Zeiss hasn't been helping. Doug Deedrick had demo on tool from Phil. Both want demo on week of June 27. Call about | PM | |
| 2/23/99 | 6:23 PM | Note | Talked at AAFS 99 in Orlando. Now reports directly to Doug Deedrick. Invited me to TWGMAT which will be around April 20. Will send e-mail. Also wants to do joint presentation at AAFS next year in Reno  : w.h. | PM | |
| ..... | 3 32 PM | Letter Sent | Letter with GRAMS 5 software demo | PM | C:\ACT\Document\Letter to |
| 24... | 3 12 PM | Ca Completed | Is just trying to stir the pot and get other companies interested in microspectrometry Looking at Nikon E600 (or maybe E800) to put in training labs. Next fiscal year Polarization, fluorescence, transmission for fiber work Currently has MPM 800 and 400  Looked at Zeiss PDA system. Would like to be able to pop off, roll unit into another room, (basically share the spectrometer portion) Spoke with Mohan at NCSU. Interesting work with dye diffusion. Wants to purchase 2 desktop systems next year for fiber work. 380 to 700 nm absorbance, 2 nm step size. fluorescence. polarization though this is not a std. spectral | PM | |
| ..16/98 | 2.43 PM | Letter Sent | Fax asking about TWGMAT guidelines | PM | C:\ACT\Document\Fax to M. |
| 4/98 | 1.33 PM | Call Completed | Per Rick Heilman e-mail: told him that adding spectroscopy to microscopes is a difficult business. Adding to a comparison scope may be very difficult. Will meet at booth at AAFS next week and go see the Leica DMR B comparison scope. But didn't promise | PM | |
| /3/98 | 9 25 AM | To-do Done | Send copy of Japan presentation | PM | |
| /30/98 | 4 24 PM | Letter Sent | brochure sent (intl Wkshop - Japan 01/98) | Andrea Desrosier | |
| /26/97 | 9 20 AM | Letter Sent | Rep y letter to AAFS 97 leads | PM | C:\My Documents\Reply lett |
| /26/97 | 9 16 AM | Letter Sent | Reply letters to AAFS leads | PM | |

window:    Notes History Tab
Contact:   Mr. Max Houck · Fed    Bureau of Investigation
Types:     Notes, Histories, Attachments
Dates:     All
Users:     All
      abase: business.dbf

| Date | Time | Type | Regarding | Record Manager | Attachment |
|------|------|------|-----------|----------------|------------|
| 11 28/01 | 10 29 AM | Note | Last day at FBI is November 30. First day as director of forensic institute in WV is Jan 2. | PM | |
| 11/28 01 | 10 28 AM | Call Left Messag | Call and schedule meeting. | PM | |
| 11 21/01 | .0 39 AM | Letter Sent | ISO customer satisfaction survey | Debbie Bowles | |
| 11/13/01 | 3:48 PM | Cal Left Messag | Set up refresher training in January. | PM | |
| 11-9/01 | 2 51 PM | To-do Not Done | Prelim AAFS workshop handout due! | PM | |
| 11/6/01 | 3 34 PM | Note | returned NIST recert by UPS today attn: Max | Dee | |
| 10/30/01 | 9.53 AM | Call Received | He left message on Paul's voice mail 10/29 @ 1 pm. Their seminar | Debbie Bowles | |
| | | | DETAILS. for AAFS was rejected because Paul's not a member and they have no co-chair that is a member. They also ran out of rooms for all day seminars. Max is none too happy. | | |
| 10/25/01 | 3 50 PM | Note | Letter RADCO new rep announcement. | Debbie Bowles | |
| 10/23/01 | 4.00 PM | Note | rec'd NIST filters today for re-cert | Dee | |
| 10/12/01 | 11 19 AM | Call Completed | Recertification, Ed Bartick, Prelim for workshop due. AAFS dissed us on the | PM | |
| | | | DETAILS: workshop. He will try and get it reinstated. Ed Bartick is an idiot and don't confuse Max and Ed. Please! Told him I would take of the recert. Just send up the filters. | | |
| 01 | 1.30 PM | Call Left Messag | Recertification, Ed Bartick, Prelim for workshop | PM | |
| 10/17/01 | 1 15 PM | Call Received | Received our letter regarding re cert of filter set. Because the lette | Debbie Bowles | |
| | | | DETAILS. says filter set "has to be re-certified after one year" their quality assurance dept. will not let them use the instrument if not re-certified. There is no $ available at this time. He is not sure when there will be $ but doesn't believe it will be before NIST re-cert date. We can either send letter changing verbage that it's okay if it goes beyond time frame. Or we can re-cert and | | |
| 9/13/01 | 3 47 PM | Letter Sent | | Dee | |
| 8/28/01 | 4 17 PM | Note | sent NIST recertif letter on 8/27/01 | Dee | |
| 8/1 01 | 11:50 AM | Call Left Messag | Any luck contacting Dawn Young? | PM | |
| 7/25/01 | 11 44 AM | Letter Sent | Fax answering some questions about | PM | C:\My Documents\ACT\Docu |

