UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 04-12708-MLW

| | |
|---|---|
| PHILLIP TRINGALI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| PAUL MARTIN AND | ) |
| JUMI LEE, | ) |
| | ) |
| Defendants | ) |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' TO STAY MOTION
FOR A MORE DEFINITE STATEMENT**

Defendants' motion to stay discovery and for a more definite statements is utterly frivolous. Plaintiff respectfully requests that this Court deny the motion, and in doing so treat the motion, and this opposition, as part of the pending motions to compel and for a protective order for purposes of awarding Plaintiff his fees and costs associated with obtaining discovery in this matter.

**I.   DEFENDANTS KNOW WHAT PROPRIETARY INFORMATION THEY ARE ALLEGED TO HAVE APPROPRIATED**

To even entertain the instant motion as meritorious, one has to accept that the Defendants do not know what proprietary and confidential information they are alleged to have miss-appropriated. This suggestion is ludicrous. Defendant Martin was primarily responsible for developing, marketing, selling, installing and servicing analytical microspectrophotometers for S.E.E., Inc. since 1996, and was intimately involved in the development and marketing of S.E.E.'s analytical products. Defendant Lee participated in, and/or directed the development, fabrication and assembly of S.E.E.'s products since she was hired in 1997. [Exhibit 1, Tringali's

1

answers to Martin's Interrogatory 1]. In fact, Martin and Lee allege in their complaint in the Norfolk County Action that Martin and S.E.E. Lee allege that Martin and S.E.E. started the microspectrometer business in Martin and Lee's home in California in 1996, and that Martin was granted 20,000 shares of stock in recognition of his development of the microspectrometer business. [See document previously filed as Exhibit 2 to Docket No. 7, ¶¶7-10]. Their feigned ignorance as to what confidential information they are alleged to have appropriated is simply not credible.

     A.     **THE CUSTOMER AND SALES INFORMATION**

     Defendants cannot, in good faith, claim that they do not know what customer and sales information they are alleged to have appropriated.. Plaintiff's complaint alleges that Defendants had intimate knowledge of S.E.E. Inc.'s database of customer information, and that they had improperly copied and appropriated a copy of all of S.E.E.'s analytical product customer information. [Docket No. 1, Plaintiff's Complaint, ¶¶ 24, 38]. In addition, Plaintiff stated in his answers to Martin's interrogatories that the soon after Defendants resigned from S.E.E, Inc., they contacted S.E.E.'s distributors and vendors, and began contacting S.E.E. customers and prospective customers using S.E.E.'s confidential database and sales projections. [See Exhibit 1, Tringali's answer to Martin's interrogatory no. 6].

     In fact, Defendants have known that they are alleged to have appropriated a copy of S.E.E., Inc.'s entire database, which had been maintained using s software application called "ACT" since S.E.E. sued them in Plymouth County Superior Court in March of 2002 for using the information in this database to improperly compete with S.E.E., Inc. On March 12, 2002, S.E.E. employee Deborah Bowles executed an affidavit that was submitted in support of S.E.E., Inc.'s Motion for a Preliminary Injunction in the Plymouth County Action in which she stated:

    3.      During the last year, it has been a part of my duties to interact on a nearly daily basis with Paul Martin ("Martin") and Jumi Lee,("Lee") defendants herein.

    4.      As a result of that close interaction, I was aware of the fact that both Martin and Lee had downloaded the corporation's database, kept by the software program "ACT" , onto each of their laptop computers used in the course of their employment.

\*\*\*

    8.      The database managed by the program "ACT" contains the names, addresses telephone numbers, contact persons within the customer's company, notes regarding the status of jobs. and notes regarding telephone conversations with customers or potential customers and forecasts of the needs of the corporation's customers and other pertinent customer information.

[Exhibit 2, March 12, 2002, affidavit of Deborah Bowles]. A representative page of the ACT! database was attached to Bowles' affidavit. [Id.].

Lest there be any doubt, Martin offered the following testimony during Martin's deposition in the related Norfolk County action:

    Q.    And what kind of records did you maintain specifically with respect to marketing?

    A.    Competitive information, specifications of our own tools, price lists, customer contact information, prospective customers and general contact information.

    Q.    And was any specific piece of software used to maintain the categories of information that you just identified?

    A.    Could you read each category back?

    Q.    Customer Contact Info

    A.    We used the ACT! database.

    Q.    Prospective Customers?

    A.    ACT database, Excel

>   Q. And general Contact Information?
>
>   A. ACT! Database.
>
>   Q. And Price List?
>
>   A. Word, Excel?
>
>   Q. Specifications?
>
>   A. Word.

[Exhibit 3, Martin Deposition, pp. 32-33].

