UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CIVIL ACTION NO.: 04-12708-MLW

| | |
|---|---|
| PHILLIP TRINGALI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| PAUL MARTIN AND | ) |
| JUMI LEE, | ) |
| | ) |
| Defendants | ) |

AMENDED MOTION OF PLAINTIFF PHILLIP TRINGALI TO COMPEL
DEFENDANTS TO PERMIT HIM TO INSPECT DOCUMENTS[1]

Phillip Tringali hereby moves this Honorable Court to compel the defendants Paul Martin and Jumi Lee to allow the him to inspect all of the documents that they produce. In support of this motion, the plaintiff states:

1. On April 10, 2006, (after hearing on March 22, 2006) this court issued a protective order that allowed the plaintiff to see all documents that the defendants produced. (Docket No. 57).

2. Plaintiff Tringali is a defendant in a related case in the Norfolk Superior Court. The documents produced in this action are relevant to certain equitable defenses Mr. Tringali has asserted in the Norfolk Superior Court action.

3. On April 5, 2006, during a pretrial conference in the Norfolk Superior Court action, Associate Justice Judith F. Fabricant asked the parties to either agree on a protective order

---

[1]Plaintiff files this Amended Motion at the demand of defendants, to correct a date and restate a fact that defendants claim was intentionally misrepresented. Plaintiff denies any such intent, but is happy to oblige defendants' request.

1

limiting disclosure of information produced during discovery, or to submit proposed orders. Tringali and Martin and Lee mailed proposed orders to court on April 7th and 10th respectively, both similar to those proposed here.

4.  On April 13, 2006, Judge Fabricant issued a protective order allowing the parties to designate material as "attorneys eyes only". Notice of this order issued on April 19, 2006.

5.  Martin and Lee are under Court order to produce documents and provide complete answers to interrogatories in this matter by May 19, 2006. Defendants have informed plaintiff that they will produce six boxes of documents, containing communications, vendor records, telephone and sales records, source code and design records, on May 16 and 17, 2006, but that all will be designated as "attorneys eyes only" pursuant to the Norfolk County Protective Order except for the sales and telephone records. Plaintiff will be permitted to help his attorney inspect only one of the six boxes of documents. [Exhibit 1, Letters of April 26 and 27, 2006]. This directly contravenes the protective order in this case.

6.  Plaintiff has moved the Norfolk County Superior Court to conform its to the terms of the order entered here. In so moving, Mr. Tringali noted that Nanometrics, Inc., terminated its relationship with him as of March 31, 2006. [Exhibit 2, Nanometrics termination letter]. Defendants claimed that they needed a highly restrictive protective order because Tringali was an outside sales representative for Nanometrics, a purported competitor of the defendants.

7.  Martin and Lee's opposition to the above referenced motion argues that Mr. Tringali as a liar who cannot be trusted with the defendants' confidential information. Defendants claim that Tringali lied about his relationship with Nanometrics during his March 10,

2

2005 deposition taken in the Norfolk County action.[2]

       8.      This accusation rests upon the following exchange:

*Q.      After 1988, did you have any business dealings or were you involved in any way with the sale or manufacturing of microspectrophotometers?*

*A.      Yes.*

*Q.      When?*

*A.      I have had right along. I represented Nanometrics which made micro spectrophotometers.*

*Q.      For what time did you represent Nanometrics?*

*A.      I represented them from 1988 until I believe March of last year.*

[Exhibit 3, Transcript of March 10, 2005, Deposition of Phillip Tringali, p. 14., ll. 1-11]

       9.      Defendants claim that this statement conflicts with Tringali's subsequent attestations in that he represented Nanometrics through 2005, that his claim that Nanometrics terminated his representation is the third different story he has told about his relationship with Nanometrics, and that neither it, nor he, can be trusted.

       10.     This is untrue. When Tringali testified that he represented Nanometrics until March 2004, he understood Mr. Davis (defendant's counsel) to be asking about S.E.E., Inc.'s relationship with Nanometrics, which did end in March 2004 when S.E.E. ceased operating.[3]

       11.     Tringali so understood because prompted by attorney Davis' consistently used the

---

[2]These accusations are contained in defendants' opposition to plaintiff's motion in the Norfolk Action.

[3]S.E.E., Inc. is the bankrupt former employer of the parties.

pronoun "you" to refer S.E.E. Inc. while questioning Tringali about S.E.E.'s conduct. Before the question at issue, attorney Davis had already asked Tringali:

- "After that, did *you* hire [Mr. Martin]?"; [Exhibit 3, p. 8, l. 12].

- "And in what capacity did *you* hire Dr. Martin?"; [Exhibit 3, p. 8, l. 17].

