UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| PHILLIP TRINGALI<br>Plaintiff<br><br>V.<br><br>PAUL MARTIN AND JUMI LEE<br>Defendants | )<br>)<br>)<br>)<br>)<br>)<br>) | C. A. NO. 04-12708-MLW |

**DEFENDANTS' OBJECTION TO PLAINTIFF'S SECOND MOTION FOR SANCTIONS PURSUANT TO FED.R.CIV.P. 11**

## I. Preliminary Statement

The defendants, Paul Martin ("Martin) and Jumi Lee ("Lee"), oppose the Second Motion for Sanctions filed by the plaintiff, Phillip Tringali ("Tringali"). Tringali's motion arises out of the status of a counterclaim filed in the companion Norfolk County Action, which action was filed by Martin and Lee as plaintiffs, on May 14, 2002, as a stockholder's derivative action, wage claims under c.149 §150 and claims for breach of contract.

On July 1, 2002, Tringali filed a responsive pleading entitled Defendants S.E.E., Inc. and Phillip Tringali's Answer to Plaintiffs' Complaint and Counterclaim (Exhibit "A"). The counterclaim, Count One,[1] sets forth a claim for breach of fiduciary duty, including a claim that Martin and Lee misappropriated trade secrets and confidential proprietary information of the corporation. While Count One of the Counterclaim is initially styled referring to S.E.E., Inc. ("S.E.E.") as the plaintiff in counterclaim,[2] in the requests for relief, Tringali has included himself as a plaintiff in counterclaim in the prayers for relief. If there is any ambiguity as to whether Tringali himself is a named plaintiff in counterclaim, Tringali created it in his wording of that pleading.

---

[1] Neither Count Two, which was previously dismissed, nor Count Three, alleging alteration of wage records is relevant to this Objection.

[2] S.E.E. is no longer a party to this case it filed for bankruptcy a second time on March 5, 2004 and on January 14, 2005, this Court allowed the case to proceed against Tringali individually.

Notwithstanding the status of the counterclaim in the Norfolk County Action, it is clear from the proceedings in both courts, as evidenced by Tringali's responses to interrogatories, deposition testimony in both cases, his statements in the Norfolk County Action Joint Pre-Trial Memorandum, and his designation of witnesses in both cases, that Tringali has raised the same issue, to wit, the allegations that Martin and Lee committed a breach of fiduciary duty, in both this instant action and in the Norfolk County Action. Tringali has asserted claims for breach of fiduciary duty as affirmative defenses and according to the Norfolk County Action Joint Pre-Trial Memorandum, he intends to try those issues in that court. On the other hand, he has asserted the same claims in his complaint in this instant action. Irrespective of the ambiguity created by Tringali in the original wording of the counterclaim it is apparent that all allegations by Tringali of breach of fiduciary duty should be treated as a compulsory counterclaim in the Norfolk County Action, pursuant to Rule 13(a).[3] Simply put, Tringali is engaged in forum shopping by litigating the affirmative defenses of breach of fiduciary duty in the Norfolk County Action and filing the same claims as part of the complaint in this action.

## II. Tringali's Affirmative Defenses In The Norfolk County Action Allege Misappropriation Of Trade Secrets

In the Norfolk County Action Answer and Counterclaim Tringali set forth affirmative defenses alleging misappropriation of trade secrets and confidential information of Tringali's company S.E.E.:

> Second Defense: alleging that Martin and Lee are seeking to destroy the corporation by misappropriation and use of the corporation's trade secrets and confidential information, "are actively interfering with the corporation's economic opportunities and even thought [sic] they are stockholders, are engaging in active competition with the corporation."
>
> Third Defense: alleging "breach of their fiduciary duties as stockholders…misappropriate[d] confidential information and trade secrets."

[3] Martin and Lee have served a Motion for Clarification as to the counterclaim, on Attorney Treger on May 1, 2006, pursuant to Superior Court Rule 9A, and expecting an opposition in response, will file that motion with the Norfolk Superior Court accordingly.

> Eighth Defense: alleging that the plaintiffs "breached their fiduciary duties to the corporation, are actively competing against the corporation, have usurped corporate opportunities for the corporation of which they are principals and have used defendants' confidential information and trade secrets to compete against the defendant corporation, all while remaining stockholders of the corporation."

On November 28, 2005, a substitute second amended complaint was filed by Martin and Lee and Tringali filed a new answer which did not include a counterclaim, however, it is the position of Martin and Lee that pursuant to Rule 41(a)(1)(c) a counterclaim cannot be dismissed unless by stipulation or by order of the court.

On January 25, 2006, Tringali filed an answer to the substitute second amended complaint, restating his affirmative defenses including defenses which clearly relate to alleged breach of fiduciary duty, Defendant Phillip Tringali's Answer to Plaintiffs' Second [sic] Substitute Second Amended Complaint (Exhibit "B"):

FOURTH AFFIRMATIVE DEFENSE

> The plaintiffs' claims are barred by their own unclean hands

FIFTH AFFIRMATIVE DEFENSE

> The plaintiffs are estopped from recovering upon their claims by their own bad-faith and disloyal conduct.

SIXTH AFFIRMATIVE DEFENSE

> The plaintiffs are barred from recovering on their contract claims by their own breach of contract and/or obligations of good faith and fair dealing.

More recently in the Joint Pre-Trial Memorandum filed in the Norfolk County Action on March 29, 2006, Tringali has claimed as an issue to be tried in that case whether Martin and Lee breached fiduciary duty by misappropriating confidential or proprietary information.

## III. Counterclaim In The Norfolk County Action

Exhibit A also included a Counterclaim naming in Count One S.E.E. as the plaintiff in counterclaim, however, in the requests for relief, Tringali included himself as a plaintiff in counterclaim (Exhibit "A," Page 9):

> WHEREFORE the plaintiffs in counterclaim S.E.E., Inc and Phillip Tringali (emphasis added) make the following requests for relief:
>
> 1. That the Court award judgment to plaintiffs [referring to plaintiffs in counterclaim] for damages, together with interest, costs and attorney's fees, pursuant to Counts I through III;
>
> 2. For such relief as the Court may deem just and proper.

Notwithstanding whether Tringali is a plaintiff in counterclaim, the allegations regarding misappropriation of trade secrets, even as affirmative defenses, constitute a compulsory counterclaim under Rule 13 which, therefore, required Tringali to assert that as a counterclaim in the Norfolk County Action. The Counterclaim, however styled, clearly alleges that Martin and Lee committed breach of fiduciary duty by misappropriating trade secrets and confidential information of S.E.E. (see paragraphs):

> 7. During the course of their employment Martin and Lee were officers of the S.E.E. corporation in charge of sensitive and confidential information of the corporation.
>
> 8. On or about January 9, 2002, after an unsuccessful attempt to gain control of S.E.E. from majority stockholder and president Phillip Tringali, Martin and Lee resigned from S.E.E.
>
> 9. At the time of tendering their resignation, the solely owned laptop computers of Martin and Lee contained the entire confidential data base of S.E.E.
>
> 10. Prior to tendering her resignation, Lee had transferred confidential corporate financial information to her solely owned laptop computer.
>
> 15. As shareholders of a closely held corporation, Martin and Lee owe the corporation a duty of the utmost good faith and must discharge their corporate responsibilities without avarice, expediency or self-interest in derogation of their loyalty to other stockholders.
>
> 16. The plaintiffs Martin and Lee, while stockholders of S.E.E., Inc. planned and conspired to establish a competing business with

> S.E.E. and incorporated such a business while still employed by S.E.E.
>
> 21. Martin and Lee left S.E.E. with all the confidential information of S.E.E. with all the proprietary codes and trade secrets of S.E.E., and with all of the design and development information for the production of the next generation of product on their computer hard drives.
>
> 22. Within two weeks of their resignation from S.E.E. Martin and Lee were contacting S.E.E. vendors, representatives and customers with a product virtually identical to S.E.E.'s product except that it included specifications which were those of the next generation of product as envisioned, discussed and planned while Martin and Lee were employed by and paid a salary by S.E.E. as well as stockholders of S.E.E.

## IV. This Action Alleges Misappropriation of Trade Secrets

On December 28, 2004, more than two and half years after the Norfolk County Action was filed, Tringali filed this action. In his complaint (Exhibit "C") Tringali has made the same allegations of breach of fiduciary duty as in the Norfolk County Action (see numbered paragraphs of the Exhibit "C" complaint):

> 24. As the personnel primarily responsible for developing and marketing S.E.E.'s analytical product, both Martin and Lee acquired, during their respective employment by S.E.E., comprehensive knowledge of S.E.E.'s most sensitive product development and customer-related trade secrets and confidential information, including but not limited to S.E.E.'s database of customer information.
>
> 26. In February 2001, S.E.E. embarked upon a plan to develop an enhanced analytical product ("Enhanced Product") product with features and improvements that would make the Analytical Product suitable for use in the microelectronics manufacturing process as well as in the forensic sciences. Martin and Lee predicted that it would take one year to bring the Enhanced Product to market.
>
> 27. Martin and Lee were primarily responsible for managing the development, manufacture and marketing of the Enhanced Product, including the hiring of additional employees required to develop the product, and cultivating contacts with prospective customers.
>
> 30. In 2001, on information and belief, Martin and Lee embarked upon a plan to obtain control of S.E.E.

31.    On December 31, 2001, defendants Martin and Lee filed the articles of organization for Quantum Dynamics International, LLC, ("Quantum") a Massachusetts limited liability corporation.

33.    Martin and Lee formed Quantum for the purpose, and with the intent of designing, marketing and installing an integrated, computerized analytical device to compete directly with S.E.E.'s product.

38.    Unbeknownst to Tringali, prior to resigning from S.E.E., Martin and Lee had duplicated the paper and digital records containing all of S.E.E.'s confidential and proprietary information of S.E.E., including but not limited to all of the design and development information for the Enhanced Product, and all of S.E.E.'s Analytical Product customer information, and had removed the copies from S.E.E.'s facility.

39.    Unbeknownst to Tringali, prior to resigning from S.E.E., Martin and Lee had removed from the S.E.E. facility a portion of S.E.E.'s inventory of the components to be integrated into the Analytical Product and/or the Enhanced Product.

40.    Unbeknownst to Tringali, prior to resigning from S.E.E., Martin and Lee destroyed certain of S.E.E.'s corporate records, including all paper records and digital information regarding the specifications for the Enhanced Product, all computer code written for integration into the Enhanced Product, and all documentation regarding the process developed for assembling and manufacturing the Enhanced Product.

41.    Within two weeks of their resignation from S.E.E., Martin and Lee, as employees, managers, and sole equity owners of Quantum, began to market a product virtually identical to S.E.E.'s product except that it included the features that S.E.E. had discussed and planned to incorporate into the Enhanced Product while Martin and Lee were directors and stockholders of S.E.E.

42.    After Martin and Lee resigned, but while they were still stockholders of S.E.E., Quantum marketed its product by contacting S.E.E.'s existing customers, representatives and distributors to offer them products and services in direct competition with S.E.E.

48.    As shareholders of a closely held corporation, Martin and Lee owed a fiduciary duty of loyalty to their fellow stockholders.

Furthermore, in Paragraph 49 of the complaint in this action, Tringali claims that Martin and Lee breached their fiduciary duties by conspiring to start a business competing with S.E.E. while they were stockholders of S.E.E., expropriating S.E.E.'s confidential information, converting confidential and

proprietary information, selling to S.E.E.'s customers a product that they had developed while employed by S.E.E., purposely failing to perform their duties while at S.E.E., and destroying S.E.E.'s corporate records.

## V. Tringali's Answers To Interrogatories And Deposition Testimony Clearly Support Plaintiffs' Contentions As To The Compulsory Counterclaim

On December 23, 2002, in the Norfolk County Action, Tringali served Answers of the Defendant Phillip Tringali to First Set of Interrogatories of Paul Martin (Exhibit "D"), which consisted of responses to seven interrogatories all of which were directed to Tringali individually with reference to specific paragraphs of the Counterclaim. If Tringali claims that he was not a party to the counterclaim, he nevertheless answered each of the seven interrogatories and responded to the counterclaim allegations of breach of fiduciary duty by Martin and Lee as follows:

1. Paragraph 10, he stated that Lee transferred S.E.E.'s confidential information to her laptop;

2. Paragraph 18, he stated that Martin and Lee deliberately and intentionally failed to fulfill their responsibility to hire additional personnel for S.E.E.;

3. Paragraph 20, he stated that Lee was to develop the next generation of product;

4. Paragraph 21, he stated that Martin and Lee left S.E.E. with all confidential information, proprietary codes, trade secrets and design and development information for the next generation of product of S.E.E. on their computer hard drives;

5. Paragraph 22, he stated that Martin and Lee contacted S.E.E.'s vendors, representatives and customers "with a product virtually identical to S.E.E.'s product;"

6. Paragraph 23, he stated that S.E.E. suffered financial loss as a result of the plaintiff's appropriation of S.E.E.'s work product and trade secrets.

Also on December 23, 2002, in the Norfolk County Action, Tringali served Answers of the Defendant S.E.E., Inc. to Interrogatories of the Plaintiff, Paul Martin (Exhibit "E"). These interrogatories sought information based upon

affirmative defenses appearing in the Answer which directly relate to the same issue, i.e., breach of fiduciary duty:

2. Allegations in the Second Defense that Martin and Lee misappropriated S.E.E.'s trade secrets and confidential information, interfering with S.E.E.'s economic opportunities and engaged in active competition;

3. Allegations in the Third Defense that Martin and Lee breached their fiduciary duties as stockholders;

4. Allegations in the Fifth Defense that Martin and Lee's conduct injured or damaged S.E.E.

The answers to all of these interrogatories make it clear that the principal issue in contention, whether it be affirmative defenses or the counterclaim, was Tringali's claims that Martin and Lee misappropriated S.E.E.'s trade secrets and confidential information, by establishing two competing corporations, transferring S.E.E.'s confidential information to their own personal laptop computers, and contacting customers and vendors of S.E.E.

On March 10, 2005, Tringali's deposition in the Norfolk County Action was taken by counsel for Martin and Lee and a substantial part of his testimony related to the allegations of breach of fiduciary duty, as evidenced by the following pages of the transcript (Exhibit "F"):

Pages 86-97 dealing with the alleged misappropriation of trade secrets

Pages 100-104 dealing with misappropriation and removal of customer information

Page 105 dealing with alleged misappropriation of customer bid information

Pages 106-108 testimony regarding alleged competitive activities

Pages 109-115 dealing with Martin and Lee's competitive products

Pages 125-127 testimony regarding inequitable conduct and breach of fiduciary duties

Page 128 allegations regarding attempts to hire S.E.E. employees

Page 129 allegations regarding taking over S.E.E.'s business

Pages 133-135 additional testimony regarding alleged breach of fiduciary duty

Pages 142-144 testimony regarding attempts to gain control of S.E.E.

Pages 144-146 allegations regarding appropriation of the confidential database of S.E.E. on Martin and Lee's laptop computers.

During the same deposition Tringali's own counsel, Attorney Treger, questioned him:

Pages 199-202 regarding Martin and Lee's duties developing a next generation product for S.E.E.;

Pages 203-204 regarding Martin and Lee's competitive products;

Page 205 specifically with reference to Paragraph 21 of the counterclaim, he questioned his client regarding allegations that Martin and Lee left S.E.E. with confidential information of the company.

On May 24, 2005, Tringali's counsel took Martin's deposition in the Norfolk County Action. A number of the questions put to Martin relate to the allegations regarding breach of fiduciary duty as follows (Exhibit "G"):

Pages 55-57 development of a new product

Pages 67-73 development of a new product

Pages 84-85 S.E.E. 1100, 2100 and Maximus products

Pages 102-104 upgrading S.E.E.'s operating system

Pages 156-157 termination at S.E.E. and the creation of Quantum Dynamics

Pages 162-165 use of personal laptop computer and business information of S.E.E.

Page 171 Martin's testimony that he erased the S.E.E. database on his laptop on January 11, 2002.

On May 25, 2005, Tringali's counsel took the deposition of Lee in the Norfolk county Action (Exhibit "H"), which included questions regarding subject matters which were relevant to the counterclaim as follows:

Pages 64-65 questions regarding her personal desktop computer

Pages 69-73 questions regarding the Maximus project

Pages 77-81 work on the upgrades for the S.E.E. Models 2100 and 1100

Page 84 additional testimony regarding the Maximus project.

## VI. Tringali Has Served Identical Document Requests In Both Cases

On February 9, 2006, in the Norfolk County Action, Tringali served two identical notices of the continued deposition of Martin and Lee for March 20 and 21, 2006. Attached to each notice is a Schedule A, which is again identical to each notice of deposition. A copy of the cover letter, two notices and the Schedule A are attached (Exhibit "I").

What is striking, however, it that the Schedule A request for documents attached to the deposition notices are identical, word-for-word with the twenty-two requests in Tringali's First Request for Production of Documents to Defendant Paul Martin (Exhibit "J") served in this action on September 14, 2005, all of which seek communications between Martin and Lee's companies, Quantum and CRAIC, to customers or prospective customers, documents concerning product specifications, source codes, application papers, communications with vendors, distributors, sales representatives, telephone bills, promotional literature, upgrades, documents concerning sales of products developed by Quantum and CRAIC, parts purchased, etc.

The identical document requests in both cases clearly support Martin and Lee's contentions that Tringali intends to try the identical breach of fiduciary duty allegations in both courts.

## VII. Tringali's Statements In The Joint Pre-Trial Memorandum Demonstrate His Intention to Litigate Breach Of Fiduciary Duty In This Action

On March 29, 2006, a Pre-Trial Memorandum (Exhibit "K") was filed in the Norfolk County Action, which included Tringali's Defendant's Statement, beginning at the bottom of Page 3, where Tringali has stated that an issue to be tried in the Norfolk County Action is whether Martin and Lee breached their fiduciary duty to S.E.E. by misappropriating its confidential or proprietary information:

> S.E.E., Inc. soon learned that Martin and Lee had breached their duty of loyalty to S.E.E., Inc. and its shareholders, by appropriating its confidential and proprietary information. Within two weeks of their resignation, were contacting S.E.E.'s customers, suppliers, vendors, sales representatives and employees, soliciting

> business for Quantum Dynamics International ("QDI") which they had incorporated in December 2001. Within one month of Martin's and Lee's resignation, while they still owned 20% of S.E.E.'s stock, QDI was marketing microspectrophotometers practically identical to S.E.E.'s products to S.E.E.'s customers, and to prospective customers Martin had cultivated while employed by S.E.E. Within four months of Martin and Lee's departure, QDI was marketing a new microspectrophotometer with enhanced features. S.E.E. had been developing a product with substantially similar enhancements since February, 2001. Martin and Lee were primarily responsible for developing the new product. After their departure, S.E.E.'s remaining employees could find no work product reflecting the development of the enhanced product.

Tringali's intention to try this issue is further supported by his statement in Section III, Agreed Description to be Read to Jury, Page 5, second paragraph:

> Defendant Phillip Tringali denies all of plaintiff's allegations. Defendant also claims that the plaintiffs improperly took confidential and proprietary information from S.E.E., Inc., and used it to complete against S.E.E., Inc. and that because of this conduct, they are not allowed to recover damages against him.

**VIII. <u>Tringali Has Listed Identical Witnesses in Both Cases</u>**

In the same Joint Pre-Trial Memorandum, Tringali listed nineteen witnesses, in addition to Tringali himself and Martin and Lee. Previously on July 25, 2005, in this action, Tringali filed Plaintiff's Supplemental Automatic Disclosure Statement (Exhibit "L"). Included in the list of nineteen witnesses in the Joint Pre-Trial Memorandum are the following twelve individuals, all of whom are also listed as witnesses or potential witnesses by Tringali in this action:

Deborah Bowles
Demetra Hixson
Anthony Facchiano
Andrea Desrosiers
John Richardson
Judy Moniz
Michael Kupferman
Graham Bird
Dave Patterson
Maclyn Smith
Paul Norlander
Jim Viets

Obviously, it is Tringali's contention that these witnesses have relevant information on the issue of whether Martin and Lee misappropriated confidential and trade secrets of S.E.E. and committed any breach of fiduciary duty.

**VIII. Tringali Should Not Be Permit To Engage In Claim Or Issue Splitting**

In Liberty Mutual Ins. Co. v. Foremost-McKesson, Inc., 751 F.2d 475 (1st Cir. 1985), prior to bringing a federal action, a state court action was brought by Liberty Mutual to determine liability coverage under certain insurance policies. Subsequently, Liberty Mutual commenced a diversity action seeking a declaratory judgment under the same insurance policies. McKesson moved for a stay in the District Court pending the outcome of the related state court action, and the First Circuit held:

> The state action embraces the same issue as is involved in the Federal action and the res judicata effect of resolution of the state action would preclude further litigation in the district court. Id. at 477.

The court also noted in upholding a stay of the federal action:

> If the federal and state actions were to proceed concurrently, there is the real possibility that the two courts might interpret the same standard policy language differently... Id. at 477.

This language is appropriate to the instant case, specifically with respect to the issue of whether Martin and Lee committed any breach of fiduciary duty in misappropriating trade secrets of S.E.E. It appears that matter will be litigated first in the Norfolk County Action[4] and, Martin and Lee could be severely prejudiced by piecemeal litigation of this important issue. For example if the Norfolk County Action determined that Martin and Lee did not commit any breach of fiduciary duty (as part of the affirmative defenses) and this Court then relitigated that same issue, that would be unfair and prejudicial to Martin and Lee.

The court in Liberty Mutual cited the case of Moses H. Cone Memorial Hosp. v. Mercury Construction Corp., 460 U.S. 1, 8-9 (1983). In that case, the

[4] The Superior Court has scheduled a pre-trial conference for December 18, 2006.

District Court entered a stay where there had been a parallel action commenced in the state court which was affirmed on appeal:

> Hence, a stay of the federal suit pending resolution of the state suit meant that there would be no further litigation in the federal forum; the state court's judgment on the issue would be res judicata…Hence, as the Court of Appeals held, the stay order amounts to a dismissal of the suit.

In Turbocare Div. v. General Electric, 938 F.Supp. 83, 86 (D.Mass. 1996), the court held:

> "The [res judicata"] doctrine is aimed at deterring claim splitting and requires, therefore, that all available claims be offered in one suit. (emphasis added)

Massachusetts appellate decisions are in accord with the Federal cases.

In the case of Derderian v. Union Market Nat'l Bank, 95 N.E.2d 552, (1950), the mortgagor brought an action in tort to recover against the mortgagee bank for damages arising out of an alleged improper foreclosure sale. The bank had previously brought an action to recover the balance due after the foreclosure sale and in his answer to that action, Derderian had set up as a defense that the bank had improperly conducted the foreclosure sale. In that prior action, judgment had been entered in favor of Derderian that there was no deficiency balance. The court noted that the damages sought by Derderian in the second action "arose out of the identical transaction which was the basis of the prior equity suit…the mortgagor [Derderian] was free to set off these damages by way of recoupment or to bring an action to recover his entire damages. He had a single cause of action and he was not entitled to have his damages partially assessed in successive actions." Id. at 553. The court went on to cite "the weight of authority that a party who has a right to elect whether to assert a cross-demand as a matter of defence or is a basis for an independent action, and chooses the first course and secures the benefit of such defence, cannot subsequently maintain an action to recover additional damages on the ground that they exceeded the amount for which he was credited in his defense of the first action." (citations omitted) Id. at 554.

In Boyd v. Jamaica Plain Co-Op Bank, 386 N.E.2d 775, 781 (1979), the court stated:

> This principle [prohibiting claim splitting] will be applied to extinguish a claim even though the plaintiff is prepared in the second action to present evidence, grounds, or theories of the case not presented in the first action or to seek remedies or forms of relief not demanded in the first action. This policy promotes judicial economy and has been applied by our courts to bar successive actions.

In Yentile v. Howland, 525 N.E.2d 689 (1988), Howland, filed an action in the Land Court seeking a declaration that a certain option had been lawfully extended and remained in full force and effect. Yentile filed an answer claiming that Howland had failed to extend the option in the manner required by the agreement, however, the Land Court ruled for Howland entering a judgment that the option in question was valid and in full force and effect.

Yentile then filed an action in the Superior Court claiming that the option in question violated the rule against perpetuities and that Howland had breached an agreement regarding a zoning change. The Appeals Court upheld the dismissal of the second action based on the "salutary well established rule against claims splitting" which "preclude the Yentiles from attempting in a pending or subsequent action to undermine the Land Court judgment establishing the validity of the option. They may not raise a claim in the Superior Court which was available as a defense in the Land Court action." Id. at 690.

In Bagley v. Moxley, 555 N.E.2d 229 (1990), the issue in the first action in the Superior Court was the use of certain land for a public way, which became the subject of a second action where Bagley alleging ownership of the contested way by way of adverse possession. The court upheld dismissal of the second case on the grounds that Bagley's adverse possession claim was raised or should have been raised in the prior action:

> We find it unnecessary, however, to determine whether an adverse possession claim was actually presented in Bagley II (the prior action), because we believe this claim was capable of being raised in Bagley II and should have been raised in the context of that case. (citations omitted) Id. at 232.

> The plaintiffs were not entitled to pursue their claim of ownership through piecemeal litigation, offering one legal theory to the court while holding others in reserve for future litigation should the first theory prove unsuccessful. Claim preclusion applies "even though the claimant is prepared in a second action to present different evidence or legal theories to support his claim." (citations omitted) This is so because "the party to be precluded has had the incentive and opportunity to litigate the matter fully in the first lawsuit." (citations omitted) Id. at 232.

Finally, the court added this important note:

> Were we to allow the plaintiffs' claim to continue, we would have to turn a blind eye to "[c]onsiderations of fairness and the requirements of efficient judicial administration [which] dictate that an opposing party in a particular action as well as the court is entitled to be free from continuing attempts to relitigate the same claim." (citations omitted) Id. at 232.

In Bendetson v. Revere Bldg. Inspector, 634 N.E.2d 143, 145-146 (1994), the court held:

> Claim preclusion forecloses the litigation of all matters that were or should have been litigated in the first action…The purpose of the rule is to prevent the splitting of a cause of action where the party to be precluded had both the opportunity and the incentive to litigate the matter fully in the first lawsuit.

## IX. Tringali's Allegations Regarding Breach Of Fiduciary Duty Constitute A Compulsory Counterclaim.

Based upon all of the foregoing matters, answers to interrogatories, requests for production, identity of witnesses and statements in the Norfolk County Action Joint Pre-Trial Memorandum, that Tringali's allegations that Martin and Lee committed a breach of fiduciary duty, as a matter of law, constitute a compulsory counterclaim under Rule 13(a). The question as to whether a counterclaim is compulsory or permissive has been discussed in the Reporters' Notes to Rule 13, Massachusetts Practice, Vol. 6, Smith & Zobel, at Page 363-364:

> Classification of a counterclaim as compulsory or permissive depends in turn upon a definition of "transaction or occurrence." The word "transaction", in the present context, has been defined thus: "'[A] transaction is where both causes of action proceed from the same wrong.'" (citations omitted)

And at Page 364, second paragraph:

> The word 'transaction' commonly indicates an act of transacting or conducting business but in the rule under consideration it is not restricted to such sense. It is broad enough to include an occurrence. ...The words 'transaction' and 'occurrence' probably mean, whatever may be done by one person which affects another's rights and out of which a cause of action may arise. ...A familiar test may be applied by inquiring whether the same evidence will support or refute the opposing claims. (citations omitted)

The authors stated at §13.10:

> **§13.10 Compulsory Counterclaims—Elements**
> A counterclaim is regarded as prima facie compulsory if (1) the court has power to give the relief sought; (2) defendant possesses the claim at the time of serving the answer containing the counterclaim; (3) the claim arises out of the transaction or occurrence that is the subject matter of plaintiff's claim.

With respect to the foregoing three elements, it is clear Tringali possessed the claim for breach of fiduciary duty not only at the time when he served his original answer, but also in his subsequent affirmative defenses in the second answer and his statements in the Joint Pre-Trial Memorandum. Tringali's claim arises out of the transaction or occurrence which is the subject matter of Martin and Lee's claims, since he has asserted those claims as affirmative defenses as well as in the Joint Pre-Trial Memorandum. Both Federal and Massachusetts decisions regarding the determination of a compulsory counterclaim are in accord.