Window:   Note
Contact:   Mr. Pat Johnson · Tex    Department of Public Safety
Types:     Notes, Histories, Attachments
Dates:     A l
Users:     A.l
base: business.dbf

| Date | Time | Type | Regarding | Record Manager | Attachment |
|------|------|------|-----------|----------------|------------|
| 9/26/01 | 9:30 AM | Call Completed | Austin PO? | Debbie Bowles | |
| | | | DETAILS He sent approval thru last week. His boss signed off. The chief signed off. It is waiting for directors signature then it goes to purchasing It may take another couple of weeks for us to actually get it. While Pat is out for month of Oct. Glen Johnson or Steve Robertson can be contacted via Pat's phone number with any | | |
| 9/24/01 | 5:30 PM | Call Completed | Spoke to Graham Bird regarding Austin PO. We should have in | Debbie Bowles | |
| | | | DETAILS: hand by end of Oct. 5th week. Pat told Graham for training there are 5 people from the off-site labs and 7 from Austin Lab. | | |
| 9/17/01 | 1:33 PM | Call Completed | Asked about 4th system order. He needed a copy of the quote. | Debbie Bowles | |
| | | | DETAILS: Faxed to him. He said he wrote up the order last Friday (9/14). | | |
| 8/28/01 | 4:04 PM | Note | sent NIST recertif letter on 8/27/01 | Dee | |
| 8/17/01 | 12:27 PM | Call Received | Needs a favor. Can only spend $240,000 now Please split quote for | PM | |
| | | | DETAILS: 4 instruments. Send quote at full price for 3 instruments. On September 1, he can get the $20,000 for the fourth instrument. Said this was OK and would fax to Lynn Garcia. Money coming from seized assets funds | | |
| 5/5/01 | 2:45 PM | Note | Per Graham Bird: Ron U. spending time with the legislators. Trying to get money for next 4 systems. Pat still doesn't know results. If doesn't work, wait until september when can | PM | |
| 1/4/00 | 5:46 PM | Call Completed | Got technical data, submitted request, bid in a month? | PM | |
| 1/3/00 | 11:23 AM | Note | Graham Bird will follow up | PM | |
| 1/3/00 | 11:22 AM | Call Left Message | Returning call | PM | |
| 1/3/00 | 11:19 AM | Field Changed | ID/Status · Customer | PM | |
| 1/1/00 | 11:22 AM | Call Left Message | Returning call | PM | |
| 31/00 | 11:20 AM | Call Received | Wants information about MSP | PM | |

Case 1:04-cv-12708-MLW     Document 48-4     Filed 03/21/2006     Page 1 of 2

Paul Martin 5-24-2005
Paul Martin, et al. v. S.E.E., Inc., et al.



# COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS.                    SUPERIOR COURT

C.A. NO. 02-801

--------------------------------x

PAUL MARTIN and JUMI LEE,

Individually and as Stockholders

on Behalf of S.E.E., Inc.,

                    Plaintiffs

     vs.