Nevertheless, in an effort to resolve the issues raised in the instant motion pursuant to Local Rule 7.1, Plaintiff offered to provide Defendants with a copies of S.E.E.'s ACT! database. When Defendant's counsel learned that the database contained database records of over 1900 contacts, he declined, instead accepting a representative print-out of reports generated by ACT! about one contact. [See Exhibit 4, Plaintiff's Letter of January 30, 2006, and documents 501-503 attached thereto; Exhibit 5, Affidavit of Plaintiff's Counsel]. Defendants' counsel has also declined several invitations to inspect the data that Plaintiff obtained from a computer disk drive that S.E.E.'s Trustee in Bankruptcy had sequestered. This data includes copies of the S.E.E. ACT! database, and has been available to Defendant's Counsel since September 17, 2005.

### B.   THE TECHNICAL INFORMATION

Nor can Defendants in good faith, claim that they do not know what technical information they are alleged to have appropriated. Plaintiffs have specifically alleged that defendant appropriated all of the design and development information for an enhanced product that Martin and Lee were developing during the year before they resigned from S.E.E., and that they then destroyed all of S.E.E.'s copies of this information, including "paper records and digital information regarding the specifications for the enhanced product, all computer code written for

integration in to the enhanced product, and all documentation regarding the process developed for assembling the enhanced product." [Docket No. 1, Plaintiff's Complaint, ¶¶ 38-40]. Plaintiff's further allege that within two weeks of their resignation, Defendants began marketing a microspectrophotometer "virtually identical to S.E.E's product except that it included the features that S.E.E. and discussed and planned to incorporate into the enhanced product." [Id., ¶ 41].

By now, it is obvious that the term "S.E.E.'s product" as referenced in the complaint meant S.E.E.'s model 2100 microspectrophotometer.

- When instructed in Paul Martin's interrogatory No. 6, to identify all documents that supported paragraph 33 of this Complaint, that Martin and Lee formed Quantum dynamics for the purpose of marketing and installing "an integrated, computerized analytic device to compete with S.E.E.'s product," he responded in relevant part:

    (a)   documents drawings, test results, specifications, designs, and source code with documentation relating to the development, the specifications, the identity of component parts, and the testing of S.E.E., microspectrophotometers . . .

    (d)   Documents, correspondence, print materials, pamphlets, scientific papers, service records and other materials used to sell or market S.E.E. microspectrophotometers, or to service customers who had purchased such instruments . . .

    (g)   All documents relating to the specification and identity of parts ordered by Quantum from S.E.E's suppliers after defendants' departure from S.E.E., currently in the possession of said suppliers.

    (h)   **An S.E.E. 2100 microspectrophotometer**, currently in a storage facility in Halifax, Massachusetts.

    (I)   A Quantum Mach 1 and Mach 10 microspectrophotometer, currently in the possession of Quantum and/or CRAIC.

5

[See Exhibit 1, Tringali's answer to Martin's interrogatory no. 6].

- When asked at his September 12, 2005 deposition if the QDI instrument he saw at an April, 2002 conference resembled any S.E.E. products, he responded the 2100 and 2200, based upon the specifications and some of the internal components. [Exhibit 6, Phillip Tringali Deposition, p. 65-66].

- At the time Martin and Lee resigned from S.E.E., S.E.E. had only two primary products; the S.E.E. 1100 microspectrophotometer, and the S.E.E 2100 NIR (near infra red) microspectrophotometers .   [See Exhibit 4, Plaintiff's Letter of January 30, 2006, and documents 505-520 attached thereto].   Martin and Lee moved the Microspectrophotometer business to Massachusetts in the year 2000.  [See document previously filed as Exhibit 2 to Docket No. 7, ¶9].   The 2100, however, was developed in 1998/1999, while the business was still under the direct control of Martin and Lee in California.  At the time Martin and Lee resigned, the planned successors to the 2100 and 1100, designated the 1200 and 2200, were still under development.  [Exhibit 6, Tringali Depo. p. 27-40; 236].

- Despite purporting to need a more definite statement regarding what proprietary technical information they were alleged to have appropriated, Defendant's counsel was able to produce a detailed list of this information to include in its December 30, 2005, letter requesting that Plaintiff provide documents "as to all models" to resolve the threatened motion for a more definite statement:

    1. The specifications;

    2. The optical design documents;

    3. Mechanical drawings;

    4.       Parts list included microscope parts;

    5.       Assembly instructions;

    6.       Development notes for hardware and software;

    7.       Source code and all revisions.

[See Document attached to Docket No. 42 as Exhibit B].

- On January 20, 2005, as the result of the Local Rule 7.1 conference, relating to the defendants' purported need for a more definite statement, plaintiff produced specifications and promotional literature for the S.E.E. 1100 and 2100. [See Exhibit 4, Plaintiff's Letter of January 30, 2006, and documents 505-533].