- "And by the way, did *you* ever enter into any written agreement regarding his employment?"; [Exhibit 3, p. 9, ll. 11-13].

- "Who did *you* hire specifically that signed that non-compete contract?" [Exhibit 3, p. 10, ll 23-24].

12.     There is no dispute that it was S.E.E., Inc. and not Mr. Tringali individually, that hired and employed Martin and Lee, and required certain employees to sign non-competition contracts.

13.     Soon after asking the question at issue, attorney Davis confirmed that he had been using the pronoun "you" to refer to S.E.E., Inc., and not to Tringali individually:

Q.     *I take it since 1995 you have not been involved in the sales of any Nanometrics forensic products.*

A.     *No.*

Q.     *Is that a fair statement?*

A.     *No.*

Q.     *When you say no --*

      Mr. Treger:     *I'm going to object to the form. I don't understand.*

Q.     **When I say you, I mean S.E.E.**  *After 1995, did you sell any Nanometrics forensics products? [Exhibit 3, p. 16, l. 17 - p. 17, l. 3].*

4

14.     If defendants had truly believed Tringali was trying to hide his relationship with Nanometrics, they would have raised this issue when they first moved for a protective order, *eight months* after this deposition.

WHEREFORE, plaintiff respectfully request that defendants be compelled to allow him to inspect all documents to be produced for inspection, and that he be awarded his fees and costs in bringing this motion pursuant to Fed.R.Civ.P. 37(a)(4)(A).

Dated: May 8, 2006                                  RESPECTFULLY SUBMITTED
                                                    Plaintiff Phillip Tringali
                                                    By his attorneys

                                                    //Daniel Treger//
                                                    Daniel Treger, Esq.
                                                    B.B.O. #562147
                                                    Phillips & Angley
                                                    One Bowdoin Square
                                                    Boston, MA 02114
                                                    Tel No.: (617) 367-8787

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing. (NEF), and paper copies will be sent to those indicated as non-registered participants on this day, May 8, 2006.

/s/ Daniel Treger

## CERTIFICATE PURSUANT TO LOCAL RULE 37.1

I hereby certify, as counsel for the plaintiff, that on May 2, 2006, I telephoned defendants' counsel and conferred with him in an attempt to resolve the issues arising from the conflicting protective orders, but that we were unable to do so.

/s/Daniel Treger

L:\LITG\Trng001\maydiscoverymotion

EXHIBIT "1"

# DAVIS & RUBIN

ATTORNEYS AT LAW

ROGER S. DAVIS
JOEL S. RUBIN (1948-1991)

ONE BOWDOIN SQUARE
SUITE 901
BOSTON, MASSACHUSETTS 02114-2919
(617) 742-4300
FACSIMILE (617) 742-4304

**VIA FACSIMILE
617-227-8992**

April 26, 2006

Daniel Treger, Esq.
PHILLIPS & ANGLEY
One Bowdoin Square
Boston, MA 02114

Re: Document Production

Dear Mr. Treger:

To confirm our telephone conversation of this date regarding the production of the records. As I discussed with you, my client will be shipping to me five boxes of records which been have kept and produced in the ordinary course of business. The records consist of the following:

1. Three boxes designated as "A," "B" and "C" consist of communications including emails and records of all communications, all of which are designated as "Attorney's Eyes Only" pursuant to the Norfolk County protective order entered by Judge Fabricant on April 13, 2006.

2. Box "D" consists of vendor records, including telephone records which are designated as "Confidential" pursuant to the protective order.

3. Box "E" consists of sales records, software source code and design records (including mechanical drawings), all of which are designated as "Attorney's Eyes Only."

I will advise you when the five boxes have arrived at our office and set aside sufficient time for you to inspect them. As I indicated boxes "A," "B," "C" and "E" should be inspected by you alone and box "D" may be inspected by you and your client, pursuant to the Norfolk County protective order. I have arranged with IKON that all documents which you select to be copied will be stamped and copied by IKON at your expense. The document production will take place in our conference room and I have reserved May 8 and 10, 2006.