In Bottero Enterprises v. Southern New England Production Credit Assoc., 743 F.2d 57, 59 (1st Cir. 1984), after the lender commenced proceedings to foreclose on a mortgage, Bottero brought a diversity action in the federal court claiming in part that the lender had failed to fulfill the duty of reasonable care in scheduling and advertising the auction sale of the real estate. The court affirmed the District Court decision barring Bottero's claim:

> a compulsory counterclaim that should have been brought in the prior action. The court correctly ruled that the stockholder issues arose out of the same loan transactions that were the basis of the earlier suit.

In Eon Laboratories, Inc. v. Smithkline Beecham Corp., 298 F.Supp. 175, 179 (D.Mass. 2003), the court noted that the First Circuit has outlined four tests to determine whether a counterclaim is compulsory under Rule 13(a):

> (1) Are the issues of fact and law raised by the claim and counterclaim largely the same?
>
> (2) Would res judicata bar a subsequent suit on defendant's claim absent the compulsory counterclaim rule?
>
> (3) Will substantially the same evidence support or refute plaintiff's claim as well as defendant's counterclaim?
>
> (4) Is there any logical relation between the claim and the counterclaim?

> If a counterclaim satisfies one of these tests "but is not brought," it is "thereafter barred." Baker v. Gold Seal Liquors, Inc. 417 U.S. 467, 469 n.1, 41 L.Ed 2d 243, 94 S.Ct. 2504 (1974).
>
> The fourth test described above, the "logical relationship" test, "enjoys by far the widest acceptance among the courts." McCaffrey v. Rex Motor Transp., Inc., 672 F.2d 246, 248 (1st Cir. 1982) (quoting Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure §1410 (1971). A counterclaim has a logical relationship to the original claim if "it arises out of the same aggregate of operative facts as the original claim" in the sense that "the same aggregate of operative facts serves as the basis of both claims"; or "the aggregate core of facts upon which the original claim rests activates additional legal rights in a party defendant that would otherwise remain dormant." (citations omitted)

The court held in National Lumber v. Canton Inst. for Savings, 775 N.E.2d 1241 (2002):

> Under Mass.R.Civ.P. 13(a)...a counterclaim is compulsory if it "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim" and requires neither the presence of additional parties nor adjudication in another county or judicial district. Failure to raise a compulsory counterclaim typically bars assertion of the claim in a subsequent action. Id. at 1242.
>
> For the purposes of determining whether a counterclaim is compulsory or permissive, the word "transaction" "should not be construed narrowly or technically, but should be construed in a sense to effectuate the settlement in one proceeding of controversies *so closely connected* as appropriately to be combined in one trial in order to prevent duplication of testimony, to avoid unnecessary expense to the parties and to the public, and to

> expedite the adjudication of suits. (citations omitted) Principles of judicial economy, as well as the avoidance of inconsistent results, suggest that all claims affecting the determination of such rights and priorities be joined in a single action. Id. at 1242-1243.

> Principles of judicial economy, as well as the avoidance of inconsistent results, suggest that all claims affecting the determination of such rights and priorities be joined in a single action. Id. at 1243.

In Mancuso v. Kinchella, 806 N.E.2d 427 (2004), in March, 1999, DiSola filed suit in the U.S. District Court for Massachusetts against Mancuso for various claims in connection with a certain redemption agreement. That court held that Mancuso had breached the agreement and awarded damages to DiSola. Mancuso then filed a state court action alleging that DiSola's manager, Kinchella, violated c.93A and made representations and breached the same redemption agreement. The Appeals Court upheld dismissal of the state action stating "there was a logical relationship" between Mancuso's state claims and DiSola's federal claim, in that the state claims should have been added as compulsory counterclaims in the federal action

> "That [the essential facts underlying the two sets of claims] are not precisely identical, or that the counterclaim embraces additional allegations…does not matter." (citations omitted) The failure to plead a compulsory counterclaim bars a party from bringing a later independent action on that claim (citations omitted). Id. at 433.

Although the parties had failed to address the compulsory counterclaim issue, the court affirmed the dismissal based upon claim and issue preclusion.

> All of the appellants' claims based on that common nucleus of fact could, therefore, and should have been brought in the original Federal litigation, where they would have formed a rational and convenient trial unit that would have appropriately conserved the parties' as well as judicial recourses. Id. at 439.

## X. Tringali's Misstatements In Paragraph 7 Of His Motion

The statement made by Tringali in Paragraph 7 of the Second Motion for Sanctions, claiming that Martin and Lee failed to disclose to the court that during certain depositions in the Norfolk County Action, their attorney had refused to allow Tringali's counsel to ask questions regarding alleged appropriation of confidential information is incorrect. A brief history of the

proceedings in the Norfolk Superior Court is in order.  Martin and Lee attempted to take the deposition of Tringali in the Norfolk County Action which was opposed by his prior counsel and Martin and Lee's motions were denied by the Superior Court on April 27, 2004 and again on May 4, 2004.  However, a second motion to compel Tringali's deposition was filed on January 10, 2005, requesting leave to depose Tringali as to two of the counts in the Norfolk County Action, breach of contract and salary and commissions, Counts V and VII.  On January 14, 2005, the court allowed that motion permitting Martin and Lee to depose Tringali, but only as to Counts VI and VII of the amended complaint.  Tringali's deposition was taken on March 10, 2005 and Martin's deposition was taken by Tringali on May 24, 2005 and Lee's deposition on May 25, 2005.  Hence, it was clear at the time that all matters except for Counts VI and VII had been stayed at the time of Martin and Lee's depositions on May 24 and 25, 2005.

On September 30, 2005, Martin and Lee filed a Second Amended Complaint reciting among other matters, that Martin and Lee as a result of a settlement with the S.E.E. bankruptcy trustee, had acquired all of the stockholder derivative claims in the Norfolk County Action.

On October 31, 2005, the Superior Court entered an order (Exhibit "M") treating Martin and Lee's motion as a motion to vacate the stay to dismiss claims against S.E.E. and to file a Second Amended Complaint.

On February 9, 2006, Attorney Treger served two deposition notices in the Norfolk Count Action by letter of that date (see Exhibit "I").  He stated in pertinent part "As this action is no longer subject to the automatic stay, I will reconvene the depositions of Paul Martin and Jumi Lee, on March 20 and 21st, respectively.  He also stated in the first paragraph that Martin and Lee had been instructed not to answer questions about the first four counts of the complaint or the corporate counterclaims against them arguing that the automatic stay precluded such questions.

Contrary to the statement made in Paragraph 7 of the Second Motion for Sanctions, it is clear that as of the time of Martin and Lee's depositions taken

on May 24 and 25, 2005, everything except for Counts VI and VII had been precluded by the automatic stay and it was not until that stay was lifted on October 31, 2005, some five months later, that discovery could go forward on the balance of the Norfolk County Action.

**XI. Conclusion**

As stated on Page 2, fn 3, Martin and Lee served a motion for clarification in the Norfolk County Action on May 1, 2006. On May 10, 2006, Tringali filed a motion to extend the response time and referring to the motion for clarification stated **"...this motion, if allowed, will have the effect of compelling or causing the dismissal of the pending Federal District Court case...."** This admission made by Tringali clearly supports the fact that the claims of Martin and Lee regarding the counterclaim in the Norfolk County Action are meritorious and demonstrate that Martin and Lee have not made any misrepresentations nor committed any other misconduct which would warrant the imposition of any sanctions. Tringali's statement in Paragraph 5 of his motion that his "fresh answer" to the complaint stated no counterclaims ignores the provisions of Rule 41(a)(1)(c) that a counterclaim can only be dismissed by stipulation or court order. Further, the statements made in Paragraph 6 regarding the extensive discovery is borne out by the depositions of Tringali, Martin and Lee all as described hereinabove. We have already addressed the misstatements in Paragraph 7 and it is clear that there is no merit to this motion and that it should be denied accordingly.

May 11, 2006

Attorney for plaintiffs,

/s/Roger S. Davis
Roger S. Davis
BBO No. 116320
DAVIS & RUBIN
One Bowdoin Square
Suite 901
Boston, MA 02114-2919
(617) 742-4300

QDI13:USDC:OBJMOTSANCTNS2

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, S.S.

SUPERIOR COURT DIVISION
Civil Action No. 02-801

PAUL MARTIN and JUMI LEE, Individually and as Stockholders on behalf of S.E.E., Inc.

Plaintiffs

v.

S.E.E., INC. and PHILLIP TRINGALI
Defendants

DEFENDANTS S.E.E., INC AND PHILLIP TRINGALI'S ANSWER TO PLAINTIFFS' COMPLAINT AND COUNTERCLAIM

The defendants S.E.E., Inc. and Phillip Tringali answer the plaintiffs' complaint as follows:

1. The defendants admit the allegations contained in paragraphs 1, 2, 3 and 4 of the complaint.

2. The defendants have no knowledge of the truth of the allegations contained in paragraphs 5 and 6 of the complaint and therefore deny same.

3. The defendants deny the allegations contained in paragraphs 7 and 8 of the complaint.

4. The defendants admit that the analytical division of S.E.E. was moved from California to Middleborough, MA and that Lee and Martin worked at Middleborough until their resignations on January 9, 2002 and deny all other allegations contained in paragraph 9 of the complaint.

5. The defendants deny the allegations contained in paragraph 10 (a) of the complaint and admit the allegations contained in paragraph 10 (b) of the complaint.

6. The defendants deny the allegations contained in paragraph 11 (a) and (b) of the complaint, admit the allegations contained in paragraph 11(c) of the complaint.

7. The defendants admit the allegations contained in paragraph 12 of the complaint.

"A"

8. The defendants admit the allegations contained in paragraph 13 of the complaint.

9. The defendants admit that the mortgage principal, interest and taxes for the Bridgton property have been paid by S.E.E. and deny the remaining allegations contained in paragraph 14 of the complaint.

10. The defendants admit the allegations contained in paragraph 15 of the complaint.

11. The defendants deny the allegations contained in paragraph 16 of the complaint.

12. The defendants admit the allegations contained in paragraph 17 of the complaint.

13. The defendants deny the allegations contained in paragraph 18 of the complaint except to the extent that they admit that Lee was the person in charge of the finances and accounting system of S.E.E. during 2001 and 2002.

14. The defendants deny the allegations contained in paragraphs 19, 20 and 21 of the complaint.

15. The defendants admit the allegations contained in paragraphs 22 and 23 of the complaint.

16. The defendants admit that S.E.E. is obligated to purchase the stock of Martin and Lee in an amount equal to the book value of the said stock thirty (30) days prior to their termination with the corporation, *i.e.* December 9, 2001, and denies the remainder of allegations contained in paragraph 24 of the complaint.

17. The defendants admit the allegations contained in paragraph 25 of the complaint.

18. The defendants deny the allegations contained in paragraphs 26, 27, 28, 29, 30 and 31 of the complaint.

19. The defendants deny the allegations contained in paragraph 32 of the complaint.

20. The defendants admit the allegations contained in paragraph 33 of the complaint.

21. The defendants admit that the letter dated March 26, 2002 (Exhibit "E" of the complaint) was sent and deny all remaining allegations contained in paragraph 34 of the complaint.

22. The defendants deny the allegations contained in paragraphs 35 and 36 of the complaint, except to the extent that it is admitted that Phillip Tringali owns approximately 70% of the outstanding stock of the corporation.

23. Paragraphs 1 through 22 of this answer are incorporated herein by reference in answer to paragraph 38 of the complaint.

24. The defendants deny that the plaintiffs have an unlimited right to inspect the books, records and accounts of S.E.E. as alleged in paragraph 38 of the complaint.

25. The defendants admit the request by the plaintiffs to inspect the articles of organization, by-laws, records of stockholder meetings and stock transfer records but deny the remaining allegations contained in paragraph 39 of the complaint.

26. The defendants deny that the plaintiffs have requested examination of the financial condition of the corporation for any legitimate stockholder purpose as alleged in paragraph 40 of the complaint and further, deny that the corporation has refused to permit the plaintiffs to inspect requested records, as alleged in paragraph 41 of the complaint.

27. No response is required of the defendants regarding the statement contained in paragraph 42 of the complaint.

28. Paragraphs 1 through 27 of this answer are incorporated herein by reference in answer to paragraph 43 of the complaint.

29. The defendants deny the allegations contained in paragraphs 44, 45 and 46 of the complaint.

30. Paragraphs 1 through 29 of this answer are incorporated herein by reference in answer to paragraph 47 of the complaint.

31. The defendants admit that as an officer and stockholder of S.E.E., Phillip Tringali owed a duty of utmost good faith and fair dealing to the corporation and deny all other allegations contained in paragraph 48 of the complaint.

32. The defendants deny the allegations contained in paragraphs 49 and 50 of the complaint.

33. Paragraphs 1 through 32 of this answer are incorporated herein by reference in answer to paragraph 51 of the complaint.

34. The defendants deny the allegations contained in paragraphs 52 and 53 of the complaint.

35. Paragraphs 1 through 34 of this answer are incorporated herein by reference in answer to paragraph 54 of the complaint.

36. The defendants deny the allegations contained in paragraphs 55, 56, 57 and 58 of the complaint.

37. Paragraphs 1 through 36 of this answer are incorporated herein by reference in answer to paragraph 57 of the complaint.

38. The defendants deny the allegations contained in paragraphs 58, 59, and 60 of the complaint.

39. Paragraphs 1 through 38 of this answer are incorporated herein by reference in answer to paragraph 61 of the complaint.

40. Paragraph 62 of the complaint requires no response by the defendants.

41. Paragraph 63 of the complaint is a conclusion of law which the defendants deny.

42. The defendants admit the allegations contained in paragraph 64 of the complaint.

43. The defendants admit that Tringali was the president of S.E.E. at all relevant times hereto and further answer that the remainder of paragraph 65 of the complaint as a conclusion of law which is denied.

44. Paragraphs 66 and 67 of the complaint require no response by the defendants as they are conclusions of law which are denied by the defendants.

First Defense

The plaintiffs' complaint fails to state a claim upon which relief can be granted.

Second Defense

The plaintiffs falsely and maliciously, and without reasonable and probable cause, have alleged they are acting on behalf of the corporation and in the best interests of the corporation even while they are seeking to destroy the corporation by misappropriation and use of the corporation's trade secrets and confidential information, are actively interfering with the corporation's economic opportunities and even thought they are stockholders, are engaging in active competition with the corporation.

Third Defense

The plaintiffs are estopped from obtaining any relief in this action by reason of their representations and conduct that are in breach of their fiduciary duties as stockholders of the defendant corporation, which representations and conduct was intended to induce the defendant to place the said plaintiffs in positions of power and trust and with access to all confidential information and trade secrets of the defendant and as a result, the plaintiffs misappropriate confidential information and trade secrets, all to the detriment of the defendant.

Fourth Defense

If the defendant failed to perform any of its agreements contained in the instruments referred to in the plaintiff's complaint, it was excused from the performance of such agreements by the prior breach of agreement by the plaintiffs.

Fifth Defense

The injuries or damage alleged were caused in whole or in part by the violation by the plaintiffs, their servants or agents, of the various statutes, ordinances and regulations governing the conduct of the parties at the time the injuries or damage were received.

Sixth Defense

The plaintiffs are not entitled to maintain this action because of their laches, in that the plaintiffs had knowledge of all of the acts of the defendant set forth in the complaint at the time of the said action and all of the facts in connection therewith, and nevertheless the plaintiff refrained from taking any action or commencing this action until May 2002.

Seventh Defense

Prior to the commencement of this action, on or about the 11th day of January 2002, and on January 8 and 19, 2002, the defendant duly paid, satisfied and discharged the alleged claim of the plaintiffs for all wages, vacation pay and commissions as were then due and payable by payment to the plaintiff of the sum of $ 23,775.10 and therefore plaintiff has been paid in full.

Eighth Defense

The plaintiffs are not entitled to equitable relief inasmuch as they have been guilty of inequitable conduct and have failed to come into equity with clean hands, in that they have breached their fiduciary duties to the corporation, are actively competing against the corporation, have usurped corporate opportunities for the corporation of which they are principals and have used defendants' confidential information and trade secrets to compete against the defendant corporation, all the while remaining stockholders of the corporation.

Counterclaim

Facts

1. Plaintiff-in-counterclaim S.E.E., Inc. ("S.E.E.") is a corporation duly organized and existing under the laws of the Commonwealth of Massachusetts and has a principal place of business at 48 Leona Drive, Unit D, Middleborough, Massachusetts, 02346.

2. S.E.E., Inc. is a closely-held corporation with only four stockholders at the present time.

3. Defendant-in-counterclaim Paul Martin ("Martin") is an individual who resides 54 Heritage Road, Quincy, Massachusetts, is married to defendant Jumi Lee and is a principal in Quantum Dynamics International, LLC.

4. Defendant-in-counterclaim Jumi Lee ("Lee") is an individual who resides at 54 Heritage Road, Quincy, Massachusetts, is married to Paul Martin and is a principal in Quantum Dynamics International LLC.

5. Martin and Lee are and have been at all times relevant to this action, stockholders of the S.E.E., Inc. corporation.

6. Quantum Dynamics International, LLC ("QDI") is a corporation duly organized and existing under the laws of the Commonwealth of Massachusetts which has a principal place of business at 54 Heritage Road, Quincy, Massachusetts and was organized on December 31, 2001 by Martin and Lee, during the period in which Martin and Lee were employees, officers, directors and stockholders, as well as key personnel of S.E.E.

7. During the course of their employment Martin and Lee were officers of the S.E.E. corporation in charge of sensitive and confidential information of the corporation.

8. On or about January 9, 2002, after an unsuccessful attempt to gain control of S.E.E. from majority shareholder and president Phillip Tringali, Martin and Lee resigned from S.E.E.

9. At the time of tendering their resignation, the solely owned laptop computers of Martin and Lee contained the entire confidential data base of S.E.E.

10. Prior to tendering her resignation, Lee had transferred confidential corporate financial information to her solely owned laptop computer.

11. During the course of their employment, Martin and Lee regularly contracted for airline tickets for travel on behalf of S.E.E.

12. The tickets, while in the names of Martin and/or Lee, were charged to and paid by S.E.E.

13. Martin and Lee did not travel on behalf of S.E.E. after January 9, 2002.

<u>Count One</u>
(S.E.E., Inc. v. Martin and Lee)

14. The plaintiff in counterclaim S.E.E., Inc. (S.E.E.) re-alleges the allegations contained in paragraphs 1 through 13 of this counterclaim as if fully set forth herein and incorporated them in this Count One.

15. As shareholders of a closely held corporation, Martin and Lee owe the corporation a duty of the utmost good faith and must discharge their corporate responsibilities without avarice, expediency or self-interest in derogation of their loyalty to other stockholders.

16. The plaintiffs Martin and Lee, while stockholders of S.E.E., Inc. planned and conspired to establish a competing business with S.E.E. and incorporated such a business while still employed by S.E.E.

17. The plaintiffs Martin and Lee made no disclosure to S.E.E. in regard to the establishment of their competing corporation, Quantum Dynamics International, LLC.

18. During the last year of their employment with S.E.E., Martin and Lee were charged with the responsibility of hiring additional developmental personnel to insure the continuity of operation of the company, which duty they deliberately and intentionally failed to fulfill.

19. The plaintiffs Martin and Lee, knowing they were key personnel to the development of S.E.E.'s product line, and knowing that there was no back-up personnel to replace them or perform their jobs for the company, resigned without notice.

20. During the year prior to her resignation, Lee's major responsibility at S.E.E. was to develop the next generation of product, which was anticipated to take approximately one (1) year.

21. Martin and Lee left S.E.E. with all the confidential information of S.E.E. with all the proprietary codes and trade secrets of S.E.E., and with all of the design and development information for the production of the next generation of product on their computer hard drives.

22. Within two weeks of their resignation from S.E.E. Martin and Lee were contacting S.E.E. vendors, representatives and customers with a product virtually identical to S.E.E.'s product except that it included specifications which were those of the next generation of product as envisioned, discussed and planned while Martin and Lee were employed by and paid a salary by S.E.E. as well as stockholders of S.E.E.

23. S.E.E. has suffered financial loss and economic opportunities as a result of the appropriation of work product and trade secrets developed by Martin and Lee while being paid as employees of S.E.E. to develop such work product.

24. S.E.E. has suffered financial loss and economic opportunities as a result of the appropriation of work product and trade secrets developed by Martin and Lee and the communication of this work product and trade secret to the corporation of which they are principals in order to actively compete with S.E.E. while they remained stockholders of S.E.E.

Count Two
(S.E.E., Inc. v. Martin and Lee)

25. The plaintiff in counterclaim re-alleges the allegations contained in paragraphs 1 through 24 of this counterclaim as if fully set forth herein and incorporated them in this Count Two.

26. Martin and Lee have been credited by one or more airlines, in their individual names for the price of unused airline tickets purchased for travel to Washington, D.C. and to Denver, CO on behalf of S.E.E., Inc.

27. Matin and Lee did not take these scheduled trips on behalf of S.E.E. and the tickets have been or ought to have been canceled and the cost of the tickets credited to Martin and Lee in the amount of One Thousand Seven Hundred Fifty Nine and 82/100 Dollars ($ 1,759.82).

28. These airline tickets were paid for by S.E.E. but the refunds have been or will be credited to the named ticket holders i.e. Martin and Lee.

29. Martin and Lee owe to S.E.E., Inc. the cost of these tickets which has not been paid to it.

Count Three
(S.E.E., Inc. v. Martin and Lee)

30. The plaintiff in counterclaim re-alleges the allegations contained in paragraphs 1 through 29 of this counterclaim as if fully set forth herein and incorporated them in this Count Three.

31. During approximately the last year of her employment with S.E.E., Lee was the person responsible for the operation and maintenance of the financial information of the corporation.

32. As part of her duties of financial supervision, she was the person who was enabled to designate, alter, delete and input information into "Business Works", the computer software program which was used by the corporation.

33. On or about August 2001, without authorization and contrary to company policy, Lee changed her husband's master wage record by altering the category entitled "vacation pay", in which the payroll software program automatically accrues vacation days earned based upon hours/days worked.

34. The unauthorized and wrongful change to her husband's master wage record resulted in the payroll software program being programmed to calculate as earned and vested vacation time, an extra four (4) week period.

35 . As a result of the wrongful and unauthorized alteration of the financial program of Lee, Martin has sued the corporation for this so-called "vacation" pay, to the detriment of the corporation.

36. As a result of the wrongful and unauthorized alteration of the financial program, Lee has attempted to manipulate the finances of the corporation for her family's advantage, to the detriment and financial loss of the corporation.

WHEREFORE the plaintiffs in counterclaim S.E.E., Inc and Phillip Tringali make the following requests for relief:

1. That the Court award judgment to plaintiffs for damages, together with interest, costs and attorney's fees, pursuant to Counts I through III;

2. For such relief as the Court may deem just and proper.

S.E.E., Inc. and Phillip Tringali,
By their attorneys,

Susan S. Maire, Esq.
Oppenheim & Maire, LLP
313 Plymouth Street
Halifax, MA 02338
(781) 294-8000
BBO #315360

Date: July 1, 2002

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS

SUPERIOR COURT DEPARTMENT
CIVIL ACTION NO. 02801

PAUL MARTIN AND JUMI LEE, INDIVIDUALLY AND AS ASSIGNEES OF OF S.E.E., INC.
Plaintiffs

vs.

PHILLIP TRINGALI,
Defendants

DEFENDANT PHILLIP TRINGALI'S ANSWER TO PLAINTIFFS' SECOND SUBSTITUTE SECOND AMENDED COMPLAINT

1. Denied

2. Denied

3. Admitted.

4. Denied.

5. The defendant has no knowledge of the truth of the allegations contained in paragraphs 5 and therefore deny same.

6. The defendant has no knowledge of the truth of the allegations contained in paragraphs 5 and therefore deny same.

7. Admitted that S.E.E. started an analytical division in 1996 that initially operated out of Martin's home, otherwise denied.

8. Denied.

9. Denied that the move was made at the direction of S.E.E., otherwise admitted.

"B"

10.     Admitted that Martin owns 25,000.00 shares of S.E.E. common stock, otherwise denied.

11.     Admitted that Lee owns 15,000.00 shares of S.E.E. common stock, otherwise denied.

12.     Admitted.

13.     Admitted that property in Bridgton Maine was purchased by S.E.E., Inc., otherwise denied.

14.     Admitted that the mortgage principal, interest and taxes for the Bridgton property were paid by S.E.E., otherwise denied.

15.     Admitted

16.     Denied.

17.     Admitted as to the fiscal years 1999 and 2000, otherwise denied.

18.     Admitted that Lee was the person in charge of the finances and accounting system of S.E.E. during 2001 and 2002, otherwise denied.

19.     Denied.

20.     Denied.

21.     Denied

22.     Admitted.

23.     Admitted.

24.     The document speaks for itself, otherwise denied.

25.     Admitted as to the book value as of June 30, 2001, otherwise denied.

26.     Denied.

27.  Denied.

28.  Denied.

29.  Denied.

30.  Denied.

31.  The document speaks for itself.

32.  No response required.

33.  Admitted

34.  The document speaks for itself, otherwise denied.

35.  Denied.

36.  Admitted that Tringali owns 70% of S.E.E. stock, otherwise denied.

37.  Admitted.

38.  Admitted.

39.  Admitted.

40.  Admitted.

41.  No response required.

42.  Paragraphs 1 through 41 of this answer are incorporated herein by reference.

43.  The statute speaks for itself, otherwise denied.

44.  Admitted that plaintiffs sought to inspect the articles of organization, by-laws, records of stockholder meetings and stock transfer records, otherwise denied.

45.  Denied.

46.  denied.

47.  No response required.

48.    Paragraphs 1 through 47 of this answer are incorporated herein by reference

herein..

49.    States a legal conclusion to which no answer is required.

50.    Denied.

51.    Denied.

52.    Paragraphs 1 through 51 of this answer are incorporated herein by reference

herein .

53.    States a legal conclusion to which no answer is required.

54.    Denied.

55.    Denied.

56.    Paragraphs 1 through 55 of this answer are incorporated herein by reference

herein

57.    States a legal conclusion to which no answer is required.

58.    Denied.

59.    Paragraphs 1 through 58 of this answer are incorporated herein by reference.

60.    Denied.

61.    Denied.

62.    Denied.

63.    No response required.

64.    Paragraphs 1 through 62 of this answer are incorporated herein by reference.

65.    Denied.

66.    Denied.

67. Denied.

68. Paragraphs 1 through 67 of this answer are incorporated herein by reference.

69. No response required.

70. The statute speaks for itself.

71. The statute speaks for itself.

72. Defendant admits that he was the president of S.E.E., otherwise, calls for a legal conclusion to which no response is required.

73. Denied.

74. The statute speaks for itself.

75. Denied.

AFFIRMATIVE DEFENSES

FIRST AFFIRMATIVE DEFENSE

The plaintiffs' complaint fails to state a claim upon which relief can be granted.

SECOND AFFIRMATIVE DEFENSE

Some or all of the plaintiffs' claims are barred by the applicable statutes of limitation.

THIRD AFFIRMATIVE DEFENSE

Some or all of the plaintiffs' claims are barred by laches.

FOURTH AFFIRMATIVE DEFENSE

The plaintiffs' claims are barred by their own unclean hands.

FIFTH AFFIRMATIVE DEFENSE

The plaintiffs are estopped from recovering upon their claims by their own bad-faith and disloyal conduct.

SIXTH AFFIRMATIVE DEFENSE

The plaintiffs are barred from recovering on their contract claims by their own breach of contract and/or obligations of good faith and fair dealing..

SEVENTH AFFIRMATIVE DEFENSE

The plaintiffs' claims are barred by their failure to exhaust their administrative remedies.

EIGHT AFFIRMATIVE DEFENSE

The plaintiffs are barred from recovering due to their failure to mitigate damages.

NINTH AFFIRMATIVE DEFENSE

The plaintiffs' claims are barred by waiver and\or release.

TENTH AFFIRMATIVE DEFENSE

The plaintiffs' claims are barred by accord and satisfaction.