S.E.E., INC., and PHILLIP

TRINGALI,

                    Defendants

--------------------------------x

     DEPOSITION OF PAUL MARTIN, a witness

called on behalf of the Defendant Phillip

Tringali, taken pursuant to the

Massachusetts Rules of Civil Procedure,

before Deborah G. Rumson, Registered

Professional Reporter and Notary Public, in

and for the Commonwealth of Massachusetts,

at the Offices of Phillips & Angley, One

Bowdoin Square, Boston, Massachusetts, on

Tuesday, May 24, 2005, commencing at 10:25

a.m.

Paul Martin 5-24-2005
Paul Martin, et al. v. S.E.E., Inc., et al.

|  | | 30 |
|---|---|---|
| 1 | A | Office manager. |
| 2 | Q. | Anybody else? |
| 3 | A. | I don't remember the exact order. I can |
| 4 | | only give you names. Andrea Desrosier. |
| 5 | Q. | What did she do? |
| 6 | A | Applications. |
| 7 | Q. | Can you explain to me what you mean, since I |
| 8 | | have a different idea of what that term |
| 9 | | means, can you explain to me what |
| 10 | | applications means with respect to what you |
| 11 | | were manufacturing. |
| 12 | A. | It would depend on -- it is a very broad |
| 13 | | term. It can mean analysis of different |
| 14 | | types of samples. It can mean training and |
| 15 | | installation, attendance at trade shows. |
| 16 | | Different companies have different |
| 17 | | designations. |
| 18 | Q | At S.E.E., in the manufacturing operation, |
| 19 | | did it mean writing computer software? |
| 20 | A | She was also hired as a programmer. |
| 21 | C | And anybody else? |
| 22 | A | Ann Sofi was her first name. I don't |
| 23 | | remember her last. |
| 24 | Q. | What did she do? |

|  | | 31 |
|---|---|---|
| 1 | A | Applications |
| 2 | Q. | For her did that include programming? |
| 3 | A | I don't recall. There's more. Melissa |
| 4 | | Calberro. |
| 5 | Q | What did she do? |
| 6 | A. | Office manager. There was one engineer, but |
| 7 | | I don't recall his name. |
| 8 | Q | What did he do? |
| 9 | A | Not much. He was only there for two weeks. |
| 10 | Q | Were there any others? |
| 11 | A | For Middleborough? |
| 12 | Q. | For Burlingame |
| 13 | A | For Burlingame, Dee Hixson. |
| 14 | Q. | What did she do? |
| 15 | A. | Office assistant. |
| 16 | Q. | And any others? |
| 17 | A | Judy Moniz, I believe it was. |
| 18 | Q. | And what did she do? |
| 19 | A | She was hired as an office assistant. |
| 20 | Q | And? |
| 21 | A | Tony Facchiano, as an assembler. I am |
| 22 | | trying to think of the name  John was hired |
| 23 | | as an intern, not hired as such  I believe |
| 24 | | that's all I remember. |

|  | | 32 |
|---|---|---|
| 1 | Q | Do you remember anyone named Peter Lin? |
| 2 | A | I think that might have been the engineer, |
| 3 | | but I am not sure. |
| 4 | Q | Why did he end up leaving so soon? |
| 5 | A. | I don't know. |
| 6 | Q. | And who was responsible for record keeping |
| 7 | | at the California facility? |
| 8 | A. | It would depend upon the records. |
| 9 | Q. | Who was responsible for keeping records of |
| 10 | | the day-to-day operations, like, checkbook, |
| 11 | | inventory? |
| 12 | A | Deborah Koenig and Jumi Lee |
| 13 | Q | And in what form were those records?  Were |
| 14 | | they electronic or paper? |
| 15 | A | Both. |
| 16 | Q. | And who was in charge of maintaining records |
| 17 | | related to sales and marketing? |
| 18 | A. | That could be Deborah Koenig and myself. |
| 19 | Q | And what form were those records kept in, |
| 20 | | electronic or paper? |
| 21 | A | Both. |
| 22 | Q. | And what kind of records did you maintain |
| 23 | | specifically with respect to marketing? |
| 24 | A | Competitive information, specifications of |