- On January 24, 2006, Plaintiff produced a CD containing 218 pages of additional documentation as described in Exhibit D to Docket No. 42. Counsel expended significant effort to gather the documents from the hard drive in his possession, convert the documents from MSWord to PDF format, search for "freeware" that would convert the AutoCAD Drawings to PDF format, and number the documents consecutively for easy reference. The Titles of the documents were as follows:Assembly Procedures for Filter

- Removal from Halogen Lamp House (part 10003);

- Assembly Procedure - Installation of Image Capture Package (Part 10005);

- Assembly Procedure  - Installation of Color Software Package (Part No. 10008);

- Assembly Procedure S.E.E. 2000;

- Assembly Procedure for S.E.E. 2000 UV Visible Transmission Package;

- Assembly Procedure for S.E.E. 2000 Visible Transmission Package;

- Assembly Procedure for S.E.E. 2000 UV vertical illuminator;

- Assembly Procedure of the Microscope - spectrometer Adapter (Part No. P

10017);

- Assembly Procedure for UV - Visible Xenon Lamp (Part P10018);
- Assembly Procedure, S.E.E. 2100- Assembly Procedure for UV Fluorescence Package;
- Assembly Procedure of the Microscope - Spectrometer Adaptor 1100/2100 Series;
- Quality Control Procedure of the 1100/2100 Series;
- Assembly Procedure for the S.E.E. 2100 UV - Visible Microspectrometer;
- Assembly Procedure for S.E.E. 2100-2 "Standoff" fasteners;
- Quality Control Manual Reflectance Testing;
- Assembly Procedure for S.E.E. 2100 UV Vertical Illuminator;
- S.E.E. Parts List 1100 + 2100 XLS
- Parts Pickup List 1100 + 2100 XLS

These documents identify several pieces of software, including "SeeImage," "SEEScope" "SEE Drivers", "Bandit Drivers", "Bandit Image Capture Software," "SEE GRAMS Drivers," and "SEE operations Software." This disk also contained 107 AutoCad drawings of parts, identified by part names.

The "properties" linked by Microsoft word to the written documents produced reveal that 18 were authored by Paul Martin, and 1 was authored by Jumi Lee. The assembly procedures included photographs of parts, and diagrams of the instruments. Of the 100 pages of assembly instructions, 88 bore the word "confidential" in the bottom left corner.

### C. DEFENDANTS DID NOT CONFERENCE THIS MOTION IN GOOD FAITH

It is inconceivable that Defendants still need a more definite statement of the technical information they are alleged to have appropriated and incorporated into their competing product.

They directed the development and marketing of S.E.E.'s 1100 and 2100 microspectrophotometers, and authored documents describing how to assemble and test it.

Defendants did not conference this motion after receiving the 251 additional pages of documentation, nor have they indicated why it was insufficient to place them on notice of what proprietary information they are alleged to have appropriated, other than the fact that unrelated documents were inadvertently copied onto the disk produced to defendant. The file directory of the disks produced clearly indicates which documents are referenced in the cover letter, and which are not. [See Exhibit "D" to Docket No. 42; Exhibit 7 hereto]. It is curious that Martin and Lee, two highly educated Ph.D's, could not figure out which documents were relevant. [Exhibit 5, Affidavit of Defendant's Counsel]. The only other suggestion, that the production contained no assembly instructions for the S.E.E. 2200, is specious. This is the designation given to the "enhanced product" referenced in Plaintiff's Complaint. [Docket No. 1]. Plaintiff specifically alleged that Defendants destroyed all assembly instructions for this product, which never went to market. See Docket No. 1, Exhibit 40].

Finally the Court should note that with the exception of the 15 page promotional pamphlet, this information was harvested from the disk drive to which Defendants' counsel has had access since September 17, 2005. Defendants' claim that Plaintiff's counsel represented that the disk was physically produced by the plaintiff himself is a patent misrepresentation. The exhibits that purportedly make this information state no such thing. Moreover, during discussions regarding this matter, Plaitniff's counsel informed defendant's counsel that he had possession of the source code for various S.E.E. software, but had no software that would allow him to print it out as a text file. Defendants' failure to conference this motion in good faith, and persistent misrepresentation of fact reflects poorly upon the merit of the instant motion. [Exhibit

5, Affidavit of Plaitniff's Counsel].

## CONCLUSION

WHEREFORE, plaintiff Phillip Tringali respectfully requests that defendants' motion to stay and for a more definite statement be denied, and that he be awarded his fees and costs in responding to them with this filing.

Phillip Tringali,
By his attorneys,

Date: March 21, 2006

*/s/ Daniel Treger*

Daniel Treger, Esq.
B.B.O. #562147
Phillips & Angley
One Bowdoin Square
Boston, MA 02114
Tel. No.: (617) 367-8787

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing. (NEF), and paper copies will be sent to those indicated as non-registered participants on this day, March 21, 2006.

*/s/ Daniel Treger*