Very truly yours,

Roger S. Davis

RSD:cat
QD113:MARTIN:DTPAX

# DAVIS & RUBIN

ATTORNEYS AT LAW

ROGER S. DAVIS
JOEL S. RUBIN (1946-1991)

ONE BOWDOIN SQUARE
SUITE 901
BOSTON, MASSACHUSETTS 02114-2919
(617) 742-4300
FACSIMILE (617) 742-4304

**VIA FACSIMILE**
**617-227-8992**

April 27, 2006

Daniel Treger, Esq.
PHILLIPS & ANGLEY
One Bowdoin Square
Boston, MA 02114

Re:   Document Production

Dear Mr. Treger:

This is to follow up to my letter of April 26, 2006 regarding the production of the five boxes, which were to take place on May 8 and 10, 2006 in my office. Due to the time needed to pack these boxes securely, attach them to a shipping pallet and ship them cross country, I am informed that telephone discussion shiment will not arrive before May 10, 2006. Furthermore, there are now six boxes rather than five. As indicated in my prior letter, boxes "A," "B" and "C" will be designated as Attorney's Eyes Only pursuant to the Norfolk County Protective Order. Box "D" will now consist of vendor records, which is also designated as Attorney's Eyes Only, box "E" will consist of software source code, design records, including mechanical drawings, designated as Attorney Eyes Only and box "F" will consist of sales records and telephone records will be designated as Confidential. I have rescheduled the production of documents in our conference room for May 16 and 17, 2006.

Very truly yours,

Roger S. Davis

RSD:cat

QDI13:MARTIN.DTFAX

EXHIBIT "2"

# NANOmetrics

NANOMETRICS INCORPORATED   1550 Buckeye Drive   Milpitas, CA 95035   Tel: 408.435.9600   Fax: 408.232.5910

March 31, 2006

Phil Tringali
PT Technology
98 Walnut Street,
Halifax, MA 02338

Dear Phil:

Please note the attached Nanometrics Representative Termination Agreement between PT Technology and Nanometrics Inc.

Please sign and return one copy to me and keep a copy for your records.

We appreciate your support and sales efforts during the many years with Nanometrics and wish you continued success in the future.

Best regards,

Nathan Coe
Sr. Director of Sales

EXHIBIT "3"

```
                                                              Page 1
 1                                           Volume:   I
 2                                           Pages:    1-215
 3                                           Exhibits: 1-9
 4            COMMONWEALTH OF MASSACHUSETTS
 5    Norfolk, ss                    Superior Court
 6
 7    Civil Action No. 02-801
 8    - - - - - - - - - - - - - - - - - - - x
 9    PAUL MARTIN and JUMI LEE, Individually
10    and as Stockholders on behalf of
11    S.E.E., Inc.,
12                Plaintiffs,
13    vs.
14    S.E.E., INC. and PHILLIP TRINGALI,
15                Defendants.
16    - - - - - - - - - - - - - - - - - - - x
17
18            DEPOSITION OF PHILLIP TRINGALI
19               Thursday, March 10, 2005
20                   Davis & Rubin
21                 One Bowdoin Square
22              Boston, Massachusetts 02114
23               Commencing at 10:04 a.m.
24       Reporter:  Karen A. Morgan, CSR/RPR
```

Page 6

1 were formerly engaged in while you were a principal of
2 S.E.E.?
3   A. It was the same field, yes.
4   Q. Directing your attention to company S.E.E.,
5 Inc. and I'll refer to that as S.E.E. When was that
6 first organized?
7   A. I believe in July of 1988 and it was
8 incorporated in August.
9   Q. What was the nature of S.E.E.'s business?
10   A. It was selling equipment used in the
11 semiconductor field.
12   Q. And that company is presently in Chapter 7
13 proceedings?
14   A. Yes, it is.
15   Q. At some point in time S.E.E. acquired or
16 started an additional business?
17   A. Yes.
18   Q. That was what, sir?
19   A. That was in the forensic field.
20   Q. When was that?
21   A. I believe in April of '95 it was started.
22   Q. All right. Was that add or about the time
23 that you first met Dr. Martin?
24   A. No, it wasn't.

Page 7

1   Q. Was it before or after you met Paul Martin?
2   A. It was after.
3   Q. Tell me when you first met Dr. Martin.
4   A. I would have to guess. I don't know the
5 exact time. Probably --
6       MR. TREGER: No. Don't guess. If you
7 don't know, you don't know.
8   Q. Your best memory then.
9   A. Probably the end of '94.
10   Q. And how did you happen to meet him?
11   A. He had been hired by Nanometrics.
12   Q. Nanometrics was a company engaged in what,
13 please?
14   A. They were engaged primarily in the
15 semiconductor business.
16   Q. Where were they located?
17   A. At the time I believe they were in Sunnyvale,
18 California.
19   Q. Was Dr. Martin involved in the semiconductor
20 business or some other kind of business?
21   A. He was involved in the analytical business of
22 Nanometrics at the time and I think some in the
23 semiconductor.
24   Q. All right. Tell me if you will what the