ELEVENTH AFFIRMATIVE DEFENSE

Plaintiffs alleged injuries or damages were caused in whole or in part by the violation by the plaintiffs, their servants or agents, of the various statutes, ordinances and regulations governing the conduct of the parties at the time the injuries or damage were received.

TWELFTH AFFIRMATIVE DEFENSE

Plaintiffs are barred from recovery on some or all of its claims by a novation.

THIRTEENTH AFFIRMATIVE DEFENSE

Any claims of monies owed to plaintiffs must be set off against extra damages caused by plaintiffs' conduct.

FOURTEENTH AFFIRMATIVE DEFENSE.

All of plaintiffs' claims sounding in contract are barred for lack of consideration.

FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiffs are barred from recovering on their claims because of their ratification of the conduct alleged in their complaint.

SIXTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claim of damages in claims assigned to them by S.E.E., Inc. must be set off or reduced proportionally according to defendant's interest in S.E.E., Inc.

SEVENTEENTH AFFIRMATIVE DEFENSE*

Plaintiffs' claims are barred due to improper venue.

EIGHTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred by fraud.

NINETEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred by the business judgment rule.

WHEREFORE defendant Phillip Tringali requests that that plaintiffs' claims be dismissed, and that he be awarded his fees and costs incurred defending this action.

RESPECTFULLY SUBMITTED
Defendant, Phillip Tringali
By his attorneys

Date 1/25/06

Jeffrey J. Phillips, Esq.
B.B.O. #398480
Daniel Treger, Esq.
B.B.O. #562147
Phillips & Angley
One Bowdoin Square
Boston, MA 02114
Tel. No.: (617) 367-8787

L:\LITG\trng002\secondamendedans.wpd

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by (hand) (mail) on 1/25/06

FILED
IN CLERKS OFFICE
2004 DEC 27 P 4:52
U.S. DISTRICT COURT
DISTRICT OF MASS.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 04-12708 MLW

COPY

PHILIP TRINGALI,
Plaintiff

v.

PAUL MARTIN AND JUMI LEE,
Defendants

## COMPLAINT

1. The plaintiff Philip Tringali ("Tringali") is an individual residing at 98 Walnut Street, Halifax, Plymouth County, Massachusetts.

2. Defendant Paul Martin ("Martin") is an individual residing at 2400 Lincoln Ave. #212, Atladena Los Angeles County, CA, and is the husband of defendant Jumi Lee

3. Defendant Jumi Lee ("Lee"), is an individual residing at 2400 Lincoln Ave. #212, Atladena Los Angeles County, CA, and is the wife of defendant Paul Martin.

## JURISDICTION AND VENUE

4. Jurisdiction is proper under 28 U.S.C. 1332. The parties reside in different states, and the amount in controversy is greater than$75,000.00.

5. Venue is proper under 28 U.S.C. 1391 because all of the acts and omissions giving rise to the claims herein occurred in the Commonwealth of Massachusetts.

ALLEGATIONS COMMON TO ALL COUNTS

6. Plaintiff and defendants are all shareholders of S.E.E., Inc., ("S.E.E."), a closely held corporation organized under the laws of the Commonwealth of Massachusetts.

7. At all times relative to this action, S.E.E. was headquartered in Massachusetts.

8. Tringali founded S.E.E. in 1988 as a sales organization engaged in selling various analytical equipment and systems used in the microelectronic industry.

9. In 1996, S.E.E. embarked upon a business plan to design, manufacture and market an integrated, computer operated microspectrophotometry system for use in the forensic sciences (the "Analytical Product").

10. On or about May 8, 1996, S.E.E. hired Martin as a research analyst to develop the Analytical Product.

11. On February 28, 1997, Martin was made a director of S.E.E., was granted 10%, or 20,000 shares of S.E.E.'s stock, and was given the opportunity to purchase additional company stock at .50¢ per share.

12. The Analytical Product development was directed by Martin and Lee in California, while S.E.E.'s sales business was operated from Massachusetts.

13. In February, 2000, S.E.E.'s Analytical Product operation and its sales operation moved into a single facility in

Middleboro, Massachusetts.

14.   Martin and Lee relocated to Massachusetts as well,
establishing residence in Quincy, Massachusetts.

15.   On or about April 7, 2000, Martin was promoted to
senior vice president of sales and marketing for the Analytical
Product.

16.   On or about August 28, 2000, Martin exercised his
option to purchase 5000 additional shares of S.E.E. stock at .50¢
per share.

17.   On or about October 1, 1996, Lee began working at
Wavetech, a business that provided research and development
consulting services to S.E.E.

18.   In her consultant role, she worked closely with her husband,
Martin, developing the Analytical Product.

19.   Approximately six (6) months later, Lee was hired as an
employee of S.E.E.

20.   On or about May 13, 1998, Lee was also made a director
of S.E.E., and was granted 8000 shares of S.E.E. stock, with the
opportunity to purchase additional company stock at .50¢ per
share.

21.   On April 20, 1999, S.E.E. issued to Lee an additional
2000 shares of stock.

22.   On or about August 28, 2000, Lee exercised her option
to purchase 5000 additional shares of S.E.E. stock at .50¢ per

share.

23. In May, 2000, Lee was promoted to operations manager of S.E.E.

24. As the personnel primarily responsible for developing and marketing S.E.E.'s analytical product, both Martin and Lee acquired, during their respective employment by S.E.E., comprehensive knowledge of S.E.E.'s most sensitive product development and customer-related trade secrets and confidential information, including but not limited to S.E.E.'s database of customer information.

25. In 2000, S.E.E. earned 1.7 million dollars from the sale of the Analytical Product.

26. In February 2001, S.E.E. embarked upon a plan to develop an enhanced analytical product ("Enhanced Product") product with features and improvements that would make the Analytical Product suitable for use in the microelectronics manufacturing process as well as in the forensic sciences. Martin and Lee predicted that it would take one year to bring the Enhanced Product to market.

27. Martin and Lee were primarily responsible for managing the development, manufacture and marketing of the Enhanced Product, including the hiring of additional employees required to develop the product, and cultivating contacts with prospective customers.

28. Lee, as operations manager, was responsible for the day to day operations of S.E.E...

29. By the beginning of 2001, defendants together owned 21% of the stock of S.E.E.

30. In 2001, on information and belief, Martin and Lee embarked upon a plan to obtain control of S.E.E...

31. On December 31, 2001, defendants Martin and Lee filed the articles of organization for Quantum Dynamics International, LLC, ("Quantum") a Massachusetts limited liability corporation.

32. Quantum's principal place of business was located at Martin and Lee's residence.

33. Martin and Lee formed Quantum for the purpose, and with the intent of designing, marketing and installing an integrated, computerized analytical device to compete directly with S.E.E.'s product.

34. Defendants Martin and Lee did not disclose to S.E.E. or Tringali their intention to establish a competing corporation, Quantum Dynamics International, LLC.

35. Defendants Martin and Lee did not offer S.E.E. or Tringali the opportunity to participate in S.E.E.'s business.

36. Martin and Lee organized Quantum while they were employed by S.E.E., still served as directors of S.E.E., Inc. and together owned 21% of S.E.E.'s stock.

37. On or about January 9, 2002, after Martin and Lee had

unsuccessfully attempted to force Tringali to sell to them his majority interest in S.E.E., Martin and Lee resigned from their positions as officers and directors of S.E.E.

38. Unbeknownst to Tringali, prior to resigning from S.E.E., Martin and Lee had duplicated the paper and digital records containing all of S.E.E.'s confidential and proprietary information of S.E.E., including but not limited to all of the design and development information for the Enhanced Product, and all of S.E.E.'s Analytical Product customer information, and had removed the copies from S.E.E.'s facility.

39. Unbeknownst to Tringali, prior to resigning from S.E.E., Martin and Lee had removed from the S.E.E. facility a portion of S.E.E.'s inventory of the components to be integrated into the Analytical Product and/or the Enhanced Product.

40. Unbeknownst to Tringali, prior to resigning from S.E.E., Martin and Lee destroyed certain of S.E.E.'s corporate records, including all paper records and digital information regarding the specifications for the Enhanced Product, all computer code written for integration into the Enhanced Product, and all documentation regarding the process developed for assembling and manufacturing the Enhanced Product.

41. Within two weeks of their resignation from S.E.E. Martin and Lee, as employees, managers, and sole equity owners of Quantum, began to market a product virtually identical to

S.E.E.'s product except that it included the features that S.E.E. had discussed and planned to incorporate into the Enhanced Product while Martin and Lee were directors and stockholders of S.E.E.

42. After Martin and Lee resigned, but while they were still stockholders of S.E.E., Quantum marketed its product by contacting S.E.E.'s existing customers, representatives and distributors to offer them products and services in direct competition with S.E.E.

43. On information and belief Martin sold Quantum's product to customers that Martin had solicited while he was being paid by S.E.E. to market S.E.E.'s Enhanced Product.

44. On information and belief, after resigning from S.E.E., Martin and Lee made false statements to S.E.E.'s Analytical Product distributor and certain of its Analytical Product sales representatives Tringali had improperly used corporate funds of S.E.E. for personal purposes, and had engaged in other financial improprieties with respect to the operation of S.E.E.

45. As a direct and proximate result of Martin's and Lee's conduct, S.E.E.'s revenues fell precipitously, forcing the company to file for Chapter 11 Bankruptcy protection on May 22, 2003.

46. On March 28, 2004, S.E.E. was forced to convert its Chapter 11 Bankruptcy case to a Chapter 7 liquidation.

COUNT I

TRINGALI V. MARTIN AND LEE - BREACH OF FIDUCIARY DUTY

47. Tringali incorporates the allegations set forth in paragraphs one (1) through forty six (6) as if restated herein.

48. As shareholders of a closely held corporation, Martin and Lee owed a fiduciary duty of loyalty to their fellow stockholders.

49. Martin and Lee breached their fiduciary duties to Tringali by conduct including, but not limited to the following acts, all committed while they were still stockholders of S.E.E.:

a. Conspiring to start and operate a business that would compete directly with S.E.E. while they owned stock in, and were being paid by, S.E.E.

b. Conspiring to compete with S.E.E. by expropriating S.E.E.'s confidential information, including but not limited to the specifications and work product for S.E.E.'s Enhanced Product, and S.E.E.'s database of customers and customer service and purchase histories, sales representatives and service agents;

c. Converting all of S.E.E.'s confidential and proprietary information, and some or all of S.E.E.'s inventory of Analytical Product components;

d. Selling to S.E.E.'s customers a product that they

had developed for S.E.E. while they were employed by S.E.E. to do so.

e. Exploiting economic relationships and sales opportunities, and other corporate opportunities that they had developed for S.E.E. while they were employed by S.E.E. to do so.

f. Purposefully failing to perform their duties as employees of S.E.E., most importantly their responsibility to hire additional software developer and Application Engineer to insure the continuity of operation of the S.E.E. for the purpose of inhibiting S.E.E.'s continued operation in the event of their departure from S.E.E.

g. Destroying S.E.E.'s corporate records in order to inhibit S.E.E.'s continued operation in the event of their departure from S.E.E.

50. Martin and Lee's intentional conduct, in violation of their fiduciary duty, was a direct and proximate cause of S.E.E.'s failure, and has caused Tringali's interest in S.E.E. to become valueless.

51. As a direct and proximate cause of Martin's and Lee's conduct, Tringali has suffered financial damages.

COUNT II

TRINGALI V. MARTIN AND LEE - SLANDER

52. Tringali incorporates the allegations set forth in paragraphs one (1) through fifty one (51) as if restated herein.

53. At various times on and after January 9, 2002, Martin and Lee made false statements to S.E.E.'s Analytical Product Distributor and certain of its Analytical Product sales representatives that Tringali had improperly used corporate funds of S.E.E. for personal purposes, and had engaged in other financial improprieties with respect to the operation of S.E.E.

54. These statements were false, and were made with actual malice.

55. These statements were intended to prejudice Tringali's profession and business, and were slanderous per-se.

56. As a result of Martin and Lee's slanderous conduct, Tringali has suffered actual economic losses, emotional distress, and damage to his reputation.

WHEREFORE the plaintiff, Phillip Tringali, respectfully requests that this court award him damages, together with interest, costs and attorney's fees, against defendants Paul Martin and Jumi Lee, jointly and severally, in an amount sufficient to compensate him for his losses, together with attorneys fees and costs.

Plaintiff claims a trial by jury of all counts so triable.

RESPECTFULLY SUBMITTED,
Phillip Tringali,
By their attorney,

Date: 12/23/04

Jeffrey J. Phillips, Esq.
B.B.O. #398480
Daniel Treger, Esq.
B.B.O. #562147
Phillips & Angley
One Bowdoin Square
Boston, MA 02114
Tel. No. 617-367-8787

L:\LITG\Trng001\tringali(revised)complaint.wpd

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS

SUPERIOR COURT
C.A. NO. 02-801

PAUL MARTIN and JUMI LEE, Individually and as Stockholders on behalf of S.E.E., INC.
Plaintiffs

V.

S.E.E., INC. and PHILLIP TRINGALI
Defendants

**ANSWERS OF THE DEFENDANT PHILLIP TRINGALI TO FIRST SET OF INTERROGATORIES OF PAUL MARTIN**

1. State all facts on which you base the allegation in Paragraph 10 of the Counterclaim that Jumi Lee ("Lee") transferred S.E.E.'s confidential financial information to her laptop computer, and as part of your answer:

   a. Identify each person having knowledge of each such allegation;
   b. Identify all documents which evidence or support each such allegation.

Ans. Prior to her resignation, Lee was observed transferring data from the S.E.E. Computer(s) to her personal laptop. Lee also directed a secretary of S.E.E. to make copies of financial and insurance information as well as information pertaining to the Maine property.

Philip Tringali, Deborah Bowles and Dee Hixson have knowledge of these acts.

There are no particular documents which support these allegations at this time.

2. State all facts on which you base the allegation in Paragraph 18 of the Counterclaim that the plaintiffs deliberately and intentionally failed to fulfill their

"D"

responsibility to hire additional developmental personnel for S.E.E., and as part of your answer:

a. Identify each person having knowledge of each such allegation;

b. Identify all documents which evidence or support each such allegation.

Ans. The long term and short term planning of the officers of the corporation included hiring additional developmental personnel. Martin and/or Lee were responsible for hiring such personnel. In the course of at least a year, they or each individually, did not hire anyone. The corporation was put to great expense for travel , interviews and meals for a no-result search. It was in the best interests of the plaintiffs to be indispensable to the corporation.

The person with knowledge of these allegations is Philip Tringali. The expense records of Martin and Lee indicate the monies spent by them for the alleged search for additional personnel and the time period of such alleged search.

3. State all facts on which you base the allegation in Paragraph 20 of the Counterclaim that Lee was to develop the next generation of product for S.E.E., and as part of your answer:

a. Identify each person having knowledge of each such allegation;

b. Identify all documents which evidence or support each such allegation.

Ans. The officers of the corporation held meetings at which goals for the coming year were discussed. At such a meeting, early in 2001, the development by Lee of the next generation of instrument, name the 2000 platform was discussed. It was the responsibility of Lee to develop this next generation of product during the coming year. The persons having knowledge of this are Philip Tringali and Paul Martin and Andrea Desrosiers.

I do not know at this time if there are any corporate memo of these meetings. If any are found, they will be provided as supplemental answers to the plaintiffs' interrogatories.

4. State all facts on which you base the allegations in Paragraph 21 of the Counterclaim that the plaintiffs left S.E.E., Inc. ("S.E.E.') with all confidential information, proprietary codes, trade secrets and design and development information for the next generation of product of S.E.E. on their computer hard drives, and as part of your answer:

a. Identify each person having knowledge of each such allegation;

b. Identify all documents which evidence or support each such allegation.

Ans. See answer to Interrogatory number 1.

5. State all facts on which you base the allegations in Paragraph 22 of the Counterclaim that the plaintiffs contacted S.E.E.'s vendors, representatives and customers 'with a product virtually identical to S.E.E.'s product...," and as part of your answer:

a. Identify each person having knowledge of each such allegation;

b. Identify all documents which evidence or support each such allegation.

Ans. The product being marketed by the plaintiffs' corporations uses the same software and operates in the same manner as the product of S.E.E. except for the use of the 2000 platform, which was developed while the plaintiffs were employed by S.E.E. The persons having knowledge of the specifications of the products or S.E.E. and those of the plaintiffs' corporations are Philip Tringali, Deborah Bowles, Andrea Desroisers, and the agents used by S.E.E..

The specifications of plaintiffs' product on its web site and as indicated at trade shows and as set forth in its bids and the same documents of S.E.E. would establish the virtual identicalness of the products.

6.    State all facts on which you base the allegations in Paragraph 23 of the
Counterclaim that S.E.E. suffered financial loss and economic opportunities as a result
of the plaintiffs appropriation of S.E.E.'s work product and trade secrets, and as part of
your answer:

    a. Identify each person having knowledge of each such allegation;

    b. Identify all documents which evidence or support each such allegation.


Ans.  S.E.E. has lost several bids because of the direct competition of the plaintiffs
and/or their companies ; manufacturing of some of S.E.E.'s product has been delayed
because of the unauthorized interference with S.E.E.'s vendor by Lee which has
reduced S.E.E.'s cash flow; S.E.E. has suffered the delay in ordering by a customer of
S.E.E. for a bid which was awarded to S.E.E. as a result of the plaintiffs frivolous and
wrongful appeal of the bid process . The plaintiffs have also used the S.E.E. products
as references , as if such products were their personal product in order to qualify for
bids for which they are not otherwise qualified, attempting to win the bid at the expense
of S.E.E. which is qualified to gain the bid. The defendant reserves the right to
supplement this answer as additional damages are recognized and incurred, upon
reasonable notice to the plaintiff.

The persons having knowledge of the damages incurred by S.E.E. are Philip Tringali,
Deborah Bowles, Andrea Desrosiers, Gary Unruh and Jeffrey Husted and customers
who requested bids for the manufacture of instruments.

The documents which support these facts are the financial accounts of the corporation,
the bids made and not accepted by potential customers of S.E.E. the correspondence
to Dynamic Light Control, and the bids submitted by the plaintiffs for the manufacture of
instruments.

7. State all facts on which you base the allegations in Paragraph 24 of the Counterclaim that S.E.E. suffered financial loss and economic opportunities as a result of plaintiffs 'communication of S.E.E.'s work product and trade secrets while stockholders of S.E.E., and as part of your answer:

a. Identify each person having knowledge of each such allegation;

b. Identify all documents which evidence or support each such allegation.

Ans. See the answer to Interrogatory number 6 above since the plaintiffs have been stockholders before and continuing after their resignation from S.E.E. and the incorporation of their corporations.

Signed under the pains and penalties of perjury this 23rd day of December 2002.

[signature]
Phillip Tringali

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document was served upon (each party appearing pro se and) the attorney of record for each party by faxand mail (~~by hand~~) on 12/23/02

(Signature) [signature]

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS

SUPERIOR COURT
C.A. NO. 02-801

PAUL MARTIN and JUMI LEE,
Individually and as Stockholders on
behalf of S.E.E., INC.
Plaintiffs

V.

S.E.E., INC. and PHILLIP TRINGALI
Defendants

**ANSWERS OF THE DEFENDANT, S.E.E., INC., TO INTERROGATORIES OF THE PLAINTIFF, PAUL MARTIN**

1. State fully and in detail a computation of the book value of the S.E.E. stock as of December 9, 2001, and as part of your answer:

   a. Identify each person having knowledge of each such allegation;

   b. Identify all documents which evidence or support each such allegation.

Ans. There is no book value of S.E.E. stock as of Dec. 9, 2001.

2. State all facts on which you base the allegations in the Second Defense that the plaintiffs have misappropriated and used S.E.E.'s trade secrets and confidential information, are interfering with S.E.E.'s economic opportunities and are engaged in active competition with S.E.E., and as part of your answer:

   a. Identify each person having knowledge of each such allegation;

   b. Identify all documents which evidence or support each such allegation.

"E"

Ans. The plaintiffs have established two competing corporations which are in direct competition to S.E.E. in a limited, specific marketplace. By virtue of the transfer of all of the S.E.E. confidential information contained on the corporation computers to Martin and Lee's personal laptop computers, the plaintiffs have contacted customers, agents and vendors of S.E.E. to establish and develop their own business. The plaintiffs have listed as their own product, the products of S.E.E. in the bidding process to obtain business from customers. The plaintiffs have issued unauthorized orders which have interfered with job orders to vendors. The potential customers of the plaintiffs' corporations are the same customers as those of S.E.E., Inc.

The persons having knowledge of these facts are Philip Tringali and Deborah Bowles. The documents which support these facts are the copies of the bid proposals which have been bid upon by the plaintiffs' corporation(s); the correspondence and/or e-mails with Dynamic Light Control, Inc. and telephone records of plaintiffs' telephone calls.

3. State all facts on which you base the allegations in the Third Defense that the plaintiffs are in breach of their fiduciary duties as stockholders of S.E.E., and as part of your answer:

a. Identify each person having knowledge of each such allegation;

b. Identify all documents which evidence or support each such allegation.

Ans. The stockholders of a small, closely held corporation owe a fiduciary duty to the other stockholders and the corporation. This duty includes taking no action which would harm the corporation. The plaintiffs have incorporated two corporations whose purpose is to manufacture a competing product in the same marketplace as the product(s) and marketplace of S.E.E. They are actively seeking to have S.E.E. customers buy their product(s) rather than S.E.E.'s product(s).

Philip Tringali, Deborah Bowles, agents of S.E.E. and customers of S.E.E. all have knowledge of these acts of the plaintiffs.

The bids which have been received by customers of S.E.E. from the plaintiffs, the state corporation records of Massachusetts and California, the web site of the plaintiffs all document the activities of the plaintiffs. As additional documents may become available, defendants will supplement this answer.

4. State all facts on which you base the allegations in the Fifth Defense that the plaintiffs' conduct or actions have injured or damaged S.E.E., and as part of your answer:

a. Identify each person having knowledge of each such allegation;

b. Identify all documents which evidence or support each such allegation.

Ans. The plaintiffs' deliberate failure to hire additional personnel left the corporation without a viable research department if the resignations of the plaintiffs were accepted, and unable to proceed with immediate further development of product; the deliberate interference with S.E.E.'s order to Dynamic Light Control delayed the completion of product by S.E.E. to its economic harm; the use of processes such as the 2000 platform developed by and for S.E.E., and the removal of all of the development information from the S.E.E. computers and corporate files have injured the S.E.E. corporations ability to compete with the product the plaintiff alleges to be theirs.

The persons having knowledge of the actions of the plaintiffs are Philip Tringali, Deborah Bowles, Andrea Desrosier, and Jeffrey Husted.

The financial records of the corporation indicate the drop in business of the corporation, the expense records of the corporation for Martin and Lee establish the cost to the corporation of the deliberate failure to hire additional personnel, the Dynamic Light Control correspondence evidences the unauthorized interference with that vendor. The

plaintiffs' actions have removed all documents from the corporation which would indicate the re search and development of the 2000 platform.

5. State all facts on which you base the allegation in the Seventh Defense that the plaintiffs were paid $23,775.10 in full payment of all claims for wages, vacation pay and commissions due, and as part of your answer:

a. Identify each person having knowledge of each such allegation;

b. Identify all documents which evidence or support each such allegation.

Ans. The financial records of the corporation reflect that both Lee and Martin were paid all current wages to the date of their resignation, have been paid all commissions as they have become due and have been paid for all accrued vacation pay.

Philip Tringali and Deborah Bowles have knowledge of the payroll records and payments.

6. State all facts on which you base the allegation in Paragraph 8 of the Counterclaim that on or about January 9, 2002 plaintiffs attempted to gain control of S.E.E., and as part of your answer:

a. Identify each person having knowledge of each such allegation;

b. Identify all documents which evidence or support each such allegation.

Ans. The plaintiffs attempted to call a directors meeting without proper notice. An informal meeting was had with Philip Tringali, Jumi Lee, Paul Martin and Jeffrey Husted and a private stenographer hired by Lee and/or Martin, were present at the meeting. The purpose of the meeting was to grant pay raises to Lee and Martin if they stayed with the corporation and to remove Philip Tringali from having authority over the manufacturing division of S.E.E.

Persons present at the meeting have knowledge of that meeting and there is a written
transcript of the notes taken by the stenographer, which is in the possession of the
plaintiffs. The improper notices of that call of a meeting are also in the possession of
the plaintiffs.


6.    State all facts on which you base the allegations in Paragraph 23 of the
Counterclaim that S.E.E. suffered financial loss and economic opportunities as a result
of the plaintiffs appropriation of S.E.E.'s work product and trade secrets, and as part of
your answer:

    a. Identify each person having knowledge of each such allegation;

    b. Identify all documents which evidence or support each such allegation.


Ans.  S.E.E. has lost several bids because of the direct competition of the plaintiffs
and/or their companies ; manufacturing of some of S.E.E.'s product has been delayed
because of the unauthorized interference with S.E.E.'s vendor by Lee which has
reduced S.E.E.'s cash flow; S.E.E. has suffered the delay in ordering by a customer of
S.E.E. for a bid which was awarded to S.E.E. as a result of the plaintiffs frivolous and
wrongful appeal of the bid process . The plaintiffs have also used the S.E.E. products
as references , as if such products were their personal product in order to qualify for
bids for which they are not otherwise qualified, attempting to win the bid at the expense
of S.E.E. which is qualified to gain the bid. The defendant reserves the right to
supplement this answer as additional damages are recognized and incurred, upon
reasonable notice to the plaintiff.

The persons having knowledge of the damages incurred by S.E.E. are Philip Tringali,
Deborah Bowles, Andrea Desrosier, Gary Unruh and Jeffrey Husted and customers
who requested bids for the manufacture of instruments.

The documents which support these facts are the financial accounts of the corporation, the bids made and not accepted by potential customers of S.E.E. the correspondence to Dynamic Light Control, and the bids submitted by the plaintiffs for the manufacture of instruments.

7. State all facts on which you base the allegations in Paragraph 24 of the Counterclaim that S.E.E. suffered financial loss and economic opportunities as a result of plaintiffs 'communication of S.E.E.'s work product and trade secrets while stockholders of S.E.E., and as part of your answer:

a. Identify each person having knowledge of each such allegation;

b. Identify all documents which evidence or support each such allegation.

Ans. See the answer to Interrogatory number 6 above since the plaintiffs have been stockholders before and continuing after their resignation from S.E.E. and the incorporation of their corporations.

Signed under the pains and penalties of perjury this 23rd day of December 2002.

S.E.E., INC.

By: [signature]
Phillip Tringali

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon (each party appearing pro se and) the attorney of record for each party by fax and mail ~~(by hand)~~ on 12/23/02.

(Signature) [signature]

Volume: I

Pages: 1-215

Exhibits: 1-9

COMMONWEALTH OF MASSACHUSETTS

Norfolk, ss Superior Court

Civil Action No. 02-801

- - - - - - - - - - - - - - - - - - - - x

PAUL MARTIN and JUMI LEE, Individually and as Stockholders on behalf of S.E.E., Inc.,

Plaintiffs,

vs.

S.E.E., INC. and PHILLIP TRINGALI,

Defendants.

- - - - - - - - - - - - - - - - - - - - x

DEPOSITION OF PHILLIP TRINGALI

Thursday, March 10, 2005

Davis & Rubin

One Bowdoin Square

Boston, Massachusetts 02114

Commencing at 10:04 a.m.