|  | | 33 |
|---|---|---|
| 1 | | our own tools, price lists, customer contact |
| 2 | | information, prospective customers, and |
| 3 | | general contact information. |
| 4 | Q | And was any specific piece of software used |
| 5 | | to maintain the categories of information |
| 6 | | that you just identified? |
| 7 | A. | Could you read each category back" |
| 8 | Q | Customer contact info. |
| 9 | A. | We used ACT! database. |
| 10 | Q. | Prospective customers? |
| 11 | A | ACT! database, Excel |
| 12 | Q | And general contact information? |
| 13 | A. | ACT! database. |
| 14 | Q | And price list? |
| 15 | A. | Word, Excel |
| 16 | Q | Specifications? |
| 17 | A. | Word. |
| 18 | Q | And competitive info? |
| 19 | A | That was paper and electronic, HTML website. |
| 20 | Q | Did S.E.E. have a website for its |
| 21 | | microspectrophometers? |
| 22 | A | Yes |
| 23 | Q | And who designed that website? |
| 24 | A | Joe Buckle. |

9 (Pages 30 to 33)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 04-12708-MLW

PHILLIP TRINGALI,           )
                            )
        Plaintiff,          )
                            )
v.                          )
                            )
PAUL MARTIN AND             )
JUMI LEE,                   )
                            )
        Defendants          )

**AFFIDAVIT OF PLAINTIFF'S COUNSEL IN SUPPORT OF PLAINTIFF'S MOTION
FOR A MORE DEFINITE STATEMENT**

Now comes counsel for the plaintiff, Daniel Treger, Esq., and hereby on oath does depose and say:

1.      My name is Daniel Treger.

2.      I am an attorney licensed to practice law in the Commonwealth of Massachusetts since 1992.

3.      I have been admitted to practice before the United States District Court for the District of Massachusetts since 1996.

4.      On Septembe 16, 2005, I visited the offices of the accounting firm retained by S.E.E. Inc.'s trustee in bankruptcy to copy a hard drive that the trustee's agents had removed from an S.E.E. computer.  I was permitted to copy the entire hard drive.

5.      The almost all of the documentation produced on January 20 and 24, 2006 was obtained from this hard drive.

6.      Defendants' counsel has declined several invitations to come to my office and

review all the documentation on the hard drive.  Notably, we our offices are located in the same building.

7.      In discussions relating to the instant motion conducted pursuant to Local Rule 7.1, I told the Defendant's counsel that I would arrange for the production of the entire ACT! database on the hard drive in my office, but that it would exceed 1900 pages.  He asked me to produce a representative sample of the information from the database instead.

8.      I also offered to produce source code for software on the hard drive in my office, but that I currently knew of no way to print the software code as a text file.  He declined production of this material as well.

Signed under the pains and penalties of perjury this 21st day of March, 2006.


_____
/s/ Daniel Treger
Daniel Treger, Esq.
B.B.O. #562147
Phillips & Angley
one Bowdoin Square
Boston, MA 02114
Tel. No. (617) 367-8787


CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing. (NEF), and paper copies will be sent to those indicated as non-registered participants on this day, March 20, 2006.

/s/ Daniel Treger

_____


L:\LITG\Trng001\statementoppaff.wpd

Phillip Tringali

1

1                               Volume:  I

2                               Pages:  1 to 274

3                               Exhibits:  1 to 4

4            UNITED STATES DISTRICT COURT

5         FOR THE DISTRICT OF MASSACHUSETTS

6          CIVIL ACTION NO. 04-12708-MLW

7    ---------------------------------

8   PHILLIP TRINGALI,              )

9            Plaintiff,       )

10   vs.                           )

11   PAUL MARTIN AND JUMI LEE,     )

12           Defendants.      )

13   ---------------------------------

DEPOSITION OF PHILLIP TRINGALI

Monday, September 12, 2005

10:04 a.m.

at

Davis & Rubin

One Bowdoin Square, Suite 901

Boston, MA   02114

Reporter:  Kathryn L. Santo

Print a transcript, condensed transcript,

Need another copy?