Page 8

1 analytical business means.
2   A. It has to do with analytical products which
3 is a computerized instrument. It was used in the
4 forensic field for doing trace evidence analysis.
5   Q. Does that instrument have a generic name?
6   A. Well, it would be called a microprocessor I
7 guess in principle.
8   Q. After you met Dr. Martin, was there a time
9 when he left Nanometrics?
10   A. Yes. He was laid off I believe in April of
11 '95.
12   Q. After that did you hire him?
13   A. Yes, I did.
14   Q. Approximately when was that?
15   A. That would have been I think a couple of
16 weeks after he left Nanometrics.
17   Q. And in what capacity did you hire Dr. Martin?
18   A. I believe at that time it was -- I would have
19 to go back. I don't remember the title at the time. I
20 would have to back and check. I don't recall.
21   Q. Let me ask you this then. Where was he
22 situated initially?
23   A. He was in California.
24   Q. Did he work for your company S.E.E. while he

Page 9

1 was residing in California?
2   A. Yes, he did.
3   Q. Was he involved in the analytical business of
4 S.E.E. while he was living in California?
5   A. Yes.
6   Q. What did he do for S.E.E. while he was
7 residing in California?
8   A. A number of things involved in the
9 development of new products. He did marketing. He did
10 some sales.
11   Q. And by the way, did you ever enter into any
12 written agreement with Dr. Martin regarding his
13 employment?
14   A. I don't believe so at the time, no.
15   Q. Subsequently you also hired his wife Jumi
16 Lee. Miss Lee.
17   A. Yes.
18   Q. Did you ever enter into any written agreement
19 with Miss Lee?
20   A. Other than I believe made an offer, I would
21 have to go back.
22   Q. Is it a fair statement that neither Dr.
23 Martin nor Miss Lee ever entered into any non-compete
24 agreements with S.E.E.?

Page 10

1  A. Not at that time, no.
2  Q. Or at any time?
3     MR. TREGER: Objection.
4  Q. Let me ask the question. Did either Dr.
5  Martin or Miss Lee enter into a noncompetition
6  agreement with S.E.E. at any time during the term of
7  their employment?
8     MR. TREGER: Are you talking about a
9  written agreement?
10    MR. DAVIS: A written agreement.
11 A. Not that I'm aware of.
12 Q. Did either one of them enter into an oral
13 agreement regarding noncompetition at any time during
14 the term of their employment?
15    MR. TREGER: Objection. You can answer.
16 A. We had a noncompete contract that employees
17 signed which Dr. Martin and Lee generated.
18 Q. Did either Dr. Martin or Miss Lee ever sign
19 this contract?
20 A. Not that I'm aware of, no.
21 Q. Who did sign the contract?
22 A. Anyone that we had hired.
23 Q. Who did you hire specifically that signed
24 that noncompete contract?

Page 11

1  A. I believe without checking the records that
2  there were three or four employees.
3     MR. TREGER: Only testify as to what you
4  know.
5  Q. Your best memory.
6  A. I know Andrea Desroisier signed it. I know
7  Mitchell Kupferman signed it. Those are the ones that
8  I'm aware of at this point.
9  Q. To the best of your memory when did you hire
10 Miss Lee?
11 A. In what capacity?
12 Q. In any cavity.
13 A. She was hired as a consultant I believe in
14 roughly September of '95 if I recall.
15 Q. Was that when she was residing in California?
16 A. Yes, it was.
17 Q. At some point in time did Dr. Martin and Miss
18 Lee relocate to Massachusetts?
19 A. Yes, they did.
20 Q. And when was that, please?
21 A. I believe approximately February of 2000.
22 Q. So for what period of time did they work in
23 California for S.E.E.?
24 A. Well, it would have been from the time they

Page 12

1  started up until roughly February 2000.
2  Q. Approximately in excess of four years?
3  A. For Dr. Martin, yes.
4  Q. What duties did Dr. Martin perform for S.E.E.
5  while he was residing in California?
6  A. He was a vice president of the company.
7  Q. Well, other than his title what duties did he
8  perform?
9  A. He continued to perform the duties that he
10 had from the time he began.
11 Q. Which were what?
12 A. Working the sales, marketing, development of
13 the products.
14 Q. Now, the product he was selling was what
15 specifically?
16 A. Well, there were a couple of products but
17 there were a couple different models. They were
18 microspectrophotometers used in primarily the forensic
19 field.
20 Q. And these microspectrophotometers, can we
21 shorten that by calling them any shortened name for
22 that?
23 A. MSP. Would that help?
24 Q. We'll call them by their generic name. Were