Reporter: Karen A. Morgan, CSR/RPR

"F"

refresh your memory?
A. Yes.
Q. I direct you to Page 4. Second defense. It says in pertinent part that the plaintiffs, that's referring to Martin and Lee, seeking to destroy the corporation, meaning S.E.E., by misappropriation and use of corporation trade secrets and confidential information. Do you see that?
A. Yes.
Q. Tell me what do you claim that Martin and Lee misappropriated of the corporation S.E.E.?
A. Database records.
Q. I'm sorry?
A. Database records.
Q. Anything else?
A. Well, I allege they took -- misappropriated company material.
Q. Specifically other than database records. Let me ask you what the database records consisted of?
A. It would have been our internal database which contained all the contact, customer information, contact records, everything that we had done.
Q. That database was on what form?
A. It was in -- well, it was on a company

server.
Q. Disk format or a hard drive?
A. It would have been in hard drive I believe.
Q. On a computer?
A. Well, accessible on all computers, yes.
Q. That's what the database records consisted of?
A. Yes.
Q. What else do you allege or claim that Martin and Lee misappropriated as set forth in the second defense?
MR. TREGER: Specifically you're saying what is he alleging?
Q. Well, what does this refer to. The second defense says that Martin and Lee misappropriated trade secrets and confidential information. I'm asking you to tell me what did Martin and Lee misappropriate?
MR. TREGER: Are you asking him for what he is able to prove now because discovery is still ongoing or are you asking him what he alleges?
MR. DAVIS: I didn't use the word proof.
Q. What do you say that Martin and Lee misappropriated in addition to the database?
A. Internal development.

Q. In what form? What format was that internal development?
MR. TREGER: Objection. You can answer that.
A. Well, I guess in some cases I'm assuming some documented format.
Q. I'm sorry?
A. I'm assuming some documented format.
Q. Okay. You're assuming a document format?
A. Yes.
Q. What type of a document format are you assuming?
MR. TREGER: Objection. If you can answer.
A. I can't answer that.
Q. All right. Have you told me everything that Martin and Lee -- do you say Martin and Lee have misappropriated by way of trade secrets and confidential information anything other than the database and the internal development?
MR. TREGER: Objection. Are you asking what he believes at this time?
MR. DAVIS: At any time.
MR. TREGER: Or what he believed --
Q. What you believed at any time.

A. Well, I guess it's very broad in the sense customer bid information. There could be a number of issues.
Q. Are these aspects of this misappropriation what you knew at the time this document was filed on July 1, 2002?
MR. TREGER: Objection. Are you asking what he believes, what he knows?
MR. DAVIS: What he knew then and what he knows now.
Q. What did you know in July 2002 when this answer and counterclaim was filed as to what Martin and Lee misappropriated?
A. I don't know any difference between then and now. I mean there's been no discovery.
Q. All right. Going back to the database records. This consisted of a company server which would have been a hard drive accessible to any computer?
A. It would have been with password, yes.
Q. Okay. Who maintained the password?
A. Dr. Martin maintained the database.
Q. On her own personal computer?
A. No. On his.

Q. On his computer.
A. He made the master password. He was the --
Q. Was this database on any other computers other than Dr. Martin? Did you say it was on Dr. Martin's computer?
A. Well --
MR. TREGER: I believe the testimony was it was on a company server.
A. It was on a company server. Dr. Martin also had a personal business database on his computer.
Q. And when do you say that he misappropriated database records?
A. When do I say?
Q. I'm sorry?
A. When the time he left.
Q. He left on January 9, 2002.
A. Right.
Q. Is that the date?
A. I believe he stopped back in on the 11th.
Q. The 11th?
A. Yes.
Q. When do you say is the date he misappropriated the database records?
MR. TREGER: Objection. What do you mean

by misappropriate?
Q. Do you understand the word misappropriate?
A. Yes.
Q. What is your understanding of the word?
A. Took for his own personal use.
Q. Okay. Based upon that definition, when do you say Dr. Martin misappropriated the database records of S.E.E.?
A. When he walked out the door with his laptop.
Q. What was on his laptop?
A. The database.
Q. How do you know that?
A. I watched him put it on it.
Q. When did you see Dr. Martin transfer the database to his personal computer?
A. I don't recall the exact date. It was shortly before leaving.
Q. Do you know whether or not he erased it from his computer?
A. I have no knowledge of that.
Q. One way or other; is that correct? You don't know whether he did or he didn't?
A. No. I don't know either way.
Q. So if Dr. Martin erased that database from

his personal computer, he would not have misappropriated, would he?
MR. TREGER: Objection.
A. I did not see him erase the database. I can't answer that.
Q. Where was it that you saw Dr. Martin transfer this data? Where did this occur?
A. At S.E.E. offices.
Q. Who was present at the time?
A. In his office.
Q. When you say he transferred this database to his personal computer, who was present?
A. I was present.
Q. What did he do?
A. Basically copied the database on to his personal computer.
Q. Did he tell you that?
A. Yes.
Q. How long before he left did that occur?
A. Within a couple of weeks.
Q. All right. He gave you notice he was leaving on January 9th. Is that the date he resigned?
A. Yes.
Q. Was it two weeks before that that he

transferred this database?
A. Whenever he got the new laptop.
Q. When did he get the new laptop?
A. I believe it was a December time frame.
Q. Okay. December. Was there a laptop that Dr. Martin had before this particular laptop he acquired in December?
A. Yes.
Q. And was that his personal laptop?
A. I believe so.
Q. Did he also have the database on his prior laptop?
A. I believe so.
Q. How many other laptops were there that had the company database on them?
A. I believe my laptop that I'm aware of and I can't answer for other laptops.
Q. Have you changed laptops from time to time?
A. Yes.
Q. Each time when you changed them, did you transfer the database?
A. No.
Q. Dr. Martin had done the same thing?
A. Yes.

Page 94

Q. Did Debra Bowles or anyone else transfer any of the database to their personal laptop?
A. I can't answer for them.
Q. Did Miss Lee transfer the database if you know?
A. I don't know.
Q. All right. The internal development, and you used the words after the internal development, you said you assumed that was in a document format. You say that Dr. Martin and Miss Lee misappropriated internal development.
A. Yes.
Q. What document format did they misappropriate?
A. I can't answer that.
Q. How do you know that they misappropriated this internal development?
MR. TREGER: Objection.
A. There was no information.
Q. What did the internal development consist of? How did it evidence itself?
A. It would usually be software programs and drawings.
Q. Okay. Something disappeared from the S.E.E. premise?

Page 95

A. Something couldn't be found on the S.E.E. premises.
Q. What was it that couldn't be found?
A. Ten months worth of work.
Q. And ten months worth of work on what?
A. Development of the next generation product.
Q. The 2200?
A. Yes.
Q. All right. Do you know whether Dr. Martin or Miss Lee took that information with them?
A. I don't know whether.
Q. You have no personal knowledge as to the misappropriation of this internal development work, do you?
A. Not that I physically saw, no.
Q. Did anyone else see it?
A. I can't answer that. I don't know.
Q. Do you have any evidence at all that any internal development work was misappropriated by either Martin or Lee?
A. Not that I found.
Q. You referred to customer bid information.
A. Yes.
Q. What was that?

Page 96

A. Well, when we bid on projects or bid on sales of products through government agencies there's a bid process that takes place.
Q. Is that bid process evidenced in some documentary form?
A. The bids we have would be in the files, yes.
Q. And what type of files are they? Hard copy?
A. Company records, yes.
Q. Were they kept in some kind of a filing cabinet or some type of files?
A. Usually.
Q. Okay. File folders with documents in them?
A. Yes, I believe so.
Q. Okay. You say that Dr. Martin and Miss Lee took these files?
A. I allege, yes.
Q. And when did they take them?
A. I don't know the exact time.
Q. Did you see them take the files?
A. I didn't personally see them take the files, no.
Q. Did these files disappear?
A. There are some files missing, yes.
Q. Some files. Tell me what files were missing

Page 97

at the time that this answer and counterclaim was filed in July '02.
MR. TREGER: Objection. You can answer.
A. There were corporate records, records on Maine.
Q. Records on names?
A. On Maine.
Q. On Maine?
A. Yes.
Q. What do mean on Maine? You mean the State of Maine?
A. No. On our property in Maine.
Q. Okay.
A. Our insurance records, all our financials.
Q. Did any of these corporate records -- first of all the records with regard to the State of Maine. What do you say that Martin and Lee took with them?
A. Copies of all the information on Maine. All the records.
Q. Which information did they copy?
A. It would probably be the mortgage information, any of the records on things spent in Maine, any of the legal records, the rentals, numbers. Pretty much all of that.

Q. How do you know these documents were taken?
A. Because she had a subordinate copy them.
Q. I'm sorry?
A. Jumi Lee had a subordinate copy all the records.
Q. Photocopy these?
A. Yes.
Q. Who copied them?
A. Dee Hixon.
Q. Is it Mr. or Mrs.?
A. Mrs.
Q. Hixon?
A. Yes.
Q. What is her first name?
A. Dee or Dimetra I believe.
Q. Is she employed by the company?
A. No longer.
Q. What was her capacity?
A. Office administrator.
Q. Where does Miss Hixon live now?
A. In Middleboro.
Q. When was the last time you spoke with her?
A. I don't know exactly.
Q. Did Miss Hixon tell you she copied the Maine records?

A. Yes.
Q. Miss Lee didn't take the originals, did she?
A. No, I don't believe so.
Q. The insurance and financials consisted of what? Photocopies?
A. Yes.
Q. Photocopies of what?
A. All our financials, all of the insurance records.
Q. Insurance records on what? The Maine property?
A. Everything.
Q. Okay. Did Miss Hixon say she copied these, too?
A. Yes. Well, I don't know on the insurance records. I know that the last time the insurance folder was in the hands of Jumi Lee and it could not be found.
Q. All right. These records with regard to the Maine property, insurance or financials have nothing to do with a competing business that you say was organized by Martin and Lee, did it?
A. You just asked me what I saw them copy or take.

Q. My question is did the records regarding the Maine property have anything to do with a competing business?
A. Not the Maine property, no.
Q. How about the insurance records?
A. Insurance and corporate would, yes.
Q. Okay. Corporate records that you say they took consisted of what? Minutes of meetings?
A. They took copies of all the financials. I don't know about the minutes of meetings.
Q. Okay. Customer bid information. Let's go back to that.
A. Right.
Q. That consisted of a number of files?
A. Yes.
Q. What files were missing in July '02?
A. There were no files missing that I'm aware of.
Q. So what customer bid information was taken?
A. I'm alleging they took information on current bids.
Q. On what?
A. On upcoming bids.

Q. And that information on upcoming bids consisted of what? Paperwork?
A. It would have been forecast and other additional information.
Q. And was that kept in a file cabinet?
A. Yes. I believe. It is also on disk or hard drive. Excuse me.
Q. I'm sorry?
A. It's on hard drive also I believe.
Q. At the time that they left in January '02, what did these customer bids consist of that you say were taken or misappropriated?
A. Basically specifications and bids that were ongoing at the time.
Q. And who has knowledge concerning this misappropriation of the customer bids?
A. I would assume the -- well, depending on the case the plaintiffs or the defendants Martin and Lee.
Q. Other than Martin and Lee, did someone see this occurring?
MR. TREGER: If you know.
A. I don't know.
Q. Do you have any personal knowledge that Martin and Lee ever took any customer bid information?

A. They had the French QC book. I don't know if there was bid information in it in their possession.
Q. They had the what?
A. There's a book that we do on each sale and they had the French one in their possession.
Q. Do you have any personal knowledge that they took any of that information with them?
A. Well, yeah.
Q. What personal knowledge do you have?
A. They sent it back to me after they left the company.
Q. What was sent back to you after they left the company?
A. There was a QC manual on a French order and I don't recall what other stuff was included at the time.
Q. A French order?
A. Yes.
Q. An order submitted by who?
A. The order submitted from our distributor in Europe.
Q. That company was what?
A. Resultech.
Q. Resultech was located where?
A. In Germany.

Q. They had a bid for a French customer?
A. They had a bid and order for a French customer, yes.
Q. Bid and order. The order was placed by who? What was the French customer's name?
A. Well, it was placed by the gendarmerie.
Q. That's a law enforcement agent in France?
A. Yes.
Q. For what product?
A. I believe it was the 2100.
Q. Was that the information that you say Martin and Lee or somebody, either Martin or Lee, returned to you?
A. That was returned to me by them, yes.
Q. When?
A. As best I can recall, it would have been maybe in February.
Q. Did you request it or did they send it back on their own?
A. I requested it.
Q. How did you request that?
A. I believe by letter or fax. I don't recall 100 percent.
Q. And what was returned to you physically?

What was sent back to you?
A. The binder on the French sale and I don't recall what else at the time.
Q. Did S.E.E. end up making the sale to this gendarmerie in France?
A. It was already a sale.
Q. It was already a sale?
A. Yes.
Q. So what if anything did Martin and Lee misappropriate with respect to this French order?
A. All of the records concerning the French order.
Q. To what extent did they use that?
A. You would have to ask them.
Q. Do you know whether or not any of this information was ever used by Martin and Lee?
A. Can't answer that.
Q. Do you know if any -- other than the French order were there any other customer bids either on disk, hard drive or documents that you say were misappropriated by Martin and Lee?
A. Not that I'm aware of.
MR. TREGER: He is not asking you what you're aware of. He's asking you what you allege.

A. Well again, I haven't got all the discovery. I don't know all the details.
Q. Do you have any knowledge as you sit here today of any other customer bid information either on disk, hard drive or documents that were allegedly misappropriated by Martin and Lee?
A. Not specifically at this point.
Q. Going back to the second defense. It also claims in there that Martin and Lee are engaging in active competition with S.E.E.
A. Yes.
Q. At that time what were Martin and Lee -- what did Martin and Lee's active competition consist of?
A. What type of detail would you like?
Q. Well, tell me what you know about this active competition. Did they form another company?
A. Yes.
Q. When?
A. Prior to them leaving.
Q. December 31, '01?
A. It may have been.
Q. That was nine days before they left?
A. If that's the date, yes.
Q. During the period between December 31, '01

and the time they left, whether January 9th or January 11th, what activities do you say that Martin and Lee engaged in with respect to competition with S.E.E.?
A. I can't answer that.
Q. Do you have any evidence that Martin and Lee ever did any competitive activities, engaged in any competitive activities between the time they formed Quantum, the company, and the time they left S.E.E.?
A. I don't have first-hand knowledge I guess.
Q. Do you have any information other than first-hand knowledge that Martin and Lee ever engaged in any competitive activity from the time that they organized Quantum and the time that they left S.E.E.?
A. Not that I'm aware.
Q. So the competitive activities were engaged in by Martin and Lee after they left S.E.E.; is that correct?
MR. TREGER: Objection.
A. I don't have the answers.
Q. Well, in the second defense you say that Martin and Lee are engaged in active competition with the corporation.
A. Yes.
Q. My question is when did this active

competition commence?
A. I guess only Martin and Lee can answer that.
Q. So you don't know that?
A. Well, I know that they set up a competing company. I know that they went to a conference and presented a paper in February.
Q. In February of '02. That would be after they left?
A. Right.
Q. Anything other than that?
A. They were offering products for sale, competitive products to us.
Q. When?
A. I don't know. The first date they did I'm aware of it in March.
Q. Neither one of them had a noncompetition agreement; correct?
MR. TREGER: Objection.
A. Not a signed.
Q. And other than what you have told me about the conference and the paper in February '02 and offering competitive products in March '02, what other competitive activities were they engaged in at the time this answer and counterclaim was filed in July '02?

MR. TREGER: Objection. Are you asking what he knows or what he's alleging?
Q. What do you know?
A. Well, I know they started a competitive company offering competitive products. I know they presented data on a system in February which was just over a month after they left. I know they had set up Quantum Dynamics and I know they were contacting employees, representatives, distributors and customers.
Q. The customers that you say -- when you say they, who was contacting the customers of S.E.E.?
A. I don't know specifically if it was Paul or Jumi.
Q. Either Dr. Martin or Miss Lee would you agree that they would know the identities of the customers by reason of their employment?
A. Identities.
Q. Yes.
A. Possibly.
Q. When Martin left, he had working for S.E.E. for how many years?
A. Close to six. I believe over five years.
Q. He started in 1995?
A. Mm-mm.

Q. So it was close to six years?
A. Six years.
Q. Fair statement that during that six-year period he would have acquired the knowledge of who the customers, forensic customers of S.E.E. were?
A. Some knowledge, yes.
Q. How about Miss Lee?
A. Yes.
Q. Did either Martin or Lee ever solicit any of the semiconductor customers of S.E.E.?
A. Yes.
Q. For what product?
A. For one of our models.
Q. For a forensic product?
A. Yes. Well, it was one of our designs for a semiconductor application.
Q. For which model?
A. I don't recall which one at the time.
Q. Was it similar to one of your models?
A. Yes.
Q. Which one was it similar to?
A. One of the two at the time. I don't recall which one.
Q. When you say one of the two, give me the

model number?
A. The 1100 or the 2100.
Q. Bot of these were forensic devices?
A. They were sold to the forensic business by us, yes.
Q. Who did Martin and Lee solicit for a sale of a -- you say that they solicited a customer of S.E.E. for a sale of a product similar to the 1100 or the 2100?
A. Yes.
Q. What was the product that was solicited? What did they solicit these customers for?
A. One of those two products.
Q. What customer did they solicit?
A. I believe at the time it was Cortek.
Q. How do you spell that, please?
A. C-O-R-T-E-K.
Q. Located where?
A. I think Billerica.
Q. And when did this solicitation take place?
A. I'm not sure of the time frame. I don't recall the exact time.
Q. Having in mind that they left January of '02, how long after the time they left was it?

A. It was not after the time they left.
Q. This was a solicitation before they left?
A. Yes.
Q. For what product though?
A. It would have been one of the two products. I don't recall.
Q. Who were they soliciting on behalf of, themselves or S.E.E.?
A. S.E.E.
Q. My question to you is did Martin and Lee -- so they didn't solicit this Cortek for a product of their own. It was for one of your products?
A. Right.
Q. I think my question to you was --
A. You can repeat it. You asked me if they solicited anyone.
Q. Did they solicit any of your customers after they left?
A. I don't recall.
Q. Do you have any evidence that Martin and Lee solicited any of S.E.E.'s customers after they resigned from the company?
A. Yes.
Q. What evidence is that?

A. Phone records.
Q. Who did they solicit?
A. I would have to go back and look.
Q. For what product did they solicit?
A. For their product.
Q. When did this take place? In 2002?
A. Right.
Q. What was, quote unquote, their product?
A. I would have to go back and recall the numbers. I don't know.
Q. Their product was a competing forensic device?
A. Yes, it was.
Q. Who developed it?
A. I can't answer that.
Q. Did you ever inspect the Martin and Lee product?
A. No.
Q. Do you know in any way if it is similar to any product that was developed or sold by S.E.E.?
A. Yes.
Q. How do you know that?
A. By what I have seen at shows.
Q. I'm sorry?

A. But what I have seen at shows.
Q. What do you base that on? What did you see?
A. Well, I saw their product at a show. I saw some of the features on it. Some of the capabilities.
Q. Were there features and capabilities similar to which of your product?
A. What I saw would have been similar to the 2100 or the 2200 design.
Q. Were there any other products in the marketplace that were similar to your 2100 product?
A. Yes. One by J and M.
Q. Tell me what were the features that you say were similar between your 2100 product and the Martin and Lee product?
A. Well, had the same capabilities. It had the same reflecting optic configuration. It had utilized the same detector board we were looking at and some software.
Q. Did you examine the detector board to determine that?
A. Not physically.
Q. How did you make that determination that it used the same detector board?
A. I'm aware of the specifications and

capabilities.
Q. Do you have a document that shows the specification and capability of the Martin and Lee product?
A. I don't know if I have a copy of their specifications. I'm assuming there's some -- I know there's some someplace.
Q. Did you make any determination as to the J and M product whether it was similar? You said it was similar to your 2100.
A. Right.
Q. What J and M product was this? Did it have a particular trade name?
A. I don't recall but I believe they did.
Q. By itself way, going back to the Martin and Lee product, when did you make the determination as to the similarity?
A. I guess between looking at specifications and looking at the product.
Q. When?
A. I don't recall the time.
Q. Was it during the year 2002?
A. Yes.
Q. Have you made any determinations or

examinations of any of the Martin and Lee products after 2002?
A. Well, I didn't examine it. I saw it.
Q. Have you seen any -- where did you see the Martin and Lee product? Was it at a trade show?
A. Trade shows.
Q. Where did that take place?
A. There were a number of them.
Q. During what year? 2000?
A. Well, 2002 and on.
Q. You have attended a number of trade shows?
A. Yes.
Q. Have they sold the same product consistently throughout that period of time?
A. I think they have introduced additional products.
Q. And which of their products do you say were similar to yours, the first one or the subsequent ones?
A. Well, the first one was similar and the subsequent ones were similar to a project we were working on.
Q. Is that the 2200?
A. No. That was a special system.
Q. What was that project you were working on,

the special system?
A. I don't have all the details other than the fact we were working with the Secret Service and Battelle and the army.
Q. This special -- what did you call it?
A. It was a project. It was a phase two project.
Q. When you were working on that, were you developing a new device for the Secret Service?
A. Potentially a new product, yes.
Q. What was the product that you were developing? It wasn't the 2200?
A. No. It was different.
Q. What was it?
A. I don't know if you could give it a specific name. There was a specific requirement we were looking at for them.
Q. You were looking at a requirement. Had you done any development work for this phase two project?
A. We had done phase one and had a phase two contract, yes.
Q. What had you done with respect to phase one?
A. I don't have specific details.
Q. Who had done it?

A. Paul had the secret clearance for the company so he was actively involved in that.
Q. With the Secret Service?
A. Yes.
Q. Do you know what exactly he did since he had the clearance?
A. All I know it was to develop a new instrument and was taking a look at currencies.
Q. Going back to the number of products you say that you examined at different trade shows. You say there was one that was similar to a 2100 and there was subsequent devices, Martin and Lee devices.
A. Products.
Q. Products. Similar to your 2100 or similar to one of your other products?
A. No. It was similar to the 2100.
Q. Did you observe in these trade shows any other competitors products that were similar to any of your products?
A. No.
Q. You indicated the J and M product was.
A. Right.
Q. At how many trade shows did you examine or did you observe the J and M product?

Q. Did you purchase these, the components for the optical designs from other vendors?
A. Yes.
Q. And the head design itself, did you purchase that from another vendor?
A. Parts. Again, it is hard without getting into every detail. Parts of it, yes.
Q. When you examined the Martin and Lee device you say at the trade show, was the head design of their device the same as your 2100?
A. I couldn't tell you.
Q. Was the optical design the same as your 2100?
A. Very similar.
Q. Do you know how did you determine it was similar?
A. It was using all reflecting optics which is the design we were using.
Q. What type of an optical design did the J and M product use?
A. Used a fiber optic based design.
Q. They used a different type?
A. Right.
Q. Now at these trade shows in addition to J and M and your products and Martin and Lee's products, were

there other vendors, other people?
A. Not for this specific product, no.
Q. So there were only three people in the field you, Martin and Lee and J and M?
A. At what time?
Q. At any time after they left in January '02.
A. Yes.
Q. You were the only three parties involved in this field?
A. Yes.
Q. Page 5 of the answer and counterclaim. There is a section called the eighth defense. Just read that to yourself.
(Witness perused document.)
A. Right.
Q. The second line -- it starts in the first line. It says that Martin and Lee are guilty of inequitable conduct. Do you see that?
A. Yes.
Q. Tell me all the instances of inequitable conduct you say that Martin and Lee were guilty of.
A. I guess I need more detail.
Q. Other than what you told us today, is there anything else that you say Martin and Lee did that

constituted, quote unquote, inequitable conduct?
MR. TREGER: We have to take a break. I think you're getting into attorney-client. Let's go outside.
(Witness conferred with counsel.)
MR. TREGER: I'm going to instruct him not to answer on the basis of attorney-client privilege.
Q. At the time that this document was filed in July of '02, do you know, apart from anything any attorney told you, do you know of any conduct by Martin and Lee that constituted inequitable conduct?
MR. TREGER: Objection. I'm going to instruct him not to answer based on attorney-client privilege.
Q. Other than what an attorney told you, other than communicating with an attorney, do you have any knowledge of any inequitable conduct committed by Martin and Lee?
MR. DAVIS: That's a fair question, Mr. Treger. I'm excluding anything he learned as a result of a discussion with an attorney.
MR. TREGER: Do you know what inequitable means other than what an attorney explained to you?
A. I think I need you explain that to me again,

the legal context.
MR. TREGER: I mean you're asking about a legal concept that came from an attorney.
Q. You don't understand the word inequitable?
MR. TREGER: You're asking about an affirmative defense.
MR. DAVIS: I understand that. I'm asking what facts he knows.
Q. I'm not asking you what an attorney told you. I'm asking what facts you know that constituted inequitable conduct by Martin and Lee.
A. I guess I can't answer that at this point.
Q. All right. In third line it also claims Martin and Lee, quote unquote, breached their fiduciary duties to the corporation, unquote. Do you understand that phrase?
A. Yes.
Q. Other than what an attorney told you, what conduct of Martin and Lee constituted -- first of all Martin, constituted a breach of fiduciary duty to the corporation?
A. Well, they were in addition to stockholders, directors and officers of the corporation, they started a competing company.

Q. When did they start that competing company?
MR. TREGER: Objection. Asked and answered.
A. Before they left.
Q. Do you have any knowledge as to any competing activities of Martin and Lee before they left the company?
A. I guess I can't answer that at this time.
Q. Now, other than what you told me, what other conduct do you say of Martin or Lee or the both of them constituted a breach of fiduciary duty?
A. I guess the fact that they were supposed to be building our next generation product and came out with their own a month later.
Q. Well me about that.
A. As far as what?
Q. What were they supposed to be doing?
A. They had been for last ten months supposed to be developing the next generation of product for us which was the 2200.
Q. That product was never completed; correct?
A. No.
Q. And did Martin and Lee thereafter compete S.E.E. with a product identical to the 2200?

A. Yes.
Q. When?
A. That I'm first aware of was in February.
Q. Of '02. You say that was the product you first saw at the trade show?
A. No. That was a paper they gave on their new product at an American Academy conference.
Q. You were present at that time?
A. Yes.
Q. What did the paper consist of?
A. If I recall, it had something to do with UV microspectroscopy.
Q. Were the specifications in that paper the same as the specifications for the 2200?
A. As best I recall.
Q. Were there specifications in the paper?
A. I don't believe there were specifications in the paper.
Q. Do you have this, quote unquote, paper in your possession?
A. They are may be in S.E.E. a copy of it. It was done at the American AAFS show so there would have been a record of it.
Q. Other than this paper that was delivered,

tell me what else you say constituted a breach of fiduciary duty?
A. Trying to hire employees from the company.
Q. And when did Martin and Lee try to hire any S.E.E. employees?
A. From what I understand, before they left and after they left.
Q. What do you understand that before they left? Did someone tell you something?
A. I heard --
Q. Let me withdraw that. Before Martin and Lee left you say they attempted to hire an employee or employees of S.E.E.
A. I learned they were talking to employees of S.E.E.
Q. What did you learn and from whom did you learn it?
A. I learned from Dee Hixon for one that there were discussions I think that went on internally that I wasn't aware of.
Q. What did Miss Hixon tell you and when did she tell you it? What did she say and when did she say it?
A. I believe it was shortly after they had left is that there was some comments made in I believe

around the August time frame when I was not at the company that there were discussions by Jumi Lee about, you know, I guess doing their thing.
Q. I'm sorry?
A. Well, from what I understand there were discussions about them basically in a sense taking over the business.
Q. Taking over the S.E.E. business?
A. Yes.
Q. All right. You claim that -- by the way, do you claim that Martin and Lee at some point attempted to take control of the company?
A. Well, I think there was an effort was made to take control of the company, yes.
Q. How much of the stock did Martin and Lee own?
A. Twenty percent.
Q. What percentage of stock did you own?
A. About 70 percent.
Q. If Martin and Lee owned 20 percent of the stock, tell me how they would gain control of the company.
A. Because there were two directors. They were both directors of the company and I was the third director.

Q. And who elected the directors?
A. The stockholders.
Q. Who had the majority -- you could have elected anyone on the board, could you not? You were the 70 percent stockholder; correct?
A. I suppose, yes.
Q. You could have removed any director.
A. Through a meeting, yes, I guess I could.
Q. Tell me you owned 70 percent and they owned 20 percent, 21 percent. How could they gain control of S.E.E.?
MR. TREGER: Objection.
A. Well, I guess the story will present itself, won't it?
Q. You don't know then. Can you answer that question?
MR. TREGER: Objection. Are you qualified to answer that without the advice of counsel?
A. No.
Q. You don't know then.
MR. TREGER: Don't answer that.
MR. DAVIS: Don't answer for him.
Q. Did you understand that you were the 70 percent stockholder of the company?