(see reverse for details)

Phillip Tringali

27

1    Q.   Which?

2    A.   The 1100 and the 2100.

3    Q.   Okay.  Tell me what the difference

4  between the 1100 and any of these other three that

5  were developed before the 1000, 2000, and 3000.

6    A.   Well, the 1100 was the next generation of

7  1000 product.

8    Q.   And how many of the model 1100 did you

9  sell?

10    A.   I don't recall exactly.  Maybe three or

11  four.

12    Q.   When you say the "next generation" then,

13  what were the differences between the 1000 and the

14  1100?

15    A.   There were a number of differences

16  between it, one of them being the spectrometer

17  detector was now mounted up inside the microscope,

18  versus being in the computer, and there were

19  additional features and software that were

20  incorporated into the product.

21    Q.   Were all the components from the 1100

22  purchased from outside manufacturers?

23    A.   No.

24    Q.   Which products were developed -- were

Phillip Tringali

28

1    purchased -- were not purchased from -- I'm sorry.

2            Which components of the 1000 were

3    purchased from outside contractors?

4        A.    Parts of the microscope assembly computer

5    and some computer software.

6        Q.    The components that were not purchased

7    outside, were they -- where were they obtained?

8        A.    Well, we developed assemblies.

9        Q.    And what did you develop?

10       A.    We developed the head assemblies for the

11   systems.  We developed software for the systems and

12   additional optical components.

13       Q.    Did you manufacture these in-house?

14       A.    They were manufactured to our specs

15   out -- an outside supplier.

16       Q.    An outside contractor?

17       A.    Yes.

18       Q.    Did you ever manufacture any components

19   for any of the MSP products in house?

20       A.    Physically manufacture?

21       Q.    Yes.

22       A.    Not that I'm aware of.

23       Q.    Okay.  When was the 2100 developed?

24       A.    Roughly '98/'99 time frame.

Phillip Tringali

28

1    purchased -- were not purchased from -- I'm sorry.

2         Which components of the 1000 were

3    purchased from outside contractors?

4         A.    Parts of the microscope assembly computer

5    and some computer software.

6         Q.    The components that were not purchased

7    outside, were they -- where were they obtained?

8         A.    Well, we developed assemblies.

9         Q.    And what did you develop?

10        A.    We developed the head assemblies for the

11   systems.  We developed software for the systems and

12   additional optical components.

13        Q.    Did you manufacture these in-house?

14        A.    They were manufactured to our specs

15   out -- an outside supplier.

16        Q.    An outside contractor?

17        A.    Yes.

18        Q.    Did you ever manufacture any components

19   for any of the MSP products in house?

20        A.    Physically manufacture?

21        Q.    Yes.

22        A.    Not that I'm aware of.

23        Q.    Okay.  When was the 2100 developed?

24        A.    Roughly '98/'99 time frame.

Phillip Tringali

29

1      Q.   I'm not sure that I asked you this.

2           How many of the 1100 models did you sell?

3      A.   I think three or four.

4      Q.   And the 2100 model, how many of that did

5   you sell?

6      A.   I think about 30 or so.

7      Q.   And that, I take it, is a variation of

8   the 2000?

9      A.   It was the next-generation product.

10      Q.   And what was the difference between the

11   2000 and the 2100?

12      A.   Again, the detector assembly was up on

13   top of the microscope, versus the computer

14   software, hardware, and optical changes on it.

15      Q.   When you attended a trade show, would you

16   typically bring one or more of these products to

17   the trade show?