Page 13

1  there specific models that Dr. Martin was engaged in
2  selling for S.E.E. while he was residing in California?
3  A. Yes.
4  Q. What were those models?
5  A. There were I believe three models at the
6  time, 1000, 2000 and 3000.
7  Q. What is the 1000, 2000 and 3000? Does that
8  denote some type of a different specification?
9  A. Yes, it does.
10 Q. Tell me what the differences were.
11 A. The 1000 was basically an instrument capable
12 of looking from the visible up into the near infrared
13 region. The 2000 was a system capable of looking at
14 the UV up through the near infrared and the 3000 was a
15 portable macro-based system.
16 Q. Before you met Dr. Martin did you have any
17 experience in any way with the microspectrophotometer
18 field?
19 A. Yes. Quite a bit.
20 Q. Tell me about that.
21 A. Well, I had been working for Nanometrics from
22 I believe '82 until '88 and I was selling
23 microspectrophotometers to customers and also to the
24 forensic field.

Page 14

1  Q.  After 1988 did you have any business dealings
2  or were you involved in any way with the sale or
3  manufacturing of microspectrophotometers?
4  A.  Yes.
5  Q.  When?
6  A.  I have had right along.  I represented
7  Nanometrics which made microspectrophotometers.
8  Q.  For what period of time did you represent
9  Nanometrics?
10  A.  I represented them from 1988 until I believe
11  March of last year.
12  Q.  During that period of time were you engaged
13  in the sale of the semiconductor products of
14  Nanometrics?
15  A.  Yes.
16  Q.  Principally?
17      MR. TREGER:  Objection to the form.  You
18  can answer if you understand it.
19  A.  Well, it was in the forensic field and the
20  semiconductor industry.
21  Q.  To your recollection what was the volume of
22  forensic sales that you did for Nanometrics beginning
23  in the year 1990?
24      MR. TREGER:  I'm sorry.  For just that

Page 15

1  year?
2      MR. DAVIS:  Let's take 1990.
3  A.  I would have to check.  I don't know off the
4  top of my head.
5  Q.  Your best memory as to what range.  Was it
6  more than a hundred thousand dollars?
7      MR. TREGER:  Only if you can remember.
8  A.  What year?
9  Q.  1990.
10  A.  1990.  I think it was close to but I can't --
11  I don't know exact numbers.  I would have to check
12  financials.
13  Q.  What was the last year in which you sold any
14  forensic products for Nanometrics?
15  A.  I would have to guess because they got out of
16  the forensic field for a period of time and got back
17  into it.
18  Q.  When did they get out?
19  A.  I believe somewhere around '88.  I don't know
20  specifically.
21  Q.  When was Dr. Martin laid off by Nanometrics?
22  A.  I believe it was in April of '95.
23  Q.  Isn't it true at that time he was involved in
24  the forensic field prior to his layoff by Nanometrics?

Page 16

1  A.  Yes.
2  Q.  So in 1995 Nanometrics was still involved in
3  the forensic field?
4  A.  They had got back into the forensic field.
5  Q.  You say they got out '88?
6  A.  Roughly.
7  Q.  When did they get back in?
8  A.  As best I can recollect, probably '92.
9  Q.  And in 1995 when Dr. Martin was laid off, was
10  Nanometrics still involved in the forensic field?
11  A.  They were in the process of getting out of
12  it.
13  Q.  So they got out in 1988.  They got back in
14  1992 and they were in the process of getting out of the
15  forensic field in 1995?
16  A.  Right.
17  Q.  I take it since 1995 you have not been
18  involved in the sales of any Nanometrics forensic
19  products?
20  A.  No.
21  Q.  Is that a fair statement?
22  A.  No.
23  Q.  When you say no --
24      MR. TREGER:  I'm going to object to the

Page 17

1  form.  I don't understand.
2  Q.  When I say you, I mean S.E.E.  After 1995 did
3  you sell any Nanometrics forensic products?
4  A.  It would have been into '95 as best I
5  recollect until they got out of the business.
6  Q.  What is your best memory as to when
7  Nanometrics actually got out of the forensic business
8  for the second time?
9  A.  I believe it was in April.
10  Q.  Of 1995?
11  A.  Right.
12  Q.  So is it a fair statement that after April of
13  1995 S.E.E. was not involved in the sale of any
14  Nanometrics forensic products?
15      MR. TREGER:  Perhaps it would be best if
16  you just asked.  Instead of saying it was a fair
17  statement, just say did you.
18  Q.  Let me try it again.  Was S.E.E. involved in
19  the sale of any Nanometrics forensic products after
20  April 1995?
21  A.  Not that I can recall, no.
22  Q.  Is it also true then that's the reason why
23  you hired Dr. Martin because he was leaving
24  Nanometrics.  Nanometrics was getting out of the