A. Yes. That's a detail.
Q. What does that mean, a 70 percent stockholder?
A. That means I'm the majority stockholder of the corporation.
Q. And you have the right to control the company; correct?
A. I have influence on the control of the question, company.
Q. You have the controlling influence or you had the controlling influence.
A. Of the stock of the company, yes. I had the controlling interest of the stock of the company.
Q. Going back to August of '01. What do you say you learned about what took place in August '01?
A. I didn't learn it in August of '01.
Q. When did you learn it?
A. I learned it shortly after they had left the company.
Q. Miss Hixon told you what specifically?
A. Told me specifically that there were discussions going on that she had aware of in August. There was also records that she was asked to make copies of prior to Paul and Jumi leaving.

Q. And what did that have to do with gaining control of the company? First let's go back to August. What did she tell you took place in August? You said there was discussions; correct?
A. Yes.
Q. Did she say she was involved in any discussions?
A. Not that I recall. I don't recall.
Q. Did she say who was involved in the discussions?
A. Other than Jumi, I don't recall.
Q. Did she tell you what the discussions were between Jumi and somebody else?
A. I think it was a little vague at the time. I don't recall, no.
Q. Did she tell you what the nature of these discussions were?
A. No.
Q. Do you have any knowledge other than what Miss Hixon told you about any of these so-called discussions in August of '01?
A. No.
Q. Getting back to the claim of breach of fiduciary duties. Is there anything else you can tell

me that constituted a breach of fiduciary duty by Martin and Lee?
MR. TREGER: Objection. Are you saying anything that he believes? Asking him what he alleges?
Q. I want to know what you know about any other alleged breach of fiduciary duty.
A. Well, I guess all the details about starting a competitive company and coming out with a competitive product.
Q. That's what you testified. Other than what you have already testified to, is there anything in addition to what you testified to that you say constituted a breach of fiduciary duty by Martin and/or Lee?
A. Well, I guess other than the file that I found about Jumi planning this.
Q. I'm sorry?
A. Other than the file I found about Jumi planning this.
Q. What file was that?
A. There was a file I found on a laptop after she had left.
Q. Whose laptop?
A. It was on Jumi Lee's laptop.

Q. And this is a laptop she left at the company?
A. Yes, it is.
Q. Where is that laptop now?
A. I believe it is in the possession of the trustee.
Q. And did you print a hard copy of this file?
A. Yes, I did.
Q. Where is that hard copy of it?
A. It would be with the trustee.
Q. You didn't keep a copy of the record?
A. Everything was -- I was required to turn over everything to the trustee.
Q. And how many pages did this hard copy consist of?
A. One page.
Q. What did it say on it?
A. Well, it had details of pro and con of taking over S.E.E.
Q. Okay. When was it created, the date of it?
A. From what I could tell in early December.
Q. What did it say with respect to pro or con with respect to taking over S.E.E.?
A. I would have to review the document again.
Q. Do you have any memory of what this document

says?
A. There was something about, you know -- again, I would have to review it. Something about, you know, buying out, not buying out, legal issues, house and car, losing it. I don't have all the specifics.
Q. Buying out and not buying?
A. Yes. There was a list of details, pros and cons which I assume she was surmising herself and without having a copy I mean I can't, you know, answer those questions I guess.
Q. Was it a plan to buy you out?
A. You could interpret it different ways. I really don't know.
Q. Were there some discussions at some time you had with Martin and Lee about either you buying them out or them buying you out?
A. We had discussions in January, yes.
Q. And what were those discussions?
A. Well, there was a meeting I believe the fourth of January or so, somewhere in that time frame prior to them leaving.
Q. And that meeting, who was present at the meeting?
A. I believe the Jeff Husted was present at the

meeting, myself and Paul and Jumi.
Q. What was discussed at that meeting?
A. There was some discussion of them being me out or me buying them out.
Q. Was that the first time that a discussion was had between you and Martin and Lee about a potential buyout?
A. That I can recall.
Q. Is it possible it was a prior discussion to January 4, '02?
A. Not that I was aware of.
Q. What was said about first of all Martin and Lee buying you out?
A. There was nothing said.
Q. You said there was discussion. What was the discussion?
A. The discussion was either we buy you out or you buy us out and that's it. They gave an hour to do it.
Q. And what happened in that hour?
A. I went out to lunch with the accountant. I basically asked them could they do this and from a legal standpoint and, you know, him not being an attorney, he tried to interject when we got back to

talk a couple scenarios and that's what I recall of that afternoon.
Q. Was there a price mentioned for this buyout?
A. There wasn't specifics. There was general talk about it.
Q. What was the general talk?
A. I would have to go back and review it.
Q. What would you need to review?
A. The fact of what we were jotting as notes. There was two scenarios that were looked at.
Q. Do you have some notes of this meeting?
A. I don't have any notes of the meeting.
Q. So what do you need to review?
A. It would probably be notes with the -- I'm assuming in the hands of the trustees or the files. I don't know.
Q. What is your best recollection of what the various -- were there various prices, purchase prices discussed?
A. There were general discussions. No specifics at the time.
Q. At that time did you make a proposal to buy Martin and Lee out for the sum of approximately $200,000?

Q. It took place after January 2, '02?
A. I believe so.
Q. Where did it take place?
A. At S.E.E.
Q. You say there was discussion concerning you running the rep business yourself and Martin and Lee running the forensic business?
A. There was discussion about breaking up the two ends of the company, yes.
Q. Who initiated that discussion?
A. I don't recall at the time.
Q. Well, other than that discussion what other events took place with regard to this unsuccessful attempt to gain control of S.E.E.?
A. Well, other than the fact that they were not -- when I had asked for a staff meeting, they refused to have a staff meeting. They weren't keeping me posted of what was going on in the manufacturing end of the business.
Q. I'm talking about gaining control from them of the majority stockholder. What took place that constituted an attempt to gain control of the company?
A. They were many details I think and a lot of that had to do with isolating me from the business.

Q. When did that take place?
A. That had been going on for some time.
Q. Starting when?
A. I would say probably the beginning of 2001.
Q. And isolating you from the business, how did that evidence itself?
A. Well, there were I think a number of things that went on. The first one is that if I recall in February of that year I was on the road working and got a phone call from Jumi that she was either going to leave the company or she had asked everyone in the company to resign.
Q. Why was that?
A. There were some internal issues going on with personnel and as much I can tell, that was something she brought on.
Q. What were the internal issues?
A. Personnel I guess bickering a little bit, stuff not happening and I don't have all the details. You would have to ask her.
Q. Directing yourself to gaining control as referred to in Paragraph 8. When I use the term gaining control, I mean gaining control ownership. What attempts were made by Martin and Lee to gain

control ownership of the company other than the discussion that was had with you on January 4th concerning a buyout?
A. I guess, you know, to answer that would be probably somewhat involved unless you were going through the situation at the time. I don't know what specifics you're looking for.
Q. All right. Let's go to Paragraph 9 then. Solely owned laptops of Martin and Lee contained the entire confidential database of S.E.E.
A. Yes.
Q. Tell me with respect to Miss Lee's laptop the entire confidential database of S.E.E. consisted of what?
A. All of the customer contact information and records.
Q. You say that was on her personal laptop?
A. Right.
Q. Do you know whether -- do you recall that in another case that Martin and Lee gave some affidavits concerning that they had erased that from their laptop computers?
A. They alleged.
Q. Okay. Do you have any information whether

that is true or not true?
A. No, I don't.
Q. You don't know whether or not they erased the confidential database from their laptops, do you?
A. No, I don't have first-hand knowledge.
Q. I'm sorry?
A. I don't have first-hand knowledge, no.
Q. Do you have personal knowledge that they kept the -- that either of them kept any of the confidential database on their personal laptops without erasing it?
MR. TREGER: Objection. You can answer.
A. I don't have personal knowledge.
Q. What knowledge do you have that Lee transferred the confidential information to her laptop prior to leaving?
A. I don't have personal first-hand knowledge. It was indicated to me that the information was put on to a laptop.
Q. By who?
A. I don't recall. Maybe Debbie Bowles at the time.
Q. As far as Martin having the database, this is something you have testified before that you observed that being transferred?

A. Yes.
Q. Once again, you don't know whether he erased it or not?
A. No, I can't answer that.
Q. You are aware of the fact both Dr. Martin and Miss Lee have given affidavits to the effect they have erased that?
A. I'm aware of the fact that they have alleged that they erased it, yes.
MR. DAVIS: Off the record.
(Discussion off the record.)
(A break was taken for lunch.)
Q. Going to Page 7 of this answer and counterclaim. Paragraph 20. First Jumi Lee's responsibility to develop the next generation of product. When did that responsibility commence?
A. I believe that was in February of 2001.
Q. And was there a some meeting that or other -- strike that. Is there any documents that evidence that?
A. There was a directors meeting that was taking place off site to discuss a number of issues.
Q. And what was discussed at that meeting?
A. We discussed putting together specifications

for the new generation or the next generation of product.
Q. Was that new generation what you have given the number as 2200?
A. It was to be the 2200 system, yes.
Q. What did Miss Lee's responsibility consist of? What was she to do exactly?
A. Develop and design the next generation product.
Q. Okay. When did she commence to do that?
A. She was commenced to do that after the meeting.
Q. How long after did she start working on it?
A. I can't answer that. I know we had some discussions.
Q. And who was to work with her on it?
A. Dr. Martin, Paul Martin and any assistance that I could provide.
Q. And what was done with respect to development of the 2200 product?
A. As far as?
Q. How far did it go?
A. Well, I know that parts were ordered, work was supposedly being done. Optics were ordered. There

was an order placed for mechanical design for the mechanical components of it.
Q. Who was to do the mechanical design?
A. That was Dynamic Light Control.
Q. Dynamic Light Control did part of the work?
A. Dynamic Control had done work for us in the past for a number of years in the mechanical design and drawings and layouts. They were -- I believe there was parts of a microscope sent out and some software and an order placed to do design layouts and drawings for the next generation.
Q. And did Dynamic Light do any of the design and drawings?
A. As to what time?
Q. At any time after this meeting was held in February of '01 I believe you said.
A. They were contracted. I believe towards the end of the year a contract was placed to do mechanical layouts. I believe the day that Jumi left on the 11th she sent a letter to the mechanical designer to return everything.
Q. Did you instruct her to do that?
A. No.
Q. Did Dynamic Light return anything to you?

A. They returned parts of the hardware and software that was sent to them, yes.
Q. Did they return that to you?
A. Yes.
Q. Did you thereafter contact Dynamic Light and ask them to continue with the work?
A. I asked them to finish the work that she had paid them to do.
Q. Did they do it?
A. No.
Q. Why not?
A. They delayed us until the May or June time frame and I had to have the attorney send letters to get our money back she had paid them.
Q. Well, who sent Dynamic Light letters? What attorney?
A. Attorney Maire, corporate attorney.
Q. And when were these letters sent out to Dynamic Light?
A. Approximately I believe it would have been April time frame.
Q. Did anyone at Dynamic Light communicate with you as to why they wouldn't complete the project?
A. Well, they were busy, didn't have time.

A. Yes.
Q. Subsequently a sale was made to the Commonwealth of Massachusetts in May of '03.
A. Yes. I believe so.
Q. Did you pay commissions on those sales to either Martin or Lee?
A. I would have to go back and review. I know they were paid commissions on some orders. The exact ones I can't answer.
Q. How about a company by the name of French?
A. French?
Q. French. The French may be the French customer.
A. The French order?
Q. Yes.
A. Yes.
Q. Did you pay a commission on that sale to either Martin or Lee?
A. Not that I'm aware of.
MR. DAVIS: That's all I have. Let's go off the record.
(A break was taken.)

EXAMINATION BY MR. TREGER

Q. You just want to ask you a few questions about a subject we touched on before relating to the development of the next generation product. Was that the 2200 product?
A. Yes, it was.
Q. And you testified that there was a directors meeting at which it was determined that this product would be developed; is that the case?
A. Yes.
Q. When was that directors meeting again?
A. In February of 2001 I believe.
Q. And I believe you testified several times that you are unable to testify as to what work was actually done on that product; is that correct?
A. All the details of it, yes.
Q. And why is that?
A. Well, in most cases usually with a small company, six people, people are off doing the jobs that they need to do. Part of my responsibilities were running the rep end of things and I was traveling quite a bit. I had gone through an overview of what we needed to do. We discussed hiring people. We put numbers together for the development in the time frame

and it was up to in primary function Paul and Jumi to get going and get things done.
Q. Between the meeting at which the development of this product was discussed and Paul and Jumi's resignation, what was your understanding as to what they were actually doing at S.E.E. with respect to the second generation product?
A. It was my understanding that we had -- they had put together an overview of the product specifications and that they were in the process of developing and getting the hardware and software done to bring out the next generation product and also allow us to develop a semiconductor system from it.
Q. After Paul and Jumi resigned, were you able to find any evidence of the work they had performed?
A. I didn't find anything internally as far as software or anything in the development. Other than components being bought, discussions being done, no.
Q. Were you able to determine whether any of the work product -- strike that. Did you find any evidence of any work product relating to the development of this product after they left?
A. Well, I found basically orders -- well, we had components in house of the next generation. I

found records of purchase of software for development, third party software we used in the system. I did find missing software but I couldn't find any software relating to the design.
Q. Now when you say you saw a purchase order for software, these were purchase orders for software that was going to be incorporated into the product?
A. Yes.
Q. Were those purchase orders paid for?
A. Yes.
Q. Was that software actually in the inventory of S.E.E.?
A. Yes.
Q. Did you find any evidence that any work had ever been done to incorporate it into a product?
A. Not that I could find.
Q. Did you find any evidence that any of the adaption of various components necessary to make it into the product had been performed?
A. Yes.
Q. Did you find that that had been performed?
A. Well, no. I found records of components for the new system, purchases of detector boards, purchases of software used in the development, purchases of

software for doing I think Adobe. There was also development of software from CDI in house but I didn't find any hard S.E.E. software on the next generation, no.

Q. The S.E.E. software would have been a combination or an adaption of those products that had been purchased?

A. Right. It's drivers and controllers that pull all the functions together of the different software and hardware.

Q. Where would that S.E.E. product have been stored or found?

A. It should have been found on Jumi's computer.

Q. Should it have been found on the server?

A. Might have been found on the server. It depends on if she had uploaded the information into the server. There was nothing that I could find on the server.

Q. Was it found anywhere after they left?

A. No.

Q. Did you have a time line or an estimation of how long it would take to develop a second generation product?

A. One year.

Q. And how long after their resignation are you aware that Jumi Lee and Paul Martin rolled out their product?

A. I saw data from their product within a month. Just over a month after they left.

Q. Now with respect to bids for products, were you privy to details of all of the deals that were in the works between S.E.E. and customers while Paul Martin was working for S.E.E.?

A. Basically some details. I usually had a forecast sheet that was provided to me for potential sales and sales coming down.

Q. Were there some deals that you weren't permitted to know about?

A. I didn't have a lot of details of the discussions because of the secret nature. Paul was cleared for secret clearance in the dealings with the Secret Service, Battelle, and the army concerning the development of a potentially new designed system. I was aware we had a phase one, phase two contract with them and I was aware we brought a safe into the office which contained the secure information.

Q. So you have no way of knowing what the status of those deals were at the time they left?

A. No. The only thing I know is that a couple of months after they left, I think Battelle or the army showed up and picked up everything that was in the safe which I didn't even have the combination to. Paul provided it to them.

Q. Did S.E.E. to your knowledge obtain or receive any compensation from the army for the work that was done while Mr. Martin was at S.E.E.?

A. I believe we received, if I recall, a couple of payments for work that was done.

Q. Is there any way you could be aware of whether work that was done while Mr. Martin was at S.E.E. was eventually sold to the army?

A. I don't have enough discovery to even fathom that. The only thing I know is that did introduce an instrument, a secure instrument for currency.

Q. To your knowledge is that what Mr. Martin was developing while he was at S.E.E.?

A. Could have been. I can only surmise.

Q. Now, you were also asked repeatedly about the factual support for various answers and affirmative defenses in your complaint which was marked as Exhibit 4. I'm referring to Exhibit 4. Now you testified previously as to various information that was taken by

Martin and Lee I believe that's in Paragraph 21 of the counterclaim. Can you state the facts that led you to believe or lead you to believe that Martin and Lee left with confidential information of S.E.E.?

A. Well, I know that they purchased two personal laptops in roughly the December time frame, brought them into the company and uploaded information onto those. I was with Paul when he had put in the database to his system and it was interesting because he was authorized by me to purchase computers and he went out and purchased them individually for himself and Jumi Lee and I got a new computer at that time which he assisted me in uploading the information onto mine.

Q. Now, with respect to the business records of S.E.E., were there any business records that you have been unable to locate since Martin and Lee left the corporation?

A. Yes, there have been a few. I haven't been able to find records of the approvals for the purchase of the Maine property. I haven't been able to find any records of the software development by Jumi on the 2200. I know there is software that was purchased prior to them leaving that is no longer at the company and I know that they were seen taking parts and

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS. SUPERIOR COURT

C.A. NO. 02-801

--------------------------------x

PAUL MARTIN and JUMI LEE,
Individually and as Stockholders
on Behalf of S.E.E., Inc.,

Plaintiffs

vs.

S.E.E., INC., and PHILLIP
TRINGALI,

Defendants

--------------------------------x

DEPOSITION OF PAUL MARTIN, a witness called on behalf of the Defendant Phillip Tringali, taken pursuant to the Massachusetts Rules of Civil Procedure, before Deborah G. Rumson, Registered Professional Reporter and Notary Public, in and for the Commonwealth of Massachusetts, at the Offices of Phillips & Angley, One Bowdoin Square, Boston, Massachusetts, on Tuesday, May 24, 2005, commencing at 10:25 a.m.

"G"

whole rather than the day-to-day operations of just the analytical division.
Q. And during 2000, did you hire any additional employees in Massachusetts?
A. I do not remember the exact dates of hires.
Q. When you were in Massachusetts, did you hire any additional employees?
A. Yes.
Q. Can you tell me who you hired.
A. As I stated previously, Dee Hixson, Judy Moniz, Tony Facchiano.
Q. These people were hired in Massachusetts?
A. Yes. And there was one other lady, who was a secretary. I don't recall her name.
Q. And so just to clarify, which of these employees worked for you while you were in California?
A. Andrea Desrosier.
Q. And did the products, once you got to Massachusetts, did you introduce any new products?
A. The 3100 and 3200.
Q. What was the 3100?
A. They are both, basically, imaging systems.

Q. What did they do?
A. Create images, take pictures.
Q. What was their application?
A. We were hoping to apply them to larger scale forensic analysis as well as industrial applications as we could determine.
Q. Were there further improvements to the 1100 and 2100 when you were in Massachusetts?
A. Olympus discontinued the microscope so we had to redesign the base, but that was not completed while we were employed there.
Q. And when did Olympus discontinue the microscope?
A. I would assume 2001.
Q. Who was retained to redesign the base?
A. Dr. Lee and Gary Unruh.
Q. And were there any plans to develop any new products?
A. There were plans to develop a new product.
Q. And what was that product going to be?
A. Microspectrophometer for semiconductor analysis.
Q. And was it going to have application in the forensic field as well?

A. It was designed for semiconductor analysis.
Q. And when was it decided to go into this, to start work on this product?
A. We never got to the stage of working on the product.
Q. When was the product first discussed?
A. March 2001 on or about.
Q. And what were the circumstances of that discussion?
A. I don't understand the question.
Q. How did you come to discuss the development of a new product?
A. We were having a board of directors' meeting.
Q. What was discussed at the directors' meeting?
A. Why we needed a new product and some of the specifications of that new product. Basically, what it should do.
Q. What were the specifications of the product?
A. I don't recall the exact specifications, but it was to mirror one of the Nanometrics tabletop models.
Q. What decisions were made in March of 2000

with respect to developing this?
A. To attempt to develop it?
Q. Yes.
A. To hire people to develop it.
Q. To hire people to develop it?
A. Yes.
Q. Were you going to have any role in developing it?
A. Personally?
Q. Yes.
A. No.
Q. What existing employees were to have a role in --
A. Dr. Jumi Lee.
Q. Any others?
A. I don't recall.
Q. Did Ms. Desrosier remain employed throughout 2000 and 2001?
A. She was terminated sometime in either 2000 or 2001.
Q. How come?
A. She resigned her position.
Q. Do you know why?
A. She was asked to resign her position.

66

off-the-shelf components.
Q. What share of the market did you have, let's say, in America compared to Zeiss?
A. It would depend upon the year that we were discussing.
Q. In 1998.
A. In 1998, this is an estimate only, I would say 80 percent.
Q. Of the U.S. market?
A. Yes.
Q. And how about; 99?
A. 1999 Zeiss closed down their division.
Q. So your only competitors at this point were like J&M, whatever?
A. Yes.
Q. In 1999, what percent of the U.S. market did S.E.E. have?
A. I don't have the exact figures, but I would say 90 percent.
Q. And in 2000?
A. The same.
Q. In 2001?
A. I don't know.
Q. What percentage of your sales were

67

international in 1998, 1999, and 2000?
A. I don't know the numbers.
Q. Are you able to determine or tell me what market share you had internationally?
A. No.
Q. At the bottom of that page, there's five steps: Define a standard, define a specification, build the instrument, instrument testing and characterization, and define marketing plan. Now, did you ever determine what standard this instrument would be defined by or what standard would be used to test?
A. No, we never got that far.
Q. How did you intend to determine what standard to use?
A. We never got that far.
Q. Did you define any specifications?
A. Only generally, as stated here in this document.
Q. Did you build any of the instrument?
A. No.
Q. Did you do any defining of the marketing plan?

68

A. Defining of the market plan?
Q. Yes. Did you do any of that?
A. Only in very general terms. No definitive defining.
Q. What was the N&K patent?
A. N&K is a company that makes a microspectrophometer for semiconductor analysis. They have a patent on a particular type of film thickness calculation technique we needed to make. Strike that.
Q. I assume you were going to have to compete with that product; you had to develop your own system that did not violate their patent?
A. Precisely.
Q. The next one says, "Phil: Hardware is there for spectroscopy. We need software, increase wafer handling size, programmable stage with autofocus and cassette handling." Were those additional steps that you needed to do, write programming, and write software, develop a stage?
A. This sentence is a combination of minimum

69

specifications required for the instrument, as well as steps that needed to be taken.
Q. The next page, it says, "First step is to build a UV-visible 3000 unit with transmission and thick film capability."
A. Okay.
Q. Was that ever accomplished?
A. No.
Q. And did you acquire a library of the characterized samples? That's a couple of lines down.
A. Did we require or acquire?
Q. Did you acquire?
A. Not a library, no.
Q. Did you acquire any?
A. Yes.
Q. Did you evaluate any software packages? That's the next line down.
A. We started to evaluate some software packages.
Q. Did you purchase those software packages?
A. I don't recall which ones were used so I can't answer that question.
Q. Now, that was continued on February 13. You

named a project Maximus. Did you purchase any equipment for Maximus?
A. Not that I recall.
Q. And it says, "Can GRAMS do the job?" What is GRAMS?
A. GRAMS is the software package that we used for spectral analysis on the current forensic tools or current at that time forensic tools.
Q. And is that software simply loaded in, or does it need to be adapted in any way?
A. It was loaded in, the GRAMS package.
Q. Did it in any way need to be integrated with any other software?
A. Yes. Other software was integrated with it.
Q. Was that process performed by S.E.E. personnel?
A. Yes.
Q. And then it references, the next meeting. That would be product specifications from Jumi and Paul, product design from Jumi, Phil, and Paul, and software guidelines." Do you recall if that meeting occurred?
A. I don't recall that meeting occurring.

Q. Do you recall coming up with product specifications?
A. Only in this meeting.
Q. How much of the work of Maximus was going to be done by yourself?
A. By myself?
Q. Yes.
A. Defining specifications, marketing, very general product design and requirements.
Q. And can you tell me what part of this process Dr. Lee was going to perform.
A. Product design. Overseeing product design, I should say.
Q. Now, Maximus was, basically, an adaptation of the tool guide for forensics?
A. We never got that far in product design to determine which way it would go.
Q. So you didn't know whether you were going to adapt the existing machine or make an entirely new machine?
A. Precisely.
Q. Who was going to make that decision?
A. We would have, the board of directors.
MR. TREGER: Off the record.

(Discussion off the record)
MR. TREGER: The next document is, for the record, a memo, and it is dated 7/12/02, which, again, I believe is not the accurate date. It is RE: Project Maximus Review Meeting Notes.
(Document marked as Exhibit 3 for identification)
Q. Do you recall drafting this memo?
A. No, I don't.
Q. Do you recall, if you look at No. 9, it says, "To be done by April meeting." Do you recall having a meeting about project Maximus in March?
A. No, I don't.
Q. Do you recall any meetings after the off-site board meeting?
A. Not as such, not formal meetings.
Q. Do you know what No. 1 refers to?
A. Yes.
Q. What does it refer to?
A. Mr. Tringali had an agreement with Nanometrics to act as their representative. If we were to develop a potentially

competing product, we would have to terminate that, and we felt it best that the attorney review that contract.
Q. And, No. 2, do you know what that refers to?
A. Yes.
Q. What does that refer to?
A. Tony was an employee of Thermo Galactic, and GRAMS 6 was that generation of software.
Q. Was that a new generation of software?
A. Yes.
Q. And that was what you were going to use; you were looking at using that in this product?
A. We were evaluating several possibilities.
Q. Why were you wondering whether you had to divulge customer names?
A. All previous versions had required that we do that.
Q. No. 3, it says, "Use SEE1100 demo system for development bench." Was that ever done?
A. I don't recall.
Q. When it said, "Build a computer specifically for the project," does that mean for development or --
A. I don't know.

82

Were any of these machines used in the semiconductor --
A. Yes.
Q. Do you recall whether you had anyone putting together this budget?
A. I don't recall.
Q. This document shows a software engineer being hired in June. It shows a payroll expense for a software engineer in June, and a payroll expense for an applications engineer in July, and for a sales engineer in September. I think the columns are off. Does this represent a reasonable estimate of the schedule for the development of this project?
A. Since I don't recall, the document, I couldn't say.
Q. When you were planning the project, did you ever formulate in your mind a schedule for developing the product?
A. I don't recall.
Q. How long did it take to develop the first project, the first product, the first analytical product that you sold? I'm

83

sorry. The first analytical product that S.E.E. manufactured and sold, how long did it take to develop that?
A. Can you redefine the sentence, please.
Q. How long did it take you to develop the first microspectrophometers that S.E.E. sold?
A. I don't know the exact time. I could only estimate.
Q. What is your estimate?
A. It was a copy of the system from Mission Peak Optics, about a year.
Q. It took a year to develop a copy?
A. Estimated, one year.
Q. How long did it take you to develop the 2100?
A. I don't recall.
Q. Do you remember how long after you introduced the first round of machines that you began to develop the 1100 and the 2100?
A. No.
MR. TREGER: The next document is entitled "S.E.E. Inc. Detail Master Parts list."

84

(Document marked as Exhibit 5 for identification)
Q. Do you recognize this document?
A. No.
Q. Can you tell me what the term "1200/2200" refers to?
A. As a guess.
Q. As a guess?
A. Yes.
Q. What is your guess?
A. A next generational product for S.E.E.
Q. That was the Maximus product?
A. I don't know.
Q. And do you recall deciding that the Maximus project would use a microscope base manufactured by Olympus?
A. We were considering it.
Q. Do you recall receiving a microscope base to test for use in this product?
A. No.
Q. Do you recall considering using a lamp socket and full socket housing lens, do you recall considering whether to use that assembly?