18      A.   Yes.

19      Q.   Were they demonstrated at the trade show?

20      A.   Yes.

21      Q.   Did Dr. Martin attend all of these trade

22   shows?

23      A.   Most of them, yes.

24      Q.   Did Dr. Lee attend them?

Phillip Tringali

30

1    A.    Very few.

2    Q.    Did you attend all of them?

3    A.    Not all.

4    Q.    How many -- what percentage of the trade

5    shows did you attend?

6    A.    What time frame?

7    Q.    During the time before Dr. Martin moved

8    to Massachusetts.

9    A.    Probably about half the trade shows.

10    Q.    And after he moved to Massachusetts, how

11    many -- between the time he moved to Massachusetts

12    in January of '02, how many trade shows did S.E.E.

13    participate in?

14    A.    It was February of 2000.  Again, about 10

15    to 12 a year.  And I'd have to go back and look how

16    many I attended.  Typically, half the shows.

17    Q.    Dr. Martin would attend them all?

18    A.    Most of them, yes.

19    Q.    Now, other than the 1100 and the 2100,

20    were there any other products developed by S.E.E.?

21    A.    We were working on the next generation of

22    products.

23    Q.    Was there a name or number given to the

24    next generation?

Phillip Tringali

31

1    A.    2200 and 1200.

2    Q.    2200 and 1200?

3    A.    Yup.

4    Q.    Let's go to the 1200.  That's a variation
5    now of the 1000?

6    A.    Yes.

7    Q.    And what was the difference between the
8    1200 and the 1100?

9    A.    It had to do with the microscope design,
10   optical design, and the detector design.

11   Q.    Who manufactured the microscope for the
12   1200?

13   A.    Well, the parts, we were utilizing for
14   the 1200 would have been from Olympus at the time.

15   Q.    And the detector, who manufactured the
16   parts of those -- the detector?

17   A.    Well, the detector that we were looking
18   at was from a company called "CDI."

19   Q.    Located where?

20   A.    Oh.  I don't recall.

21   Q.    Is it a fair statement you assembled
22   the comp -- the physical components for the 1200
23   were either purchased or manufactured for you by
24   outside contractors?

Phillip Tringali

32

1      A.   Yes.

2      Q.   You assembled them in-house?

3      A.   Yes.

4      Q.   And the software was procured where?

5      A.   Different suppliers and modified in

6   house.

7      Q.   Who modified the software?

8      A.   It would have been Dr. Lee and some,

9   Dr. Martin.

10      Q.   Did Dr. Lee have some expertise in

11   modifying software?

12      A.   Well, according to Paul, she had done

13   some software development for, I believe,

14   SperiUNIVAC at the time.

15      Q.   Well, during the time she worked for

16   S.E.E., was that one of her duties, modifications

17   of the software?

18      A.   Yes.

19      Q.   Was she competent to perform that

20   service?

21      A.   Seemed to be.

22      Q.   And what did you do with respect to the

23   1200 development of the 1200?

24      A.   Help put together the specifications for

Phillip Tringali

33

1    the products.

2        Q.    And how many 1200 models -- by the way,

3    when did the 1200 come on the market?

4        A.    The 1200 was not released to the market.

5        Q.    And why was that?

6        A.    It wasn't finished.

7        Q.    So when Dr. Martin and Dr. Lee left the

8    company, the 1200 was still under development?

9        A.    Yes.

10       Q.    And what stage had been developed by

11   January of '02?

12       A.    January of '02?

13       Q.    That's when they left.  They left

14   January 9th, '02; is that correct?

15       A.    No.  Oh, excuse me.  '02.  Yes, it was

16   '02.  I don't have all the details.  I know we

17   purchased components, software, and stuff for

18   development.

19       Q.    Was there some percentage that you were

20   going to affix to the portion of development of the

21   1200?  50 percent, 40 percent, 60 percent?

22       A.    No.

23       Q.    Did you continue with the development of

24   the 1200 after Martin and Lee left?