85

A. Excuse me. What are you referring to?
Q. The second part down, Part info: 10398.
A. Okay.
Q. Do you recall determining or do you recall considering using that product as a prospective part of the Maximus project?
A. No.
Q. Do you recall receiving one to test?
A. No.
Q. If you turn the page, it has a turret by Olympus. Do you recall considering using that part for the Maximus project?
A. No.
Q. Do you recall ordering one of them to examine for use?
A. No.
Q. Did you do the ordering of the parts and supplies?
A. No.
Q. Who did?
A. Dr. Jumi Lee, and Debbie Bowles, and other staff.
MR. TREGER: Do you want to break for half an hour?

regarding this quotation from Mr. Houser.
Q. Was there anything else discussed during that meeting?
A. I don't recall.
Q. In 2001, were there any plans to upgrade the forensic product?
A. No.
Q. There were none. Were there any plans to upgrade the operating system to Windows 2000?
A. There was discussion, but no plans.
Q. What were the discussions?
A. Informal discussions.
Q. Informal discussions with whom?
A. Mr. Tringali, Dr. Lee.
Q. Did you ever discuss this with customers or suppliers?
A. I don't recall.
Q. Do you recall the nature of the discussions? Strike that. Did these discussions have to do with the feasibility or affordability or some other subtopic like that?
A. I don't recall.
Q. Were you in favor of doing such an upgrade?

A. Yes.
Q. What would that have required with respect to creating the upgrade?
A. You would have to ask a programmer.
Q. And the programmer, what would the programmer change?
A. The ability to program.
Q. What part of the S.E.E., what part of the existing models would be retained and what part would be replaced?
A. That was never discussed or decided.
Q. But to make it possible, you had to create a new project; you just write software to allow your --
A. That was never discussed.
Q. Let me ask you this. What was necessary when you upgraded to Windows 98 from 95?
A. I didn't do the software on that.
Q. What was required just new software?
A. I don't know. I didn't do the software.
Q. Did you do anything with respect to that upgrade?
A. No.
Q. Who was that work done by?

A. That would be Dr. Lee and Andrea Desrosier.
Q. Do you recall how long it took to create that upgrade?
A. No. I do not know if an upgrade took place.
Q. From 95 to 98?
A. Correct.
Q. You made a number of claims against Mr. Tringali, individually, in this case. I would like to ask you some questions about them.
First, is it true that you're alleging that a contract existed between you and Mr. Tringali, individually, to purchase your stock in S.E.E.?
A. Yes.
Q. In your interrogatories, I believe you stated the offer to purchase was made on January 9; is that correct?
A. Correct.
Q. Can you tell me how you had come to have this discussion on January 9, 2002?
A. From previous meetings, we decided to meet again and come to terms where we could have a mutual agreement. Mr. Tringali came up

with two proposals for us to accept.
Q. This was made on January 9, 2002?
A. Yes.
Q. Can you tell me who was present at this meeting.
A. Mr. Tringali, myself, Dr. Lee, Jeff Housted.
Q. Was this the same day that there was a stenographer present to take down discussions?
A. Not for that meeting.
Q. Can you tell me why the stenographer was dismissed for this part of the meeting?
A. I can't recall.
Q. Who went about retaining the stenographer?
A. Myself.
Q. Do you recall what temp agency you used?
A. No.
Q. Do you recall how she took down the meeting? Was it shorthand, or was it like she is doing?
A. I don't recall.
Q. Now, what meetings occurred before the meeting at which you claim this offer was made?

154

hire people, no.
Q. Are you able to tell me any work product at all that was generated for the Maximus project by you?
A. The only ones that I am aware of are from documents that you have presented.
Q. And when you say you devoted time to personnel, what specific -- strike that. Do you recall what projects you were working on, what sales you were working on in 2001?
A. All of them?
Q. The ones that you recall.
A. The ones that I recall. Hewlett-Packard Corporation. I would have to refer back to company records to tell you the rest. French, Maryland State Police, State of Texas.
Q. Did you ever --
MR. DAVIS: Have you exhausted your memory?
THE WITNESS: I am still thinking.
A. And more.
Q. And did you ever make any suggestions to the other directors as how to increase revenue

155

in order to better fund the Maximus project?
A. No.
Q. Are you able to recall how much time on average, if any, how much time an on average per month you spent on the Maximus project?
A. No.
Q. But you did continue to work on that; is that correct?
A. I don't recall spending time on it beyond the meetings and the meeting notes.
Q. You did offer employment to someone in September?
A. If you would include that as part of the Maximus project.
Q. Did you forward any work to your mechanical designer?
A. No.
Q. Do you know if Dr. Lee did?
A. No, I am not aware of that.
Q. Did you speak with any customers about upcoming products that would be released?
A. I don't recall.
Q. Did S.E.E. ever have a plan to lease a Windows 2000 upgrade for the 2100?

156

A. There was no plan.
Q. Did you ever discuss any possible upgrade like that with any of your customers?
A. I don't recall.
Q. So it is your testimony that in 2001, your time was dedicated primarily to marketing existing products and serving existing customers?
A. Installations, training, applications, attending trade shows.
Q. When did you decide to leave S.E.E.?
A. January 2002.
Q. Was that decision made on January 9?
A. No.
Q. When was it made?
A. I don't recall the exact date.
Q. Was it made before January?
A. No.
Q. Didn't you incorporate Quantum Dynamics in December?
A. No.
Q. Did you organize it in December?
A. Yes.
Q. What was the purpose of organizing it?

157

A. As a consulting company.
Q. What consulting would it offer?
A. Let's see, consulting for anything that needed to be done. It was also used as a real estate company.
Q. What real estate did it buy and sell? What real estate did it own?
A. It never did.
Q. What was it intended to own?
A. That was one of the purposes of forming it and then look for property.
Q. When did you decide to use Quantum Dynamics to develop spectrometry equipment for the forensics market?
A. Quantum Dynamics was not used to develop spectrometers.
Q. What was it used -- what products -- did it ever sell spectrometers?
A. It sold them.
Q. And who manufactured the spectrometers?
A. CRAIC Technologies.
Q. When was CRAIC organized?
A. It was officially organized June 2002.
Q. QDI, weren't they advertising for

162

that is.
A. It is an organization of the U.S. Army that works on research projects.
Q. And was that done pursuant to a contract?
A. I don't recall.
Q. And was that work done during 2001?
A. Part of the work was done during 2001.
Q. And part of it was done during 2000?
A. Yes.
Q. Was that project completed?
A. No.
Q. Now, you stated you had a laptop that was personal. Did you ever copy the S.E.E. database onto your laptop?
A. While an employee of S.E.E., yes.
Q. Did you also retain your own database separate from the company?
A. What type of database?
Q. A list of customers and contacts.
A. No, not of customers and contacts.
Q. Did you have any kind of personal business database that you kept on your personal computer?
A. Not a personal computer database.

163

Q. Did you have any other business related information on your personal computer?
A. Yes.
Q. What was that?
A. Electronic copies of brochures and applications papers.
Q. Do you have any knowledge of how the inventory was maintained at S.E.E.?
A. No.
Q. Did you ever have any discussions with any of your distributors, with any of S.E.E.'s distributors, about leaving prior to leaving S.E.E., prior to resigning your positions?
A. What type of distributors?
Q. Any of the distributors that sold S.E.E. equipment.
A. No.
Q. Did you have discussions or did you tell anybody about your decision to leave prior to your resignation?
A. No, except for Dr. Lee.
Q. Did you do the documents to organize QDI, did you do that yourself?
A. Yes, with Dr. Lee.

164

Q. Now, the computers that you used, were they password protected? The S.E.E. computers, were they password protected?
A. What do you mean?
Q. Did the individual workers have to have a password to get on a computer?
A. Yes. But it was an open operating system and it could be easily avoided by pressing escape.
Q. What would that do?
A. Put you right into full access to the computer.
Q. Would it give you full access to all of the files on the computer?
A. If those were individually password protected, no. But if they were standard files, yes.
Q. Did you individually password protect all of your files?
A. No.
Q. Did you individually protect some of them?
A. Some.
Q. How did you determine which ones to password protect?

165

A. The ones that I thought I didn't want other people to see.
Q. And can you tell me, in general, what types those usually included?
A. No general ones as such. The only one I recall, in particular, was the document referring to the Maximus project.
Q. Why did you want that to be restricted?
A. It was a board meeting.
Q. So you thought it should be restricted to the board?
A. People in the company.
Q. You password protected the sales forecasts as well, though, didn't you?
A. Yes.
Q. Why was that password protected?
A. Because I thought it was important information.
MR. TREGER: Let's take a quick break. I think I am almost done.
(Recess taken)
Q. I am going to ask you just a few more questions. In 2001, did you have a project whereby you were working on fiber analysis

170

recall the identity of every other file on there.
Q. Did you need a password and a user name to get access to the network server?
A. I don't recall.
Q. And were the doors always kept locked at the facility?
A. Which doors?
Q. The doors to the manufacturing portion.
A. I don't know. I don't recall.
Q. And you were the administrator of the ACT software. You were designated as the administrator?
A. Not officially.
Q. With respect to the one person who can change the settings. They say, "Do you want to be the administrator."
A. Everybody could change the settings.
Q. And Dr. Lee was the administrator of the BusinessWorks program; is that correct?
A. One of them. The other two were Mr. Tringali and myself.
Q. And did you have full access to everything in the BusinessWorks program?

171

A. Yes.
Q. Did Mr. Tringali?
A. Yes.
MR. TREGER: I think that's all I have.

EXAMINATION BY MR. DAVIS:

Q. Mr. Tringali asked you whether you had copied, I think, the S.E.E., database onto your laptop. I think you answered you did. Did you erase that?
A. Yes, I did.
Q. When did you erase that?
A. January 11, 2002.
Q. What did you erase?
A. The S.E.E. database and any S.E.E. files.
Q. One other question. Did you also turn over the passwords to --
A. Yes, I did.
Q. When was that?
A. January 9, 2002.
MR. DAVIS: That's all.

172

EXAMINATION BY MR. TREGER:

Q. How long were you out of work before you started working at Quantum Dynamics?
MR. DAVIS: Wait a minute. I just gave him a redirect. You are entitled to ask him cross on my redirect. If you are going into a whole line of questioning about Quantum Dynamics, I am objecting that that's irrelevant. You don't have any standing. I am instructing him not to answer.
MR. TREGER: Very good. To the extent I am going to object to that, based on your conduct of the deposition, I will suspend. Otherwise, it is completed.
(Whereupon the deposition was adjourned at 4:26 p.m.)

173

COMMONWEALTH OF MASSACHUSETTS ESSEX, SS.

I, Deborah G. Rumson, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that pursuant to appropriate notice of taking deposition, there came before me the following-named person, to wit: PAUL MARTIN, who was by me duly sworn; that he was thereupon examined upon his oath and his examination reduced to writing by me; and that the deposition is a true record of the testimony given by the witness.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this day of , 2005.

My commission expires:
December 15, 2006

Notary Public

COMMONWEALTH OF MASSACHUSETTS

NORFOLK COUNTY, SS. SUPERIOR COURT

* * * * * * * * * * * * * * * * * * * * * * * * * * *

PAUL MARTIN and JUMI LEE, Individually and as Stockholders on behalf of S.E.E, Inc. — No. 02-801

vs.

S.E.E., INC. and PHILLIP TRINGALI

* * * * * * * * * * * * * * * * *

Deposition of JUMI LEE taken under the applicable provisions of the Massachusetts Rules of Civil Procedure by Lynda C. Vetter, Registered Professional Court Reporter and Notary Public of the State of Massachusetts, taken at the law offices of Phillips & Angley, One Bowdoin Square, Boston, Massachusetts, on Wednesday, May 25, 2005, commencing at 10:14 a.m.

"H"

Q. Okay.
A. I recall there was in 2000, 2001. I don't recall.
Q. I'm going to enter the next exhibit. For the record, it's the ledger page that was entered in -- actually, we don't need to enter this. Do you remember interviewing somebody named Steve Parmen?
A. I don't remember the name but I might have.
Q. Do you recall interviewing somebody in May?
A. May of?
Q. 2001?
A. I don't recall.
Q. Do you recall interviewing somebody in August of 2001?
A. I believe there was somebody in August, yes. Maybe.
Q. Do you know if an offer was extended to that person?
A. I don't remember.
Q. Okay. Do you know if any other offers were extended at all?
A. I don't remember.

Q. Okay. Was anybody hired for that position?
A. No.
Q. Do you know why no one was hired?
A. Because I could not find anybody that was qualified and would accept the salary that we offered. And I wasn't quite sure what qualifications that I was actually looking for, combination of all three.
Q. Okay. You weren't sure if the mix was good?
A. I wasn't quite sure what programming skill that a programmer must have.
Q. And who was to determine what the skills were, what the required skills were?
A. Who was to determine?
Q. Yes.
A. That was not clear, the defined function of that.
Q. Okay. What was the salary you were offering?
A. The $40,000 a year salary for a Ph.D., probably 60,000 if we push it. Programmer, 60,000 maybe. That was the amount we had been offering.

Q. Who set that salary?
A. I don't recall.
Q. And did you post the ads? Were you the one who actually did that work?
A. I did many different things. I don't recall whether I specifically posted the ads.
Q. Did you write the ads?
A. I don't recall.
Q. Do you know what records there would be, what the ads said?
A. Records?
Q. Yes.
A. What does it say in the job?
Q. Yes. Is there any record of the text of these job postings that you would put out?
A. Probably in vendor file.
Q. Okay. Would that have been done on a computer or would you have written those up on a computer?
A. If I did, yes.
Q. Was there a specific computer at work that you used?
A. One in my office.
Q. Okay. Did you ever use any of the other computers at SEE?

A. Yes.
Q. Which ones?
A. I don't recall specifically which computer but all computers except Internet computer.
Q. Okay.
A. Actually, you need to define "use." Did I have access to it or use it?
Q. Did you use it to do your job?
A. Mainly it would my personal desktop computer.
Q. At some point, did you have a lap-top that the company provided you?
A. No.
Q. If you turn to the third page of this document, it says, "John's status as a co-op student." Was he from Northeastern?
A. Yes. I believe so.
Q. Now, at the bottom of the third page, the bullets change shape. It says, "Need to go into the semi-conductor market." Do you recall this discussion?
A. Yes.
Q. Can you tell me basically why the

66

decision was made to go into the semi-conductor market?
A. I don't believe there was a decision.
Q. Okay. What was it? Was it a suggestion?
A. Talking about it. I believe so.
Q. Okay. Down from that, there is a list of -- starts with line one, two, three, four, five. Now at one point, you said there was a list of tasks to be performed --
A. Yes.
Q. -- In development of new product. Is this the kind of list you are talking about?
A. No.
Q. Okay. Do you know what that list represents?
A. Are you talking about one, two, three, four, five?
Q. Yes.
A. Are you asking my opinion?
Q. I'm asking what your understanding was at the time.
A. I believe it was a procedure to bring the product to the market.

67

Q. Okay. Did you discuss how long it would take to bring this product to the market?
A. I don't recall.
Q. Okay. If you look at that -- by the way, was it Mr. Martin who typed up this document?
A. You would have to ask him. I did not type this.
Q. Okay. Looking at that list of steps, would any of those have been your responsibility?
A. Number two, three, four.
Q. Defining a specification, building?
A. I'm sorry. Nos. three and four.
Q. Okay. Did you ever discuss how long it would take to build the instrument?
A. I don't recall.
Q. Do you recall if you ever discussed how long it would take to test and characterize the instrument?
A. I don't recall.
Q. Okay. If you go to the next page, the seventh bullet down, it says, "The first step is to build a UV visible 3000 unit." Do you recall discussing how long that would take?
A. No. I don't recall.

68

Q. Okay. Do you recall discussing how much that would cost?
A. I don't recall either.
Q. A little bit further down, just before it says, "February 13, 2001," it says, "Jumi can use these to evaluate software packages." It says, "Phil needs to acquire a library of well-characterized samples. These must be single and multi-layer films." The next bullet says, "Jumi can use these to evaluate software packages."
A. Yes.
Q. Do you recall discussing that?
A. Yes.
Q. What software packages were you going to be evaluating?
A. I don't remember the name of the software. Something -- I don't recall. There were three or something.
Q. What was the function of that software?
A. Calculate film thickness.
Q. Those were off-the-shelf programs?
A. Yes.
Q. Do you recall buying any of these software packages?

69

A. I recall purchasing one software, one -- I cannot give you the name.
Q. Do you recall when that was?
A. Sometime in the year 2001.
Q. On the 13th, sixth bullet down, "Have to purchase equipment from Maximus. Need to set up a budget." Would that have been your responsibility to set up a budget?
A. No.
Q. Do you know if a budget was ever set up?
A. No.
Q. At the bottom, it says -- the fifth bullet from the bottom -- it says, "Can GRAMS do the job? It handles three-dimensional arrays, it can do deconvolutions, Kramers-Kronig transforms and other math functions as well as sophisticated statistical analysis." Was GRAMS the software package you purchased?
A. I purchased?
Q. That was purchased for you to use and evaluate?
A. No.
Q. Okay. Now, if you look at the bottom,

it says, "March 15th will be the meeting to review Maximus, project specifications from Phil and Paul." Then it says, "Product design from Jumi, Phil and Paul." Do you recall another meeting regarding this project?
A. No.
Q. Do you recall if meetings were held regularly about this project?
A. No.
Q. Were they -- do you know if they were held or you just don't recall?
A. I don't recall attending a meeting.
Q. Any meetings?
A. Meeting like this (indicating)?
Q. No, meetings about this particular project.
A. I recall informing my test results.
Q. Okay. What were those tests results of? What tests did you perform?
A. There was a wafer, W-A-F-E-R. And I don't know if that's a wafer or standard. I believe it's a standard for Nanometrics. I run that waver under a SE instrument, SE 2100, and plugged that data to see whether I can come up with the correct

results.
Q. What were the test results?
A. Bad.
Q. And do you know why it did not give you the right results?
A. I believe it was lack of my understanding in film thickness and number two, software interface. Number three, misunderstanding of parameters. But I cannot tell for sure.
Q. Were those test results preserved in a file, computer file or printed out?
A. They should be in the computer in the conference room.
Q. What was that computer usually used for?
A. That's SE-2100.
Q. So that the unit processed toward the data?
A. Yes.
Q. You said you recall discussing or reporting these results?
A. Yes.
Q. Who did you report them to?
A. My recollection it was more informal.

I tested software, doesn't seem to work, to Paul Martin and Mr. Tringali.
Q. Okay. And do you know if anything was done as a result of that?
A. I don't think so.
Q. Did you buy any other pieces of software to test?
A. Buy another?
Q. Yes.
A. No.
Q. Was there any discussion about writing your own piece of software?
A. If they ever were going to make this product, maybe. I don't recall.
Q. Did you keep any personal notes of your meetings about this?
A. No, I don't. There might be --
MR. DAVIS: You have answered that. Just answer the question.
Q. Do you know if any notes of these meetings were ever kept by anyone?
A. Meeting notes?
Q. Any notes. Do you know if there were any notes of the progress of this project kept?

A. I don't recall.
Q. What were you going to say before your attorney stopped you? You said there might be?
A. I might have worked with some -- the test results on a piece of paper.
Q. If you had, would this have been retained anywhere?
A. It would be in -- either in my office computer, yes.
Q. Okay. I would like to take a short break.
(Luncheon recess.)
MR. TREGER: The next document is a memo that was marked as Exhibit 3 at Mr. Martin's deposition. For the record, that's Exhibit 2.
(Lee Exhibit No. 2 was marked for identification.)
Q. Do you recall seeing this document before?
A. I do not.
Q. Do you recall attending a meeting about Project Maximus in March of 2001?
A. I do not.
Q. Do you recall discussing any of the

subjects listed in this document?
A. Number, item three discussed at some other time but not at this meeting, no.
Q. You said you were recall discussing No. 3?
A. Item No. 3 but not in this meeting. I remember talking about it.
Q. Which part of No. 3? It has two subjects. Using one of the demo systems for a bench and then building a computer specific --
A. Demo system for development.
Q. That was the one in the conference room that you ended up using?
A. Yes.
Q. In No. 9, it says, "To be done by April meeting, evaluate software packages with essentials we have received, will use dedicated computer." Is that referring to the same instrument that you used for the bench?
A. I don't know what this is.
Q. And No. 7, it says, "A&P samples used in Nan 4150 with a 49. Map." Do you know what was inscribed on the back?
A. I don't know anything about this.

Q. Okay. The next exhibit is the memo that was entered as Exhibit 6 in Mr. Martin's deposition. I believe it's a memo dated 7-12-02.
MR. DAVIS: I want to raise an objection to these memos. They are all dated 7-12-02. That's long after Dr. Martin and Dr. Lee left the employ of SEE.
(Lee Exhibit No. 3 was marked for identification.)
Q. Do you recognize this document?
A. No.
Q. Do you recognize the password Twyster?
A. Yes.
Q. What password is that?
A. That's one of the passwords Dr. Martin used.
Q. Do you recall ever seeing a document listing the specifications for project Maximus, stage one?
A. I don't recall.
Q. Do you recall seeing or discussing any of the subjects of this document?
A. In a directors meeting something related to Nanometric. I don't recall.

Q. You don't recall?
A. No.
MR. TREGER: Appears next exhibit is the document entered as Exhibit 4 in Mr. Martin's deposition.
(Lee Exhibit No. 4 was marked for identification.)
Q. Do you recognize that document?
A. No.
Q. Do you know who generated it?
A. No.
Q. Do you recall ever discussing putting together a budget for the Maximus project?
A. No.
Q. Do you recall ever discussing expenses for the development of the Maximus project?
A. No.
MR. TREGER: This is the next exhibit. It is the exhibit entered in Mr. Martin's deposition as Exhibit I5.
(Lee Exhibit No. 5 was marked for identification.)
MR. DAVIS: Again, this is dated January 22, 2003, an entire year after my clients

left the employ of SEE.
Q. Do you recognize this document?
A. In terms of - - this particular document, no.
Q. Do you recognize what software it was generated in?
A. It appears to be from BusinessWorks.
Q. Do you know what the term SE-1200/2200 refers to?
A. That must be the product designations.
Q. Was that a product that was being developed while you were at SEE?
A. I don't recall.
Q. Do you recall ever discussing with anybody working on an upgrade for the SE 2100 and 1100 that would run out of the Windows operating system?
A. Any upgrade?
Q. While you were working at SEE, do you recall discussing with anybody working on an upgrade to the SE-1100 and 2100 that was run on a Windows operating system?
A. Yes.
Q. When?

A. 1999.
Q. Who did you discuss that with?
A. Dr. Paul Martin mostly. I believe with Mr. Tringali as well.
Q. What would have been necessary to create that upgrade?
A. It must be upgraded to Windows 2000 platform.
Q. How would that be accomplished?
A. Writing new software.
Q. What part of the software would need to be changed?
A. Drivers.
Q. How about the graphic user interface?
A. Yes.
Q. Would that need to be rewritten?
A. Yes.
Q. How about the color software?
A. I do not know.
Q. Okay. Can you tell me if any work was ever done on that upgrade?
A. No. What do you mean by "work was done"?
Q. Can you tell me whether anybody ever

rewrote the drivers?
A. Rewrote the drivers, no.
Q. Did anybody do any programming work?
A. No.
Q. Why was that?
A. Why was what?
Q. Why was no work done on this?
A. Number one, I did not know the program language. Number two, I wasn't sure which language to go to. There are two possibilities. I did not know either languages.
Q. Did you ever bring up these problems at any directors meetings?
A. Yes, with the programmer.
Q. So you are referring to the meeting, the minutes of which we have reviewed today?
A. Yes, unofficial indications.
Q. As well as doing the Maximus project, you were planning on do this upgrade?
A. Yes.
Q. Were there going to be two instruments or one instrument that was adaptable to either application?
A. I don't understand your question.

Q. You just stated there were two apparent goals. One was to upgrade the system, the instruments to run on Windows 2000 and the other goal was to enter the semi-conductor market. Were you intending on building a completely new instrument or were you intending on building an instrument that would run on Windows 2000 and be adaptable to both?
A. First step is to write a software to collect data which will work on forensic. And film thickness software has to be written on top of Beta collection software.
Q. That was going to be put on the instrument you already had designed?
A. What? I don't understand the question.
Q. Let me ask you this. What language were you going to have to write in to adapt the system to 2000?
A. Are you talking about data collection portion, forensic portion?
Q. Forensic portion?
A. I haven't made a decision. There was one version of the GRAMS 5,6-AI versus which is a second generation version of GRAMS 4 that requires understanding and programming ability of ACTIVE X,

OCX, CONS, OLE. And the second item was a Labview, second programming possible language was a Labview.
Q. And you did not know these programming languages?
A. I don't even know if Active X.
Q. Did Dr. Martin know any of these languages?
A. You would have to ask him.
Q. You don't know?
A. I don't.
Q. Getting back to the exhibits before you, do you recall ever making a parts list for the upgraded 1200 and 2200?
A. Olympus discontinued Model BX-60 or something like that. And we had no choice but upgrading to BX50 something and at the time maybe put the new number on it.
Q. Was the product that is designated 1200 and 2200, was that going to be the next generation of the forensic product?
A. I don't recall.
MR. TREGER: This is the next exhibit for the record, a memo dated 9-4-01 from SEE Incorporated from Jeff Hustead.

82

(Lee Exhibit No. 6 was marked for identification.)
Q. Do you recognize that document?
A. Appears it's what I wrote.
Q. Do you recall sending this memo?
A. I don't recall sending it.
Q. Do you recall the subject matter of the memo?
A. I'm not quite sure. I don't know.
Q. Does this refresh your recollection as to what work was done on the upgrade to the 2200/1200?
A. It looks like it.
Q. This has something -- it refers to the IC Module. What is that?
A. Inventory control module. That's BusinessWorks inventory control module.
Q. What was that? What was the inventory control module used for?
A. In an accounting package in BusinessWorks, there was an account receivable module, account payable module, payroll module, inventory module, and general ledger module.
Q. Whose responsibility was it to maintain

83

the data in the inventory control module?
A. Responsible for? I was doing it. I'm not sure whether I am responsible for it.
Q. Did anybody else do it?
A. Yes.
Q. Who else?
A. Debbie Bowles, Tony Faciano, Phil Tringali and myself and Paul Martin and possibly Jeff Hustead. Those are the people to make the modifications.
Q. When did they make modifications? Was there somebody specifically responsible for entering new equipment or new parts in inventory?
A. Whoever receives the parts.
Q. Comes over to the computer and enters it into the inventory control model?
A. I don't understand.
Q. You are saying whoever received the part would go to the computer and input it in the --
A. Yes.
Q. -- in the BusinessWorks program?
A. Correct.
Q. Okay.
MR. DAVIS: Can we take a short

84

two-minute break?
(Recess.)
Q. Are you able to tell me if additional work was done on the Maximus project?
A. In addition to what I already testified to?
Q. Yes.
A. I don't think so.
Q. Do you know if any additional parts were ordered for use in developing?
A. For the Maximus project?
Q. Yes.
A. No.
Q. Do you know if any additional parts were purchased for developing the 2200 and the old 1200?
A. At the then Olympus VX 50 something -- I don't know, no.
Q. You don't know one way or the other?
A. I don't recall issuing a purchase order for that.
Q. All right. You made a series of claims against Mr. Tringali. I will ask you some questions about these claims. Now, first of all, you claim

85

there is a contract between yourself and Mr. Tringali personally to purchase your stock in SEE?
A. Yes.
Q. And can you explain to me how that contract came to be.
A. Not exactly -- I don't recollect, but it was January 8th or 9th. After meeting, Tringali and Jeff Hughstead went out for lunch. They came back with two proposals. Proposal number one is that was negotiable, proposal number one. Based on estimate of company value, it will -- to purchase a stock of Tringali by me and Paul -- it will be neighborhood of 1.5 something million dollars approximately with approximately 2 to $300,000 cash up-front. Option No. 2 was non-negotiable. Tringali will purchase Paul Martin and Jumi Lee's stock for $200,000 cash. And Tringali is expecting an answer on the 11th of January around ten a.m.
Q. What was said that made you believe one was negotiable and one was not?
A. That's what I was told.
Q. Who told you that?
A. Tringali and Jeff Hughstead.
Q. Both?