Phillip Tringali

34

1      A.    Yes.

2      Q.    And did you hire someone to do that work?

3      A.    Yes.

4      Q.    Who?

5      A.    Andrea Desrosiers.

6      Q.    Do you want to spell that for the --

7      A.    Andrea just the way it sounds.

8    Desrosiers is D-E-S-R-O-I-R-E-R-S [sic], I believe.

9      Q.    Had you -- Ms. Desrosiers was hired when,

10   please?

11     A.    She -- well, she was first hired in, I

12   believe, 2000.

13     Q.    And she would have been hired where?

14   Massachusetts or California?

15     A.    California.

16     Q.    What were her duties when she was hired

17   initially?

18     A.    To work with applications.

19     Q.    And what was her background?

20     A.    She, I believe, had a master's degree

21   from Boston University in spectroscopy.

22     Q.    And how long did she work for S.E.E.

23   initially?

24     A.    I believe just over a year, maybe a

Phillip Tringali

35

1    little longer, 18 months.

2        Q.    Did she leave, or was she terminated by

3    S.E.E.?

4        A.    She was terminated.

5        Q.    And the reason for the termination was

6    what?

7        A.    Job performance.

8        Q.    And when did you rehire her?

9        A.    I believe the end of January, beginning

10    of February of 2002.

11        Q.    When you say she was "terminated" for

12    "job performance," she wasn't doing the job

13    according to your standards?

14        A.    She wasn't doing the job according to

15    Jumi Lee's standard.

16        Q.    Okay.  When you hired her the second

17    time, where did you hire her?  In California or

18    Massachusetts?

19        A.    Massachusetts.

20        Q.    Did she move to Massachusetts?

21        A.    Well, she did, when the company moved,

22    yes.

23        Q.    When the company moved, she came with

24    Dr. Martin and Dr. Lee in 2000?

Phillip Tringali

36

1     A.   Yes.

2         Q.   So she was residing in Massachusetts?

3     A.   Yes.

4         Q.   When you hired her the second time, what

5   was her duties?

6     A.   As -- pretty much, engineering manager of

7   R&D.  She had a number of duties.

8         Q.   Was she given responsibility for

9   completing the development of the 1200 model?

10    A.   She was given responsibility to develop

11  the 1200 and 2200, yes.

12        Q.   Well, those -- the 1200 was partially

13  developed at that time when Ms. Desrosiers was

14  hired?

15    A.   Yeah.  I guess we could say that.

16        Q.   Was she given the responsibility to

17  finish that?

18    A.   Well, I -- I guess you could say that.

19        Q.   Well, who was her supervisor?

20    A.   Me.

21        Q.   And what were her duties?  What did you

22  tell her to do?

23    A.   We -- well, first of all, we had to

24  continue to keep the business going for the

Phillip Tringali

37

1    company.  We had a lot of installations, training,

2    and customers to support.  Our secondary

3    responsibilities were also to develop the next

4    generation of products.

5        Q.    And was Ms. Desrosiers given those

6    responsibilities to support the present customer

7    base and develop the 1200 and 2200?

8        A.    Yes.

9        Q.    Did she have any assistance from anyone

10   else?

11       A.    To do?

12       Q.    Any of these jobs.

13       A.    At what time?

14       Q.    When you hired her the second time.

15       A.    Well, we had, basically, in-house

16   personnel.

17       Q.    In house also worked on the 1200 and the

18   2200?

19       A.    Well, Anthony Facchiano would had done

20   some.  He was in manufacturing.  We also hired an

21   application scientist who had done some work also.

22       Q.    And that person's name is what?

23       A.    Mitchell Kupferman, and I believe it's

24   K-U-P-F-E-R-M-A-N.

Phillip Tringali

38

1    Q.    When was Mr. Facchiano hired?

2    A.    I believe August of 2000.

3    Q.    And was that before the folks moved from

4    California?

5    A.    No.

6    Q.    It was after they moved?

7    A.    Yes.

8    Q.    And what were his duties?

9    A.    He was a manufacturing associate involved

10   in the production testing of the systems.