PHILLIPS & ANGLEY
ATTORNEYS AND COUNSELLORS AT LAW
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
ONE BOWDOIN SQUARE
BOSTON, MASSACHUSETTS 02114
(617) 367-8787

JEFFREY J. PHILLIPS, P.C.
JEFFREY T. ANGLEY, P.C.
JONATHAN M. FEIGENBAUM*
CHRISTOPHER S. TOLLEY
DANIEL TREGER
STEPHANIE M. SWINFORD
KRISTEN M. PLOETZ

*ALSO ADMITTED IN DC AND CA

TELECOPIER (617) 227-8992

February 9, 2006
By Hand

Roger S. Davis, Esq.
Davis & Rubin
One Bowdoin Square, Suite 901
Boston, MA 02114-2919

Re: Paul Martin and Jumi Lee v. Phillip Tringali
Norfolk Superior Court, Civil Action No. 02-801

Dear Mr. Davis:

As you recall, on May 24 and May 25, 2005, your clients were deposed in this matter. As you will also recall, you instructed your clients not to answer questions about the first four counts of your complaint or the corporate counterclaims against them, arguing that the automatic stay precluded any such questions. I therefore suspended both depositions.

As this action is no longer subject to the automatic stay, I will reconvene the depositions of Paul Martin and Jumi Lee, on March 20 and 21st, respectively, at 10:00 am at my office. Because your clients now assert all counts against my client individually, my client is entitled to obtain discovery regarding the counts that were formerly subject to the automatic stay. My client is also entitled to obtain discovery regarding the formation and operation of Quantum Dynamics and CRAIC, which are the basis of several of his affirmative defenses.

If you have any questions or comments, please do not hesitate to contact me.

Very truly yours,

Daniel Treger

DT/hs
enclosure
cc: Client
Jeffrey J. Phillips, Esq.
L:\LITG\trng002\Davis.12.9.06.wpd

"I"

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS

SUPERIOR COURT DEPARTMENT
CIVIL ACTION NO. 02801

PAUL MARTIN AND JUMI LEE, INDIVIDUALLY AND AS STOCKHOLDERS ON BEHALF OF S.E.E., INC.
Plaintiffs

vs.

S.E.E., INC. AND PHILLIP TRINGALI,
Defendants

**NOTICE OF CONTINUED TAKING DEPOSITION OF PAUL MARTIN**

To: Roger S. Davis, Esq.
Davis & Rubin
One Bowdoin Square, Suite 901
Boston, MA 02114-2919

Please take notice that at 10:00 a.m. on Monday, March 20 2006 at the law offices of Phillips & Angley, One Bowdoin Square, Boston, Massachusetts the defendant Phillip Tringali, by his attorney will recommence the deposition upon oral examination of the plaintiff Paul Martin pursuant to Rule 30 of the Massachusetts Rules of Civil Procedure, before a notary public in and for the Commonwealth of Massachusetts or before some other officer authorized by law to administer oaths. Pursuant to Mass.R.Civ.P. 30(b)(5) and 30, deponent is further directed to produce, at the deposition, the documents and things described in Schedule "A" hereto. The oral examination will continue from day to day until completed. You are invited to attend and cross-examine.

PHILLIP TRINGALI,
By his attorney,

Date: February 9, 2006

Jeffrey J. Phillips, Esq.
B.B.O. #398480
Daniel Treger
B.B.O. 562140
Phillips & Angley
One Bowdoin Square
Boston, MA 02114
Tel. No.: (617) 367-8787

CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing

on all parties or their attorney of record this day by hand.

Date:February 9, 2006

Daniel Treger, Esq.

L:\LITG\trng002\lee.not2.wpd

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS

SUPERIOR COURT DEPARTMENT
CIVIL ACTION NO. 02801

PAUL MARTIN AND JUMI LEE, INDIVIDUALLY AND AS STOCKHOLDERS ON BEHALF OF S.E.E., INC.
Plaintiffs

vs.

S.E.E., INC. AND PHILLIP TRINGALI,
Defendants

**NOTICE OF CONTINUED TAKING DEPOSITION OF JUMI LEE**

To: Roger S. Davis, Esq.
Davis & Rubin
One Bowdoin Square, Suite 901
Boston, MA 02114-2919

Please take notice that at 10:00 a.m. on Tuesday, March 21 2006, at the law offices of Phillips & Angley, One Bowdoin Square, Boston, Massachusetts the defendant Phillip Tringali, by his attorney will recommence the deposition upon oral examination of the plaintiff Jumi Lee pursuant to Rule 30 of the Massachusetts Rules of Civil Procedure, before a notary public in and for the Commonwealth of Massachusetts or before some other officer authorized by law to administer oaths. Pursuant to Mass.R.Civ.P. 30(b)(5) and 30, deponent is further directed to produce, at the deposition, the documents and things described in Schedule "A" hereto. The oral examination will continue from day to day until completed. You are invited to attend and cross-examine.

PHILLIP TRINGALI,
By his attorney,

Date: February 9, 2006

Jeffrey J. Phillips, Esq.
B.B.O. #398480
Daniel Treger
B.B.O. 562140
Phillips & Angley
One Bowdoin Square
Boston, MA 02114
Tel. No.: (617) 367-8787

CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing on all parties or their attorney of record this day by hand.

Date:February 9, 2006

Daniel Treger, Esq.

L:\LITG\trng002\martin.not2.wpd

SCHEDULE A

DEFINITIONS

(1) Communication.  The term "communication" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

(2) Document.

a. The word "document" includes without limitation the original or any copy of any notes, correspondence, memoranda (including written memoranda of telephone conversations, other communications, discussions, agreements, and any other acts, transactions or activities), contracts, agreements, letters, telegrams, evaluations, work papers, calendars, appointment books, diaries, instructions, order forms, records, sound recordings, forms, statements, photographs, x-rays, journals, notices, interoffice and interoffice communications, photostats, and any other written matter of any kind, including, but without limitation, any marginalia appearing on any documents or any other writing.  A document in the possession, custody or control of another person is considered to be in the possession, custody or control of the defendant if the defendant has a right or privilege to examine it upon request or demand.

b. In the event that it is claimed that any communication or document responsive to any interrogatory is privileged or attorney's work product, each such communication or document should be fully identified in writing, except that the substance thereof need not be described to the extent it is claimed to be privileged.

(3) Identify (With Respect to Persons).  When referring to a person, "to identify" means to give, to the extent known, the person's full name, present or last known address, and, when referring to a natural person, the present or last known place of employment.  Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

(4) Identify (With Respect to Documents).  When referring to documents, "to identify" means to give, to the extent known, the

(a) type of document;

(b) general subject matter;

(c) date of the document;  and

(d) author(s), addressee(s), and recipient(s).

(5) Parties.  The terms "plaintiff" and "defendant" as well as a party's full or abbreviated name or a pronoun referring to a party mean the party and, where applicable, its officers, directors, employees, partners, corporate parent, subsidiaries, or affiliates.  This definition is not intended to impose a discovery obligation on any person who is not a party to the litigation.

(6) Person.  The term "person" is defined as any natural person or any business, legal, or governmental entity or association.

(7) Concerning.  The term "concerning" means referring to, describing, evidencing, or constituting.

(8) State the Basis.  When an interrogatory calls upon a party to "state the basis" of or for a particular claim, assertion, allegation, or contention, the party shall

(a) identify each and every document (and, where pertinent, the section, article, or subparagraph thereof), which forms any part of the source of the party's information regarding the alleged facts or legal conclusions referred to by the interrogatory;

(b) identify each and every communication which forms any part of the source of the party's information regarding the alleged facts or legal conclusions referred to by the interrogatory;

(c) state separately the acts or omissions to act on the part of any person (identifying the acts or omissions to act by stating their nature, time, and place and identifying the persons involved) which form any part of the party's information regarding the alleged facts or legal conclusions referred to in the interrogatory;  and

(d) state separately any other fact which forms the basis of the party's information regarding the alleged facts or conclusions referred to in the interrogatory.

Additional definitions are as follows:

(9) Quantum means Quantum Dynamics International, LLC, its agents and employees.

(10) CRAIC means CRAIC  Technologies, LLC, its agents and employees

(11) S.E.E. means S.E.E., Inc, its agents or employees.

(12) Customer of S.E.E. means any person who purchased products manufactured by S.E.E. Inc. prior to your separation from S.E.E., Inc.

(13) Prospective Customer of S.E.E. means any person contacted by S.E.E., Inc., its agents or employees regarding the purchase of products manufactured by S.E.E., Inc. prior to January 11, 2002.

REQUESTS

Request No. 1

All documents concerning communications between Quantum and customers or prospective customers of S.E.E. during the years from January 9, 2002 through March 22, 2004 including, but not limited to, any computerized data base used to track customer contacts, such as ACT.

Request No. 2

All documents concerning communications between CRAIC and customers or prospective customers of S.E.E. from January 9, 2004 through March 22, 2004, but not limited to, any computerized data base used to track customer contacts, such as ACT.

Request No. 3

All documents concerning the product specifications of all products developed by Quantum and/or CRAIC between January 9, 2002 and March 22, 2004.

Request No. 4

All source code written for, or commissioned for use in the analytical device developed between January 9, 2002 and March 22, 2004 including but not limited to any source code for any graphic user interface, and for adaptation to the Windows 2000 operating system.

Request No. 5

All documents concerning applications papers presented by you during the year 2002, including but not limited to the paper entitled "Ultraviolet Spectroscopy of Textile Fibers."

Request No. 6

All documents concerning vendors who supplied software, hardware, optical, electrical or other components, and design or other services related to the development of the Quantum and/or CRAIC products between January 9, 2002 and March 22, 200 including but not limited to all communications therewith.

Request No. 7

All documents concerning communications between the defendants and employees of S.E.E., Inc. dating from after January 9, 2002.

Request No. 8

All documents concerning communications between the defendants and any of S.E.E., Inc.'s distributors or sales representatives dating from after January 9, 2002.

Request No. 9

All itemized telephone bills for telephone numbers used by the defendants while engaged in activities related to designing,

developing, manufacturing, and/or marketing of Quantum and CRAIC products between January 9, 2002 through March 22, 2004, including telephone numbers listed in the names of Quantum and CRAIC.

Request No. 10

All promotional literature for Quantum and/or CRAIC products dating from between January 9, 2002 through March 22, 2004, including but not limited to all documents posted on websites maintained by Quantum and/or CRAIC.

Request No. 11

All documents of, concerning or relating to upgrades of S.E.E. instruments, repairs or service performed on S.E.E. instruments by Quantum and/or CRAIC from January 9, 2002 through March 22, 2004.

Request No. 12

All documents concerning sales of products developed by Quantum and/or CRAIC from January 9, 2002 through March 22, 2004.

Request No. 13

All documents concerning parts purchased for the first prototypes of the Mach 1 and/or the Mach 10, as identified in Exhibit "A".

Request No. 14

All documents, including employment contracts, concerning, in whole or in part, any policy of confidentiality maintained by Quantum and CRAIC.

Request No. 15

All documents concerning or relating to the organization of Quantum and/or CRAIC.

Request No. 16

All documents concerning communications between the defendants and Sarah Walbridge dating from after January 9, 2002.

Request No. 17

All documents concerning communications between the defendants and Georgia Institute  of Technology, its agents or employees dating from after January 9, 2002.

Request No. 18

All documents concerning communications between the defendants and Dynamic Light Control, LLC dating from and after January 9, 2002.

Request No. 19

All documents concerning the development of the following software packages marketed for use with the Mach 1 and the Mach 10:

a. Absolute Reflectance Package.

Request No. 20

All documents concerning any training performed by defendants for users of S.E.E. instruments after January 9, 2002.

Request No. 21

All documents concerning the "low end system" that is the subject of the email attached hereto as Exhibit "B".

Request No. 22

All documents reflecting the income and expenses of Quantum and/or CRAIC from January 7, 2002 through March 22, 2004.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 04-12708-MLW

PHILLIP TRINGALI, )
)
Plaintiff, )
)
v. )
)
PAUL MARTIN AND )
JUMI LEE, )
)
Defendants )

**PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFENDANT PAUL MARTIN**

Pursuant to Fed.R.Civ.P., Rule 34 and Local Rules 26.5 and 34.1 of the United States District Court for the District of Massachusetts, plaintiff Phillip Tringali hereby requests that the defendant, Paul Martin respond to the following document request and produce documents at plaintiff's counsel's office in accordance with the Rules.

DEFINITIONS

The uniform definitions set forth in Rule 26.5 of the Local Rules of the United States for the District of Massachusetts apply:

(1) *Communication.* The term "communication" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

(2) *Document.* The term "document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Fed.R.Civ.P. 34(a). A draft or non-identical copy is a separate document within the meaning of this term.

"J"

(3) *Identify (With Respect to Persons).* When referring to a person, "to identify" means to give, to the extent known, the person's full name, present or last known address, and, when referring to a natural person, the present or last known place of employment. Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

(4) *Identify (With Respect to Documents).* When referring to documents, "to identify" means to give, to the extent known, the

(a) type of document;

(b) general subject matter;

(c) date of the document; and

(d) author(s), addressee(s), and recipient(s).

(5) *Parties.* The terms "plaintiff" and "defendant" as well as a party's full or abbreviated name or a pronoun referring to a party mean the party and, where applicable, its officers, directors, employees, partners, corporate parent, subsidiaries, or affiliates. This definition is not intended to impose a discovery obligation on any person who is not a party to the litigation.

(6) *Person.* The term "person" is defined as any natural person or any business, legal, or governmental entity or association.

(7) *Concerning.* The term "concerning" means referring to, describing, evidencing, or constituting.

(8) *State the Basis.* When an interrogatory calls upon a party to "state the basis" of or for a particular claim, assertion, allegation, or contention, the party shall

(a) identify each and every document (and, where pertinent, the section, article, or subparagraph thereof), which forms any part of the source of the party's information regarding the alleged facts or legal conclusions referred to by the interrogatory;

(b) identify each and every communication which forms any part of the source of the party's information regarding the alleged facts or legal conclusions referred to by the interrogatory;

(c) state separately the acts or omissions to act on the part of any person (identifying the acts or omissions to act by stating their nature, time, and place and identifying the persons involved) which form any part of the party's information regarding the alleged facts or legal conclusions referred to in the interrogatory; and

(d) state separately any other fact which forms the basis of the party's information regarding the alleged facts or conclusions referred to in the interrogatory.

Additional definitions are as follows:

(9) *Quantum* means Quantum Dynamics International, LLC, its agents and employees.

(10) *CRAIC* means CRAIC Technologies, LLC, its agents and employees

(11) *S.E.E.* means S.E.E., Inc, its agents or employees.

(12) *Customer of S.E.E.* means any person who purchased products manufactured by S.E.E. Inc. prior to your separation from S.E.E., Inc.

(13) *Prospective Customer of S.E.E.* means any person contacted by S.E.E., Inc., its agents or employees regarding the purchase of products manufactured by S.E.E., Inc. prior to January 11, 2002.

## REQUESTS

Request No. 1

All documents concerning communications between Quantum and customers or prospective customers of S.E.E. during the years from January 9, 2002 through March 22, 2004 including, but not limited to, any computerized data base used to track customer contacts, such as ACT.

Request No. 2

All documents concerning communications between CRAIC and customers or prospective customers of S.E.E. from January 9, 2004 through March 22, 2004 , but not limited to, any computerized data base used to track customer contacts, such as ACT.

Request No. 3

All documents concerning the product specifications of all products developed by Quantum and/or CRAIC between January 9, 2002 and March 22, 2004.

Request No. 4

All source code written for, or commissioned for use in the analytical device developed between January 9, 2002 and March 22, 2004 including but not limited to any source code for any graphic user interface, and for adaptation to the Windows 2000 operating system.

Request No. 5

All documents concerning applications papers presented by you during the year 2002, including but not limited to the paper entitled “Ultraviolet Spectroscopy of Textile Fibers.”

Request No. 6

All documents concerning vendors who supplied software, hardware, optical, electrical or other components, and design or other services related to the development of the Quantum and/or CRAIC products between January 9, 2002 and March 22, 200 including but not limited to all communications therewith.

Request No. 7

All documents concerning communications between the defendants and employees of
S.E.E., Inc. dating from after January 9, 2002.

Request No. 8

All documents concerning communications between the defendants and any of S.E.E.,
Inc.'s distributors or sales representatives dating from after January 9, 2002.

Request No. 9

All itemized telephone bills for telephone numbers used by the defendants while engaged
in activities related to designing, developing, manufacturing, and/or marketing of Quantum and
CRAIC products between January 9, 2002 through March 22, 2004, including telephone
numbers listed in the names of Quantum and CRAIC.

Request No 10

All promotional literature for  Quantum and/or CRAIC products dating from between
January 9, 2002 through March 22, 2004, including but not limited to all documents posted on
websites maintained by Quantum and/or CRAIC.

Request No 11

All documents of, concerning or relating to upgrades of S.E.E. instruments, repairs or
service performed on S.E.E. instruments by Quantum and/or CRAIC from January 9, 2002
through March 22, 2004.

Request No. 12

All documents concerning sales of products developed by Quantum and/or CRAIC from
January 9, 2002 through March 22, 2004.

Request No. 13

All documents  concerning parts purchased for the first prototypes of the Mach 1 and/or the Mach 10, as identified in Exhibit "A"..

Request No. 14

All documents, including employment contracts, concerning, in whole or in part, any policy of confidentiality maintained by Quantum and CRAIC.

Request No. 15

All documents concerning or relating to the organization of Quantum and/or CRAIC.

Request No. 16

All documents concerning communications between the defendants and Sarah Walbridge dating from after January 9, 2002.

Request No. 17

All documents concerning communications between the defendants and Georgia Institute of Technology, its agents or employees dating from after January 9, 2002.

Request No. 18

All documents concerning communications between the defendants and Dynamic Light Control, LLC dating from and after January 9, 2002.

Request No. 19

All documents concerning the development of the following software packages marketed for use with the Mach 1 and the Mach 10:

a.       Absolute Reflectance Package.

Request No. 20

All documents concerning any training performed by defendants for users of S.E.E. instruments after January 9, 2002.

Request No. 21

All documents concerning the "low end system" that is the subject of the email attached hereto as Exhibit "B".

Request No. 22

All documents reflecting the income and expenses of Quantum and/or CRAIC from January 7, 2002 through March 22, 2004.

RESPECTFULLY SUBMITTED,
Phillip Tringali,
By his attorney,

Date: 9/14/05

Jeffrey J. Phillips, Esq
B.B.O. #398480
Daniel Treger, Esq
B.B.O. #562147
Phillips & Angley
One Bowdoin Square
Boston, MA 02114
Tel. No. 617-367-8787

L:\LITG\Trng001\martinreq.wpd

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by (hand) (mail) on 9/14/05

rospectrophotometer and Microspectrometer http://www.microspectra.com/prod01.htm

QDi™

# QDI Mach10™ MSP

Home
Up

The QDI Mach10™ Microspectrophotometer is the most advanced microspectrophotometer to date. It is a powerful yet user friendly tool for measuring the spectral characteristics of microscopic samples non-destructively. Samples can be as small as 2 microns across and require little preparation. The system can measure transmission, reflectance, and fluorescence spectra in the near-UV, visible, and NIR regions with high spectral resolution.

The QDI Mach1™ Spectrophotometer for Microscopes is used to give many models of microscopes spectroscopic capabilities without the expense of a dedicated system. It enables a scientist to measure the spectral characteristics of microscopic samples non-destructively. The system can measure transmission, reflectance, and fluorescence spectra in the visible and near infrared regions with high spectral resolution depending on the microscopes configuration.

represent your company going forward for all sales and support (the latter most important to ESR). However, nothing was mentioned by either of us regarding Foster & Freeman. I was told in an e-mail by Nick on 1 March that "The Fx5 is back there [at ESR] and working fine." (see below)

Apparently, the problems with this instrument continued past this time and Angus must have believed that Alphatech was still involved with this product but was not assisting F&F with it. Paul is going to call Angus directly to get his spin on this but this is how I read things from Paul's comments. So the negative comments about Alphatech in the Referee Review given by Angus appear to have been based on his perception that we were not doing what they expected to support the "entire package" (including the F&F FX5).

I have asked Paul to find out from Angus if this is indeed how he (Angus) viewed Alphatech when he gave his evaluation to DAIS in his role as our reference. More tomorrow on this.

Stay tuned,

Evan S.

>Date: Fri, 01 Mar 2002 08:36:50 +1100
>From: Nick Weber <nick@xtek.net>
>Subject: Head Up
>X-Envelope-To: evan.sales@alphatech.co.nz
>To: "Evan Snyder (E-mail)" <evan.sales@alphatech.co.nz>
>Cc: "'Nigel French (E-mail)'" <nigel@xtek.net>,
> "Nick Away (E-mail)" <nickw@xtek.net>
>X-MIMEOLE: Produced By Microsoft MimeOLE V6.00.2600.0000
>X-Mailer: Microsoft Outlook CWS, Build 9.0.2416 (9.0.2911.0)
>Importance: Normal
>X-MSMail-priority: Normal
>
Evan,

The Fx5 is back there and working fine.

More importantly, you might be interested to know that Paul Martin and S.E.E. have parted company. Paul and Phil couldn't see eye to eye over various matters. The upshot is that Paul has started his own company (QDI) with Jumi and already has an improved range of equipment including a less expensive low end system (which he and I worked out in New Zealand).

Paul has undertaken to pick up the warranty issues on all the equipment I've sold over the last two or three years, so I'm comfortable with the arrangements.

The upshot is that XTEK has informed S.E.E. that we no longer intend to represent them. It would seem to me that the same will happen at S.E.E. as it did at Nanometrics - the msp division will wither away without their input and ideas. I expect that Phil will be in touch with you very soon, if he has not already been offering some attractive deals. That's entirely up to you of course, but I know that I'll be sticking with Paul.

QDI - www.microspectra.com - will be attending the ANZFSS conference with us and showing their new range of instruments - perhaps you might like to come along as well?

Cheers,

Nick
nick@xtek.net
Website: www.xtek.net
Tel: +61 2 6280 6321
Fax: +61 2 6280 6518

00001 B

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS

SUPERIOR COURT
C.A. NO. 02-801

PAUL MARTIN and JUMI LEE, Individually and as Assignees of S.E.E., INC.
Plaintiffs

V.

PHILLIP TRINGALI
Defendant

**JOINT PRE-TRIAL MEMORANDUM**

**I. Agreed Facts**

1. S.E.E., Inc. ("S.E.E.") is a corporation duly organized under the laws of the Commonwealth of Massachusetts.

2. Defendant Phillip Tringali ["Tringali"] founded S.E.E., Inc. in 1988.

3. Tringali has always been a director, shareholder and president of S.E.E.

4. Phillips Tringali has been a member of S.E.E.'s Board of Directors at all times.

5. Mr. Martin was responsible for sales, marketing, and applications for S.E.E.'s microspectrophotometers.

6. S.E.E. hired plaintiff Jumi Lee, ("Lee") Martin's wife, around March of 1997 to be director of research and development for S.E.E.'s microspectrophotometer division.

7. S.E.E. issued 20,000 shares of its common stock to Martin and 15,000 shares to Lee.

8. At the present time, Martin and Lee together own a total of 40,000 shares or approximately 21% of the outstanding common stock of S.E.E.

9. By January 1, 2001, Martin and Lee were both officers and directors of S.E.E., Inc.

10. On or about January 9, 2002, Martin and Lee both resigned from S.E.E. 

11. On May 22, 2003, S.E.E., Inc., filed for reorganization under Chapter 11 of the United States Bankruptcy Code.

12. On March 24, 2004, S.E.E., Inc., filed for Liquidation under Chapter 7 of the Bankruptcy code, and ceased operating.

## II. Statement of the Evidence

### A. Plaintiffs' Statement

In September, 1998, the corporation S.E.E. had purchased a vacation home in Bridgton, Maine, for approximately $206,000 using corporate funds for the down payment. S.E.E. borrowed the balance of the purchase price in the original $147,000 secured by a first mortgage. From and after that date, for a period of several years, the property was used by Tringali as his personal vacation home. During that time the mortgage principal, interest and taxes and other expenses for the maintenance were paid by S.E.E. While S.E.E. listed the property as a business asset on its books and records, it produced virtually no income since it was used as Tringali's personal vacation home. By March, 2000, the plaintiffs, Martin and Lee, experienced differences with Tringali concerning the operation and finances of S.E.E., including, but not limited to the conduct of certain litigation and S.E.E.'s purchase of the vacation home and use of S.E.E.'s funds to maintain that property. On several occasions, Tringali threatened to fire Lee, continuing to January, 2002, and on January 9, 2002, Martin and Lee both resigned from S.E.E.

At the time Martin and Lee left the employ of S.E.E. on or about January 11, 2002 they entered into an agreement with Tringali who agreed to purchase Martin and Lee's stock in S.E.E. for $200,000, however, Tringali has refused to perform that agreement.

Additionally, at the time of Martin's resignation from S.E.E. he had earned 256 hours of vacation pay for which he claims a balance due in the amount of unpaid vacation pay. Additionally, Martin and Lee also claimed amounts due from S.E.E. for unpaid commissions. These claims are made against Tringali individually under the provisions of Massachusetts General

Laws, which holds the president of a corporation liable for unpaid vacation pay and commissions.

B. Defendant's Statement

Phillip Tringali founded S.E.E., Inc., in 1988 to sell scientific and analytical instruments as a manufacturer's representative. In 1996, S.E.E. hired Martin, and later his wife, Jumi Lee, in order to design, manufacture and market its own microspectrophotometers for the forensics market. Martin and Lee were primarily responsible for the microspectrophotometer business. Martin and Lee ran the microspectrophotometer business in California from 1996 through early 2000, when they moved the business to Massachusetts. By this time, Martin and Lee were both officers and directors of S.E.E., Inc.

S.E.E., Inc. purchased investment property in Maine in September, 1998 for $206,000.00. By that time, Martin was an officer and director of S.E.E., Inc. Martin, Tringali, and the third director, Ronald Gallagher, all approved of the transaction. Martin and Lee knew of the transaction as soon as it occurred. Upon moving to Massachusetts, Jumi Lee assumed responsibility for the day to day operation of S.E.E., Inc. She and Martin were aware of all compensation and benefits paid to all employees, including Tringali.

S.E.E. successfully sold forensic microspectrophotometers, until December, 2001. On January 9, 2002, Martin and Lee resigned from S.E.E. On that day, Martin and Lee demanded that Tringali provide terms pursuant to which they would sell their S.E.E. stock to Tringali, or purchase Tringali's stock and acquire the microspectrophotometer business from S.E.E. Tringali responded with potential, basic terms of these two possible transactions. The parties were never able to agree on the essential terms of either option, however, and no contract was formed. As a result, Martin and Lee instructed their attorney to demand that S.E.E., Inc. purchase their stock pursuant to the terms of a shareholder agreement.

S.E.E., Inc. soon learned that Martin and Lee had breached their duty of loyalty to S.E.E., Inc. and its shareholders, by appropriating its confidential

and proprietary information. Within two weeks of their resignation, were contacting S.E.E.'s customers, suppliers, vendors, sales representatives and employees, soliciting business for Quantum Dynamics International ("QDI") which they had incorporated in December 2001. Within one month of Martin's and Lee's resignation, while they still owned 20% of S.E.E.'s stock, QDI was marketing microspectrophotometers practically identical to S.E.E.'s products to S.E.E.'s customers, and to prospective customers Martin had cultivated while employed by S.E.E.. Within four months of Martin and Lee's departure, QDI was marketing a new microspectrophotometer with enhanced features. S.E.E. had been developing a product with substantially similar enhancements since February, 2001. Martin and Lee were primarily responsible for developing the new product. After their departure, S.E.E.'s remaining employees could find no work product reflecting the development of the enhanced product.

In March of 2002, S.E.E. filed an action against QDI, Martin and Lee in Plymouth County Superior Court seeking, among other things, to enjoin them from using S.E.E.'s confidential and proprietary customer information. On March 18, 2002, such an injunction issued. In May, 2002, Martin and Lee retaliated by filing this matter. The evidence will show that Martin and Lee's breach of fiduciary duty claim time-barred, having expired in or about September 2001, three years after Martin and Lee approved and/or learned about the purchase of the Maine Property. The evidence will also be unable to prove any damages related to the Maine property. Tringali obtained no personal benefit from the investment, which was sold by the Corporation in August, 2003 for a gross profit of approximately $244,000.00, all of which was used to pay corporate obligations. The evidence will further show that just before Martin and Lee resigned, Lee altered corporate accounting records without authority to reflect falsely that Martin had earned a month's vacation time. Finally, the evidence will show that the shareholder derivative suit was brought for an improper purpose. fees.