11   Q.    So he was -- and what was his background

12   credentials?

13   A.    I think his previous job was in the

14   position in manufacturing for Motorola.

15   Q.    In what type of product plan?

16   A.    I believe Intel communications area.

17   Q.    So he worked -- how long did he work for

18   S.E.E., Mr. Facchiano?

19   A.    Until, I believe, January of 2004.

20   Q.    Did his duties change during his tenure

21   with S.E.E.?

22   A.    No.

23   Q.    Mr. Kupferman, what was his background?

24   A.    He had just received a degree in forensic

Phillip Tringali

39

1    science from the University of New Haven.

2        Q.    And when was he hired?

3        A.    Around July of 2002.

4        Q.    And what were his duties?

5        A.    To assist with installations, training,

6    customer support.

7        Q.    Did he assist at all with developing the

8    1200 and the 2200?

9        A.    Yes.

10        Q.    And how long did he work for S.E.E.?

11        A.    Just over a year.

12        Q.    That would have been to July of '03 or

13    August of '03?

14        A.    Yes.

15        Q.    Did he leave on his own, or was he

16    terminated?

17        A.    Left on his own.

18        Q.    Do you know why he left?

19        A.    I believe to take another position and go

20    back to school.

21        Q.    All right.  Was the development of the

22    1200 ever completed?

23        A.    No.

24        Q.    And why was that?

Phillip Tringali

40

1      A.    It wasn't completed.

2      Q.    The folks that you had weren't able to

3   complete the development of it?

4      A.    Not by the time we had shut the company

5   down, no.

6      Q.    And how about the 2200; we haven't talked

7   about that.  When was the development on that

8   started?

9      A.    Well, it's supposed to have started in

10   the beginning of 2001.

11      Q.    And did it start in the beginning of

12   2001?

13      A.    As far as I know, yes.

14      Q.    And who was involved in that?

15      A.    Jumi Lee and Paul Martin.

16      Q.    And when Dr. Martin and Dr. Lee left in

17   January of '02, what was the status of the 2200?

18      A.    Don't completely know.

19      Q.    I'm sorry?

20      A.    I don't completely know.

21      Q.    What do you know about it?

22      A.    We had some components and some software

23   in the facility.

24      Q.    And that's -- was there specifications

Phillip Tringali

41

1    written for the 2200?

2         A.    Yes.

3         Q.    Was there specifications written for the

4    1200?

5         A.    Somewhat.

6         Q.    And where are these specifications now?

7         A.    Now?

8         Q.    Yes.

9         A.    Probably in company records.

10        Q.    Now, you have a storage facility

11   somewhere?

12        A.    Yes.

13        Q.    Where is that storage facility located?

14        A.    In Halifax.

15        Q.    Describe it, if you would.  What is it?

16        A.    It's a 10 by 15 closed storage facility.

17        Q.    What's in it?

18        A.    Everything that was moved from S.E.E.'s

19   facility.

20        Q.    And that consisted of what?

21        A.    Computers, files, records, some

22   components, demo systems.

23        Q.    You were -- there was a document request

24   made in this case at some point in time by me?

236

1    Q. What -- is this description -- in this

2    description is a reference to the easy-to-use

3    windows 2000 software.

4    A. Mm-hmm.

5    Q. Is that the same software that the --

6    S.E.E. devices used?

7    A. Well, that's what they were supposed to

8    be building for us, yes.

9    Q. Well, did any of the S.E.E. devices used

10    to -- the last S.E.E. device prior to Martin and

11    Lee leaving was what? -- the 2200 or 2100?

12    A. 2100.

13    Q. That used a windows 2000 software?

14    A. Windows '98.

15    Q. Okay. The 2200 used -- was to use what?

16    A. Windows 2000.

17    Q. Did you ever develop and complete the

18    2200?

19    A. No.

20    MR. TREGER: Objection. Asked and

21    answered.

22    Q. What does it mean by the "only

23    microspectrometer with a scientific grade, CCD

24    detector"?