By March 24, 2004, S.E.E. had been driven into Chapter 7 bankruptcy. On August 1, 2005, Martin and Lee and S.E.E.'s trustee in bankruptcy settled

all of the Massachusetts state court claims between them by exchanging mutual releases. Martin and Lee also paid $5,000.00, for which they received an assignment of S.E.E. Inc.'s right to pursue corporate claims against Tringali individually.

## III. Agreed Description to be Read to Jury

Plaintiffs and defendant were officers, directors and stockholders of a Massachusetts corporation called S.E.E., Inc., until January 9, 2002, when Plaintiffs left their jobs at S.E.E., Inc. Plaintiffs Paul Martin and Jumi Lee allege that defendant Phillip Tringali improperly used corporate funds for his personal use, and that the stockholders of S.E.E., Inc. were damaged as a result. They also allege that defendant Tringali breached a contract to purchase their stock in S.E.E., Inc., and that Tringali must pay them commissions and vacation pay they allege were owed to them when they left S.E.E., Inc.

Defendant Phillip Tringali denies all of plaintiff's allegations. Defendant also claims that the plaintiffs' improperly took confidential and proprietary information from S.E.E., Inc., and used it to compete against S.E.E., Inc., and that because of this conduct, they are not allowed to recover damages against him.

## IV. Unusual Legal Issues

Plaintiff's Statement

A matter for determination by the Court is the question of the counterclaim initially filed as part of the Answer and Counterclaim to the First Amended Complaint in the affirmative defenses. Those affirmative defenses set forth claims for breach of fiduciary duty and the counterclaim itself sets forth a claim for breach of fiduciary duty. In the counterclaim, Count One, S.E.E. stated as the plaintiff-in-counterclaim, however, under the prayers for relief, it is both Tringali and S.E.E. now listed "plaintiffs in counterclaim." After a second amended complaint was filed, Tringali filed a new answer in which a counterclaim was not included, however, pursuant to Rule 41(a)(1), (c), a counterclaim cannot be dismissed unless by stipulation or by order of the

court. Therefore, it is the plaintiffs' position that the counterclaim remains viable in this action and that it is a counterclaim of Tringali since the prayers for relief include a claim by Tringali for damages, interest, costs and attorney's fees.

A second issue regards the filing of a second substituted amended complaint, which occurred under the following circumstances. S.E.E. initially filed a suggestion of bankruptcy on May 29, 2003, at which time this case was stayed. The filing was a Chapter 11 petition in the U.S. Bankruptcy Court by S.E.E., however, in December, 2003 that court abstained thereby dismissing the Chapter 11 proceeding and remanding this action back to this Court. After this Court issued another preliminary injunction on January 4, 2004 and after a complaint for contempt was filed on March 5, 2004, S.E.E. filed a second suggestion of bankruptcy, this time based upon a Chapter 7 filing in the U.S. Bankruptcy Court.

By orders of this Court on January 14, 2005, the case was allowed to proceed against Tringali individually. Subsequently, Tringali filed a motion for partial summary judgment as to Count VII claiming that the plaintiffs had failed to obtain permission from the Attorney General to proceed under c.149 §150. The plaintiffs then obtained letters from the Attorney General consenting to their proceeding, and the Court ruled on August 19, 2005 that the alleged failure to exhaust the administrative remedy had been cured and thereby denied Tringali's motion for partial summary judgment. As a result of that denial, the plaintiffs then filed an amendment to Count VII to set forth the facts relating to the permission by the Attorney General to proceed and that amendment was later encompassed in a second substituted amended complaint on November 28, 2005. Tringali filed an answer to the substitute second amended complaint on January 25, 2006 and in that answer restated the affirmative defenses, including defenses which clearly relate to an alleged breach of fiduciary duty.

FOURTH AFFIRMATIVE DEFENSE

> The plaintiffs' claims are barred by their own unclean hands

FIFTH AFFIRMATIVE DEFENSE

> The plaintiffs are estopped from recovering upon their claims by their own bad-faith and disloyal conduct.

SIXTH AFFIRMATIVE DEFENSE

> The plaintiffs are barred from recovering on their contract claims by their own breach of contract and/or obligations of good faith and fair dealing.

It is the plaintiffs' position that the substitute second amended complaint was in reality a supplemental pleading as referred to in Rule 15(d) the authors state in Smith and Zobel, Mass. Practice, Vol. 6, §15.1:

> Rule 15 distinguishes amended pleadings from supplemental pleadings. The latter embrace only events following the date of the pleading involved; the former treat events which occurred before the original pleading was served, but which were omitted through oversight or ignorance. Unlike amendments, supplementation is never, under Rule 15, a matter of course.

Clearly the document filed as a substitute second amended complaint was a supplemental complaint since it is based upon events which occurred following the date of the original pleadings, in this case, the permission obtained on February 17, 2005 from the Attorney General's office to proceed with the c.149 §150 Count VII. That was the only change to the prior complaint and therefore, we believe it is a supplemental complaint and that the answer and counterclaim originally filed on July 1, 2002 remains intact.

Defendant's Response to Plaintiff's Statement of Legal Issues

Defendant is at a loss as to why this is an issue. There is no counterclaim pending in this claim. The only plaintiff-in-counterclaim named in the original answer, and listed on the docket sheet, is S.E.E. S.E.E., Inc. settled this claim against Martin and Lee on August 1, 2005. As a result of

that settlement agreement, Martin and Lee were assigned its claims directly against Tringali. When Martin and Lee filed their second amended complaint naming Tringali as the only defendant, Tringali filed an answer that did not assert a counterclaim. Because Martin and Lee are seeking equitable relief against Tringali, he is permitted to raise plaintiff's own bad-faith conduct as a bar to their equity claims pursuant to the doctrine of unclean hands.

Defendant's Statement of Unusual Legal Issues

a)     Admissions of defendants' counsel: Plaintiffs' counsel sent the defendant a demand letter in which he admitted that the discussions that plaintiffs allege created a contract were only proposals. Tringali asserts that this letter is admissible as an adverse party admission made by an agent of the defendants. Blake v. Hendrickson, 40 Mass.App.Ct. 579, 582-583 (1996)(The statements of an attorney contained in a letter making demand on, or giving notice of, a claim are admissible evidence of an admission of an adverse party.)

b)     Defenses - Tringali asserts that is entitled to all defenses that he would have been permitted to assert against the assignor, S.E.E., Inc., including the business judgment rule and plaintiffs ratification of all corporate acts.

c)     Plaintiff's Damages: Tringali asserts that plaintiff's damages are limited to his actual gains resulting from the alleged conduct. Demoulas v. Demoulas Super Markets, Inc., 424 Mass 501, 556 (1997). Tringali asserts that plaintiffs will be unable to prove damages resulting from the real estate purchase because S.E.E. Inc. sold the real estate in 2003 for a significant profit that exceeded all expenses attributable to owning it, all of which was used to pay corporate obligations.

d)     Right to a jury Trial: Plaintiff's bring the shareholder derivative action as assignee of the Corporation. A shareholder derivative claim is an equitable action, for which there is no right to a jury trial. Demoulas v. Demoulas Super Markets, Inc., 424 Mass. 501, 527  (1997).

e) Plaintiffs' Damages. Plaintiff alleged breach of a stock repurchase agreement, and claims for wages and unpaid commissions, against both S.E.E., Inc., and defendant Phillip Tringali. Plaintiffs' then settled all of their claims against S.E.E., Inc., including the stock purchase agreement claim and the unpaid wage claim, and paid $5,000.00, for exchange for a release of all of S.E.E.'s claims against them, and an assignment of S.E.E., Inc.'s, rights against Tringali. Tringali submits that plaintiff received valuable consideration for releasing S.E.E., Inc. from its contractual obligation to purchase their stock, and its obligation to pay them unpaid wages and commissions, and that this value must deducted from plaintiff's liability on the stock purchase agreement, to avoid double recovery.

f) Counts I - III of plaintiff's complaint are brought on behalf of all stockholders. The benefits of the suit therefore inure to the benefits of the Corporation as a whole, and all of its shareholders. Plaintiffs are therefore entitled to a proportion of damages proven equal only their percentage of ownership. Marquis Theatre Corp. v. Condado Mini Cinema, 846 F.2d 86 (1st Cir. 1988)

g) Statute of Limitations. Defendant has documentary evidence establishing that plaintiffs' shareholder derivative claim was brought after the three-year statute of limitations had expired because they had knowledge of the disputed real estate transaction shortly after it occurred in September, 1998 (this suit was brought in May, 2002, three years and eight months after the transaction). Demoulas v. Demoulas Super Markets, Inc., 424 Mass. 501, 527 (1997)(derivative claim based upon breach of fiduciary duty has three year statue of limitation). However, to the extent that the plaintiffs purport to be asserting a separate claim for breach of fiduciary duty as assignees of the Corporation, the action is time barred because the two of three directors, the president, and a disinterested minority shareholder all had knowledge of the action when it occurred, and that knowledge is imputed to the Corporation. The action was therefore time barred when Martin and Lee acquired it from the

Corporation. Marvel v. Cobb, 200 Mass. 293, 297 (1908)(assignee of time barred action has no greater rights than assignor).

## V. Witnesses

A. Plaintiffs' Witnesses

Paul Martin
948 N. Amelia Avenue
San Dimas, California

Jumi Lee
948 N. Amelia Avenue
San Dimas, California

Phillip Tringali
98 Walnut St
Halifax, Massachusetts

B. Defendant's Witnesses

Phillip Tringali
98 Walnut Street
Halifax, MA 02338

Paul Martin and Jumi Lee
2400 N. Lincoln Avenue
Altadena, CA

Deborah Bowles
78 Stoney Weir Rd.
Halifax, MA

Demetra Hixson
12 Basking Ridge Dr.
Middleboro, MA

Anthony Facchiano
425 Archer Street
Fall River, MA

Andrea Desrosiers
475 Medford St., Apt. 2
Somerville, MA

John Richardson
6 Verna Hall Dr.
Pembroke, MA

Judy Moniz
2911 Lewis St.
Dighton, MA

Mitchell Kupferman
Boston, MA

Lisa Russell
114 Puritan Avenue
E. Wareham, MA 02538

Nancy Peter
280 Church Street, #177
Raynham, MA 02767

Ron Gallagher
109 Harrison Ln.
Bethleham, CT 06751

Graham Bird
Atomic Spectroscopy Instrument
3451 County Road 409
Taylor, TX 76574

Dave Patterson
D.B., Patterson & Associates
555 Plate Drive, Suite 3
East Dundee, IL 60118

Maclyn Smith
Maclyn Smith & Company
2115 NW 33rd Avenue
Portland, OR 97210

Paul Norlander
Nord Scientific Company
26575 Dolorosa
Mission Viejo, CA 92691

Jim Viets
Western Analytical Instrumentation
268 Gardenia Court
Golden, CO 80101

Fitzpatrick & Warrenbrand LLP
One McKinley Square
Boston, MA 02109

Jeffrey Husted
4 Lyman Street
Duxbury, MA

Debora Casey
97 Whiting Street
Hingham, MA 02043

Craig Jalbert
Verdolino & Lowey
124 Washington St # 101
Foxboro, MA

## VI. Expert Witnesses

A. Plaintiffs' Expert Witnesses

The plaintiffs do not expect to call any expert witness.

B. Defendant's Expert Witnesses

Defendant has not yet determined who he will call, if anyone, as an expert witness in this matter. Defendant may call accountants Jeffrey Husted and Craig Jalbert, as percipient witnesses to testify as to their conduct related directly to this matter, such as the sale of the Maine property, and the calculation of the book value of S.E.E., Inc.'s stock.. Defendant reserves the right to supplement this memorandum if the event that plaintiff names expert witnesses.

## VII. Estimated Length of Trial

One week (full days).

## VIII. Settlement and Damages

Counsel have discussed the possibility of settlement, mediation and alternate dispute, none of which are agreeable to both parties. The plaintiffs seek liquidated damages for the breach of contract in the amount of $200,000 and unpaid commissions and vacation pay in the approximate amount of $13,000. The plaintiffs' derivative claims cannot be reduced to a liquidated amount at this time.

Dated this 29th day of March, 2006

Attorney for defendant,

______________________________

Daniel Treger
BBO No. 562147
PHILLIPS & ANGLEY
One Bowdoin Square
Suite 300
Boston, MA 02114
(617) 367-8787

Attorney for plaintiffs,

______________________________

Roger S. Davis
BBO No. 116320
DAVIS & RUBIN
One Bowdoin Square
Suite 901
Boston, MA 02114-2919
(617) 742-4300

QDI12:MARTIN:JOINTPRETRIALC

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 04-12708-MLW

PHILLIP TRINGALI,
Plaintiff,
v.
PAUL MARTIN AND JUMI LEE,
Defendants

TRINGALI
Exhibit No. 3
KLS 9/29/05

**PLAINTIFF'S AUTOMATIC DISCLOSURE STATEMENT**

Now comes the Plaintiff Phillip Tringali, and hereby makes the following automatic disclosure pursuant to Fed.R.Civ.P. 26(a): In making this disclosure, plaintiff reserves the right to object to the production of documents or disclosure of oral testimony that is not relevant to the subject matter involved, that is protected by any common law or statutory privilege, that was prepared in anticipation of litigation or for trial, that is attorney work product, or is otherwise protected under Rule 26 of The Federal Rules of Civil Procedure:

**A. INDIVIDUALS LIKELY TO HAVE DISCOVERABLE INFORMATION THAT THE DISCLOSING PARTY MAY USE TO SUPPORT ITS CLAIMS OR DEFENSES:**

1. Phillip Tringali, 98 Walnut Street Halifax, MA 02338, is likely to have information regarding the formation and conduct of S.E.E., Inc.'s manufacturing business, the hiring of the defendants, the products developed, manufactured and sold by S.E.E., the methods and manner of how S.E.E. conducted business, the defendants' conduct during their employment by S.E.E., the defendants' resignation from S.E.E., Inc., the defendants' conduct after they left "L"

S.E.E., Inc., the defendants' contacts with S.E.E.'s customers, prospective customers and distributers, missing inventory, equipment, parts, software and data, the course of S.E.E.'s business after the departure of the defendants, and damages suffered by S.E.E., Inc.;

2. Paul Martin and Jumi Lee, 2400 N. Lincoln Avenue, Altadena, CA, have knowledge of all facts and events alleged in the complaint;

3. Deborah Bowles, 78 Stoney Weir Rd., Halifax, MA, is likely to have knowledge of the methods and manner in which S.E.E. conducted business after the defendants relocated to Massachusetts, the defendants' conduct during their employment by S.E.E., the defendants' resignation from S.E.E., Inc., the defendants' conduct after they left S.E.E., Inc., the defendants' contacts with S.E.E.'s customers, prospective customers and distributers, missing inventory, equipment, parts, software and data, the course of S.E.E.'s business after the departure of the defendants, and damages suffered by S.E.E., Inc.;

4. Demetra Hixson, 12 Basking Ridge Dr., Middleboro, MA, may have information regarding defendants' conduct in relation to their intent to start a competing business, and their conversion of S.E.E. property;

5. Anthony Facchiano, 425 Archer St. Fall River, MA, may have information regarding defendants' conduct in relation to their intent to start a competing business, and their conversion of S.E.E. property;

6. Andrea Desrosiers, 475 Medford St. Apt 2, Somerville, Massachusetts, may have information regarding the specifications of instruments developed, manufactured and sold by S.E.E., Inc., and the nature and identity of S.E.E.'s confidential information and intellectual property;

7. John Richardson, 6 Verna Hall Dr., Pembroke, Mass. may have information regarding the specifications of instruments developed, manufactured and sold by S.E.E., Inc., and the nature and identity of S.E.E.'s confidential information and intellectual property;

8. Judy Moniz, 2911 Lewis St., Dighton, Mass. may have information regarding the specifications of instruments developed, manufactured and sold by S.E.E., Inc., and the nature and identity of S.E.E.'s confidential information and intellectual property;

9. Mitchell Kupferman, Boston, MA may have information regarding damages caused by defendants' conduct;

The following suppliers of material to S.E.E. may have information regarding the defendants' conduct and intent in forming Quantum Dynamics International, the extent to which S.E.E. protected its confidential information, and whether any of S.E.E.'s confidential information was converted to Quantum Dynamic's use at the defendants' instruction:

10. Optoline Associates, Wilmington, MA;

11. Edmund Scientific, Haddon Heights, NJ;

12. Ludl Electronic, Pleasantville, NY;

13. Coerent, Auburn, CT, Melles Griot, Irvine, CA;

14. OceanOptics, Dunedin, FL;

15. Esco Products, New Foundland, NJ;

16. Multimedia Fiber Optics, Whippany, NJ;

17. Paul Norman, Chroma Tech, HI;

18. Norm Park, AMS Intercert, Boca Raton, FL;

19. Randy Griffin, Franklin Mechanical Services, Gilroy, CA.

20. Gary Unruh, Dynamic Light Control, Grass Valley, CA, is likely to have information regarding the development a new product for S.E.E. in 2001, the specifications of products he designed for S.E.E. and for Quantum Dynamics International, the defendants' conduct and intent in forming Quantum Dynamics International, the extent to which S.E.E. protected its confidential information, and whether any of S.E.E.'s confidential information was converted to Quantum Dynamic's use at the defendants' instruction.

21. Mohan Srinivasaro, Georgia Institute Technology, Atlanta, GA, may have discoverable information regarding the defendants' conduct and intent in forming Quantum Dynamics International.

The following customers or prospective customers of S.E.E., Inc. likely to have discoverable information about defendants' use of S.E.E.'s confidential information and customer good will for the benefit of Quantum Dynamics International after their departure from S.E.E., Inc.:

22. Gary Schubert, Illinois State Police, Carbondale, IL;

23. Employees of the California Department of Justice, Riverside, CA;

24. Anthony Tambasco, Mansfield Police Department, Mansfield, OH;

25. Mary Carrabba, Hewlett Packard, Corvallis, OR;;Tracy Tanaka, Tim Pasell, Honolulu Police Department Honolulu, HI;

26. Tim Wolfe, Alaska State Crime Lab, Anchorage, AK;

27. James Brown, Washington, D.C.;

28. Stephen Kaszubinsky, Onondaga County Department of Criminal Investigation, Syracuse, NY;

29.    Kathleen Connado Onondaga Center for Forensics, Syracuse, NY;

30.    Allen L. Southmayd, US Army CIL, 4553 North 2nd Street Forest Park, GA 30297-5122;

31.    Marvin Reed; Stephen D. Greene; Paul McCaffrey; Jeffrey Fletcher; Frederick H. Panhorst, MSM; Joseph L. Parker; Alvin J. Hazan, BS; Janelle Mueller, BS; Derek L. Hammond, BA;  Clyde J. Gayle, MBA; Chris E. Taylor; Larry Chelko; Robert Thibault, MFS; US Army Criminal Investigation Lab, 4553 N 2nd Street Forest Park, GA 30297-5122;

32.    Michael Wagner, BS, MS, PA, Robin Gall, Broward County Medical Examiner's Office 5301 Southwest 31st Avenue, Fort Lauderdale, FL 33312;

33.    Gretchen Hicks, Maine State Police Crime Laboratory, 30 Hospital Street, Augusta, ME 04338;

34.    Ted R. Schwartz, MS, Westchester County Forensic Lab, 2 Dana Road, Valhalla, NY 10595;

35.    Mary Eng, NY City Police Department Lab, 150-12 Jamaica Avenue Jamaica, NY 11432;

36.    Marc Surrency, US Secret Service Forensic Services Division, 950 H Street, NW, Washington, DC 20223;

37.    Amy L. Michaud, BS, FBI, 935 Pennsylvania Avenue, NW, Room 3931, Washington, DC 20535;

38.    Leanora Brun-Conti, Bureau of Alcohol, Tobacco, and Firearms Forensic Science Lab 401 Research Boulevard Rockville, MD 20850;

39. Daniel Van Gelder, MFS, Baltimore Police Department, 601 East Fayette Street, Baltimore, MD 21202;

40. David A. Green, Lake County, Regional Forensic Lab 235 Fairgrounds Road, Painesville, OH 44077;

41. Skip Palenik, Microtrace, 1990 Jamestown Lane Elgin, IL 60123;

42. Sheri Murphy, Colorado Bureau of Investigation, 690 Kipling Street, Denver, CO 80215;

43. Helen Griffin, Ventura County Sheriff's Office Crime Laboratory, 800 South Victoria Avenue, Ventura, CA 93009;

44. Jason Kwast, Karen Sheldon, BS, Contra Costa County Sheriff's Department Criminalistics Laboratory, 1122 Escobar Street, Martinez, CA 94553;

45. Mark Eastman, Ann Murphy, Sacramento County Crime Laboratory, 4800 Broadway, Suite 200 Sacramento, CA 95820;

46. Sarah Walbridge - last known address, Lansing, MI, may have information regarding defendants' conduct in relation to their intent to start a competing business, and their conversion of S.E.E. property.

47. Brad Rogers, Oklahoma State Bureau of Investigations, Oklahoma City, OK, may have discoverable information about defendants' use of S.E.E.'s confidential information and customer good will for the benefit of Quantum Dynamics International after their departure from S.E.E., and the comparative specifications of products manufactured by S.E.E. and QDI.

48. Keeper of the Records, Control Development, Inc., South Bend, IA, may have information regarding the defendants' conversion of parts from S.E.E.'s inventory.

49. Joe Buckle, RCMP Lab, Ottawa Ont, may have discovered information regarding the products being developed by S.E.E. in 2001, products developed by QDI in 2002, and the contents of S.E.E.'s and ODI's website.

50. Employees of the Georgia Bureau of Investigation may have discovereable information regarding S.E.E.'s development of a windows 2000 based instrument in 2001.

51. Employees of the Florida Department of Law Enforcement may have knowledge of the specifications and function of QDI and CRAIC instrument.

The following former representatives and distributors of S.E.E.'s microspectrophotometers are likely may have discoverable information about defendants' use of S.E.E confidential information and customer good will for the benefit of Quantum Dynamics International after their departure from S.E.E.,the comparative specifications of products manufactured by S.E.E. and QDI:

52. Graham Bird, Atomic Spectroscopy Instruments, 3451 County Road 409, Taylor, TX 76574;

53. Dave Patterson, D.B. Patterson & Associates 555 Plate Drive, Suite 3, East Dundee, IL 60118;

54. Maclyn Smith, Maclyn Smith & Company, 2115 NW 33rd Avenue, Portland, OR 97210;

55. Paul Norlander, Nord Scientific Company, 26575 Dolorosa, Mission Viejo, CA 92691;

56. Jim Viets, Western Analytical Instrumentation, 268 Gardenia Court Golden, CO 80401;

57.    Dr. Manfred Feustel, Resultec Analytic Equipment Bremer Str. 54 D-30826

Garbsen, Germany;

58.    Bob Hirche, ICMAS, TN;

59.    Lihsi Ho, Hopewell (USA), Merrimac NH;

**B.    A COPY OF, OR DESCRIPTION BY CATEGORY AND LOCATION OF, ALL DOCUMENTS, DATA COMPILATIONS, INTANGIBLE THINGS IN THE POSSESSION, CUSTODY OR CONTROL OF THE PARTY THAT THE DISCLOSING PARTY MAY USE TO SUPPORT ITS CLAIMS OR DEFENSES, UNLESS SOLELY FOR IMPEACHMENT:**

The following list represents the plaintiff's best efforts to identify classes of documents

that existed or may have existed at the time that S.E.E. was a going concern. Their identification

here does not constitute a representation that such documents exist or are retained in plaintiffs'

custody, or include substantive facts helpful to plaintiff's case. The following does not include

the contents of several boxes of documents in the possession of the Bankruptcy Trustee, to which

plaintiff has not had access.

1.    Documents, drawings, test results, specifications, designs, and source code with

documentation relating to the development, the specifications, the identity of component parts,

and the testing of S.E.E. microspetrophotometers, currently located, if at all, in a storage facility

in Halifax, Massachusetts in paper form and on the hard drives of approximately 30 computers

formerly used by S.E.E. to manufacture, test and market microspectrophotometers.

2.    The contents of S.E.E.'s ACT database containing all histories of contacts between

S.E.E. customers and suppliers and S.E.E. personnel, currently stored on a hard drive on a

computer in the possession of the U.S. Bankruptcy Trustee.

3.    The contents of S.E.E.'s Businessworks database containing all of S.E.E.'s

financial information including financial statements, profit and loss statements, check book

register, inventory control information, currently stored on a hard drive on a computer in the

possession of the U.S. Bankruptcy Trustee.

4.    Documents, correspondence, print materials, pamphlets, scientific papers, service

records and other materials used to sell or market S.E.E. microspectrophotometers, or to service

customers who had purchased such instruments, currently located in a storage facility in Halifax,

Massachusetts in paper form and on the hard drives of approximately 30 computers formerly

used by S.E.E. to manufacture, test and market microspectrophotometers.

5.    "Vendor files" documenting parts purchased by S.E.E. for inventory, currently

located in a storage facility in Halifax, Massachusetts in paper form.

6.    Documents relating to the design, development, marketing and sales of QDI

products, currently in the possession, custody or control of defendants as officers and/or

managers of QDI and CRAIC, Inc., and the subject of a court order issued by the Plymouth

Superior Court preliminary injunction requiring their preservation.

7.    All documents relating to the specification and identity of parts ordered by QDI

from S.E.E.'s suppliers after defendants' departure from S.E.E., currently in the possession of said

suppliers.

8.    An S.E.E. 2100 microspectrophotometer, currently in a storage facility in Halifax,

Massachusetts.

9.    A QDI Mach 1 and Mach 10 microspectrophotometer, currently in the possession

of QDI and/or CRAIC.

## C. A COMPUTATION OF DAMAGES

Plaintiff has not performed a comprehensive calculation of all of his damages, and will be unable to do so without discovery. Plaintiff's damages are, at minimum, the book value of his stock in S.E.E. rendered valueless by the defendants' conduct, approximated to be $700,000.00. Plaintiff, however, seeks compensation for his interest in S.E.E., Inc. as a going concern, approximated to be $2,000,000.00 to $3,000.000.00, not including the value of any corporate opportunities missappropriated by the defendants, the nature and value of which may be revealed by discovery. Plaintiff also as well has the sum of S.E.E.'s current outstanding obligations to him, $72,820.43.

PHILLIP TRINGALI
By his Attorneys

Date: 6/6/05

Jeffrey J. Phillips, Esq.
B.B.O. #398480
Daniel Treger, Esq.
B.B.O. #562147
Phillips & Angley
One Bowdoin Square
Boston, MA 02114
Tel. No. 617-367-8787

CERTIFICATE OF SERVICE

I hereby certify that I served a copy of the foregoing on all parties or their attorney of record this by first class mail, postage prepaid.

Date: 6/6/05

Daniel Treger, Esq.

L:\LITG\Trng001\DISCLOSURE.STATEMENT.wpd

**Commonwealth of Massachusetts**
**County of Norfolk**
**The Superior Court**

Civil Docket **NOCV2002-00801**

RE: Martin Individually et al v S E E Inc et al

TO: Roger S Davis, Esquire
Davis & Rubin
1 Bowdoin Square
Suite 901
Boston, MA 02114-2919

## CLERK'S NOTICE

This is to notify you that in the above referenced case the Court's action on **10/31/2005**:

*RE: Plaintiffs' motion to vacate stay and for leave to file second amended complaint (rec'd 10/3/05)*

**is as follows:**

**MOTION (P#71.0) Treated as a motion to vacate stay, dismiss all claims asserted against W.E.E., Inc. and to file second amended complaint and, as such, allowed. (Charles J. Hely, Associate Justice) (IDated 10/31/05) Notices mailed 10/31/2005**

Dated at Dedham, Massachusetts this 31st day of October, 2005.

Walter F. Timilty,
Clerk of the Courts

BY:

Assistant Clerk

Telephone: (781) 326-1600

Copies mailed 10/31/2005

